**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **RU-EL SAILOR,**<br>c/o Friedman & Gilbert<br>50 Public Square, Ste 1900<br>Cleveland, Ohio 44113, | Case No. |
| | Judge |
| Plaintiff, | |
| -vs- | |
| **CITY OF CLEVELAND,**<br>**EUGENE JONES (#1241),**<br>**HENRY VEVERKA (#607),**<br>**JAMES METZLER (#2489),**<br>**HARRY MATLOCK (#194),**<br>**ANDREW DESATNIK,**<br>**SMITH (#1730),**<br>**SHAIR HASAN (#2358),**<br>**RICK FARINACCI,** and<br>**JAMES PURCELL (#9921),**<br>c/o City of Cleveland Law Department<br>601 Lakeside Avenue, Room 106<br>Cleveland, Ohio 44114, | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Ru-el Sailor states as follows for his Complaint:

### INTRODUCTION

1.       This is a civil rights action. Ru-el Sailor was wrongfully convicted in 2003 for a murder that he did not commit.  Sailor was just 23 years old when he was arrested, jailed, prosecuted, tried, and convicted for the murder of Omar Clark.

2.       After years in prison, Ru-el Sailor was finally exonerated and released on March 28, 2018.

3.     Sailor was exonerated after the real shooter admitted his role, and then years later, the second person present at the murder also came forward, other witnesses admitted to their false testimony, and still other witnesses exposed police intimidation that prevented them from testifying.

4.     Misconduct by Cleveland police officers and those working in concert with them caused Sailor's wrongful conviction, in violation of his constitutional rights. Sailor therefore brings this action under 42 U.S.C. § 1983 and Ohio law seeking redress for the wrongs done to him, as well as to deter future misconduct.

## JURISDICTION AND VENUE

5.     This action arises under the laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental jurisdiction of the Court over the claims arising under state law is invoked under 28 U.S.C. § 1367 (supplemental jurisdiction).

6.     Venue in the Northern District of Ohio is proper under 28 U.S.C. § 1391(b), because it is the district in which many if not all of the defendants reside, and because a substantial part of the events or omissions giving rise to the claims occurred within the Northern District of Ohio.

## PARTIES

7.     Plaintiff **Ru-el Sailor** is a 40-year-old resident of Northeast Ohio. At the time of his arrest in March 2003, Sailor was 23 years old, and lived in Cleveland, Ohio.

8.     Defendant **City of Cleveland** (the "City") is an Ohio municipal corporation that operates the Cleveland Division of Police.  Defendant City is a unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law. Defendant City is a "person" under 42 U.S.C. § 1983. Defendant City is the

employer and principal of Defendants Eugene Jones (#1241), Henry Veverka (#607), James Metzler (#2489), Harry Matlock (#194), Andrew Desatnik, Smith (#1730), and Shair Hasan (#2358), and Sergeants Rick Farinacci and James Purcell, and is responsible for the policies, practices, and customs of the Cleveland Division of Police ("CDP").

9.     Defendants **Detectives Eugene Jones (#1241), Henry Veverka (#607), James Metzler (#2489), Harry Matlock (#194), Andrew Desatnik, Smith (#1730)**, and **Shair Hasan (#2358)**, and **Sergeants Rick Farinacci** and **James Purcell (#9921)** were, at all times relevant to the allegations made in this complaint, duly-appointed police officers employed by the City of Cleveland, acting within the scope of their employment for the Defendant City and the CDP and under the color of state law. They are sued in their individual capacities.

## FACTS

### Ru-el Sailor Prepared for a Bright Future

10.     Ru-el Sailor grew up in Cleveland, Ohio. He was part of a tight-knit family. Ru-el was the oldest child of Bernatte Brown, a single mother and nurse who juggled shifts working for an agency and as a private home health aid. Ru-el's mother had to rely on him to take care of his siblings, Sharell and Duke, while she worked all-nighters.

11.     Sailor was also part of a tight-knit friend group and was involved in the music scene.

12.     By age 23, Sailor and his best friend, Cordell Hubbard ("Hubbard"), prepared to start the next phase of their careers. They were in the process of setting up a music store — C and El's Music — in a space on East 116th and Martin Luther King Boulevard. They obtained their vendor's license and were prepping for opening.

13.     On November 16, 2002, 23-year-old Sailor spent the night out at bars and clubs with friends, including Hubbard, Hubbard's friend Will, and others.

14.     Though unknown to him at the time, Sailor was about to unnecessarily lose his promising future to wrongful conviction and incarceration.

### The Murder of Omar Clark

15.     On the afternoon and evening of November 16, 2002, Nichole Hubbard ("Nichole"), Maria Whitlow ("Maria"), Ellen Taylor ("Puddin"), Clark Lamar Williams, aka Dude ("Williams" or "Dude"), and Omar Clark were hanging out at Puddin's house.

16.     Nichole, Maria, Williams, and Omar Clark left the house together in a car. They dropped Maria off at her home.

17.     Nichole, Williams, and Omar Clark then went to a gas station.

18.     Williams borrowed twenty dollars from Nichole to obtain a "wet cigarette."

19.     Nichole then took Williams and Omar Clark to Englewood Avenue, where Williams lived. Williams went into his house to get money to repay Nichole. While inside the house, Williams decided to repay Nichole only ten dollars because she also smoked the wet cigarette.

20.     When Williams returned with only ten dollars, Nichole was upset. Williams refused to pay the full twenty dollars.

21.     Nichole called her brother—Hubbard (the friend who was set to open the music store with Ru-el). Nichole told Hubbard what was going on.

22.     Nichole left Englewood Avenue, but her brother headed toward that street.

23.     In the car with Hubbard was William Sizemore ("Sizemore"), who was known to Hubbard at the time only as "Will."

24.     When Hubbard and Sizemore arrived on Englewood Avenue, they saw Williams and Omar Clark.

25.     Hubbard confronted the men about ripping off his sister, Nichole.

26.     Tensions were high. Hubbard yelled. Omar Clark and Hubbard were both armed.

27.     Sizemore, who knew both Omar Clark and Hubbard, attempted to deescalate the situation. He told Hubbard that Omar Clark was family, and was the father of his cousin's child. Sizemore's attempts to mediate failed.

28.     Hubbard shot Omar Clark several times.

29.     Sizemore and Hubbard left the scene.

30.     Williams returned to the scene, where Lonnell Brooks (a member of Omar Clark's family) confronted him.

31.     Paramedics and police arrived shortly after. Omar Clark was alive when they arrived, but he died later at the hospital.

32.     Ru-el Sailor was not present on Englewood Avenue that night.

33.     Sailor did not know Hubbard had been on Englewood Avenue that night, nor did he know that Hubbard shot anyone. Likewise, Sailor did not know that Hubbard and Will had gone to Englewood together.

34.     Ru-el Sailor had nothing to do with the murder of Omar Clark. He is completely innocent.

**Defendant Officers' Fabrication of Evidence, Suggestive Identifications,
and Suppression of Exculpatory Evidence**

35.     Police quickly identified Hubbard as a suspect in the case. Hubbard was arrested on December 11, 2002, less than one month after Omar Clark's death.

36.     Defendants CDP Detectives Henry Veverka (#607), James Metzler (#2489), and Harry Matlock (#194) of the homicide unit were working the case.

37.     For months, Defendants Veverka, Metzler, and Matlock made no arrests for the second person present during the murder despite interviewing several witnesses, including Williams and another young man named Larry Braxton ("Braxton").

38.     In their initial statements to Veverka, Metzler, and Matlock, Williams and Braxton each described men who were "light-skinned."

39.     According to a December 4, 2002 police report, prior to Sailor becoming a suspect in the case, Braxton described the shooter as light-skinned. Braxton was unable to make an identification from a photo array.

40.     Braxton likewise described the shooter to Umar Clark, the brother of decedent Omar Clark. After Braxton's description, Umar Clark said that the shooter "sounds like Cordell [Hubbard]."

41.     Hubbard is a light-skinned man.

42.     Sailor is not light-skinned—he is a dark-skinned man.

43.     Williams also identified the two men he witnessed on the street as having a similar skin color to each other.

44.     Williams, who recognized Hubbard at the scene and easily picked Hubbard out of an array and identified him as a suspect, did not pick Sailor out or identify him during the investigation of the case. Williams was shown Sailor's photos on several different occasions, but was unable to identify him at those times. Williams could not identify Sailor when he was shown Sailor's photograph in a police photo array months after the shooting.

45.     On March 20, 2003, Hubbard's attorney filed a Notice of Alibi, claiming that Hubbard was with Sailor on the night of the murder.

46.    On March 25, 2003, Defendant CDP Detective Eugene Jones, a member of the 6th District Vice Unit, wrote a report stating that:

a.  Since mid-January, Defendant Jones had attempted to assist the CPD homicide unit with investigation of the Omar Clark homicide.

b.  Jones had initially received information from an informant ("CRI"): the CRI had a conversation with a woman who told the informant that Cordell Hubbard did not shoot Omar Clark, and that Hubbard may not have acted alone.

c.  The CRI referred to the male as Will.

d.  The CRI gave a physical description of Will and told Jones about confrontation that CRI had with Will at a bar.

e.  Jones stated he believed Will was a member what he called the "Four Block" gang. Jones began asking classmates and gang members who Will was.

f.  Sometime between mid-January and March 2003, an alleged classmate of Will's took Jones to an address on East 150th Street, where that person told Jones that "L" was Will and "L" was actually Ru-el Sailor.

g.  Jones stated that he "had dealings with Ru-el Sailor and Cordell Hubbard at Collinwood High School," where he had worked off-duty for secondary employment for the past 14 years, and where he claimed he had access to current and former students.

h.  Jones stated that the CRI refused to cooperate further out of fear.

i.  Jones stated that in the month of March 2003, he hit a dead end in his investigation because nobody was willing to come forward. He described a person who was at that point willing to wear a wire to further the investigation.

47.     For his work in the Vice Unit, Defendant Eugene Jones worked under the active supervision of Sgt. James Purcell.

48.     Defendant Eugene Jones' report, which contained both fabricated and exculpatory information, was never provided to Sailor or his counsel. Sailor only obtained a copy of this report over a decade later, after repeated attempts to obtain documents related to his case.

49.     Because this report was never turned over the to the defense, neither Sailor nor his counsel were made aware before or during trial of a person named "Will" being named as suspect in relation to the murder of Omar Clark.

50.     Neither Sailor nor his counsel were made aware before or during trial that Defendant Eugene Jones developed a lead for a person named "Will," and Sailor was deprived of the opportunity to call and question and/or impeach him at trial.

51.     Sailor was deprived of the opportunity to investigate who "Will" was—and was never given the chance to identify William Sizemore as the suspect "Will" before or during trial.

52.     Sailor never had the opportunity before or during trial to investigate, challenge, or impeach Defendant Jones' fabricated statements in the report, *inter alia* the shifting of "Will" into "Ru-el."

53.     Sailor never had the opportunity before or during trial to investigate, challenge, or impeach different accounts of how his name first came up as a lead in the case.

54.     Defendant Eugene Jones was motivated to pin criminal acts on Ru-el Sailor due to earlier interactions between the two.

55.     When Sailor was a high school student, Defendant Eugene Jones regularly harassed Sailor about missing school, reporting to truancy to Sailor's mother even on dates when Sailor was actually in school.

56.     Eventually, Defendant Eugene Jones targeted Sailor for drug charges. Jones went to Sailor's house and talked to Sailor's mother about Sailor's alleged drug activity. Jones arrested Sailor and planted drugs on him.

57.     The court sentenced Sailor only to probation.

58.     Defendant Eugene Jones was unhappy about this outcome.

59.     Sailor approached Defendant Jones about Jones talking to his mother about alleged drug activity. During this conversation, Defendant Eugene Jones told Sailor that he would get his hands on Sailor one day.

60.     Defendant Eugene Jones had a reputation for "aggressive" performance of his duties, for his "uncanny ability to cultivate informants," and for building "airtight cases for Prosecution."

61.     Defendant Eugene Jones' supervisors in the CDP praised him for these attributes and condoned and/or ratified his policing techniques, including fabrication of evidence and suppression of exculpatory evidence.

62.     On the same date Defendant Eugene Jones wrote his report—March 25, 2003—Defendants Metzler and Veverka had Braxton come to the station to view a photo array without explanation. Suddenly, Braxton was able to identify Sailor in a photo array.

63.     Until this point in time, no other witnesses identified Sailor in a photo array. Witnesses Joseph Mayhand and Brandon Gibbs, who also saw the shooting, were not able to make an identification.

64.     On a date prior to Braxton coming to the station and picking out Sailor in the array, Defendant officers visited Braxton at his home. They spoke with him and presented him with an

array and Braxton made a tentative selection. Defendants looked at each other, and in front of Braxton said, "That's the guy."

65.    Defendants' conduct was unduly suggestive and prejudicial and infected Braxton's memory and identification.

66.    Braxton's identifications of Sailor both at his home and at the station were the result of unduly suggestive lineup procedures, which were unnecessary and created a substantial prospect of a misidentification.

67.    Braxton made these identifications as a result of CDP's use of improper identification procedures—after first describing the shooter as "light-skinned," looking like Hubbard per Umar Clark's assessment, and despite Sailor obviously being dark-skinned.

68.    On the same date Defendant Eugene Jones wrote his report—March 25, 2003— Defendants Metzler and Veverka conferred with Defendant Sergeant Rick Farinacci, who had been actively supervising and involved in the investigation of the Omar Clark murder since it began.

69.    Defendant Farinacci informed Defendants Metzler and Veverka that Defendant Eugene Jones had advised Farinacci of his investigation and was writing his report.

70.    Defendant Farinacci informed Defendants Metzler and Veverka that after Defendant Eugene Jones' report was complete, they should get a warrant for Ru-el Sailor.

### Sailor's Wrongful Conviction

71.    On March 26, 2003, the very next day after Defendant Eugene Jones wrote his report, a secret indictment was issued for Sailor in Cuyahoga County Court of Common Pleas, Case No. CR-03 435700. He had become a co-defendant in Hubbard's and Nichole's case.

72.    The indictment charged Sailor with: (1) aggravated murder with firearm specifications; (2) complicity in commission of aggravated murder with firearm specifications; (3)

murder with firearm specifications; (4) complicity in commission of a murder with firearm specifications; (5) kidnapping with firearm specifications; (6) complicity to commit kidnapping with firearm specifications; (7) kidnapping with a firearm specification; (8) complicity to commit kidnapping with firearm specifications; (9) felonious assault with a firearm specification; (10) felonious assault with a firearm specification; (11) complicity to commit felonious assault with a firearm; (12) complicity to commit felonious assault with a firearm; (13) weapons under disability.

73.    Sailor learned police were looking for him. He voluntarily appeared in the courthouse and turned himself in on April 2, 2003. He remained in custody during the weeks leading up to trial.

74.    On April 3, 2003, Ru-El Sailor pled not guilty to a 13-count indictment in relation to the murder of Omar Clark.

75.    Hubbard's and Nichole's trial was scheduled for May 19, 2003. The trial date was not pushed back for Sailor, the new defendant—the trial court denied Sailor's Motion for Continuance and to Sever Counts.

76.    On May 19, 2003, pretrial hearings began.

77.    Williams testified in a pretrial hearing while Sailor was present in the courtroom.

78.    After testifying during that pretrial hearing, Williams spoke to Defendant Veverka. Suddenly Williams had decided that Sailor was, indeed, the person present with Hubbard at the shooting, and Sailor was the driver—the one who in his account had the gun.

79.    Just six weeks after turning himself in, on May 21, 2003, a jury trial commenced on counts one through twelve, with trial on Count 13 bifurcated.

80.    The trial lasted seven days.

81.    There was no physical evidence tying Sailor the murder of Omar Clark.

11

82.     The only evidence tying Sailor the murder of Omar Clark was the identifications by Williams and Braxton.

83.     No other witnesses identified Sailor as being present at the scene.

84.     Sailor testified in his own defense, and testified that he was not present for nor did he participate in the murder of Omar Clark.

85.     Sailor maintained his innocence throughout the trial.

86.     Defendants Andrew Desatnik and Metzler testified at trial, and presented the reports and investigations by the CDP.

87.     Sailor had alibi witnesses for that night, who could explain where he was during the time of the murder.

88.     Bobby Nettles was with Sailor on the night of the murder and was prepared to testify on Sailor's behalf.

89.     Defendant Eugene Jones intimidated Nettles, and told Nettles, "Things will be really bad for you" if he testified for Sailor. Defendant Jones also told Nettles' mother that if Nettles testified on Sailor's behalf, "it would be bad."

90.     Nettles understood Defendant Eugene Jones to be threatening to file unfounded criminal charges against him if he testified on Sailor's behalf.

91.     As a result of Defendant Eugene Jones' conduct, Nettles did not appear to testify at trial.

92.     Likewise, Anthony McKenzie was with Sailor on the night of the murder.

93.     While working security at a Collinwood High School basketball game, Defendant Eugene Jones notified McKenzie of Clark's murder.

94.     Anthony McKenzie understood Jones' comments to constitute intimidation and to manipulate him into not being involved with Sailor's case.

95.     As a result of Defendant Eugene Jones' conduct, McKenzie did not volunteer information he had about the murder of Omar Clark—namely, that Hubbard and Sizemore left the bar together.

96.     In addition, Dawn Gooseby owned the bar where Sailor, Hubbard, Sizemore, Nettles, and McKenzie started the night on November 16, 2002.

97.     Defendant Eugene Jones threatened and intimidated Gooseby, saying that her bar would be shut down if she got involved in Sailor's case.

98.     As a result of Jones' conduct, Gooseby did not testify on Sailor's behalf at trial.

99.     Because his alibi witnesses did not show up, Sailor was forced to testify in his own defense.

100.     During trial, Sailor's mother, Bernatte Brown, talked to Defendant Eugene Jones.

101.     Defendant Eugene Jones avoided acknowledging his role in fabricating and suppressing evidence in Sailor's case. He told Brown that the homicide unit "used him." He said they came to him to ask who hangs out with Hubbard, and that Jones simply provided Sailor's name because he knew Sailor and Hubbard to have been close friends, and constantly together, since they were young. Jones also expressed that he was mad that the other Defendant officers would not let him testify.

102.     Because it had been suppressed, Defendant Jones' report naming "Will" as a suspect—and related grounds for investigation, impeachment, and evidence of innocence—were not presented by Sailor's defense at trial.

103.    Upon information and belief, Defendant Officers and/or other CDP officers were aware of William Sizemore as a suspect before and/or during trial. This exculpatory information was known or knowable to Defendants Veverka, Metzler, Matlock, Dasatnik, Jones, Farinacci, and Purcell. None of these defendants disclosed this information to Sailor or his counsel.

104.    On June 5, 2003, the jury found Sailor guilty on all thirteen counts. On July 24, 2003, the court found Sailor not guilty of Count 13.

105.    Sailor was convicted as the shooter—and as the cause of the death of Omar Clark.

106.    After the verdict and in the interim time before sentencing, CDP reports establish that Defendants and other CDP officers were aware of William Sizemore as the second person present with Hubbard at the shooting of Omar Clark.

107.    On July 22, 2003, Defendant Sgt. Rick Farinacci assigned Defendants Det. Smith (#1730) and Shair Hasan (#2358) to further investigate the murder of Omar Clark, and sent them to look for William Sizemore.

108.    This report was written before Sailor or his counsel were told that "Will"—or Sizemore specifically—was involved in the murder.

109.    Upon information and belief, prior to and/or during trial, Defendant officers and other CDP officers had knowledge that Sizemore was the correct suspect and that Sailor was innocent.

110.    Defendants Smith and Hasan went looking for Sizemore but did not find him at his alleged residence.

111.    Defendants Farinacci, Smith, and Hasan did not inform Sailor or his counsel of their knowledge of William Sizemore as the second person present at the murder of Omar Clark, their search for him, or information concerning his whereabouts.

112.    None of the Defendant Officers nor any other CDP officer informed Sailor or his counsel of their knowledge of Sizemore as the correct suspect or of Sailor's innocence before or during trial.

113.    Defendants' failures to disclose this exculpatory information deprived Sailor of his right to a fair trial.

114.    Two days later, on July 24, 2003, Sailor was sentenced.

115.    Shockingly, Hubbard admitted at the sentencing hearing that Sailor had not been present during the murder of Omar Clark.

116.    Hubbard stated that he and Will were the people present at the shooting of Omar Clark.

117.    Sailor understood who Will was—the other friend who had been present with Hubbard at the bars during the night of November 16, 2002.

118.    Sailor learned later that Will's last name was Sizemore.

119.    The court nonetheless proceeded to sentencing and sentenced Sailor to: three years' mandatory time on each gun specification, to run concurrent to each other; twenty years to life on Counts 1 and 2; fifteen years to life on Counts 3 and 4; three years on each of Counts 5, 6, 7, and 8; and two years each on Counts 9, 10, 11, and 12. The Court merged Counts 1, 2, 3, and 4. The Court also merged Counts 5, 6, 7, 8, 9, and 11. The Court ordered Counts 1 through 9 and 11 to be served concurrently. The Court merged Counts 10 and 12, as well, to be served concurrent to one another but consecutive to the sentences for Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, and 11. In total, Sailor faced three years on the gun specifications, plus twenty years to life on Counts 1 through 9 and 11, and two years on Counts 10 and 12. In sum, he was sentenced to prison for 28 years to life. He received jail time credit for 113 days.

120. Sailor never indicated that he would plead guilty to the murder because he was innocent and had committed no crime.

121. In August 2003, Sailor filed a motion for new trial and attached an affidavit from Hubbard stating that it was Hubbard—and not Sailor—who actually shot and killed Omar Clark. Hubbard again testified in the affidavit that Sailor was not present for the murder.

122. On September 4, 2003, a hearing was held on Sailor's motion for new trial.

123. Defendant Eugene Jones was subpoenaed to testify at this hearing but did not show.

124. Likewise, Sizemore was subpoenaed to testify at this hearing but did not show.

125. At that hearing, Hubbard testified consistently with his affidavit.

126. In spite of this new evidence, however, the trial court denied Sailor's motion and left him imprisoned for a murder he did not commit.

127. At the time of this hearing, Sailor's mother spoke to Defendants Metzler and Veverka. She told them that people in the street say that Sailor was not present at the murder of Omar Clark. Defendants Metzler and Veverka responded, saying "We know." Defendant Metzler threw up his hands.

128. In spite of this admission that they knew people on the street did not think Sailor was the shooter nor present at the murder, Metzler and Veverka never provided this information to Sailor or his counsel before or during trial.

129. As a result, Sailor was deprived of the opportunity to investigate, challenge, and impeach their evidence, along with the evidence of other witnesses.

130. At no point during these new trial proceedings did any Defendant officer or any other CDP officer disclose exculpatory information that had been previously suppressed as described in this Complaint.

131.    Ohio's Eighth District Court of Appeals subsequently affirmed the trial court's denial of Sailor's motion. *State v. Sailor*, No. 83552, 2004-Ohio-5207 (Ohio Ct. App. 2004).

**Defendant Officers' Coordinated Efforts**

132.    Each of the Defendant officers were aware of the other Defendant officers' misconduct and knew or should have known that Ru-el Sailor had not murdered Omar Clark nor been present at the shooting.

133.    Defendants' conduct involved suppression, fabrication, and otherwise unconstitutional conduct concerning material evidence and was unduly prejudicial in the case against Sailor.

134.    Upon information and belief, Defendant Farinacci—the Sergeant who actively supervised and was involved in the investigation of the murder of Omar Clark—was aware of, ratified, and encouraged unconstitutional conduct of Defendants Jones, Veverka, Metzler, Matlock, Smith, and Hasan during the course of the investigation, and for, at, and after trial.

135.    Likewise, upon information and belief, these Defendants were aware of each other's misconduct in fabricating and suppressing evidence for and at trial, and their other unconstitutional conduct as described in this Complaint, including but not limited to conducting or being aware of the use of suggestive identification procedures.

136.    Further, upon information and belief, Defendant Sergeant Purcell—Jones' supervisor in the Vice Unit—condoned, and encouraged Jones' improper and unconstitutional policing tactics, and in fact praised Jones' conduct in performance reviews, including Jones' ability to create "complete cases," his "unparalleled … ability to cultivate informants," and "prepare airtight cases for prosecution."

137.    Upon information and belief, the Defendant Officers suppressed and destroyed additional evidence still unknown to Plaintiff, which would have shown Sailor's innocence.

138.    The Defendant Officers upheld a "code of silence" in which they did not disclose the improprieties alleged herein—among other known and unknown improprieties—in order to protect each other and ensure they could continue to engage in their egregious behavior with impunity.

139.    Sailor was taken into custody without probable cause and jailed for months and then imprisoned for years.

140.    Defendants ignored evidence of Sailor's innocence and instigated, influenced, or participated in the prosecution of Plaintiff despite lacking probable cause and instead being aware of or knowing that there was evidence indicating his innocence.

141.    In addition to the affirmative misconduct described in this Complaint, the Defendant Officers willfully ignored and acted to undermine evidence that showed conclusively that Sailor had nothing to do with Omar Clark's murder.

142.    If the prosecutors had known that the Defendant Officers fabricated and suppressed evidence and committed the other misconduct described herein, they would not have pursued the prosecution of Plaintiff, and his unlawful detention would not have been initiated or continued.

143.    Had the Defendant Officers disclosed their fabrication and suppression of evidence and other misconduct to prosecutors, or to the Sailor or his counsel, the prosecution would not have been pursued and Sailor would not have been convicted.

144.    At all relevant times during the trial of this matter, the stated policy of the attorneys in the Cuyahoga County Prosecutor's Office was to disclose all exculpatory evidence of which they were aware.

145.    The exculpatory evidence described in this Complaint was not provided by the Defendant Officers or any member of the Cleveland Division of Police to any member of the Prosecutor's Office.

146.    The Defendant Officers' misconduct continued even after Sailor was convicted and during the time he was pursuing appellate and post-conviction relief. For years after Sailor's conviction, and still today, witnesses remain fearful about coming forward. In particular, the alibi witnesses for Sailor, whom Defendant Jones intimidated into not testifying, continue to be fearful of what the Defendant Officers and other CDP officers would do if they came forward to tell the truth.

147.    Defendants' conduct as described in this Complaint caused extreme prejudice to Sailor in the criminal proceedings at issue here.

**Defendant City of Cleveland's Policies and Practices**

148.    The misconduct described in this Complaint was undertaken pursuant to the policies and practices of the Defendant City and the CDP in that Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and/or suppressing exculpatory evidence, fabricating evidence, feeding information to witnesses, engaging in unduly suggestive identification and lineup procedures, and engaging in leading, coercive, and unduly suggestive questioning of and contact with witnesses.  These were widespread, clear, and persistent patterns and practices of the officers in the CDP and were established for decades before the prosecution of Ru-el Sailor.

149.    This misconduct dates back into the past—and is well-documented as far back as the 1970s and continued through the time of the investigation and prosecution of Ru-el Sailor— and beyond.

Case: 1:20-cv-00660-DAR  Doc #: 1  Filed:  03/27/20  20 of 49.  PageID #: 20

150.    It was a widespread, clear, and persistent pattern and practice of the officers in the CDP destroy and/or not to turn over investigative notes, including statements of witnesses, taken during the course of an investigation.

151.    Likewise, the CDP has a documented historical practice reaching back to the 1970s of using suggestive and/or coercive identification procedures and of coercing witnesses to testify in a manner inconsistent with the truth.

152.    These widespread practices were so historically evident and well-settled as to constitute *de facto* policy in the Cleveland Division of Police, and it was allowed to exist because municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, thereby effectively ratifying it.

153.    The misconduct described in this Complaint was undertaken pursuant to the policy of the Defendant City and the CDP in that the City and CDP had inadequate policies, training, and supervision on the following: Cleveland police officers' obligation to disclose exculpatory and impeachment evidence; the fabrication of evidence or police reports; the obligation not to provide details about crimes to witnesses; the handling, preserving, and disclosure of exculpatory or impeachment evidence; officers' obligations not to intimidate witnesses; the conduct of lineups or showups and identifications; the conduct of arrests; and writing of police reports or notes of witness statements,  even though the need for such policies, training, and supervision was obvious.

154.    The historical nature of these policies and practices is well-established. For example, Former Cleveland Mayor Carl Stokes described that the failures of the Cleveland Division of Police and its officers went to the highest levels, including the Office of Mayor.  His autobiography, "Promises of Power," published in 1973, provides some of these facts.

20

a.  Stokes explains that when he became Mayor in 1967, he viewed the election "as a mandate to reform the Police Department."  (171.)  In his words, "This great hope became my greatest frustration, my greatest failure."

b.  Stokes noted that Cleveland police officers were "all almost totally lacking in the training in human relations that some departments have at least made a beginning to provide."  (173.)  "The most obvious, and to me the most important, failure of the police was in their dealings with the black community."

c.  Stokes also remarked on the policy or practice under which improper or criminal conduct toward black people was left without consequence:  "And all the police knew that few policemen faced charges or an appearance before the grand jury for shooting a black man while on duty."  (173.)

d.  Stokes noted that the officers' determination "to live by the old ways won out," and that "we were never able to penetrate their inward ways, their cohesive hostility to any change."  (174.)

e.  Stokes also provided insight into the true leadership within the CDP itself: "A clique of senior police officers actually ran the Cleveland Division of Police— no matter who was chief."  (177.)

f.  In the end, Stokes conceded that the improvements he sought for the Police Department never occurred: "But it is true that I accomplished none of the substantive, structural reforms of the department that I had hoped for."  (205.)

155.  The longstanding, systemic policy and training failures within the Cleveland Division of Police are well documented.  In September 1975, the Cleveland Foundation issued a written report regarding the Cleveland Division of Police after extensive study and interviews with

21

the Chief of Police and many officers in the CDP.  The report recognized the lack of supervision over the massive power delegated to subordinate officers, and it quoted one commentator as follows: "No other agency, so far as I know, does so little supervising of vital policy determinations which directly involve justice or injustice to individuals."  (1.)

    a.    The report was titled **"Private Sector Assistance to the Cleveland Division of Police,"** authored by John D. Maddox and Mark H. Furstenberg.  Maddox was a local attorney and Furstenberg was the Director of Personnel for the Boston Police Department.   The purpose of the report was to effectuate the Cleveland Foundation's "continuing effort to assist the Department."  (4.)  One main goal was to "ascertain in cooperation with the Police Department problem areas in its operation . . . ."  Moreover, "[t]he majority of individuals interviewed were officers of the Department who must deal with these problems in the daily discharge of their duties."

    b.    The report also noted racial concerns with police interactions at that time, explaining that "[m]inorities dissatisfied simultaneously with the abuse they have suffered at the hands of police demanded more influence over the policies of the police department and greater access to it."  Yet, this "has produced little change in police departments."  (14.)

    c.    The report also noted a lack of training within the CDP.  There was no "ongoing inservice training" for all officers, with "inservice training" defined as "the periodic training received by a police officer throughout his career to maintain, update, and improve his police knowledge and skills."  The report noted that there was "little formal training going on in the Department . . . ." (27.)

d.  The importance of and need for training was known to final policymakers of the City and CDP.  The lack of training in the CDP at that time was so severe that Cleveland police officers emphasized that it was a major concern.  The report stated, "The need for inservice training was one of the two problems most frequently mentioned by the officers interviewed."  (27.)

156.  At all times relevant to this Complaint, policymakers for the City and the CDP knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training, or supervision.

157.  The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip Cleveland police officers with the specific tools—including polices, training, and supervision—to handle the recurring situations of how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct interrogations and witness interviews and interactions, how to conduct identifications or lineups or showups, how to conduct arrests, and how to write police reports or notes of witness statements.

158.  The misconduct described in this Complaint was undertaken pursuant to the policy and practice of the Defendant City and the CDP in that there was a widespread, clear, and persistent practice of police corruption within the CDP at all times relevant to this Complaint.

159.  In 1974, the Mayor of Cleveland appointed the **Cleveland Crime Commission** to investigate police corruption.  The **Crime Commission produced a report on police corruption and criminal conduct** in 1974.  The Commission recommended solving structural problems at the highest levels, noting that establishing a position of Director of Police would "solidify the presently diffused executive responsibility for the Police Department's Operations."  This "would establish lines of responsibility and accountability and would foster the changes necessary to

23

correct the structural, organizational and procedural sources that can lead to police corruption and misconduct." (3.) The Cuyahoga County Grand Jury also investigated police corruption in 1974.

160.    This report also included in its Appendix a 1966 **study by Public Administration Service on the Cleveland Division of Police**, noting massive structural and organizational problems.  This study noted that Police Division's "formal organization violates sound organizational concepts in many respects.  It is further confused by informal arrangements, power centers, and unusual lines of communications which make the apparent structure of organization virtually meaningless."  Moreover, "there is a lack of uniform policies and procedures, common objectives, and control."  (20.)

a.   This study also explained that the CDP can perhaps "best be described as a loose federation."  "Such an organization precludes effective leadership, and encourages tendencies to build small empires, and to create sinecure positions." (20.)  Such "small empires" show that there are various policymakers within the CDP.    Additionally, "[t]he management process of planning is conspicuously absent."  (22.)  "[T]here is no sense of urgency about planning for the solution of even obviously critical problems."

b.   Supervision problems were severe: "The management process of directing is but little exercised by many commanders and effective field supervision is virtually non-existent."  "Some of the commanding officers interviewed could not fully define their own responsibilities, let alone those of subordinate elements or personnel." (22.)  "The management process of controlling is little exercised in any meaningful sense, because the concept is not recognized, its significance is not appreciated and the administrative processes that make

control possible are not present."  "No great improvement can be made in Cleveland's police service unless organization and management are brought to higher standards."

161.    The report noted how indifferent the CDP was to its own obvious shortcomings: "The problems of police and community relations are so critical in Cleveland that they warrant immediate and serious attention leading to the adoption of new concepts, policies, programs, and procedures.  Yet the division stands aloof from very serious community problems, and it has no real program directed toward the analysis of these problems, nor for their solution.  Training in police and community relations is not offered in sufficient depth or extent."  And "[n]o tactical or strategical plans have been devised."  (23.)

162.    The City and CDP were on notice of a widespread problem with police corruption prior to and after the misconduct described herein.  This widespread practice was so well settled as to constitute a *de facto* policy in the Cleveland Division of Police, and the practice was allowed to exist because municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, effectively ratifying it.

163.    The misconduct described in this Complaint was undertaken pursuant to the policy of the Defendant City and the CDP in that the City and CDP decided not to implement any legitimate mechanism for oversight or punishment of officers who violated their *Brady* obligations or citizens' constitutional rights, or who fabricated evidence or fed information to witnesses or used suggestive identification procedures or coerced or intimidated witnesses.  This led officers to believe that they could violate citizens' constitutional rights with impunity.

164.    Defendant City and the CDP have a long history—from well before Sailor's prosecution and continuing beyond his conviction—of failing to supervise, investigate, and discipline allegations of officer misconduct.

165.    For example, despite having knowledge of news reports and complaints against a detective for false testimony and beating confessions out of detainees, the City failed to investigate or take disciplinary action against the involved officer.

166.    In another case, a CDP officer attempted to report a fellow officer's fabrication of evidence and use of excessive force in shooting a young woman, and Internal Affairs ruled the complaint not substantiated and took no action against the officer who engaged in misconduct.

167.    This same officer witnessed years of repeated misconduct by his fellow officers, indicative of a pattern, practice, custom, and policy of such misconduct. The officer was aware of other officers conducting interrogations of suspects where officers punched suspects in the face and head, knocking them down, in efforts to get those suspects to confess or implicate others. When physically beating these people, the officers would say things along the lines of, "Now you're going to tell us the truth."

168.    When this officer attempted to notify superiors in the CDP of the wrongful conduct described above, he was either reprimanded or told not to pursue the claims of misconduct any further.

169.    At all times relevant to this Complaint, policymakers for the City and the CDP knew of these problems and allowed them to continue, even though the need for a legitimate mechanism for new or different policies, training, oversight, or punishment of officers was obvious.  The constitutional violations complained of by Plaintiff were a highly predictable consequence of the failure to have such mechanisms in place.

170.    The policies and practices of the Defendant City and the CDP were the moving force behind the misconduct described in this Complaint and the violation of Plaintiff's rights. The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Division of Police, and they were allowed to exist because municipal policymakers with authority over these practices exhibited deliberate indifference to the problems, effectively ratifying them.

171.    Specifically, policymakers for the City on matters relating to the CDP knew, among other things, that there was a need to implement policies, train, and supervise police officers on how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct interrogations and witness interviews and interactions, how to conduct identifications or lineups or showups, how to conduct arrests, how to write police reports or notes of witness statements, and how not to conduct unduly suggestive identifications or interrogations.

172.    In addition, the misconduct described in this Complaint was undertaken pursuant to the policy and practice of the Defendant City and the CDP in that the violation of Plaintiff's rights was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

173.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Complaint was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

174.    Defendant City and the CDP's policies and practices for training, supervising, monitoring, and disciplining its officers, and its code of silence, also caused the Defendant Officers to believe that they could abuse Sailor's rights and cover up what they did—all without fear of discipline.

175.    As a matter of both policy and practice, municipal policy makers and CDP supervisors condoned and facilitated a code of silence within the CDP.  In accordance with this code, police department detectives refused to report, and otherwise lied about, misconduct committed by their colleagues, including the misconduct at issue in this case.  Defendant City of Cleveland's training, supervisory, and disciplinary practices supported this code of silence, by protecting from discipline officers who engaged in misconduct and teaching police officers that they must abide by the code.

176.    As a result of Defendant City's and the CDP's established practice of failing to track and identify police officers who are repeatedly accused of the same kinds of serious misconduct; failing to properly investigate cases in which the police are implicated in fabricating or suppressing evidence, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the CDP, CDP officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

177.    The Defendant City's and CDP's failure to train, supervise, and discipline its officers effectively condones, ratifies and sanctions the kind of misconduct that the Defendant Officers committed against Sailor in this case.  Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of Defendant City of Cleveland's practices and *de facto* policies, as alleged in this Complaint.

178.    Defendant City and officials within the CDP failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Sailor's ongoing injuries.

179.    The constitutional violations that caused Sailor's wrongful conviction were not isolated events.  To the contrary, the constitutional violations resulted from Defendant City of Cleveland's policies and practices of pursuing wrongful convictions by: (a) relying on profoundly flawed investigations and coercive or intimidating policing tactics; (b) fabricating inculpatory evidence and suppressing exculpatory evidence; (c) using unduly suggestive identification procedures; (d) failing to adequately train, supervise, monitor, and discipline its police officers; (e) and maintaining the police code of silence.

180.    Consistent with the municipal policy and practice described herein, members of the CDP, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced statements, both from the prosecuting attorneys and from criminal defendants.

181.    The policies and practices described in this Complaint were consciously approved by Defendant City of Cleveland policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

182.    As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth in this Complaint.

**Ru-el Sailor's Exoneration**

183.    Sailor steadfastly maintained his innocence throughout his arrest, trial, and imprisonment.

184.    From the date of his arrest in 2003 until February 28, 2018, Sailor remained continuously imprisoned.

185.    Years passed. Sailor maintained his innocence. He continued to try to free himself from the terror of wrongful conviction and imprisonment, filing motion after motion and conducting continuing investigation.

186.    In January 2017, Sailor asked the Cuyahoga County Prosecutor's Office Conviction Integrity Unit (CIU) to reexamine his 2003 conviction.

187.    The CIU accepted Sailor's request and initiated an investigation, reviewing transcripts, affidavits, the prosecutor's entire file, and all evidence in the case. The CIU interviewed several people, including Clark Lamar Williams and William Sizemore, who were present at the murder of Omar Clark.

188.    In July 2017, the CIU interviewed William Sizemore.

189.    During the interview, Sizemore confirmed several key facts about the case:

      a.    He was present at the scene of the shooting of Omar Clark;

      b.    The only people present were himself, Cordell Hubbard, Omar Clark, and Clark's friend, whom Sizemore did not know.

      c.    Cordell Hubbard and Omar Clark each had a gun;

      d.    Sizemore pleaded with Hubbard not to shoot Omar Clark, saying that Clark was family and the father of his cousin's baby; and

      e.    Cordell Hubbard shot and killed Omar Clark.

190.    On March 20, 2018, Sizemore voluntarily returned to meet with representatives of the CIU to execute a sworn affidavit containing substantively the same information provided in his July 2017 interview.

191.    The CIU also interviewed Clark Williams in March 2018.

192.    In this interview, Williams admitted that after he testified in hearings prior to trial, he went into the hallway and spoke to Puddin.

193.    Puddin pointed to Ru-el Sailor through the window in the courtroom door, and told Williams that Sailor was Hubbard's friend, and that Sailor was the other person present on the night of Omar Clark's murder.

194.    Williams admitted that he did not know Ru-el Sailor and did not remember seeing him before that date in court.

195.    Nonetheless, Williams trusted Puddin, and asked to speak to detectives on the case. Williams told them that Sailor was the other person present at the murder of Omar Clark.

196.    Williams also admitted that Omar Clark also had a gun that night.

197.    The CIU also interviewed family members of the decedent, Omar Clark. These family members, including Umar Clark, were convinced of Sailor's innocence and supported vacating Sailor's conviction.

198.    With this information, the State ultimately concluded that the State's theory of the case at trial could not be upheld and that Sailor's convictions could not withstand scrutiny.

199.    On March 28, 2018, Sailor and the State of Ohio filed a joint motion to vacate his conviction based on new evidence demonstrating Sailor's innocence of allegations underlying the charges contained in the original indictment.

200.    The trial court granted the joint motion to vacate on March 28, 2018.

201.    In a hearing that day, the State nollied Counts 1, 2, 4, 6, 7, 8, 9, 10, 11, and 12.

202.    The State amended Count 3 of the indictment to Perjury, R.C. 2921.11(A), a felony of the third degree, and amended Count 5 of the indictment to Obstructing Justice, R.C. 2921.32(A), a felony of the third degree.

203.    The amended Counts 3 and 5 charged Sailor not for Omar Clark's murder nor for Sailor's conduct on the night of Clark's murder, but instead for a separate, later event—Sailor's conduct at trial.

204.    Sailor entered a plea of guilty to the amended indictment on Counts 3 and 5.

205.    Also at the hearing on March 28, 2018, the trial court imposed a sentence for the amended Counts 3 and 5 and ordered Sailor released from prison.

206.    On March 28, 2018, Ru-El Sailor again became a free man.

### Ru-el Sailor's Injuries

207.    Sailor's years of wrongful imprisonment deprived him of all things in life so many of us take for granted.

208.    Defendants robbed Sailor of his hopes and dreams of a better life.  As a result of his wrongful conviction, Sailor spent years locked up behind bars, with the liberties granted to free citizens stripped from him. Defendants destroyed Sailor's life without any warning.

209.    Sailor was deprived of the opportunity to maintain meaningful relationships with his mother, grandfather, siblings, and friends.

210.    Early on during his time in prison, Sailor's cousin—whom he treated like a son—passed away at 11 years old in an accident. Sailor's grandfather—who was more like a father to Sailor and practically raised him—passed in 2015. Sailor missed these funerals.

211.    At the time Sailor entered prison, he had three biological children and one step daughter. Shortly after entering prison, he also learned he had twins who were three years old. Sailor suffered the deep pain of being deprived of the opportunity to build and maintain meaningful relationships with his children as they grew up. He was unable to be an active part of their lives,

to support them and to show them he loved them, and to be present for important milestones and events.

212.    During his wrongful incarceration, Sailor was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, to have romantic relationships, to marry, and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

213.    Sailor was deprived of the opportunity to enjoy the financial and general benefits of employment and entrepreneurship, including plans to open a record shop, which had been set to open around the time of his arrest.

214.    Sailor was deprived of the opportunity to seek additional education and job training and to have available to him many avenues to learn and gain experience in the world.

215.    Ru-el Sailor must now attempt to make a life for himself without the benefit of years of life experiences and with the burden of his prior imprisonment.

216.    As a result of Defendants' conduct, Sailor suffered various physical, mental, and emotional injuries in prison and continues to suffer today.

217.    In addition to the severe trauma of wrongful imprisonment and Sailor's loss of liberty, Defendants' misconduct continues to cause Sailor extreme physical and psychological pain and suffering, humiliation, fear, anxiety, deep depression, and other physical and psychological effects. Sailor also experiences insomnia, and when he can sleep, he experiences nightmares.

218.    As a result of the foregoing, Plaintiff suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

## COUNT 1
### 42 U.S.C. § 1983 — Fourteenth Amendment:
### *Brady* Violations

219.    All of the foregoing paragraphs are incorporated as though fully set forth here.

220.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, deliberately destroyed, failed to disclose, and otherwise withheld and/or suppressed exculpatory information and material from the prosecution, Plaintiff, and Plaintiff's defense counsel, including evidence upon which State witnesses could be impeached and the use of threats and intimidation against witnesses.

221.    The Defendant Officers, while acting individually, jointly and in conspiracy with one another, deprived Plaintiff of his constitutional right not to be deprived of his liberty without due process of law.

222.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

223.    The Defendant Officers' misconduct directly resulted in the unjust criminal convictions of Plaintiff, thereby denying him his constitutional right to a fair trial guaranteed by the U.S. Constitution.  By their actions, the Defendant Officers thereby misled and misdirected the criminal prosecution of Plaintiff.  Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

224.    Furthermore, in the manner described more fully above, one or more of the Defendant Officers continued to withhold and/or suppress favorable and exculpatory evidence from prosecutors, Plaintiff, and Plaintiff's defense counsel even after his criminal trial, during sentencing, and during the time that Plaintiff's appellate and post-conviction efforts were pending.

225.    In addition, upon information and belief, the Defendant Officers concealed and/or fabricated additional evidence that is not yet known to Plaintiff.

226.    In the manner described in this Complaint, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City and the CDP.

227.    In the manner described more fully above, the policies and practices of the Defendant City and the CDP were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Division of Police, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

228.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City and the CDP in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

229.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

230.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

231.    Defendants are jointly and severally liable for this conduct.

**COUNT 2**
**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:**
**Fabrication of False Evidence**

232.    All of the foregoing paragraphs are incorporated as though fully set forth here.

233.    In the manner described more fully above, the Defendant Officers, acting individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements and identifications attributed to witnesses, and fabricated testimony offered at Plaintiff's trial.

234.    In addition, upon information and belief, the Defendant Officers concealed and/or fabricated additional evidence that is not yet known to Plaintiff.

235.    Defendants knowingly fabricated evidence, and a reasonable likelihood exists that the false evidence affected the decision of the jury.  Defendants' actions violated Plaintiff's right to due process guaranteed by the U.S. Constitution.

236.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

237.    The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional rights to a fair trial guaranteed by the U.S. Constitution.  Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued.  This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

238.    In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City and the CDP.

239.    In the manner described more fully above, the policies and practices of the Defendant City and the CDP were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Division of Police, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

240.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the CDP in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

241.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

242.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

243.    Defendants are jointly and severally liable for this conduct.

## COUNT 3
### 42 U.S.C. § 1983 — Fourteenth Amendment:
### Unconstitutional Identification Procedures

244.    All of the foregoing paragraphs are incorporated as though fully set forth here.

245.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, in the identification procedures noted

above, fabricated evidence by using unduly and impermissibly suggestive identification procedures.

246.    The Officers were acting under color of law and within the scope of their employment when they took these actions.

247.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the CDP in that Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and suppressing exculpatory evidence, coercing and threatening witnesses into providing false inculpatory testimony or not testifying at all, coercing or unduly suggesting that witnesses identify suspects in lineups or photos, providing their own false testimony, and fabricating false evidence.

248.    This widespread practice was so well-settled as to constitute de facto policy in the Cleveland Division of Police, and it was allowed to exist because municipal policymakers with authority over the conduct exhibited deliberate indifference to the problem, thereby effectively ratifying it.

249.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the CDP declined to implement sufficient policies or training on the disclosure of exculpatory evidence, fabrication of evidence, feeding information to witnesses, engaging in coercive, leading, or unduly suggestive questioning of witnesses and unduly suggestive lineups and photo identifications, or use of coercion or threats against witnesses, even though the need for such policies and training was obvious. The Defendant City and the CDP also declined to implement any legitimate mechanism for oversight or punishment of officers who committed such misconduct, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

250.     In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the CDP in that the violation of Plaintiff's rights described in this Count was caused by the actions of policymakers for these Defendants.

251.     The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Officers.

252.     As a direct and proximate result of the Officers' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

253.     Defendants are jointly and severally liable for this conduct.

### COUNT 4
### 42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:
### False Arrest

254.     All of the foregoing paragraphs are incorporated as though fully set forth here.

255.     In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, caused Plaintiff to be unreasonably seized, detained, imprisoned and deprived of his liberty without probable cause to believe that he had committed a crime, in violation of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

256.     In the manner described more fully above, the policies and practices of the Defendant City and the CDP were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Division of Police, and they were allowed to exist

because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

257.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the CDP in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

258.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

259.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

260.    Defendants are jointly and severally liable for this conduct.

**COUNT 5**
**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:**
**Malicious Prosecution**

261.    All of the foregoing paragraphs are incorporated as though fully set forth here.

262.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, instigated, influenced, or participated in the decision to prosecute Plaintiff, and there was no probable cause for the criminal prosecution. As a consequence of the criminal prosecution, Plaintiff suffered a deprivation of liberty apart from his initial seizure.  Plaintiff's criminal prosecution was terminated in his favor in a manner indicative of innocence.

263.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and the Defendant Officers made statements to other officers and/or to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

264.    Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that these statements were false and perjured.  In so doing, the Defendants fabricated evidence and withheld exculpatory information.

265.    In the manner described more fully above, the Defendant Officers' misconduct denied Plaintiff his constitutional rights to procedural due process under the Fourteenth Amendment and rights under the Fourth Amendment to be free from continued detention without probable cause.  Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued.  This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

266.    Furthermore, in the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

267.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

268.    In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City and the CDP.

269.    In the manner described more fully above, the policies and practices of the Defendant City and the CDP were the moving force behind the misconduct described in this Count

and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Division of Police, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

270.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the CDP in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

271.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

272.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

273.    Defendants are jointly and severally liable for this conduct.

### COUNT 6
### 42 U.S.C. § 1983 — Sixth and Fourteenth Amendments:
### Right to Compulsory Process

274.    All of the foregoing paragraphs are incorporated as though fully set forth here.

275.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, deprived Plaintiff of his civil rights by violating his right to compulsory process based on the deprivation of the testimony of witnesses as required under the Sixth Amendment to the United States Constitution. Defendants' substantial

interference with Plaintiff's ability to call witnesses deprived Plaintiff of material and favorable witness testimony, and Defendants violated Plaintiff's Fourteenth Amendment right to a fair trial.

276.     Defendants' conduct was taken with deliberate indifference to or reckless disregard for Plaintiff's rights and for the truth.

277.     Defendants violated Plaintiff's rights under the Sixth and Fourteenth Amendments to present exculpatory evidence.

278.     Defendants are jointly and severally responsible to permit Plaintiff to present evidence in support of his criminal defense.  Each engaged in, knew, or should have known, of the unconstitutional conduct alleged in this Complaint and failed to prevent it, which each had a responsibility to do, and each ratified, approved, or acquiesced in it.

279.     Defendants' conduct constituted substantial interference with witnesses' free and unhampered determination to testify.

280.     The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

281.     In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City and the CDP.

282.     In the manner described more fully above, the policies and practices of the Defendant City and the CDP were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Division of Police, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

283.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the CDP in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

284.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

285.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

286.    Defendants are jointly and severally liable for this conduct.

### COUNT 7
### 42 U.S.C. § 1983 — Failure to Intervene

287.    All of the foregoing paragraphs are incorporated as though fully set forth here.

288.    In the manner described more fully above, during the constitutional violations described here, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

289.    The Defendant Officers' actions and omissions in the face of a constitutional duty to intervene were the direct and proximate cause of Plaintiff's constitutional violations and injuries, including but not limited to loss of liberty, physical harm and emotional distress.

290.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

291.    In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City and the CDP.

292.    In the manner described more fully above, the policies and practices of the Defendant City and the CDP were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Division of Police, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

293.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the CDP in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

294.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

295.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

296.    Defendants are jointly and severally liable for this conduct.

### COUNT 8
### 42 U.S.C. § 1983 — Supervisory Liability

297.    All of the foregoing paragraphs are incorporated as though fully set forth here.

298.    The constitutional injuries complained of here were proximately caused by (i) the intentional misconduct of the supervisory defendants, or (ii) by these supervisory defendants being deliberately and recklessly indifferent to their subordinates' misconduct, knowing that ignoring that misconduct would necessarily violate Plaintiff's constitutional rights.

299.    Specifically, these supervisory defendants were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants to obtain or provide false evidence, suppress exculpatory and impeachment evidence, intimidate witnesses, and to use unduly suggestive identification procedures, or these supervisory defendants failed to disclose that information or were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

300.    The supervisory defendants, including Defendants Farinacci and Purcell, were acting under color of law and within the scope of their employment when they took these actions.

301.    As a direct and proximate result of the actions of the supervisory defendants Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

302.    Defendants are jointly and severally liable for this conduct.

### COUNT 9
### 42 U.S.C. § 1983 — *Monell* Policy and Practice Claim
### Against Defendant City of Cleveland

303.    All of the foregoing paragraphs are incorporated as though fully set forth here.

304.    Defendant City of Cleveland is liable for the violations of Plaintiff's constitutional rights as described in this Complaint by virtue of its official policies and practices.

305.     The actions of the Defendant Officers were undertaken pursuant to policies, practices, and customs of the Defendant City and Cleveland Division of Police, which were approved, encouraged, and/or ratified by policymakers for the Defendant City and the CDP with final policymaking authority.

306.     These policies and practices included the failure to adequately train, supervise, monitor, and discipline officers who engaged in constitutional violations, pursuing wrongful convictions through reliance on profoundly flawed investigations, along with unduly suggestive identifications and coerced, fabricated, and suppressed evidence, witness intimidation, and the police code of silence as described in this Complaint.

307.     One or more of the policies, practices, and customs described in this Complaint was maintained and implemented by Defendant City of Cleveland with deliberate indifference to Plaintiff's constitutional rights and were a moving force behind the violations of those rights.

308.     These widespread practices were so well-settled as to constitute de facto policy in the Cleveland Division of Police, and were allowed to exist because municipal policymakers with authority over the conduct exhibited deliberate indifference to the problems, thereby effectively ratifying them.

309.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the CDP declined to implement sufficient policies or training on the disclosure of exculpatory evidence, fabrication of evidence, feeding information to witnesses, engaging in coercive, leading, or unduly suggestive questioning of witnesses and unduly suggestive lineups and photo identifications, or use of coercion or threats against witnesses, even though the need for such policies and training was obvious. The Defendant City and the CDP also declined to implement any legitimate mechanism for oversight or

punishment of officers who committed such misconduct, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

310.    As a direct and proximate result of the Defendant City of Cleveland's actions and inactions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT 10**
**Ohio State Law — Negligence: Willful, Wanton, and/or Reckless Conduct**

311.    All of the foregoing paragraphs are incorporated as though fully set forth here.

312.    Defendant Officers failed to exercise due care and acted with malicious purpose, in bad faith, and/or in a wanton or reckless manner, and engaged in willful, wanton, and/or reckless conduct, while engaged in police functions and activities, including but not limited to *Brady* violations, the fabrication of evidence, unconstitutional identification procedures, false arrest, malicious prosecution, compulsory process, the failure to intervene during civil-rights violations, conspiracy to deprive constitutional rights, and supervisory liability giving rise to constitutional violations as described in this Complaint.

313.    As a direct and proximate result of Defendants' willful, wanton, and/or reckless conduct, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

314.    Defendants are jointly and severally liable for this conduct.

**PRAYER FOR RELIEF**

Plaintiff Ru-el Sailor respectfully requests that this Court enter judgment in his favor and against Defendants City of Cleveland, Detectives Eugene Jones (#1241), Henry Veverka (#607), James Metzler (#2489), Harry Matlock (#194), Andrew Desatnik, Smith (#1730), and Shair Hasan (#2358), and Sergeants Rick Farinacci and James Purcell (#9921), awarding (a) compensatory and consequential damages, costs, and attorneys' fees (including those pursuant to 42 U.S.C. § 1988) against each Defendant, jointly and severally, along (b) with punitive damages against each of the individual Defendants, as well as (c) any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: March 27, 2020                    Respectfully submitted,

                                         */s/ Jacqueline Greene*
                                         Jacqueline Greene (0092733)
                                         Sarah Gelsomino (0084340)
                                         Marcus Sidoti (0077476)
                                         Terry H. Gilbert (0021948)
                                         FRIEDMAN & GILBERT
                                         50 Public Square, Suite 1900
                                         Cleveland, OH  44113
                                         Tel: (216) 241-1430
                                         Fax: (216) 621-0427
                                         jgreene@f-glaw.com
                                         sgelsomino@f-glaw.com
                                         marcus@f-glaw.com
                                         tgilbert@f-glaw.com

                                         *Attorneys for Plaintiff Ru-El Sailor*