# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RU-EL SAILOR, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:20-cv-00660-DAR |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, *et al.*, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| Defendants. | ) | |

---

## MEMORANDUM IN SUPPORT

---

MARK GRIFFIN (0064141)
Director of Law

By: s/Dylan F. Ford
ELENA N. BOOP (0072907)
Chief Trial Counsel
WILLIAM M. MENZALORA (0061136)
Chief Assistant Director of Law
MATTHEW R. AUMANN (0093612)
DYLAN F. FORD (0101464)
Assistant Directors of Law
City of Cleveland, Department of Law
601 Lakeside Avenue E., Room 106
Cleveland, Ohio  44114
Tel: (216) 664-2800
wmenzalora@clevelandohio.gov
maumann@clevelandohio.gov
dford@clevelandohio.gov

*Attorneys for Defendant City of Cleveland*

HANNA, CAMPBELL & POWELL, LLP

s/John D. Latchney
KENNETH A. CALDERONE (0046860)
JOHN D. LATCHNEY (0046539)
3737 Embassy Parkway, Suite 100
Akron, Ohio 44333
Tel: (330) 670-7602/(330) 670-7324
Email: kcalderone@hcplaw.net
Email: jlatchney@hcplaw.net

*Attorneys for Defendants Eugene Jones,
Henry Ververka, James Metzler, Harry
Matlock, Andrew Desatnik, Sahir Hasan,
Rick Farinacci, and Estate of James
Purcell*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

STATEMENT OF THE ISSUES ........................................................................................... 1

PRELIMINARY STATEMENT ............................................................................................ 2

I.   STATEMENT OF FACTS ......................................................................................... 2

    A.  Moments after the murder of Omar Clark, Sailor learns that Cordell Hubbard and William Sizemore were involved. .......................................................... 2

    B.  Hubbard and Sailor are arrested for the murder. ........................................... 4

    C.  Sailor is convicted because his false testimony links him to the shooter. .................... 4

    D.  Sailor perjures himself again and procures a false affidavit from Cordell Hubbard. ..................................................................................................... 5

    E.  Sailor and his girlfriend orchestrate a media campaign based on a false story. .......... 6

    F.  Sailor submits a false application to the Conviction Integrity Unit to get out of jail. ...................................................................................................... 9

    G.  Sailor uses Hubbard's perjured affidavit to defraud taxpayers of $652,000. ............. 10

    H.  Sailor defrauds this Court—and lies in his deposition. ................................. 10

    I.  Discovery sheds light on Sailor's efforts to defraud the courts. ................................. 12

II.  STANDARD ......................................................................................................... 13

III. ANALYSIS .......................................................................................................... 14

    A.  This Court should dismiss the Complaint because Sailor acted with willfulness, bad faith, and is at fault.  The totality of the circumstances establishes the existence of all three. .................................................................................. 14

    B.  This Court should dismiss the Complaint because Sailor's lies harmed the Defendants. ............................................................................................... 17

    C.  This Court should dismiss the Complaint because Sailor had notice that dismissal was an appropriate remedy. ...................................................... 17

D.  This Court should dismiss the Complaint because no other sanctions sufficently protect the public interest. ........................................................................................... 18

E.  This Court would be in good company dismissing the Complaint. ............................ 18

CONCLUSION ......................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Pages**

*Brown v. Oil States Skagit Smatco*, 664 F.3d 71(5th Cir. 2011)……………………..………14

*Chambers v. NASCO, Inc*., 501 U.S. 32, 45 (1991)…………………………………………..13

*D & R Servs., LLC v. Mesa Underwriters Specialty Ins. Co.*, No. 23-5651, 2024 WL 2830660 (6th Cir. June 4, 2024)…………………………………………………………………………..17

*Farrar v. Lapan*, No. 22-1908, 2023 WL 3151093 (6th Cir. Apr. 28, 2023)……………passim

*Green v. Mayor & City Council of Baltimore*, 198 F.R.D. 645 (D. Md. 2001)………………15

*Harmon v. CSX Transp., Inc.*, 110 F.3d 364 (6th Cir. 1997)………………….…………....17, 19

*Hernandez v. Franco Am. Baking Co.*, No. 320CV00628LRHWGC, 2021 WL 6498256 (D. Nev. Sept. 3, 2021)…………………………………………………………………………………16

*Hughes v. Anderson*, 829 F. App'x 724 (7th Cir. 2020)………………………………...…19

*Johnson v. Baltimore Police Dep't*, No. CV ELH-19-0698, 2022 WL 9976525……………19

*Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485 (N.D. Ohio 2013)………………………..……14

*Mathews v. Moss*, No. 09-22117-CV, 2011 WL 13134350 (S.D. Fla. Sept. 13, 2011)………15

*McClafferty v. Portage Cnty., Ohio Bd. of Commissioners*…………………………………19

*Ramirez v. T&H Lemont*, Inc., 845 F.3d 772 (7th Cir. 2016)…………………………………16

*Universal Health Grp. v. Allstate Ins. Co.*, 703 F.3d 953, 955–56 (6th Cir. 2013)………..passim

*Vaughan v. Brigham*, No. CIV.A. 3:10-05-DCR, 2011 WL 2633369 (E.D. Ky. July 5, 2011)……………………………………………………………………………………..15

*Wu v. T.W. Wang*, Inc., 420 F.3d 641, 643 (6th Cir. 2005)………………………………...14

*Young v. Off. of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 67 (D.D.C. 2003)…………...16

**STATEMENT OF THE ISSUES**

1.  Whether a dismissal sanction is warranted against Ru-El Sailor for bringing this lawsuit based on a known lie.

2.  Whether a dismissal sanction is warranted against Ru-El Sailor for his perjury in this action.

3.  Whether a dismissal sanction is warranted against Ru-El Sailor for his efforts to tamper with key fact witnesses.

## PRELIMINARY STATEMENT

This motion is based on a pattern of fraud that Plaintiff Ru-El Sailor has perpetrated against this and other Courts over the last twenty years.  Since the night Omar Clark was murdered, Sailor has known exactly who was responsible:  Cordell Hubbard and William Sizemore.  Yet in pleadings, depositions, affidavits, and in the press, he has feigned ignorance, claiming that he only learned the truth *after* he was convicted.  What's more, he has used witnesses, journalists, and attorneys to perpetuate this lie.

Now, Sailor demands that taxpayers pay him public funds on the grounds that police officers deliberately withheld the identity of one of the murderers.  These allegations are not just false; they are outrageous.  After four years of litigation, the Court should put an end to Sailor's fraud and dismiss the case in its entirety.

## I.  <u>STATEMENT OF FACTS</u>

### A.  **Moments after the murder of Omar Clark, Sailor learns that Cordell Hubbard and William Sizemore were involved.**

On November 17, 2002, Cordell Hubbard brutally murdered Omar Clark over ten dollars' worth of "wet"—cigarettes dipped in embalming fluid.  Minutes later, Hubbard called Sailor, his best friend, and asked for a ride to a party at St. Aloysius Church.  Ex. A, Dep. of R. Sailor at 102.  Sailor obliged.

In a recently acquired prison call, Sailor told a local journalist that Hubbard was "emotional" the moment he got in the car.  ECF 81-9, PageID#1230; *see also* Ex. R, Sailor's Prison Call with Cleveland Scene Reporter Kyle Swenson, <u>D2 C618</u> starting at minute mark 3:40.[1]  As they drove across town, Hubbard confessed to Sailor that he committed the murder.  *Id*.  He

---

[1] All prison call recordings can be accessed by clicking or copying the hyperlinks in the body of this brief, or by clicking <u>this link</u>.  A flash drive containing the recordings will be manually filed with the Court.

explained how he and William Sizemore—"Will" for short—confronted the victim on a dark street.  *Id.*  Tempers flared, and Sizemore tried to deescalate.  But when the victim turned to flee, Hubbard shot him eleven times.  Ex. B, Trial Transcript at 1879.

Sailor claims he "didn't know what to do" when he heard Hubbard's confession.  ECF 81-9, PageID#1231.  He drove around the neighborhood so Hubbard could compose himself.  *Id.*  Eventually, the pair made their way to St. Aloysius, where they posed for some photographs together, manufacturing an alibi:[2]



Ex. B, Trial Transcript at 1551.  After the party, Sailor dropped Hubbard off at his girlfriend's house and called it a night.

---

[2] Hubbard is wearing the red jersey; Sailor is in gray.

**B.  Hubbard and Sailor are arrested for the murder.**

Within days, detectives learned that Hubbard was involved in the murder.  After an eyewitness identified him from a photo array, he was arrested and charged.  Ex. C, December 10, 2002 Police Report.  Trial was scheduled for early 2003.

Meanwhile, detectives focused on finding the other suspect.  In February, they interviewed Hubbard's girlfriend, who mentioned that Hubbard and Sailor were best friends. Ex. D, February 11, 2003 Police Report.  A background search revealed that Sailor had been arrested less than a month after the murder with an unlicensed 9mm handgun, the same caliber as the murder weapon. *Id.*

In March, Hubbard's attorneys named Sailor on a list of potential alibi witnesses.  Ex. E, List of Witnesses.  Acting on this information, detectives created a photo array that included Sailor's mugshot.  They showed it to Larry Braxton, who had witnessed the murder from his front porch.  Ex. F, March 25, 2003 Police Report.  Braxton identified Sailor as the other suspect.  *Id.* Sailor was arrested and charged with murder; his case was joined with Hubbard's.  *Id.*

**C.  Sailor is convicted because his false testimony links him to the shooter.**

Hubbard and Sailor went to trial in May 2003.  Sailor took the stand in his own defense, falsely testifying that he was out barhopping with Hubbard when the murder occurred.  Ex. G, Trial Transcript at 1545-1550.  To corroborate this story, Sailor's attorney introduced the photographs that Sailor and Hubbard took together at St. Aloysius Church. *Id.* at 1551 and 1585.

During cross-examination, prosecutors asked Sailor if he and Hubbard had spent the entire night "in each other's company." *Id.* at 1572.  Unwilling to implicate his best friend, Sailor lied and said "yes," they had been together all night.  *Id*.  Years later, Sailor would explain that telling on Cordell "wasn't even an option."  Prison Call with Kyle Swenson, Ex. R, D2 C618 starting at minute mark 6:31.  He "wasn't going to tell." *Id.*

4

Given the overwhelming evidence against Hubbard—phone records, eyewitness statements, and inconsistencies in his alibi—Sailor's testimony amounted to self-incrimination.  If he spent the entire night with Hubbard, who was certainly guilty, then he must have been present when the shooting occurred.  Jurors convicted Sailor and Hubbard on all counts, including murder.

### D. Sailor perjures himself again and procures a false affidavit from Cordell Hubbard.

Before sentencing, Sailor filed a motion for a new trial based on "newly discovered evidence."  Ex. H, Motion for a New Trial.  In a supporting affidavit, he claimed he did not know Hubbard was involved in the murder until after he was convicted.  *Id.* at 4.  According to Sailor's affidavit, when the jury returned its verdict, Hubbard "turned" to him "and said for the first time that he was going to tell the truth. . . that he, Cordell Hubbard, was the shooter[,] that [Sailor] was not even present, [and that] the only person who was present with Cordell Hubbard was named 'Will.'"  *Id.*  Sailor, lying, testified that this was "the first time he learned of this information and the first time it was available to him."  *Id.* at 5.

Sailor also procured a false affidavit from Hubbard.  Ex. I, Affidavit of Cordell Hubbard.  In it, Hubbard claimed that "after the jury returned the verdict of guilty he informed Ru-El Sailor, for the first time, that he was in fact the shooter and that he caused the death of Omar Clark."  *Id.* at 3.  Sailor knew this was a lie.  Hubbard had confessed to him in detail on the night of the shooting, months before the verdict.  Yet Sailor chose to file the affidavit anyways.

In September 2003, the Court held a hearing on the motion for a new trial.  Ex. B at 1852-1898.  Hubbard took the stand and testified consistently with his perjured affidavit.  He claimed that he told Sailor about the murder while they were in a "holding cell" after the verdict.  *Id.* at 1862-1863.  He stated that Sailor did not know what happened until then.  *Id.* at 1886.  After a strong cross-examination by the State, the Court denied the motion.

5

**E.  Sailor and his girlfriend orchestrate a media campaign based on a false story.**

In 2014, Sailor retained attorney Kim Corral to assist in getting a new trial.  Around this time, he and his then-girlfriend (now wife), Amy Spence, began discussing ways to generate publicity for Sailor's story.  In early 2016, they reached out to Kyle Swenson, a journalist at Scene Magazine.  Swenson agreed to interview Sailor.

Prison call recordings reveal how Swenson became familiar with Sailor's case.  In the first conversation—a three-way phone call orchestrated by Amy—Swenson asks how Sailor learned about the murder.  Sailor repeats the false story he told in his motion for a new trial, claiming that Hubbard waited until after the verdict to come forward:

| | |
|---|---|
| Sailor: | …I got a phone call from him.  And I went and picked him up so we could ride together to St. Aloysius. |
| Swenson: | Did Cordell tell you what happened at that point? |
| Sailor: | No. |
| Swenson: | When did he fill you in on that? |
| Sailor: | We was already in the County. |

ECF 81-8, PageID#1209; Ex. R, D2 C617 at 6:58.  After fifteen minutes, the line drops.  Sailor calls Amy so she can reconnect Swenson via three-way.  ECF 81-9, PageID#1226; Ex. R, D2 C618 at 0:59.  Before patching Swenson back in, Amy urges Sailor to "be honest" about the night of the murder.  *Id*.

| | |
|---|---|
| Amy: | Don't forget we're being honest with him about your knowledge. |
| Sailor: | I know, man.  Look, I got stuck on that, right?  And it's like, man, I'm not used to telling people that.  It's always like, man, I got stuck. |
| Amy: | Start off by saying "off the record."  "Off the record, I knew about this in advance." |

*Id.* at PageID#1226-1227; Ex. R, D2 C618 at 1:02.  Swenson rejoins the call, and Sailor states the following:

<div style="margin-left: 2em;">

Sailor:	**Alright, look man, like man, it's only like probably five people in this whole world I've been completely honest with about the situation, you know what I'm saying?**  Like, due to the fact I don't really know the repercussions, right?  But as far as my lawyer told me, like, I really can't be in trouble.

But not only that, it's more of a moral standpoint with Umar Clark, the victim's brother, you know, he in full support getting me out of prison.  And I don't want him, like, to change his mind on me because he found out, like, I knew what happened ahead of time, you know what I'm saying?

Swenson:	Uh-huh, uh-huh.

Sailor:	But like me, me and Cordell, man, like we go back like fourth grade and grew up like damn near brothers, you know what I'm saying, like he can go to my mother's house, without any one of us being there, and the night that it happened…he called me after, you know what I'm saying, when I left the 4U2B and I dropped Bobby off, he called me to come pick him up from his mother house and I went and got him like man, he was…He was highly distraught, emotional, you know what I'm saying, like and I'm like "what's wrong man?"…and he's like, man, he told me he shot somebody in self-defense.  He's like, "man, somebody put a gun on me man, and I shot him."  He's like, "I don't know, you know what I'm saying, how many times I shot him…**I just shot him, got in the car and left." You know what I'm saying?  Him and the dude Will, and he's like "Will knew the dude," and whatever the case may be**.

</div>

ECF 81-9, PageID#1229 – PageID#1231; Ex. R, D2 C618 at 3:40.

After Swenson hangs up, Sailor calls Amy.  ECF 81-3, PageID#1098; Ex. R, D2 C619 at 2:45.  Amy reassures him that Swenson did not intend to publish when Sailor learned about the murder.  *Id.* at 2:57.  According to Amy, Swenson was like "'well, I can definitely finesse around it . . . we can say that [Sailor] knew, but we don't have to say when he knew.'"  *Id.*

A month later, in June 2016, Swenson reached out to Sailor to clarify a few details for the article.  On another three-way call, Amy, Swenson, and Sailor discuss Sailor's knowledge of the

shooting.  ECF 81-10, PageID#1264; Ex. R, D3 C118 at 8:54.  Swenson asks if he should write that Sailor knew "right away," "found out later," or "had a suspicion." *Id.* at 14:21.  Sailor rejects the first option and suggests that Swenson adopt the timeline in Hubbard's perjured affidavit. *Id.* at PageID#1265; Ex. R, D3 C118 at 15:15.  Amy interjects, representing to Swenson that only he and Attorney Kim Corral know the truth about the shooting:

| | |
|---|---|
| Swenson: | Cordell says he told you after.  I mean, that's in his affidavit that he told you right after. |
| Sailor: | Right.  And I'm saying, I don't want to contradict his affidavit because if I contradict his affidavit, then it goes down the drain, you see what I'm saying? |
| Swenson: | Yeah.  So I'm just going to go based on that affidavit then, that he had said that— |
| Sailor: | That will work better.  I will deal with Umar, the victim's brother, at a later date.  I'd rather not contradict Cordell's affidavit because it gives them another reason to keep me here. |
| Swenson: | Yeah, that creates an issue, but that's fine. |
| Amy: | Yeah, that's something that he's only told you and Kim, and that's because he's trying to be, you know, honest about that part of the whole situation.  I mean everything else is truthful, but it was something, you know, that had been said so early on that it was like, you know, he was afraid that knowing earlier would have made the situation worse. |

ECF 81-10, PageID#1265 – PageID#1266; Ex. R, D3 C118 at 15:15.

On June 29, 2016, Scene Magazine published a front-page article about Sailor's case.  The article described how, "[i]mmediately after the verdict, Cordell opened up to Sailor, telling him that, yes, he was there, and yes, he had done this.  He was the shooter."  Ex. J, Cleveland Scene Article.

**F.  Sailor submits a false application to the Conviction Integrity Unit to get out of jail.**

Attorneys from the Ohio Innocence Project took notice of the article and volunteered to serve as co-counsel in Sailor's post-conviction proceedings.  Ex. R, <u>D3 C378</u> at 8:51.  Later, the Cuyahoga County Prosecutor's Conviction Integrity Unit (CIU) agreed to re-examine Sailor's case.

As Sailor's attorneys got to work on his CIU application, soliciting affidavits and making public records requests, Sailor and Amy discussed their progress in prison calls.  In one recording, Sailor expresses concern that his attorneys might reveal that he found out about the murder before trial.  Ex. R, <u>D4 C241</u> at 11:08.  On a later call, Amy and Sailor discuss whether Corral told his other attorneys the truth about Sailor's knowledge. ECF 81-8, PageID#1042-43; ECF 81-6, PageID#1163; *see also* Ex. R, <u>D4 C275</u> at 2:17 and Ex. R, <u>D4 C279</u> at 7:47.

Sailor, through Corral and OIP, submitted his application to CIU in April 2017, asserting: "Cordell Hubbard chose not to testify during the trial, but at sentencing, he finally spoke for the first time about the night of the crime. Cordell admitted that he was present at the scene of the shooting and identified a man named 'Will' as the other person with him that night.  Cordell stated that Ru-El Sailor was not there that night."  Ex. K, CIU Application at 9-10, 18.  Sailor knew this was not true; Hubbard had told him the truth about the murder on the night it occurred.

Relying on the false application, the Cuyahoga County Prosecutor's office agreed to Sailor's release provided he pled guilty to charges of obstruction for falsely testifying—at trial—that he was barhopping with Hubbard when the murder occurred.  This arrangement had nothing to do with Hubbard's perjured affidavit, which prosecutors did not know to be false.  In fact, in a 20-page report, Prosecutor Russell Tye noted that the affidavit "was a critical factor in CIU's analysis and conclusion."  Ex. L, CIU Report at 15.  And in a joint motion filed in Cuyahoga

9

County Court of Common Pleas, the parties referred to Hubbard's testimony as a reason to vacate Sailor's sentence.  Ex. M, Motion to Vacate at 3.

On March 28, 2018, Sailor pled guilty to perjury and obstruction.  He was released with time served.

**G.  Sailor uses Hubbard's perjured affidavit to defraud taxpayers of $652,000.**

Two years after his release, Sailor filed a declaratory judgment action in Cuyahoga County Court of Common Pleas seeking a judicial declaration that he was wrongfully imprisoned.  In the Complaint, he referred directly to Hubbard's perjured affidavit, as well as Hubbard's perjured testimony from the September 2003 new trial hearing.  Ex. N, Dec Action Complaint at 3-4.  After discovery, the State moved for dismissal on grounds that, under the express language of the wrongful imprisonment statute, Sailor's perjury and obstruction convictions "were part of a continuing course of criminal conduct…making him ineligible to be declared a 'wrongfully imprisoned individual.'"  Ex. O, State MSJ at 8-9.  Sailor opposed, arguing that his "perjury and obstruction. . . would not occur until months after [Omar] Clark's unfortunate demise."  Ex. P, Sailor Opposition at 17-18.  Unbeknownst to the State, Sailor's position was not simply a disagreement over statutory language.  It was a complete distortion of the facts.  Sailor's perjury and obstruction started on the night of the murder, when he and Hubbard took the photographs together, ginning up a false alibi.  Presented with an inaccurate record, the Court denied the State's motion, granted Sailor's cross-motion, and formally declared Sailor a wrongfully incarcerated person, entitling him to $652,000.00 in compensation.  Ex. Q, Judgment Entry; Ex. R, Entry Approving Settlement.

**H.  Sailor defrauds this Court—and lies in his deposition.**

In 2020, Sailor filed this case against the City of Cleveland and several of the officers involved in the underlying homicide investigation.  Sailor claims, broadly, that police withheld

exculpatory evidence regarding the identity of Hubbard's accomplice, "Will."  But his Complaint draws heavily from Hubbard's perjured affidavit (Compl., ¶¶ 120–126, ECF 43, PageID#453); and it is replete with fraudulent statements about Sailor's own knowledge of the murder.  For example: "Sailor did not know that Hubbard had been on Englewood Avenue that night, nor did he know that Hubbard shot anyone.  Likewise, Sailor did not know that Hubbard and Will had gone to Englewood together." Compl. ¶ 33, ECF 43, PageID#442.  And: "Sailor was deprived of the opportunity before or during trial to investigate who 'Will' was—and was never given the chance to identify William Sizemore as the suspect 'Will' before or during trial." *Id.,* ¶ 51 at PageID#445; *see also,* ¶ 49 at PageID#445, ¶ 108 at PageID#451, ¶¶ 112-13 at PageID#452, and ¶¶ 115-18 at PageID#452.

Sailor has repeated these lies for the duration of this case, including at his deposition, where he insisted that he did not know the truth about the shooting until after his trial:

> Q:    Now, when you picked up Cordell that evening, did he tell you that he had been involved in the incident with Omar Clark?
>
> A:    No.
>
> Q:    Did he seem excited or act unusual in any way?
>
> A:    No. Not to my recollection.

Ex. A, Dep. of R. Sailor at 103.  When further pressed on the issue, and questioned specifically whether he knew Hubbard and Sizemore were responsible for the murder, Sailor professed ignorance:

> Q:    If I understand your testimony, when you dropped Cordell Hubbard off early in the morning hours on November 17th, you had no idea he had been involved in a shooting, correct?
>
> A:    Correct.

*Id.* at 121.

11

Q:     Before you were arrested, did you believe that Cordell shot Omar Clark?

A:     No.

…

Q:     Did he tell you that he did shoot Omar Clark?

A:     No.

Q:     Did he deny shooting Omar Clark?

A:     Yeah.  He said he ain't did nothing.

*Id.* at 124 – 125.

Q:     Well, before your trial went forward, you knew that Cordell Hubbard had left the 4U2B with William Sizemore, correct?

A:     No.  I was still learning.  Like, I was still piecing that night together as I was going.  It was—everything was just like—it was just like a blur, like, I was getting pieces from different people…

*Id.* at 134.

**I.  Discovery sheds light on Sailor's efforts to defraud the courts.**

Following Sailor's deposition, the City Defendants subpoenaed the Ohio Department of Rehabilitation and Corrections for recordings of Sailor's prison calls.  These recordings prove that he knew about the murder on the night it happened and, more importantly, that Hubbard and Will Sizemore were responsible.  They also revealed a broader pattern of misconduct, including efforts to bribe witnesses, falsify affidavits, and suborn perjury:

- In several calls, Sailor and Amy discuss paying eyewitness Clark Williams to recant his in-court identification of Sailor.  Amy Sailor Dep., ECF 81-1, PageID#1049; *see also* Ex. R, [D4 C178](#) at 13:37; [D4 C185](#) at 4:32; [D4 C343](#) at 7:17; [D5 C132](#) at 15:53.  Later, Williams signed an affidavit to this effect.  Ex. L, CIU Report at 46-47.  Sailor relied on Williams' recantation in his Motion to Vacate.  Ex. M, Motion to Vacate at 4.

- In other calls, Amy describes how she wrote the entire declaration of Umar Clark—the victim's brother—and then added the date of signature days after he agreed to sign it.  Ex. R, [D5 C141](#) at 1:42; [D5 C144](#) at 12:15; [D5 C145](#) at 9:23;

12

[D5 C162](#) at 11:51.  Sailor included this affidavit with his CIU application.  Ex. K, CIU Application at 18.

- Amy and Sailor also tried to manipulate Larry Braxton to recant his identification of Sailor.  In one call, Amy states that she offered Braxton a week's worth of salary to testify on Sailor's behalf.  Ex. R, [D2 C63](#) at 13:05.  While Braxton did not participate in Sailor's release, he refused to testify at his deposition in this action, pleading the Fifth Amendment in response to nearly every question he was asked.  After the deposition, he called Amy on her cellphone, although she claims she did not answer.  ECF 81-1, PageID#842.

Amy Sailor confirmed the authenticity of the prison calls at her deposition on July 1, 2024.  *See, e.g.*, ECF 81-1, PageID#1001; PageID#1011; PageID#1016.  On July 17, Sailor's counsel moved to withdraw from the case.  ECF 82, PageID#1316.

## II. <u>STANDARD</u>

A trial court's implied powers include the power to "dismiss a party's case entirely" as a sanction for fraud or other misconduct.  *Farrar v. Lapan*, No. 22-1908, 2023 WL 3151093, at *1 (6th Cir. Apr. 28, 2023) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991)).  In determining whether this sanction is appropriate, the Sixth Circuit uses a four-factor test: (1) whether the party acted with willfulness, bad faith, or fault; (2) whether her misconduct prejudiced the opposing party; (3) whether she had warning that her actions could lead to dismissal; and (4) whether the court considered or tried lesser sanctions before ordering dismissal. *Id.* (citing *Universal Health Grp. v. Allstate Ins. Co.*, 703 F.3d 953, 955–56 (6th Cir. 2013)).  No factor is dispositive, and the trial court's decision is reviewed for the abuse of discretion. *Id.*

Here, because Sailor has known since the night of the murder that Hubbard was the shooter, and that Sizemore was there too, yet perpetually committed perjury to hide this fact, this Court should dismiss the Complaint with prejudice.

13

## III. <u>ANALYSIS</u>

Sailor's fraud has pervaded these proceedings and made a mockery of the Court's truth-seeking function.  It must stop—not only to avoid wasting time and resources—but also so that the police officers, and the families of the police officers, who have been damaged by this wrongful behavior, can get on with their lives and no longer have this litigation hanging over their heads.  All four factors weigh in favor of dismissal.

### A. This Court should dismiss the Complaint because Sailor acted with willfulness, bad faith, and is at fault.  The totality of the circumstances establishes the existence of all three.

A plaintiff acts with willfulness, bad faith, or fault when his conduct "displays an intent to thwart judicial proceedings*." Farrar*, 2023 WL 3151093, at *1 (citing *Wu v. T.W. Wang, Inc*., 420 F.3d 641, 643 (6th Cir. 2005)) (cleaned up). Because Sailor lied under oath, used a knowingly false affidavit, influenced witnesses, and conspired with the media to impact court proceedings, he acted with willfulness, bad faith, or fault.

#### 1. *Sailor lied under oath about what he knew and when.*

This Court should dismiss the Complaint because Sailor provided perjured testimony here and in other cases. As one district court recently explained, "Numerous cases support the Court's authority to dismiss a case for perjury or fabricating evidence." *Vaughan v. Brigham*, No. CIV.A. 3:10-05-DCR, 2011 WL 2633369, at *4 (E.D. Ky. July 5, 2011) (collecting cases). This includes when a plaintiff provides "false and intentionally manufactured" deposition testimony. *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 503 (N.D. Ohio 2013) (dismissal as a sanction); *see also Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 78 (5th Cir. 2011) ("Through his perjured testimony, Brown committed fraud upon the court, and this blatant misconduct constitutes contumacious conduct.").

14

Sailor knew what happened right after the shooting: Hubbard pulled the trigger and Sizemore was with him. Hubbard confessed, "I just shot him," and explained how "Will [Sizemore] knew" the victim. But Sailor lied under oath in this litigation when asked whether Hubbard confessed:

> Q:     Did he tell you that he did shoot Omar Clark?
>
> A:     No.

Ex. A, Dep. Of Sailor, *Id.* at 121. This is no small lie—it is contrary to his entire *Brady* claim. He testified that he did not know Sizemore was there. This too was a lie.

Because Sailor lied during his deposition, and did so about key facts in the case, this Court should dismiss the Complaint with prejudice.

### 2.   *Sailor used the false Hubbard affidavit to support his claims.*

Of course, Sailor did more than lie under oath. He also knowingly used a false affidavit to thwart the judicial process. Courts have found that using false testimony is a separate act of willful misconduct. *Mathews v. Moss*, No. 09-22117-CV, 2011 WL 13134350, at *3 (S.D. Fla. Sept. 13, 2011), *aff'd*, 506 F. App'x 981 (11th Cir. 2013). In *Mathews*, for example, the court found that the plaintiff's use of affidavits he knew to be false was an independent "fraud on the Court." *Id.*; *see also Green v. Mayor & City Council of Baltimore*, 198 F.R.D. 645, 646 (D. Md. 2001) (dismissing case because "The affidavits—and the integrity thereof—were both material and critical to an important part of the Court's process of adjudication.").

Here, Sailor engaged in the separate fraud of using a knowingly false affidavit of Hubbard to support his claims. Sailor knew that Hubbard shot the victim the night of the murder—Hubbard confessed to him. Ex. R, D2 C618 at 3:40. Yet Hubbard's affidavit says that he told Sailor only after the criminal trial.  Ex. I, Hubbard Affidavit at 3.  This was not true, and Sailor knew it.  He then used this affidavit in this litigation, including using it to support his Complaint against the

15

Defendants. Compl., ¶¶ 120–126, ECF 43, PageID#453. Therefore, he engaged in a separate, additional fraud against this Court, and his claims should be dismissed.

### 3. *Sailor and his wife attempted to pay witnesses for testimony.*

Sailor conducted a third fraud: attempting to pay witnesses for testimony. As one court explained, "[W]itness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 782 (7th Cir. 2016). Any attempt to bolster a case by "offering payment to a witness to support [the plaintiff's] allegations" is fraud, and requires dismissal. *Id.*; *see also Young v. Off. of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 67 (D.D.C. 2003) (dismissal for "tampering with the witnesses and seeking false testimony"); *Hernandez v. Franco Am. Baking Co.*, No. 320CV00628LRHWGC, 2021 WL 6498256, at *3 (D. Nev. Sept. 3, 2021) (Cobb, M.J.) ("[O]ffering to pay a witness for his testimony (even if the testimony is true) constitutes bad faith or is tantamount to bad faith and is sanctionable conduct.").

Here, Sailor and his wife offered to pay multiple witnesses, willfully committing fraud on judicial proceedings.  Sailor's efforts directly impacted this litigation.   Not only did he offer to pay Larry Braxton to recant his testimony,[3] Amy Sailor had multiple calls with Braxton before and after his deposition *in the civil action*, where Braxton refused to provide substantive testimony. This constitutes litigation misconduct and provides independent grounds for dismissal.

### 4. *Sailor conspired to impact court proceedings through media falsehoods.*

Finally, Sailor committed fraud by using false statements in the media to impact the judicial process.  Ex. R, [D2 C618](#) at 3:40; [D3 C118](#) at 15:15.

---

[3] Braxton is a key fact witness whose testimony at the original trial underlies Sailor's Fourth Amendment/Unduly Suggestive Identification Procedures claim.  Compl., ¶¶ 62-67, ECF 43, PageID#447. Without his testimony, the City Defendants cannot adequately defend the case.

**B. This Court should dismiss the Complaint because Sailor's lies harmed the Defendants.**

The Sixth Circuit has found prejudice where a defendant "'wasted time, money, and effort" defending a case. *D & R Servs., LLC v. Mesa Underwriters Specialty Ins. Co.*, No. 23-5651, 2024 WL 2830660, at *5 (6th Cir. June 4, 2024) (citations and quotations omitted). The Sixth Circuit has upheld dismissals for comparatively small things like discovery abuses. *See, e.g.*, *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 368 (6th Cir. 1997). When a plaintiff offers "fraudulent evidence," the prejudice is "plain." *Farrar v. Lapan*, No. 22-1908, 2023 WL 3151093, at *2 (6th Cir. Apr. 28, 2023).

Here, the prejudice against the Defendants is plain, so this Court should dismiss the Complaint. This case was first initiated in 2020. Since that time, the Defendants have spent thousands of hours—and have paid outside counsel and staff hundreds of thousands of dollars in legal fees—defending Sailor's claims. These claims were a sham: from the start, Sailor knew that Hubbard and Sizemore were responsible for the murder.  Compl., ¶¶ 32-113,  ECF No. 43, PageID#442-52.  He had ample opportunity to come forward with the truth.  Instead, he covered for his best friend, lied to obtain his release, obtained compensation from the State of Ohio, and filed a fraudulent lawsuit in hopes of a windfall.  Significant municipal and judicial resources have now been lost, and the Court should dismiss the case to limit the damage.

**C. This Court should dismiss the Complaint because Sailor had notice that dismissal was an appropriate remedy.**

Because Sailor was on notice that dismissal was available, this Court should dismiss the Complaint. The Federal Rules of Civil Procedure provide for sanctions, including dismissal, as remedy lying under oath or otherwise thwarting the judicial process.  Therefore, as the Sixth Circuit recently explained, "no explicit warning of dismissal is necessary." *Farrar v. Lapan*, No.

17

22-1908, 2023 WL 3151093, at *2 (6th Cir. Apr. 28, 2023) (quoting *Universal Health Grp. v. Allstate Ins. Co.*, 703 F.3d 953, 956 (6th Cir. 2013)).

Here, this Court should dismiss the Complaint because Sailor was on notice that lying under oath and tampering with witnesses could result in dismissal. The rules of civil procedure, including Rule 11, make this clear. Moreover, Sailor knew what he was doing was wrong.  In prison calls, he and Amy discussed how his efforts to bribe witnesses and procure favorable testimony could jeopardize his case.  *See, e.g.,* ECF 81-1, PageID#1045-47; Ex. R, D1 C118 at 5:36.  Finally, Sailor's lies were not incidental or sporadic.  He repeatedly lied at his deposition about one of the central issues in this case: his knowledge of William Sizemore.  Such consistency proves an intent to defraud the Court.

**D. This Court should dismiss the Complaint because no other sanctions sufficently protect the public interest.**

Because no other sanction will protect the judicial process, this Court should dismiss the Complaint with prejudice. This last factor asks whether the "district court considered or imposed less drastic sanctions ahead of dismissal with prejudice." *D & R Servs., LLC v. Mesa Underwriters Specialty Ins. Co.*, No. 23-5651, 2024 WL 2830660, at *6 (6th Cir. June 4, 2024). Lesser sanctions must only be considered, not accepted. That is because the Sixth Circuit has "never held that a district court is without power to dismiss a complaint as the first and only sanction." *Id.* (quoting *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 367 (6th Cir. 1997)) (brackets omitted).

Sailor is serial perjurer. He has lied so thoroughly, and for so long—under oath, in front of this Court and others—that it is impossible to disentangle his lies from the case.  For this reason, this Court should reject any lesser sanction and dismiss the Complaint.

**E. This Court would be in good company dismissing the Complaint.**

This Court should dismiss the Complaint because other courts have taken the same action in response to recorded jail calls that reveal the truth in alleged wrongful incarceration cases. *See, e.g.*, *McClafferty v. Portage Cnty., Ohio Bd. of Commissioners*, No. 21-3335, 2021 WL 5755631, at *5 (6th Cir. Dec. 3, 2021) (dismissal sanction warranted where jail call recordings captured bragging about his personal wealth while claiming to be indigent); *Johnson v. Baltimore Police Dep't*, No. CV ELH-19-0698, 2022 WL 9976525, at *39 (D. Md. Oct. 14, 2022), *aff'd in part, appeal dismissed in part*, No. 22-2095, 2024 WL 1209744 (4th Cir. Mar. 21, 2024) (dismissing case as a sanction where jail calls proved that the plaintiff had bribed and tampered with witnesses); *see also Hughes v. Anderson*, 829 F. App'x 724, 725 (7th Cir. 2020) (using jail calls to dismiss as a sanction).

Therefore, this Court is in good company dismissing the Complaint.

**CONCLUSION**

Because Sailor lied under oath and engaged in other misconduct, this Court should dismiss the Complaint.

<div style="margin-left:40%">

Respectfully submitted,

MARK D. GRIFFIN (0064141)
Director of Law

By: *s/ Dylan F. Ford*
Elena N. Boop (0072907)
Chief Trial Counsel
William M. Menzalora (0061136)
Chief Assistant Director of Law
Matthew R. Aumann (0093612)
Dylan F. Ford (0101464)
Assistant Directors of Law
City of Cleveland, Department of Law
601 Lakeside Avenue E., Room 106
Cleveland, Ohio  44114
Tel: (216) 664-2675
wmenzalora@clevelandohio.gov

</div>

19

maumann@clevelandohio.gov
dford5@clevelandohio.gov

***Attorneys for Defendant City of Cleveland***

Kenneth A. Calderone (0046860)
John D. Latchney (0046539)
Hanna, Campbell & Powell
3737 Embassy Parkway, Suite 100
Akron, Ohio 44333
Tel: (330) 670-7602/(330) 670-7324
Email: kcalderone@hcplaw.net
Email: jlatchney@hcplaw.net

***Attorneys for Defendants Eugene Jones, Henry Ververka, James Metzler, Harry Matlock, Andrew Desatnik, Sahir Hasan, Rick Farinacci, and Estate of James Purcell***

## CERTIFICATION OF TRACK ASSIGNMENT AND COMPLIANCE WITH PAGE LIMITATIONS

This case is on a standard track and the above Memorandum complies with the page limitations set forth in Loc. R. 7.1(f).

s/Dylan Ford
DYLAN F. FORD

20