Deposition of Ru-El Sailor, Jr.                          Ru-El Sailor, vs. City of Cleveland, et al.,

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF OHIO
3  EASTERN DIVISION

7  RU-EL SAILOR,          )
8                         )
9       Plaintiff,        )
10                        )   JUDGE CHRISTOPHER A. BOYKO
11  -vs-                  )   CASE NO. 1:20-CV-00660
12                        )
13  CITY OF CLEVELAND, et al.,)
14                        )
15      Defendants.   )
16                        )
17              - - - -
18     Videotaped deposition of Ru-El Sailor, taken as if
19  upon examination before Denise L. Kautzman, a Notary
20  Public within and for the State of Ohio, at the offices
21  of Friedman, Gilbert + Gerhardstein, 50 Public Square,
22  Suite 1900, Cleveland, Ohio, at 9:11 a.m., on Tuesday,
23  August 10, 2021, pursuant to notice and/or stipulations
24  of counsel.
25              - - - -

Page 2

1  APPEARANCES:
2        On behalf of the Plaintiff:
3  SARAH GELSOMINO, ESQ.
4  Friedman, Gilbert + Gerhardstein
5  50 Public Square, Suite 1900
6  Cleveland Ohio 44113
7  216-241-1430
8  Sara@fggfirm.com

10        On behalf of the Defendant Police Officers:
11  KENNETH A. CALDERONE, ESQ.
12  Hanna, Campbell & Powell, LLP
13  3737 Embassy Parkway, Suite 100
14  Akron, Ohio 44333
15  330-670-7324
16  Kcalderone@hcplaw.net
17        On behalf of the Defendant The City of
18  Cleveland:
19  TIMOTHY J. PUIN, ESQ.
20  The City of Cleveland
21  Department of Law
22  601 Lakeside Avenue, Room 106
23  Cleveland, Ohio 44114
24  216-644-2807
25  Tpuin@city.cleveland.oh.us

Page 3

1  APPEARANCE CONT'D:

4  ALSO PRESENT:

6  A. David Tackla, Videographer
                - - -

Page 4

1              INDEX
2              - - -
3  EXAMINATION OF RU-EL SAILOR:
4  BY MR. CALDERONE.........................6, 207
5  BY MR. PUIN..............................152, 210

7  DEFENDANT'S EXHIBITS:
8  A    Notice of Alibi....................106
9  B    Photos.............................88
10  C    (was not presented)
11  D    Notice of Alibi and Amended Notice
12       Of Alibi..........................110
13  E    Proposed and Amended Witness list...115
14  F    Affidavit of Clark Williams.........208
15  G    Affidavit of William Sizemore.......209
16  H    Polygraph test of Ru-El Sailor......209
17  I    Polygraph test of Cordell Hubbard...210
18              - - -

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed:  07/25/24  2 of 72.  PageID #: 1351

Deposition of Ru-El Sailor, Jr.                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 5

1        P-R-O-C-E-E-D-I-N-G-S

2           - - -

3        THE VIDEOGRAPHER:  We are on the record.

4 Today's date is August 10th, 2021.  The time is now

5 11 -- excuse me, 9:11:58.  This is the beginning of

6 media 1, in the case of Ru-El Sailor, plaintiff, versus

7 the City of Cleveland, et al., defendants.  It is being

8 held in the U.S. District Court, Northern District of

9 Ohio, Eastern Division.  Case No. 1:20-CV-00660.

10        My name is Dave Tackla.  I'm the

11 videographer with the firm Tackla Court Reporting.  Our

12 court reporter is Denise Kautzman, also with the firm

13 Tackla Court Reporting.

14        Can you please introduce yourselves and who

15 you represent.

16        MS. GELSOMINO:  Sarah Gelsomino, on behalf

17 of the plaintiff, Ru-El Sailor.

18        MR. CALDERONE:  Ken Calderone, representing

19 the police officer defendants.

20        MR. PUIN:  Timothy Puin, Assistant Director

21 of Law, City of Cleveland.

22        THE VIDEOGRAPHER:  Sir, will you please

23 raise your right hand to be sworn in by our court

24 reporter.

25        Ru-El Sailor, of lawful age, being first duly

Page 6

1 sworn, testified upon his oath as follows:

2        EXAMINATION OF RU-EL SAILOR

3 BY MR. CALDERONE:

4    **Q.  Mr. Sailor, would you please state your full name**

5 **for the court reporter?**

6    A.  Ru-El James Sailor, Jr.

7    **Q.  And how would you like me to address you today,**

8 **Mr. Sailor, Ru-el, or how would you prefer?**

9    A.  Mr. Sailor, either one.

10    **Q.  Okay.**

11    A.  Either one is good with me.

12    **Q.  Mr. Sailor, could you tell me what your current**

13 **address is?**

14    A.  829 East 150th or 384 East 211th.

15    **Q.  Those are both in the City of Cleveland?**

16    A.  One is in Euclid.  One is in Cleveland.

17    **Q.  Which is which?**

18    A.  East 150th is in Cleveland and 384 is in Euclid.

19    **Q.  These two addresses, do other people live there?**

20    A.  Yes.

21    **Q.  Who else lives at the 829 East 150th Street**

22 **address?**

23    A.  My mom and my daughter.

24    **Q.  All right.  And your mother's name is?**

25    A.  Bernatte Brown.

Page 7

1    **Q.  And your daughter's name?**

2    A.  El-Laja.

3    **Q.  Can you spell --**

4    A.  E-L, hyphen, L-A-J-A, Sailor.

5    **Q.  And how old is El-Laja?**

6    A.  Twenty.

7    **Q.  I'm sorry?**

8    A.  Twenty.

9    **Q.  Twenty?**

10    **The address at East 29 -- East 150th Street, is**

11 **that a house?**

12    A.  Yes.

13    **Q.  Is that owned by your mother?**

14    A.  Yes.

15    **Q.  The other address at 384 East 211th Street, who**

16 **lives there with you?**

17    A.  My wife, our three daughters.

18    **Q.  And what is your wife's name?**

19    A.  Amy Sailor.

20    **Q.  How long have you been married?**

21    A.  Three -- two years.  Get me in trouble.

22    **Q.  It only gets harder.**

23    **You said you have daughters, as well?**

24    A.  Yes.

25    **Q.  And who are your daughters, their names?**

Page 8

1    A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮.

17 ▮▮▮▮▮▮.

18

19

20

21    **Q.  I know that you have testified before at least in**

22 **a trial.**

23    **Have you ever testified before at a deposition**

24 **like this?**

25    A.  No.

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 9

1   Q.  I'm going to ask you questions about your
2   background, about your life now and your life back in
3   2002 and about this lawsuit.  You'll have to respond
4   verbally as you are doing so that the court reporter can
5   take down everything that you and I say.
6        Do you understand that?
7   A.  Yes.
8   Q.  I caution you not to guess at questions.  If you
9   don't know the answer to a question, you can tell me you
10  don't recall or you don't know.  Those are perfectly
11  acceptable answers.
12       Do you understand that?
13  A.  Yes.
14  Q.  I may even be able to help refresh your memory by
15  showing you something.
16       But if you guess at an answer, would you please
17  tell me that you are giving me a guess and you are not
18  certain?
19  A.  Yes.
20  Q.  The last thing I'll caution you about is you have
21  to wait until I'm done asking the question before you
22  answer because the court reporter can only take down one
23  person speaking at a time.
24       Fair enough?
25  A.  Yes.

Page 10

1   Q.  Okay.  El-Laja, am I pronouncing that right?
2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4   ▮▮▮▮▮▮▮▮▮▮▮▮
5   ▮▮▮▮▮▮▮▮▮▮▮▮▮
6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7   A.  Letishea Hammond.
8   Q.  And Amy Sailor, your wife, what is her maiden
9   name?
10  A.  Amy Gangloff.
11  Q.  How do you spell that?
12  A.  G-A-N-G-L-O-F-F.
13  Q.  Do you split time between your mother's house and
14  Amy's house?
15  A.  Yeah.  Mainly at home though.
16  Q.  Mainly at home?
17  A.  Yes.
18  Q.  "Home" meaning your mom's house?
19  A.  No.  Amy's house.
20  Q.  Amy's house?
21  A.  Yeah.
22  Q.  Okay.  Is there any particular reason -- or is
23  there any particular reason that you split the time
24  between the two?
25  A.  I did 15 years, you know what I'm saying, away

Page 11

1   from my mother.  So I go over there and chill sometimes
2   and hang around and spend time with her.
3   Q.  Okay.  Give me your date of birth real quick.
4   A.  ▮▮▮▮▮▮▮▮▮▮▮
5   Q.  Give me the last four of your social security
6   number.
7   A.  4482.
8   Q.  You told me your mother's name is Bernatte?
9   A.  Yes.  B-E-R-N-A-T-T-E.
10  Q.  How about your father's name?
11  A.  Ru-El Sailor, Sr.
12  Q.  Is he still alive?
13  A.  Yes.
14  Q.  Where does he live at?
15  A.  I don't know his address.
16  Q.  Is it in Ohio?
17  A.  Yes.  It's in Cleveland.
18  Q.  How often do you see your father?
19  A.  Probably twice a week.
20  Q.  And do you typically go visit him at his house or
21  do you go someplace with him?
22  A.  He'll probably come to my store or, like, family
23  functions.
24  Q.  Do you have any brothers or sisters?
25  A.  Yes.

Page 12

1   Q.  Tell me the names of your brothers and sisters.
2   A.  Sharell Sailor, S-H-A-R-E-L-L; Darell Sailor,
3   D-A-R-E-L-L.
4        My father got two kids.  Do you count those, too?
5   Q.  Yes.
6   A.  Druell Sailor, D-R-U-E-L-L.  And Casandriell, I
7   don't know how to spell her name, Sailor.
8   Q.  How old is Sharell Sailor?
9   A.  Thirty-five.  35.
10  Q.  I won't hold you to exact --
11  A.  Yeah.  I'm terrible with birthdays and ages.
12  Q.  And is Sharell's mother and father Bernatte and
13  Ru-El, Sr.?
14  A.  Yes.
15  Q.  Darell Sailor, how old is he?
16  A.  Thirty-four.
17  Q.  And Darell's parents are Bernatte and Ru-El
18  Sailor, Sr.?
19  A.  Yes.
20  Q.  Druell Sailor --
21  A.  Yes.
22  Q.  -- how old is he?
23  A.  Oh, Druell Sailor, you mean?
24  Q.  Druell, yes.
25  A.  Druell would be like 30.

Deposition of Ru-El Sailor, Jr.

Ru-El Sailor, vs. City of Cleveland, et al.,

Page 13

1  Q. And is Bernatte Druell's mother?
2  A. No.
3  Q. Do you know who his mother is?
4  A. A lady by the name of Rhonda. I don't know the
5  full name.
6  Q. Okay. So Druell is the stepbrother then?
7  A. Yes.
8  Q. And then Cassandra[sic], how old is she?
9  A. Thirty-two.
10  Q. And Cassandra is a stepsister?
11  A. Yes.
12  Q. Do any of your siblings live with your father?
13  A. No.
14  Q. So they are all adults in their own place?
15  A. Yes.
16  Q. Do they all live in the City of Cleveland?
17  A. Yes.
18  Q. You told me that you got married a couple of
19  years ago to Amy.
20    Is that your first marriage?
21  A. Yes.
22  Q. Are you currently employed?
23  A. Self-employed, yes.
24  Q. And what is your business?
25  A. Comma Club, LLC.

Page 14

1  Q. I'm sorry, you're going to have to help me spell
2  that.
3  A. Oh. C-O-M-M-A, Club, LLC. It's a clothing line.
4  Q. It's a clothing line?
5  A. Yes.
6    MS. GELSOMINO: He's wearing it.
7  Q. Ah. And where is Comma Club located at?
8  A. East 185th. 589 East 185th.
9  Q. 589?
10  A. Yes.
11  Q. So is it like a store?
12  A. Yes.
13  Q. When did you start Comma Club?
14  A. 2018.
15  Q. Are you the sole owner of Comma Club, or do you
16  have other co-owners?
17  A. No. I'm the sole.
18  Q. And what exactly does Comma Club do? I know it's
19  a store.
20    Do you make the clothing and design it yourself?
21  A. Yeah. Manufacture it myself and I outsource.
22  Q. And I see you are wearing a sharp-looking shirt
23  here today.
24    What types of clothes do you manufacture and
25  sell?

Page 15

1  A. T-shirts, hats, jogger sets, two-button polo like
2  I'm wearing today.
3  Q. Well, I know the economy has been sporadic the
4  last year and a half or two years.
5    How's your business been doing?
6  A. I was able -- to be honest, I was able to open my
7  store up during COVID, due to the fact that all the
8  malls had shut down. So I was able to open my store off
9  of that, because people couldn't go to the malls and I
10  was in the neighborhood. So it worked out for me.
11  Q. So it actually helped you a little bit?
12  A. Yeah. It's just slow as of lately. It's been a
13  lot slower.
14  Q. Since you were released from prison, have you had
15  any other employment other than starting your own
16  business?
17  A. No.
18  Q. Since being released from prison, have you
19  applied for any other jobs?
20  A. No.
21  Q. So it sounds like you knew what you wanted to do
22  once you got out --
23  A. Yes.
24  Q. -- and you were able to do it. Good for you.
25    Before your arrest back in 2002, back at that

Page 16

1  time, were you employed?
2  A. No.
3  Q. If you can remember, prior to your arrest back in
4  2002, when had you been last employed, if at all?
5  A. I wasn't employed on record. I worked for my
6  grandmother. She has her own daycare. So I worked for
7  her under the table.
8  Q. And what did you do for your grandmother?
9  A. Janitorial work, maintenance.
10  Q. I want to ask you about your educational history.
11    At the time of your arrest back in 2002, my
12  understanding is you had stopped attending high school;
13  is that true?
14  A. Yes.
15  Q. What was the last grade you had attended in high
16  school before dropping out of school?
17  A. Tenth grade.
18  Q. Tenth grade?
19    And where was that at?
20  A. Collinwood High School.
21  Q. I'm from Akron.
22    So what was that again?
23  A. Collinwood High School.
24  Q. Collinwood.
25  A. Yes. C-O-L-L-I-N-W-O-O-D.

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 17

Q. Back then, was there a particular reason that you dropped out of school?

A. No. I didn't drop out. I was expelled and I just never signed back up anywhere else.

Q. When you were in prison, were there any types of programs that allowed you to obtain a GED degree or complete your education?

A. Yes.

Q. And were you able to do that?

A. Yes.

Q. So did you obtain a GED?

A. My GED.

Q. Other than your GED, were there any other trade certifications or training that you received while you were in prison?

A. I was in carpentry, but I didn't get to get certified because I had rolled out before the ceremony. I did -- carpentry was the only trade I think I did. Carpentry.

Q. And is that a program that they had in prison, where they taught you carpentry skills?

A. Yes. Like I completed Toastmasters.

Q. What is that?

A. A speaking program. Teach you how to do public speaking.

Page 18

Q. Okay. Any other training or courses that you took when you were in prison?

A. No. Not that I can remember.

Q. Before your conviction and your arrest back in 2002, had you had -- had you made any career choices at that time, like what you wanted to do with your career?

A. Entrepreneur. Me and my best friends was -- we had opened up -- about to open up a record store. We had got our vendor's license and we had a location.

Q. Who was the best friend you were referring to?

A. Cordell Hubbard.

THE COURT REPORTER: What was the name?

THE WITNESS: Cordell Hubbard.

THE COURT REPORTER: Thank you.

Q. So back at that time, you and Cordell had obtained a vendor's license?

A. Yes.

Q. And was that from the City of Cleveland?

A. Yes.

Q. Do you recall whose name the vendor's license was in?

A. Me and his, both.

Q. Both of you individually?

A. Yes.

Q. You didn't have a fictitious name or a business

Page 19

name that --

A. Oh, C and El's Music.

Q. Is that --

A. Just the letter C and "and", and then E-L, C and El's Music.

Q. What did you and Cordell plan on doing with your business back then?

A. Sell CDs, tapes, music for cars, accessories.

Q. Other than having the vendor's license, had you and Cordell obtained any other assets or any other things that you needed to start your business?

A. No. We didn't get a chance.

Q. Okay. You didn't rent a business location?

A. Oh, yes. We had a location, yes. Sorry about that. We had a location.

Q. What was the location?

A. East 116th, Martin Luther King Jr. Drive. I'm not sure of the number of the address.

Q. And did you and he sign a lease at that location or you just located the spot?

A. No. His father owned a whole entire building on a corner with multiple storefronts, so he rented one of the storefronts to me and Cordell.

Q. Cordell's father?

A. Yes.

Page 20

Q. What was his name?

A. Anthony Hubbard, if I ain't mistaken. He's deceased.

Q. Incidentally, how old is your father? It's another test question for you.

A. I think I'm going to take 59.

Q. Okay. And how old is your mother?

A. Sixty.

Q. What are your current sources of income?

A. Just Comma Club.

Q. I'm sorry?

A. Comma Club.

Q. Comma Club. This fan is running so you have to keep your voice up --

A. Oh, sorry.

Q. -- so I can hear you.

A. All right. Sorry. Comma Club.

Q. And you don't have to give me an exact number, but can you give me approximation of how much money Comma Club made last year?

A. Can I look?

Q. If there's something you would like to look at to refresh your memory, sure.

A. I'm not sure.

MS. GELSOMINO: It just has to be an

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

---

Page 21

1  approximation. Nobody's going to hold you to a specific
2  number.
3      A. I think it was like 50,000.
4      Q. Okay. Is that the gross total sum of money you
5  think you've earned?
6      A. Yes.
7      Q. And once you paid all your expenses and utilities
8  or whatever else you had to pay, what was the net profit
9  that the business made?
10     A. Like, probably somewhere around -- after I paid
11 and everything for the year?
12     Q. Yes.
13     A. It would probably come out to probably like 25,
14 27.
15     Q. After you were released, did you make any
16 applications in the State of Ohio to be compensated for
17 your time in prison?
18     A. Yes. Did I? I'm not sure.
19     Q. If you know.
20     A. (Indicating.)
21     Q. Did you receive any money from the State of Ohio?
22     A. No.
23     Q. Since being released from prison, have you joined
24 any social clubs or any organizations?
25     A. No.

Page 22

1      Q. Prior to your conviction, were you a member of
2  any social clubs or organizations?
3      A. No.
4      Q. Prior to your conviction, were you a member of
5  any gangs?
6      A. No.
7      Q. Prior to your conviction, who were your primary
8  friends that you hung around with and went out with or
9  socialized with?
10     A. Cordell Hubbard, Anthony McKenzie, Bobby Nettles,
11 Samuel Brown.
12     Q. Is Samuel Brown related to you?
13     A. No.
14     Q. Do you currently have a cellphone?
15     A. Yes.
16     Q. What is your current cellphone number?
17     A. 216-659-6825.
18     Q. And who is the cellphone provider?
19     A. Sprint.
20     Q. Is the cellphone account in your name?
21     A. No.
22     Q. Whose name is it in?
23     A. My sister's, Sharell Sailor. I mean, Sharell
24 Robinson. She's married.
25     Q. If you can recall, back when you were first

Page 23

1  arrested, did you have a cellphone at that time?
2      A. Yes.
3      Q. Do you remember what the cellphone number was?
4      A. No. It's -- no.
5      Q. Do you recall who the cellphone provider was?
6      A. I think it was Alltel.
7      Q. And whose name was on the account?
8      A. Mine. Mine or my kid's mother. I'm pretty sure.
9      Q. And your kid's mother's name?
10     A. Letishea.
11     Q. I'm sorry?
12     A. Letishea Hammond.
13     Q. Letishea.
14         While in prison, were you given access to any
15 computers or social media?
16     A. No.
17     Q. Since being released, have you become a member or
18 participated in any types of social media, like Facebook
19 or others?
20     A. Yes.
21     Q. What social media have you participated in?
22     A. Facebook and Instagram.
23     Q. Since being released, have you been able to take
24 any vacations or go anywhere, take any trips?
25     A. Yes.

Page 24

1      Q. What -- where have you went?
2      A. Mississippi, Atlanta, Florida, Washington D.C.,
3  Chicago.
4      Q. Your trip to Mississippi, were you simply there
5  as a tourist, or do you have family or friends you
6  visited there?
7      A. Family.
8      Q. And your trip to Atlanta, was that purely for
9  tourism, or do you have friends or family there?
10     A. It was an Ohio Innocence Project Convention.
11     Q. And did you attend the convention or did you
12 speak there?
13     A. I attended.
14     Q. Your trip to Florida, was that purely for tourism
15 or did you have family or friends there?
16     A. Tourism.
17     Q. Did you go to Disney World?
18     A. No. I went to Universal Studios. Disney World
19 was what we booked.
20     Q. Your trip to Washington D.C., was that purely
21 tourism or do you have family and friends there?
22     A. Tourism.
23     Q. And your trip to Chicago, was that tourism or do
24 you have family or friends there?
25     A. Tourism.

---

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 25

Q. Ru-El, you're a pretty big-built guy.

Approximately, what is your height and your weight?

A. Five-ten, 220.

Q. You look like you work out.

Do you work out?

A. Yeah. Sometimes.

Q. If you recall back in 2002 at the time of your arrest, do you know what your height and weight was then?

A. Probably, like, five-nine, like, 160.

Q. I want to ask you about different people that I have seen in a lot of different documents. You may or may not know them, but I wanted to ask you about them.

First of all, do you know Tamika McMann[spelling]?

A. Tamika McMann?

Q. Uh-huh.

A. No. Takima[spelling]?

Q. Maybe that's it. Takima? I think it was Cordell's ex-girlfriend --

A. -- kids' mother.

Q. Okay. You've got to let me finish.

A. Oh, sorry.

Q. Is it Takima?

Page 26

A. Yes.

Q. And she was Cordell's ex-girlfriend?

A. Yes.

Q. And did you say she was the mother of a child of his?

A. His two sons.

Q. Do you know how to spell her first name? Is it T-A-K-I-M-A?

A. I'm not sure.

Q. Since being released, have you seen or spoken to Takima McMann?

A. Yes.

Q. Tell me about those occasions.

How many times have you seen her or spoken to her?

A. Like, two or three times.

Q. And where have you seen her at?

A. In the neighborhood.

Q. Does she live nearby?

A. I'm not sure where she lives.

Q. Where did you see her at? You said in the neighborhood. Is it somebody's house or...

A. No. Like, in our neighborhood, we be outside, outside on the street. East 141st is where everybody in the neighborhood meet up at. And I've seen her out

Page 27

there.

Q. She just happened to be walking by or...

A. Just out there with other family members and friends.

Q. And what have you spoken to Takima about since seeing her after your release?

A. Nothing. Just normal speak and how the boys are doing.

Q. Catching up on things?

A. Yeah.

Q. Would you describe your relationship with Takima as being friends with her?

A. Cordial.

Q. Back at the time of your arrest and before your arrest, what was your relationship with Takima at that time? Was it any different?

A. Cordial.

Q. Just friends? Or acquaintances or friends?

A. Acquaintances, yes.

Q. Did Takima communicate with you at all while you were in prison?

A. No.

Q. Now, you told me before that Cordell Hubbard is -- or at least was your best friend, correct?

A. Yes.

Page 28

Q. Do you still consider him your best friend today?

A. We talk.

Q. How often do you talk?

A. Like, three, four times a week.

Q. Is he still in jail?

A. Yes.

Q. How do you communicate with him, by phone or do you visit him?

A. By phone.

Q. Back when you were in prison, were you in the same location where he was?

A. Yes.

Q. And I'm not sure how it works when you are incarcerated.

Were you able to see him or speak to him while you were in prison?

MS. GELSOMINO: Objection on the timeframe.

Q. From any time, from 2002 through the time you were released, how frequently did you get to speak with him while you were in prison, in general?

A. Often. We was cellies at one point.

Q. Cellmates?

A. Yes.

Q. Let me ask you this, and maybe we can do it a

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  8 of 72.  PageID #: 1357

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 29

1  different way.

2      When you were initially convicted and you went to

3  prison, how many different locations did you end up

4  staying at during your entire incarceration?

5      A.  Six.

6      Q.  Do you remember what they were?

7      A.  Yes.

8      Q.  Please, what are they?

9      A.  Lorain, Mansfield, Lucasville, Toledo, Trumbull,

10  and OSP, Ohio State Penitentiary.

11      Q.  If you recall, approximately, how long were you

12  in Lorain?

13      A.  I can't recall.  It was some months.  I'm not

14  sure how many.

15      Q.  If you recall, how long were you in Mansfield?

16      A.  Seven years.

17      Q.  If you recall, how long were you in Lucasville?

18      A.  Well, I was there twice.  The first time was a

19  year.  And the second time was, like, two and a half.

20      Q.  If you recall, how long were you in Toledo?

21      A.  A year and a half.

22      Q.  If you recall, how long were you in

23  Trumbull County?

24      A.  Two and a half.

25      Q.  And if you recall, how long were you in OSP?

Page 30

1      A.  Like, a year and a half.

2      Q.  Now, of those places where you were incarcerated,

3  which locations was it or were it, were Cordell was also

4  present?

5      A.  Mansfield.

6      Q.  Only Mansfield?

7      A.  Yes.

8      Q.  And were you cellmates with Cordell in Mansfield?

9      A.  Yes.

10      Q.  Is Cordell still at Mansfield?

11      A.  No.

12      Q.  Where is he at now?

13      A.  Grafton.

14      Q.  Do you remember approximately what years it was

15  that you were in Mansfield?

16      A.  2003 until 2010.

17      Q.  Nichole Hubbard, Cordell's sister?

18      A.  Yes.

19      Q.  Was she a friend of yours back in 2002 when you

20  were arrested?

21      A.  No.

22      Q.  How would you describe your relationship with

23  her?

24      A.  Really didn't have one.  She was just Cordell's

25  sister.  She didn't live at the house with Cordell and

Page 31

1  them so I didn't see her that much.

2      Q.  Would it be fair to describe her just as an

3  acquaintance at that time?

4      A.  Yes.

5      Q.  Since being released, have you spoken to Nichole

6  Hubbard?

7      A.  No.

8      Q.  Is she --

9      A.  I JPay'ed her.  I sent her a JPay.  I haven't

10  spoke to her.

11      Q.  Forgive me.  When you say send her a JPay, what

12  does that mean?

13      A.  It's correspondence through electronically

14  through inmates and outside.

15      Q.  Okay.  Is she still incarcerated?

16      A.  Yes.

17      Q.  Clark Williams, I'm told Clark Lamar Williams,

18  also known as Dude?

19      Q.  Before -- back in 2002 when you were arrested,

20  what was your relationship with Clark Williams?

21      Q.  I didn't know him.

22      Q.  Back in 2002 at the time of your arrest, you have

23  not socialized or hung out with Clark Williams?

24      A.  No.  I didn't know him.

25

Page 32

1      Q.  While you were incarcerated, did you ever have

2  any direct communications with Clark Williams?

3      A.  No.

4      Q.  After your release, did you have communications

5  with Clark Williams?

6      A.  No.

7      Q.  I'm sorry?

8      A.  No.

9      Q.  My understanding is that Mr. Williams has passed

10  away.

11      From the time that you were released until him

12  passing away, did you have any communications with him?

13      A.  No.

14      Q.  Umar Clark, do you know Umar Clark?

15      A.  Yes.

16      Q.  How do you know Umar Clark?

17      A.  I know him as the victim's brother.

18      Q.  Back in 2002 when you were arrested, did you have

19  any type of relationship with Umar Clark?

20      A.  No.

21      Q.  While you were incarcerated, I think you received

22  some letters from him?

23      A.  Yes.

24      Q.  Other than the letters that you received from

25  him, did you ever speak to him while you were

Deposition of Ru-El Sailor, Jr.                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 33

1  incarcerated?

2  A. Yes.

3  Q. Tell me about those occasions.

4  A. I was incarcerated with his son. So his son had

5  put him on the phone with me before.

6  And then we was in OSP. He came to see his son

7  in a visit and I was on a visit as well.

8  Q. Okay. His son, what was his son's name that you

9  were incarcerated with?

10  A. Umar Clark, Jr.

11  Q. Do you know how to spell that?

12  A. U-M-A-R.

13  Q. Is that the same way you spell -- same name?

14  A. Yeah. He a junior, yes.

15  Q. So Umar Clark, Jr.

16  And where were you incarcerated with him at?

17  A. Trumbull.

18  Q. Approximately, what years were those?

19  A. 2013 to '16.

20  Q. And how many times do you think you spoke

21  directly with Umar Clark, Sr. before you were released

22  from prison?

23  A. Maybe, like, four times.

24  Q. The four times that you spoke with him, were they

25  all while you were at Trumbull County?

Page 34

1  A. No.

2  Q. Where else were you when you spoke to him?

3  A. Lucasville.

4  Q. And, approximately, what years were those?

5  A. In between '16 and '18, 2016 and 2018.

6  Q. Was Umar Clark Sr.'s son also at Lucasville?

7  A. No.

8  Q. You said something about OSP.

9  Did you visit or speak to Umar Clark while you

10  were at OSP?

11  A. Yes.

12  Q. Did he come visit you?

13  A. No. Came to visit his son. His son was at OSP

14  with me.

15  Q. So you were incarcerated with Umar Clark, Jr. in

16  Trumbull County?

17  A. And OSP.

18  Q. And OSP?

19  A. Yes.

20  Q. And what years do you think you were incarcerated

21  with him at OSP?

22  A. I'm going to say, like, '15 to '16.

23  Q. Again, I'm not going to hold you to specific

24  years.

25  So tell me, when you were in Trumbull County, you

Page 35

1  said you had the opportunity to speak directly with Umar

2  Clark, Sr.

3  What did you speak with him about?

4  A. Just -- it was more about the case itself. Like

5  him trying to help me get exonerated or get released.

6  Q. Well, at some point, Umar, Sr. became interested

7  or active to help get you released?

8  A. Yes.

9  Q. Do you know what caused that?

10  A. I wrote him a letter when I was in Lucasville,

11  like, 2010. I had found -- somebody had told me that he

12  was incarcerated somewhere else. And I just wrote him a

13  letter, like, just asking him -- because I knew he knew

14  the truth.

15  I just asked him if he could just come forward

16  and tell the truth.

17  Q. Okay. And did he respond to you in writing?

18  A. Yes.

19  Q. And said, yes, he would come forward and try to

20  help you?

21  A. Yes. And that he knew the truth since court --

22  since the trial.

23  Q. The first time you spoke directly with him, you

24  said -- you just spoke about the case itself.

25  Can you recall anything specific about what you

Page 36

1  discussed at that time?

2  A. It was more so about him just reassuring that he

3  was going to fight as hard as he could to help me prove

4  my innocence.

5  Q. Was it your understanding that William Sizemore

6  had informed Umar Clark, Sr. that he was the individual

7  that was with Cordell Hubbard on the night of the

8  shooting?

9  A. Yes.

10  Q. And the first time when you spoke with Umar

11  Clark, Sr., did the discussions center around the fact

12  that William Sizemore had informed him of that?

13  A. It was part of the conversation, I'm sure.

14  Q. Other than Umar Clark telling you that William

15  Sizemore did, in fact, tell him -- I'll say confess to

16  him, that he was with Cordell on the night of the

17  shooting, is there any other information you recall Umar

18  Clark providing you about the case or your conviction?

19  A. No.

20  Q. And based upon the dates that you have provided

21  me for your incarceration, the communications with Umar

22  Clark, Sr. and you started approximately around 2013,

23  2014?

24  A. Like, verbal communication? Face-to-face, like,

25  or on the phone?

Case: 1:20-cv-00660-DAR   Doc #: 88-2   Filed: 07/25/24   10 of 72.   PageID #: 1359

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 37

Q. I think verbal or writing.

A. Writing was in 2010.

Q. Okay. And the verbal communication started around 2013, 2014?

A. Yes.

Q. When Umar Clark started exchanging writings with you, did you provide his letters to your attorney?

A. Yes.

Q. And at that time, who was your attorney?

A. Kimberly Corral[phonetic].

Q. Kimberly who?

A. No. No. No. She wasn't. I apologize.

Paul Mancino was my lawyer at the time.

THE COURT REPORTER: What was the name?

THE WITNESS: Paul Mancino.

THE COURT REPORTER: Thank you.

Q. Now, was Mr. Mack your attorney during your trial?

A. Yes.

Q. Did he remain one of your attorneys through your appeal?

A. No.

Q. Did you end that attorney-client relationship at some point after the trial?

A. Yes.

Page 38

Q. And is that when you hired Mr. Mancino as your attorney?

A. Yes. I acquired Mr. Mancino after the verdict.

Q. And why did you no longer want Mr. Mack to represent you?

MS. GELSOMINO: Objection. Form.

A. He told me that --

MS. GELSOMINO: Oh, wait. Hold on. I don't want you to say anything that you talked about with your lawyer because that's protected.

So if you could answer the question without talking about what you guys talked about, then that's okay.

MR. CALDERONE: Yeah. Everything you've discuss with your attorneys is privileged. Well, most everything, anyways.

A. I just wanted a better appeal lawyer.

Q. But I can ask you what your reasons were for making your decisions.

A. Okay.

Q. But do not tell me anything that you discussed with your lawyers.

A. Okay.

Q. So what was your reason for terminating Mr. Mack and hiring Mr. Mancino?

Page 39

A. I wanted someone that specializes in appeals.

Q. After your conviction, were you satisfied with the performance of Mr. Mack as your trial attorney?

A. Yes.

Q. Now, I was asking you a moment ago about your discussions with Umar Clark, Sr. You told me about the first conversation you had with him. I want to ask you about the other verbal conversations you had with him.

What do you recall discussing during the other conversations with Umar Clark, Sr.?

A. It was always about just proving my innocence.

Q. And with regard to proving your innocence, was there any -- strike that.

Was there ever any other substance to Umar Clark, Sr.'s communications, other than the fact that William Sizemore had confessed to him that William Sizemore was with Cordell on the night of the shooting?

Do you understand the question?

A. No. Can you say it again?

Q. Okay. Yeah. I know, from reading things, that Umar Clark, Sr. informed you and informed others that William Sizemore had come to him at some point and informed him that William Sizemore was with Cordell that night. I know that fact.

What I'm asking you is, during your discussions

Page 40

with Umar Clark, Sr., did he ever share any other information that could help you get released, other than what he knew about William Sizemore?

A. No. Not that I can recollect.

Q. Okay. For example, Umar Clark, Sr. never told you, "Hey, I found a new alibi witness that can help you" or anything like that?

A. No.

Q. Okay. After your release from prison, did you meet with or have any conversations with Umar Clark, Sr.?

A. Yes. I saw him once when I was -- I mean, as soon as I got released, I saw him.

Q. Where was that at?

A. My mother's house.

Q. And tell me about that conversation.

A. He just -- he had pulled up and congratulated me on my release. And I told him thank you for what he did, you know what I'm saying, for telling the truth. And that was pretty much it.

Q. Do you know if Umar Clark, Jr. is still incarcerated?

A. Yes.

Q. Do you know where he's incarcerated at?

A. Mansfield.

Case: 1:20-cv-00660-DAR Doc #: 88-2 Filed: 07/25/24 11 of 72. PageID #: 1360

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 41

1  Q. And have you spoken with him since you've been
2  released?
3  A. Yes.
4  Q. How frequently do you speak to Umar, Jr. -- Umar,
5  Umar Jr.?
6  A. Probably once or twice a month.
7  Q. What's he in prison for?
8      MS. GELSOMINO: If you know.
9      MR. CALDERONE: If you know.
10 A. Something like a kidnapping or something to that
11 extent, murder.
12 Q. Did you know Omar Clark?
13 A. No.
14 Q. To your knowledge, you had never met or spoken to
15 Omar Clark before his death?
16 A. No.
17 Q. Do you know Lonnell Brooks?
18 A. No.
19 Q. And to your knowledge, you've never spoken to
20 Lonnell Brooks?
21 A. No.
22 Q. William Sizemore, back before you were arrested,
23 what was your relationship with William Sizemore?
24 A. He was Cordell's friend more so. He was an
25 acquaintance -- an acquaintance to me, but Cordell's

Page 42

1  friend.
2  Q. I'm presuming there were times that you may have
3  socialized with Cordell, and William Sizemore was also
4  present?
5  A. Yes.
6  Q. Other than socializing with William Sizemore when
7  Cordell was present, did you ever socialize with
8  Mr. Sizemore separately, when Cordell was not present?
9  A. No.
10 Q. How frequently, if you recall, did you socialize
11 with Cordell and William Sizemore back before your
12 arrest?
13 A. I can't recall.
14 Q. While you were incarcerated, did you have any
15 communications, either in written or direct verbal
16 communications with William Sizemore?
17 A. No.
18 Q. After your release, did you have any
19 communications with William Sizemore?
20 A. Once.
21 Q. When was that?
22 A. I don't know the exact time. I was out for a
23 couple of months, but I had went to a restaurant and he
24 was there.
25 Q. And did the two of you speak?

Page 43

1  A. Yes.
2  Q. Tell me about the conversation. What was said?
3  A. He apologized. And told me that he was glad I
4  was out and that he kept apologizing that it took so
5  long for him to come get me out.
6  Q. So he apologized for not coming forward earlier?
7  A. Yes.
8  Q. But I'm guessing you thanked him for finally
9  coming forward?
10 A. Yes.
11 Q. And any other communications with William
12 Sizemore, other than that one time?
13 A. No.
14 Q. Do you know Larry Braxton?
15 A. Yes.
16 Q. How do you know Larry Braxton?
17 A. He was the witness on my case.
18 Q. At the time when you were arrested, did you know
19 Larry Braxton?
20 A. No.
21 Q. Did you ever communicate with Larry Braxton while
22 you were in prison?
23 A. No.
24 Q. To your knowledge, did anyone on your behalf
25 communicate with Larry Braxton while you were in prison?

Page 44

1  A. Yes.
2  Q. Who spoke with him on your behalf?
3  A. My wife.
4  Q. And tell me what you know about your wife
5  speaking to Larry Braxton.
6  A. She basically just asked him, could he come
7  forward and, like, just tell the truth. And she
8  explained to him that William Sizemore had come forward
9  and Clark Williams had came forward, and could he just
10 come forward also as well and tell the truth.
11 Q. And what is your understanding of Braxton's
12 response?
13 A. He didn't want to tell the truth. He didn't want
14 to be involved, period.
15 Q. So Mr. Braxton did not assist you in any way for
16 getting -- in order to get released?
17 A. No.
18 Q. Since being released, have you spoken to
19 Mr. Braxton?
20 A. Yes.
21 Q. How many times?
22 A. Twice.
23 Q. Tell me about those occasions.
24     Where was the first time you spoke to him?
25 A. The first time I spoke to him, he approached me

---

Page 45

1  at Walmart.  And I didn't know who he was, but he knew
2  who I was.  And he apologized for his role that he
3  played in my conviction.  And we exchanged numbers.  And
4  then we spoke again on the phone.
5      Q.  Why was it that you asked his phone number?
6      A.  Because I wanted him -- I was asking him, could
7  he -- even though I was free, I was like, "Man, could
8  you still come forward and just tell the truth, you know
9  what I'm saying, you don't want to get that off your
10 conscience?"  You know what I'm saying?
11     We exchanged numbers and talked on the phone
12 about it and that was it.
13     Q.  So the second time you communicated with him was
14 on the phone?
15     A.  Yes.
16     Q.  You called him?
17     A.  Yes.
18     Q.  And you were trying to convince Mr. Braxton to
19 recant his prior testimony?
20         MS. GELSOMINO:  Objection to the form.
21         You can answer.
22     Q.  Do you understand what I'm asking?
23     A.  Yeah.  I just wanted him to tell the truth for
24 real.  That's it.
25     Q.  And when you say "tell the truth," you know he

---

Page 46

1  testified and identified you as an individual who was
2  with Cordell at the time of the shooting --
3      A.  Yes.
4      Q.  -- correct?
5      A.  Correct.
6      Q.  And when you spoke with him after your release
7  and you indicating you wanted him to tell the truth, you
8  wanted him to come forward and recant his prior
9  testimony?
10     A.  Yes.
11     Q.  When you spoke with him the second time, though,
12 he still would not agree to do that?
13     A.  No.  He just basically was like, he would get
14 around to it.  I said okay.
15     That was the end of it.
16     Q.  To your knowledge, as you sit here today, has
17 Mr. Braxton ever, as you say, told the truth or recanted
18 his prior testimony?
19     A.  Not to my knowledge.
20     Q.  Do you have his phone number still?
21     A.  No -- yes.  I think it's in my other phone,
22 though.  Yeah.
23     Q.  All right.  Can you provide that number to your
24 attorney?
25     A.  Yes.

---

Page 47

1      Q.  Other than your wife speaking to Larry Braxton,
2  are you aware of anyone else speaking to Larry Braxton
3  about this case or his role in the case?
4      A.  Private investigators.
5      Q.  What investigators are you aware of that spoke to
6  Larry Braxton?
7      A.  Tom Pavlish.
8      Q.  Tom Pavlish?
9      A.  Pavlish, P-A-V-L-I-S-H.
10     Q.  Okay.  And who else?
11     A.  That's it.
12     Q.  And do you know who Mr. Pavlish was working for
13 when he tried to speak to Larry Braxton?
14     A.  Me.
15     Q.  Did your attorneys hire him?
16     A.  Yes.
17     Q.  To your knowledge, have you or your attorneys
18 acquired any type of written statement from Mr. Braxton
19 or recorded statement from Mr. Braxton?
20     A.  No.
21     Q.  Next person I want to ask you about is Joseph
22 Mayhand.
23         Do you know Joseph Mayhand?
24     A.  No.
25     Q.  Do you recall if you ever spoke to Mr. Mayhand

---

Page 48

1  before you were arrested?
2      A.  No.
3      Q.  To your knowledge, did you ever speak with him
4  while you were in prison?
5      A.  No.
6      Q.  And have you spoke with him since you've been
7  released?
8      A.  No.
9      Q.  How about Brandon Gibbs?  Do you know Brandon
10 Gibbs?
11     A.  No.  I mean -- scratch that.  Excuse me.
12     I know of him being a witness in my case.  But
13 personally, no.
14     Q.  Did you ever speak with Brandon Gibbs before your
15 arrest?
16     A.  No.
17     Q.  Did you ever speak with Mr. Gibbs while you were
18 in prison?
19     A.  No.
20     Q.  And have you spoken with Mr. Gibbs since you've
21 been out?
22     A.  No.
23     Q.  I want to ask you about some people that I think
24 are, perhaps, friends of yours.
25         First one I wanted to ask you about is Samuel

---

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed:  07/25/24  13 of 72.  PageID #: 1362

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 49

1  Brown.
2      A.  Yes.
3      Q.  Before you were arrested, what was your
4  relationship with Samuel Brown?
5      A.  Close friend.
6      Q.  And how frequently did you see or speak to Samuel
7  Brown back before you were arrested?
8      A.  Almost every day.
9      Q.  And you socialized with him frequently, correct?
10     A.  Yes.
11     Q.  While you were in prison, did you communicate
12  with Samuel Brown?
13     A.  Yes.
14     Q.  Did he come to visit you or just call you?
15     A.  No.  He came to visit me like once or twice.
16     Q.  How about letters or telephone calls?
17     A.  Telephone calls.
18     Q.  What do you recall speaking with Samuel Brown
19  about when you were in prison?
20     A.  Just normal stuff.  When I first got to prison,
21  we talked frequently just about normal stuff, what was
22  going outside, more so than anything.  And then as the
23  years progressed, we just stopped talking as much.
24     Q.  Samuel Brown testified I think on your behalf at
25  trial?

Page 50

1      A.  Yes.
2      Q.  Did you guys ever talk about the case while you
3  were in prison?
4      A.  No.  He just asked me what, like, was going on.
5  I'd tell him where I was at with it.  And that was it.
6      Q.  Since you were released from prison, have you
7  spoken to Samuel Brown?
8      A.  Yes.
9      Q.  How many times?  A lot?
10     A.  Yeah.
11     Q.  Is he still a friend today?
12     A.  Not as close as we was before I got incarcerated.
13     Q.  How frequently do you see or socialize with
14  Samuel Brown since your release?
15     A.  Once or twice a month.
16     Q.  When you do see him, where do you socialize at?
17     A.  It's probably at a bar, more than likely.
18     Q.  Is Samuel Brown still live around the Cleveland
19  area?
20     A.  Yes.
21     Q.  Do you know where he lives at?
22     A.  No.
23     Q.  Do you have his phone number?
24     A.  Yes.
25     Q.  Would you give that to your attorney also?

Page 51

1      A.  Yes.
2      Q.  Bobby Nettles.
3          Bobby Nettles was a friend of yours before you
4  were arrested?
5      A.  Yes.
6      Q.  What was your relationship with Bobby Nettles?
7      A.  Close friend.
8      Q.  You socialized and spoke to Bobby Nettles
9  frequently before you were arrested?
10     A.  Yes.
11     Q.  After your arrest and while you were in prison,
12  did you speak with Bobby Nettles?
13     A.  Yes.
14     Q.  And what did you speak about?
15     A.  Same thing as Samuel, just more so about what was
16  going on out there and somewhat about the case.
17     Q.  What about the case did you speak to Bobby
18  Nettles about?  Let me rephrase that.
19          While you were in prison on the times when you
20  and Bobby Nettles spoke about the case, what is it that
21  you spoke to him about?
22     A.  In the beginning, it was more so about, just
23  seeing was he ready to come forward.
24     Q.  When you say "was he ready to come forward," do
25  you mean ready to come forward and be an alibi witness

Page 52

1  for you?
2      A.  Yes.
3      Q.  Okay.  What else do you recall speaking to Bobby
4  Nettles about?
5      A.  That's about it.  Just general stuff, family,
6  kids.
7      Q.  After you got released, have you spoken to Bobby
8  Nettles?
9      A.  Yes.
10     Q.  How frequently do you speak to Bobby Nettles?
11     A.  Probably, like, once or twice a month.
12     Q.  Have you socialized with him at all?  Went out --
13     A.  Like went out, no.  Not for real, no.
14     Q.  Go to a bar or anything with him?
15     A.  No.
16     Q.  On the times that you speak with Bobby Nettles
17  now, do you just speak with him on the phone?
18     A.  On the phone or he would come to the store.
19     Q.  Since your release, have you and Bobby Nettles
20  spoken about the criminal case that you were convicted
21  in?
22     A.  Not to my recollection.
23     Q.  Since your release, have you and Bobby Nettles
24  spoken about the civil lawsuit that we are here for
25  today?

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  14 of 72.  PageID #: 1363

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 53

1   A. No. Like -- probably just asked, like, how that
2  was coming about. And I'm like, it ain't even got
3  started yet.
4     Q. I'm sorry. You have to explain what you mean. I
5  didn't understand you.
6     A. Like, the compensation or settlement or civil is
7  like, what was going on with that part? Like, everybody
8  asks what was going on with that part.
9     So I was like, we haven't -- last we spoke, I was
10  like, it hasn't got started yet.
11    Q. If I understand what you're telling me, there
12  have been a couple of occasions when Bobby has asked you
13  what the status of this lawsuit is?
14    A. Yeah. Like -- yeah.
15    Q. Asked you if you've -- if it's still pending, if
16  you recovered anything?
17    A. Yes.
18    Q. That type of thing?
19    A. Yes.
20    Q. Have you asked Bobby to be a witness for you in
21  this case?
22    A. No. I told him there's a possibility that he may
23  be. I didn't ask him. I told him there's a possibility
24  that he may be called upon.
25    Q. Other than telling him there's a possibility he

Page 54

1  may be called upon to be a witness, any other
2  conversations you've had with Bobby about this lawsuit?
3     A. No.
4     Q. And forgive me, I may have asked you this. But
5  back before you were arrested, you saw and spoke to
6  Bobby Nettles probably several times a week?
7     A. Yes.
8     Q. Ronald Snipe, Ronald Snipe was also a friend of
9  yours?
10    A. Yes.
11    Q. Was he a good friend of yours back before you
12  were arrested?
13    A. More of an acquaintance. He was Cordell's
14  cousin.
15    Q. You had socialized at times when Ronald Snipe was
16  present back before you were arrested?
17    A. Yes.
18    Q. I guess I'll ask that a different way.
19    There were times when you socialized with group
20  of guys and Ronald Snipe was there?
21    A. Yes.
22    Q. So you knew him, he knew you?
23    A. Yes.
24    Q. While you were incarcerated, did you have any
25  communications with Ronald Snipe?

Page 55

1   A. Yes.
2     Q. Tell me about those communications.
3     A. Well, I had got in contact him -- contact with
4  him through a mutual friend. And I asked him would he
5  as well come forward and give an affidavit to the case
6  of that night.
7     Q. All right. Well, did you have any direct
8  communication yourself with Bobby Nettles, or was it
9  always through a mutual friend while you were in prison?
10    A. Bobby Nettles or Ronald Snipe?
11    Q. I'm sorry, Ronald Snipe.
12    While you were in prison, did you ever have any
13  direct communications with Ronald Snipe, or were all the
14  communications through a mutual friend?
15    A. No. We had a communication. And I asked him,
16  could my PI come talk to him. And he said yeah.
17    Q. And that communication you had with him, was it
18  by telephone?
19    A. Yes.
20    Q. And the PI you are talking about is Tom Pavlish?
21    A. Yes.
22    Q. And you wanted Mr. Snipe to come forward and be
23  an alibi witness for you?
24    A. Not so much alibi witness for me. But just to
25  come say what he knew about that night, the incident.

Page 56

1   Q. Okay. We'll come back to that.
2     Since you've been released, have you spoke to
3  Ronald Snipe?
4     A. Yes.
5     Q. How many times?
6     A. Frequently. When I first came home, we spoke
7  frequently.
8     Not so much as now. I don't know a number.
9     Q. You don't have his number?
10    A. No. I said I don't know a number, like, of
11  times.
12    Q. Do you still speak to him?
13    A. Occasionally.
14    Q. Okay. How many times do you think you spoke to
15  him since you've been released?
16    A. Twenty, 30 times, maybe.
17    Q. Have you socialized with him since you've been
18  released?
19    A. No. Not socialized. But he had -- I was
20  mentoring a youth when I first came home through a
21  program that he had.
22    Q. So you were -- were you assisting him in a
23  program he had?
24    A. He was -- he had a program and he would have me
25  come there and speak to kids.

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  15 of 72.  PageID #: 1364

Deposition of Ru-El Sailor, Jr.                              Ru-El Sailor, vs. City of Cleveland, et al.,

Page 57

Q. What was that program?

A. I can't recall the name of it. It was when I first, first came home.

Q. Was it through a church or a social club?

A. No. It was a program, went through a church. They had a building on Euclid Avenue in Cleveland, Ohio. I can't remember the name.

But they had -- they would help guys -- like a reentry program. They would help guys who got out of prison, help them get jobs. And they were also, like, mentoring youth in the neighborhood.

So he asked me to come up there and speak to the youth.

Q. And what were the topics you were talking to the youth about?

A. Just staying off the streets, staying in school, you know, informing them of prison, how it really is, how they don't want to go there, things like that.

Q. Okay.

THE VIDEOGRAPHER: Ken, can we change the media?

MR. CALDERONE: Sure.

THE VIDEOGRAPHER: We are going to go off the record. This is the end of media one. The time is now 10:18:51. We are off the record.

Page 58

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER: We are back on the record. This is the beginning of media two. The time is now 10:29:46. On the record.

BY MR. CALDERONE:

Q. Mr. Sailor, what was your relationship with Anthony McKenzie back before you were arrested?

A. Close friend as well.

Q. Before you were arrested, you spoke to or saw Mr. McKenzie several times a week?

A. Yes.

Q. And you had socialized with him frequently?

A. Yes.

Q. Did you speak with Anthony McKenzie while you were incarcerated?

A. Yes.

Q. What did the two of you speak about?

A. The case. And just general stuff, family, stuff like that.

Q. And what were your discussions about the case?

A. I was seeing if he, too, would speak with my private investigator about coming forward about the night in question.

Page 59

Q. And he agreed to speak with the investigator?

A. Yes.

Q. Other than asking him to come forward and talk about the night in question, did you ever have any other discussions with him about the case while you were in prison?

A. No. Just the progress of it, like, check in with each other. He would check in with me and see what I had -- you know what I'm saying, where I was at, things of that nature.

Q. Since your release, have you spoken to Anthony McKenzie?

A. Yes.

Q. How frequently?

A. Probably like the same, like, once or twice a month.

Q. Have you socialized with him since you've been released?

A. Yes.

Q. How frequently?

A. Probably, like, four or five times.

Q. Where have you guys went?

A. Couple of bars or, like, events in our neighborhood. We all from the same neighborhood.

Q. Since being released, have you spoken to him

Page 60

about this civil lawsuit?

A. Yes.

Q. And what have you spoken to him about?

A. That he also may be getting called upon about his affidavit.

Q. Okay. Dawn Goolsby, do you know Dawn Goolsby?

A. Yes.

Q. Who is Dawn Goolsby?

A. She is the owner of -- she was the owner of the Benjamin's Bar, the bar that we was at the night in question.

Q. And is the Benjamin Bar still open?

A. No.

Q. The Benjamin Bar was a bar that you and your friends had socialized at several times before the night of the shooting of Omar Clark?

A. Yes.

Q. And you knew Dawn Goolsby as the owner and also the bartender there?

A. Yes.

Q. And since you and your friends were a regular, Dawn knew who you were?

A. Yes.

Q. Did you speak to Dawn Goolsby while you were in prison?

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 61

1  A. No.
2  Q. Have you spoken to Dawn since you've gotten out
3  of prison?
4  A. I seen her, like, twice.
5  Q. Okay. And where did you see her at?
6  A. It was at a bar, both times.
7  Q. What bar?
8  A. The BStone.
9  Q. BStone?
10  A. Yes.
11  Q. How do you spell that?
12  A. Just the letter B, Stone, all in one word,
13  though.
14  Q. And where is the BStone at?
15  A. 260th in Euclid.
16  Q. In Cleveland?
17  A. Yes.
18  Q. Was she working there or just there?
19  A. No, she was there.
20  Q. Just socializing?
21  A. I think if I'm not mistaken, both times I saw
22  her was there, at the BStone?
23  Q. And she was there as a patron, she was not
24  working there?
25  A. Yes.

Page 62

1  Q. And what did you talk about with her when you saw
2  her?
3  A. Her, as well, coming forward and telling the
4  truth.
5  Q. Cordell's brother, Rome, do you know who he is?
6  A. He don't have a brother named Rome.
7  Q. Do you know anyone that people referred to as
8  Rome?
9  A. Ronald Snipe.
10  Q. So Rome is Ronald Snipe?
11  A. Yes.
12  Q. How about a girl that people referred to as
13  Smiley?
14  A. Yeah. I know her.
15  Q. Who is Smiley?
16  A. She's a friend of Cordell's.
17  Q. Do you know Smiley's real name?
18  A. No.
19  Q. Smiley was someone who also frequented the
20  Benjamin Bar?
21  A. No. I can't say.
22  Q. How is it that you know Smiley?
23  A. I know her through Cordell, and just around the
24  neighborhood. I know she was, like -- reason why her
25  name, her and Cordell was talking on the night of the

Page 63

1  incident at the 4U2B.
2  Q. At the 4U2B?
3  A. 4U2B, yeah.
4  Q. Okay. Lesley Gresham, or something along those
5  lines?
6  A. Lesley Gresham?
7  Q. Yeah.
8  Lesley or Lesley Gresham or Greshan or Geshan?
9  A. I know a boy by that name, but I don't know a
10  girl.
11  Q. You know a boy by that name?
12  A. Yes.
13  Q. Lesley?
14  A. Yes.
15  Q. Who was Lesley Gresham, a boy?
16  A. He was my old cellie's brother.
17  Q. Who is the cellmate you are referring to?
18  A. Gregory Gresham.
19  Q. Did you know Lesley Gresham before you were
20  arrested?
21  A. Yes.
22  Q. How did you know him before you were arrested?
23  A. Because I knew his older brother, Gregory
24  Gresham.
25  Q. Where did you see or talk to Lesley Gresham

Page 64

1  before you were arrested?
2  A. I didn't.
3  Q. You did not?
4  A. No.
5  Q. So you just knew of him?
6  A. Yes.
7  Q. But you didn't -- you had not spoken to him prior
8  to the time you were arrested?
9  A. No.
10  Q. Did you ever speak with Lesley Gresham while you
11  were incarcerated?
12  A. No. If I did, I don't recollect.
13  Q. Have you spoken to Lesley Gresham since you've
14  been released?
15  A. No.
16  Q. To your knowledge, has anyone spoken to Lesley
17  Gresham on your behalf?
18  A. No.
19  Q. Do you know if Lesley Gresham was at the Benjamin
20  or the 4U2B on the night when Omar Clark was shot?
21  A. No. He was way younger. He wasn't even allowed
22  in the bars. He was younger than me and Cordell.
23  Q. Prior to the arrest for Omar Clark's death, had
24  you ever been arrested before that?
25  A. Yes.

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  17 of 72.  PageID #: 1366

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 65

Q. For what?

A. Drug trafficking and carrying concealed weapon.

Q. That was in Cuyahoga County?

A. Yes. And Lake County.

Q. Those are two different charges?

A. Yes.

Q. Did you plead guilty to both of those charges?

A. Yes.

Q. And were you sentenced at all for those charges?

A. Probation.

Q. Other than the drug trafficking and the carrying a concealed weapon charge, any other prior arrests or convictions before Omar Clark's charge?

A. No.

Q. Since being released from prison, have you been arrested for any reason?

A. No.

Q. While you were in prison, were you ever subject to discipline or have any privileges removed?

A. Yes.

Q. How many times?

A. I can't remember the number. Quite a few times over the course of 15 years.

Q. Tell me the occasions you can recall being disciplined or having the privileges removed.

Page 66

A. I was -- I had a Rule 24 at Mansfield. I was sent to Lucasville. A Rule 24 is, like, establishing a relationship with the officer. I was sent to the hole and sent to Lucasville.

Q. And what about the officer? Was the officer disciplined?

A. Yes.

Q. What other privileges were removed or what other disciplines did you receive while you were in prison?

A. Just mainly segregation, cellphone ticket.

Q. What's that?

A. A rule infraction.

Q. Okay.

A. I had got caught with a cellphone and had to go to segregation.

THE COURT REPORTER: Excuse me?

THE WITNESS: I had got caught with a cellphone. I had to go to segregation, like the hole in prison.

Q. Isolation?

A. Yes.

Q. And what's the rule with the cellphone?

A. What's the rule? You ain't supposed to have one.

Q. Oh. And you had one?

A. Yes.

Page 67

Q. Okay. What other discipline do you recall while you were in prison?

A. Another 24. I was at another institution. I had another Rule 24 establishing. Segregation. And then another cellphone ticket.

Q. Okay. Other than cellphone tickets and Rule 24 infractions, what other discipline did you have or privileges removed?

A. Just, I had a drug infraction, and my visits was removed, and segregation, and that's it. No fights or nothing like that.

Q. Okay. Prior to your conviction, did you ever know anyone named Henry Veverka?

A. No.

Q. And prior to your conviction, have you ever spoken to, directly or indirectly, anyone named Henry Veverka?

A. Prior to my conviction, yes.

Q. What communications did you have or someone have on your behalf with Henry Veverka before you were convicted?

A. Just the day I was arrested.

Q. So he was one of the officers that arrested you?

A. Yes.

Q. And that was the last communication you -- or

Page 68

interaction you had with Mr. Veverka?

A. Yes.

Q. How about James Metzler? Before you were convicted, did you ever meet or speak to James Metzler?

A. When I was arrested.

Q. So he was one of the officers that arrested you also?

A. Yes.

Q. Other than the day of your arrest, had you ever spoken to or interacted with James Metzler?

A. No.

Q. Prior to conviction, had you ever met or interacted with Harry Matlock?

A. No.

Q. Do you know Harry Matlock?

A. No.

Q. Prior to your conviction, had you ever met or interacted with Andrew Desatnik?

A. No.

Q. Do you know who Mr. Desatnik is?

A. No.

Q. Prior to your arrest, had you ever met or spoken with or interacted with Shair Hasan? And that's, S-H-A-I-R, Hasan.

A. No.

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 69

1  Q. To your knowledge, do you know who Mr. Hasan is?
2  A. No.
3  Q. Prior to your conviction, have you ever met or
4  interacted with Rick Farinacci?
5  A. No.
6  Q. Do you know who Mr. Farinacci is?
7  A. No.
8  Q. Prior to your conviction, had you ever met or
9  interacted with James Purcell?
10 A. No.
11 Q. Do you know who Mr. Purcell is?
12 A. No.
13 Q. Prior to your conviction, had you ever met or
14 interacted with Melvin Smith?
15 A. No.
16 Q. Do you know who Melvin Smith is?
17 A. No.
18 Q. Prior to your conviction for Omar Clark's murder,
19 had you ever met or interacted with Eugene Jones?
20 A. Yes.
21 Q. How many times?
22 A. Like, five, maybe six.
23 Q. And where had you met or interacted with Eugene
24 Jones at?
25 A. Collinwood High School. Gas station on East

Page 70

1  140th and St. Clair. My mom's house at 829 East 149th.
2  I can't recollect the others.
3  Q. Okay. You said a gas station at -- is it East
4  140th and St. Clair?
5  A. Yes.
6  Q. What gas station was that?
7  A. It was a Shell at the time. I don't know -- it's
8  not open right now.
9  Q. And what interactions did you have with Mr. Jones
10 at the gas station?
11 A. He arrested me.
12 Q. For what?
13 A. Narcotics.
14 Q. For possession of narcotics or trafficking?
15 A. Yes. But the drugs came from him.
16 Q. Is that the criminal charge that you pled guilty
17 for?
18 A. Yes.
19 Q. You said you had met or interacted with him at
20 your mom's house?
21 A. Yes.
22 Q. Tell me about that.
23    When was that?
24 A. This was -- I was still in high school. Once,
25 maybe twice, I was still in high school. He was, like,

Page 71

1  a vice cop in my neighborhood but also did truancy. And
2  he would come over there and tell my mother I wasn't in
3  school some days and I was in school. Or he would come
4  looking for me.
5  Q. Okay. So on the occasions he came to your mom's
6  house, it was related to truancy about being in school?
7  A. Yes.
8  Q. Did your mom get along with Eugene Jones as far
9  as you know?
10 A. I mean, no. She -- at first she responded --
11 accepted to what he was saying. But then after that,
12 she became irritated with him because it was more like
13 he was harassing me.
14 Q. You said you interacted with him at Collinwood
15 High School.
16 A. He was the security guard there.
17 Q. And what were your interactions with him in high
18 school?
19 A. Him just telling me that he -- like, better not
20 catch me on the corner or he going to catch me -- he
21 can't wait to catch me on the corner and stuff like
22 that.
23 Q. While you were in high school, did he ever tell
24 you to stay out of trouble?
25 A. No.

Page 72

1  Q. So I'm confused on the communication when you
2  were in high school.
3    He would be in the high school because he was a
4  security guard there, correct?
5  A. Yes.
6  Q. And there were times that you spoke to him in the
7  school, correct?
8  A. Yes.
9  Q. In the times that you spoke with Mr. Jones in the
10 school, were they friendly conversations?
11 A. No.
12 Q. How would you describe the conversations you had
13 with him then?
14 A. Threatening.
15 Q. How so?
16 A. Like, basically saying, like, "I know you be on
17 those corners and I can't wait to catch you," type of
18 stuff like that.
19 Q. And when you say "on the corners," you're talking
20 about on the streets, selling drugs?
21 A. Yes.
22 Q. Just so we understand what you were saying --
23 what you mean when you say "on the streets," you're
24 talking about selling drugs?
25 A. Yes.

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  19 of 72.  PageID #: 1368

Deposition of Ru-El Sailor, Jr.                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 73

1  Q. And so while you were in school, there were times
2  when he confronted you in the school building during the
3  day indicating to you he knew you were selling drugs and
4  he was going to catch you?
5  A. Yes.
6  Q. And that was before you were expelled from
7  Collinwood?
8  A. Yes.
9  Q. What were you expelled from Collinwood for?
10  A. It was a fight in the hallway, like, amongst the
11  neighborhoods. So they just expelled everybody who they
12  thought was a part of the fight. They didn't have,
13  like, no details of who was involved, who wasn't. So
14  they just expelled everybody that was there.
15  Q. You said "a fight among neighborhoods"?
16  A. Yes.
17  Q. What do you mean by that?
18  A. Like, I'm -- I live in the St. Clair area of
19  Cleveland. And there were other kids that live in other
20  neighborhoods in Cleveland, and they put us all in one
21  school.
22  Q. Were the fights gang related at all?
23  A. No. It wasn't -- we didn't -- never -- it was
24  never in a gang. It was more so about, this is our
25  neighborhood, this is where I'm from, and you from over

Page 74

1  there.
2      It was never, like, we didn't have no gangs or no
3  or rules, or nothing like that.
4  Q. You said you also interacted with him on East
5  149th Street?
6  A. Yes.
7  Q. What is at East 149th Street?
8  A. It's the street that we all used to hang out on.
9  Q. Is that a street in the neighborhood?
10  A. Yes.
11  Q. And what interactions did you have with him on
12  that street?
13  A. Him just pulling up, harassing me, thinking I
14  was -- at the times, I wasn't even selling drugs.
15      Him just harassing me.
16  Q. How was he harassing you?
17  A. Telling me, go home, why am I outside, things
18  like that.
19  Q. And have you told me about the occasions when you
20  interacted with Mr. Jones before your conviction, those
21  four different locations or...
22  A. Yeah. The gas station incident, he planted drugs
23  on me. That's where the charge came from.
24      I pled out because I didn't know no better. I
25  was young. I just didn't want to go to jail. And they

Page 75

1  told me if I pled, I wasn't going to go to jail.
2  Q. Okay. Let me back up here.
3      In the times that Eugene Jones came to your house
4  for the truancy issues, were there any occasions when he
5  came to your house and you were there at the house?
6  A. No.
7  Q. So anything he did or said at the house, you have
8  learned from your mom?
9  A. No. I came there -- he was there when I got
10  there. I wasn't there when he came. But I came twice
11  and he was there.
12  Q. Talking to your mom?
13  A. Yes.
14  Q. Did he ever threaten you at your house?
15  A. No.
16  Q. Did he ever physically assault you in any way at
17  your house?
18  A. No.
19  Q. Now you told me at school he would see you or had
20  seen you in the hallways and told you he knew that you
21  were dealing drugs and he was going to catch you.
22      Other than that, did he ever physically touch you
23  or assault you in school?
24  A. No.
25  Q. Other than telling you he was going to catch you

Page 76

1  selling drugs, did he ever say anything that you
2  perceived as a threat at school?
3  A. Yeah. He told me he was going to get me. Like,
4  "I'm going to get you."
5  Q. And you understood that to mean arrest you for
6  doing something wrong?
7  A. Yeah.
8      MS. GELSOMINO: Objection.
9  Q. And those times when he said he was going to
10  catch you or going to get you, was that before you were
11  ultimately arrested at the gas station?
12  A. Before.
13  Q. And then when you were on the streets at East
14  149th Street, he would tell you to go home, to get off
15  the streets, you shouldn't be out there. And you
16  perceive that as being harassing?
17  A. Yes.
18  Q. Okay. Did he ever threaten you when he would see
19  you out on the street at East 149th Street?
20  A. Threaten me? Like, physically threaten me?
21  Q. Yes.
22  A. No.
23  Q. Did he ever physically touch you or assault you
24  in any way?
25  A. He has been overly aggressive, as far as a shake

Page 77

-- or pat-down.

Q. Okay. I'm talking about when you were out on the streets on East 149th Street.

A. That's what I'm talking about.

Q. So he patted you down when you were out on the street?

A. Yes.

Q. How many times did he do that?

A. Probably twice.

Q. And on those couple of occasions when he patted you down, were there any drugs that he found on you?

A. No.

Q. On those couple of times that he patted you down, were there any drugs that you contend he planned on you?

A. At the gas station.

Q. Okay. But is the gas station East 149th?

A. No. It's a separate location.

Q. I'm talking about East 149th.

A. No.

Q. On the occasions when he patted you down on East 149th Street, he did not find any drugs, nor did he plant any drugs on you?

A. No.

Q. And then there was the incidents at the gas station at East 140th Street.

Page 78

In that incident, were you there with other people?

A. Yes.

Q. Who were you there with?

A. I'm not sure. It was -- gas station was, like -- it's a local gas station, but it was, like, a hangout spot. So there was quite a few people there.

Q. So you were just at the gas station hanging out?

A. No.

Q. Well, tell me what happened on this incident when he arrested you and you say he planted drugs on you.

A. I was in the gas station. The car pulls up. There's a white individual in the car wanting to buy some drugs.

I was talking to the individual in the car. And then the vice cop stormed the gas station. I fled on foot.

Then they caught me a block away. They brought me back to the gas station.

I didn't have any drugs on me. They brought me back to the gas station. And Eugene Jones was there. And he was like, "Oh, I finally got you. I finally got you."

And I said, "I don't even got nothing on me."

He's like, "Well, you going down today. You did

Page 79

have something on you."

I'm like, "No. I'm pretty sure I didn't have nothing on me."

And he was like, "Well, these is yours."

And he produced a bag of cocaine I never seen before.

Q. And you were charged with trafficking drugs for that?

A. Yes.

Q. And you pled guilty to that?

A. Yes.

Q. Other than that incident, are there any other times when Mr. Jones arrested you?

A. No.

Q. And he was not involved in the arrest where you were carrying a concealed weapon, correct?

A. No.

Q. That was out in Lake County?

A. No. That was in Cleveland Heights.

Q. To your knowledge, had Mr. Jones ever arrested any of your other friends before you were convicted for Omar Clark's shooting?

A. Yes. A lot of them. I mean, he's a vice cop in our neighborhood, so he's made plenty of arrests.

Q. Which of your friends do you recall him arresting

Page 80

back before you were convicted for Omar Clark's shooting?

A. I can't recollect off --

Q. You're not sure?

A. Yeah. I'm not sure who all...

Q. Did you ever speak with Mr. Jones while you were in prison?

A. No.

Q. Have you spoken with him since you've been released?

A. No.

Q. Do you know if Mr. Jones ever arrested Bobby Nettles, if you know?

A. No. I don't know.

Q. Do you know if Mr. Nettles[sic] ever arrested Mr. McKenzie?

A. Huh?

Q. Do you know if Mr. -- I'm sorry.

Do you know if Mr. Jones ever arrested Mr. McKenzie?

A. No. I'm pretty sure that I remember Mr. McKenzie, when he was in high school, like, him and his mom going to file a complaint against Eugene Jones.

Q. To your knowledge, though, Mr. Jones never arrested McKenzie?

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  21 of 72.  PageID #: 1370

Deposition of Ru-El Sailor, Jr.                                      Ru-El Sailor, vs. City of Cleveland, et al.,

Page 81

1  A. Not to my knowledge.

2  Q. To your knowledge, did Mr. Jones ever arrest

3  Mr. Snipe?

4  A. No.

5  Q. To your knowledge, did Mr. Jones ever arrest

6  Cordell Hubbard?

7  A. No.

8  Q. Prior to your conviction for Cordell -- I'm

9  sorry -- for Omar Clark's shooting, did you or your

10  mother ever file a complaint against Mr. Jones?

11  A. No.

12  Q. I want to ask you about the evening of -- I guess

13  it would start at November 16th going into the morning

14  of November 17th.

15  And I may refer to that as the night in question.

16  But if I do, you understand what I'm referring to,

17  correct?

18  A. Yes.

19  Q. On November 16th, my understanding is after you

20  got up that day, you stayed at home taking care of some

21  kids while your then girlfriend went with your mom down

22  to Amish Country or something?

23  A. Yes.

24  Q. Can you tell me, approximately, what time you

25  recall getting up that day and your mom and your

Page 82

1  girlfriend leaving?

2  A. No. I can't recall what time.

3  Q. Was it in the morning?

4  A. In the morning, I'm sure.

5  Q. Okay.

6  MR. CALDERONE: This fan is loud so I'm

7  going to caution you to keep your voice up.

8  THE WITNESS: Oh, okay.

9  MR. CALDERONE: Speak loud.

10  A. It was in the morning.

11  Q. And do you recall during the day while you were

12  at home with your kids -- two kids?

13  A. No. At the time, it was four.

14  Q. Four kids?

15  A. Yes -- well, three. I had a daughter that

16  following December, so I had three at the time.

17  Q. So at the time on November 16th, 2002, you spent

18  the day at home taking care of three kids?

19  A. Yeah.

20  Q. During the day, no one else was at home with you?

21  A. No. Just me and my kids.

22  Q. During the day, did you have any visitors come

23  over to the house?

24  A. No.

25  Q. During the day on November 16th, 2002, do you

Page 83

1  recall if you spoke to any of your friends, like Cordell

2  Hubbard, about going out that evening?

3  A. I'm pretty sure.

4  Q. Who do you recall talking to during the day?

5  A. Probably just Cordell, Bobby Nettles, Samuel

6  Brown, and probably Anthony McKenzie.

7  Q. What time do you recall your mother and

8  girlfriend getting back that evening?

9  A. It was somewhere around like 8:00, 9:00.

10  Q. In the evening?

11  A. Yeah.

12  Q. And take me through everything you recall

13  happening that evening from the point in time when your

14  mom and your girlfriend got back home.

15  A. I can't even recall, probably just me getting

16  dressed and going out when they got there.

17  Q. I won't hold you to exact times, but,

18  approximately, when do you recall leaving the house to

19  go out that evening?

20  A. Somewhere, like, 9:00 or 10:00 o'clock.

21  Q. And you had made plans either earlier in the day

22  or before that day to meet up with your friends,

23  correct?

24  A. Correct.

25  Q. Including Nettles, Brown, Hubbard, and McKenzie?

Page 84

1  A. Correct.

2  Q. Where is it that you were going to first meet

3  them at that evening?

4  A. The Benjamin's.

5  Q. And that's a bar, correct?

6  A. Yes.

7  Q. Did you drive a car to the Benjamin's?

8  A. Yes.

9  Q. Did you drive by yourself?

10  Well, strike that. Let me rephrase the question.

11  When you left your house, did you drive directly

12  to the Benjamin's?

13  A. Pretty sure I went and picked somebody up, but I

14  can't recall who I picked up.

15  Q. Did you pick up Cordell Hubbard or did he drive

16  separately?

17  A. I can't recall who I picked up. I can't -- No. I

18  can't recall.

19  Q. Do you recall the vehicle you drove that night to

20  the Benjamin's?

21  A. It was a white Focus.

22  Q. A white Ford Focus?

23  A. Yes.

24  Q. Tell me what you recall that evening once you

25  arrived at the Benjamin's.

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  22 of 72.  PageID #: 1371

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 85

A. I remember just sitting around, like, we all was there. And on Saturdays was, like, open mic night. So it was, like, they used to pass the microphone around throughout the bar and they would play a beat, and if you think you could rap, they gave you the microphone. Everybody just enjoying, just drinking, rapping or singing on the microphone.

Q. What time do you think you arrived at the Benjamin that evening?

A. It would have to be probably like 10:30, 10:00, 10:30.

Q. And before arriving at the Benjamin, did you and your friends already make plans for what you were going to do that evening, where you were going to go?

A. Yes.

Q. What was the plan that was made ahead of time of where you and your friends were going to go?

A. The Benjamin's and 4U2B.

Q. 4U2B?

A. Yes. Another bar.

Q. And when you and your friends made your plans, did you discuss how long you were going to stay at each place?

A. No.

Q. You were just going to start at the Benjamin,

Page 86

have some drinks and socialize?

A. Yeah. And then go to 4U2B.

Q. And do the open mic thing, correct?

A. Yes.

Q. And then whenever the spirit moved you, you guys would then go to 4U2B?

A. Yes.

Q. Dawn Goolsby was working the bar that night?

A. I'm not sure. More than likely. Because she's the owner. So sometimes she would be back there with the other bartenders.

Q. And when you're at the Benjamin, you did, in fact, meet up with Nettles, Brown, Hubbard, and McKenzie, correct?

A. Yes.

Q. Did Will Sizemore show up at the Benjamin?

A. Yes.

Q. With Cordell?

A. I'm not sure, to be exact, to be honest.

Q. But he met up with a group of you?

A. Yes.

Q. So at the Benjamin was Nettles, Brown, Hubbard, McKenzie, Sizemore, and you, correct?

A. Yes.

Q. And what did the group of you do while you were

Page 87

at the Benjamin, other than have some drinks?

A. Open mic. And socialize.

Q. Do you recall what you wore that night?

A. Yes.

Q. What did you wear?

A. A black leather Phat Farm jacket with a big, like, flag on the back of it and some blue jeans and a jersey.

Q. Okay. I'm going to show you a photograph that -- or some photographs that I've seen in some file materials.

MR. CALDERONE: Do you have a stapler?

MS. GELSOMINO: I can get one.

MR. CALDERONE: Yeah. Let's go off the record for a second.

THE VIDEOGRAPHER: We're going to go off the record. It's the end of media two. The time is now 11:07:05.

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER: We are back on the record. This is the beginning of media three. The time is now 11:08:38. On the record.

BY MR. CALDERONE:

Page 88

- - - -

(Thereupon, Defendant's Exhibit B was marked for purposes of identification.)

- - - -

Q. Mr. Sailor, I'm showing you a document that has a sticker on the front of it that says Defendant's Exhibit B.

And these are some pages that have been produced in this case. And I think they were in the homicide file of Cleveland. If you'll turn to the second page of Exhibit B, there's a photograph of three individuals there.

Do you recognize that photograph?

A. Yes.

Q. Do you recognize the individuals in the photograph?

A. Yes.

Q. Who are they?

A. Myself, Cordell Hubbard, and Ronald Snipe.

Q. All right. You are wearing a New Jersey jersey?

A. Yes.

Q. Which one is Cordell?

A. Left, red-and-gray jersey.

Q. That has a number 42 on it?

A. Yes. Red headband.

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  23 of 72.  PageID #: 1372

Deposition of Ru-El Sailor, Jr.                                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 89

1  Q.  And on the right is Ronald Snipe?
2  A.  Yes.
3  Q.  Was this photograph taken the evening of
4  November 16th?
5  A.  Yes.
6  Q.  And was this taken at the Benjamin?
7  A.  No.  This was taken at the third location.
8  Q.  St. Aloysius?
9  A.  St. Aloysius.
10 Q.  If you turn now to the fourth page, there's
11 another photograph there, correct?
12 A.  Yes.
13 Q.  And I believe you are wearing the black leather
14 jacket; is that correct?
15 A.  Yes.
16 Q.  Is that Cordell next to you wearing a white
17 jacket and a red headband?
18 A.  No.  That's -- it's --that's Ronald Snipe behind
19 me but you can't see his face.
20 Q.  Okay.  There's a hand in this photograph sticking
21 up right behind your left ear?
22 A.  That's Cordell's hand.
23 Q.  Okay.  And I do see behind you, pretty much
24 concealed, is Snipe, correct?
25 A.  Yes.

Page 90

1  Q.  You can just see part of the ear, correct?
2  A.  Yes.  His hand is closer to my ear.
3  Q.  Got it.  Yeah.  Next is Snipe.
4       Is that Cordell?
5  A.  Yes.
6  Q.  And Cordell is wearing a red headband?
7  A.  Yes.
8  Q.  And who is the lady that is standing next to
9  Cordell?
10 A.  I'm not sure.  I think it's Smiley.  It might be
11 the girl, Smiley, that was in question earlier.
12 Q.  Smiley?
13 A.  Yes.
14 Q.  And then there is a gentleman standing next to
15 Smiley?
16 A.  I don't know who that brother is.  I don't know
17 who he is.
18 Q.  You don't know who he is?
19      And if you turn two pages after that, to the last
20 page of the exhibit, there is again a photograph.  And I
21 believe that is you, Cordell and Mr. Snipe, correct?
22 A.  Yes.
23 Q.  And all of these photographs were taken at
24 St. Aloysius during the early morning hours of
25 November 17th --

Page 91

1  A.  Yes.
2  Q.  -- 2002, correct?
3  A.  Yes.
4  Q.  Okay.  Thank you.
5       Before arriving at the Benjamin that evening of
6  November 16th, 2002, did you smoke anything?
7  A.  Yes.
8  Q.  What did you smoke?
9  A.  Marijuana.
10 Q.  And where did you smoke marijuana at?
11 A.  In my car.
12 Q.  Before going into the Benjamin that evening, did
13 you take any drugs?
14 A.  Marijuana.
15 Q.  Any other types of drugs?  Cocaine, pills, or
16 anything?
17 A.  No.
18 Q.  Before arriving at the Benjamin that night, had
19 you had any alcohol to drink?
20 A.  Yes.
21 Q.  What had you drank before you arrived at the
22 Benjamin?
23 A.  I had a bottle of -- I forgot.  I don't remember.
24 I think, like, Belvedere maybe, vodka.
25 Q.  Is that vodka?

Page 92

1  A.  Yes.
2  Q.  When had you started drinking that day, on
3  November 16th?
4  A.  Before I came outside, so probably, like, 5:00 or
5  6:00 in the afternoon.
6  Q.  And how do you take your vodka, straight or do
7  you mix it?
8  A.  Straight.
9  Q.  And how many glasses of vodka do you think you
10 had before you left the house that evening?
11 A.  Maybe three or four.  I'm not sure.
12 Q.  Now, when you arrived at the Benjamin, you had
13 more to drink?
14 A.  Yes.
15 Q.  What did you drink while you're at the Benjamin?
16 A.  Vodka and champagne.
17 Q.  Do you recall approximately how much?
18 A.  No.  I can't recall how much.
19 Q.  Was more than one, though, correct?
20 A.  Yes.
21 Q.  Do you recall what any of your friends were
22 drinking that night?
23 A.  Probably the same.
24 Q.  Do you recall any discussions that you had with
25 your friends while you were at the Benjamin's that

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  24 of 72.  PageID #: 1373

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 93

1  night?

2  A. No.

3  Q. Now, sometime that evening, you and your friends

4  decided to leave the Benjamin's, correct?

5  A. Yes.

6  Q. And you were going to go from the Benjamin's to

7  the 4U2B bar?

8  A. Yes.

9  Q. Do you recall what time that was?

10  A. No.

11  Q. In your criminal trial testimony, I believe you

12  testified that you left the Benjamin's around 12:40 a.m.

13  Does that sound correct?

14  A. No.

15  Q. What time do you think you left the Benjamin's?

16  A. Me just going over how we used to, we probably

17  would have left the Benjamin's somewhere like 11:30 so

18  we could get to the 4U2B by 12:00.

19  Q. Okay. So your recollection is that you -- you

20  and your friends all left the Benjamin's at

21  approximately 11:30 p.m., correct?

22  A. Correct.

23  Q. And you drove straight to the 4U2B bar, correct?

24  A. Correct.

25  Q. Did anybody --

Page 94

1  A. Sorry.

2  Q. Did anybody ride with you in your car when you

3  drove from the Benjamin's to the 4U2B bar?

4  A. Yes.

5  Q. Who rode with you?

6  A. I'm not sure who rode with me exactly because I

7  was kind of under the influence. It was a group of us

8  and it was different -- like three or four cars, seven,

9  eight of us.

10  Q. Was Cordell with you in your car when you left

11  the Benjamin's?

12  A. No. No.

13  Q. To make sure we're clear with each other, you are

14  certain that Cordell was not with you when you left the

15  Benjamin's bar, correct?

16  A. Correct.

17  Q. You are not sure if any of your other friends

18  might have been with you in your car?

19  A. I'm sure someone was, I'm just not sure exactly

20  who.

21  Q. Do you recall how many of your friends may have

22  been with you in your car when you drove from the

23  Benjamin's to the 4U2B?

24  A. No more than one or two. Or no more than two.

25  Q. And you are fairly certain that you arrived at

Page 95

1  the 4U2B by midnight?

2  A. Yes.

3  Q. And what was the purpose of going to the 4U2B?

4  A. Just to kick it.

5  Q. Now, while you were at the 4U2B bar, I want to

6  make sure I have a count of who was there with you.

7  It was still you and Mr. Nettles, correct?

8  A. (Indicating.)

9  Q. You have to respond.

10  A. Oh, I'm sorry. I'm thinking in my head. Yes.

11  Yes.

12  Q. Yeah. Mr. Brown was at the 4U2B bar with you?

13  A. Yes.

14  Q. Mr. Hubbard was at the 4U2B bar with you,

15  correct?

16  A. Yes.

17  Q. Mr. McKenzie was at the 4U2B bar with you,

18  correct?

19  A. Yes.

20  Q. Mr. Sizemore was with you at the 4U2B bar,

21  correct?

22  A. Yes.

23  Q. So the six of you were still there at the 4U2B

24  bar?

25  A. And Ronald Snipe was there.

Page 96

1  Q. Yes. I'm sorry.

2  So there were seven of you at the 4U2B bar?

3  A. It was more than that. But, like, the main core

4  of it, yeah.

5  Q. And what did the group of you do when you were at

6  the 4U2B bar?

7  A. Drink.

8  Q. Any dancing?

9  A. Drink.

10  Q. Any smoking?

11  A. Yes.

12  Q. What did you guys smoke there?

13  A. Marijuana.

14  Q. Did all of you smoke that night?

15      MS. GELSOMINO: Objection.

16  A. No.

17      MS. GELSOMINO: If you know.

18  A. No. I mean, no. Because everybody don't smoke,

19  so no.

20  Q. More than one person was smoking, though?

21  A. Yes.

22  Q. And you were one of the people that were smoking?

23  A. Yes.

24  Q. Do you know if Cordell Hubbard smoked marijuana

25  that night?

Deposition of Ru-El Sailor, Jr.        Ru-El Sailor, vs. City of Cleveland, et al.,

Page 97

1   A. No. He don't smoke.

2   Q. Either before arriving at the 4U2B or after you

3 were at the 4U2B, did you take any types of drugs other

4 than smoking marijuana?

5   A. I don't know. I may have took an ecstasy pill,

6 but I'm not sure, to be honest. I don't recollect.

7   Q. Do you recall if any of your friends took any

8 drugs either before or while you were at the 4U2B bar?

9   A. No.

10   Q. No. You do not recall?

11   A. No.

12   Q. Okay. Do you recall how long you were at the

13 4U2B bar?

14   A. No.

15   Q. Do you recall other people you might have seen or

16 spoken to at the 4U2B bar, other than the group of your

17 friends?

18   A. Yes.

19   Q. Who else do you recall seeing at the 4U2B bar?

20   A. Just a lot of people from my neighborhood.

21   Q. Like who?

22   A. I don't --

23   Q. Not sure?

24   A. Not sure. I'm not sure.

25   Q. Would it be fair for me to say that while you

Page 98

1 were at the 4U2B bar, there were several other people

2 from your neighborhood that you recognized on that

3 evening, but now 15, 20 years later --

4   A. Yeah.

5   Q. -- you are not sure who it was?

6   A. Right. Yes.

7   Q. Okay. But on the evening you were there, on

8 November 16th into the morning hours of the 17th, on

9 that day or that evening, you did and you were able to

10 identify those people?

11   A. Yes.

12   Q. And if and when you saw them at the 4U2B bar, you

13 would have said, "Hey, how you doing?"

14   A. Yes.

15   Q. Or at least recognized their presence?

16   A. Yes.

17   Q. Okay. So when did the group of you leave the

18 4U2B?

19   A. Everybody left at different times. And when I

20 left, it was Bobby Nettles and Anthony McKenzie with me.

21   Q. Well, first of all, when, if you recall, did you

22 leave the 4U2B bar?

23   A. It had to be probably around -- I'm just guessing

24 on how I normally would move, so it probably around 1:00

25 or 1:30.

Page 99

1   Q. This shooting of Omar Clark happened at

2 approximately 12:30 a.m. If I understand your testimony

3 today, you believe that you and your friends arrived at

4 the 4U2B bar by midnight, and that you and your friends

5 were all there while this shooting occurred?

6    MS. GELSOMINO: Objection to form.

7   Q. Yeah. Let me rephrase that.

8    We now know Cordell Hubbard was involved in the

9 shooting, correct?

10   A. Correct.

11   Q. We now know that William Sizemore was with him on

12 the evening of the shooting, correct?

13   A. Correct.

14   Q. Do you recall what time William Sizemore and

15 Cordell Hubbard left the 4U2B bar?

16   A. I wasn't aware.

17   Q. Other than Cordell Hubbard and William Sizemore

18 leaving, do you believe that you and your other friends

19 were still at the 4U2B at approximately 12:30 p.m. -- or

20 a.m., when the shooting of Omar Clark occurred?

21   A. Yes.

22   Q. When you left the 4U2B bar, did you leave on your

23 own or did someone go with you?

24   A. Anthony McKenzie and Bobby Nettles both asked me

25 to drop them off.

Page 100

1   Q. Were the group of you going to go to St. Aloysius

2 first?

3   A. No. That came about after 4U2B. That wasn't

4 part of the initial plan.

5   Q. Okay. So Anthony and McKenzie and Nettles asked

6 you to drop them off. So they left the 4U2B with you?

7   A. Yes.

8   Q. Who did Snipe leave the 4U2B with, if anyone?

9   A. I think he left by himself, if I'm not mistaken.

10   Q. How about Mr. Brown, did he leave the 4U2B bar by

11 himself?

12   A. I'm not sure.

13   Q. And Sizemore and Hubbard we now know left

14 together, correct?

15   A. Correct.

16   Q. When you and Nettles and McKenzie were leaving

17 the 4U2B bar, had the group of you already made plans to

18 meet at St. Aloysius?

19   A. No.

20   Q. Before leaving the 4U2B Bar, do you recall

21 Cordell Hubbard or Mr. Sizemore having any discussion

22 about where it is they were going to go?

23   A. No.

24   Q. Did anything unusual occur while you were at the

25 4U2B Bar that evening that you either heard or observed?

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  26 of 72.  PageID #: 1375

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 101

1  A. No.

2  Q. Any fights, arguments, or disagreements that you

3  witnessed?

4  A. No.

5  Q. As far as you recall today, you and the group of

6  you were having a good time while you were at the 4U2B

7  bar that evening?

8  A. Yes.

9  Q. So what happened then after you left the 4U2B

10  bar?

11  A. To my recollection, I was dropping McKenzie and

12  Nettles off, and Cordell asked me to pick him up.

13  Q. Did Cordell call you?

14  A. Yes.

15  Q. Was McKenzie and Nettles in the car when he

16  called you?

17  A. Yes.

18  Q. And what did Cordell tell you when he called you?

19  A. After I drop them off, pick him up from his mom's

20  house.

21  Q. Did he tell you why he wanted you to pick him up?

22  A. He said he wanted to go to St. Aloysius.

23  Q. Did he sound fine when he was on the phone, if

24  you recall?

25  A. I can't recall. He just said that we was going

Page 102

1  to St. Aloysius. A friend -- a girl that he knew was

2  having a party there, or something of that nature. And

3  that Ronald Snipe was going to meet us there.

4  Q. So you dropped off McKenzie and Nettles, correct?

5  A. Yeah -- I'm sorry about that.

6  Q. No. Go ahead. You tell me what happened.

7  A. He was going to drop Will Sizemore off and he was

8  going to meet me at my mom's house after I drop them

9  off.

10  Q. So did you meet him at your mom's house?

11  A. His mom.

12  Q. His mom's house?

13  A. Yes.

14  Q. And when you -- I just want to make sure I

15  understand.

16  You left the 4U2B bar, you dropped off McKenzie

17  and Nettles, correct?

18  A. Correct.

19  Q. And then you went to Cordell's mother's house?

20  A. Yes.

21  Q. And when you got to Cordell's mother's house, was

22  Cordell there?

23  A. Yes.

24  Q. Was any other of your friends there with him?

25  A. No.

Page 103

1  Q. All right. What did you and Cordell talk about

2  when you were at his mother's house?

3  A. Nothing. I just picked him up. And she stayed

4  probably, like, five or six minutes from St. Aloysius.

5  Q. And so you went from Cordell's house to

6  St. Aloysius, correct?

7  A. Yes.

8  Q. Now, when you picked up Cordell that evening, did

9  he tell you that he had been involved in the incident

10  with Omar Clark?

11  A. No.

12  Q. Did he seem excited or act unusual in any way?

13  A. No. Not to my recollection.

14  Q. All right. And in all fairness to you, you were

15  probably still fairly buzzed from alcohol and marijuana?

16  A. Overly.

17  Q. Okay. So you picked up Cordell then, and you

18  went to St. Aloysius.

19  Do you recall anyone that you saw at

20  St. Aloysius?

21  A. No. Just Snipe -- Ronald Snipe.

22  Q. All right. Ronald Snipe was there?

23  A. Yes.

24  Q. And from looking at the photographs, Smiley may

25  have been there?

Page 104

1  A. Yes.

2  Q. Anyone else you recall seeing that evening at

3  St. Aloysius?

4  A. I really can't remember. That was the end point

5  for me.

6  Q. All right. Do you recall, approximately, what

7  time you got there?

8  A. No.

9  Q. Do you recall what time it was you picked Cordell

10  up?

11  A. After 1:00.

12  Q. How late was the party going at St. Aloysius?

13  A. We got there just -- it was almost over. It's

14  over at 2:00 o'clock.

15  Q. Any other ladies or men you recall seeing or

16  speaking to at St. Aloysius?

17  A. No. I can't recall.

18  Q. While you were at St. Aloysius, did Cordell

19  Hubbard tell you anything about the shooting incident he

20  had been involved in with Omar Clark?

21  A. No.

22  Q. Did you notice anything unusual about Cordell

23  Hubbard while you were at St. Aloysius?

24  A. Not that I can remember, no.

25  Q. And approximately what time did you leave

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed:  07/25/24  27 of 72.  PageID #: 1376

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 105

St. Aloysius?

A. I'm not sure.  It was late.

Q. Who left with you when you left St. Aloysius?

A. Cordell.

Q. All right.  Snipe went his own way?

A. Yes.

Q. Where did you and Cordell go after you left St. Aloysius?

A. I took him, like, three blocks down to his girl's -- a girl's house.

Q. Do you remember whose house it was?

A. Her name is Shawn.  I don't know her last name.

Q. I'm sorry, Shawna?

A. Shawn, just Shawn.

Q. Shawn?

A. S-H-A-W-N.

Q. And when you dropped him off that evening, you had no idea he had been involved in a shooting?

A. No.

Q. And then where did you go after you dropped him off?

A. Home.

Q. Give me one second here.

So if I understand your testimony, at the time when this shooting approximately occurred, you,

Page 106

Mr. Snipe, Mr. Nettles, Mr. Brown, Mr. McKenzie were all at the 4U2B bar?

A. As far as my recollection, yes.  Because once we get to the bar, we just -- we -- everybody do their own thing.

Q. Okay.  I want to show you an exhibit here.

- - - -

(Thereupon, Defendant's Exhibit A was marked for purposes of identification.)

- - - -

Q. Showing you what's been marked as Defendant's Exhibit A.  And I'm going to represent to you this is a Notice of Alibi Witnesses that Cordell Hubbard filed with the Court back during his criminal proceeding.

And if you look at the second page of this pleading, there's the beginning of a list of witnesses that carry over to the next page.

You see these names?

A. Yes.

Q. I want to go through these names with you.

Looking at the second page, he identifies Dawn Goolsby as an alibi witness?

She was the bartender at the Benjamin's, correct?

A. Yes.

Q. He identifies you as an alibi witness, correct?

Page 107

A. Yes.

Q. He identifies Samuel Brown, correct?

A. Yes.

Q. He has a name there that says Sherome?

A. That's Ronald Snipe.

Q. That's Snipe?

A. Yes.

Q. He has a name here that says Yolanda.

Do you know who that is?

A. Huh-uh.

Q. No?

A. I mean, I know her, but I don't know her personally.  That's a girl that he talked to.  But I don't know her personally.

Q. Was she at the Benjamin's bar that evening?

MS. GELSOMINO:  She --

If you know.

Q. Yeah, if you know.

A. I think it was her who had the party at St. Aloysius.

Q. Okay.  Below that there's a name, Nakeya Goshen?

A. I don't know that, Nakeya -- I know one of these girls on here is Smiley.  So I don't know if that's her real name or, like --

Q. Okay.

Page 108

A. I know one of the females on here would be Smiley.

Q. Okay.  Other than possibly being Smiley, you do not recognize Nakeya Goshen?

A. No.

Q. There's name of Toni Watson, did you know him?

A. That's the lady whose car I had.

Q. That's the lady whose car -- you borrowed a car?

A. The Ford Focus that I was driving.

Q. Did you see her at either the 4U2B or St. Aloysius on --

A. No.

Q. -- the evening in question?

A. No.

Q. There's a name on the second page that says Twan Watson.

Is that -- do you know Twan Watson?

A. That's her -- the lady who's car it was, that's her boyfriend.

Q. How is it that you came to get the car, the white Ford Focus you were driving?

A. I rented it from her.

Q. The next name on the list is Shawn McCreary?

A. That's where I dropped Cordell, to his girlfriend.

Deposition of Ru-El Sailor, Jr.                                        Ru-El Sailor, vs. City of Cleveland, et al.,

Page 109

1  Q. That's where you dropped Cordell off?
2  A. Yes.
3  Q. After you left St. Aloysius?
4  A. Yes.
5  Q. The next name here is Taneisha.
6     Do you know who that is?
7  A. No. She could be Smiley.
8     MS. GELSOMINO: If you don't know, don't
9  guess. Just testify to what you know.
10 Q. There's a name after that, Kicia?
11 A. I don't know.
12 Q. And there's a name after that, Ty?
13 A. Ty is another friend of ours, Jesse Prather.
14 Q. Jesse who?
15 A. Prather. P-R-A-T-H-E-R.
16 Q. And did you see Jesse Prather at either the 4U2B
17 or at St. Aloysius that evening?
18    A. No.
19 Q. Did you happen to see her at the Benjamin's?
20 A. Yes.
21 Q. Okay. Thank you.
22    After you were arrested and charged, you
23 obviously -- I don't want to know what you said, but you
24 obviously spoke to your attorney to help prepare for
25 your criminal case, correct?

Page 110

1  A. Yes.
2  Q. And before your trial began, you are aware that
3  you had the opportunity to call witnesses on your behalf
4  at trial, correct?
5  A. Yes.
6  Q. I'm going to show you another exhibit here.
7  Didn't have time to staple everything.
8     - - - -
9     (Thereupon, Defendant's Exhibit D was marked
10    for purposes of identification.)
11    - - - -
12 Q. I'm showing you a document I've marked as
13 Exhibit D. And this is --
14    MR. CALDERONE: Actually, let's go off the
15 record for a second.
16    THE VIDEOGRAPHER: We're going to go off the
17 record. This is the end of media three. The time is
18 now 11:37:38. Off the record.
19    - - - -
20    (Off the record.)
21    - - - -
22    THE VIDEOGRAPHER: We are back on the
23 record. This is the beginning of media four. The time
24 is now 11:38:13. On the record.
25 BY MR. CALDERONE:

Page 111

1  Q. Okay. I'm showing you a document that I've
2  marked as Defendant's Exhibit D. And it actually
3  consists of two documents.
4     The first two pages is a Notice of Alibi that was
5  filed by Attorney Jimmie Mack, Jr.
6     Do you see this on the front page?
7  A. Um-hmm.
8  Q. And if you look at the first paragraph that's
9  typed on this, it says that "The defendant will offer
10 for his defense, testimony to establish an alibi on his
11 behalf and will prove at the time of the alleged
12 offense, alleged to have occurred on November 17th,
13 2002, at approximately 12:23 a.m., he was in the
14 presence of Samuel Brown and others from 10:00 p.m. on
15 November 16th, 2002, to 12:45 a.m. on November 17th,
16 2002, at Benjamin Lounge, East 152nd Street and
17 St. Clair, Cleveland, Ohio."
18    Do you see that?
19 A. Uh-huh.
20 Q. Mr. Mack was your attorney at trial, correct?
21 A. Yes.
22 Q. And he appears to identify Samuel Brown as an
23 alibi witness for you prior to your criminal trial,
24 correct?
25 A. Yes.

Page 112

1  Q. If you turn to the last two pages of this
2  document, we see an Amended Notice of Alibi.
3     Do you see that?
4  A. Um-hmm. Yes.
5  Q. And if you'll take a moment to look at that, he
6  indicates that the alibi witness he identifies is still
7  Samuel Brown, correct?
8  A. Correct.
9  Q. But he indicates that he may be an alibi witness
10 for you being at the Benjamin and also the 4U2B Lounge
11 on that evening in question, correct?
12 A. Correct.
13 Q. Mr. Mack never identified Mr. Snipe as an alibi
14 witness for you, correct?
15 A. Not here, no.
16 Q. Mr. Mack never identified Mr. McKenzie as an
17 alibi witness for you, correct?
18 A. No.
19 Q. Mr. Mack never identified William Sizemore as an
20 alibi witness for you, correct?
21 A. Correct.
22    MS. GELSOMINO: Are you -- and you are
23 talking about on these documents, right?
24    MR. CALDERONE: Correct.
25 Q. Correct?

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  29 of 72.  PageID #: 1378

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 113

1  A. Correct.
2  Q. Mr. Mack never identified Ms. Goolsby as an alibi
3  witness for you, correct?
4  A. Correct.
5  Q. But at the time when your criminal trial went
6  forward, you were aware that all of those individuals
7  had either seen you or were with you at the Benjamin Bar
8  and/or at the 4U2B bar, correct?
9  A. Correct.
10 Q. At the time your criminal trial went forward, you
11 knew that all of those individuals could provide alibi
12 testimony for you to account for where you were at the
13 time Omar Clark was shot, correct?
14 A. Correct.
15 Q. And to be more specific, you were aware that all
16 those other individuals could testify that you were not
17 at the scene of Omar Clark's murder at the time it
18 occurred, correct?
19 A. Correct.
20 Q. And all of those individuals could testify that
21 you did not leave either the Benjamin or 4U2B bar with
22 Cordell Hubbard, correct?
23 A. Correct.
24 Q. And when your criminal trial went forward, at
25 least some of those individuals that you knew about

Page 114

1  could testify that Cordell Hubbard left either the
2  Benjamin or the 4U2B with William Sizemore, correct?
3      MS. GELSOMINO: Objection.
4  Q. Correct?
5  A. Correct.
6  Q. Now Samuel Brown did testify as an alibi witness
7  for you at trial, correct?
8  A. Correct.
9  Q. And he did testify that you were with him and he
10 was with you at the time this shooting occurred,
11 correct?
12 A. Correct.
13 Q. And you testified at trial on your own behalf,
14 correct?
15 A. Yes.
16 Q. When you testified at trial on your own behalf,
17 you informed the jury that Samuel Brown was with you
18 that evening, correct?
19 A. Correct.
20 Q. But you did not inform the jury that Anthony
21 McKenzie was with you that night, correct?
22 A. I don't recall.
23 Q. You did not inform the jury that Ronald Snipe
24 with was with you that evening, correct?
25 A. I don't recall.

Page 115

1  Q. You did not inform the jury that William Sizemore
2  was with you that evening, correct?
3  A. I don't recall.
4  Q. To your knowledge, did you or anyone on your
5  behalf inform the prosecutor that you had been with
6  Ronald Snipe, Mr. McKenzie, Mr. Nettles, or William
7  Sizemore at the time -- strike that.
8      At any time before your criminal trial began, did
9  you or anyone on your behalf inform the prosecutor or
10 the police that Samuel Brown, Ronald Snipe,
11 Mr. McKenzie, or Mr. Nettles had been with you that
12 evening and could be alibi witnesses?
13     MS. GELSOMINO: Objection.
14 A. I told my attorney.
15 Q. Other than your attorney, did you tell the police
16 or the prosecutor?
17     MS. GELSOMINO: Objection.
18 A. No.
19 Q. I want to show you another exhibit here. Here we
20 go again.
21     I'm going to show you a document that I'm marking
22 as Defendant's Exhibit E.
23     - - - -
24     (Thereupon, Defendant's Exhibit E was marked
25     for purposes of identification.)

Page 116

1      - - - -
2  Q. And I'd ask you to take a moment to look at that.
3      And I'll represent to you that this is a document
4  that was filed with the Court prior to your criminal
5  trial.
6      The first three pages are a proposed witness list
7  for Ru-El Sailor and the last two pages are an amended
8  proposed witness list for Ru-El Sailor.
9      If you look at the second and third page of this
10 document, you see it was filed by your attorney, Jimmie
11 Mack Jr., correct?
12 A. Yes. Yes.
13 Q. And now if we look at the first page of the
14 document, there's some names here that are listed as
15 witnesses, correct?
16 A. Correct.
17 Q. But they're not identified as alibi witnesses, as
18 we saw in Exhibit D, correct?
19 A. Correct.
20 Q. We see Samuel Brown as identified as a witness.
21 And he did testify, correct?
22 A. Yes.
23 Q. Letishea Hammond was identified as a witness.
24 And she did testify, correct?
25 A. Yes.

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 117

1  Q. Bobby Nettles was identified as a witness,
2  correct?
3  A. Correct.
4  Q. It says here that his address was unknown.
5      Did you not know the address to Bobby Nettles
6  back when your criminal trial was going forward?
7  A. No.
8  Q. After that, there's the names of Darell Brown,
9  Sharell Brown, and Bernatte Brown.
10      Who are they?
11  A. My -- Darell Brown is my brother -- his real last
12  name is Sailor, I don't know why they had Brown.  Darell
13  Brown is my brother.  Sharell Brown is my sister and
14  Bernatte Brown is my mother.
15  Q. None of them were with you at the Benjamin Bar,
16  the 4U2B bar, or St. Aloysius on the night in question,
17  correct?
18  A. Correct.
19  Q. And then we see the name Dawn Goolsby.  That was
20  the bartender at the Benjamin, correct?
21  A. Correct.
22  Q. Also identified is, it says, security guard, last
23  name unknown.  And then identifies the Benjamin Lounge
24  as a location or the address.
25      Was there a security guard present at the

Page 118

1  Benjamin's bar when the group of you was there on the
2  evening in question?
3  A. I'm not sure.
4  Q. Okay.  On the next page, there's a witness
5  identified as DJ Sweet Daddy?
6  A. Yes.
7  Q. Is that the DJ that was working at the Benjamin's
8  Lounge?
9  A. Yes.
10  Q. And were you familiar with that DJ?  I mean, did
11  you do open mic with him more than one time?
12  A. Yes.
13  Q. Next it says Anthony McKenzie as someone who
14  would be a witness for you, correct?
15  A. Yes.
16  Q. But it says, Address unknown.
17      Did you not know Anthony's address back when your
18  criminal trial went forward?
19  A. No.
20  Q. The next name is Toni, LNU.  I'm guessing "last
21  name unknown."
22      Do you know what that is referring to?
23  A. No.
24  Q. And then there is Sherome.
25      Is that Ronald Snipe?

Page 119

1  A. Yes.
2  Q. It says, Address unknown.
3      Did you not know Ronald Snipe's address back when
4  this criminal trial was going forward?
5  A. No.
6  Q. Next is the name Yolanda.
7      You're not sure who that is, correct?
8  A. Correct.
9  Q. It also says Nakeya Goshen.
10      You don't know who that is, correct?
11  A. Correct.
12  Q. Toni Watson is the boyfriend of the lady from
13  whom you rented --
14  A. No.  She is the lady.
15  Q. Okay.  Toni Watson is the lady from whom you
16  rented your car?
17  A. Yes.
18  Q. But she was not with you and you did not see her
19  on the night in question, correct?
20  A. Correct.
21  Q. Shawn McCreary.  Refresh my memory.
22      Who's that?
23  A. Cordell's girlfriend at that time.
24  Q. She was not with you on the night in question,
25  correct?

Page 120

1  A. No.
2  Q. And then we have the names Taneisha, Kicia, and
3  Ty, correct?
4  A. Correct.
5  Q. And you know who Ty is, but you don't know who
6  the other two is?
7  A. Correct.
8  Q. None of the individuals we see here on the first
9  two pages of Exhibit E are identified as alibi
10  witnesses, correct?
11  A. Correct.
12  Q. On the last two pages, there's two additional
13  witnesses, Brandon Gibbs and Joseph Mayhand, correct?
14  A. Correct.
15  Q. Do you know who they are?
16  A. They were witnesses in the case.
17  Q. But you had not spoken to or seen or interacted
18  with either of them prior to the night in question?
19  A. No.
20  Q. And you did not know who they were prior to the
21  night in question?
22  A. No.
23  Q. And they were not with you at the Benjamin's,
24  4U2B, or St. Aloysius on the night in question?
25  A. No.

Case: 1:20-cv-00660-DAR Doc #: 88-2 Filed: 07/25/24 31 of 72. PageID #: 1380

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 121

Q. Okay. If I understand your testimony, when you dropped Cordell Hubbard off early in the morning hours on November 17th, you had no idea he had been involved in a shooting, correct?

A. Correct.

Q. All right. What was the first thing that happened after that that alerted you that something had happened or there had been a shooting?

A. He was arrested.

Q. How did you learn he was arrested?

A. I got a call.

Q. From who?

A. I'm not even sure. At the time -- it might have been his girl, Shawn.

Q. When did you receive that call? Was it some time during the day of the 17th?

A. No. He didn't get arrested until, like, December. Like, weeks after.

Q. Before Cordell got arrested, were you ever aware that Omar Clark had been shot?

A. Yes.

Q. How did you learn that Omar Clark had been shot?

A. Just from the streets.

Q. And was there rumors that you had heard on the streets about who had shot Omar Clark?

Page 122

A. No.

Q. Did anyone mention or suggest that Omar[sic] might be arrested for the shooting of Omar Clark before he was actually arrested?

MS. GELSOMINO: Objection. I think you may have misspoken.

MR. CALDERONE: I did. A lot of names in this case.

Q. Did anyone --

MS. GELSOMINO: Similar names, too.

Q. Did anyone ever suggest to you that Cordell Hubbard was going to be arrested before he was actually arrested?

A. No.

Q. And at any time before Cordell Hubbard was arrested, did any police officers attempt to speak to you or anyone in your family about what happened that night?

A. No.

Q. So some time after Omar Clark's murder, you get a call from Cordelle Hubbard's girlfriend telling you he had been arrested?

A. Right.

Q. What did she tell you?

A. That he had went to court in Bratenahl. If I'm

Page 123

not mistaken, he had went to court in Bratenahl or something like that for traffic, and that he had a warrant and he got arrested. And it's pertaining to the death of Omar Clark.

Q. Anything else you can recall at that time?

A. No.

Q. What was the next thing that you either heard about or witnessed relating to this criminal case involving Omar Clark's shooting?

A. That his sister had something to do with it, or she was arrested or something to that nature.

Q. Now, once Omar got -- I'm sorry, once Cordell got arrested, did you ever call or talk to your friends, Nettles, McKenzie, Snipe, or any of the guys you were with that night, to talk about Cordell being arrested?

A. It came -- yeah. Yeah.

Q. Tell me the discussions you had with your friends about Cordell being arrested.

A. That he was arrested for -- they had him arrested involving a murder somewhere on 105.

Q. At any time between when Cordell is arrested and when you were arrested, did you talk to Nettles about the shooting or Cordell being arrested?

A. Yes.

Q. Tell me everything you recall about your

Page 124

discussion with Nettles.

A. That -- pretty much that they was saying that Cordell had killed somebody on 105, or that he was involved -- not that he's killed somebody, but he was involved in the killing of somebody on East 105th.

Q. Did Nettles tell you that he had heard or learned anything more about the shooting?

A. No. He just said that he heard the same thing on the streets, that Cordell was in jail for the death of Omar Clark.

Q. Before you were arrested, did you believe that Cordell shot Omar Clark?

A. No.

Q. Why not?

A. I didn't -- because I've known him my whole life. So -- I've known him since we was, like, 10 years old.

Q. Did Cordell get out on bond after he was arrested?

A. Yes.

Q. And did you speak to Cordell after he was out on bond but before you got arrested?

A. Yes.

Q. And what did you speak to him -- or what did he say about the night of the shooting?

MS. GELSOMINO: Objection.

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  32 of 72.  PageID #: 1381

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 125

1  A. He just said they was trying to charge him with
2  the murder.
3  Q. Did he tell you that he did shoot Omar Clark?
4  A. No.
5  Q. Did he deny shooting Omar Clark?
6  A. Yeah. He said he ain't did nothing.
7  Q. After Cordell Hubbard was out on bond, did he
8  approach you and ask you to be an alibi witness for him
9  for his criminal case?
10  A. Yes.
11  Q. Tell me about that.
12  A. He -- remember the night in question, he was
13  like, "Man, remember we was all at the Benjamin's, and
14  we all went 4U2B that night?"
15     I'm like, "Yeah."
16     He like, "We went to St. Aloysius that night."
17     And I was like, "Yeah."
18     And he was like, would I come to court and
19  testify to that, and I'm like, "Yeah." It's the truth.
20  Q. Do you know if Cordell Hubbard asked any of your
21  other friends to testify for him and be alibi witnesses?
22  A. Not -- me, I think Sam, I'm not sure. I don't
23  know if Sherome.
24  Q. Let me make sure you understand what I'm asking.
25     Do you know if Cordell Hubbard, or anyone on his

Page 126

1  behalf, asked Samuel Brown to be an alibi witness for
2  him?
3  A. I don't know personally because I wasn't there.
4  Q. All right. Well, before you were arrested, did
5  Samuel Brown ever come to you and tell you, "Hey, I'm
6  going to testify for Cordell"?
7  A. No.
8  Q. If you know or do you know if Cordell Hubbard
9  asked Mr. Nettles to be an alibi witness for Cordell at
10  trial?
11  A. I don't know.
12  Q. Do you know if Cordell Hubbard or anyone on his
13  behalf asked Mr. Snipe to be an alibi witness for him?
14  A. I don't know.
15  Q. Do you know if Cordell Hubbard or anyone on his
16  behalf asked Anthony McKenzie to be an alibi witness for
17  him?
18  A. I don't know.
19  Q. Do you know if Cordell Hubbard or anyone on his
20  behalf asked Dawn Goolsby to be an alibi witness for
21  him?
22  A. I don't know.
23  Q. After Cordell Hubbard was arrested and before you
24  were arrested, did you speak directly with William
25  Sizemore?

Page 127

1  A. No. Not that I can remember, no.
2  Q. After Cordell Hubbard got out on bond, did he
3  tell you that he was with William Sizemore after they
4  left the 4U2B bar?
5  A. Yes.
6  Q. And what -- where did he tell you they went?
7  A. No. He just told me that's who he left with.
8  Because I was like, "I don't even remember -- I don't
9  remember too much of the night" because I was so
10  intoxicated. I didn't even remember the night in
11  question until it became the night in question.
12     Before that, I mean, it's just a regular Saturday
13  night, like how we kick it. It's just a regular
14  Saturday night of how we kick it. We get drunk. We get
15  high. Party. And go home.
16  Q. But before you were arrested, Mr. Hubbard had
17  informed you that when he left the 4U2B bar, he left
18  with William Sizemore?
19  A. Yes.
20  Q. And that probably refreshed your memory because
21  you were at the 4U2B that night as well, correct?
22  A. Correct.
23     MR. CALDERONE: Let's take a five-minute
24  break.
25     THE VIDEOGRAPHER: We're going to go off the

Page 128

1  record. It's the end of media four. The time is now
2  12:00 o'clock. We are going off the record.
3     - - - -
4     (Off the record.)
5     - - - -
6     THE VIDEOGRAPHER: We are back on the
7  record. This is the beginning of media five. The time
8  is now 12:11:12. On the record.
9  BY MR. CALDERONE:
10  Q. Mr. Sailor, before we took our break, we went
11  through a list of all the friends of yours that you were
12  either with that night or had spoken to on the night in
13  question.
14     I'm going to represent to you that I've studied
15  your docket from your criminal case and your criminal
16  trial, and it does not reflect that any of those
17  witnesses were issued subpoenas to appear at trial.
18     Without necessarily disclosing to me anything you
19  said to your attorney, do you know why none of those
20  individuals were subpoenaed to attend trial as a
21  witness?
22  A. Most of them, I didn't know the address on them
23  or couldn't get in contact with them. Because I was in
24  a county, and this is unexpectedly -- it just happened.
25  And I didn't have too many resources to reach out to

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  33 of 72.  PageID #: 1382

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 129

1  people at the time. I didn't have an investigator or
2  anything like that on hand.
3      And then the other ones that didn't get
4  subpoenaed had already just let me know that they didn't
5  want to be a part of the situation.
6      Q. And when you say "the other ones," are you
7  referring to Nettles and McKenzie?
8      A. Nettles, McKenzie, Dawn Goolsby. They all had
9  been talked to by Eugene Jones, basically threatened in
10 the sense, that they shouldn't be involved in this case
11 or situation.
12     Q. This is what you claim they told you?
13     A. Yes.
14     Q. I think I had asked you, but before your criminal
15 trial went in place, did you speak to William Sizemore?
16     A. No.
17     Q. Was it your understanding that after Cordell was
18 arrested, that William Sizemore took off or went
19 someplace?
20     A. Yeah. He just -- he -- he knew my number. He
21 never called me or asked me what was going on with
22 Cordell or anything like that, so we he was just -- we
23 never talked like that outside of Cordell anyway.
24     Q. All right. Now, you were eventually arrested,
25 correct?

Page 130

1      A. Yes.
2      Q. And where were you at when you were arrested?
3      A. Cuyahoga County. I was going to court.
4      Q. You were going to court when you were arrested?
5      A. I was going to court for my CCW case, so I was
6  basically turning myself in.
7      Q. Oh, so you were at the courthouse and you turned
8  yourself in?
9      A. Yes.
10     Q. For the CCW case?
11     A. No. For the murder.
12     Q. That's what I want to get at.
13         How did you learn that you were a suspect for
14 this murder?
15     A. They raided my mom's house.
16     Q. The police?
17     A. Yes.
18     Q. Were you there when they raided my mom's house?
19     A. No. My sister and brother was there.
20     Q. And after they were at your mom's house, did they
21 tell your mom that they were looking for you, the
22 police?
23     A. Yes. And then I had got a phone call from Jimmie
24 Mack.
25     Q. And what did Mr. Mack say?

Page 131

1      A. That the detectives were looking for me,
2  involving a homicide.
3      Q. And was Mr. Mack also your attorney for the CCW
4  case?
5      A. Yes.
6      Q. So Mr. Mack is the one -- I'm sorry, yeah.
7         Mr. Mack is the attorney that informed you that
8  the police were looking for you for this matter,
9  correct?
10     A. Yes.
11     Q. And Mr. Mack informed you that there was a
12 warrant out for your arrest?
13     A. Yes.
14     Q. And Mr. Mack coordinated for you, you going to
15 the police department and turning yourself in?
16     A. Yes.
17     Q. So when you were arrested, you were actually at
18 the police department or the courthouse?
19     A. Yes.
20     Q. And you were processed there?
21     A. Yes.
22     Q. Were the officers who arrested you professional
23 and cordial?
24     A. Yes.
25     Q. Okay. They didn't physically assault you or

Page 132

1  abuse you in any way?
2      A. No.
3      Q. And how long were you in jail here before you got
4  out on bond?
5      A. I never bonded out.
6      Q. You did not?
7      A. No. Not until 2018 and I was exonerated.
8      Q. So when you were arrested, you remained in jail
9  the whole time and you never got out in -- on bond
10 before the criminal trial went forward?
11     A. No.
12     Q. Earlier, I think I asked you about a couple
13 officers, Mr. Veverka and Mr. Metzler.
14         And I think you said they were there when you
15 were arrested, correct?
16     A. Yes.
17     Q. Mr. Veverka and Mr. Metzler never assaulted you
18 or treated you inappropriately in any way?
19     A. No.
20     Q. Okay. When you were arrested, you did not
21 voluntarily give any statement to the police; is that
22 correct?
23     A. Correct.
24     Q. I want to ask you about your criminal trial.
25         During your trial, you testified on your own

Case: 1:20-cv-00660-DAR Doc #: 88-2 Filed: 07/25/24 34 of 72. PageID #: 1383

Deposition of Ru-El Sailor, Jr.                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 133

1  behalf, correct?
2      A. Yes.
3      Q. And you testified that you were with Cordell
4  Hubbard the entire evening of November 16th and 17th,
5  correct?
6      A. Correct.
7      Q. And I believe you testified that Cordell Hubbard
8  was with you at one of the bars at the time when the
9  shooting occurred, correct?
10     A. Correct.
11     Q. I believe you testified that you had left the bar
12 with Cordell Hubbard in your white Ford Focus, correct?
13     A. I don't recall.
14     Q. And I believe you testified that the two of you
15 went directly from bar to bar without going to the
16 location where Omar Clark was shot, correct?
17     A. I don't recall.
18     Q. You do recall that you had testified Cordell
19 Hubbard was with you all evening, correct?
20     A. Yes.
21     Q. And that was not true, correct?
22     A. I didn't testify in detail. But every spot that
23 I was at that night, Cordell Hubbard was there.
24     Q. Well, before your trial went forward, you knew
25 that Cordell Hubbard had left the 4U2B with William

Page 134

1  Sizemore, correct?
2      A. No. I was still learning. Like, I was still
3  piecing that night together as I was going. It was --
4  everything was just like -- it was just like a blur,
5  like, I was getting pieces from different spots.
6      I'm in the county, and I'm pretty much fighting
7  for my life. And I'm still distraught to the fact that
8  I'm even in jail for something I didn't even see.
9      So it was, like, a lot of stuff, it be foggy. It
10 by in and out, you know what I'm saying?
11     I was intoxicated that night. So it was like, a
12 lot of stuff that I do remember, I remember from people
13 telling me that that's what happened that night. So
14 some things be in and some be out.
15     Q. Well, when you testified at trial, you did not
16 tell the jury that you were with Cordell Hubbard at the
17 bars, but in between -- driving in between the bars, you
18 were not with him?
19        MS. GELSOMINO: Objection.
20     Q. You didn't explain that to the jury?
21     A. I didn't explain in detail.
22     Q. But you did testify that Cordell was with you all
23 night?
24     A. Yeah. Which is true.
25     Q. And at the time you testified at trial, you

Page 135

1  realized you were providing an alibi defense to
2  Mr. Hubbard, correct?
3      A. Yes. My intentions of testifying in trial was to
4  protect myself and defend myself. And in the process of
5  me defending myself, they asked about Cordell, which is
6  a part of -- I didn't study or focus on heavy. I was
7  worried about myself when I was on the stand. I was
8  more concerned about proving my innocence.
9      Q. But you just told us a few moments ago that
10 before your criminal case went to trial, you spoke to
11 Cordell, and Cordell told you and informed you that he
12 had left the 4U2B with William Sizemore.
13     So you knew that before you testified at trial,
14 correct?
15     A. When I got arrested for this crime that I didn't
16 see, everything went -- yeah --
17     Q. Not my question.
18     You knew before you testified at trial that
19 Cordell Hubbard had left one of the bars with William
20 Sizemore, correct?
21     A. Yes.
22     Q. You did not tell the jury about the fact that
23 Cordell left with William Sizemore, did you?
24     A. No.
25     Q. Did you ask Cordell Hubbard to be an alibi

Page 136

1  witness for you?
2      A. No.
3      Q. Did you know, before the criminal trial began,
4  that Cordell Hubbard was not going to testify?
5      A. No.
6      Q. Before you testified at trial, were you aware
7  that there were several eye witnesses who identified
8  Cordell Hubbard as being at the scene of the shooting
9  when Omar Clark was shot?
10     A. Yes. And there was -- yes.
11     Q. Okay. And you sat through the trial, and you
12 heard all of the State's evidence before you testified,
13 correct?
14     A. Yes. They also testified that I was there, that
15 I shot someone, so I didn't believe none of the
16 witnesses.
17     Q. There were two witnesses that identified you as
18 being at the scene of the shooting, Mr. Braxton and
19 Clark Williams, correct?
20     A. Braxton initially. Clark Williams only after he
21 testified that he didn't see the shooter. And then
22 after he saw me in court, said that he saw me.
23     Q. I'm talking about during the criminal trial in
24 front of the jury.
25     At the criminal trial in front of the jury,

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 137

1    Mr. Braxton testified that you were at the scene of the
2    shooting, correct?
3        A. Correct.
4        Q. And Clark Williams testified that you were at the
5    scene of the shooting, correct?
6        A. Correct.
7        Q. To my knowledge, those are the only two witnesses
8    who identified you as being at the scene of the
9    shooting.
10       Are you aware of anybody else that identified you
11   as a witness who saw you at the scene of the shooting?
12       A. No.
13       Q. Okay. Now, years later, your criminal conviction
14   was vacated, correct?
15       A. Yes.
16       Q. And there was some critical evidence that your
17   attorneys submitted to the Court in order to get your
18   criminal conviction vacated for murder, correct?
19       A. Correct.
20       Q. One critical piece of evidence was an affidavit
21   from Clark Williams admitting that he lied when he
22   testified at trial, and he really could not testify that
23   you were at the scene of the shooting, correct?
24       A. Correct.
25       Q. Another critical piece of evidence was the fact

Page 138

1    that William Sizemore signed an affidavit that he was
2    the one that was with Cordell Hubbard at the time of the
3    shooting, correct?
4        A. Correct.
5        Q. I think we can agree that had Mr. Williams and
6    Mr. Sizemore not come forward with their admissions, the
7    conviction against you probably would not have been
8    vacated?
9            MS. GELSOMINO: Objection.
10       Q. Can we agree on that?
11           MS. GELSOMINO: Objection.
12       A. No.
13       Q. You think the conviction would have been vacated
14   without the assistance of Mr. Williams and Mr. Sizemore?
15       A. Yes.
16       Q. Another critical piece of evidence was that
17   Cordell Hubbard not only admitted that you weren't
18   there, but also took a polygraph test to support the
19   fact that he was being truthful when he stated you were
20   not present, correct?
21       A. Correct.
22       Q. Looking at the documents, on those pieces of
23   evidence we just discussed, Clark Williams did not come
24   forward and agree to recant his prior testimony until
25   2018.

Page 139

1        Does that sound about right?
2        A. Yes.
3        Q. William Sizemore did not agree to come forward
4    and sign an affidavit that he was the one that was there
5    until approximately 2018, correct?
6        A. No. '17. I was released in '18.
7        Q. Okay. 2017.
8        Cordell Hubbard did not take his polygraph until
9    approximately 2015, correct?
10       A. Correct.
11       Q. And you also took a polygraph in 2015 to try and
12   bolster your statement that you were not there at the
13   shooting?
14       A. Correct.
15       Q. And you and Cordell both passed your polygraph
16   test?
17       A. Yes.
18       Q. Ronald Snipe and Bobby Nettles did not come
19   forward to sign affidavits that they were alibi
20   witnesses for you until 2014.
21       Does that sound about right?
22       A. Sounds about -- yeah.
23       Q. And McKenzie did not come forward to sign an
24   affidavit as an alibi witness for you until 2016,
25   correct?

Page 140

1        A. Correct.
2            MR. CALDERONE: Give me a minute here.
3    Let's take a break.
4            THE VIDEOGRAPHER: We're going to go off the
5    record. This is end of media five. The time is now
6    12:27:04. Off the record.
7            - - - -
8        (Off the record.)
9            - - - -
10           THE VIDEOGRAPHER: We are back on the
11   record. This is the beginning of media six. The time
12   is now 12:34:49. On the record.
13   BY MR. CALDERONE:
14       Q. Mr. Sailor, we already asked you some questions
15   about some of the officers. I want to follow up on some
16   of them.
17       You'd already told me that you -- other than
18   being arrested by Mr. Veverka, you had never had any
19   other interaction with him, correct?
20       A. Correct.
21       Q. You have no reason to believe that Mr. Veverka
22   has any type of vendetta against you, correct?
23       A. No.
24       Q. You have no evidence to suggest that Mr. Veverka
25   bears ill will or would like to harm you, correct?

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed:  07/25/24  36 of 72.  PageID #: 1385

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 141

1  A.  No.  Not correct.
2  Q.  You do have evidence that Mr. --
3  A.  Oh, evidence, no.  I don't have evidence.
4  Q.  And you are not aware of any evidence suggesting
5  that Mr. Veverka would consciously falsify evidence
6  against you, correct?
7  A.  Not to my knowledge, no.
8  Q.  Mr. Veverka, you have no evidence that
9  Mr. Veverka has a vendetta against you, correct?
10  A.  Correct.
11  Q.  You have no evidence that Mr. Veverka bears ill
12  will or would want to do you harm, correct?
13  A.  Correct.
14  Q.  You have no evidence that Mr. Metzler would
15  consciously falsify evidence against you, correct?
16  A.  Correct.
17  Q.  You have no evidence that Mr. Desatnik has --
18  bears a vendetta against you, correct?
19  A.  Correct.
20  Q.  You have no evidence that Mr. Desatnik bears ill
21  will or would like to do you harm, correct?
22  A.  Correct.
23  Q.  And you have no evidence that Mr. Desatnik would
24  consciously falsify evidence against you, correct?
25  A.  Correct.

Page 142

1  Q.  You have no evidence that Mr. Hasan or
2  Mr. Farinacci has vendetta against you, correct?
3  A.  Correct.
4  Q.  You have no evidence that Mr. Hasan or
5  Mr. Farinacci bears ill will or would like you to --
6  strike that.
7      You have no evidence that Mr. Hasan or
8  Mr. Farinacci bears you ill will or would like to do you
9  harm, correct?
10  A.  Correct.
11  Q.  You have no evidence that Mr. Hasan or
12  Mr. Farinacci would consciously falsify evidence against
13  you, correct?
14  A.  Correct.
15  Q.  You have no evidence that Mr. Purcell or
16  Mr. Smith have or have had a vendetta against you,
17  correct?
18  A.  Correct.
19  Q.  You have no evidence that Mr. Purcell or
20  Mr. Smith bear you ill will or would like to do harm
21  against you, correct?
22  A.  Correct.
23  Q.  You have no evidence that Mr. Purcell or
24  Mr. Smith would consciously or did consciously falsify
25  evidence against you, correct?

Page 143

1  A.  Correct.
2  Q.  It's my understanding that you think Mr. Jones
3  had a vendetta against you or was out to get you,
4  correct?
5  A.  Correct.
6  Q.  And is that for the reasons that you explained to
7  me earlier in your testimony?
8  A.  Correct.
9      MS. GELSOMINO:  Objection.
10  Q.  You explained to me how you interacted with
11  Mr. Jones at school, on the street, at the gas station,
12  and at your house.
13      Other than the testimony that you've already
14  explained to me about his actions, is there any other
15  evidence that you have suggesting Mr. Jones had a
16  vendetta against you or was out to get you?
17  A.  Pretty much, just basically, he is the forefront
18  of me being involved in this case.  Like, him not even
19  being a homicide detective.  But he's talked to
20  witnesses.  He's made a report saying that he talked to
21  witnesses, things of that nature.  He's not even a
22  homicide detective.
23  Q.  All right.  Other than the interactions you
24  described with him at school, on the street, at your
25  house, and other than him talking to witnesses when he's

Page 144

1  not a homicide detective, is there any other evidence
2  you're aware of that you believe suggests Mr. Jones had
3  a vendetta against you?
4  A.  Yes.  He involved me in a crime I had nothing to
5  do with.
6  Q.  And how did he do that?
7  A.  He gave the homicide detective my name and
8  address.
9  Q.  Okay.  Any other evidence that, you believe you
10  rely on to suggest Mr. Jones was out to get you or had a
11  vendetta against you?
12  A.  Yes.  I personally heard from Bobby Nettles
13  myself, personally, that Eugene Jones threatened him not
14  to come to court and be an alibi witness for myself or
15  witness for myself, as well as Anthony McKenzie.  Dawn
16  Goolsby, I didn't speak to her personally about it until
17  I was released, and she told me personally that he told
18  her not to be involved in this case and not get involved
19  or that he would get -- he would have had her
20  establishment, the Benjamin's, shut down.
21  Q.  So Nettles and McKenzie made those
22  statements to you and you believe Dawn Goolsby made
23  those statements to you?
24  A.  No.  I know she did.
25  Q.  Okay.  Any other evidence that you rely upon to

Case: 1:20-cv-00660-DAR Doc #: 88-2 Filed: 07/25/24 37 of 72. PageID #: 1386

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 145

1  believe that Mr. Jones had a vendetta or was out to get
2  you?
3      A. No. Just his report, his involvement in the
4  case.
5      Q. You explained to me earlier that back in --
6  before 2002, you had interactions with him on the street
7  and at school, and that he had made comments to you that
8  he knew you were dealing drugs and he would get you.
9      After your arrest for trafficking drugs and after
10 that conviction, did you have any more direct
11 interactions with Mr. Jones where he made any type of
12 comment that you perceived as a threat?
13     A. No. I didn't see him.
14         MR. CALDERONE: Can you read the last
15 question back to me?
16             - - - -
17         (Thereupon, the requested portion of the
18         record was read by the court reporter.)
19             - - - -
20     Q. Yeah, so if I understand, you believe Mr. Jones
21 was harassing you, telling you he was going to get you
22 for trafficking drugs. Then you were arrested for
23 trafficking drugs and ultimately pled guilty to that
24 charge, correct?
25     A. Correct.

Page 146

1      Q. After that conviction for trafficking drugs, from
2  that point in time, up to the point in time when you
3  were arrested in 2002, did you have any other direct
4  interactions with Mr. Jones?
5      A. No. I stayed clear out of the way. I removed
6  myself.
7      Q. Now, I wasn't clear on something.
8      Is it your contention today that you did not lie
9  when you testified at trial?
10     A. I did lie.
11     Q. Do you think your own conduct of lying at trial
12 played any role in your conviction for Omar Clark's
13 murder?
14     A. Yes.
15     Q. In addition to the things that you allege in this
16 case, do you think you, to any degree, are also at
17 fault, to any degree, for your conviction?
18         MS. GELSOMINO: Objection.
19     A. No.
20     Q. No, you do not?
21     A. No.
22     Q. So we agree that it was wrong for you to lie at
23 trial, correct?
24     A. Correct.
25     Q. But you don't think your lying at trial had

Page 147

1  anything to do with you actually being convicted?
2      A. No. Not at all because me lying about the
3  whereabouts of an individual and me actually killing an
4  individual are two totally separate things. Like,
5  there's no comparison. I was nowhere near the scene of
6  the crime, nowhere at all. That's what I was on trial
7  for, murder.
8      Q. Well, when you sat through the trial, you heard
9  the testimony of the witnesses who identified Cordell
10 Hubbard as being at the scene of the murder, correct?
11     A. Correct. They also identified me as being on the
12 scene of the murder.
13     Q. Yeah. But I'm not done with my question.
14     You heard several witnesses identify Cordell
15 Hubbard as being at the scene of the murder, correct?
16     A. Correct.
17     Q. When you testified, did you realize that by
18 testifying and telling the jury you were with
19 Cordell Hubbard all night, that you were pairing
20 yourself with him at the scene of the murder?
21     A. No. I was pairing him with me at the scene of
22 the bar.
23     Q. Well, when you testified, you realized that
24 either the jury was going -- either the jury was going
25 to believe you were both at the bar or the jury was

Page 148

1  going to believe you were both at the scene of the
2  murder --
3          MS. GELSOMINO: Objection.
4      Q. -- correct?
5      A. I ain't sure. I'm not sure. I didn't know what
6  to expect. I was on trial for something I didn't see.
7  I didn't have time to prepare for my trial. And I
8  was -- for me being arrested on April 2nd, to me being
9  in a full-blown court hearing or trial not even 30 days
10 later.
11     It was all knew to me. Everything was. And I
12 was under a great deal amount of stress I was dealing
13 with. I had a newborn baby, other kids. It was just --
14 it was a lot for somebody at 20 -- 20 years old.
15     Q. Okay. That was a long answer. I'm not sure I
16 got your --
17     A. Sorry. Sorry about that.
18     Q. Okay. I guess my question is, there are
19 witnesses that said you and Cordell Hubbard were at the
20 scene of the murder, correct?
21     A. Correct.
22     Q. There were witnesses that said you and Cordell
23 Hubbard were at a bar, correct?
24     A. Correct.
25     Q. At least Samuel Brown said it, and you testified

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed:  07/25/24  38 of 72.  PageID #: 1387

Deposition of Ru-El Sailor, Jr.                          Ru-El Sailor, vs. City of Cleveland, et al.,

Page 149

1  to that fact as well, correct?

2  A. Correct.

3  Q. When you testified at trial, you did not suggest

4  to the jury in any way that there was ever a time that

5  evening when Cordell Hubbard was not with you, correct?

6  A. Correct. I said I didn't say it in detail.

7  Q. You did not suggest in any way to the jury that

8  there was a time that evening when you were not with

9  Cordell Hubbard, correct?

10  A. I don't recollect it. Probably.

11  Q. So at the time when you testified, you realized

12  that the jury was going to believe one of two things,

13  either you were both at a bar or you were both at the

14  scene of the murder?

15       MS. GELSOMINO: Objection. Asked and

16  answered, and form.

17  A. I was more worried about myself.

18       MS. GELSOMINO: Sorry.

19  Q. What do you mean you're worried about yourself?

20  A. I was more so worried about myself. Like, I was

21  on trial for murder. They said I shot and killed

22  somebody. I was more concerned about that, more so than

23  Cordell -- where Cordell was at. I was more worried

24  about myself. I put me at the forefront. I was worried

25  about defending myself.

Page 150

1  Q. Well, can we agree that it would have helped you,

2  more than Cordell, if you would have explained to the

3  jury during trial that there were periods of time during

4  that evening when Cordell was not with you, when he and

5  William Sizemore left and were not with you and the

6  group?

7       MS. GELSOMINO: Objection.

8  A. I'm pretty sure I said that in my testimony that

9  we not locked in arm-in-arm, hand-in-hand. We not

10  shoulder-to-shoulder the entire time we in a place.

11  Q. But you knew before trial began that William

12  Sizemore and Cordell Hubbard had left a bar without the

13  rest of you, true?

14  A. True.

15  Q. And you did not explain to the jury that William

16  Sizemore and Cordell Hubbard left the rest of you during

17  that evening?

18       MS. GELSOMINO: Objection. Asked and

19  answered multiple times.

20  Q. Correct?

21       MS. GELSOMINO: Form.

22  A. Correct.

23  Q. Okay. You told me you were expelled at school,

24  and I think you said for fighting?

25  A. No. I said it was a fight.

Page 151

1  Q. It was a fight?

2  A. Yes.

3  Q. Is that the only time that you had ever gotten in

4  trouble at school before you were expelled?

5  A. As far as my recollection, yes.

6  Q. And in prison, you told me about the different

7  offenses that you got disciplined for, the Rule 24s?

8  A. Yes.

9  Q. I didn't understand exactly what that was.

10       You said it had something to do with establishing

11  a relationship with an officer?

12  A. Yes.

13  Q. What do you mean "a relationship"?

14  A. A relationship between a man and a woman.

15  Q. You mean, like, an intimate relationship?

16  A. Yes.

17  Q. So the guards for the Rule 24 violations were

18  female guards?

19  A. Yes.

20  Q. And did you, in fact, have relationships with the

21  guards?

22       MS. GELSOMINO. Objection.

23       I mean, you can answer. It's ridiculous.

24  You can still answer.

25  A. Yes.

Page 152

1  Q. Okay. And then there was the cellphone, that you

2  got in trouble for having a cellphone.

3       Where did you get the cellphone?

4       MS. GELSOMINO: Objection.

5  A. I don't recall. I bought it.

6  Q. In prison?

7  A. (Indicating.)

8  Q. You bought it from who?

9  A. I don't know.

10  Q. A cellmate, or I should say, another prisoner?

11  A. Yes.

12  Q. Not a guard?

13  A. No.

14       MR. CALDERONE: I don't think I have any

15  other questions.

16       Do you want to ask questions?

17       Do you want to switch seats?

18       EXAMINATION OF RU-EL SAILOR

19  BY MR. PUIN:

20  Q. Mr. Sailor, my name is Tim Puin, Assistant

21  Director of Law at the City of Cleveland. I have some

22  follow-up questions.

23       THE VIDEOGRAPHER: Let me see your base.

24  Q. Mr. Sailor, my name is Tim Puin. I'm the

25  Assistant Director of Law at the City of Cleveland. I

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  39 of 72.  PageID #: 1388

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 153

1  have some follow-up questions.
2      So since 2018 when you were released, you were
3  exonerated for any involvement in the murder of Omar
4  Clark, correct?
5  A. Correct.
6  Q. And you had gotten married?
7  A. Yes. Correct.
8  Q. And you've started a new business, correct?
9  A. Yes.
10  Q. And you had a new baby?
11  A. Yes.
12  Q. Correct? And that's a lot of blessings in a
13  two-and-a-half-year period, correct?
14  A. Yes.
15  Q. Okay. Well, congratulations on all of those
16  blessings.
17  A. Thank you.
18  Q. And we're here to ask about your lawsuit. So
19  we're just going to do our job and ask from the City's
20  perspective about facts bearing on your claims in this
21  lawsuit, okay?
22  A. Okay.
23  Q. Before I do that, it is almost 1:00 o'clock.
24      Do you need a lunch break or any kind of break,
25  short break now?

Page 154

1  A. No. I'm good.
2  Q. You want to keep pushing through?
3  A. Yes.
4      MR. PUIN: Okay. At 2:00 o'clock I do have
5  a case management conference in the case of Boddie
6  versus the City of Cleveland with Judge Boyko.
7  Hopefully, we will be done by then, but if we're not,
8  I'm going to have to take a break at 2:00 o'clock.
9      And for the record, by asking you questions
10  today, we are not waiving any right to reopen your
11  deposition after written discoveries are provided, and
12  we reserve that right for the record.
13      That was a little legalese.
14      THE WITNESS: All right.
15      MR. PUIN: Don't worry about it.
16  Q. But just some housekeeping questions. Your
17  friends and family call you El; is that right?
18  A. Yes.
19  Q. E-L?
20  A. Yes.
21  Q. Okay. And your friends and family typically
22  don't call you Ru-El --
23      MS. GELSOMINO: Objection.
24  Q. -- is that right?
25  A. Some do, some don't.

Page 155

1  Q. Okay. So back in 2002, did your friends call you
2  El back then, too?
3  A. Yes.
4  Q. Okay. Was one of the issues in the case that
5  "El" might have sounded like "Will", if you know?
6  A. They don't, but yes.
7  Q. Okay. People had said that?
8  A. No. Just Eugene Jones.
9  Q. Okay. Detective Jones said that? Okay.
10      You know what I'm talking about when I say it's
11  the El/Will thing?
12  A. Yes.
13  Q. Okay. All right. Understood.
14      So you were really close with the Cordell
15  Hubbard, right?
16  A. Yes.
17  Q. Okay. And you've known him since, you know, he
18  was 10 and you grew up like brothers, you said?
19  A. Yes.
20  Q. Okay. How about Nichole Hubbard, were you close
21  with her?
22  A. No.
23  Q. Did you know her at all growing up?
24  A. Yeah. She was Cordell's sister. They didn't
25  live in the same house.

Page 156

1  Q. Okay. Had you ever interacted much with her?
2  A. No.
3  Q. Okay. Did you -- were you ever close with her as
4  a friend or otherwise?
5  A. No.
6  Q. Okay. Trying to understand what happened here,
7  and I think I might have it. So let me just run it down
8  and ask you in pieces and have you confirm that my
9  understanding is correct, all right?
10      So you were partying all night with your buddies,
11  right?
12  A. Yes.
13  Q. Okay. And at some point, Cordell and Will left
14  without you noticing them leaving one of the parties,
15  right?
16  A. Correct.
17  Q. Okay. Then you get a call or a text from Cordell
18  at some point saying, "Come pick me up"?
19  A. Yes.
20  Q. Was it a call or a text?
21  A. A call.
22  Q. Okay. And he said he's at his mom's?
23  A. Yes.
24  Q. And, "Come bring me to whatever party you are
25  at," right? And that was St. Al's?

Deposition of Ru-El Sailor, Jr.                                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 157

1    A. Oh, just come --
2        MS. GELSOMINO:  Objection.
3        You can correct that.
4    A. Just come get him and then we can go to the party
5    at St. Aloysius.
6    Q. Okay.  And St. Al's had a club night or
7    something, like, casino night or something?
8    A. No.  It's an event.  It's like an event space and
9    had a cabaret there.
10   Q. Okay.  Okay.  So you they had rented out the
11   church hall --
12   A. Yes.
13   Q. Okay.
14   A. Yes.
15   Q. Was that like an every-night or every-weekend
16   thing or a special event?
17   A. I think it was a special event.  They don't have
18   it every weekend.
19   Q. Okay.  And  do you know who put that cabaret
20   night on?
21   A. No.
22   Q. Did you have to pay to get in the door
23   there?
24   A. I can't recall.
25   Q. Okay.  So you did leave the cabaret night at

Page 158

1    St. Aloysius to get Cordell?
2    A. No.  I didn't.  No.  I didn't leave St. Aloysius.
3    I went to pick Cordell up and then we went to
4    St. Aloysius.
5    Q. Gotcha.  Okay.
6        And Attorney Calderone was showing you pictures
7    earlier of you and Cordell at St. Aloysius.  So we know
8    he was at St. Aloysius?
9    A. Yes.
10   Q. Okay.  So you left 4U2B?
11   A. Yes.
12   Q. And picked him up at his mom's?
13   A. Yes.
14   Q. Okay.  And was anybody in the car with you when
15   you went to pick him up?
16   A. No.
17   Q. Okay.  And you only picked him up, you didn't
18   pick up Will or anyone else?
19   A. No.
20   Q. Okay.  Just him?
21   A. Just him.
22   Q. Okay.  Then you guys didn't go back to 4U2B, you
23   went right back to St. Al's --
24   A. Yes.
25   Q. -- Cabaret night?

Page 159

1        Okay.  Now, in that car ride, as you look back on
2    it, do you believe that at that time, he had already
3    shot Omar Clark?
4        MS. GELSOMINO:  Objection.
5    A. I can't recall.
6    Q. Okay.  But you are saying -- just so I understand
7    what happened, you are saying he didn't say anything to
8    you about just shooting somebody?
9    A. We weren't even in the car that long.
10   Q. How long a drive was it from where you guys --
11   A. Probably like five minutes.
12   Q. Okay.  So you just had him in the car briefly.
13       He didn't say anything about shooting anybody?
14   A. No.
15       MS. GELSOMINO:  Asked and answered.
16   Q. He didn't ask you to cover for him?
17       MS. GELSOMINO:  Objection.
18   Q. Correct?
19   A. Correct.
20   Q. Okay.  Then you heard on the street and later
21   from the police that Cordell was a suspect in the murder
22   of Omar Clark, right?
23   A. No.  I didn't find out until he was arrested.
24   Q. Okay.  And then trial happened really quickly and
25   your head was kind of a whirlwind because everything was

Page 160

1    happening too quickly?
2    A. Yes.
3    Q. And at the time of trial, when you said he was
4    with you all night but you didn't get into details, you
5    thought you were telling the truth at that time; is that
6    right?
7        MS. GELSOMINO:  Objection.
8    A. To a certain point.
9    Q. Okay.  You were -- you knew you were sort of
10   covering for him but you weren't getting in the details
11   and nobody was asking you for details?
12       MS. GELSOMINO:  Objection.
13   Q. Is that fair to say?
14       You didn't want to get into, "He left, I didn't
15   know he left.  I went and got him"?
16   A. Yeah.  Yeah.
17   Q. You didn't want to get into the gap, so to speak?
18   A. Yes.  I just wanted to worry about me.
19   Q. Right.  So the gap is the point in which he left
20   at some point without you knowing and then you go and
21   get him.  You don't know how long that gap was?
22   A. Yes.
23   Q. You don't know whether he had time to go kill
24   somebody and then come back?
25   A. Yeah.  Because I didn't know he even had left.

Page 161

Q. Exactly. Okay. So at the time of the trial, you didn't think it was a big deal to say that you were with Cordell all night?

It was just like saying you were with any of your other friends all night?

A. Like, I've been here with y'all all day.

If somebody was like -- if somebody asked me right now, where was I at all day? I was with y'all all day.

Not like, he went to the bathroom. He went to the bathroom.

Q. Yeah.

A. He went and got water.

Q. Right. That's what I thought he was going on.

A. Yeah.

Q. Okay. So that's what you understood your testimony to be. And you weren't like, all -- you didn't think your saying that was creating alibi or covering for him, it was just a fact, "I was with this man all night"?

A. Yeah.

Q. Okay. Then later the prosecutors and the judge made a big deal about it, right, in your opinion?

A. Yeah.

Q. They kind of blew it up out of proportion, would

Page 162

you say?

A. Yeah.

MS. GELSOMINO: When?

Q. After you were convicted and you were in trial, when it came time for the conviction and Integrity Unit to look at your file and everybody to review whether you were really involved in this or not, they made you plead guilty to perjury and obstruction of justice to get out of the prison; is that right?

A. Yes.

Q. Okay. Did you think it was unfair of them to do that? That they were blowing it up out of proportion?

A. Yes. It was more so like, "You had been in jail for murder. We know you ain't do the murder. We know you're innocent, but you lied on the stand."

I'm like, "All right. I will take accountability of that action as a man, yes. All right."

And they was like, "Well, if you want to go home now, you got to take 10 years for this perjury."

And me and my attorney both is like, "It's illegal."

Like, I know a little bit about law. I know perjury don't carry 10 years, nor five years. Like, I knew this.

At the moment, I'm in Lucasville, one of the

Page 163

worst prisons in Ohio, where they actually kill inmates and things of that nature.

And it was like, I just wanted to go home and be with my kids. If they would have told me 15 years time served, I probably would've took it for perjury, because I just wanted to go home. And they knew that.

And, you know what I'm saying? Like, you are telling me that I've been in here for 15 years for a murder I didn't even see. And it's like, you are telling me, you know I'm innocent. But you not saying, "All right. Come on, let's go. We're about to let you out."

It's like, "Oh, we don't want to let you out until you take this deal for perjury, and then we'll let you out."

And I took the deal because I wanted to go home. It was, like, in the most stressful environment I had ever been in in my life.

Q. Do you think that it was Prosecutor O'Malley that was driving the bus on that or was it the judge?

MS. GELSOMINO: I mean, objection.

You can answer to the extent that you know.

A. I think it was more so the prosecutor's office, O'Malley and Russell Todd was -- you know what I'm saying? It was -- that's who -- Russell Todd came to

Page 164

see me in Lucasville. Him, my attorney, and I think an investigator by the name O'Malley came to see me in Lucasville.

And when I was there, when I got the call they was coming, I thought that they was coming to get me.

Because my whole time in prison, everybody always talking William Sizemore will come forward or one of your witnesses recant, it's an automatic gate opener.

So, you know, I prayed my whole time in there that William Sizemore would come get me. Because Cordell had already admitted to this crime in 2003 and they ignored it. So it was like only one else that can help me is William Sizemore. And when he finally came forward, I thought my gates was going to open.

And they had called me and told me that my lawyer, Kim, and Russell Todd was coming to see me in Lucasville. So I was like, they're coming to get me. You know what I'm saying? That's what I'm thinking.

And they came and saw me. And Russell Todd told me the investigation wasn't over with yet and that they presented the deal, like will I take the perjury obstruction of justice?

And I was like, "All right. I'll own up to what I did wrong. If you are going to let me out, yes."

You know what I'm saying? And they left me in

Page 165

1 there.
2      And he told me that he didn't see William
3 Sizemore as a suspect.  William Sizemore never got
4 arrested or nothing like that.  He came and told him the
5 truth.  He confessed.  They let him go home.
6      And here I am, an innocent man that you know for
7 a fact that I wasn't even there, and they left me in
8 Lucasville and left me in prison.  And it wasn't until
9 nine months later that I got exonerated.
10     So from the time they knew that I was innocent,
11 it was nine months to ten months before they let me out.
12 So those -- it was just torture.  It was just -- ain't
13 no other way to talk about it.  It was torture.
14     Like -- and you're telling me that an individual
15 that was actually there and actually confessed to being
16 part of the situation is at home with his family.  It's
17 torture, like -- I don't know.
18     So I took the deal.  I was just like, I knew it
19 wasn't right.  I knew it wasn't legal.  I knew all those
20 things.  And it was like, I just wanted to go home.
21     Like, I was tired.  I was -- my family was tired.
22 You know what I'm saying, my kids was babies when I
23 left.  They grown.  I just wanted to go home.
24   Q. So if I understand you, what you are saying is,
25 like, from the facts that you've testified to today, you

Page 166

1 were probably driving under the influence that night,
2 right?  You were probably like drunk-driving or driving
3 impaired or whatever.
4      So you're saying it's like they said to you, "All
5 right.  We will let you out, but you got to plead to
6 drunk driving and attend your sentence to drunk
7 driving?"
8      This is kind of like that, right?
9   A. Yeah.
10   Q. It had nothing to do with the murder?
11     MR. CALDERONE:  Objection.
12   Q. Had nothing to -- it had nothing to do with you
13 being convicted, in your opinion.
14     It's just something they made you do?
15   A. Yes.
16   Q. That's how you see it, right?  Correct?
17   A. Yes.  It's like, in so many words, like dangling
18 the carrot in front of a rabbit.  Like, "If you want
19 this freedom, then you've got to give us what we want."
20     It wasn't like, "If you don't take the deal for
21 perjury, you still get to go home because you're
22 innocent of a murder, and we will indict you on perjury
23 from the streets."
24     It wasn't like that.  It was like, "You take this
25 deal, you go home today."

Page 167

1      If you don't take this deal, then we back to the
2 process where all my appeals had been exhausted.  And
3 who knows how my new trial motion would have ended.  It
4 was just --
5   Q. So it was like --
6   A. It was a no-brainer.
7   Q. Okay.  Understood.
8      So it was something -- it was somewhat under
9 duress, in your opinion, the plea of guilty to perjury,
10 and obstruction of justice.
11   A. No --
12   Q. It was this threat that you would basically be in
13 prison forever unless you did this deal?
14   A. Yeah, it wasn't somewhat.  It was definitely.
15   Q. Definitely under duress?
16   A. Definitely.
17   Q. Okay.  And you would -- just another word would
18 be "coerced".
19      You felt like you were coerced in that deal?
20   A. I just feel like -- yes.  Yes.
21   Q. Okay.  So if your testimony at trial that Cordell
22 was with you all night without getting into details,
23 that didn't have a bearing on your being convicted or
24 involvement in the murder of Omar Clark, why do you
25 think you were convicted?

Page 168

1   A. I --
2      MS. GELSOMINO:  Objection.
3   A. I don't have a clue.  If you read this case and
4 the evidence in this case, the initial witness for the
5 state, Larry Braxton, his initial identification was the
6 complete opposite of how I'm sitting here today.
7      He describes two light-skinned individuals that
8 looked like brothers.  Me and Cordell Hubbard's night
9 and day.  And this crime happened at 12:30 at night on a
10 side street, which is dark as ever.  And they are saying
11 I was light skinned.
12     So in my opinion, I didn't have a win.  Because I
13 shouldn't have been there because the detectives on the
14 case and the prosecutors should have known that I wasn't
15 a light-skinned individual just by the sight of my
16 picture.
17     MR. CALDERONE:  Objection.  Move to strike.
18     MS. GELSOMINO:  Based on what?
19     MR. CALDERONE:  His description.
20     MS. GELSOMINO:  Of himself?
21     MR. CALDERONE:  No.  His description of what
22 Braxton said at trial.
23     It's okay.  Go ahead.  I'm just making a
24 record.
25     MS. GELSOMINO:  It's okay.  Just focus on

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  43 of 72.  PageID #: 1392

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 169

1 the questions.
2        THE WITNESS: Okay.
3    Q. At the time you testified that Cordell was with
4 you all night, did you have any doubts as to whether he
5 was involved in the murder of Omar Clark or not?
6        MS. GELSOMINO: Wait. I'm sorry. Can you
7 repeat that question?
8    Q. At the time you testified that Cordell Hubbard
9 was with you all night, did you suspect that he might
10 have actually been involved in the murder?
11        MS. GELSOMINO: Objection.
12    A. Yes.
13    Q. And I was reading an interview of you with Scene
14 Magazine in 2016. You told Scene, quote, "It wasn't an
15 option, period. Me telling on him or throwing him under
16 the bus. That was my best friend. We grew up like
17 brothers."
18        So did you -- does that sound like something you
19 said to Scene?
20    A. Yes.
21    Q. Okay. And that was your feeling when you were on
22 stand at trial, is I'm not going to say something to
23 hurt him?
24        MS. GELSOMINO: Objection.
25    Q. Right?

Page 170

1        Even if it helped you?
2    A. (Indicating.)
3    Q. Is that right?
4    A. Yes.
5    Q. All right. Now, are you still friends with
6 Cordell Hubbard?
7    A. Yes.
8    Q. I think you said you talked to him frequently?
9    A. Yes.
10    Q. Did you feel that Cordell Hubbard has any
11 responsibility for your conviction?
12        MS. GELSOMINO: Objection.
13    Q. Should he have said sooner that you weren't
14 there?
15        MS. GELSOMINO: Objection.
16    A. Yes.
17    Q. Okay. All right. So you -- if we could say that
18 there's a 100 percent fault for your convictions out
19 there, and it could be spread among different sources,
20 you take zero percent responsibility for your conviction
21 based on your statements on the stand that he was with
22 you all night, right? You think that it had nothing to
23 do with your conviction?
24        MS. GELSOMINO: Objection. Asked and
25 answered. Form.

Page 171

1    Q. So you --
2        MS. GELSOMINO: Calls for legal conclusion.
3        But you can answer to the best of your
4 ability.
5    Q. As we've discussed -- and I think I understand
6 correctly how you feel about this. Your testimony that
7 he was with you all night had no bearing in your
8 conviction? You didn't think it was that big a deal at
9 the time?
10        MS. GELSOMINO: Objection. Asked and
11 answered.
12    A. You confusing me now, to be honest.
13    Q. I'm sorry?
14    A. You confusing me right now, to be honest.
15    Q. Okay. I'm sorry.
16        So when you testified that Cordell was with you
17 all night, you weren't trying to protect Cordell, you
18 weren't thinking about Cordell, you were thinking about
19 yourself?
20    A. Yes.
21    Q. Right?
22    A. Yes.
23    Q. Okay. And so your statement that he was with you
24 all night, that had zero percent bearing on your
25 conviction, in your opinion?

Page 172

1        MS. GELSOMINO: Objection.
2    Q. That had nothing to do with you getting
3 convicted?
4    A. No. In my opinion, no.
5    Q. So the answer to my question is yes, it had
6 zero percent to do with you getting convicted?
7    A. Yes.
8    Q. Okay. Now, you think the police had some percent
9 responsibility for you getting convicted because they
10 were told there was a light-skinned individual that
11 looked like his brother and that doesn't fit your
12 description, right?
13        MS. GELSOMINO: Object --
14        MR. CALDERONE: Objection to form.
15        MS. GELSOMINO: Join in the objection.
16    Q. Did you understand my question? You think the
17 police had some responsibility for your getting
18 convicted?
19    A. 100 percent.
20    Q. 100 percent.
21    A. 100 percent, yes.
22    Q. Okay. Okay. And we talked about some of the
23 reasons why, a detective had a vendetta against you
24 going back to Collinwood, right?
25    A. Yes.

Page 173

Q. Okay. And that was?

A. Eugene Jones.

Q. Okay. And another officer had been told that there was a light-skinned man at the shooting that looked like Cordell, and that doesn't match your description, right?

A. This was the witness' initial statement. His first statement ever made to detectives and the second statement he says, "Two light-skinned individuals which looked like brothers."

Q. Okay. Okay. So -- and then also, do you believe that the police failed to tell the prosecutor about their knowledge of William Sizemore's involvement?

A. Definitely, yes.

Q. Okay. And as you sit here today -- and, you know, it's a discovery deposition, you know, not the end of the story, but what else do you think the police did to violate your constitutional rights besides what you've already told us?

MS. GELSOMINO:  Objection.

Q. If you can think of anything.

If anything is sticking out in your mind, you know, what is it?

A. Just involving me in this crime, period. I don't know the law terms. I just know that I didn't kill

Page 174

anybody. I wasn't on Englewood 105 when somebody got killed.

And I know that more so than anything, that I was not present at the scene of this alleged crime that happened that night. I was nowhere near it. And I did 15 years for it.

Q. When Attorney Calderone was asking you earlier about specific officers you sued, did he ask you about James Purcell?

I'm sorry if I missed it.

MR. CALDERONE:  Yeah.

MR. PUIN:  Yeah.

Q. Okay. So you said 100 percent was on the police for your conviction. But you also said that Cordell could have, should have told people before he was convicted that you weren't there, right?

A. I say 100 percent because I should have never been there in the beginning. I should have never been involved in this crime, in the case hearings, or anything like that because I didn't commit the crime.

I wasn't there. I didn't fit in the description of any of the suspects in the crime.

So, yes, I believe the police are 100 percent. Because this is your profession, to deal with descriptions. You should know that I don't fit the

Page 175

description.

Q. Okay. So I'm just trying to understand.

So you don't blame Cordell Hubbard for having any responsibility for your being convicted; is that right?

A. No. I blame the people who involved me in this situation.

Q. Okay. Now, after -- right after Cordell Hubbard was convicted, didn't he tell the Court that you weren't there?

A. Yes.

Q. Don't you think you should have got a new trial right then and there?

A. Yes.

Q. And who do you blame for not giving you a new trial right then and there, the prosecutor --

MS. GELSOMINO:  Objection.

Q. -- the judge, right?

A. Yes.

Q. Okay. Was it Judge Nancy Donelly[sic]?

A. Nancy McDonnell.

Q. Nancy McDonnell. I'm sorry.

Do you blame her for not giving you a new trial right then and there?

MS. GELSOMINO:  Objection.

A. Yes.

Page 176

Q. Okay.

A. It's her courtroom.

Q. Okay. Now, again, from a news report, after you were exonerated, Judge Nancy McDonnell addressed you in the courtroom; is that right?

A. Yes.

Q. Okay. And she had some words for you about the perjury and obstruction of justice; is that right?

A. Very harsh words, yes.

Q. Okay. And she basically said that you put yourself in prison, and I'm going to quote what I read she said. Quote, "If you would have just told the truth, you wouldn't have spent the last 15 years in prison. You put yourself in prison", unquote.

Do you remember her saying those words?

A. Yes.

Q. Okay. And you characterize those as harsh words?

A. Yes.

Q. Okay. And I believe in an interview with Ideastream WCPN, they ask you the same question, like what's your response to that.

And you told them you didn't put yourself in prison. "A police officer who had a vendetta against me put me in prison"?

A. Yes.

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 177

1  Q. And you believe that's true today?
2  A. Yes.
3  Q. Okay. And is the source for Eugene Jones's
4  vendetta against you that you were a troublemaker in
5  high school? Do you have anything other -- more
6  personal than that, like --
7  A. No. No.
8  Q. It was just that you were basically a
9  troublemaker in high school?
10     MS. GELSOMINO: Objection.
11  A. I wasn't a troublemaker in high school.
12  Q. Okay. Well, you were dealing drugs in high
13  school, right?
14  A. No. I didn't deal -- I didn't sell drugs in
15  school.
16  Q. Not -- you mean not on the grounds of Collinwood
17  High or while you were in high school?
18  A. While I was in high school, yes, I did. But not
19  in the actual school itself.
20  Q. But he -- Detective Jones knew you were selling
21  drugs while you were a student at Collinwood High,
22  right?
23  A. He didn't actually know. He just knew I'd be on
24  corners where drugs get sold. He never saw me sell no
25  drugs ever, not once. He just knew that I'd be in the

Page 178

1  neighborhood and on the corners.
2  Q. Okay. So other than his seeing you on the corner
3  and speculating that you were selling drugs, you don't
4  know of why else he would have a vendetta against you
5  other than that?
6  A. No.
7  Q. You guys didn't have any kind of fight at any
8  time or harsh words between yourselves?
9  A. No. We just had, like, little -- I mean, at one
10  point, he came to my mom's house. This is after a
11  couple of truancy things. I wasn't even in high school
12  no more. He pulled in front of my mother's house
13  because everybody knew his car and he asked my little
14  sister at the time, probably like -- -- she was probably
15  like 10, 11, man. And he asked my baby sister to go in
16  my house and get him some drugs.
17     Basically saying, like, I sell drugs out of my
18  mom's house. You know, and my sister went in there and
19  told my mother, like, the guy in the gold car -- he had
20  a gold Chrysler or something like that -- asked her can
21  he buy drugs out of this, you know what I'm saying, out
22  of this house.
23     Like, who does that to a kid? Like, you take
24  your job to that point where you are asking a kid to get
25  you drugs on my house? Like, I've never sold drugs out

Page 179

1  of my mother's house not once ever in my life.
2     True enough I lived there and I sold drugs maybe
3  on other streets around the corner down there, but never
4  at her house.
5     And so I saw him at a light, a red light
6  together, and I was like, "I appreciate you stay away
7  from my mother's house. I mean, I don't sell drugs out
8  there. Whatever you want to deal with me, deal with me
9  in the streets. Like leave my mother's house outside of
10  it."
11     And he was like, "All right. I'll see you
12  around."
13     And that was it. And the next time I saw him was
14  when he planned the drugs on me in the gas station. And
15  then I didn't see him after that. And I ain't see him
16  after that, to be honest.
17  Q. Was it just you or did Detective Jones, in your
18  opinion, have a vendetta against your friends, too?
19     MS. GELSOMINO: Objection.
20  A. I think he had a problem with our whole
21  neighborhood.
22  Q. I'm sorry?
23  A. I think he had a problem with our whole
24  neighborhood.
25  Q. Okay. So not just you, but your friends, as

Page 180

1  well?
2  A. Yes.
3  Q. Okay. So we've talked about how you believe your
4  constitutional rights were violated by the police.
5     You are aware that you also sued the City of
6  Cleveland for violating your constitutional rights,
7  correct?
8  A. Yes.
9  Q. Okay. What -- as you sit here today, what did
10  the City itself do separate and apart from the police,
11  but what did the City do to violate the constitutional
12  rights?
13     MS. GELSOMINO: Objection.
14  Q. Not the police officers, the City itself.
15  A. The police work for the City.
16  Q. Okay. So your claims against the City are based
17  on the fact that they -- that the police work for the
18  City; is that correct?
19     MS. GELSOMINO: Objection, Tim.
20  A. I --
21     MS. GELSOMINO: Objection. He's not a
22  lawyer. You're asking him to make legal conclusions
23  here. It's not appropriate.
24  Q. Okay. So you don't know -- do you know why you
25  sued the City?

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed:  07/25/24  46 of 72.  PageID #: 1395

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 181

1  A.  Because the cops is part of the City, right?
2  That's --
3  Q.  Okay.  Okay.  For the record, are you aware of
4  any official policies by the City that were the cause of
5  the violation of your constitutional rights?
6  A.  No.
7  Q.  Okay.  And for the record, are you involved or
8  are you aware of any decisions by people in authority
9  that violated your constitutional rights?
10  MS. GELSOMINO:  Objection.
11  Q.  Other than the police that we talked about?
12  A.  I don't -- I don't know.
13  Q.  Okay.  And are you -- for the record, are you
14  aware of any training of police officers by the City
15  that was the cause of the violation of the
16  constitutional rights?
17  MS. GELSOMINO:  Objection.
18  A.  No.  I don't know.
19  Q.  Okay.  And do you know of any pattern or practice
20  of violation, or similar instances of violations of
21  constitutional rights?
22  A.  I don't know.
23  Q.  Okay.  And then you have another lawsuit going
24  right now, don't you, against the State of Ohio?  Do you
25  know?

Page 182

1  A.  Yes.
2  Q.  Okay.  So you have this lawsuit and that lawsuit.
3  Are you involved in any other lawsuits currently?
4  A.  No.
5  Q.  Okay.  Are you aware of any other lawsuits you've
6  been involved in at any time other than these two
7  lawsuits?
8  A.  No.
9  Q.  Okay.
10  MS. GELSOMINO:  For the record, that lawsuit
11  is technically over.  He was declared a wrongfully
12  convicted person.
13  MR. PUIN:  Right.  I saw that on July 27th.
14  I mean, it's not technically over. --
15  MS. GELSOMINO:  This part of it is, though.
16  I mean, yeah, there's an appeal process that can happen.
17  MR. PUIN:  Okay.
18  MS. GELSOMINO:  But the case has been closed
19  at this point.
20  Q.  All right.  So again, these are just follow-up
21  questions, so it's not as organized as I would like, I
22  apologize.  It's based on your earlier testimony.
23  All right.  So this is 100 percent on the police,
24  in your opinion, not on Cordell, it's not on you?
25  What about Clark Lamar Williams?

Page 183

1  He's Dude, right?  Clark Lamar Williams is Dude?
2  A.  Yes.
3  Q.  Okay.  Did he -- didn't he identify you as a
4  shooter?
5  A.  After he lied and said he couldn't see the
6  shooter.  After he saw me in court.
7  Q.  I thought in March of 2003, he said that you were
8  the shooter?
9  A.  March 2003?
10  Q.  Yeah.
11  A.  No.
12  Q.  Okay.  At any time, did Clark Lamar Williams say
13  you were the one who killed Omar Clark?
14  A.  Yes.  During trial, after he saw me in trial.
15  Q.  Okay.  And his name was Dude, his street name,
16  right?
17  A.  Yes.
18  Q.  Okay.  So Dude lied, right?
19  A.  Yes.
20  Q.  Okay.  Do you blame him at all for you being
21  convicted for murder?
22  MS. GELSOMINO:  Objection.
23  A.  I blame the police for having me there.  Even
24  giving him the opportunity to lie on me.
25  At the end of the day, I just -- I blame the

Page 184

1  roots of the situation.  Because I wasn't there.  I
2  wasn't involved.  I was somewhere totally different.
3  And that's just how I feel.  Like, they could
4  have put a stop to it before I even got arrested.  And
5  been, like, "He don't match the description."
6  And I wouldn't have never been involved to get
7  lied on or to lie myself.  I wouldn't have even been
8  there.
9  Q.  So where the fault lies in this case, in your
10  opinion, is in that you were named as a suspect in the
11  first place?
12  A.  Yes.
13  Q.  Okay.  So your violation of constitutional rights
14  arises out of you being fingered as a suspect?
15  A.  Yes.  By Eugene Jones.
16  MS. GELSOMINO:  Objection to that question.
17  THE WITNESS:  Oh.
18  MS. GELSOMINO:  But your answer can stand.
19  MR. PUIN:  Yeah.  Let's just -- let's just
20  read that back so it's clear for the record, the
21  question and answer.
22  - - - -
23  (Thereupon, the requested portion of the
24  record was read by the court reporter.)
25  - - - -

Case: 1:20-cv-00660-DAR   Doc #: 88-2   Filed: 07/25/24   47 of 72.   PageID #: 1396

Deposition of Ru-El Sailor, Jr.                                                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 185

MR. PUIN: Okay. Are you withdrawing that objection? Just so the record is clear.

MS. GELSOMINO: No. I'll keep that objection on the record.

Just give me a chance to object before you answer.

THE WITNESS: Okay.

Q. Okay. And I think you said at a couple of points you were under the influence or overly buzzed. In this these pictures at St. Aloysius, you look a little wasted.

And it's fair to say you probably were, right?

A. (Indicating.)

Q. You were pretty trashed at that point from weed and alcohol, right?

A. Yes.

Q. Okay. Is part of your feeling that what you told on the stand wasn't that significant about him being with you, like, Cordell, is part of that because you were still -- you knew you were so trashed that it's like...

A. I knew I didn't commit a murder. I wasn't that trashed.

Q. Okay. Okay. So you're saying you might have been extremely intoxicated, but you were aware enough to

Page 186

know what was going on? You weren't, like, in a blackout state or something?

MS. GELSOMINO: Objection.

Q. Did you ever black out that night at all?

A. Not to my knowledge -- no.

Q. Okay. Have you had blackout episodes from drinking and drugs?

A. No. I don't get that drunk.

Q. Okay. All right. I have some random follow-up questions that, you know, get asked in every case of every witness. The lawyers in this room do this a lot, right? It's our job. You as the witness are not in the situation a lot. You look on it, maybe different way than we do. But I just want you to know it's not personal. We ask everybody the same thing.

But I just have to ask you some questions for the record and about your background, et cetera, okay?

A. Yes.

Q. So were you ever in DH?

A. No.

Q. Okay. In addition, beyond the period in which you were incarcerated for the murder of Omar Clark, were you ever incarcerated any other time?

A. No.

Q. Okay. Are you, currently, as you sit here today,

Page 187

on any prescription medication?

A. High blood pressure medicine and medicine for my stomach.

Q. Okay. Have you ever taken any antianxiety, antidepressant medication?

A. No.

Q. Okay. And you haven't taken any drugs or alcohol or anything that would impair your memory or ability to testify truthfully today, correct?

A. No.

Q. Correct?

A. Correct.

Q. Okay. And were you ever diagnosed with a substance abuse disorder?

A. No.

Q. In prison or any other time?

A. No.

Q. Okay. Attorney Calderone asked you about how you got the cellphone in prison.

It was my understanding that you also were disciplined for possession of drugs in prison?

A. Yes.

Q. Okay. And how did you get the drugs?

A. I bought them.

Q. From another prisoner?

Page 188

A. Yes.

Q. Okay. Did any of the guards with whom you had relationships ever smuggle anything in to you in prison?

A. No.

Q. Okay. And when you said earlier that you were dealing drugs in high school, what drugs were you dealing?

A. Marijuana and crack.

Q. Okay. And since you've been exonerated, you've been staying out of trouble?

A. Yes.

Q. Okay. You haven't dealt marijuana or crack?

A. No.

Q. You have no intention of dealing marijuana or crack?

A. No.

Q. Okay. And I believe you said earlier you were convicted for concealed carry violation?

A. Yes.

Q. I'm not sure what the law is surrounding that. But basically you had a gun without a permit?

A. Yeah. I was in a car that had a gun in it, and I was the one who's driving so...

Q. Okay. Was it your gun?

A. No.

Case: 1:20-cv-00660-DAR Doc #: 88-2 Filed: 07/25/24 48 of 72. PageID #: 1397

Deposition of Ru-El Sailor, Jr.                    Ru-El Sailor, vs. City of Cleveland, et al.,

Page 189

Q. Okay. Do you know whose it was?

A. Yes.

Q. Okay. Whose was it?

A. I don't...

Q. You know the guy, you just don't want to say his name?

A. Yes.

Q. Was anybody involved in this case?

A. No.

Q. Okay.

A. No.

Q. Other than that one meeting with Russell Todd where he came down to Lucasville to talk to you and give you, you know, that suggestion that you take this deal to get out of there, have you ever talked to him before or after that?

A. No.

Q. You saw him at trial, right, or when you had your hearing to get exonerated, you saw him?

A. Yes.

Q. But you didn't really, like, talk to him personally?

A. No.

Q. Have you ever talked to him since being released?

A. Once or twice. I think, like, twice.

Page 190

Q. And what -- tell us about those conversations. He called you? You called him?

A. No. He was at the same -- I went to go see a fellow brother of mine getting exonerated from the CIU and he was there. We had a conversation and he asked what I had going on, what I was up to.

And I had a radio interview, I think. Or I had a speaking engagement somewhere else and he was there. And we spoke for a brief second.

Q. Okay. I apologize if this has been asked and answered. I don't remember. I think I'd asked you this.

Cordell at no point ever asked you to cover for him, right?

A. No.

Q. Now, again, this is one of those questions we have to ask everybody, and I apologize. And then I want to ask about your damages in this case.

But were you ever told at school or by your doctor that you had a learning disability?

A. No.

Q. Were you able to read and write in 2002?

A. Yes.

Q. Okay. Okay. So in terms of your damages from this case, are you saying that the whole time that you

Page 191

were in prison, which was how long? 15 years? 16 years?

A. Yeah. Fifteen.

Q. Okay. That whole time, is your damages --

MR. CALDERONE: Objection.

A. Yes.

Q. -- at least --

Okay. Now, the fact that you had to plead to perjury and obstruction and accept a sentence of 10 years, does that have any bearing on your view of your damages?

A. No.

Q. Okay. And that's because you think that the 10-year sentence is unfair for the perjury and the obstruction?

A. Yes.

Q. Okay. Now, we talked earlier. And, you know, sincerely, congratulations on all of your blessings since you were released. We talked earlier about all those blessings. Like, I know, like, you know, life is not all about that. There's also negative things and maybe some negative things that you blame the City and the police for since you were released, right?

What would you say are some of the negative things that happen in your life or damages that caused

Page 192

by what happened in this case?

A. It's just -- it's countless. Just my relationship -- like the most impactful is, like, my relationship with my kids. You know, my daughters, they was 6 -- they was 6, 3, 2, and I had a newborn. I had a newborn that was just born in December before I went to prison.

And, you know, I was an active father. I stayed in the house with my kids. I watched them while my kid's mother went to work. I kept them the whole day while she went to work. And I spent time with them, took them to events and things like that.

And when I went to prison, it just -- you know what I'm saying? It tore our bond apart. I couldn't be there physically. And now that I'm here, the 15-year gap has, like, took a toll in our relationships.

Like, I have -- I discovered I had twin daughters three years into me being in prison. So I met them in prison. And they grew up knowing me in prison.

And so since I've been home, it's just like -- it's been hell trying to get that father-daughter bond with most of them. Out of six of them, right now, today, like, I'm only in communication with, like, three of them because we just can't click.

And it's, like -- they resent me for not being

Page 193

1 there. Some of my kids, everything they went through
2 those 15 years that I was gone, they hold me accountable
3 for it. So they hold a heavy burden and resentment
4 towards because I wasn't there.
5      I wasn't there to protect them or be there for
6 them, things in that nature. You know what I'm saying?
7      I experienced, like, deaths that I can't --
8 people that I can't see again. You know what I'm
9 saying?
10      And my health ain't been right. Like, being --
11 something in prison, like, it did something -- I don't
12 know if it's stress. The doctors said that it is
13 stress, but I had continuous stomach pain, stomach
14 issues, even while I was in prison. It's in my medical
15 jacket. Like, I stayed going to -- either my blood
16 pressure or my stomach. The whole time I was in prison,
17 blood pressure and my stomach, and it's still affecting
18 me right now, to this day.
19      It's just like my whole -- my attitude and my
20 view on life is so different. I had these moments of
21 where I'm back in there. And it's, like, I don't even
22 be knowing, you know what I'm saying?
23      I have a temper, you know what I'm saying?
24      To be honest, like, I have a drinking problem. I
25 drink more than I ever did, you know what I'm saying,

Page 194

1 sometimes. And like, just to escape the things.
2      That I can't deal with my kids is the biggest
3 burden ever for me. For me not having them in my life
4 and not being able to communicate with them. And it's,
5 like, since I've been home, I've been trying to be a
6 father as best I could. And it's, like, it's hard
7 because I got all these girls. And I'm used to being
8 around one of these grown, hard, bearing men for
9 15 years. And I come home for these soft, cute, girls.
10      But my experience is so aggressive because that's
11 all I've been around in these places I've been in, you
12 know what I'm saying?
13      And I did my last the two and a half years in
14 Lucasville. And it's, like -- it's the worst
15 environment ever. Like it's just -- it takes a toll on
16 your mental. And you come out here, and you try to get
17 back on track. But it's just hard.
18      I don't want to work for nobody because, like,
19 there was a time where I didn't have anything. I
20 couldn't provide for my family because my mental is, I
21 don't want to work for nobody. And my T-shirt company,
22 my business wasn't taking off when I first started.
23      So that, right there, was putting a hinder, you
24 know what I'm saying? It's like lot of things that I
25 experienced in there, I brought out here with me. It

Page 195

1 affects my marriage and, you know what I'm saying?
2 Like, things that I can't get back, that I can't restore
3 because I don't know how.
4      Because it's already been took away from me. I
5 can't get it back.
6      And, like -- I'm just -- I deal with it every
7 single day. Like, even though I've been home for three
8 years, I've been exonerated. But I deal with it every
9 single day. Like, nonstop. My wife deals with it every
10 day. My kids deal with it.
11      You know what I'm saying? It's, like, it just be
12 on you.
13      It's like, I don't think -- I think me going
14 through that trauma, like -- it's like, I can't escape
15 it.
16      And it's, like -- so it hinders me -- it hinders
17 me a lot because I'm isolated, I'm standoff -- I don't
18 want to deal with people sometimes. Like, I'm moody.
19      And I wasn't like this before prison. And it's
20 like, it makes you numb. Prison makes you numb, because
21 you have to condition yourself to be a certain kind of
22 person in there so that you don't be a certain kind of
23 person in there.
24      You know what I'm saying? You don't want to be
25 weak in there so you have to create this hard-core

Page 196

1 exterior. And then before you know it, it becomes
2 inside of you.
3      Like, you try to be hard outside so much to where
4 your heart becomes hard. And it's, like, I'm numb to,
5 like, death. I lost family members since I've been
6 home. It's, like, I ain't shed a tear. It's, like, I
7 don't even know why. I can't even -- it was, like, I
8 spent all those years of being numb to certain things.
9      Because I couldn't show emotions. I couldn't --
10 you can't grieve in prison. Like, it's just certain
11 things you can't do in there. And I brought it out here
12 with me.
13      And then it's, like, even when I came home, it
14 was just -- like, that stuff with Russell Todd leaving
15 me in there and the judge telling me like I put myself
16 in there. And it was, like, just gave me all the blame.
17      Like, never, not once did this court system or
18 the City or prosecutor, no one never, not once said, "We
19 apologize. We made a mistake. We got it wrong."
20      It always been about me committing perjury on the
21 stand. That's been the bulk of everything since I've
22 been home. While I was in prison, it was like -- nobody
23 never said like, "Oh, we apologize. Our officers got it
24 wrong with the description."
25      Or even after these men came forward and said

Page 197

1  that they lied on the stand.  Nobody gave Clark Williams
2  perjury charge.  You see what I'm saying?
3      I have to deal with that, like, nobody went and
4  got Larry Braxton and was like, "Hey, man, you lied on
5  that man.  He did 15 years, so you get charged."
6      But here I am telling me that you left me in
7  prison because I lied on the stand and I got to take
8  10 years that I did for something I didn't do, I take
9  that and own up to it.
10     And like, it isn't even about the money.  I don't
11 even -- it ain't about that.  It's just about, like,
12 right from wrong.
13     Like, somebody had -- if you want me to be held
14 accountable for my actions, I feel like why can't
15 everybody involved in this case can't be held
16 accountable for their actions?
17     Umar Clark is the victim's brother, that man lost
18 a brother.  He had enough heart to come forward and be
19 like, "Man, that dude is innocent."
20     It took him 10 years, but he still came around
21 and he was like, "Man, I apologize.  I know you didn't
22 do it.  I was wrong."
23     Nobody.  Not no cops, not Eugene Jones.
24     My mother told Eugene Jones during trial, like,
25 "You know my son didn't do that."

Page 198

1      And he told her, like, he told my mother, like,
2  "Yeah.  I know.  But it's too late now.  There's nothing
3  that can be done about it."
4      Like, I don't know.  I deal with a lot.  I deal
5  with a lot.  And it's like, I have so many people
6  depending on me out here, my kids, my wife, my family.
7  Like, I came from being in prison, from me depending on
8  all of them to help me get out.  So now that I'm here,
9  they all look up to me, like, I'm the head of the family
10 and I'm supposed to...
11     So I carry all that burden.  And I carry all
12 these people that I met in prison, 15 years, six
13 prisons, I get like 10 jail calls a day.  Every day,
14 guys that got life.  And I wear all of this -- I just
15 carry all of it, man.
16     THE WITNESS:  I need a minute.
17     Can we take a break?
18     MS. GELSOMINO:  Yeah.
19     Can we take a break?
20     THE VIDEOGRAPHER:  Okay.  We're going to go
21 off the record.  This will be the end of media six.  The
22 time is now 1:39:49.  We're off the record.
23            - - - -
24     (Off the record.)
25            - - - -

Page 199

1      THE VIDEOGRAPHER:  We are back on the
2  record.  This is the beginning of media seven.  The time
3  is now 1:43:59.  On the record.
4  BY MR. PUIN:
5  Q.  Mr. Sailor, thank you for being honest with us
6  and describing how you've been affected by your
7  conviction.
8      We took a little break.  Did you have anything
9  you wanted to add about your damages or how it affected
10 your life?
11 A.  Man, just I can't sleep.  Like, I -- I probably
12 average this be, like, four hours, five or six on a good
13 night.  But maybe three or four hours of sleep.  If I go
14 to bed too early, I get up at 2:00 in the morning and
15 can't sleep again until that next night.
16     And it's just -- I constantly want -- it's, like,
17 affecting the people around me and my marriage because
18 I've been inside for so long.  Like, now that I'm free,
19 it's like, I want to be free.  But I'm married, I'm a
20 father, you know what I'm saying?  So it's like, I can't
21 just pick up and go when I want to.
22     And so, you know what I'm saying?  It causes a
23 problem within my household because it's, like, I have
24 to be outside.
25     When it becomes nighttime, I want to go out.

Page 200

1  Like, I don't want to be in the house because my nights
2  ended for so long at 9:00 or 10:00 o'clock at night.
3      It's like, now I'm free.  It's like, I want to be
4  outside at 9:00 or 10:00 o'clock at night.  But I got a
5  wife and she's like, "You can't just be outside every
6  night."
7      But she don't understand because she hasn't been
8  where I've been at.  But, you know what I'm saying?
9  She's my biggest supporter.  And she be there with me
10 and she push through it.
11     But it's like I know that's affecting her and
12 affecting my kids.  And it's, like, I have no control
13 over it.
14     And it's like, when I feel like I'm forced to be
15 inside, I'm grumpy.  So it's like, "All right.  You can
16 go outside."  Like, "If I'm keeping you inside, you're
17 going to be grumpy and be mean and be hostile."
18     And it's like, I don't know when I be
19 overaggressive when I talk or when I say certain things
20 or how I respond to certain situations.  And I'm like,
21 -- my wife can be like, "Take out the garbage."
22     And I might -- I instantly just snap back to
23 Lucasville and the CO telling me to do something that I
24 got no business -- telling me to do something, you know
25 what I'm saying?  It was like for a split second, I'm

Page 201

1  like, "Who are you talking to?" Or I responded to her
2  and she's like, "I just asked you to take the garbage
3  out."
4       And I was like, "My bad, I apologize."
5       But in that moment, I won't be normal if I --
6  it's just -- I don't know. It's hard, like -- it's hard
7  to go through all those years of just knowing you're
8  innocent and then you got people in there like the
9  staff, the people just telling you that you're not
10 innocent. You're not going home. You're not getting
11 out of there. Everybody's innocent in here. I sound
12 crazy.
13      It was like to the point where they almost get
14 you to believe you're supposed to be in there, if you
15 let them get in. But I was just one of the ones that
16 was fortunate enough when I first went in to block all
17 that type of stuff out.
18      But not saying it didn't affect me. I just don't
19 let it -- I don't show it as much. And it's, like --
20 it's just a lot. It's just a lot of stuff that I
21 just -- I can't even name it all right now, for real, to
22 be honest with you.
23      But me and my kids' relationship. Like it's
24 something I just -- I can't get back. You know what I'm
25 saying? Like, I missed everything. Like, I left when

Page 202

1  they was babies and I came home to them graduating high
2  school.
3       In the sense, put it, like, I missed their whole
4  entire school life. From kids to high school, like, I
5  missed it.
6       I came home just in the nick of time to see my
7  daughter graduate high school. And I had been telling
8  her my whole time in prison, like, man, I'll be there.
9  Like, I'll be there.
10      And I ain't have a clue. But I just told her,
11 like, "Make sure that you stay good, do good in school,
12 and I'll get there to see you graduate. I'll take you
13 to prom."
14      I got out in March and she went to the prom in
15 April. And graduated. I was there to see that.
16      You know what I'm saying? It was like I was
17 blessed but I missed so much, like, I missed everything,
18 like.
19 Q. So Amy -- your wife, Amy Gangloff, she's also Amy
20 Spence; is that right?
21 A. Yeah. That was -- she was married before we got
22 married. Spence was her marriage name.
23 Q. Okay. And how did you guys meet, briefly?
24 A. We knew each other from before -- before I got
25 locked -- before I went to prison. We knew each other

Page 203

1  from, like, childhood, growing up. And we got in
2  contact with each other probably, like, 10 years into my
3  sentence, we had got in contact.
4       And she was just my guardian angel, I guess.
5  Because she came in and was like, you know, like,
6  "What's the steps to be took to get you out of prison?"
7  And it was like nobody had ever -- outside of my family,
8  nobody really cared to ask me that.
9       And so she e-mailed people, wrote people,
10 harassed the prosecutor's office and had rallies
11 downtown at the courthouse, her and my family.
12 Q. And again, thank you for being honest about how
13 this has affected you. We ask everybody again in every
14 case so nothing personal.
15      But have you sought any counseling or mental
16 health counseling, physician treatment for what you've
17 suffered as a result of this case?
18 A. Yes. I've been to three specialists for my
19 stomach. And as far as counseling, the OIP provided us
20 with -- we have like these group meetings every week
21 with the name -- a doctor named Donna
22 Merrison[spelling]. And we have a -- me and other
23 exonerated individuals, we have, like, a group therapy.
24 I've been to PTSD retreats, things like that,
25 post-traumatic stress. I don't -- but right now, I'm

Page 204

1  looking for -- because it took me a long time to come to
2  grips that I had some issues. Like, when I first came
3  home, it was, like, you couldn't pay me to admit, like,
4  something was wrong with me or something was off. But
5  everybody around me was like, "He ain't how he was
6  before he left."
7       And so it took them to keep telling me, like,
8  man, you need to talk to somebody."
9       So now, right now, as we speak, I'm in the looks
10 for counseling or therapy or something like that.
11 Q. Okay. But up until now, you haven't had that,
12 like, one-on-one counseling, you had the group --
13 A. Yes.
14 Q. -- session with the exonerated?
15 A. Yes.
16 Q. And you call that OIP?
17 A. The Ohio Innocence Project who has it.
18 Q. Okay. How often have you met -- had those group
19 sessions, like, how many group sessions have you had?
20 A. I had quite a few, like -- probably, like, 30,
21 40, maybe 20, 30, 40.
22 Q. And is there one person who -- one counselor or
23 one facilitator?
24 A. It's Donna Merrison is the facilitator. But,
25 like, every group she brings in, like, different

Page 205

1 doctors, different people that deal with PTSD, trauma,
2 things of that nature would be guests, you know, that
3 would Zoom with us.
4    Q. And did -- the stomach problems, do you feel
5 those are caused by stress attributable to what you're
6 pleading in this case?
7    A. Yes. Or something, because I didn't have it
8 before I went to prison.
9    Q. And high blood pressure, too, you said?
10    A. Yes.
11    Q. Is there a family doctor you have that you've
12 been seeing for those problems?
13    A. I went to a family -- my physician, Dr. Davis,
14 yes.
15    Q. Okay. Do you know Dr. Davis's first name?
16    A. No.
17    Q. Okay. Is that a man or woman?
18    A. A woman.
19    Q. Okay. Is she affiliated with, like, Cleveland
20 Clinic, UH, anything like that, if you know?
21    A. UH.
22    Q. Okay. And do you know where you see her, where
23 you go in her office?
24    A. I see her on Lakeshore, 305 and Lake Shore.
25    Q. Okay. And is there like a name of the practice,

Page 206

1 if you know?
2    A. Not off the hand.
3    Q. Okay. So Dr. Davis is at 305 in Lakeshore?
4    A. Yes.
5    Q. Okay. And she would have records about both the
6 stomach problems and the high blood pressure?
7    A. Yes.
8    Q. Okay. And were you ever diagnosed with either of
9 those in prison?
10    A. With blood pressure?
11    Q. Yes.
12    A. Yes.
13    Q. Oh, you had been? Okay.
14    A. Yes. The whole entire -- yeah.
15    Q. It was, like, by doctors that helped out the
16 prisoners?
17    A. Yes.
18    Q. Okay. And about the stomach, was that also in
19 prison?
20    A. Yes.
21    Q. And again, the doctors?
22    A. Yeah.
23    Q. Okay. So, like, a medical unit associated with
24 Ohio Bureau of Prisoners would probably have your
25 medical records?

Page 207

1    A. Yes.
2    Q. Okay. Was it just, like, one of those six
3 facilities where you had that diagnosis or was it over
4 more than a period --
5    A. The high blood pressure was everywhere. All of
6 it. And then my stomach -- it probably, pretty much,
7 was all of it. Because it always bothered me somehow.
8    Q. Okay.
9    A. I have to, like, keep Pepto-Bismol with me all
10 the time and stuff like that.
11       MR. PUIN: Okay. If you could give me a
12 minute to check my notes. I'll make sure I'm not
13 missing any of the follow-up questions.
14       So if we can go off the record. Thank you.
15       THE VIDEOGRAPHER: We're going to go off the
16 record. This is --
17       MR. CALDERONE: Oh, before we go off the
18 record, while you are doing that, can I mark some
19 exhibits --
20       MR. PUIN: Yeah.
21       MR. CALDERONE: -- to show him while we're
22 on the record?
23       MR. PUIN: Yeah.
24       FURTHER EXAMINATION OF RU-EL SAILOR
25 BY MR. CALDERONE:

Page 208

1    Q. Mr. Sailor, I'm just going to show you some
2 documents here to confirm if you've seen them before.
3       I'm going to give you a document that's been
4 previously marked -- that I am marking as Defendant's
5 Exhibit F.
6       - - - -
7       (Thereupon, Plaintiffs' Exhibit F was marked
8       for purposes of identification.)
9       - - - -
10    Q. And I'll represent to you this is -- appears to
11 be an affidavit of Lamar Williams -- I'm sorry, Clark
12 Lamar Williams, that was filed by your attorneys to help
13 try to get you released.
14       Have you seen this document before?
15    A. Yes.
16    Q. And have you seen Mr. Williams' signature before?
17 Are you able to verify whether or not that is or is not
18 his signature on the last page?
19       THE WITNESS: I'm sorry?
20       MS. GELSOMINO: If you know, go ahead and
21 answer.
22    A. No. I don't know.
23    Q. You don't know?
24    A. No.
25    Q. Okay. I'm showing you a document I marked as

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed:  07/25/24  53 of 72.  PageID #: 1402

Deposition of Ru-El Sailor, Jr.                          Ru-El Sailor, vs. City of Cleveland, et al.,

Page 209

Exhibit G.

- - - -

(Thereupon, Defendant's Exhibit G was marked
for purposes of identification.)

- - - -

Q. I'll represent to you this is an affidavit of
William Sizemore that I think your attorneys filed to
help get you released from prison.

A. Yes.

Q. Have you seen that document before?

A. Yes.

- - - -

(Thereupon, Defendant's Exhibit H was marked
for purposes of identification.)

- - - -

Q. Showing you a document that has been marked as
Exhibit H. And my understanding is this is a copy of
the polygraph test report from Bill Evans who
administered the polygraph test to you.

Have you seen that document before?

A. Yes.

Q. As far as you know, is that a fair and accurate
copy of the original report that was prepared for your
polygraph test?

A. Yes.

Page 210

- - - -

(Thereupon, Defendant's Exhibit I was marked
for purposes of identification.)

- - - -

Q. I'm going to show you a document a marked as
Exhibit I.

Have you seen that document before?

I'll represent to you that is a copy of the
polygraph report from Bill Evans for the polygraph test
that was given to Cordell Hubbard. And this document, I
think, was submitted to, if not the Court, the
Conviction Integrity Unit to help get you released from
prison?

A. Yes.

Q. You've seen that document before?

A. Yes.

Q. Okay.

MR. CALDERONE: That's it for me.

FURTHER EXAMINATION OF RU-EL SAILOR

BY MR. PUIN:

Q. Okay. Yeah. I just had one last follow-up
question, Mr. Sailor. Thank you again for your time
today and congratulations again on your exoneration.

The question is your clothing line, Comma Club,
where did you get the name "Comma Club"? What does that

Page 211

name mean?

A. Create Opportunities and Making More
Achievements.

Q. Create opportunities --

A. Create Opportunities and Making More
Achievements.

Q. Okay. Thank you.

And then your "My story ain't over" saying that's
on your shirt today, is that on all of the items you
make?

A. That's the mantra.

Q. Tell us, what does that mean to you? Why did you
pick that and what's the meaning of that?

A. Well, my overall look of it is like, our life is
our story. And so the comma come in that every day God
gives us puts a comma on the story. So comma means
continuation, overall.

So when I say "my story ain't over", it don't
mean just my story. It's whoever where the brand.

Your story is not over. Like, no matter where
you at right now. I was someone that was serving life
in prison. I was in a cell with just me and a roll of
tissue. And here I am now. So don't even think that
your story is over because of where you are right now at
this moment of time.

Page 212

MR. PUIN: Thank you.

No more questions.

MS. GELSOMINO: We're going to read.

THE VIDEOGRAPHER: We're going to go off the
record. This will be the end of media seven, the end of
the deposition. The time is now 1:57:13. Off of the
record.

- - - -

(Deposition concluded at 1:57 p.m.)

- - - -

Page 213

### C E R T I F I C A T E

  I, Denise L. Kautzman, a Notary Public within and
for the State of Ohio, do hereby certify that I attended
the foregoing hearing in its entirety, that I wrote the
same in stenotypy, and that this is a true and correct
transcript of my stenotype notes.

  IN WITNESS WHEREOF, I have hereunto set my hand
and seal of office, at Cleveland, Ohio, this _____ day
of _____ A.D. 20___.


_____

Denise L. Kautzman, Notary Public, State of Ohio
1020 Ohio Savings Plaza, 1801 East 9th Street,
Cleveland, Ohio 44114
My commission expires November 29, 2021.

Case: 1:20-cv-00660-DAR   Doc #: 88-2   Filed: 07/25/24   55 of 72.   PageID #: 1404

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

### WORD INDEX

**< 1 >**
**1**  5:6
**1:00**  98:24  104:11
153:23
**1:20-CV-00660**  1:11  5:9
**1:30**  98:25
**1:39:49**  198:22
**1:43:59**  199:3
**1:57**  212:9
**1:57:13**  212:6
**10**  1:23  124:16  155:18
162:19, 23  178:15  191:10
197:8, 20  198:13  203:2
**10:00**  83:20  85:10
111:14  200:2, 4
**10:18:51**  57:25
**10:29:46**  58:6
**10:30**  85:10, 11
**100**  2:13  170:18  172:19,
20, 21  174:13, 17, 23
182:23
**1020**  213:19
**105**  123:20  124:3  174:1
**105th**  124:5
**106**  2:22
**10th**  5:4
**10-year**  191:14
**11**  5:5  178:15
**11:07:05**  87:18
**11:08:38**  87:24
**11:30**  93:17, 21
**11:37:38**  110:18
**11:38:13**  110:24
**116th**  19:17
**12:00**  93:18  128:2
**12:11:12**  128:8
**12:23**  111:13
**12:27:04**  140:6
**12:30**  99:2, 19  168:9
**12:34:49**  140:12
**12:40**  93:12
**12:45**  111:15
**13**  11:4
**140th**  70:1, 4  77:25
**141st**  26:24
**149th**  70:1  74:5, 7  76:14,
19  77:3, 16, 18, 21
**15**  10:25  34:22  65:23
98:3  163:4, 8  174:6
176:13  191:1  193:2
194:9  197:5  198:12
**150th**  6:14, 18, 21  7:10
**152nd**  111:16
**15-year**  192:15
**16**  33:19  34:5, 22  191:1
**160**  25:11

**16th**  81:13, 19  82:17, 25
89:4  91:6  92:3  98:8
111:15  133:4
**17**  139:6
**17th**  81:14  90:25  98:8
111:12, 15  121:3, 16
133:4
**18**  34:5  139:6
**1801**  213:19
**185th**  14:8
**1900**  1:22  2:5
**1980**  11:4

**< 2 >**
**2**  192:5
**2:00**  104:14  154:4, 8
199:14
**20**  98:3  148:14  204:21
213:12
**2002**  9:3  15:25  16:4, 11
18:5  25:8  28:19  30:19
31:20, 23  32:18  82:17, 25
91:2, 6  111:13, 15, 16
145:6  146:3  155:1
190:22
**2003**  30:16  164:11  183:7,
9
**2010**  30:16  35:11  37:2
**2013**  33:19  36:22  37:4
**2014**  36:23  37:4  139:20
**2015**  139:9, 11
**2016**  34:5  139:24  169:14
**2017**  139:7
**2018**  14:14  34:5  132:7
138:25  139:5  153:2
**2021**  1:23  5:4  213:21
**207**  4:4
**210**  4:5
**211th**  6:14  7:15
**216-241-1430**  2:7
**216-644-2807**  2:24
**216-659-6825**  22:17
**220**  25:4
**24**  66:1, 2  67:3, 4, 6
151:17
**24s**  151:7
**25**  21:13
**260th**  61:15
**27**  21:14
**27th**  182:13
**29**  7:10  213:21
**2nd**  148:8

**< 3 >**
**3**  192:5
**30**  12:25  56:16  148:9
204:20, 21
**305**  205:24  206:3
**330-670-7324**  2:15

**35**  12:9
**3737**  2:13
**384**  6:14, 18  7:15

**< 4 >**
**40**  204:21
**42**  88:24
**44113**  2:6
**44114**  2:23  213:20
**44333**  2:14
**4482**  11:7
**4U2B**  63:1, 2, 3  64:20
85:18, 19  86:2, 6  93:7, 18,
23  94:3, 23  95:1, 3, 5, 12,
14, 17, 20, 23  96:2, 6  97:2,
3, 8, 13, 16, 19  98:1, 12, 18,
22  99:4, 15, 19, 22  100:3,
6, 8, 10, 17, 20, 25  101:6, 9
102:16  106:2  108:10
109:16  112:10  113:8, 21
114:2  117:16  120:24
125:14  127:4, 17, 21
133:25  135:12  158:10, 22

**< 5 >**
**5:00**  92:4
**50**  1:21  2:5
**50,000**  21:3
**589**  14:8, 9
**59**  20:6

**< 6 >**
**6**  192:5
**6:00**  92:5
**601**  2:22

**< 8 >**
**8:00**  83:9
**829**  6:14, 21  70:1

**< 9 >**
**9:00**  83:9, 20  200:2, 4
**9:11**  1:22
**9:11:58**  5:5
**9th**  213:19

**< A >**
**A.D**  213:12
**a.m**  1:22  93:12  99:2, 20
111:13, 15
**ability**  171:4  187:8
**able**  9:14  15:6, 8, 24
17:9  23:23  28:15  98:9
190:22  194:4  208:17
**abuse**  132:1  187:14
**accept**  191:9
**acceptable**  9:11
**accepted**  71:11
**access**  23:14
**accessories**  19:8

**account**  22:20  23:7
113:12
**accountability**  162:16
**accountable**  193:2
197:14, 16
**accurate**  209:22
**Achievements**  211:3, 6
**acquaintance**  31:3  41:25
54:13
**acquaintances**  27:18, 19
**acquired**  38:3  47:18
**act**  103:12
**action**  162:17
**actions**  143:14  197:14, 16
**active**  35:7  192:8
**actual**  177:19
**add**  199:9
**addition**  146:15  186:21
**additional**  120:12
**address**  6:7, 13, 22  7:10,
15  11:15  19:18  117:4, 5,
24  118:16, 17  119:2, 3
128:22  144:8
**addressed**  176:4
**addresses**  6:19
**administered**  209:19
**admissions**  138:6
**admit**  204:3
**admitted**  138:17  164:11
**admitting**  137:21
**adults**  13:14
**affect**  201:18
**Affidavit**  4:14, 15  55:5
60:5  137:20  138:1  139:4,
24  208:11  209:6
**affidavits**  139:19
**affiliated**  205:19
**afternoon**  92:5
**age**  5:25
**ages**  12:11
**aggressive**  76:25  194:10
**ago**  13:19  39:5  135:9
**agree**  46:12  138:5, 10, 24
139:3  146:22  150:1
**agreed**  59:1
**Ah**  14:7
**ahead**  85:16  102:6
168:23  208:20
**ain't**  20:2  53:2  66:23
125:6  148:5  162:14
165:12  179:15  193:10
196:6  197:11  202:10
204:5  211:8, 18
**Akron**  2:14  16:21
**al**  1:13  5:7
**alcohol**  91:19  103:15
185:15  187:7
**alerted**  121:7
**Alibi**  4:11  40:6  51:25
55:23, 24  106:13, 22, 25

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  56 of 72.  PageID #: 1405

Deposition of Ru-El Sailor, Jr.

Ru-El Sailor, vs. City of Cleveland, et al.,

111:*4*, *10*, *23*  112:*2*, *6*, *9*, *13*, *17*, *20*  113:*2*, *11*  114:*6*  115:*12*  116:*17*  120:*9*  125:*8*, *21*  126:*1*, *9*, *13*, *16*, *20*  135:*1*, *25*  139:*19*, *24*  144:*14*  161:*18*
**Alibi**............................**110**  4:*12*
**Alibi**..................**106**  4:*8*
**alive**  11:*12*
**allege**  146:*15*
**alleged**  111:*11*, *12*  174:*4*
**allowed**  17:*6*  64:*21*
**Alltel**  23:*6*
**Aloysius**  89:*8*, *9*  90:*24*  100:*1*, *18*  101:*22*  102:*1*  103:*4*, *6*, *18*, *20*  104:*3*, *12*, *16*, *18*, *23*  105:*1*, *3*, *8*  107:*20*  108:*11*  109:*3*, *17*  117:*16*  120:*24*  125:*16*  157:*5*  158:*1*, *2*, *4*, *7*, *8*  185:*10*
**Al's**  156:*25*  157:*6*  158:*23*
**Amended**  4:*11*, *13*  112:*2*  116:*7*
**Amish**  81:*22*
**amount**  148:*12*
**Amy**  7:*19*  10:*8*, *10*  13:*19*  202:*19*
**Amy's**  10:*14*, *19*, *20*
**and/or**  1:*23*  113:*8*
**Andrew**  68:*18*
**angel**  203:*4*
**answer**  9:*9*, *16*, *22*  38:*11*  45:*21*  148:*15*  151:*23*, *24*  163:*22*  171:*3*  172:*5*  184:*18*, *21*  185:*6*  208:*21*
**answered**  149:*16*  150:*19*  159:*15*  170:*25*  171:*11*  190:*11*
**answers**  9:*11*
**Anthony**  20:*2*  22:*10*  58:*9*, *16*  59:*11*  83:*6*  98:*20*  99:*24*  100:*5*  114:*20*  118:*13*  126:*16*  144:*15*
**Anthony's**  118:*17*
**antianxiety**  187:*4*
**antidepressant**  187:*5*
**anybody**  93:*25*  94:*2*  137:*10*  158:*14*  159:*13*  174:*1*  189:*8*
**anyway**  129:*23*
**anyways**  38:*16*
**apart**  180:*10*  192:*14*
**apologize**  37:*12*  182:*22*  190:*10*, *17*  196:*19*, *23*  197:*21*  201:*4*
**apologized**  43:*3*, *6*  45:*2*
**apologizing**  43:*4*

**appeal**  37:*21*  38:*17*  182:*16*
**appeals**  39:*1*  167:*2*
**appear**  128:*17*
**APPEARANCE**  3:*1*
**APPEARANCES**  2:*1*
**appears**  111:*22*  208:*10*
**applications**  21:*16*
**applied**  15:*19*
**appreciate**  179:*6*
**approach**  125:*8*
**approached**  44:*25*
**appropriate**  180:*23*
**Approximately**  25:*2*  29:*11*  30:*14*  33:*18*  34:*4*  36:*22*  81:*24*  83:*18*  92:*17*  93:*21*  99:*2*, *19*  104:*6*, *25*  105:*25*  111:*13*  139:*5*, *9*
**approximation**  20:*19*  21:*1*
**April**  148:*8*  202:*15*
**area**  50:*19*  73:*18*
**arguments**  101:*2*
**arises**  184:*14*
**arm-in-arm**  150:*9*
**arrest**  15:*25*  16:*3*, *11*  18:*4*  25:*9*  27:*14*, *15*  31:*23*  42:*12*  48:*15*  51:*11*  64:*23*  68:*9*, *22*  76:*5*  79:*15*  81:*2*, *5*  131:*12*  145:*9*
**arrested**  23:*1*  30:*20*  31:*20*  32:*18*  41:*22*  43:*18*  48:*1*  49:*3*, *7*  51:*4*, *9*  54:*5*, *12*, *16*  58:*9*, *11*  63:*20*, *22*  64:*1*, *8*, *24*  65:*16*  67:*22*, *23*  68:*5*, *6*  70:*11*  76:*11*  78:*11*  79:*13*, *20*  80:*12*, *15*, *19*, *25*  109:*22*  121:*9*, *10*, *17*, *19*  122:*3*, *4*, *12*, *13*, *16*, *22*  123:*3*, *11*, *13*, *15*, *18*, *19*, *21*, *22*, *23*  124:*11*, *18*, *21*  126:*4*, *23*, *24*  127:*16*  129:*18*, *24*  130:*2*, *4*  131:*17*, *22*  132:*8*, *15*, *20*  135:*15*  140:*18*  145:*22*  146:*3*  148:*8*  159:*23*  165:*4*  184:*4*
**arresting**  79:*25*
**arrests**  65:*12*  79:*24*
**arrived**  84:*25*  85:*8*  91:*21*  92:*12*  94:*25*  99:*3*  **arriving**  85:*12*  91:*5*, *18*  97:*2*
**asked**  35:*15*  44:*6*  50:*4*  53:*1*, *12*, *15*, *20*  54:*4*  55:*4*, *15*  57:*12*  99:*24*  100:*5*  101:*12*  125:*20*  126:*1*, *9*, *13*, *16*, *20*  129:*14*, *21*  132:*12*  135:*5*  140:*14*  149:*15*  150:*18*  159:*15*

161:*7*  170:*24*  171:*10*  178:*13*, *15*, *20*  186:*10*  187:*18*  190:*5*, *10*, *11*, *13*  201:*2*
**asking**  9:*21*  35:*13*  39:*5*, *25*  45:*6*, *22*  59:*3*  125:*24*  154:*9*  160:*11*  174:*7*  178:*24*  180:*22*
**asks**  53:*8*
**assault**  75:*16*, *23*  76:*23*  131:*25*
**assaulted**  132:*17*
**assets**  19:*10*
**assist**  44:*15*
**assistance**  138:*14*
**Assistant**  5:*20*  152:*20*, *25*
**assisting**  56:*22*
**associated**  206:*23*
**Atlanta**  24:*2*, *8*
**attempt**  122:*16*
**attend**  24:*11*  128:*20*  166:*6*
**attended**  16:*15*  24:*13*  213:*6*
**attending**  16:*12*
**attitude**  193:*19*
**attorney**  37:*7*, *9*, *17*  38:*2*  39:*3*  46:*24*  50:*25*  109:*24*  111:*5*, *20*  115:*14*, *15*  116:*10*  128:*19*  131:*3*, *7*  158:*6*  162:*20*  164:*1*  174:*7*  187:*18*
**attorney-client**  37:*23*
**attorneys**  37:*20*  38:*15*  47:*15*, *17*  137:*17*  208:*12*  209:*7*
**attributable**  205:*5*
**August**  1:*23*  5:*4*
**authority**  181:*8*
**automatic**  164:*8*
**Avenue**  2:*22*  57:*6*
**average**  199:*12*
**aware**  47:*2*, *5*  99:*16*  110:*2*  113:*6*, *15*  121:*19*  136:*6*  137:*10*  141:*4*  144:*2*  180:*5*  181:*3*, *8*, *14*  182:*5*  185:*25*

**< B >**
**babies**  165:*22*  202:*1*
**baby**  148:*13*  153:*10*  178:*15*
**back**  9:*2*  15:*25*  16:*3*, *11*  17:*1*, *4*  18:*4*, *15*  19:*7*  22:*25*  25:*8*  27:*14*  28:*10*  30:*19*  31:*20*, *23*  32:*18*  41:*22*  42:*11*  49:*7*  54:*5*, *11*, *16*  56:*1*  58:*4*, *9*  75:*2*  78:*19*, *21*  80:*1*  83:*8*, *14*  86:*10*  87:*7*, *22*  106:*14*

110:*22*  117:*6*  118:*17*  119:*3*  128:*6*  140:*10*  145:*5*, *15*  155:*1*, *2*  158:*22*, *23*  159:*1*  160:*24*  167:*1*  172:*24*  184:*20*  193:*21*  194:*17*  195:*2*, *5*  199:*1*  200:*22*  201:*24*
**background**  9:*2*  186:*17*
**bad**  201:*4*
**bag**  79:*5*
**bar**  50:*17*  52:*14*  60:*10*, *12*, *14*  61:*6*, *7*  62:*20*  84:*5*  85:*4*, *20*  86:*8*  93:*7*, *23*  94:*3*, *15*  95:*5*, *12*, *14*, *17*, *20*, *24*  96:*2*, *6*  97:*8*, *13*, *16*, *19*  98:*1*, *12*, *22*  99:*4*, *15*, *22*  100:*10*, *17*, *20*, *25*  101:*7*, *10*  102:*16*  106:*2*, *4*  107:*15*  113:*7*, *8*, *21*  117:*15*, *16*  118:*1*  127:*4*, *17*  133:*11*, *15*  147:*22*, *25*  148:*23*  149:*13*  150:*12*
**bars**  59:*23*  64:*22*  133:*8*  134:*17*  135:*19*
**bartender**  60:*19*  106:*23*  117:*20*
**bartenders**  86:*11*
**base**  152:*23*
**based**  36:*20*  168:*18*  170:*21*  180:*16*  182:*22*
**basically**  44:*6*  46:*13*  72:*16*  129:*9*  130:*6*  143:*17*  167:*12*  176:*10*  177:*8*  178:*17*  188:*21*
**bathroom**  161:*10*, *11*
**bear**  142:*20*
**bearing**  153:*20*  167:*23*  171:*7*, *24*  191:*10*  194:*8*
**bears**  140:*25*  141:*11*, *18*, *20*  142:*5*, *8*
**beat**  85:*4*
**bed**  199:*14*
**began**  110:*2*  115:*8*  136:*3*  150:*11*
**beginning**  5:*5*  51:*22*  58:*5*  87:*23*  106:*16*  110:*23*  128:*7*  140:*11*  174:*18*  199:*2*
**behalf**  2:*2*, *10*, *17*  5:*16*  43:*24*  44:*2*  49:*24*  64:*17*  67:*20*  110:*3*  111:*11*  114:*13*, *16*  115:*5*, *9*  126:*1*, *13*, *16*, *20*  133:*1*
**believe**  89:*13*  90:*21*  93:*11*  99:*3*, *18*  124:*11*  133:*7*, *11*, *14*  136:*15*  140:*21*  144:*2*, *9*, *22*  145:*1*, *20*  147:*25*  148:*1*  149:*12*  159:*2*  173:*11*  174:*23*

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  57 of 72.  PageID #: 1406

Deposition of Ru-El Sailor, Jr.

Ru-El Sailor, vs. City of Cleveland, et al.,

176:*19*  177:*1*  180:*3*
188:*17*  201:*14*
**Belvedere**  91:*24*
**Benjamin**  60:*12, 14*
  62:*20*  64:*19*  85:*9, 12, 25*
  86:*12, 16, 22*  87:*1*  89:*6*
  91:*5, 12, 18, 22*  92:*12, 15*
  111:*16*  112:*10*  113:*7, 21*
  114:*2*  117:*15, 20, 23*
**Benjamin's**  60:*10*  84:*4, 7,*
  *12, 20, 25*  85:*18*  92:*25*
  93:*4, 6, 12, 15, 17, 20*  94:*3,*
  *11, 15, 23*  106:*23*  107:*15*
  109:*19*  118:*1, 7*  120:*23*
  125:*13*  144:*20*
**Bernatte**  6:*25*  11:*8*
  12:*12, 17*  13:*1*  117:*9, 14*
**B-E-R-N-A-T-T-E**  11:*9*
**best**  18:*7, 10*  27:*24*  28:*1*
  169:*16*  171:*3*  194:*6*
**better**  38:*17*  71:*19*  74:*24*
**beyond**  186:*21*
**big**  87:*6*  161:*2, 23*  171:*8*
**big-built**  25:*1*
**biggest**  194:*2*  200:*9*
**Bill**  209:*18*  210:*9*
**biological**  8:*11, 18*  10:*4*
**birth**  11:*3*
**birthdays**  12:*11*
**bit**  15:*11*  162:*22*
**black**  87:*6*  89:*13*  186:*4*
**blackout**  186:*2, 6*
**blame**  175:*3, 5, 14, 22*
  183:*20, 23, 25*  191:*22*
  196:*16*
**blessed**  202:*17*
**blessings**  153:*12, 16*
  191:*18, 20*
**blew**  161:*25*
**block**  78:*18*  201:*16*
**blocks**  105:*9*
**blood**  187:*2*  193:*15, 17*
  205:*9*  206:*6, 10*  207:*5*
**blowing**  162:*12*
**blue**  87:*7*
**blur**  134:*4*
**Bobby**  22:*10*  51:*2, 3, 6, 8,*
  *12, 17, 20*  52:*3, 7, 10, 16,*
  *19, 23*  53:*12, 20*  54:*2, 6*
  *55:8, 10*  80:*12*  83:*5*
  98:*20*  99:*24*  117:*1, 5*
  139:*18*  144:*12*
**Boddie**  154:*5*
**bolster**  139:*12*
**bond**  124:*17, 21*  125:*7*
  127:*2*  132:*4, 9*  192:*14, 21*
**bonded**  132:*5*
**booked**  24:*19*
**born**  192:*6*

**borrowed**  108:*8*
**bothered**  207:*7*
**bottle**  91:*23*
**bought**  152:*5, 8*  187:*24*
**boy**  63:*9, 11, 15*
**boyfriend**  108:*19*  119:*12*
**BOYKO**  1:*10*  154:*6*
**boys**  27:*7*
**brand**  211:*19*
**Brandon**  48:*9, 14*  120:*13*
**Bratenahl**  122:*25*  123:*1*
**Braxton**  13:*14, 16, 19, 21,*
  *25*  44:*5, 15, 19*  45:*18*
  46:*17*  47:*1, 2, 6, 13, 18, 19*
  136:*18, 20*  137:*1*  168:*5,*
  *22*  197:*4*
**Braxton's**  44:*11*
**break**  127:*24*  128:*10*
  140:*3*  153:*24, 25*  154:*8*
  198:*17, 19*  199:*8*
**brief**  190:*9*
**briefly**  159:*12*  202:*23*
**bring**  156:*24*
**brings**  204:*25*
**Brooks**  41:*17, 20*
**brother**  32:*17*  62:*5, 6*
  63:*16, 23*  90:*16*  117:*11,*
  *13*  130:*19*  172:*11*  190:*4*
  197:*17, 18*
**brothers**  11:*24*  12:*1*
  155:*18*  168:*8*  169:*17*
  173:*10*
**brought**  78:*18, 20*  194:*25*
  196:*11*
**Brown**  6:*25*  22:*11, 12*
  49:*1, 4, 7, 12, 18, 24*  50:*7,*
  *14, 18*  83:*6, 25*  86:*13, 22*
  95:*12*  100:*10*  106:*1*
  107:*2*  111:*14, 22*  112:*7*
  114:*6, 17*  115:*10*  116:*20*
  117:*8, 9, 11, 12, 13, 14*
  126:*1, 5*  148:*25*
**BStone**  61:*8, 9, 14, 22*
**buddies**  156:*10*
**building**  19:*21*  57:*6*  73:*2*
**bulk**  196:*21*
**burden**  193:*3*  194:*3*
  198:*11*
**Bureau**  206:*24*
**bus**  163:*20*  169:*16*
**business**  13:*24*  15:*5, 16*
  18:*25*  19:*7, 11, 13*  21:*9*
  153:*8*  194:*22*  200:*24*
**buy**  78:*13*  178:*21*
**buzzed**  103:*15*  185:*9*

**< C >**
**cabaret**  157:*9, 19, 25*
  158:*25*

**CALDERONE**  2:*11*  5:*18*
  6:*3*  38:*14*  41:*9*  57:*22*
  58:*7*  82:*6, 9*  87:*12, 14, 25*
  110:*14, 25*  112:*24*  122:*7*
  127:*23*  128:*9*  140:*2, 13*
  145:*14*  152:*14*  158:*6*
  166:*11*  168:*17, 19, 21*
  172:*14*  174:*7, 11*  187:*18*
  191:*5*  207:*17, 21, 25*
  210:*14*
**CALDERONE......................**
**.....6**  4:*4*
**call**  49:*14*  101:*13*  110:*3*
  121:*11, 15*  122:*21*  123:*13*
  130:*23*  154:*17, 22*  155:*1*
  156:*17, 20, 21*  164:*4*
  204:*16*
**called**  45:*16*  53:*24*  54:*1*
  60:*4*  101:*16, 18*  129:*21*
  164:*15*  190:*2*
**calls**  49:*16, 17*  171:*2*
  198:*13*
**Campbell**  2:*12*
**car**  78:*12, 13, 15*  84:*7*
  91:*11*  94:*2, 10, 18, 22*
  101:*15*  108:*7, 8, 18, 20*
  119:*16*  158:*14*  159:*1, 9,*
  *12*  178:*13, 19*  188:*22*
**care**  81:*20*  82:*18*
**cared**  203:*8*
**career**  18:*5, 6*
**carpentry**  17:*16, 18, 19, 21*
**carrot**  166:*18*
**carry**  106:*17*  162:*23*
  188:*18*  198:*11, 15*
**carrying**  65:*2, 11*  79:*16*
**cars**  9:*18*  94:*8*
**Casandriell**  12:*6*
**CASE**  1:*11*  5:*6, 9*  35:*4,*
  *24*  36:*18*  43:*17*  47:*3*
  48:*12*  50:*2*  51:*16, 17, 20*
  52:*20*  53:*21*  55:*5*  58:*20,*
  *22*  59:*5*  88:*9*  109:*25*
  120:*16*  122:*8*  123:*8*
  125:*9*  128:*15*  129:*10*
  130:*5, 10*  131:*4*  135:*10*
  143:*18*  144:*18*  145:*4*
  146:*16*  154:*5*  155:*4*
  168:*3, 4, 14*  174:*19*
  182:*18*  184:*9*  186:*10*
  189:*8*  190:*18, 25*  192:*1*
  197:*15*  203:*14, 17*  205:*6*
**casino**  157:*7*
**Cassandra**  13:*10*
**Cassandra[sic**  13:*8*
**catch**  120:*20, 21*  72:*17*
  73:*4*  75:*21, 25*  76:*10*
**Catching**  27:*9*
**caught**  66:*14, 17*  78:*18*
**cause**  181:*4, 15*

**caused**  35:*9*  191:*25*
  205:*5*
**causes**  199:*22*
**caution**  9:*8, 20*  82:*7*
**CCW**  130:*5, 10*  131:*3*
**CDs**  19:*8*
**cell**  211:*22*
**cellies**  28:*22*
**cellie's**  63:*16*
**cellmate**  63:*17*  152:*10*
**Cellmates**  28:*23*  30:*8*
**cellphone**  22:*14, 16, 18, 20*
  23:*1, 3, 5*  66:*10, 14, 18, 22*
  67:*5, 6*  152:*1, 2, 3*  187:*19*
**center**  36:*11*
**ceremony**  17:*17*
**certain**  9:*18*  94:*14, 25*
  160:*8*  195:*21, 22*  196:*8,*
  *10*  200:*19, 20*
**certifications**  17:*14*
**certified**  17:*17*
**certify**  213:*6*
**cetera**  186:*17*
**champagne**  92:*16*
**chance**  19:*12*  185:*5*
**change**  57:*20*
**characterize**  176:*17*
**charge**  65:*12, 13*  70:*16*
  74:*23*  125:*1*  145:*24*
  197:*2*
**charged**  79:*7*  109:*22*
  197:*5*
**charges**  65:*5, 7, 9*
**check**  59:*7, 8*  207:*12*
**Chicago**  24:*3, 23*
**child**  26:*4*
**childhood**  203:*1*
**chill**  11:*1*
**choices**  18:*5*
**CHRISTOPHER**  1:*10*
**Chrysler**  178:*20*
**church**  57:*4, 5*  157:*11*
**CITY**  1:*13*  2:*17, 20*  5:*7,*
  *21*  6:*15*  13:*16*  18:*18*
  152:*21, 25*  154:*6*  180:*5,*
  *10, 11, 14, 15, 16, 18, 25*
  181:*1, 4, 14*  191:*22*
  196:*18*
**City's**  153:*19*
**CIU**  190:*4*
**civil**  52:*24*  53:*6*  60:*1*
**claim**  129:*12*
**claims**  153:*20*  180:*16*
**Clair**  70:*1, 4*  73:*18*
  111:*17*
**Clark**  4:*14*  31:*17, 21, 24*
  32:*2, 5, 14, 16, 19*  33:*10,*
  *15, 21*  34:*6, 9, 15*  35:*2*
  36:*6, 11, 14, 18, 22*  37:*6*
  39:*6, 10, 14, 21*  40:*1, 5, 11,*

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  58 of 72.  PageID #: 1407

Deposition of Ru-El Sailor, Jr.

Ru-El Sailor, vs. City of Cleveland, et al.,

*21* 41:*12*, *15* 44:*9* 60:*16*
64:*20* 99:*1*, *20* 103:*10*
104:*20* 113:*13* 121:*20*, *22*,
*25* 122:*3* 123:*4* 124:*10*,
*12* 125:*3*, *5* 133:*16* 136:*9*,
*19*, *20* 137:*4*, *21* 138:*23*
153:*4* 159:*3*, *22* 167:*24*
169:*5* 182:*25* 183:*1*, *12*,
*13* 186:*22* 197:*1*, *17*
208:*11*

**Clark's** 64:*23* 65:*13*
69:*18* 79:*22* 80:*1* 81:*9*
113:*17* 122:*20* 123:*9*
146:*12*

**clear** 94:*13* 146:*5*, *7*
184:*20* 185:*2*

**CLEVELAND** 1:*13*, *22*
2:*6*, *18*, *20*, *23* 5:*7*, *21*
6:*15*, *16*, *18* 11:*17* 13:*16*
18:*18* 50:*18* 57:*6* 61:*16*
73:*19*, *20* 79:*19* 88:*10*
111:*17* 152:*21*, *25* 154:*6*
180:*6* 205:*19* 213:*11*, *20*

**click** 192:*24*

**Clinic** 205:*20*

**Close** 49:*5* 50:*12* 51:*7*
58:*10* 155:*14*, *20* 156:*3*

**closed** 182:*18*

**closer** 90:*2*

**clothes** 14:*24*

**clothing** 14:*3*, *4*, *20*
210:*24*

**Club** 13:*25* 14:*3*, *7*, *13*,
*15*, *18* 20:*10*, *12*, *13*, *17*, *20*
57:*4* 157:*6* 210:*24*, *25*

**clubs** 21:*24* 22:*2*

**clue** 168:*3* 202:*10*

**cocaine** 79:*5* 91:*15*

**coerced** 167:*18*, *19*

**Collinwood** 16:*20*, *23*, *24*
69:*25* 71:*14* 73:*7*, *9*
172:*24* 177:*16*, *21*

**C-O-L-L-I-N-W-O-O-D**
16:*25*

**come** 11:*22* 21:*13* 34:*12*
35:*15*, *19* 39:*22* 43:*5*
44:*6*, *8*, *10* 45:*8* 46:*8*
49:*14* 51:*23*, *24*, *25* 52:*18*
55:*5*, *16*, *22*, *25* 56:*1*, *25*
57:*12* 59:*3* 71:*2*, *3* 82:*22*
125:*18* 126:*5* 138:*6*, *23*
139:*3*, *18*, *23* 144:*14*
156:*18*, *24* 157:*1*, *4*
160:*24* 163:*11* 164:*7*, *10*
194:*9*, *16* 197:*18* 204:*1*
211:*15*

**coming** 43:*6*, *9* 53:*2*
58:*24* 62:*3* 164:*5*, *16*, *17*

**Comma** 13:*25* 14:*7*, *13*,
*15*, *18* 20:*10*, *12*, *13*, *17*, *20*
210:*24*, *25* 211:*15*, *16*

**C-O-M-M-A** 14:*3*

**comment** 145:*12*

**comments** 145:*7*

**commission** 213:*21*

**commit** 174:*20* 185:*22*

**committing** 196:*20*

**communicate** 27:*20* 28:*7*
43:*21*, *25* 49:*11* 194:*4*

**communicated** 45:*13*

**communication** 36:*24*
37:*3* 55:*8*, *15*, *17* 67:*25*
72:*1* 192:*23*

**communications** 32:*2*, *4*,
*12* 36:*21* 39:*15* 42:*15*, *16*,
*19* 43:*11* 54:*25* 55:*2*, *13*,
*14* 67:*19*

**company** 194:*21*

**comparison** 147:*5*

**compensated** 21:*16*

**compensation** 53:*6*

**complaint** 80:*23* 81:*10*

**complete** 17:*7* 168:*6*

**completed** 17:*22*

**computers** 23:*15*

**concealed** 65:*2*, *12* 79:*16*
89:*24* 188:*18*

**concerned** 135:*8* 149:*22*

**concluded** 212:*9*

**conclusion** 171:*2*

**conclusions** 180:*22*

**condition** 195:*21*

**conduct** 146:*11*

**conference** 154:*5*

**confess** 36:*15*

**confessed** 39:*16* 165:*5*, *15*

**confirm** 156:*8* 208:*2*

**confronted** 73:*2*

**confused** 72:*1*

**confusing** 171:*12*, *14*

**congratulated** 40:*17*

**Congratulations** 8:*9*
153:*15* 191:*18* 210:*23*

**conscience** 45:*10*

**consciously** 141:*5*, *15*, *24*
142:*12*, *24*

**consider** 28:*1*

**consists** 111:*3*

**constantly** 199:*16*

**constitutional** 173:*18*
180:*4*, *6*, *11* 181:*5*, *9*, *16*,
*21* 184:*13*

**contact** 55:*3* 128:*23*
203:*2*, *3*

**CONT'D** 3:*1*

**contend** 77:*14*

**contention** 146:*8*

**continuation** 211:*17*

**continuous** 193:*13*

**control** 200:*12*

**Convention** 24:*10*, *11*

**conversation** 36:*13* 39:*7*
40:*16* 43:*2* 190:*5*

**conversations** 39:*8*, *10*
40:*10* 54:*2* 72:*10*, *12*
190:*1*

**convicted** 29:*2* 52:*20*
67:*21* 68:*4* 79:*21* 80:*1*
147:*1* 162:*4* 166:*13*
167:*23*, *25* 172:*3*, *6*, *9*, *18*
174:*16* 175:*4*, *8* 182:*12*
183:*21* 188:*18*

**conviction** 18:*4* 22:*1*, *4*, *7*
36:*18* 39:*2* 45:*3* 67:*12*,
*15*, *18* 68:*12*, *17* 69:*3*, *8*,
*13*, *18* 74:*20* 81:*8* 137:*13*,
*18* 138:*7*, *13* 145:*10*
146:*1*, *12*, *17* 162:*5*
170:*11*, *20*, *23* 171:*8*, *25*
174:*14* 199:*7* 210:*12*

**convictions** 65:*13* 170:*18*

**convince** 45:*18*

**coordinated** 131:*14*

**co-owners** 14:*16*

**cop** 71:*1* 78:*16* 79:*23*

**cops** 181:*1* 197:*23*

**copy** 209:*17*, *23* 210:*8*

**Cordell** 4:*17* 18:*11*, *13*,
*15* 19:*6*, *10*, *23* 22:*10*
27:*23* 30:*3*, *8*, *10*, *25* 36:*7*,
*16* 39:*17*, *23* 42:*3*, *7*, *8*, *11*
46:*2* 62:*23*, *25* 64:*22*
81:*6*, *8* 83:*1*, *5* 84:*15*
86:*18* 88:*19*, *22* 89:*16*
90:*4*, *6*, *9*, *21* 94:*10*, *14*
96:*24* 99:*8*, *15*, *17* 100:*21*
101:*12*, *13*, *18* 102:*22*
103:*1*, *8*, *17* 104:*9*, *18*, *22*
105:*4*, *7* 106:*13* 108:*24*
109:*1* 113:*22* 114:*1*
121:*2*, *19* 122:*11*, *15*
123:*12*, *15*, *18*, *21*, *23*
124:*3*, *9*, *12*, *17*, *20* 125:*7*,
*20*, *25* 126:*6*, *8*, *9*, *12*, *15*,
*19*, *23* 127:*2* 129:*17*, *22*,
*23* 133:*3*, *7*, *12*, *18*, *23*, *25*
134:*16*, *22* 135:*5*, *11*, *19*,
*23*, *25* 136:*4*, *8* 138:*2*, *17*
139:*8*, *15* 147:*9*, *14*, *19*
148:*19*, *22* 149:*5*, *9*, *23*
150:*2*, *4*, *12*, *16* 155:*14*
156:*13*, *17* 158:*1*, *3*, *7*
159:*21* 161:*3* 164:*11*
167:*21* 168:*8* 169:*3*, *8*
170:*6*, *10* 171:*16*, *17*, *18*
173:*5* 174:*14* 175:*3*, *7*

**continuation** 211:*17*

182:*24* 185:*19* 190:*13*
210:*10*

**Cordelle** 122:*21*

**Cordell's** 19:*24* 25:*21*
26:*2* 30:*17*, *24* 41:*24*, *25*
54:*13* 62:*5*, *16* 89:*22*
102:*19*, *21* 103:*5* 119:*23*
155:*24*

**Cordial** 27:*13*, *17* 131:*23*

**core** 96:*3*

**corner** 19:*22* 71:*20*, *21*
178:*2* 179:*3*

**corners** 72:*17*, *19* 177:*24*
178:*1*

**Corral[phonetic** 37:*10*

**correct** 27:*24* 46:*4*, *5*
49:*9* 72:*4*, *7* 79:*16* 81:*17*
83:*23*, *24* 84:*1*, *5* 86:*3*, *14*,
*23* 89:*11*, *14*, *24* 90:*1*, *21*
91:*2* 92:*19* 93:*4*, *13*, *21*,
*22*, *23*, *24* 94:*15*, *16* 95:*7*,
*15*, *18*, *21* 99:*9*, *10*, *12*, *13*
100:*14*, *15* 102:*4*, *17*, *18*
103:*6* 106:*23*, *25* 107:*2*
109:*25* 110:*4* 111:*20*, *24*
112:*7*, *8*, *11*, *12*, *14*, *17*, *20*,
*21*, *24*, *25* 113:*1*, *3*, *4*, *8*, *9*,
*13*, *14*, *18*, *19*, *22*, *23* 114:*2*,
*4*, *5*, *7*, *8*, *11*, *12*, *14*, *18*, *19*,
*21*, *24* 115:*2* 116:*11*, *15*,
*16*, *18*, *19*, *21*, *24* 117:*2*, *3*,
*17*, *18*, *20*, *21* 118:*14*
119:*7*, *8*, *10*, *11*, *19*, *20*, *25*
120:*3*, *4*, *7*, *10*, *11*, *13*, *14*
121:*4*, *5* 127:*21*, *22*
129:*25* 131:*9* 132:*15*, *22*,
*23* 133:*1*, *5*, *6*, *9*, *10*, *12*, *16*,
*19*, *21* 134:*1* 135:*2*, *14*, *20*
136:*13*, *19* 137:*2*, *3*, *5*, *6*,
*14*, *18*, *19*, *23*, *24* 138:*3*, *4*,
*20*, *21* 139:*5*, *9*, *10*, *14*, *25*
140:*1*, *19*, *20*, *22*, *25* 141:*1*,
*6*, *9*, *10*, *12*, *13*, *15*, *16*, *18*,
*19*, *21*, *22*, *24*, *25* 142:*2*, *3*,
*9*, *10*, *13*, *14*, *17*, *18*, *21*, *22*,
*25* 143:*1*, *4*, *5*, *8* 145:*24*,
*25* 146:*23*, *24* 147:*10*, *11*,
*15*, *16* 148:*4*, *20*, *21*, *23*, *24*
149:*1*, *2*, *5*, *6*, *9* 150:*20*, *22*
153:*4*, *5*, *7*, *8*, *12*, *13* 156:*9*,
*16* 157:*3* 159:*18*, *19*
166:*16* 180:*7*, *18* 187:*9*,
*11*, *12* 213:*8*

**correctly** 171:*6*

**correspondence** 31:*13*

**counsel** 1:*24*

**counseling** 203:*15*, *16*, *19*
204:*10*, *12*

**counselor** 204:*22*

Case: 1:20-cv-00660-DAR   Doc #: 88-2   Filed: 07/25/24   59 of 72.   PageID #: 1408

Deposition of Ru-El Sailor, Jr.
Ru-El Sailor, vs. City of Cleveland, et al.,

count 12:4 95:6
countless 192:2
Country 81:22
County 29:23 33:25
34:16, 25 65:3, 4 79:18
128:24 130:3 134:6
couple 13:18 42:23
53:12 59:23 77:10, 13
132:12 178:11 185:8
course 65:23
courses 18:1
COURT 1:2 5:8, 11, 12,
13, 23 6:5 9:4, 22 18:12,
14 35:21 37:14, 16 66:16
106:14 116:4 122:25
123:1 125:18 130:3, 4, 5
136:22 137:17 144:14
145:18 148:9 175:8
183:6 184:24 196:17
210:11
courthouse 130:7 131:18
203:11
courtroom 176:2, 5
cousin 54:14
cover 159:16 190:13
covering 160:10 161:19
COVID 15:7
crack 188:8, 12, 15
crazy 201:12
create 195:25 211:2, 4, 5
creating 161:18
crime 135:15 144:4
147:6 164:11 168:9
173:24 174:4, 19, 20, 22
criminal 52:20 70:16
93:11 106:14 109:25
111:23 113:5, 10, 24
115:8 116:4 117:6
118:18 119:4 123:8
125:9 128:15 129:14
132:10, 24 135:10 136:3,
23, 25 137:13, 18
critical 137:16, 20, 25
138:16
current 6:12 20:9 22:16
currently 13:22 22:14
182:3 186:25
cute 194:9
Cuyahoga 65:3 130:3

< D >
D.C 24:2, 20
dad 8:17
Daddy 118:5
damages 190:18, 24
191:4, 11, 25 199:9
dancing 96:8
dangling 166:17
Darell 12:2, 15 117:8, 11,

12
D-A-R-E-L-L 12:3
Darell's 12:17
dark 168:10
date 5:4 11:3
dates 36:10
daughter 6:23 8:11, 19
10:4 82:15 202:7
daughters 7:17, 23, 25
192:4, 17
daughter's 7:1
Dave 5:10
David 3:6
Davis 205:13 206:3
Davis's 205:15
Dawn 60:6, 8, 18, 22, 24
61:2 86:8 106:21 117:19
126:20 129:8 144:15, 22
day 49:8 67:22 68:9
73:3 81:20, 25 82:11, 18,
20, 22, 25 83:4, 21, 22
92:2 98:9 121:16 161:6,
8, 9 168:9 183:25 192:10
193:18 195:7, 9, 10
198:13 211:15 213:11
daycare 16:6
days 71:3 148:9
deal 148:12 161:2, 23
163:14, 16 164:21 165:18
166:20, 25 167:1, 13, 19
171:8 174:24 177:14
179:8 189:14 194:2
195:6, 8, 10, 18 197:3
198:4 205:1
dealing 75:21 145:8
148:12 177:12 188:6, 7,
14
deals 195:9
dealt 188:12
death 41:15 64:23 123:4
124:9 196:5
deaths 193:7
deceased 20:3
December 82:16 121:18
192:6
decided 93:4
decisions 38:19 181:8
declared 182:11
defend 135:4
Defendant 2:10, 17 111:9
Defendants 1:15 5:7, 19
DEFENDANT'S 4:7 88:2,
6 106:8, 11 110:9 111:2
115:22, 24 208:4 209:3,
13 210:2
defending 135:5 149:25
defense 111:10 135:1
definitely 167:14, 15, 16
173:14
degree 17:6 146:16, 17

Denise 1:19 5:12 213:5,
18
deny 125:5
Department 2:21 131:15,
18
depending 198:6, 7
deported 8:15
deposition 1:18 8:23
154:11 173:16 212:6, 9
Desatnik 68:18, 20
141:17, 20, 23
describe 27:11 30:22
31:2 72:12
described 143:24
describes 168:7
describing 199:6
description 168:19, 21
172:12 173:6 174:21
175:1 184:5 196:24
descriptions 174:25
design 14:20
detail 133:22 134:21
149:6
details 73:13 160:4, 10,
11 167:22
detective 143:19, 22
144:1, 7 155:9 172:23
177:20 179:17
detectives 131:1 168:13
173:8
DH 186:19
diagnosed 187:13 206:8
diagnosis 207:3
different 25:12, 13 27:16
29:1, 3 54:18 65:5 74:21
94:8 98:19 134:5 151:6
170:19 184:2 186:13
193:20 204:25 205:1
direct 32:2 42:15 55:7,
13 145:10 146:3
directly 33:21 35:1, 23
67:16 84:11 126:24
133:15
Director 5:20 152:21, 25
disability 190:20
disagreements 101:2
discipline 65:19 67:1, 7
disciplined 65:25 66:6
151:7 187:21
disciplines 66:9
disclosing 128:18
discovered 192:17
discoveries 154:11
discovery 173:16
discuss 38:15 85:22
discussed 36:1 38:21
138:23 171:5
discussing 39:9
discussion 100:21 124:1

discussions 36:11 39:6,
25 58:22 59:5 92:24
123:17
Disney 24:17, 18
disorder 187:14
distraught 134:7
DISTRICT 1:2, 3 5:8
DIVISION 1:4 5:9
DJ 118:5, 7, 10
docket 128:15
doctor 190:20 203:21
205:11
doctors 193:12 205:1
206:15, 21
document 88:5 110:12
111:1 112:2 115:21
116:3, 10, 14 208:3, 14, 25
209:10, 16, 20 210:5, 7, 10,
15
documents 25:13 111:3
112:23 138:22 208:2
doing 9:4 15:5 19:6
27:8 76:6 98:13 207:18
Donelly[sic 175:19
Donna 203:21 204:24
door 157:22
doubts 169:4
downtown 203:11
Dr 205:13, 15 206:3
drank 91:21
dressed 83:16
drink 91:19 92:13, 15
96:7, 9 193:25
drinking 85:6 92:2, 22
186:7 193:24
drinks 86:1 87:1
Drive 19:17 84:7, 9, 11,
15 159:10
driving 108:9, 21 134:17
163:20 166:1, 2, 6, 7
188:23
drop 17:3 99:25 100:6
101:19 102:7, 8
dropped 17:2 102:4, 16
105:17, 20 108:24 109:1
121:2
dropping 16:16 101:11
drove 84:19 93:23 94:3,
22
Druell 12:6, 20, 23, 24, 25
13:6
D-R-U-E-L-L 12:6
Druell's 13:1
Drug 65:2, 11 67:9
drugs 70:15 72:20, 24
73:3 74:14, 22 75:21
76:7 77:11, 14, 21, 22
78:11, 14, 20 79:7 91:13,
15 97:3, 8 145:8, 9, 22, 23
146:1 177:12, 14, 21, 24,

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  60 of 72.  PageID #: 1409

Deposition of Ru-El Sailor, Jr.

Ru-El Sailor, vs. City of Cleveland, et al.,

*25* 178:*3, 16, 17, 21, 25*
179:*2, 7, 14* 186:*7* 187:*7,*
*21, 23* 188:*6*
**drunk** 127:*14* 166:*6*
186:*8*
**drunk-driving** 166:*2*
**Dude** 31:*18* 183:*1, 15, 18*
197:*19*
**due** 15:*7*
**duly** 5:*25*
**duress** 167:*9, 15*

< E >
**ear** 89:*21* 90:*1, 2*
**earlier** 43:*6* 83:*21* 90:*11*
132:*12* 143:*7* 145:*5*
158:*7* 174:*7* 182:*22*
188:*5, 17* 191:*17, 19*
**early** 90:*24* 121:*2* 199:*14*
**earned** 21:*5*
**East** 6:*14, 18, 21* 7:*10, 15*
14:*8* 19:*17* 26:*24* 69:*25*
70:*1, 3* 74:*4, 7* 76:*13, 19*
77:*3, 16, 18, 20, 25* 111:*16*
124:*5* 213:*19*
**EASTERN** 1:*4* 5:*9*
**economy** 15:*3*
**ecstasy** 97:*5*
**education** 17:*7*
**educational** 16:*10*
**eight** 94:*9*
**either** 6:*9, 11* 42:*15*
83:*21* 97:*2, 8* 100:*25*
108:*10* 109:*16* 113:*7, 21*
114:*1* 120:*18* 123:*7*
128:*12* 147:*24* 149:*13*
193:*15* 206:*8*
**El** 154:*17* 155:*2, 5*
**E-L** 7:*4* 19:*4* 154:*19*
**El/Will** 155:*11*
**electronically** 31:*13*
**El-Laja** 7:*2, 5* 10:*1, 2, 3, 4*
**El-Laja's** 10:*6*
**El's** 19:*2, 5*
**e-mailed** 203:*9*
**Embassy** 2:*13*
**emotions** 196:*9*
**employed** 13:*22* 16:*1, 4, 5*
**employment** 15:*15*
**ended** 167:*3* 200:*2*
**engagement** 190:*8*
**Englewood** 174:*1*
**enjoying** 85:*6*
**entire** 19:*21* 29:*4* 133:*4*
150:*10* 202:*4* 206:*14*
**entirety** 213:*7*
**Entrepreneur** 18:*7*
**environment** 163:*17*
194:*15*

**episodes** 186:*6*
**escape** 194:*1* 195:*14*
**ESQ** 2:*3, 11, 19*
**establish** 111:*10*
**establishing** 66:*2* 67:*4*
151:*10*
**establishment** 144:*20*
**et** 1:*13* 5:*7* 186:*17*
**Euclid** 6:*16, 18* 57:*6*
61:*15*
**Eugene** 69:*19, 23* 71:*8*
75:*3* 78:*21* 80:*23* 129:*9*
144:*13* 155:*8* 173:*2*
177:*3* 184:*15* 197:*23, 24*
**Evans** 209:*18* 210:*9*
**evening** 81:*12* 83:*2, 8, 10,*
*13, 19* 84:*3, 24* 85:*9, 14*
89:*3* 91:*5, 12* 92:*10* 93:*3*
98:*3, 7, 9* 99:*12* 100:*25*
101:*7* 103:*8* 104:*2*
105:*17* 107:*15* 108:*13*
109:*17* 112:*11* 114:*18, 24*
115:*2, 12* 118:*2* 133:*4, 19*
149:*5, 8* 150:*4, 17*
**event** 157:*8, 16, 17*
**events** 59:*23* 192:*12*
**eventually** 129:*24*
**everybody** 26:*24* 53:*7*
73:*11, 14* 85:*6* 96:*18*
98:*19* 106:*4* 162:*6* 164:*6*
178:*13* 186:*15* 190:*17*
197:*15* 203:*13* 204:*5*
**Everybody's** 201:*11*
**every-night** 157:*15*
**every-weekend** 157:*15*
**evidence** 136:*12* 137:*16,*
*20, 25* 138:*16, 23* 140:*24*
141:*2, 3, 4, 5, 8, 11, 14, 15,*
*17, 20, 23, 24* 142:*1, 4, 7,*
*11, 12, 15, 19, 23, 25*
143:*15* 144:*1, 9, 25* 168:*4*
**exact** 12:*10* 20:*18* 42:*22*
83:*17* 86:*19*
**exactly** 14:*18* 94:*6, 19*
151:*9* 161:*1*
**examination** 1:*19* 4:*3*
6:*2* 152:*18* 207:*24*
210:*19*
**example** 40:*5*
**exchanged** 45:*3, 11*
**exchanging** 37:*6*
**excited** 103:*12*
**excuse** 5:*5* 48:*11* 66:*16*
**ex-girlfriend** 25:*21* 26:*2*
**exhausted** 167:*2*
**Exhibit** 88:*2, 6, 11* 90:*20*
106:*6, 8, 12* 110:*6, 9, 13*
111:*2* 115:*19, 22, 24*
116:*18* 120:*9* 208:*5, 7*

209:*1, 3, 13, 17* 210:*2, 6*
**EXHIBITS** 4:*7* 207:*19*
**exonerated** 35:*5* 132:*7*
153:*3* 165:*9* 176:*4* 188:*9*
189:*19* 190:*4* 195:*8*
203:*23* 204:*14*
**exoneration** 210:*23*
**expect** 148:*6*
**expelled** 17:*3* 73:*6, 9, 11,*
*14* 150:*23* 151:*4*
**expenses** 21:*7*
**experience** 194:*10*
**experienced** 193:*7* 194:*25*
**expires** 213:*21*
**explain** 53:*4* 134:*20, 21*
150:*15*
**explained** 44:*8* 143:*6, 10,*
*14* 145:*5* 150:*2*
**extent** 41:*11* 163:*22*
**exterior** 196:*1*
**extremely** 185:*25*
**eye** 136:*7*

< F >
**face** 89:*19*
**Facebook** 23:*18, 22*
**Face-to-face** 36:*24*
**facilitator** 204:*23, 24*
**facilities** 207:*3*
**fact** 15:*7* 36:*11, 15*
39:*15, 24* 86:*13* 134:*7*
135:*22* 137:*25* 138:*19*
149:*1* 151:*20* 161:*19*
165:*7* 180:*17* 191:*8*
**facts** 153:*20* 165:*25*
**failed** 173:*12*
**Fair** 9:*24* 31:*2* 97:*25*
160:*13* 185:*12* 209:*22*
**fairly** 94:*25* 103:*15*
**fairness** 103:*14*
**falsify** 141:*5, 15, 24*
142:*12, 24*
**familiar** 118:*10*
**family** 11:*22* 24:*5, 7, 9,*
*15, 21, 24* 37:*3* 52:*5*
58:*20* 122:*17* 154:*17, 21*
165:*16, 21* 194:*20* 196:*5*
198:*6, 9* 203:*7, 11* 205:*11,*
*13*
**fan** 20:*13* 82:*6*
**far** 71:*8* 76:*25* 101:*5*
106:*3* 151:*5* 203:*19*
209:*22*
**Farinacci** 69:*4, 6* 142:*2, 5,*
*8, 12*
**Farm** 87:*6*
**father** 8:*13* 11:*18* 12:*4,*
*12* 13:*12* 19:*21, 24* 20:*4*
192:*8* 194:*6* 199:*20*

**father-daughter** 192:*21*
**father's** 11:*10*
**fault** 146:*17* 170:*18*
184:*9*
**feel** 167:*20* 170:*10* 171:*6*
184:*3* 197:*14* 200:*14*
205:*4*
**feeling** 169:*21* 185:*17*
**fellow** 190:*4*
**felt** 167:*19*
**female** 151:*18*
**females** 108:*1*
**fictitious** 18:*25*
**Fifteen** 8:*4* 191:*3*
**fight** 36:*3* 73:*10, 12, 15*
150:*25* 151:*1* 178:*7*
**fighting** 134:*6* 150:*24*
**fights** 67:*10* 73:*22* 101:*2*
**file** 80:*23* 81:*10* 87:*10*
88:*10* 162:*6*
**filed** 106:*13* 111:*5* 116:*4,*
*10* 208:*12* 209:*7*
**finally** 43:*8* 78:*22* 164:*13*
**find** 77:*21* 159:*23*
**fine** 101:*23*
**fingered** 184:*14*
**finish** 25:*23*
**firm** 5:*11, 12*
**first** 5:*25* 13:*20* 22:*25*
25:*15* 26:*7* 29:*18* 35:*23*
36:*10* 39:*7* 44:*24, 25*
48:*25* 49:*20* 56:*6, 20*
57:*3* 71:*10* 84:*2* 98:*21*
100:*2* 111:*4, 8* 116:*6, 13*
120:*8* 121:*6* 173:*8*
184:*11* 194:*22* 201:*16*
204:*2* 205:*15*
**fit** 172:*11* 174:*21, 25*
**five** 59:*21* 69:*22* 103:*4*
128:*7* 140:*5* 159:*11*
162:*23* 199:*12*
**five-minute** 127:*23*
**five-nine** 25:*11*
**Five-ten** 25:*4*
**flag** 87:*7*
**fled** 78:*16*
**Florida** 24:*2, 14*
**Focus** 84:*21, 22* 108:*9, 21*
133:*12* 135:*6* 168:*25*
**foggy** 134:*9*
**follow** 140:*15*
**following** 82:*16*
**follows** 6:*1*
**follow-up** 152:*22* 153:*1*
182:*20* 186:*9* 207:*13*
210:*21*
**foot** 78:*17*
**forced** 200:*14*
**Ford** 84:*22* 108:*9, 21*

Case: 1:20-cv-00660-DAR   Doc #: 88-2   Filed: 07/25/24   61 of 72.   PageID #: 1410

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

133:*12*
**forefront** 143:*17* 149:*24*
**foregoing** 213:*7*
**forever** 167:*13*
**Forgive** 31:*11* 54:*4*
**forgot** 8:*14* 91:*23*
**Form** 38:6 45:20 99:6
  149:*16* 150:*21* 170:*25*
  172:*14*
**fortunate** 201:*16*
**forward** 35:*15*, *19* 43:6, *9*
  44:7, *8*, *9*, *10* 45:8 46:8
  51:*23*, *24*, *25* 55:5, *22*
  58:24 59:3 62:3 113:6,
  *10*, *24* 117:6 118:*18*
  119:*4* 132:*10* 133:*24*
  138:6, *24* 139:*3*, *19*, *23*
  164:7, *14* 196:25 197:*18*
**found** 35:*11* 40:6 77:*11*
**four** 11:5 28:*4* 33:*23*, *24*
  59:*21* 74:*21* 82:*13*, *14*
  92:*11* 94:8 110:*23* 128:*1*
  199:*12*, *13*
**fourth** 89:*10*
**free** 45:7 199:*18*, *19*
  200:*3*
**freedom** 166:*19*
**frequented** 62:*19*
**frequently** 28:*20* 41:*4*
  42:*10* 49:6, *9*, *21* 50:*13*
  51:*9* 52:*10* 56:6, *7* 58:*14*
  59:*14*, *20* 170:*8*
**Friedman** 1:*21* 2:*4*
**friend** 18:*10* 27:*24* 28:*1*
  30:*19* 41:*24* 42:*1* 49:*5*
  50:*11* 51:*3*, *7* 54:*8*, *11*
  55:*4*, *9*, *14* 58:*10* 62:*16*
  102:*1* 109:*13* 156:*4*
  169:*16*
**friendly** 72:*10*
**friends** 18:7 22:8 24:5, *9*,
  *15*, *21*, *24* 27:*4*, *12*, *18*
  48:*24* 60:*15*, *21* 79:*21*, *25*
  83:*1*, *22* 85:*13*, *17*, *21*
  92:*21*, *25* 93:*3*, *20* 94:*17*,
  *21* 97:*7*, *17* 99:*3*, *4*, *18*
  102:*24* 123:*13*, *17* 125:*21*
  128:*11* 154:*17*, *21* 155:*1*
  161:*5* 170:*5* 179:*18*, *25*
**front** 88:6 111:6 136:*24*,
  *25* 166:*18* 178:*12*
**full** 6:*4* 13:*5*
**full-blown** 148:*9*
**functions** 11:*23*
**FURTHER** 207:*24*
  210:*19*

**< G >**
**gang** 73:22, *24*

**Gangloff** 10:*10* 202:*19*
**G-A-N-G-L-O-F-F** 10:*12*
**gangs** 22:5 74:2
**gap** 160:*17*, *19*, *21* 192:*16*
**garbage** 200:*21* 201:2
**Gas** 69:25 70:*3*, *6*, *10*
  74:*22* 76:*11* 77:*15*, *16*, *24*
  78:5, *6*, *8*, *12*, *16*, *19*, *21*
  143:*11* 179:*14*
**gate** 164:*8*
**gates** 164:*14*
**GED** 17:6, *11*, *12*, *13*
**GELSOMINO** 2:*3* 5:*16*
  14:6 20:25 28:*18* 38:6, *8*
  41:*8* 45:*20* 76:*8* 87:*13*
  96:*15*, *17* 99:6 107:*16*
  108:*8* 112:*22* 114:*3*
  115:*13*, *17* 122:*5*, *10*
  124:*25* 134:*19* 138:*9*, *11*
  143:*9* 146:*18* 148:*3*
  149:*15*, *18* 150:*7*, *18*, *21*
  151:*22* 152:*4* 154:*23*
  157:*2* 159:*4*, *15*, *17* 160:*7*,
  *12* 162:*3* 163:*21* 168:*2*,
  *18*, *20*, *25* 169:6, *11*, *24*
  170:*12*, *15*, *24* 171:*2*, *10*
  172:*1*, *13*, *15* 173:*20*
  175:*16*, *24* 177:*10* 179:*19*
  180:*13*, *19*, *21* 181:*10*, *17*
  182:*10*, *15*, *18* 183:*22*
  184:*16*, *18* 185:*3* 186:*3*
  198:*18* 208:*20* 212:*3*
**general** 28:*21* 52:5 58:*20*
**gentleman** 90:*14*
**Gerhardstein** 1:*21* 2:*4*
**Geshan** 63:*8*
**getting** 44:*16* 60:*4* 81:*25*
  83:*8*, *15* 134:5 160:*10*
  167:*22* 172:*2*, 6, *9*, *17*
  190:*4* 201:*10*
**Gibbs** 48:*9*, *10*, *14*, *17*, *20*
  120:*13*
**Gilbert** 1:*21* 2:*4*
**girl** 62:*12* 63:*10* 90:*11*
  102:*1* 107:*13* 121:*14*
**girlfriend** 81:*21* 82:*1*
  83:*8*, *14* 108:*25* 119:*23*
  122:*21*
**girls** 107:*23* 194:*7*, *9*
**girl's** 105:*9*, *10*
**Give** 11:*3*, *5* 20:*18*, *19*
  50:*25* 55:*5* 105:*23*
  132:*21* 140:*2* 166:*19*
  185:*5* 189:*13* 207:*11*
  208:*3*
**given** 23:*14* 210:*10*
**gives** 211:*16*
**giving** 9:*17* 175:*14*, *22*
  183:*24*

**glad** 43:*3*
**glasses** 92:*9*
**go** 11:*1*, *20*, *21* 15:*9*
  23:*24* 24:*17* 52:*14* 57:*18*,
  *23* 66:*14*, *18* 74:*17*, *25*
  75:*1* 76:*14* 83:*19* 85:*14*,
  *17* 86:2, *6* 87:*14*, *16* 93:6
  99:*23* 100:*1*, *22* 101:*22*
  102:6 105:*7*, *20* 106:*20*
  110:*14*, *16* 115:*20* 127:*15*,
  *25* 140:*4* 157:*4* 158:*22*
  160:*20*, *23* 162:*18* 163:*3*,
  6, *11*, *16* 165:*5*, *20*, *23*
  166:*21*, *25* 168:*23* 178:*15*
  190:*3* 198:*20* 199:*13*, *21*,
  *25* 200:*16* 201:7 205:*23*
  207:*14*, *15*, *17* 208:*20*
  212:*4*
**God** 211:*15*
**going** 9:*1* 14:*1* 20:6
  21:*1* 34:22, *23* 36:*3*
  49:22 50:*4* 51:*16* 53:*7*, *8*
  57:*23* 71:*20* 73:*4* 75:*1*,
  *21*, *25* 76:*3*, *4*, *9*, *10* 78:*25*
  80:*23* 81:*13* 82:*7* 83:*2*,
  *16* 84:*2* 85:*13*, *14*, *17*, *22*,
  *25* 87:*9*, *16* 91:*12* 93:6,
  *16* 95:*3* 100:*1*, *22* 101:*25*
  102:*3*, *7*, *8* 104:*12* 106:*12*
  110:6, *16* 115:*21* 117:6
  119:*4* 122:*12* 126:6
  127:*25* 128:2, *14* 129:*21*
  130:*3*, *4*, *5* 131:*14* 133:*15*
  134:*3* 136:*4* 140:*4*
  145:*21* 147:*24* 148:*1*
  149:*12* 153:*19* 154:*8*
  161:*14* 164:*14*, *24* 169:22
  172:*24* 176:*11* 181:*23*
  186:*1* 190:6 193:*15*
  195:*13* 198:*20* 200:*17*
  201:*10* 207:*15* 208:*1*, *3*
  210:5 212:*3*, *4*
**gold** 178:*19*, *20*
**good** 6:*11* 15:*24* 54:*11*
  101:6 154:*1* 199:*12*
  202:*11*
**Goolsby** 60:6, *8*, *18*, *24*
  86:*8* 106:*22* 113:*2*
  117:*19* 126:*20* 129:*8*
  144:*16*, *22*
**Goshen** 107:*21* 108:*4*
  119:*9*
**Gotcha** 158:*5*
**gotten** 61:*2* 151:*3* 153:*6*
**grade** 16:*15*, *17*, *18*
**graduate** 202:*7*, *12*
**graduated** 202:*15*
**graduating** 202:*1*
**Grafton** 30:*13*

**grandmother** 16:*6*, *8*
**great** 148:*12*
**Gregory** 63:*18*, *23*
**Gresham** 63:*4*, 6, *8*, *15*, *18*,
  *19*, *24*, *25* 64:*10*, *13*, *17*, *19*
**Greshan** 63:*8*
**grew** 155:*18* 169:*16*
  192:*19*
**grieve** 196:*10*
**grips** 204:*2*
**gross** 21:*4*
**grounds** 177:*16*
**group** 54:*19* 86:20, *25*
  94:*7* 96:*5* 97:*16* 98:*17*
  100:*1*, *17* 101:*5* 118:*1*
  150:6 203:*20*, *23* 204:*12*,
  *18*, *19*, *25*
**growing** 155:*23* 203:*1*
**grown** 165:*23* 194:*8*
**grumpy** 200:*15*, *17*
**guard** 71:*16* 72:*4* 117:*22*,
  *25* 152:*12*
**guardian** 203:*4*
**guards** 151:*17*, *18*, *21*
  188:*2*
**guess** 9:*8*, *16*, *17* 54:*18*
  81:*12* 109:*9* 148:*18*
  203:*4*
**guessing** 43:*8* 98:*23*
  118:*20*
**guests** 205:*2*
**guilty** 65:*7* 70:*16* 79:*10*
  145:*23* 162:*8* 167:*9*
**gun** 188:*21*, *22*, *24*
**guy** 25:*1* 178:*19* 189:*5*
**guys** 38:*12* 50:*2* 54:*20*
  57:*8*, *9* 59:*22* 86:*5* 96:*12*
  123:*14* 158:*22* 159:*10*
  178:*7* 198:*14* 202:*23*

**< H >**
**half** 15:*4* 29:*19*, *21*, *24*
  30:*1* 194:*13*
**hall** 157:*11*
**hallway** 73:*10*
**hallways** 75:*20*
**Hammond** 10:*7* 23:*12*
  116:*23*
**hand** 5:*23* 89:*20*, *22*
  90:*2* 129:*2* 206:*2* 213:*10*
**hand-in-hand** 150:*9*
**hang** 11:*2* 74:*8*
**hanging** 78:*8*
**hangout** 78:*6*
**Hanna** 2:*12*
**happen** 109:*19* 182:*16*
  191:*25*
**happened** 27:*2* 78:*10*
  99:*1* 101:*9* 102:*6* 121:*7*,
  *8* 122:*17* 128:*24* 134:*13*

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  62 of 72.  PageID #: 1411

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

156:6  159:7, 24  168:9
174:5  192:1

**happening**  83:13  160:1
**harassed**  203:10
**harassing**  71:13  74:13,
15, 16  76:16  145:21
**hard**  36:3  194:6, 8, 17
196:3, 4  201:6
**hard-core**  195:25
**harder**  7:22
**harm**  140:25  141:12, 21
142:9, 20
**Harry**  68:13, 15
**harsh**  176:9, 17  178:8
**Hasan**  68:23, 24  69:1
142:1, 4, 7, 11
**hats**  15:1
**head**  95:10  159:25  198:9
**headband**  88:25  89:17
90:6
**health**  193:10  203:16
**hear**  20:16
**heard**  100:25  121:24
123:7  124:6, 8  136:12
144:12  147:8, 14  159:20
**hearing**  148:9  189:19
213:7
**hearings**  174:19
**heart**  196:4  197:18
**heavy**  135:6  193:3
**height**  25:2, 9
**Heights**  79:19
**held**  5:8  197:13, 15
**hell**  192:21
**He'll**  11:22
**help**  9:14  14:1  35:5, 7,
20  36:3  40:2, 6  57:8, 9,
10  109:24  164:13  198:8
208:12  209:8  210:12
**helped**  15:11  150:1
170:1  206:15
**Henry**  67:13, 16, 20
**hereunto**  213:10
**Hey**  40:6  98:13  126:5
197:4
**high**  16:12, 15, 20, 23
69:25  70:24, 25  71:15, 17,
23  72:2, 3  80:22  127:15
177:5, 9, 11, 12, 14, 17, 18,
21  178:11  187:2  188:6
202:1, 4, 7  205:9  206:6
207:5
**hinder**  194:23
**hinders**  195:16
**hire**  47:15
**hired**  38:1
**hiring**  38:25
**history**  16:10
**hold**  12:10  21:1  34:23

38:8  83:17  193:2, 3
**hole**  66:3, 18
**home**  10:15, 16, 18  56:6,
20  57:3  74:17  76:14
81:20  82:12, 18, 20  83:14
105:22  127:15  162:18
163:3, 6, 16  165:5, 16, 20,
23  166:21, 25  192:20
194:5, 9  195:7  196:6, 13,
22  201:10  202:1, 6  204:3
**homicide**  88:9  131:2
143:19, 22  144:1, 7
**honest**  15:6  86:19  97:6
171:12, 14  179:16  193:24
199:5  201:22  203:12
**Hopefully**  154:7
**hostile**  200:17
**hours**  90:24  98:8  121:2
199:12, 13
**house**  7:11  10:13, 14, 18,
19, 20  11:20  26:22  30:25
40:15  70:1, 20  71:6  75:3,
5, 7, 14, 17  82:23  83:18
84:11  92:10  101:20
102:8, 10, 12, 19, 21  103:2,
5  105:10, 11  130:15, 18,
20  143:12, 25  155:25
178:10, 12, 16, 18, 22, 25
179:1, 4, 7, 9  192:9  200:1
**household**  199:23
**housekeeping**  154:16
**How's**  15:5
**Hubbard**  18:11, 13  20:2
22:10  27:23  30:17  31:6
36:7  81:6  83:2, 25  84:15
86:13, 22  88:19  95:14
96:24  99:8, 15, 17  100:13,
21  104:19, 23  106:13
113:22  114:1  121:2
122:12, 15  125:7, 20, 25
126:8, 12, 15, 19, 23  127:2,
16  133:4, 7, 12, 19, 23, 25
134:16  135:2, 19, 25
136:4, 8  138:2, 17  139:8
147:10, 15, 19  148:19, 23
149:5, 9  150:12, 16
155:15, 20  169:8  170:6,
10  175:3, 7  210:10
**Hubbard...210**  4:17
**Hubbard's**  122:21  168:8
**Huh**  80:17
**Huh-uh**  107:10
**hung**  22:8  31:24
**hurt**  169:23
**hyphen**  7:4

< I >
**idea**  105:18  121:3
**Ideastream**  176:20

**identification**  88:3  106:9
110:10  115:25  168:5
208:8  209:4, 14  210:3
**identified**  46:1  112:13, 16,
19  113:2  116:17, 20, 23
117:1, 22  118:5  120:9
136:7, 17  137:8, 10  147:9,
11
**identifies**  106:21, 25
107:2  112:6  117:23
**identify**  98:10  111:22
147:14  183:3
**ignored**  164:12
**ill**  140:25  141:11, 20
142:5, 8, 20
**illegal**  162:21
**impactful**  192:3
**impair**  187:8
**impaired**  166:3
**inappropriately**  132:18
**incarcerated**  28:14  30:2
31:15  32:1, 21  33:1, 4, 9,
16  34:15, 20  35:12  40:22,
24  42:14  50:12  54:24
58:17  64:11  186:22, 23
**incarceration**  29:4  36:21
**incident**  55:25  63:1
74:22  78:1, 10  79:12
103:9  104:19
**Incidentally**  20:4
**incidents**  77:24
**Including**  83:25
**income**  20:9
**INDEX**  4:1
**indicates**  112:6, 9
**Indicating**  21:20  46:7
73:3  95:8  152:7  170:2
185:13
**indict**  166:22
**indirectly**  67:16
**individual**  36:6  46:1
78:13, 15  147:3, 4  165:14
168:15  172:10
**individually**  18:23
**individuals**  88:11, 15
113:6, 11, 16, 20, 25  120:8
128:20  168:7  173:9
203:23
**influence**  94:7  166:1
185:9
**inform**  114:20, 23  115:1,
5, 9
**information**  36:17  40:2
**informed**  36:6, 12  39:21,
23  114:17  127:17  131:7,
11  135:11
**informing**  57:17
**infraction**  66:12  67:9
**infractions**  67:7

**initial**  100:4  168:4, 5
173:7
**initially**  29:2  136:20
**inmates**  31:14  163:1
**Innocence**  24:10  36:4
39:11, 12  135:8  204:17
**innocent**  162:15  163:10
165:6, 10  166:22  197:19
201:8, 10, 11
**inside**  196:2  199:18
200:15, 16
**Instagram**  23:22
**instances**  181:20
**instantly**  200:22
**institution**  67:3
**Integrity**  162:5  210:12
**intention**  188:14
**intentions**  135:3
**interacted**  68:10, 13, 18,
23  69:4, 9, 14, 19, 23
70:19  71:14  74:4, 20
120:17  143:10  156:1
**interaction**  68:1  140:19
**interactions**  70:9  71:17
74:11  143:23  145:6, 11
146:4
**interested**  35:6
**interview**  169:13  176:19
190:7
**intimate**  151:15
**intoxicated**  127:10
134:11  185:25
**introduce**  5:14
**investigation**  164:20
**investigator**  58:24  59:1
129:1  164:2
**investigators**  47:4, 5
**involved**  44:14  73:13
79:15  99:8  103:9  104:20
105:18  121:3  124:4, 5
129:10  143:18  144:4, 18
162:7  169:5, 10  174:19
175:5  181:7  182:3, 6
184:2, 6  189:8  197:15
**involvement**  145:3  153:3
167:24  173:13
**involving**  123:9, 20  131:2
173:24
**irritated**  71:12
**isolated**  195:17
**Isolation**  66:20
**issued**  128:17
**issues**  75:4  155:4  193:14
204:2
**items**  211:9
**its**  213:7

< J >
**jacket**  87:6  89:14, 17
193:15

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  63 of 72.  PageID #: 1412

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

**jail** 28:5 74:25 75:1
124:9 132:3, 8 134:8
162:13 198:13
**Jamaica** 8:15
**James** 6:6 68:3, 4, 10
69:9 174:9
**Janitorial** 16:9
**January** 11:4
**jeans** 87:7
**jersey** 87:8 88:20, 23
**Jesse** 109:13, 14, 16
**Jimmie** 111:5 116:10
130:23
**job** 153:19 178:24
186:12
**jobs** 15:19 57:10
**jogger** 15:1
**Join** 172:15
**joined** 21:23
**Jones** 69:19, 24 70:9
71:8 72:9 74:20 75:3
78:21 79:13, 20 80:6, 12,
19, 23, 24 81:2, 5, 10
129:9 143:2, 11, 15 144:2,
10, 13 145:1, 11, 20 146:4
155:8, 9 173:2 177:20
179:17 184:15 197:23, 24
**Jones's** 177:3
**Joseph** 47:21, 23 120:13
**JPay** 31:9, 11
**JPay'ed** 31:9
**Jr** 6:6 19:17 33:10, 15
34:15 40:21 41:4, 5
111:5 116:11
**JUDGE** 1:10 154:6
161:22 163:20 175:17, 19
176:4 196:15
**July** 182:13
**junior** 33:14
**jury** 114:17, 20, 23 115:1
134:16, 20 135:22 136:24,
25 147:18, 24, 25 149:4, 7,
12 150:3, 15
**justice** 162:8 164:22
167:10 176:8

**< K >**

**Kautzman** 1:19 5:12
213:5, 18
**Kcalderone@hcplaw.net**
2:16
**keep** 20:14 82:7 154:2
185:3 204:7 207:9
**keeping** 200:16
**Ken** 5:18 57:20
**KENNETH** 2:11
**kept** 43:4 192:10
**Kicia** 109:10 120:2
**kick** 95:4 127:13, 14

**kid** 178:23, 24
**kidnapping** 41:10
**kids** 12:4 25:22 52:6
56:25 73:19 81:21 82:12,
14, 18, 21 148:13 163:4
165:22 192:4, 9 193:1
194:2 195:10 198:6
200:12 201:23 202:4
**kid's** 23:8, 9 192:10
**kill** 160:23 163:1 173:25
**killed** 124:3, 4 149:21
174:2 183:13
**killing** 124:5 147:3
**Kim** 164:16
**Kimberly** 37:10, 11
**kind** 94:7 153:24 159:25
161:25 166:8 178:7
195:21, 22
**King** 19:17
**knew** 15:21 35:13, 21
40:3 45:1 54:22 55:25
60:18, 22 63:23 64:5
73:3 75:20 102:1 113:11,
25 129:20 133:24 135:13,
18 145:8 148:11 150:11
160:9 162:24 163:6
165:10, 18, 19 177:20, 23,
25 178:13 185:20, 22
202:24, 25
**know** 8:13, 14, 21 9:9, 10
10:25 11:15 12:7 13:3, 4
14:18 15:3 21:19 25:9,
14, 15 26:7 31:22, 25
32:14, 16, 17 33:11 35:9
39:20, 24 40:19, 21, 24
41:8, 9, 12, 17 42:22
43:14, 16, 18 44:4 45:1, 8,
10, 25 47:12, 23 48:9, 12
50:21 56:8, 10 57:17
59:9 60:6 62:5, 7, 14, 17,
22, 23, 24 63:9, 11, 19, 22
64:19 67:13 68:15, 20
69:1, 6, 11, 16 70:7 71:9
72:16 74:24 80:12, 13, 14,
15, 18, 19 90:16, 18 96:17,
24 97:5 99:8, 11 100:13
105:12 107:9, 12, 14, 17,
18, 22, 23 108:1, 6, 17
109:6, 8, 9, 11, 23 117:5,
12 118:17, 22 119:3, 10
120:5, 15, 20 125:20, 23,
25 126:3, 8, 11, 12, 14, 15,
18, 19, 22 128:19, 22
129:4 134:10 136:3
144:24 148:5 152:9
155:5, 10, 17, 23 157:19
158:7 160:15, 21, 23, 25
162:14, 22 163:7, 10, 22,
24 164:9, 18, 25 165:6, 17,
22 173:16, 23, 25 174:3,

25 177:23 178:4, 18, 21
180:24 181:12, 18, 19, 22,
25 186:1, 10, 14 189:1, 5,
14 191:17, 20 192:4, 8, 13
193:6, 8, 12, 22, 23, 25
194:12, 24 195:1, 3, 11, 24
196:1, 7 197:21, 25 198:2,
4 199:20, 22 200:8, 11, 18,
24 201:6, 22 202:16
203:5 205:2, 15, 20, 22
206:1 208:20, 22, 23
209:22
**knowing** 160:20 192:19
193:22 201:7
**knowledge** 41:14, 19
43:24 46:16, 19 47:17
48:3 64:16 69:1 79:20
80:24 81:1, 2, 5 115:4
137:7 141:7 173:13
186:5
**known** 31:18 124:15, 16
155:17 168:14
**knows** 167:3

**< L >**

**ladies** 104:15
**lady** 13:4 90:8 108:7, 8,
18 119:12, 14, 15
**L-A-J-A** 7:4
**Lake** 65:4 79:18 205:24
**Lakeshore** 205:24 206:3
**Lakeside** 2:22
**Lamar** 31:17 182:25
183:1, 12 208:11, 12
**Larry** 43:14, 16, 19, 21, 25
44:5 47:1, 2, 6, 13 168:5
197:4
**late** 104:12 105:2 198:2
**lately** 15:12
**Law** 2:21 5:21 152:21,
25 162:22 173:25 188:20
**lawful** 5:25
**lawsuit** 9:3 52:24 53:13
54:2 60:1 153:18, 21
181:23 182:2, 10
**lawsuits** 182:3, 5, 7
**lawyer** 37:13 38:10, 17
164:16 180:22
**lawyers** 38:22 186:11
**learn** 121:10, 22 130:13
**learned** 75:8 124:6
**learning** 134:2 190:20
**lease** 19:19
**leather** 87:6 89:13
**leave** 93:4 98:17, 22
99:22 100:8, 10 104:25
113:21 157:25 158:2
179:9
**leaving** 82:1 83:18 99:18
100:16, 20 156:14 196:14

**left** 84:11 88:23 89:21
92:10 93:12, 15, 17, 20
94:10, 14 98:19, 20 99:15,
22 100:6, 9, 13 101:9
102:16 105:3, 7 109:3
114:1 127:4, 7, 17 133:11,
25 135:12, 19, 23 150:5,
12, 16 156:13 158:10
160:14, 15, 19, 25 164:25
165:7, 8, 23 197:6 201:25
204:6
**legal** 165:19 171:2
180:22
**legalese** 154:13
**Lesley** 63:4, 6, 8, 13, 15,
19, 25 64:10, 13, 16, 19
**Letishea** 10:7 23:10, 12,
13 116:23
**letter** 19:4 35:10, 13
61:12
**letters** 32:22, 24 37:7
49:16
**license** 18:9, 16, 20 19:9
**lie** 146:8, 10, 22 183:24
184:7
**lied** 137:21 162:15 183:5,
18 184:7 197:1, 4, 7
**lies** 184:9
**life** 9:2 124:15 134:7
163:18 179:1 191:20, 25
193:20 194:3 198:14
199:10 202:4 211:14, 21
**light** 168:11 179:5
**light-skinned** 168:7, 15
172:10 173:4, 9
**line** 14:3, 4 210:24
**lines** 60:5
**list** 106:16 108:23 116:6,
8 128:11
**list...115** 4:13
**listed** 116:14
**little** 15:11 154:13
162:22 178:9, 13 185:10
199:8
**live** 6:19 11:14 13:12, 16
26:19 30:25 50:18 73:18,
19 155:25
**lived** 179:2
**lives** 6:21 7:16 8:15
26:20 50:21
**LLC** 13:25 14:3
**LLP** 2:12
**LNU** 118:20
**local** 78:6
**located** 14:7 19:20
**location** 18:9 19:13, 14,
15, 16, 19 28:11 77:17
89:7 117:24 133:16
**locations** 29:3 30:3 74:21
**locked** 150:9 202:25

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  64 of 72.  PageID #: 1413
Deposition of Ru-El Sailor, Jr.
Ru-El Sailor, vs. City of Cleveland, et al.,

**long** 7:20  29:11, 15, 17, 20, 22, 25  43:5  85:22  97:12  132:3  148:15  159:9, 10  160:21  191:1  199:18  200:2  204:1
**longer** 38:4
**Lonnell** 41:17, 20
**look** 20:21, 22  25:5  106:15  111:8  112:5  116:2, 9, 13  159:1  162:6  185:10  186:13  198:9  211:14
**looked** 168:8  172:11  173:5, 10
**looking** 71:4  103:24  106:21  130:21  131:1, 8  138:22  204:1
**looks** 204:9
**Lorain** 29:9, 12
**lost** 196:5  197:17
**lot** 15:13  25:13  50:9  79:23  97:20  122:7  134:9, 12  148:14  153:12  186:11, 13  194:24  195:17  198:4, 5  201:20
**loud** 82:6, 9
**Lounge** 111:16  112:10  117:23  118:8
**Lucasville** 29:9, 17  34:3, 6  35:10  66:2, 4  162:25  164:1, 3, 17  165:8  189:13  194:14  200:23
**lunch** 153:24
**Luther** 19:17
**lying** 146:11, 25  147:2

**< M >**
**Mack** 37:17  38:4, 24  39:3  111:5, 20  112:13, 16, 19  113:2  116:11  130:24, 25  131:3, 6, 7, 11, 14
**Magazine** 169:14
**maiden** 10:8
**main** 96:3
**maintenance** 16:9
**making** 38:19  168:23  211:2, 5
**malls** 15:8, 9
**Man** 45:7  125:13  151:14  161:20  162:17  165:6  173:4  178:15  197:4, 5, 17, 19, 21  198:15  199:11  202:8  204:8  205:17
**management** 154:5
**Mancino** 37:13, 15  38:1, 3, 25
**Mansfield** 29:9, 15  30:5, 6, 8, 10, 15  40:25  66:1
**mantra** 211:11

**Manufacture** 14:21, 24
**March** 183:7, 9  202:14
**Marijuana** 91:9, 10, 14  96:13, 24  97:4  103:15  188:8, 12, 14
**mark** 207:18
**marked** 88:2  106:8, 11  110:9, 12  111:2  115:24  208:4, 7, 25  209:3, 13, 16  210:2, 5
**marking** 115:21  208:4
**marriage** 13:20  195:1  199:17  202:22
**married** 7:20  13:18  22:24  153:6  199:19  202:21, 22
**Martin** 19:17
**match** 173:5  184:5
**materials** 87:11
**Matlock** 68:13, 15
**matter** 131:8  211:20
**Mayhand** 47:22, 23, 25  120:13
**McCreary** 108:23  119:21
**McDonnell** 175:20, 21  176:4
**McKenzie** 22:10  58:9, 12, 16  59:12  80:16, 20, 22, 25  83:6, 25  86:14, 23  95:17  98:20  99:24  100:5, 16  101:11, 15  102:4, 16  106:1  112:16  114:21  115:6, 11  118:13  123:14  126:16  129:7, 8  139:23  144:15, 21
**McMann** 25:17  26:11
**McMann[spelling** 25:16
**mean** 12:23  22:23  31:12  40:12  48:11  51:25  53:4  71:10  72:23  73:17  76:5  79:23  96:18  107:12  118:10  127:12  149:19  151:13, 15, 23  163:21  177:16  178:9  179:7  182:14, 16  200:17  211:1, 12, 19
**meaning** 10:18  211:13
**means** 211:16
**media** 5:6  23:15, 18, 21  57:21, 24  58:5  87:17, 23  110:17, 23  128:1, 7  140:5, 11  198:21  199:2  212:5
**medical** 193:14  206:23, 25
**medication** 187:1, 5
**medicine** 187:2
**meet** 26:25  40:10  68:4  83:22  84:2  86:13  100:18  102:3, 8, 10  202:23
**meeting** 189:12

**meetings** 203:20
**Melvin** 69:14, 16
**member** 22:1, 4  23:17
**members** 27:3  196:5
**memory** 9:14  20:23  119:21  127:20  187:8
**men** 104:15  194:8  196:25
**mental** 194:16, 20  203:15
**mention** 122:2
**mentoring** 56:20  57:11
**Merrison** 204:24
**Merrison[spelling** 203:22
**met** 41:14  68:12, 17, 22  69:3, 8, 13, 19, 23  70:19  86:20  192:18  198:12  204:18
**Metzler** 68:3, 4, 10  132:13, 17  141:14
**Mia** 8:1, 3, 11, 17
**mic** 85:2  86:3  87:2  118:11
**microphone** 85:3, 5, 7
**midnight** 95:1  99:4
**mind** 173:22
**Mine** 23:8  190:4
**minute** 140:2  198:16  207:12
**minutes** 103:4  159:11
**missed** 174:10  201:25  202:3, 5, 17
**missing** 207:13
**Mississippi** 24:2, 4
**misspoken** 122:6
**mistake** 196:19
**mistaken** 20:2  61:21  100:9  123:1
**mix** 92:7
**mom** 6:23  71:8  75:8, 12  80:23  81:21, 25  83:14  102:11  130:21
**moment** 39:5  112:5  116:2  162:25  201:5  211:25
**moments** 135:9  193:20
**mom's** 10:18  70:1, 20  71:5  101:19  102:8, 10, 12  130:15, 18, 20  156:22  158:12  178:10, 18
**money** 20:19  21:4, 21  197:10
**month** 41:6  50:15  52:11  59:16
**months** 8:8  29:13  42:23  165:9, 11
**moody** 195:18
**morning** 81:13  82:3, 4, 10  90:24  98:8  121:2  199:14

**mother** 7:13  10:6  11:1  12:12  13:1, 3  20:7  23:8  25:22  26:4  71:2  81:10  83:7  117:14  178:19  192:10  197:24  198:1
**mother's** 6:24  10:13  11:8  23:9  40:15  102:19, 21  103:2  178:12  179:1, 7, 9
**motion** 167:3
**move** 98:24  168:17
**moved** 86:5
**multiple** 19:22  150:19
**murder** 41:11  69:18  113:17  122:20  123:20  125:2  130:11, 14  137:18  146:13  147:7, 10, 12, 15, 20  148:2, 20  149:14, 21  153:3  159:21  162:14  163:9  166:10, 22  167:24  169:5, 10  183:21  185:22  186:22
**Music** 19:2, 5, 8
**mutual** 55:4, 9, 14
**Myel** 8:1, 7, 18
**M-Y-E-L** 8:2

**< N >**
**Nakeya** 107:21, 22  108:4  119:9
**name** 5:10  6:4, 24  7:1, 18  8:14, 15  10:9  11:8, 10  12:7  13:4, 5  18:12, 20, 25  19:1  20:1  22:20, 22  23:7, 9  26:7  33:8, 13  37:14  57:2, 7  62:17, 25  63:9, 11  105:12  107:4, 8, 21, 24  108:6, 15, 23  109:5, 10, 12  117:12, 19, 23  118:20, 21  119:6  144:7  152:20, 24  164:2  183:15  189:6  201:21  202:22  203:21  205:15, 25  210:25  211:1
**named** 62:6  67:13, 16  184:10  203:21
**names** 7:25  12:1  106:18, 20  116:14  117:8  120:2  122:7, 10
**Nancy** 175:19, 20, 21  176:4
**Narcotics** 70:13, 14
**nature** 59:10  102:2  123:11  143:21  163:2  193:6  205:2
**near** 147:5  174:5
**nearby** 26:19
**necessarily** 128:18
**need** 153:24  198:16  204:8

Case: 1:20-cv-00660-DAR   Doc #: 88-2   Filed: 07/25/24   65 of 72.   PageID #: 1414

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

needed 19:*11*
negative 191:*21, 22, 24*
neighborhood 15:*10*
26:*18, 22, 23, 25* 57:*11*
59:*24* 62:*24* 71:*1* 73:*25*
74:*9* 79:*24* 97:*20* 98:*2*
178:*1* 179:*21, 24*
neighborhoods 73:*11, 15,*
*20*
net 21:*8*
Nettles 22:*10* 51:2, *3, 6, 8,*
*12, 18, 20* 52:*4, 8, 10, 16,*
*19, 23* 54:*6* 55:*8, 10*
80:*13* 83:*5, 25* 86:*13, 22*
95:*7* 98:*20* 99:*24* 100:*5,*
*16* 101:*12, 15* 102:*4, 17*
106:*1* 115:*6, 11* 117:*1, 5*
123:*14, 22* 124:*1, 6* 126:*9*
129:*7, 8* 139:*18* 144:*12,*
*21*
Nettles[sic 80:*15*
never 17:*4* 40:*5* 41:*14,*
*19* 73:*23, 24* 74:*2* 79:*5*
80:*24* 112:*13, 16, 19*
113:*2* 129:*21, 23* 132:*5, 9,*
*17* 140:*18* 165:*3* 174:*17,*
*18* 177:*24* 178:*25* 179:*3*
184:*6* 196:*17, 18, 23*
new 40:*6* 88:*20* 153:*8,*
*10* 167:*3* 175:*11, 14, 22*
newborn 148:*13* 192:*5, 6*
news 176:*3*
Nichole 30:*17* 31:*5*
155:*20*
nick 202:*6*
night 36:*7, 16* 39:*17, 24*
55:*6, 25* 58:*25* 59:*4*
60:*10, 15* 62:*25* 64:*20*
81:*15* 84:*19* 85:*2* 86:*8*
87:*3* 91:*18* 92:*22* 93:*1*
96:*14, 25* 114:*21* 117:*16*
119:*19, 24* 120:*18, 21, 24*
122:*18* 123:*15* 124:*24*
125:*12, 14, 16* 127:*9, 10,*
*11, 13, 14, 21* 128:*12*
133:*23* 134:*3, 11, 13, 23*
147:*19* 156:*10* 157:*6, 7,*
*20, 25* 158:*25* 160:*4*
161:*3, 5, 20* 166:*1* 167:*22*
168:*8, 9* 169:*4, 9* 170:*22*
171:*7, 17, 24* 174:*5* 186:*4*
199:*13, 15* 200:*2, 4, 6*
nights 200:*1*
nighttime 199:*25*
nine 165:*9, 11*
Nobody's 21:*1*
no-brainer 167:*6*
nonstop 195:*9*
normal 27:*7* 49:*20, 21*

201:*5*
normally 98:*24*
NORTHERN 1:*3* 5:*8*
Notary 1:*19* 213:*5, 18*
notes 207:*12* 213:*9*
notice 1:*23* 4:*8, 11*
104:*22* 106:*13* 111:*4*
112:*2*
noticing 156:*14*
November 81:*13, 14, 19*
82:*17, 25* 89:*4* 90:*25*
91:*6* 92:*3* 98:*8* 111:*12,*
*15* 121:*3* 133:*4* 213:*21*
numb 195:*20* 196:*4, 8*
number 11:*6* 19:*18*
20:*18* 21:*2* 22:*16* 23:*3*
45:*5* 46:*20, 23* 50:*23*
56:*8, 9, 10* 65:*22* 88:*24*
129:*20*
numbers 45:*3, 11*

< O >
oath 6:*1*
Object 172:*13* 185:*5*
Objection 28:*18* 38:*6*
45:*20* 76:*8* 96:*15* 99:*6*
114:*3* 115:*13, 17* 122:*5*
124:*25* 134:*19* 138:*9, 11*
143:*9* 146:*18* 148:*3*
149:*15* 150:*7, 18* 151:*22*
152:*4* 154:*23* 157:*2*
159:*4, 17* 160:*7, 12*
163:*21* 166:*11* 168:*2, 17*
169:*11, 24* 170:*12, 15, 24*
171:*10* 172:*1, 14, 15*
173:*20* 175:*16, 24* 177:*10*
179:*19* 180:*13, 19, 21*
181:*10, 17* 183:*22* 184:*16*
185:*2, 4* 186:*3* 191:*5*
observed 100:*25*
obstruction 162:*8* 164:*22*
167:*10* 176:*8* 191:*9, 15*
obtain 17:*6, 11*
obtained 18:*16* 19:*10*
obviously 109:*23, 24*
Occasionally 56:*13*
occasions 26:*13* 33:*3*
44:*23* 53:*12* 65:*24* 71:*5*
74:*19* 75:*4* 77:*10, 20*
occur 100:*24*
occurred 99:*5, 20* 105:*25*
111:*12* 113:*18* 114:*10*
133:*9*
o'clock 83:*20* 104:*14*
128:*2* 153:*23* 154:*4, 8*
200:*2, 4*
offense 111:*12*
offenses 151:*7*
offer 111:*9*

office 163:*23* 203:*10*
205:*23* 213:*11*
officer 5:*19* 66:*3, 5*
151:*11* 173:*3* 176:*23*
Officers 2:*10* 67:*23* 68:*6*
122:*16* 131:*22* 132:*13*
140:*15* 174:*8* 180:*14*
181:*14* 196:*23*
offices 1:*20*
official 181:*4*
Oh 12:*23* 14:*3* 19:*2, 14*
20:*15* 25:*24* 38:*8* 66:*24*
78:*22* 82:*8* 95:*10* 130:*7*
141:*3* 157:*1* 163:*13*
184:*17* 196:*23* 206:*21*
207:*17*
OHIO 1:*3, 20, 22* 2:*6, 14,*
*23* 5:*9* 11:*16* 21:*16, 21*
24:*10* 29:*10* 57:*6* 111:*17*
163:*1* 181:*24* 204:*17*
206:*24* 213:*6, 11, 18, 19,*
*20*
OIP 203:*19* 204:*16*
Okay 6:*10* 8:*18* 10:*1, 22*
11:*3* 13:*6* 18:*1* 19:*13*
20:*7* 21:*4* 25:*23* 31:*15*
33:*8* 35:*17* 37:*3* 38:*13,*
*20, 23* 39:*20* 40:*5, 9*
46:*14* 47:*10* 52:*3* 56:*1,*
*14* 57:*19* 60:*6* 61:*5* 63:*4*
66:*13* 67:*1, 6, 12* 70:*3*
71:*5* 75:*2* 76:*18* 77:*2, 16*
82:*5, 8* 87:*9* 89:*20, 23*
91:*4* 93:*19* 97:*12* 98:*7,*
*17* 100:*5* 103:*17* 106:*6*
107:*21, 25* 108:*3* 109:*21*
111:*1* 118:*4* 119:*15*
121:*1* 131:*25* 132:*20*
136:*11* 137:*13* 139:*7*
144:*9, 21, 25* 148:*15, 18*
150:*23* 152:*1* 153:*15, 21,*
*22* 154:*4, 21* 155:*1, 4, 7, 9,*
*13, 17, 20* 156:*1, 3, 6, 13,*
*17, 22* 157:*6, 10, 13, 19, 22,*
*25* 158:*5, 10, 14, 17, 20, 22*
159:*1, 6, 12, 20, 24* 160:*9*
161:*1, 16, 22* 162:*11*
167:*7, 17, 21* 168:*23, 25*
169:*2, 21* 170:*17* 171:*15,*
*23* 172:*8, 22* 173:*1, 3, 11,*
*15* 174:*12, 13* 175:*2, 7, 19*
176:*1, 3, 7, 10, 17, 19*
177:*3, 12* 178:*2* 179:*25*
180:*3, 9, 16, 24* 181:*3, 7,*
*13, 19, 23* 182:*2, 5, 9, 17*
183:*3, 12, 15, 18, 20*
184:*13* 185:*1, 7, 8, 17, 24*
186:*6, 9, 17, 21, 25* 187:*4,*
*7, 13, 18, 23* 188:*2, 5, 9, 12,*
*17, 24* 189:*1, 3, 10* 190:*10,*

*24* 191:*4, 8, 13, 17* 198:*20*
202:*23* 204:*11, 18* 205:*15,*
*17, 19, 22, 25* 206:*3, 5, 8,*
*13, 18, 23* 207:*2, 8, 11*
208:*25* 210:*17, 21* 211:*7*
old 7:*5* 8:*3, 5, 7* 12:*8, 15,*
*22* 13:*8* 20:*4, 7* 63:*16*
124:*16* 148:*14*
older 63:*23*
Olivia 8:*1, 5, 16*
O'Malley 163:*19, 24*
164:*2*
Omar 41:*12, 15* 60:*16*
64:*20, 23* 65:*13* 69:*18*
79:*22* 80:*1* 81:*9* 99:*1, 20*
103:*10* 104:*20* 113:*13, 17*
121:*20, 22, 25* 122:*3, 20*
123:*4, 9, 12* 124:*10, 12*
125:*3, 5* 133:*16* 136:*9*
146:*12* 153:*3* 159:*3, 22*
167:*24* 169:*5* 183:*13*
186:*22*
Omar[sic 122:*2*
once 15:*22* 21:*7* 40:*12*
41:*6* 42:*20* 49:*15* 50:*15*
52:*11* 59:*15* 70:*24* 84:*24*
106:*3* 123:*12* 177:*25*
179:*1* 189:*25* 196:*17, 18*
one-on-one 204:*12*
ones 129:*3, 6* 201:*15*
open 15:*6, 8* 18:*8* 60:*12*
70:*8* 85:*2* 86:*3* 87:*2*
118:*11* 164:*14*
opened 18:*8*
opener 164:*8*
opinion 161:*23* 166:*13*
167:*9* 168:*12* 171:*25*
172:*4* 179:*18* 182:*24*
184:*10*
Opportunities 211:*2, 4, 5*
opportunity 35:*1* 110:*3*
183:*24*
opposite 168:*6*
option 169:*15*
order 44:*16* 137:*17*
organizations 21:*24* 22:*2*
organized 182:*21*
original 209:*23*
OSP 29:*10, 25* 33:*6* 34:*8,*
*10, 13, 17, 18, 21*
outside 26:*23, 24* 31:*14*
49:*22* 74:*17* 92:*4* 129:*23*
179:*9* 196:*3* 199:*24*
200:*4, 5, 16* 203:*7*
outsource 14:*21*
overaggressive 200:*19*
overall 211:*14, 17*
overly 76:*25* 103:*16*
185:*9*
owned 7:*13* 19:*21*

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  66 of 72.  PageID #: 1415

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

owner  14:*15*  60:*9, 18*
86:*10*

< P >
p.m  93:2*1*  99:*19*  111:*14*
212:*9*
page  88:*10*  89:*10*  90:*20*
106:*15, 17, 21*  108:*15*
111:*6*  116:*9, 13*  118:*4*
208:*18*
pages  88:*8*  90:*19*  111:*4*
112:*1*  116:*6, 7*  120:*9, 12*
paid  21:*7, 10*
pain  193:*13*
pairing  147:*19, 21*
paragraph  111:*8*
parents  12:*17*
Parkway  2:*13*
part  36:*13*  53:*7, 8*  73:*12*
90:*1*  100:*4*  129:*5*  135:*6*
165:*16*  181:*1*  182:*15*
185:*17, 19*
participated  23:*18, 21*
particular  10:*22, 23*  17:*1*
parties  156:*14*
party  102:*2*  104:*12*
107:*19*  127:*15*  156:*24*
157:*4*
partying  156:*10*
pass  85:*3*
passed  32:*9*  139:*15*
passing  32:*12*
pat-down  77:*1*
patron  61:*23*
patted  77:*5, 10, 13, 20*
pattern  181:*19*
Paul  37:*13, 15*
Pavlish  47:*7, 8, 9, 12*
55:*20*
P-A-V-L-I-S-H  47:*9*
pay  21:*8*  157:*22*  204:*3*
pending  53:*15*
Penitentiary  29:*10*
people  6:*19*  15:*9*  25:*12*
48:*23*  62:*7, 12*  78:*2, 7*
96:*22*  97:*15, 20*  98:*1, 10*
129:*1*  134:*5, 12*  155:*7*
174:*15*  175:*5*  181:*8*
193:*8*  195:*18*  198:*5, 12*
199:*17*  201:*8, 9*  203:*9*
205:*1*
Pepto-Bismol  207:*9*
perceive  76:*16*
perceived  76:*2*  145:*12*
percent  170:*18, 20*
171:*24*  172:*6, 8, 19, 20, 21*
174:*13, 17, 23*  182:*23*
perfectly  9:*10*
performance  39:*3*

period  44:*14*  153:*13*
169:*15*  173:*24*  186:*21*
207:*4*
periods  150:*3*
perjury  162:*8, 19, 23*
163:*5, 14*  164:*21*  166:*21,
22*  167:*9*  176:*8*  191:*9, 14*
196:*20*  197:*2*
permit  188:*21*
person  9:*23*  47:*21*  96:*20*
182:*12*  195:*22, 23*  204:*22*
personal  177:*6*  186:*15*
203:*14*
personally  48:*13*  107:*13,
14*  126:*3*  144:*12, 13, 16,
17*  189:*22*
perspective  153:*20*
pertaining  123:*3*
Phat  87:*6*
phone  28:*7, 9*  33:*5*
36:*25*  45:*4, 5, 11, 14*
46:*20, 21*  50:*23*  52:*17, 18*
101:*23*  130:*23*
photograph  87:*9*  88:*11,
13, 16*  89:*3, 11, 20*  90:*20*
photographs  87:*10*  90:*23*
103:*24*
Photos.............................88
4:*9*
physically  75:*16, 22*
76:*20, 23*  131:*25*  192:*15*
physician  203:*16*  205:*13*
PI  55:*16, 20*
pick  84:*15*  101:*12, 19, 21*
156:*18*  158:*3, 15, 18*
199:*21*  211:*13*
picked  84:*13, 14, 17*
103:*3, 8, 17*  104:*9*  158:*12,
17*
picture  168:*16*
pictures  158:*6*  185:*10*
piece  137:*20, 25*  138:*16*
pieces  134:*5*  138:*22*
156:*8*
piecing  134:*3*
pill  97:*5*
pills  91:*15*
place  13:*4*  85:*23*
129:*15*  150:*10*  184:*11*
places  30:*2*  194:*11*
Plaintiff  1:*9*  2:*2*  5:*6, 17*
Plaintiffs  208:*7*
plan  19:*6*  85:*16*  100:*4*
planned  77:*14*  179:*14*
plans  83:*21*  85:*13, 21*
100:*17*
plant  77:*22*
planted  74:*22*  78:*11*
play  85:*4*

played  45:*3*  146:*12*
Plaza  213:*19*
plea  167:*9*
plead  65:*7*  162:*7*  166:*5*
191:*8*
pleading  106:*16*  205:*6*
please  5:*14, 22*  6:*4*  9:*16*
29:*8*
pled  70:*16*  74:*24*  75:*1*
79:*10*  145:*23*
plenty  79:*24*
point  28:*22*  35:*6*  37:*24*
39:*22*  83:*13*  104:*4*  146:*2*
156:*13, 18*  160:*8, 19, 20*
178:*10, 24*  182:*19*  185:*14*
190:*13*  201:*13*
points  185:*8*
Police  2:*10*  5:*19*  115:*10,
15*  122:*16*  130:*16, 22*
131:*8, 15, 18*  132:*21*
159:*21*  172:*8, 17*  173:*12,
17*  174:*13, 23*  176:*23*
180:*4, 10, 14, 15, 17*
181:*11, 14*  182:*23*  183:*23*
191:*23*
policies  181:*4*
polo  15:*1*
Polygraph  4:*16, 17*
138:*18*  139:*8, 11, 15*
209:*18, 19, 24*  210:*9*
portion  145:*17*  184:*23*
possession  70:*14*  187:*21*
possibility  53:*22, 23, 25*
possibly  108:*3*
post-traumatic  203:*25*
Powell  2:*12*
practice  181:*19*  205:*25*
Prather  191:*13, 15, 16*
P-R-A-T-H-E-R  109:*15*
prayed  164:*9*
prefer  6:*8*
prepare  109:*24*  148:*7*
prepared  209:*23*
prescription  187:*1*
presence  85:*11*  111:*14*
PRESENT  3:*4*  30:*4*
42:*4, 7, 8*  54:*16*  117:*25*
138:*20*  174:*4*
presented  4:*10*  164:*21*
pressure  187:*2*  193:*16,
17*  205:*9*  206:*6, 10*  207:*5*
presuming  42:*2*
pretty  23:*8*  25:*1*  40:*20*
79:*2*  80:*21*  83:*3*  84:*13*
89:*23*  124:*2*  134:*6*
143:*17*  150:*8*  185:*14*
207:*6*
previously  208:*4*
primary  22:*7*

prior  16:*3*  22:*1, 4, 7*
45:*19*  46:*8, 18*  64:*7, 23*
65:*12*  67:*12, 15, 18*  68:*12,
17, 22*  69:*3, 8, 13, 18*  81:*8*
111:*23*  116:*4*  120:*18, 20*
138:*24*
prison  15:*14, 18*  17:*5, 15,
20*  18:*2*  21:*17, 23*  23:*14*
27:*21*  28:*10, 16, 21*  29:*3*
33:*22*  40:*9*  41:*7*  43:*22,
25*  48:*4, 18*  49:*11, 19, 20*
50:*3, 6*  51:*11, 19*  55:*9, 12*
57:*10, 17*  59:*6*  60:*25*
61:*3*  65:*15, 18*  66:*9, 19*
67:*2*  80:*7*  151:*6*  152:*6*
162:*9*  164:*6*  165:*8*
167:*13*  176:*11, 14, 23, 24*
187:*16, 19, 21*  188:*3*
191:*1*  192:*7, 13, 18, 19*
193:*11, 14, 16*  195:*19, 20*
196:*10, 22*  197:*7*  198:*7,
12*  202:*8, 25*  203:*6*  205:*8*
206:*9, 19*  209:*8*  210:*13*
211:*22*
prisoner  152:*10*  187:*25*
prisoners  206:*16, 24*
prisons  163:*1*  198:*13*
Private  47:*4*  58:*24*
privileged  38:*15*
privileges  65:*19, 25*  66:*8*
67:*8*
Probably  11:*19, 22*  21:*10,
13*  25:*11*  41:*6*  50:*17*
52:*11*  53:*1*  54:*6*  59:*15,
21*  77:*9*  83:*5, 6, 15*  85:*10*
92:*4, 23*  93:*16*  98:*23, 24*
103:*4, 15*  127:*20*  138:*7*
149:*10*  159:*11*  163:*5*
166:*1, 2*  178:*14*  185:*12*
199:*11*  203:*2*  204:*20*
206:*24*  207:*6*
Probation  65:*10*
problem  179:*20, 23*
193:*24*  199:*23*
problems  205:*4, 12*  206:*6*
proceeding  106:*14*
P-R-O-C-E-E-D-I-N-G-S
5:*1*
process  135:*4*  167:*2*
182:*16*
processed  131:*20*
produced  79:*5*  88:*8*
profession  174:*24*
professional  131:*22*
profit  21:*8*
program  17:*20, 24*  56:*21,
23, 24*  57:*1, 5, 9*
programs  17:*6*
progress  59:*7*

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  67 of 72.  PageID #: 1416

Deposition of Ru-El Sailor, Jr.

Ru-El Sailor, vs. City of Cleveland, et al.,

**progressed** 49:23
**Project** 24:10 204:17
**prom** 202:13, 14
**pronouncing** 10:1
**proportion** 161:25 162:12
**Proposed** 4:13 116:6, 8
**prosecutor** 115:5, 9, 16
163:19 173:12 175:15
196:18
**prosecutors** 161:22
168:14
**prosecutor's** 163:23
203:10
**protect** 135:4 171:17
193:5
**protected** 38:10
**prove** 36:3 111:11
**provide** 37:7 46:23
113:11 194:20
**provided** 36:20 154:11
203:19
**provider** 22:18 23:5
**providing** 36:18 135:1
**proving** 39:11, 12 135:8
**PTSD** 203:24 205:1
**Public** 1:20, 21 2:5
17:24 213:5, 18
**PUIN** 2:19 5:20 152:19,
20, 24 154:4, 15 174:12
182:13, 17 184:19 185:1
199:4 207:11, 20, 23
210:20 212:1
**PUIN.................................15
2** 4:5
**pulled** 40:17 178:12
**pulling** 74:13
**pulls** 78:12
**Purcell** 69:9, 11 142:15,
19, 23 174:9
**purely** 24:8, 14, 20
**purpose** 95:3
**purposes** 88:3 106:9
110:10 115:25 208:8
209:4, 14 210:3
**pursuant** 1:23
**push** 200:10
**pushing** 154:2
**put** 33:5 73:20 149:24
157:19 176:10, 14, 22, 24
184:4 196:15 202:3
**puts** 211:16
**putting** 194:23

**< Q >**
**question** 9:9, 21 20:5
38:11 39:18 58:25 59:4
60:11 81:15 84:10 90:11
108:13 112:11 117:16
118:2 119:19, 24 120:18,
21, 24 125:12 127:11

128:13 135:17 145:15
147:13 148:18 169:7
172:5, 16 176:20 184:16,
21 210:22, 24
**questions** 9:1, 8 140:14
152:15, 16, 22 153:1
154:9, 16 169:1 182:21
186:10, 16 190:16 207:13
212:2
**quick** 11:3
**quickly** 159:24 160:1
**Quite** 65:22 78:7 204:20
**quote** 169:14 176:11, 12

**< R >**
**rabbit** 166:18
**radio** 190:7
**raided** 130:15, 18
**raise** 5:23
**rallies** 203:10
**random** 186:9
**rap** 85:5
**rapping** 85:6
**reach** 128:25
**read** 145:14, 18 168:3
176:11 184:20, 24 190:22
212:3
**reading** 39:20 169:13
**ready** 51:23, 24, 25
**real** 11:3 45:24 52:13
62:17 107:24 117:11
201:21
**realize** 147:17
**realized** 135:1 147:23
149:11
**Really** 30:24 57:17
104:4 137:22 155:14
159:24 162:7 189:21
203:8
**reason** 10:22, 23 17:1
38:24 62:24 65:16
140:21
**reasons** 38:18 143:6
172:23
**reassuring** 36:2
**recall** 9:10 18:20 22:25
23:5 25:8 29:11, 13, 15,
17, 20, 22, 25 35:25 36:17
39:9 42:10, 13 47:25
49:18 52:3 57:2 65:24
67:1 79:25 81:25 82:2,
11 83:1, 4, 7, 12, 15, 18
84:14, 17, 18, 19, 24 87:3
92:17, 18, 21, 24 93:9
94:21 97:7, 10, 12, 15, 19
98:21 99:14 100:20
101:5, 24, 25 103:19
104:2, 6, 9, 15, 17 114:22,
25 115:3 123:5, 25

133:13, 17, 18 152:5
157:24 159:5
**recant** 45:19 46:8
138:24 164:8
**recanted** 46:17
**receive** 21:21 66:9
121:15
**received** 17:14 32:21, 24
**recognize** 48:13, 15 108:4
**recognized** 98:2, 15
**recollect** 40:4 64:12
70:2 80:3 97:6 149:10
**recollection** 52:22 93:19
101:11 103:13 106:3
151:5
**record** 5:3 16:5 18:8
57:24, 25 58:2, 5, 6 87:15,
17, 20, 23, 24 110:15, 17,
18, 20, 23, 24 128:1, 2, 4, 7,
8 140:5, 6, 8, 11, 12
145:18 154:9, 12 168:24
181:3, 7, 13 182:10
184:20, 24 185:2, 4
186:17 198:21, 22, 24
199:2, 3 207:14, 16, 18, 22
212:5, 7
**recorded** 47:19
**records** 206:5, 25
**recovered** 53:16
**Red** 88:25 89:17 90:6
179:5
**red-and-gray** 88:23
**reentry** 57:9
**refer** 81:15
**referred** 62:7, 12
**referring** 18:10 63:17
81:16 118:22 129:7
**reflect** 128:16
**refresh** 9:14 20:23
119:21
**refreshed** 127:20
**regard** 39:12
**regular** 60:21 127:12, 13
**related** 22:12 71:6 73:22
**relating** 123:8
**relationship** 27:11, 15
30:22 31:21 32:19 37:23
41:23 49:4 51:6 58:8
66:3 151:11, 13, 14, 15
192:3, 4 201:23
**relationships** 151:20
188:3 192:16
**release** 27:6 32:4 40:9,
18 42:18 46:6 50:14
52:19, 23 59:11
**released** 15:14, 18 21:15,
23 23:17, 23 26:10 28:20
31:5 32:11 33:21 35:5, 7
40:2, 13 41:2 44:16, 18
48:7 50:6 52:7 56:2, 15,

18 59:18, 25 64:14 65:15
80:10 139:6 144:17
153:2 189:24 191:19, 23
208:13 209:8 210:12
**rely** 144:10, 25
**remain** 37:20
**remained** 132:8
**remember** 16:3 18:3
23:3 29:6 30:14 57:7
65:22 80:21 85:1 91:23
104:4, 24 105:11 125:12,
13 127:1, 8, 9, 10 134:12
176:15 190:11
**removed** 65:19, 25 66:8
67:8, 10 146:5
**rent** 19:13
**rented** 19:22 108:22
119:13, 16 157:10
**reopen** 154:10
**repeat** 169:7
**rephrase** 51:18 84:10
99:7
**report** 143:20 145:3
176:3 209:18, 23 210:9
**reporter** 5:12, 24 6:5
9:4, 22 18:12, 14 37:14,
16 66:16 145:18 184:24
**Reporting** 5:11, 13
**represent** 5:15 38:5
106:12 116:3 128:14
208:10 209:6 210:8
**representing** 5:18
**requested** 145:17 184:23
**resent** 192:25
**resentment** 193:3
**reserve** 154:12
**resources** 128:25
**respond** 9:3 35:17 95:9
200:20
**responded** 71:10 201:1
**response** 44:12 176:21
**responsibility** 170:11, 20
172:9, 17 175:4
**rest** 150:13, 16
**restaurant** 42:23
**restore** 195:2
**result** 203:17
**retreats** 203:2
**review** 162:6
**Rhonda** 13:4
**Rick** 69:4
**ride** 94:2 159:1
**ridiculous** 151:23
**right** 5:23 6:24 10:1
20:17 46:23 55:7 70:8
88:20 89:1, 21 98:6
103:1, 14, 22 104:6 105:5
112:23 121:6 122:23
126:4 129:24 139:1, 21
143:23 154:10, 12, 14, 17,

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  68 of 72.  PageID #: 1417

Deposition of Ru-El Sailor, Jr.

Ru-El Sailor, vs. City of Cleveland, et al.,

*24* 155:*13, 15* 156:*9, 11, 15, 25* 158:*23* 159:*22* 160:*6, 19* 161:*8, 14, 23* 162:*9, 16, 17* 163:*11* 164:*23* 165:*19* 166:*2, 5, 8, 16* 169:*25* 170:*3, 5, 17, 22* 171:*14, 21* 172:*12, 24* 173:*6* 174:*16* 175:*4, 7, 12, 15, 17, 23* 176:*5, 8* 177:*13, 22* 179:*11* 181:*1, 24* 182:*13, 20, 23* 183:*1, 16, 18* 185:*12, 15* 186:*9, 12* 189:*18* 190:*14* 191:*23* 192:*22* 193:*10, 18* 194:*23* 197:*12* 200:*15* 201:*21* 202:*20* 203:*25* 204:*9* 211:*21, 24*

**rights** 173:*18* 180:*4, 6, 12* 181:*5, 9, 16, 21* 184:*13*

**Robinson** 22:*24*

**rode** 94:*5, 6*

**role** 45:*2* 47:*3* 146:*12*

**roll** 211:*22*

**rolled** 17:*17*

**Rome** 62:*5, 6, 8, 10*

**Ronald** 54:*8, 15, 20, 25* 55:*10, 11, 13* 56:*3* 62:*9, 10* 88:*19* 89:*1, 18* 95:*25* 102:*3* 103:*21, 22* 107:*5* 114:*23* 115:*6, 10* 118:*25* 119:*3* 139:*18*

**Room** 2:*22* 186:*11*

**roots** 184:*1*

**RU-EL** 1:*7, 18* 4:*3, 16* 5:*6, 17, 25* 6:*2, 6, 8* 11:*11* 12:*13, 17* 25:*1* 116:*7, 8* 152:*18* 154:*22* 207:*24* 210:*19*

**Rule** 66:*1, 2, 12, 22, 23* 67:*4, 6* 151:*7, 17*

**rules** 74:*3*

**rumors** 121:*24*

**run** 156:*7*

**running** 20:*13*

**Russell** 163:*24, 25* 164:*16, 19* 189:*12* 196:*14*

< S >

**SAILOR** 1:*7, 18* 4:*3* 5:*6, 17, 25* 6:*2, 4, 6, 8, 9, 12* 7:*4, 19* 8:*2, 18* 10:*8* 11:*11* 12:*2, 6, 7, 8, 15, 18, 20, 23* 22:*23* 58:*8* 85:*3* 116:*7, 8* 117:*12* 128:*10* 140:*14* 152:*18, 20, 24* 199:*5* 207:*24* 208:*1* 210:*19, 22*

**Sailor......209** 4:*16*

**Sam** 125:*22*

**Samuel** 22:*11, 12* 48:*25* 49:*4, 6, 12, 18, 24* 50:*7, 14, 18* 51:*15* 83:*5* 107:*2* 111:*14, 22* 112:*7* 114:*6, 17* 115:*10* 116:*20* 126:*1, 5* 148:*25*

**Sara@fggfirm.com** 2:*8*

**SARAH** 2:*3* 5:*16*

**sat** 136:*11* 147:*8*

**satisfied** 39:*2*

**Saturday** 127:*12, 14*

**Saturdays** 85:*2*

**Savings** 213:*19*

**saw** 40:*12, 13* 54:*5* 58:*11* 61:*21* 62:*1* 98:*12* 103:*19* 116:*18* 136:*22* 137:*11* 164:*19* 177:*24* 179:*5, 13* 182:*13* 183:*6, 14* 189:*18, 19*

**saying** 10:*25* 40:*19* 45:*9, 10* 59:*9* 71:*11* 72:*16, 22* 124:*2* 134:*10* 143:*20* 156:*18* 159:*6, 7* 161:*4, 18* 163:*7, 10, 25* 164:*18, 25* 165:*22, 24* 166:*4* 168:*10* 176:*15* 178:*17, 21* 185:*24* 190:*25* 192:*14* 193:*6, 9, 22, 23, 25* 194:*12, 24* 195:*1, 11, 24* 197:*2* 199:*20, 22* 200:*8, 25* 201:*18, 25* 202:*16* 211:*8*

**says** 88:*6* 107:*4, 8* 108:*15* 111:*9* 117:*4, 22* 118:*13, 16* 119:*2, 9* 173:*9*

**scene** 113:*17* 136:*8, 18* 137:*1, 5, 8, 11, 23* 147:*5, 10, 12, 15, 20, 21* 148:*1, 20* 149:*14* 169:*13, 14, 19* 174:*4*

**school** 16:*12, 16, 20, 23* 17:*2* 57:*16* 69:*25* 70:*24, 25* 71:*3, 6, 15, 18, 23* 72:*2, 3, 7, 10* 73:*1, 2, 21* 75:*19, 23* 76:*2* 80:*22* 143:*11, 24* 145:*7* 150:*23* 151:*4* 177:*5, 9, 11, 13, 15, 17, 18, 19* 178:*11* 188:*6* 190:*19* 202:*2, 4, 7, 11*

**scratch** 48:*11*

**seal** 213:*11*

**seats** 152:*17*

**second** 29:*19* 45:*13* 46:*11* 87:*15* 88:*10* 105:*23* 106:*15, 21* 108:*15* 110:*15* 116:*9* 173:*8* 190:*9* 200:*25*

**security** 11:*5* 71:*16* 72:*4* 117:*22, 25*

**see** 11:*18* 14:*22* 26:*21* 28:*15* 31:*1* 33:*6* 49:*6*

50:*13, 16* 59:*8* 61:*5* 63:*25* 75:*19* 76:*18* 89:*19, 23* 90:*1* 106:*18* 108:*10* 109:*16, 19* 111:*6, 18* 112:*2, 3* 116:*10, 20* 117:*19* 119:*18* 120:*8* 134:*8* 135:*16* 136:*21* 145:*13* 148:*6* 152:*23* 163:*9* 164:*1, 2, 16* 165:*2* 166:*16* 179:*11, 15* 183:*5* 190:*3* 193:*8* 197:*2* 202:*6, 12, 15* 205:*22, 24*

**seeing** 27:*6* 51:*23* 58:*23* 97:*19* 104:*2, 15* 178:*2* 205:*12*

**seen** 25:*13* 26:*10, 14, 17, 25* 61:*4* 75:*20* 79:*5* 87:*10* 97:*15* 113:*7* 120:*17* 208:*2, 14, 16* 209:*10, 20* 210:*7, 15*

**segregation** 66:*10, 15, 18* 67:*4, 10*

**Self-employed** 13:*23*

**sell** 14:*25* 19:*8* 177:*14, 24* 178:*17* 179:*7*

**selling** 72:*20, 24* 73:*3* 74:*14* 76:*1* 177:*20* 178:*3*

**send** 31:*11*

**sense** 129:*10* 202:*3*

**sent** 31:*9* 66:*2, 3, 4*

**sentence** 166:*6* 191:*9, 14* 203:*3*

**sentenced** 65:*9*

**separate** 77:*17* 147:*4* 180:*10*

**separately** 42:*8* 84:*16*

**served** 163:*5*

**serving** 211:*21*

**session** 204:*14*

**sessions** 204:*19*

**set** 213:*10*

**sets** 15:*1*

**settlement** 53:*6*

**Seven** 29:*16* 94:*8* 96:*2* 199:*2* 212:*5*

**Shair** 68:*23*

**S-H-A-I-R** 68:*24*

**shake** 76:*25*

**share** 40:*1*

**Sharell** 12:*2, 8* 22:*23* 117:*9, 13*

**S-H-A-R-E-L-L** 12:*2*

**Sharell's** 12:*12*

**sharp-looking** 14:*22*

**Shawn** 105:*12, 14, 15* 108:*23* 119:*21* 121:*14*

**S-H-A-W-N** 105:*16*

**Shawna** 105:*13*

**shed** 196:*6*

**Shell** 70:*7*

**Sherome** 107:*4* 118:*24* 125:*23*

**shirt** 14:*22* 211:*9*

**shoot** 125:*3*

**shooter** 136:*21* 183:*4, 6, 8*

**shooting** 36:*8, 17* 39:*17* 46:*2* 60:*16* 79:*22* 80:*2* 81:*9* 99:*1, 5, 9, 12, 20* 104:*19* 105:*18, 25* 114:*10* 121:*4, 8* 122:*3* 123:*9, 23* 124:*7, 24* 125:*5* 133:*9* 136:*8, 18* 137:*2, 5, 9, 11, 23* 138:*3* 139:*13* 159:*8, 13* 173:*4*

**Shore** 205:*24*

**short** 153:*25*

**shot** 64:*20* 113:*13* 121:*20, 22, 25* 124:*12* 133:*16* 136:*9, 15* 149:*21* 159:*3*

**shoulder-to-shoulder** 150:*10*

**show** 86:*16* 87:*9* 106:*6* 110:*6* 115:*19, 21* 196:*9* 201:*19* 207:*21* 208:*1* 210:*5*

**showing** 9:*15* 88:*5* 106:*11* 110:*12* 111:*1* 158:*6* 208:*29* 209:*16*

**shut** 15:*8* 144:*20*

**siblings** 13:*12*

**side** 168:*10*

**sight** 168:*15*

**sign** 19:*19* 139:*4, 19, 23*

**signature** 208:*16, 18*

**signed** 17:*4* 138:*1*

**significant** 185:*18*

**Similar** 122:*10* 181:*20*

**simply** 24:*4*

**sincerely** 191:*18*

**singing** 85:*7*

**single** 195:*7, 9*

**Sir** 5:*22*

**sister** 30:*17, 25* 117:*13* 123:*10* 130:*19* 155:*24* 178:*14, 15, 18*

**sisters** 11:*24* 12:*1*

**sister's** 22:*23*

**sit** 46:*16* 173:*15* 180:*9* 186:*25*

**sitting** 85:*1* 168:*6*

**situation** 129:*5, 11* 165:*16* 175:*6* 184:*1* 186:*13*

**situations** 200:*20*

**Six** 29:*5* 69:*22* 95:*23* 103:*4* 140:*11* 192:*22* 198:*12, 21* 199:*12* 207:*2*

**Sixty** 20:*8*

**Sizemore** 36:5, *12, 15*
*39:16, 22, 23* 40:*3* 41:22,
*23* 42:*3, 6, 8, 11, 16, 19*
*43:12* 44:8 86:*16, 23*
95:20 99:*11, 14, 17*
100:*13, 21* 102:7 112:*19*
114:2 115:*1, 7* 126:25
127:*3, 18* 129:*15, 18*
134:*1* 135:*12, 20, 23*
138:*1, 6, 14* 139:*3* 150:5,
*12, 16* 164:7, *10, 13* 165:*3*
209:7
**Sizemore.......209** 4:*15*
**Sizemore's** 173:*13*
**skills** 17:*21*
**skinned** 168:*11*
**sleep** 199:*11, 13, 15*
**slow** 15:*12*
**slower** 15:*13*
**Smiley** 62:*13, 15, 19, 22*
90:*10, 11, 12, 15* 103:24
107:23 108:*2, 3* 109:7
**Smiley's** 62:*17*
**Smith** 69:*14, 16* 142:*16,
20, 24*
**smoke** 91:6, *8, 10* 96:*12,
14, 18* 97:*1*
**smoked** 96:24
**smoking** 96:*10, 20, 22*
97:4
**smuggle** 188:*3*
**snap** 200:22
**Snipe** 54:8, *15, 20, 25*
55:*10, 11, 13, 22* 56:*3*
62:9, *10* 81:*3* 88:*19* 89:*1,
18, 24* 90:*3, 21* 95:25
100:8 102:*3* 103:*21, 22*
105:5 106:*1* 107:*5, 6*
112:*13* 114:23 115:6, *10*
118:25 123:*14* 126:*13*
139:*18*
**Snipe's** 119:*3*
**social** 11:5 21:24 22:2
23:*15, 18, 21* 57:4
**socialize** 42:7, *10* 50:*13,
16* 86:*1* 87:2
**socialized** 22:9 31:24
42:*3* 49:*9* 51:*8* 52:*12*
54:*15, 19* 56:*17, 19* 58:*14*
59:*17* 60:*15*
**socializing** 42:6 61:20
**soft** 194:9
**sold** 177:24 178:25 179:2
**sole** 14:*15, 17*
**somebody** 35:*11* 84:*13*
124:*3, 4, 5* 148:*14* 149:22
159:*8* 160:24 161:7
174:*1* 197:*13* 204:8
**somebody's** 26:22

**someplace** 11:2*1* 129:*19*
**somewhat** 51:*16* 167:8, *14*
**son** 33:*4, 6, 8* 34:6, *13*
197:25
**sons** 26:6
**son's** 33:8
**soon** 40:*13*
**sooner** 170:*13*
**sorry** 7:7 14:*1* 19:*14*
20:*11, 15, 17* 23:*11* 25:24
32:7 53:4 55:*11* 80:*18*
81:9 94:*1* 95:*10* 96:*1*
102:5 105:*13* 123:*12*
131:6 148:*17* 149:*18*
169:6 171:*13, 15* 174:*10*
175:*21* 179:22 208:*11, 19*
**sort** 160:*9*
**sought** 203:*15*
**sound** 93:*13* 101:23
139:*1, 21* 169:*18* 201:*11*
**sounded** 155:5
**sounds** 15:2*1* 139:22
**source** 177:*3*
**sources** 20:9 170:*19*
**space** 157:8
**speak** 24:*12* 27:7 28:*15,
20* 32:25 34:9 35:*1, 3*
41:*4* 42:25 47:*13* 48:*3,
14, 17* 49:6 51:*12, 14, 17*
52:*10, 16, 17* 56:*12, 25*
57:*12* 58:*16, 19, 23* 59:*1*
60:24 64:*10* 68:4 80:6
82:9 122:*16* 124:20, *23*
126:24 129:*15* 144:*16*
160:*17* 204:9
**speaking** 9:23 17:24, *25*
44:5 47:*1, 2* 49:*18* 52:*3*
104:*16* 190:8
**special** 157:*16, 17*
**specialists** 203:*18*
**specializes** 39:*1*
**specific** 21:*1* 34:23
35:25 113:*15* 174:8
**speculating** 178:*3*
**spell** 7:*3* 10:*11* 12:7
14:*1* 26:7 33:*11, 13*
61:*11*
**Spence** 8:*1, 3, 11, 16*
202:20, 22
**S-P-E-N-C-E** 8:*1*
**spend** 11:2
**spent** 82:*17* 176:*13*
192:*11* 196:8
**spirit** 86:5
**split** 10:*13, 23* 200:25
**spoke** 31:*10* 33:20, 24
34:2 35:23, 24 36:*10*
44:2, *24, 25* 45:4 46:6, *11*
47:5, *25* 48:6 51:*8, 20, 21*
53:9 54:5 56:2, 6, *14*

58:*11* 72:6, 9 83:*1*
109:24 135:*10* 190:9
**spoken** 26:*10, 14* 27:5
31:5 41:*1, 14, 19* 44:*18*
48:20 50:7 52:7, 20, *24*
59:*11, 25* 60:*3* 61:2 64:7,
*13, 16* 67:*16* 68:*10, 22*
80:9 97:*16* 120:*17*
128:*12*
**sporadic** 15:*3*
**spot** 19:20 78:7 133:22
**spread** 170:*19*
**Sprint** 22:*19*
**Square** 1:2*1* 2:5
**Sr** 11:*11* 12:*13, 18* 33:2*1*
35:2, 6 36:6, *11, 22* 39:6,
*10, 21* 40:*1, 5, 11*
**Sr.'s** 34:6 39:*15*
**St** 70:*1, 4* 73:*18* 89:8, 9
90:24 100:*1, 18* 101:22
102:*1* 103:*4, 6, 18, 20*
104:*3, 12, 16, 18, 23* 105:*1,
3, 8* 107:20 108:*11* 109:*3,
17* 111:*17* 117:*16* 120:24
125:*16* 156:25 157:5, 6
158:*1, 2, 4, 7, 8, 23* 185:*10*
**staff** 201:9
**stand** 135:7 162:*15*
169:22 170:2*1* 184:*18*
185:*18* 196:2*1* 197:*1, 7*
**standing** 90:8, *14*
**standoff** 195:*17*
**staple** 110:7
**stapler** 87:*12*
**start** 14:*13* 19:*11* 81:*13*
85:25
**started** 36:22 37:*3, 6*
53:*3, 10* 92:2 153:8
194:22
**starting** 15:*15*
**State** 1:20 6:4 21:*16, 21*
29:*10* 168:5 181:24
186:2 213:6, *18*
**stated** 138:*19*
**statement** 47:*18, 19*
132:2*1* 139:*12* 171:23
173:7, 8, 9
**statements** 144:22, *23*
170:2*1*
**STATES** 1:2
**State's** 136:*12*
**station** 69:25 70:*3, 6, 10*
74:22 76:*11* 77:*15, 16, 25*
78:5, 6, 8, 12, 16, 19, 21*
143:*11* 179:*14*
**status** 53:*13*
**stay** 71:24 85:22 179:6
202:*11*
**stayed** 81:20 103:*3*
146:5 192:8 193:*15*

**staying** 29:*4* 57:*16*
188:*10*
**stenotype** 213:9
**stenotypy** 213:8
**stepbrother** 13:6
**steps** 203:6
**stepsister** 13:*10*
**sticker** 88:6
**sticking** 89:20 173:22
**stipulations** 1:23
**stomach** 187:*3* 193:*13, 16,
17* 203:*19* 205:4 206:6,
*18* 207:6
**Stone** 61:*12*
**stop** 184:*4*
**stopped** 16:*12* 49:23
**store** 11:22 14:*11, 19*
15:7, 8* 18:8 52:*18*
**storefronts** 19:22, 23
**stormed** 78:*16*
**story** 173:*17* 211:8, *15,
16, 18, 19, 20, 24*
**straight** 92:6, 8 93:23
**Street** 6:2*1* 7:*10, 15*
26:24 74:5, 7, 8, 9, 12
76:*14, 19* 77:*3, 6, 21, 25*
111:*16* 143:*11, 24* 145:6
159:20 168:*10* 183:*15*
213:*19*
**streets** 57:*16* 72:20, *23*
76:*13, 15* 77:*3* 121:23, *25*
124:9 166:23 179:*3, 9*
**stress** 148:*12* 193:*12, 13*
203:25 205:5
**stressful** 163:*17*
**strike** 39:*13* 84:*10* 115:7
142:6 168:*17*
**student** 177:2*1*
**studied** 128:*14*
**Studios** 24:*18*
**study** 135:6
**stuff** 49:20, 2*1* 52:5
58:20 71:2*1* 72:*18* 134:9,
*12* 196:*14* 201:*17, 20*
207:*10*
**subject** 65:*18*
**submitted** 137:*17* 210:*11*
**subpoenaed** 128:20 129:4
**subpoenas** 128:*17*
**substance** 39:*14* 187:*14*
**sued** 174:8 180:5, 25
**suffered** 203:*17*
**suggest** 122:2, *11* 140:24
144:*10* 149:*3, 7*
**suggesting** 141:*4* 143:*15*
**suggestion** 189:*14*
**suggests** 144:2
**Suite** 1:22 2:5, *13*
**sum** 21:*4*

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  70 of 72.  PageID #: 1419

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

support 138:*18*
supporter 200:*9*
supposed 66:*23* 198:*10*
  201:*14*
sure 19:*18* 20:23, *24*
  21:*18* 23:*8* 26:*9, 20*
  28:*13* 29:*14* 36:*13* 57:22
  78:5 79:2 80:*4, 5, 21*
  82:*4* 83:*3* 84:*13* 86:*9, 19*
  90:*10* 92:*11* 94:*6, 13, 17,*
  *19* 95:*6* 97:*6, 23, 24* 98:5
  100:*12* 102:*14* 105:2
  118:*3* 119:*7* 121:*13*
  125:22, *24* 148:5, *15*
  150:*8* 188:*20* 202:*11*
  207:*12*
surrounding 188:*20*
suspect 130:*13* 159:*21*
  165:*3* 169:*9* 184:*10, 14*
suspects 174:*22*
Sweet 118:*5*
switch 152:*17*
sworn 5:*23* 6:*1*
system 196:*17*

< T >
table 16:*7*
Tackla 3:*6* 5:*10, 11, 13*
take 9:*5, 22* 20:*6* 23:*23,*
  *24* 83:*12* 91:*13* 92:6
  97:*3* 112:*5* 116:*2* 127:*23*
  139:*8* 140:*3* 154:*8*
  162:*16, 19* 163:*14* 164:*21*
  166:20, *24* 167:*1* 170:20
  178:*23* 189:*14* 197:*7, 8*
  198:*17, 19* 200:*21* 201:2
  202:*12*
taken 1:*18* 89:*3, 6, 7*
  90:*23* 187:*4, 7*
takes 194:*15*
Takima 25:20, *25* 26:*11*
  27:5, *11, 15, 20*
T-A-K-I-M-A 26:*8*
Takima[spelling 25:*19*
talk 28:2, *3* 50:2 55:*16*
  59:*3* 62:*1* 63:25 103:*1*
  123:*13, 15, 22* 165:*13*
  189:*13, 21* 200:*19* 204:*8*
talked 38:*9, 12* 45:*11*
  49:*21* 107:*13* 129:*9, 23*
  143:*19, 20* 170:*8* 172:*22*
  180:*3* 181:*11* 189:*15, 24*
  191:*17, 19*
talking 38:*12* 49:*23*
  55:*20* 57:*14* 62:*25* 72:*19,*
  *24* 75:*12* 77:2, *4, 18*
  78:*15* 83:*4* 112:*23*
  136:*23* 143:*25* 155:*10*
  164:*7* 201:*1*

Tamika 25:*15, 17*
Taneisha 109:*5* 120:2
tapes 19:*8*
taught 17:*21*
Teach 17:*24*
tear 196:*6*
technically 182:*11, 14*
telephone 49:*16, 17* 55:*18*
tell 6:*12* 9:*9, 17* 12:*1*
  26:*13* 33:*3* 34:25 35:*16*
  36:*15* 38:*21* 40:*16* 43:2
  44:*4, 7, 10, 13, 23* 45:*8, 23,*
  *25* 46:*7* 50:*5* 55:2 65:*24*
  70:*22* 71:*2, 23* 76:*14*
  78:*10* 81:*24* 84:*24*
  101:*18, 21* 102:*6* 103:*9*
  104:*19* 115:*15* 122:*24*
  123:*17, 25* 124:*6* 125:*3,*
  *11* 126:*5* 127:*3, 6* 130:*21*
  134:*16* 135:*22* 173:*12*
  175:*8* 190:*1* 211:*12*
telling 36:*14* 40:*19*
  53:*11, 25* 62:*3* 71:*19*
  74:*17* 75:25 122:*21*
  134:*13* 145:*21* 147:*18*
  160:*5* 163:*8, 10* 165:*14*
  169:*15* 196:*15* 197:6
  200:*23, 24* 201:*9* 202:*7*
  204:*7*
temper 193:*23*
Ten 8:*6, 8* 165:*11*
Tenth 16:*17, 18*
terminating 38:*24*
terms 17:*25* 190:*24*
terrible 12:*11*
test 4:*16, 17* 20:*5* 138:*18*
  139:*16* 209:*18, 19, 24*
  210:*9*
testified 6:*1* 8:*21, 23*
  46:*1* 49:*24* 93:*12* 114:*13,*
  *16* 132:25 133:*3, 7, 11, 14,*
  *18* 134:*15, 25* 135:*13, 18*
  136:*6, 12, 14, 21* 137:*1, 4,*
  *22* 146:*9* 147:*17, 23*
  148:25 149:*3, 11* 165:25
  169:*3, 8* 171:*16*
testify 109:*9* 113:*16, 20*
  114:*1, 6, 9* 116:*21, 24*
  125:*19, 21* 126:*6* 133:22
  134:*22* 136:*4* 137:22
  187:*9*
testifying 135:*3* 147:*18*
testimony 45:*19* 46:*9, 18*
  93:*11* 99:2 105:*24*
  111:*10* 113:*12* 121:*1*
  138:*24* 143:*7, 13* 147:*9*
  150:*8* 161:*17* 167:*21*
  171:*6* 182:*22*
text 156:*17, 20*

Thank 8:*10* 18:*14* 37:*16*
  40:*18* 91:*4* 109:*21*
  153:*17* 199:*5* 203:*12*
  207:*14* 210:22 211:*7*
  212:*1*
thanked 43:*8*
therapy 203:*23* 204:*10*
thing 9:*20* 51:*15* 53:*18*
  86:*3* 106:*5* 121:*6* 123:*7*
  124:*8* 155:*11* 157:*16*
  186:*15*
things 19:*11* 27:*9* 39:*20*
  57:*18* 59:*9* 74:*17* 134:*14*
  143:*21* 146:*15* 147:*4*
  149:*12* 163:*2* 165:*20*
  178:*11* 191:*21, 22, 25*
  192:*12* 193:*6* 194:*1, 24*
  195:*2* 196:*8, 11* 200:*19*
  203:*24* 205:*2*
think 17:*18* 20:*6* 21:*3, 5*
  23:*6* 25:*20* 32:*21* 33:20
  34:*20* 37:*1* 46:*21* 48:*23*
  49:*24* 56:*14* 61:*21* 85:*5,*
  *8* 88:*9* 90:*10* 91:*24* 92:*9*
  93:*15* 100:*9* 107:*19*
  122:*5* 125:22 129:*14*
  132:*12, 14* 138:*5, 13*
  143:*2* 146:*11, 16, 25*
  150:*24* 152:*14* 156:*7*
  157:*17* 161:*2, 18* 162:*11*
  163:*19, 23* 164:*1* 167:*25*
  170:*8, 22* 171:*5, 8* 172:*8,*
  *16* 173:*17, 21* 175:*11*
  179:*20, 23* 185:*8* 189:25
  190:*7, 11* 191:*13* 195:*13*
  209:*7* 210:*11* 211:*23*
thinking 74:*13* 95:*10*
  164:*18* 171:*18*
third 89:*7* 116:*9*
Thirty-five 12:*9*
Thirty-four 12:*16*
Thirty-two 13:*9*
thought 73:*12* 160:*5*
  161:*14* 164:*5, 14* 183:*7*
threat 76:*2* 145:*12*
  167:*12*
threaten 75:*14* 76:*18, 20*
threatened 129:*9* 144:*13*
Threatening 72:*14*
three 7:*17, 21* 26:*16*
  28:*4* 82:*15, 16, 18* 87:*23*
  88:*11* 92:*11* 94:*8* 105:*9*
  110:*17* 116:*6* 192:*18, 23*
  195:*7* 199:*13* 203:*18*
throwing 169:*15*
ticket 66:*10* 67:*5*
tickets 67:*6*
Tim 152:20, *24* 180:*19*
time 5:*4* 9:*23* 10:*13, 23*
  11:2 16:*1, 11* 18:6, *15*

21:*17* 23:*1* 25:*8* 27:*14,*
  *16* 28:*19* 29:*18, 19* 31:*3,*
  *23* 32:*11* 35:*23* 36:*1, 10*
  37:*9, 13* 42:*22* 43:*12, 18*
  44:*24, 25* 45:*13* 46:*2, 11*
  57:*24* 58:*5* 64:*8* 70:*7*
  81:*24* 82:*2, 13, 16, 17*
  83:*7, 13* 85:*8, 16* 87:*17,*
  *23* 93:*9, 15* 99:*14* 101:*6*
  104:*7, 9, 25* 105:*24* 110:*7,*
  *17, 23* 111:*11* 113:*5, 10,*
  *13, 17* 114:*10* 115:*7, 8*
  118:*11* 119:*23* 121:*13, 15*
  122:*15, 20* 123:*5, 21*
  128:*1, 7* 129:*1* 132:*9*
  133:*8* 134:*25* 138:*2*
  140:*5, 11* 146:*2* 148:*7*
  149:*4, 8, 11* 150:*3, 10*
  151:*3* 159:*2* 160:*3, 5, 23*
  161:*1* 162:*5* 163:*4* 164:*6,*
  *9* 165:*10* 169:*3, 8* 171:*9*
  178:*8, 14* 179:*13* 182:*6*
  183:*12* 186:*23* 187:*16*
  190:*25* 191:*4* 192:*11*
  193:*16* 194:*19* 198:*22*
  199:*2* 202:*6, 8* 204:*1*
  207:*10* 210:*22* 211:*25*
  212:*6*
timeframe 28:*18*
times 26:*14, 16* 28:*4*
  33:*20, 23, 24* 42:2 44:*21*
  50:*9* 51:*19* 52:*16* 54:*6,*
  *15, 19* 56:*5, 11, 14, 16*
  58:*12* 59:*21* 60:*15* 61:*6,*
  *21* 65:*21, 22* 69:*21* 72:*6,*
  *9* 73:*1* 74:*14* 75:*3* 76:*9*
  77:*8, 13* 79:*13* 83:*17*
  98:*19* 150:*19*
TIMOTHY 2:*19* 5:*20*
tired 165:*21*
tissue 211:*23*
Toastmasters 17:*22*
today 6:*7* 14:*23* 15:*2*
  28:*1* 46:*16* 50:*11* 52:*25*
  78:*25* 99:*3* 101:*5* 146:*8*
  154:*10* 165:*25* 166:*25*
  168:*6* 173:*15* 177:*1*
  180:*9* 186:*25* 187:*9*
  192:*23* 210:*23* 211:*9*
Today's 5:*4*
Todd 163:*24, 25* 164:*16,*
  *19* 189:*12* 196:*14*
told 11:*8* 13:*18* 27:*23*
  31:*17* 35:*11* 38:*7* 39:6
  40:*5, 18* 43:*3* 46:*17*
  53:*22, 23* 74:*19* 75:*1, 19,*
  *20* 76:*3* 115:*14* 127:*7*
  129:*12* 135:*9, 11* 140:*17*
  144:*17* 150:*23* 151:*6*
  163:*4* 164:*15, 19* 165:*2, 4*

Case: 1:20-cv-00660-DAR   Doc #: 88-2   Filed: 07/25/24   71 of 72.   PageID #: 1420

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

169:*14*  172:*10*  173:*3, 19*
174:*15*  176:*12, 22*  178:*19*
185:*17*  190:*19*  197:*24*
198:*1*  202:*10*
**Toledo**  29:*9, 20*
**toll**  192:*16*  194:*15*
**Tom**  47:*7, 8*  55:*20*
**Toni**  108:*6*  118:*20*
119:*12, 15*
**topics**  57:*14*
**tore**  192:*14*
**torture**  165:*12, 13, 17*
**total**  21:*4*
**totally**  147:*4*  184:*2*
**touch**  75:*22*  76:*23*
**tourism**  24:*9, 14, 16, 21,
22, 23, 25*
**tourist**  24:*5*

**Tpuin@city.cleveland.oh.us**
2:*25*
**track**  194:*17*
**trade**  17:*13, 18*
**traffic**  123:*2*
**trafficking**  65:*2, 11*  70:*14*
79:*7*  145:*9, 22, 23*  146:*1*
**training**  17:*14*  18:*1*
181:*14*
**transcript**  213:*9*
**trashed**  185:*14, 20, 23*
**trauma**  195:*14*  205:*1*
**treated**  132:*18*
**treatment**  203:*16*
**trial**  8:*22*  35:*22*  37:*18,
24*  39:*3*  49:*25*  93:*11*
110:*2, 4*  111:*20, 23*  113:*5,
10, 24*  114:*7, 13, 16*  115:*8*
116:*5*  117:*6*  118:*18*
119:*4*  126:*10*  128:*16, 17,
20*  129:*15*  132:*10, 24, 25*
133:*24*  134:*15, 25*  135:*3,
10, 13, 18*  136:*3, 6, 11, 23,
25*  137:*22*  146:*9, 11, 23,
25*  147:*6, 8*  148:*6, 7, 9*
149:*3, 21*  150:*3, 11*
159:*24*  160:*3*  161:*1*
162:*4*  167:*3, 21*  168:*22*
169:*22*  175:*11, 15, 22*
183:*14*  189:*18*  197:*24*
**tried**  47:*13*
**trip**  24:*4, 8, 14, 20, 23*
**trips**  23:*24*
**trouble**  7:*21*  71:*24*
151:*4*  152:*2*  188:*10*
**troublemaker**  177:*4, 9, 11*
**truancy**  71:*1, 6*  75:*4*
178:*11*
**true**  16:*13*  133:*21*
134:*24*  150:*13, 14*  177:*1*
179:*2*  213:*8*

**Trumbull**  29:*9, 23*  33:*17,
25*  34:*16, 25*
**truth**  35:*14, 16, 21*  40:*19*
44:*7, 10, 13*  45:*8, 23, 25*
46:*7, 17*  62:*4*  125:*19*
160:*5*  165:*5*  176:*13*
**truthful**  138:*19*
**truthfully**  187:*9*
**try**  35:*19*  139:*11*  194:*16*
196:*3*  208:*13*
**trying**  35:*5*  45:*18*  125:*1*
156:*6*  171:*17*  175:*2*
192:*21*  194:*5*
**T-shirt**  194:*21*
**T-shirts**  15:*1*
**Tuesday**  1:*22*
**turn**  88:*10*  89:*10*  90:*19*
112:*1*
**turned**  130:*7*
**turning**  130:*6*  131:*15*
**Twan**  108:*15, 17*
**Twenty**  7:*6, 8, 9*  56:*16*
**twice**  11:*19*  29:*18*  41:*6*
44:*22*  49:*15*  50:*15*  52:*11*
59:*15*  61:*4*  70:*25*  75:*10*
77:*9*  189:*25*
**twin**  192:*17*
**two**  6:*19*  7:*21*  10:*24*
12:*4*  15:*4*  26:*6, 16*  29:*19,
24*  42:*25*  58:*5, 19*  65:*5*
82:*12*  87:*17*  90:*19*  94:*24*
111:*3, 4*  112:*1*  116:*7*
120:*6, 9, 12*  133:*14*
136:*17*  137:*7*  147:*4*
149:*12*  168:*7*  173:*9*
182:*6*  194:*13*
**two-and-a-half-year**
153:*13*
**two-button**  15:*1*
**Ty**  109:*12, 13*  120:*3, 5*
**type**  32:*19*  47:*18*  53:*18*
72:*17*  140:*22*  145:*11*
201:*17*
**typed**  111:*9*
**types**  14:*24*  17:*5*  23:*18*
91:*15*  97:*3*
**typically**  11:*20*  154:*21*

**< U >**
**U.S**  5:*8*
**UH**  205:*20, 21*
**Uh-huh**  25:*18*  111:*19*
**ultimately**  76:*11*  145:*23*
**Umar**  32:*14, 16, 19*  33:*10,
15, 21*  34:*6, 9, 15*  35:*1, 6*
36:*6, 10, 14, 17, 21*  37:*6*
39:*6, 10, 14, 21*  40:*1, 5, 11,
21*  41:*4, 5*  197:*17*
**U-M-A-R**  33:*12*
**Um-hmm**  111:*7*  112:*4*

**understand**  9:*6, 12*  39:*18*
45:*22*  53:*5, 11*  72:*22*
81:*16*  99:*2*  102:*15*
105:*24*  121:*1*  125:*24*
145:*20*  151:*9*  156:*6*
159:*6*  165:*24*  171:*5*
172:*16*  175:*2*  200:*7*
**understanding**  16:*12*
32:*9*  36:*5*  44:*11*  81:*19*
129:*17*  143:*2*  156:*9*
187:*20*  209:*17*
**understood**  76:*5*  155:*13*
161:*16*  167:*7*
**unexpectedly**  128:*24*
**unfair**  162:*11*  191:*14*
**Unit**  162:*5*  206:*23*
210:*12*
**UNITED**  1:*2*
**Universal**  24:*18*
**unknown**  117:*4, 23*
118:*16, 21*  119:*2*
**unquote**  176:*14*
**unusual**  100:*24*  103:*12*
104:*22*
**utilities**  21:*7*

**< V >**
**vacated**  137:*14, 18*  138:*8,
13*
**vacations**  23:*24*
**vehicle**  84:*19*
**vendetta**  140:*22*  141:*9,
18*  142:*2, 16*  143:*3, 16*
144:*3, 11*  145:*1*  172:*23*
176:*23*  177:*4*  178:*4*
179:*18*
**vendor's**  18:*9, 16, 20*  19:*9*
**verbal**  36:*24*  37:*1, 3*
39:*8*  42:*15*
**verbally**  9:*4*
**verdict**  38:*3*
**verify**  208:*17*
**versus**  5:*6*  154:*6*
**Veverka**  67:*13, 17, 20*
68:*1*  132:*13, 17*  140:*18,
21, 24*  141:*5, 8, 9, 11*
**vice**  71:*1*  78:*16*  79:*23*
**victim's**  32:*17*  197:*17*
**Videographer**  3:*6*  5:*3, 11,
22*  57:*20, 23*  58:*4*  87:*16,
22*  110:*16, 22*  127:*25*
128:*6*  140:*4, 10*  152:*23*
198:*20*  199:*1*  207:*15*
212:*4*
**Videotaped**  1:*18*
**view**  191:*10*  193:*20*
**violate**  173:*18*  180:*11*
**violated**  180:*4*  181:*9*
**violating**  180:*6*

**violation**  181:*5, 15, 20*
184:*13*  188:*18*
**violations**  151:*17*  181:*20*
**visit**  11:*20*  28:*8*  33:*7*
34:*9, 12, 13*  49:*14, 15*
**visited**  24:*6*
**visitors**  82:*22*
**visits**  67:*9*
**vodka**  91:*24, 25*  92:*6, 9,
16*
**voice**  20:*14*  82:*7*
**voluntarily**  132:*21*
**vs**  1:*11*

**< W >**
**wait**  9:*21*  38:*8*  71:*21*
72:*17*  169:*6*
**waiving**  154:*10*
**walking**  27:*2*
**Walmart**  45:*1*
**want**  16:*10*  25:*12*  38:*4,
9*  39:*7*  44:*13*  45:*9*  47:*21*
48:*23*  57:*18*  74:*25*  81:*12*
95:*5*  102:*14*  106:*6, 20*
109:*23*  115:*19*  129:*5*
130:*12*  132:*24*  140:*15*
141:*12*  152:*16, 17*  154:*2*
160:*14, 17*  162:*18*  163:*13*
166:*18, 19*  179:*8*  186:*14*
189:*5*  190:*17*  194:*18, 21*
195:*18, 24*  197:*13*  199:*16,
19, 21, 25*  200:*1, 3*
**wanted**  15:*21*  18:*6*
25:*14*  38:*17*  39:*1*  45:*5, 6,
23*  46:*7, 8*  48:*25*  55:*22*
101:*21, 22*  160:*18*  163:*3,
6, 16*  165:*20, 23*  199:*9*
**wanting**  78:*13*
**warrant**  123:*3*  131:*12*
**Washington**  24:*2, 20*
**wasted**  185:*11*
**watched**  192:*9*
**water**  161:*13*
**Watson**  108:*6, 16, 17*
119:*12, 15*
**way**  29:*1*  33:*13*  44:*15*
54:*18*  64:*21*  75:*16*  76:*24*
103:*12*  105:*5*  132:*1, 18*
146:*5*  149:*4, 7*  165:*13*
186:*13*
**WCPN**  176:*20*
**weak**  195:*25*
**weapon**  65:*2, 12*  79:*16*
**wear**  87:*5*  198:*14*
**wearing**  14:*6, 22*  15:*2*
88:*20*  89:*13, 16*  90:*6*
**weed**  185:*14*
**week**  11:*19*  28:*4*  54:*6*
58:*12*  203:*20*

Case: 1:20-cv-00660-DAR  Doc #: 88-2  Filed: 07/25/24  72 of 72.  PageID #: 1421

Deposition of Ru-El Sailor, Jr.                                    Ru-El Sailor, vs. City of Cleveland, et al.,

**weekend** 157:*18*
**weeks** 121:*18*
**weight** 25:*3, 9*
**well** 7:*23* 15:*3* 29:*18*
 33:*7* 35:*6* 38:*15* 44:*10*
 55:*3, 5, 7* 58:*10* 62:*3*
 78:*10, 25* 79:*4* 82:*15*
 84:*10* 98:*21* 126:*4*
 127:*21* 133:*24* 134:*15*
 144:*15* 147:*8, 23* 149:*1*
 150:*1* 153:*15* 162:*18*
 177:*12* 180:*1* 211:*14*
**went** 22:*8* 24:*1, 18* 29:*2*
 42:*23* 52:*12, 13* 57:*5*
 59:*22* 81:*21* 84:*13*
 102:*19* 103:*5, 18* 105:*5*
 113:*5, 10, 24* 118:*18*
 122:*25* 123:*1* 125:*14, 16*
 127:*6* 128:*10* 129:*15, 18*
 132:*10* 133:*15, 24* 135:*10,
 16* 158:*3, 15, 23* 160:*15*
 161:*10, 13* 178:*18* 190:*3*
 192:*6, 10, 11, 13* 193:*1*
 197:*3* 201:*16* 202:*14, 25*
 205:*8, 13*
**We're** 87:*16* 94:*13*
 110:*16* 127:*25* 140:*4*
 153:*18, 19* 154:*7* 163:*11*
 198:*20, 22* 207:*15, 21*
 212:*3, 4*
**we've** 171:*5* 180:*3*
**whereabouts** 147:*3*
**WHEREOF** 213:*10*
**whirlwind** 159:*25*
**white** 78:*13* 84:*21, 22*
 89:*16* 108:*20* 133:*12*
**wife** 7:*17* 10:*8* 44:*3, 4*
 47:*1* 195:*9* 198:*6* 200:*5,
 21* 202:*19*
**wife's** 7:*18*
**William** 4:*15* 36:*5, 12, 14*
 39:*15, 16, 22, 23* 40:*3*
 41:*22, 23* 42:*3, 6, 11, 16,
 19* 43:*11* 44:*8* 99:*11, 14,
 17* 112:*19* 114:*2* 115:*1, 6*
 126:*24* 127:*3, 18* 129:*15,
 18* 133:*25* 135:*12, 19, 23*
 138:*1* 139:*3* 150:*5, 11, 15*
 164:*7, 10, 13* 165:*2, 3*
 173:*13* 209:*7*
**Williams** 31:*17, 21, 24*
 32:*2, 5, 9* 44:*9* 136:*19, 20*
 137:*4, 21* 138:*5, 14, 23*
 182:*25* 183:*1, 12* 197:*1*
 208:*11, 12, 16*
**Williams.........208** 4:*14*
**win** 168:*12*
**withdrawing** 185:*1*
**Witness** 4:*13* 18:*13*
 37:*15* 40:*6* 43:*17* 48:*12*

51:*25* 53:*20* 54:*1* 55:*23,
 24* 66:*17* 82:*8* 106:*22, 25*
 111:*23* 112:*6, 9, 14, 17, 20*
 113:*3* 114:*6* 116:*6, 8, 20,
 23* 117:*1* 118:*4, 14* 125:*8*
 126:*1, 9, 13, 16, 20* 128:*21*
 136:*1* 137:*11* 139:*24*
 144:*14, 15* 154:*14* 168:*4*
 169:*2* 173:*7* 184:*17*
 185:*7* 186:*11, 12* 198:*16*
 208:*19* 213:*10*
**witnessed** 101:*3* 123:*8*
**Witnesses** 106:*13, 16*
 110:*3* 115:*12* 116:*15, 17*
 120:*10, 13, 16* 125:*21*
 128:*17* 136:*7, 16, 17*
 137:*7* 139:*20* 143:*20, 21,
 25* 147:*9, 14* 148:*19, 22*
 164:*8*
**woman** 151:*14* 205:*17, 18*
**word** 61:*12* 167:*17*
**words** 166:*17* 176:*7, 9,
 15, 17* 178:*8*
**wore** 87:*3*
**work** 16:*9* 25:*5, 6*
 180:*15, 17* 192:*10, 11*
 194:*18, 21*
**worked** 15:*10* 16:*5, 6*
**working** 47:*12* 61:*18, 24*
 86:*8* 118:*7*
**works** 28:*13*
**World** 24:*17, 18*
**worried** 135:*7* 149:*17, 19,
 20, 23, 24*
**worry** 154:*15* 160:*18*
**worst** 163:*1* 194:*14*
**would've** 163:*5*
**write** 190:*22*
**writing** 35:*17* 37:*1, 2*
**writings** 37:*6*
**written** 42:*15* 47:*18*
 154:*11*
**wrong** 76:*6* 146:*22*
 164:*24* 196:*19, 24* 197:*12,
 22* 204:*4*
**wrongfully** 182:*11*
**wrote** 35:*10, 12* 203:*9*
 213:*7*

**< Y >**
**y'all** 161:*6, 8*
**Yeah** 10:*15, 21* 12:*11*
 14:*21* 15:*12* 25:*7* 27:*10*
 33:*14* 38:*14* 39:*20* 45:*23*
 46:*22* 50:*10* 53:*14* 55:*16*
 62:*14* 63:*3, 7* 74:*22* 76:*3,
 7* 80:*5* 82:*19* 83:*11* 86:*2*
 87:*14* 90:*3* 95:*12* 96:*4*
 98:*4* 99:*7* 102:*5* 107:*18*
 123:*16* 125:*6, 15, 17, 19*

129:*20* 131:*6* 134:*24*
 135:*16* 139:*22* 145:*20*
 147:*13* 155:*24* 160:*16, 25*
 161:*12, 15, 21, 24* 162:*2*
 166:*9* 167:*14* 174:*11*
 182:*16* 183:*10* 184:*19*
 188:*22* 191:*3* 198:*2, 18*
 202:*21* 206:*14, 22* 207:*20,
 23* 210:*21*
**year** 15:*4* 20:*20* 21:*11*
 29:*19, 21* 30:*1*
**years** 7:*21* 10:*25* 13:*19*
 15:*4* 29:*16* 30:*14* 33:*18*
 34:*4, 20, 24* 49:*23* 65:*23*
 98:*3* 124:*16* 137:*13*
 148:*14* 162:*19, 23* 163:*4,
 8* 174:*6* 176:*13* 191:*1, 2,
 10* 192:*18* 193:*2* 194:*9,
 13* 195:*8* 196:*8* 197:*5, 8,
 20* 198:*12* 201:*7* 203:*2*
**Yolanda** 107:*8* 119:*6*
**young** 74:*25*
**younger** 64:*21, 22*
**youth** 56:*20* 57:*11, 13, 15*

**< Z >**
**zero** 170:*20* 171:*24*
 172:*6*
**Zoom** 205:*3*