THE STATE OF OHIO,        )
                          )  SS:      NANCY McDONNELL, J.
COUNTY OF CUYAHOGA.       )

FILED
COURT OF APPEALS

JUL 11 2013

Clerk of Courts
Cuyahoga County, Ohio

IN THE COURT OF COMMON PLEAS
(CRIMINAL BRANCH)

THE STATE OF OHIO,                )
                                  )
                    Plaintiff,    )
                                  )
        vs.                       )        Case Nos. CR 435700(A)
                                  )        435700(B), 435700(C)
CORDELL HUBBARD,                  )        C/A No. 83552
NICHOLE HUBBARD,                  )
RU-EL SAILOR,                     )
                                  )
                    Defendants.   )

- - -

TRANSCRIPT OF PROCEEDINGS     CA03083552

VOLUME 9 of 10

APPEARANCES:

17004074

        William D. Mason, Prosecuting Attorney,
        Blaise Thomas, Assistant Prosecuting Attorney,
        Maureen Clancy, Assistant Prosecuting Attorney,

             On behalf of the State of Ohio.

        Myron Watson, Esq.,
             On behalf of Defendant Cordell Hubbard.

        James R. Willis, Esq.,
             On behalf of Defendant Nichole Hubbard.

        Jimmie Mack, Jr., Esq.,
             On behalf of Defendant Ru-el Sailor.

Lisa Hrovat
Robert Kraska
Mary Jean Cooley
Kathleen Kilbane
Official Court Reporters
Cuyahoga County, Ohio

FILED
COURT OF APPEALS

DEC 4 - 2003

GERALD E. FUERST
CLERK OF COURTS
CUYAHOGA COUNTY, OHIO

FILED

NOV 2 8 2003

GERALD E. FUERST
CLERK OF COURTS
CUYAHOGA COUNTY, OHIO

THE STATE OF OHIO,          )
                            )  SS:      NANCY McDONNELL, J.
COUNTY OF CUYAHOGA.         )

              IN THE COURT OF COMMON PLEAS
                    (CRIMINAL BRANCH)

THE STATE OF OHIO,                )
                                  )
              Plaintiff,          )
                                  )
      vs.                         )      Case Nos. CR 435700(A)
                                  )      435700(B), 435700(C)
CORDELL HUBBARD,                  )      C/A No. 83552
NICHOLE HUBBARD,                  )
RU-EL SAILOR,                     )
                                  )
              Defendants.         )

                          - - -
              TRANSCRIPT OF PROCEEDINGS
                          - - -


          BE IT REMEMBERED, that at the MAY, A.D.

      2003 Term of said Court, this cause came on to

      be heard before the Honorable Nancy McDonnell,

      and a jury, in Courtroom No. 17-B, The Justice

      Center, Cleveland, Ohio, on Monday, June 2,

      2003, upon the indictment filed heretofore.


                          - - -

                   OFFICIAL COURT REPORTERS
                     Cuyahoga County, Ohio

```
 1              JUNE 2, 2003, MONDAY MORNING SESSION

 2                          - - - - -

 3                      (Thereupon, the jury was brought

 4                      into open court and proceedings

 5                      were as follows:)

 6                          - - - - -

 7              THE COURT:  Mr. Watson?

 8              MR. WATSON:  Your Honor, the Defendant

 9     rests pending the submission of its exhibits.

10              THE COURT:  All right.  Come up to the

11     bench for one second.

12                          - - - - -

13                      (Thereupon, the following discussion

14                      was had between Court and Counsel

15                      outside the hearing of the jury:)

16              THE COURT:  Are you making your Rule 29

17     now?  The other day the early motions for

18     acquittal were overruled.  You are renewing your

19     motion?

20              MR. WATSON:  Yes, I am, reincorporating

21     the same arguments briefly made.

22              THE COURT:  Miss Clancy --

23              MS. CLANCY:  Yes.

24              THE COURT:  -- are you reincorporating your

25     earlier motions?
```

```
1              MS. CLANCY:  Yes.

2              THE COURT:  Are you ready?  How many

3         witnesses do you have?

4              MR. MACK:  I'm going to put on two.

5                   - - - - -

6              (Thereupon, the following proceedings

7              were had in open court:)

8                   - - - - -

9              (The DEFENDANT, RU-EL SAILOR, to maintain

10        the issues on his part to be maintained, called as

11        a witness, LETISHEA HAMMOND, who, being first duly

12        sworn, was examined and testified as follows:)

13             THE COURT:  Come around here.  There are

14        two steps.

15                  - - - - -

16        DIRECT EXAMINATION OF LETISHEA HAMMOND

17   BY MR. MACK:

18   Q.    Good morning.

19   A.    Good morning.

20   Q.    Would you please state your name for the record and

21   spell your last name, please.

22   A.    Letishea Hammond.  H-a-m-m-o-n-d.

23   Q.    Are you presently employed, Miss Hammond?

24   A.    No.

25   Q.    Are you attending school?
```

```
 1   A.      Yes.

 2   Q.      What school are you attending?

 3   A.      Christ The King GED classes.

 4   Q.      Now, have you ever been guilty or pled guilty to

 5   a state or federal felony?

 6   A.      No.

 7   Q.      Do you know a person by the name of Ru-el Sailor?

 8   A.      Yes.

 9   Q.      Is Ru-el Sailor in this courtroom today?

10   A.      Yes.

11   Q.      Would you please point him out and describe for the

12   Court what he is wearing.

13   A.      Dark-skinned fella with the blue suit, light blue

14   shirt.

15               MR. MACK:  May the record reflect she has

16           identified the Defendant Ru-el Sailor?

17               THE COURT:  The record will so reflect.

18   Q.      How long have you known Ru-el Sailor?

19   A.      Ten years or so.

20   Q.      Would you please state for the record how is it

21   that you came to know Ru-el Sailor?

22   A.      We grew up together on the same street, and he's my

23   fiance and the father of my kids.

24   Q.      How long has he been your fiance?

25   A.      Four years.
```

```
 1   Q.     You indicated that he is the father of your
 2   children?
 3   A.     Yes.
 4   Q.     How many children does he have?
 5   A.     We have three together.
 6   Q.     Okay.  Their names?
 7   A.     One is two, her name is Chantel; El-Lajye is one,
 8   and Chalay is five months.
 9   Q.     Back on November 16th, which was a Saturday of the
10   year 2002, do you recall where you were living at that
11   particular time?
12   A.     Yes.
13   Q.     For the record, please tell us where you were
14   living.
15   A.     With his parents.  With his mom.
16   Q.     Where were you so living?
17   A.     On 150th Street.
18   Q.     Okay.  Do you recall the date of November 16th,
19   2002?
20   A.     Yes.
21   Q.     How is it that you are able to remember the date of
22   November 16, 2002?
23   A.     We went on a Amish country trip.
24   Q.     When you say, We who, if anyone, are you
25   describing?
```

```
 1   A.     Me, his mom, his sister, his brother, grandmother,
 2   and a couple other family members.
 3   Q.     Okay.  Do you recall approximately what time it was
 4   when you left?
 5   A.     Yes. 'It was around 7, 7:30.
 6   Q.     Is this a.m.?
 7   A.     a.m., yes.
 8   Q.     Do you recall where Ru-el was when you left?
 9   A.     Yes.  He was at home.
10   Q.     Okay.  How was it that you were able to get to the
11   Amish country?
12   A.     I rode with his mom, and we went to the site we was
13   all meeting at to get on the bus, a charter bus.
14   Q.     Did there come a point in time when you returned
15   back to the home on East 150th Street?
16   A.     Yes.
17   Q.     When you returned home who, if anyone, was present
18   at that home?
19   A.     Just Ru-el and my kids.
20   Q.     When you came in did you have an opportunity to
21   observe Ru-el Sailor on that particular day?
22   A.     Yes.
23   Q.     By the way, if I didn't ask, what time was it when
24   you arrived back?
25   A.     Around between 7:30 and 8.
```

1   Q.      This is p.m., I take it?

2   A.      p.m., yes.

3   Q.      Do you recall how he was dressed when you appeared

4   on that evening?

5   A.      Yes, I do.

6   Q.      For the record, would you please indicate or tell

7   us how he was dressed?

8   A.      He had on some light blue jeans, gray and red Nets

9   jersey and white T-shirt underneath with some gray

10  Timberland boots.

11  Q.      Do you know if he put that on after he left, or had

12  he had it on?

13  A.      He had it on like the previous days.

14  Q.      I'm going to show you what has been previously

15  marked for identification purposes as Defendant's Exhibit

16  M.  Would you please take a look at this and, for the

17  record, would you please indicate what it is that I have

18  handed you?

19  A.      Yes.  It is a photograph of Ru-el and Cordell.

20  Q.      Can you see what is depicted in there, or what

21  Ru-el is wearing in this particular photograph?

22  A.      Yes.

23  Q.      Is that what you were indicating that he was

24  wearing on that particular day?

25  A.      Yes.

1   Q.      For the record, can you please describe what it is

2   he is wearing in that photograph?

3   A.      Gray Nets jersey, light blue jeans, gray boots and

4   white T-shirt.

5   Q.      Did there come a point in time when either you or

6   Ru-el left the house on November 16th?

7   A.      No, we didn't leave the house.

8   Q.      Did he leave?

9   A.      Yes, he left.

10  Q.      Okay.  Do you recall approximately what time of day

11  or night it was when he left?

12  A.      Somewhere between 10 and 10:30.

13  Q.      That night?

14  A.      Yes.

15  Q.      Now, when he left did he leave with anyone?

16  A.      I can't recall.

17  Q.      Now, do you know whether or not he was driving a

18  vehicle on November the 16th?

19  A.      Yes.

20  Q.      What type of vehicle, if you recall, was he

21  driving?

22  A.      It was a white focus.

23  Q.      Now, when he left did he tell you where, if

24  anyplace, he was going?

25  A.      He told me he was going to some lounge.

```
 1   Q.      You said that you have known him for ten years; is
 2   that correct?
 3   A.      Uh-huh.
 4   Q.      You have been his fiancee for approximately four?
 5   A.      Yes.
 6   Q.      Have you had an opportunity during those particular
 7   years to ever look at his head?
 8   A.      Yes.
 9   Q.      What color is his hair?
10   A.      Dark brown.  Black almost.
11   Q.      Have you ever known him to have any -- Strike that.
12   Do you know what weaves are?
13   A.      Yes.
14   Q.      What is a brush weave?
15   A.      It's like weaves in the hair like.
16   Q.      I didn't hear.
17   A.      Like good hair.
18   Q.      Have you ever known Ru-el to have any weaves in his
19   hair?
20   A.      No.
21   Q.      Do you know if he returned home any time either the
22   16th or 17th?
23   A.      Yes.  It was early morning the 17th.  Early morning
24   the 17th.
25   Q.      Okay.  Now, ma'am, do you recall whether or not any
```

1    time Ru-el Sailor was ever in the hospital?

2    A.      Yes.

3    Q.      Do you recall when it was that he was in the

4    hospital?

5    A.      December the 17th.

6    Q.      Of what year?

7    A.      2002.

8    Q.      December the 17th, 2002 he was in the hospital for

9    approximately how long?

10   A.      Like a week or two.

11   Q.      Okay.  Do you know what, if anything, caused him to

12   be in the hospital?

13   A.      He was attacked.

14   Q.      Okay.  As a consequence of the attack do you know

15   if he ever did anything?

16   A.      No.

17                  MR. MACK:  No further questions.

18                  THE COURT:  On behalf of the State?

19                  MR. THOMAS:  Thank you.

20                      - - - - -

21            CROSS-EXAMINATION OF LETISHEA HAMMOND

22   BY MR. THOMAS:

23   Q.      Good morning, Miss Hammond.

24   A.      Morning.

25   Q.      Do you know Cordell?

```
 1    A.      Yes.

 2    Q.      Do you see him in court?

 3    A.      Yes.

 4    Q.      Point to him.

 5    A.      He is the light-skinned gentleman with the white

 6    shirt and the green tie.

 7    Q.      Do you know Leshawn McCreary?

 8    A.      Yes.

 9    Q.      How do you know her?

10    A.      She's his girlfriend.

11    Q.      How long have you known Cordell?

12    A.      For about like four years.  Since I have been

13    engaged with Ru-el.

14    Q.      How long have you known Leshawn?

15    A.      Probably about two months.

16    Q.      Do you know who Ru-el was with after he went out

17    about 10:30 on the night of the 16th?

18    A.      No, I don't.

19    Q.      You say that he told you that he was going to

20    Benjamin's.  Do you know if he ever got there?

21    A.      Yes.  Well, yes -- He say that is where he was

22    at.  I didn't go with him.

23    Q.      You stayed home?

24    A.      Yes.

25    Q.      With the children?
```

1   A.      Yes.

2   Q.      The white focus, whose car is that?

3   A.      A friend of his.

4   Q.      Who is the friend?

5                   THE COURT:   Hold on.   Go ahead, Mr. Thomas.

6                   MR. THOMAS:   Thank you, your Honor.

7   Q.      The white focus was a friend's car?

8   A.      Uh-huh.

9   Q.      Is that a yes?

10  A.      Yes.

11  Q.      What is the name of that friend?

12  A.      Her name is Toni.

13  Q.      Toni what?

14  A.      I don't know her last name, I just know her by her

15  first name.

16  Q.      Who was using the focus?

17  A.      Me and Ru-el both.

18  Q.      Why?

19  A.      We did not have a vehicle, and I had to get my

20  daughter back and forth to school.

21  Q.      Is Ru-el employed?

22  A.      No, he isn't.

23  Q.      He is how old?

24  A.      He's 23.

25  Q.      With three children?

```
1   A.      Yes.

2   Q.      Are you employed?

3   A.      No, I'm not.

4   Q.      Does Ru-el do anything to contribute to the support

5   of his three children?

6                   MR. MACK:  Objection, your Honor.

7                   THE COURT:  Overruled.

8   A.      Yes.

9   Q.      What does he do?

10  A.      He works for his grandmother on a time-to-time

11  basis.  She's a day care provider.  She has a day care

12  center.

13  Q.      I thought that you just said that he is not

14  employed?

15  A.      He works for his grandmother from time to time.

16  Q.      How frequently?

17  A.      He is not currently employed now.

18  Q.      How frequently would he work for his grandmother?

19  A.      Like on every two weeks' basis.  He just cleans up

20  for her.

21  Q.      What was Toni's name again?

22  A.      Toni.

23  Q.      Just Toni?

24  A.      I don't know her last name.

25  Q.      How long did you have the Ford focus?  How many
```

```
 1   days, or weeks, or months?
 2   A.      Just like at that time we had it for about two
 3   days.
 4   Q.      What time did you go to bed that night?
 5   A.      Probably around 11:30, 12.
 6   Q.      Did you sleep through the night?
 7   A.      Yes.
 8   Q.      Did you sleep without awakening?
 9   A.      Well, I woke up once he got home but I can't recall
10   what time exactly that was.  I know it was early morning.
11   Q.      Was it still dark outside, or was it getting light?
12   A.      It was getting light.
13   Q.      Into Sunday morning when the sun is coming up?
14   A.      Yeah.
15   Q.      It was the transition time from dark to morning?
16   A.      Yes.
17   Q.      Between the time that you went to bed and the time
18   that you got up you don't know where he was because you
19   were home in bed, right?
20   A.      Right.
21               MR. THOMAS:  Thank you.  No further
22         questions.
23               THE COURT:  Mr. Watson?
24               MR. WATSON:  No questions.
25               THE COURT:  Mr. Willis?
```

1                   MR. WILLIS:  No, none.

2                   THE COURT:  Mr. Mack?

3                      - - - - -

4       REDIRECT EXAMINATION OF LETISHEA HAMMOND

5   BY MR. MACK:

6   Q.    You got up the next morning after he returned early

7   morning of the 17th; is that correct?

8   A.    Yes.

9   Q.    Did you have an opportunity to look at his

10  clothing?

11  A.    Yes.

12  Q.    Did you see any blood or anything on his clothing?

13  A.    No.

14               MR. MACK:  No further questions.

15               THE COURT:  Mr. Thomas?

16                  - - - - -

17     RECROSS-EXAMINATION OF LETISHEA HAMMOND

18  BY MR. THOMAS:

19  Q.    On the issue of the clothing, did you say this is

20  the outfit you saw him in, (indicating)?

21  A.    Yes.

22  Q.    Including the red headband?

23  A.    Yes.

24  Q.    What about in the black leather that he is wearing

25  there, (indicating)?

```
 1   A.      Uh-huh.

 2   Q.      Do you recognize that leather?

 3   A.      Yes, I do.

 4   Q.      Do you know if he had it on that night?

 5   A.      Yes.

 6   Q.      So he is wearing a black leather jacket under which

 7   he has on the gray and red New Jersey jersey?

 8   A.      Uh-huh.

 9   Q.      Is that a yes?

10   A.      Yes.

11   Q.      Then light blue jeans?

12   A.      Yes.

13   Q.      Underneath the New Jersey jersey is a white

14   T-shirt?

15   A.      Yeah.

16   Q.      The headband is red?

17   A.      Yes.

18   Q.      There is some red on the shirt?

19   A.      Yes.

20   Q.      What color would you call the background color of

21   the jersey?

22   A.      Background color?  Gray.

23   Q.      Did you see Cordell Hubbard at all Saturday the

24   16th?

25   A.      No.
```

```
1    Q.    Did you see him at all Sunday the 17th?

2    A.    No.

3    Q.    Did you have any phone conversations with Cordell

4    either Saturday or Sunday?

5    A.    No.

6    Q.    Do you know Cordell Hubbard's cell phone number?

7    A.    Yes.

8    Q.    What is it?

9    A.    513-7870.

10   Q.    How long have you known that to be his number?

11   A.    For like a couple months or so.

12   Q.    Have you ever had occasion to call that number?

13   A.    Yes.

14   Q.    Has it always been Cordell's number?

15   A.    Yes.

16   Q.    Do you know a Samuel Brown?

17   A.    Yes.

18   Q.    How do you know Samuel?

19   A.    He is friends with Ru-el.

20   Q.    Did you speak to Samuel Brown at all Saturday the

21   16th?

22   A.    No.

23   Q.    Or Sunday the 17th?

24   A.    No.

25   Q.    Do you know where Samuel was at any time during the
```

1    evening of Saturday or after midnight early Sunday

2    morning?

3    A.    No.

4    Q.    What kind of car does Cordell drive?

5    A.    He has a Cadillac, and he has another car.  I don't

6    recall what kind of car it is but I know it's orange.

7    Q.    What kind of car does Leshawn McCreary have?

8    A.    Like dark blue.  I only seen the car at nighttime

9    so it looked blue in the nighttime.

10   Q.    How many doors does Leshawn's car have?

11   A.    Four.

12   Q.    Would you recognize or remember the manufacturer if

13   it is a GM, or Ford, or Chrysler?

14   A.    Leshawn's car?

15   Q.    Yes.

16   A.    It is a Ford Contour.

17   Q.    Have you ever known Cordell to drive that car?

18   A.    Yes.

19   Q.    How frequently?

20   A.    Just a couple times that he came to the house with

21   her.

22   Q.    Have you ever known Cordell and Ru-el to travel in

23   Leshawn's car without her being present?

24   A.    No.

25   Q.    Cordell and Ru-el, what would you state is the

```
 1    degree of their friendship?

 2    A.      They're good friends.

 3                  MR. THOMAS:  No further questions.  Thank

 4          you.

 5                  MR. WATSON:  No. questions.

 6                  THE COURT:  Mr. Willis?

 7                  MR. WILLIS:  No.

 8                  THE COURT:  You may step down.  Call your

 9          next witness, please.

10                  MR. MACK:  Yes, your Honor.

11                  THE COURT:  Approach the bench, ma'am.

12          Just walk up to me.

13                      - - - - -

14                  (The DEFENDANT RU-EL SAILOR, to further

15          maintain the issues on his part to be maintained,

16          called as a witness, SHARELL SAILOR, who, being

17          first duly sworn, was examined and testified as

18          follows:)

19                  THE COURT:  Come around here.  Have a seat

20          in the chair.  Be careful, there are two steps.

21                      - - - - -

22          DIRECT EXAMINATION OF SHARELL SAILOR

23    BY MR. MACK:

24    Q.      Thank you.  Ma'am, would you please state your full

25    name and spell it for the record.
```

```
 1   A.      Sharell Sailor.  S-a-i-l-o-r.

 2   Q.      Slow down.

 3                   THE COURT:  Say your first name.

 4                   THE WITNESS:  Sharell.

 5                   THE COURT:  How do you spell it?

 6                   THE WITNESS:  S-h-a-r-e-l-l.

 7   Q.      What do you presently do for a living?

 8   A.      I go to high school, and I have a part-time job.

 9   Q.      Slow down.  Take your time.  You go to high school?

10   A.      Uh-huh.

11   Q.      What high school do you go to?

12   A.      Collinwood High.

13   Q.      What grade are you in?

14   A.      11th.

15   Q.      What is your grade point average?

16   A.      2.5.

17   Q.      You said that you were employed?

18   A.      Uh-huh.

19   Q.      Yes or no?

20   A.      Yes.

21   Q.      Okay.  Where are you so employed?

22   A.      A grocery store.  Family Foods.

23   Q.      How long have you been so employed?

24   A.      Since September of 2002.

25   Q.      What do you for them?
```

```
1    A.      I'm a cashier.

2    Q.      Do you know someone by the name of Ru-el Sailor?

3    A.      Yes.

4    Q.      Who is Ru-el Sailor?

5    A.      He's my brother.

6    Q.      Is he presently in this courtroom?

7    A.      Yes.

8    Q.      Would you point him out and describe for the record

9    what he is wearing.

10   A.      He's wearing a blue striped suit with a light blue

11   shirt, and there he is right over there, (indicating).

12                   MR. MACK:  May the record reflect she has

13              identified the Defendant Ru-el Sailor?

14                   THE COURT:  The record will so reflect.

15   Q.      Is he any relationship to you?

16   A.      He is my brother.

17   Q.      How old is your brother, do you know?

18   A.      Huh?

19   Q.      How old is your brother, do you know?

20   A.      23.

21   Q.      You are in high school so I won't ask you what your

22   age is because you're a lady.  You have known your brother

23   for a long time, I take it; is that correct?

24   A.      17 years of my life.

25   Q.      All right.  Have you ever had occasion to look at
```

```
 1   his head to see how he wears his hair?
 2   A.      Yes.
 3   Q.      Do you know what weaves are?
 4   A.      Yes.
 5   Q.      Would you describe to the Court what your version
 6   is of what weaves are?
 7   A.      Just little grooves in boys' hair.
 8   Q.      Have you ever known your brother to wear such
 9   weaves in his hair?
10   A.      No.  He don't have good hair.
11   Q.      Do you recall Saturday, November the 16th, 2002?
12   A.      Yes.
13   Q.      How are you able to recall November 16th, 2002?
14   A.      My grandmother took a trip to the Amish country.
15   Q.      Did you go on that trip?
16   A.      Yes.
17   Q.      Approximately what time did you wake up that
18   morning?
19   A.      Around 6:00.
20   Q.      Do you know approximately what time you left to go
21   to the Amish country?
22   A.      Like quarter to 8.
23   Q.      How did you get to the Amish country?
24   A.      We drove in my mother's car.
25   Q.      What kind of car?
```

```
 1    A.      GEO Prism.

 2    Q.      What color?

 3    A.      Blue.

 4    Q.      There comes a point in time when you went to Amish

 5    country and you returned home?

 6    A.      Yes.

 7    Q.      Do you recall at what time that was?

 8    A.      Around 8.

 9    Q.      p.m.?

10    A.      Yes.

11    Q.      When you got back home who, if anyone, was present

12    at the house?

13    A.      Ru-el, his two children.

14    Q.      Okay.  By the way, do you know what Ru-el's

15    fiancee's name is?

16    A.      Letishea Hammond.

17    Q.      Do you see her today?

18    A.      Yes.

19    Q.      Just came out of the courtroom.  Did she just come

20    out of the courtroom?

21    A.      No, she still sitting there.

22    Q.      Okay.  Do you know where they were staying on

23    November the 16th?

24    A.      They were staying with us.

25    Q.      Where, if anyplace, were they sleeping?
```

```
 1   A.      Sleeping in my room.

 2   Q.      Now, when you returned home you said Ru-el was

 3   there; is that correct?

 4   A.      Yes.

 5   Q.      Did you have occasion to see how your brother was

 6   dressed when he returned home on this particular day?

 7   A.      Yes.

 8   Q.      Would you please describe what he was wearing?

 9   A.      He had on a gray Nets jersey, light blue jeans, and

10   gray boots.

11   Q.      You saw him?

12   A.      Yes.

13   Q.      Did there come a point in time when he left the

14   house?

15   A.      Yes.

16   Q.      Do you recall approximately what time that was?

17   A.      No.

18   Q.      Do you know what time he left that night?

19   A.      I was in my room.

20   Q.      But he was home when you were there at about

21   8 p.m.?

22   A.      Yes.

23   Q.      He did leave; is that correct?

24   A.      Yes.

25   Q.      Now, I'm going to show you what has been marked as
```

```
 1   Defendant's Exhibit M.  Would you please take a look at
 2   this and, for the record, would you please indicate what
 3   it is that I have just handed you?
 4   A.      You handed me a picture of my brother.
 5   Q.      You do recognize your brother in there?
 6   A.      Uh-huh.
 7   Q.      For the record, do you recognize anything about
 8   that particular photograph?
 9   A.      That he had two friends.
10   Q.      Do you recognize what, if anything, that he is
11   wearing in there?
12   A.      Yes.
13   Q.      What is he wearing?
14   A.      A gray Nets jersey, light blue jeans, and gray
15   boots.
16   Q.      Do you recall seeing that particular outfit?
17   A.      Yes.
18   Q.      When do you recall seeing it?
19   A.      When I walked in the house.
20   Q.      What day?
21   A.      November the 16th.
22   Q.      How did you get here today?  Did you receive a
23   subpoena to come down?
24   A.      Yes.
25   Q.      Who issued that subpoena?
```

1    A.      You.

2    Q.      When I asked you to come what, if anything, did I

3    tell to do?

4                   MR. THOMAS:  Objection.

5                   THE COURT:  The objection is overruled.

6    A.      You asked me to tell the truth.

7    Q.      Are you telling the truth for me this day?

8                   MR. THOMAS:  Objection.

9    A.      Yes.

10                  THE COURT:  Overruled.

11                  MR. MACK:  Thank you.  No further

12          questions.

13                  THE COURT:  Mr. Thomas?

14                       - - - - -

15          CROSS-EXAMINATION OF SHARELL SAILOR

16   BY MR. THOMAS:

17   Q.      What time did you go to bed that night?

18   A.      I'm really not for sure.

19   Q.      You went to bed at some point?

20   A.      Probably 11, 12.  Probably watching T.V.

21   Q.      What is the last show that you recall watching?

22   A.      Usually Mad T.V. on 12.

23   Q.      Mad T.V.?

24   A.      Uh-huh.

25   Q.      After you went to bed and fell asleep were you

```
 1    watching T.V. in your bedroom, or downstairs?

 2    A.      My mother's room.

 3    Q.      You turned off the T.V. and went to your room

 4    or --

 5    A.      I stayed in my mother's room.

 6    Q.      After you fell asleep did you sleep through the

 7    night?

 8    A.      Yes.

 9    Q.      Did you awaken at any point?

10    A.      Not that I can think of.

11    Q.      I'm sorry?

12    A.      Not that I can think of.

13    Q.      You don't know when Ru-el got home that night?

14    A.      No.

15    Q.      You don't know who he was with that night?

16    A.      No.

17    Q.      You don't know where he was at any point after he

18    left home?

19    A.      No.

20            MR. THOMAS:  Thank you.  No further

21        questions.

22            THE COURT:  Mr. Watson?

23                 - - - - -

24

25
```

Cuyahoga County Prosecutor's Office 5092460 198501 V5560736-4931 PRES1

```
 1              CROSS-EXAMINATION OF SHARELL SAILOR

 2    BY MR. WATSON:

 3    Q.     Have you ever watched The Apollo?

 4    A.     Yes.

 5    Q.     What time does it come on?

 6    A.     1:00.

 7                  MR. WATSON:  No further questions.

 8                  THE COURT:  Mr. Willis?

 9                  MR. WILLIS:  No questions.

10                  THE COURT:  Mr. Mack?

11                  MR. MACK:  No questions.

12                  THE COURT:  Your next witness, Mr. Mack.

13                  MR. MACK:  May I have just one moment?

14                  THE COURT:  Sure.

15                  MR. MACK:  Call Ru-el Sailor.

16                        - - - - -

17                  (The DEFENDANT RU-EL SAILOR, to further

18          maintain the issues on his part to be maintained,

19          called as a witness, RU-EL SAILOR, who, being

20          first duly sworn, was examined and testified as

21          follows:)

22                  THE COURT:  Be careful.  There are two

23          steps, sir.

24                        - - - - -

25
```

<u>DIRECT EXAMINATION OF RU-EL SAILOR</u>

<u>BY MR. MACK:</u>

Q.    Would you state your name for the record and spell your last name, please.

A.    My name is Ru-el Sailor.  S-a-i-l-o-r.

Q.    Mr. Sailor, where were you living on or about November 16th of the year 2002?

A.    My mother's house on East 150th.

Q.    Okay.  Who were you living there with?

A.    My mother, my brother, me, my fiancee and my kids.

Q.    Now, Mr. Sailor, let's get down to it.  Have you ever pled guilty or been convicted of a state or federal offense?

A.    Yes, sir.

Q.    Please tell the jurors what that is.

A.    It was a drug conviction in '98.  I was sentenced to two years probation which I completed.

Q.    Just tell them what you were convicted of.

A.    Drug possession.

Q.    Anything else?

A.    No.  Drug trafficking, yeah.

Q.    Now, November the 16th, do you recall that day?

A.    Yes.

Q.    Do you recall what, if any, time did you get up on that early morning?

```
 1   A.     I got up at like 7 'cuz my fiancee and everybody
 2   was leaving.  I had to keep the kids that day so I was up
 3   the rest of the day.
 4   Q.     Now, at some point in time did your family return
 5   home?
 6   A.     Yes.
 7   Q.     Do you recall approximately what time that was?
 8   A.     It was after 7:00 because I was mad at her because
 9   I couldn't get my clothes from the cleaners.
10   Q.     Did there come a point in time when you left the
11   house that night?
12   A.     Yes.
13   Q.     Do you recall how you were dressed?
14   A.     Yes.
15   Q.     How were you dressed?
16   A.     I had on my Nets jersey, light blue aqua jeans, and
17   light gray Timberland boots that I had on the day before.
18   Q.     Where, if anyplace, had you intended to go?
19   A.     I was supposed to go pick up Cordell but he said
20   that he already had a ride, so I went to Benjamin's.
21   Q.     Benjamin's?
22   A.     Yes.
23   Q.     How did you get there?
24   A.     I drove.
25   Q.     What kind of vehicle did you drive?
```

```
 1    A.      2000 focus.

 2    Q.      Now, when you left did you take anything with you

 3    from the house?

 4    A.      No, just my jacket.

 5    Q.      Did you take a weapon?

 6    A.      No.

 7    Q.      Now did you, in fact, arrive at The Benjamin?

 8    A.      Yes.

 9    Q.      Approximately what time was it that you arrived?

10    A.      Probably about 11.

11    Q.      11:00?

12    A.      Yeah.

13    Q.      Now, when you arrived there did you see anybody

14    that you knew?

15    A.      No.  Just the bartender, people like that.

16    Q.      Now, do you know Samuel Brown?

17    A.      Yes.

18    Q.      Do you know whether or not he arrived at Benjamin's

19    that particular night?

20    A.      Yes, he did.

21    Q.      Were you there first?

22    A.      Yes.

23    Q.      He arrived, correct?

24    A.      Yes.

25    Q.      Do you have any idea approximately what time he
```

1  arrived?

2  A.      I really -- had to be like 11:30.  I was there

3  about 11:30.

4  Q.      Did there come a particular time -- Strike that.

5  What, if anything, did you do while at Benjamin's?

6  A.      I'm addicted to the little games you put your

7  quarters in so I was already over there spending all my

8  money on the game, and drinking, socializing.

9  Q.      Now, did you see Samuel Brown while in that bar?

10  A.      Yes.

11  Q.      What, if anything, was he doing?

12  A.      He came in, sat down next to me.

13  Q.      Okay.  Where were the two of you sitting in The

14  Benjamin bar?

15  A.      At the end when you walk in, the D.J. booth by the

16  bathroom, there is a stool with the game and the D.J.

17  booth.  Samuel was sitting next to me.

18  Q.      Did you participate in any of the activities other

19  than the games?

20  A.      Yeah.  Later on that night Cordell think he a

21  rapper so D.J. gave him the microphone so everybody

22  started rappin'.

23  Q.      Cordell arrived there at the bar sometime that

24  night?

25  A.      He came after Samuel.

1   Q.   Do you have any idea approximately what time that

2   he arrived?

3   A.   Probably like 15, 20 minutes after Samuel.

4   Q.   Now, during the time that you were there that

5   night do you know what Samuel was doing the whole time?

6   A.   Regular socializing.

7   Q.   What does that mean?

8   A.   Talking, laughing, whatever.  Drinking.

9   Q.   Did you sit in one position all the time?

10  A.   No.

11  Q.   What, if anything, did you do?

12  A.   I mean, like the music loud so somebody phone

13  ring, you go back and forth to the bathroom, or you go

14  step outside in front of the bar outside.  We just be

15  walkin' around talkin' to people, you know.

16  Q.   Were you all together at that particular time

17  sitting at the bar?

18  A.   Yeah.  The bar ain't bigger than this courtroom.

19  We was all, you know what I'm sayin', where we could see

20  each other or something.

21  Q.   Did there come a particular time when you decided

22  to leave the bar?

23  A.   We all had agreed we was going to the party at the

24  4U2B bar at Euclid and they don't let nobody in after

25  1:30.  We agreed we was going to leave Benjamin's prior to

1    1:00 so we could get there and get in.

2    Q.    Do you have any idea approximately what time you

3    left?

4    A.    Between like 12:40 and 1.

5    Q.    12:40 and 1?

6    A.    Yeah.

7    Q.    When you left what were you driving, or how did

8    you get to the next place?

9    A.    Focus that I left my house in.

10   Q.    You were driving?

11   A.    Yes.

12   Q.    Was anyone riding with you?

13   A.    Yes, Cordell.

14   Q.    Now, this was at 12:40?

15   A.    Yes.

16   Q.    Are you sure that you did not leave at 12:00?

17   A.    Positive.

18   Q.    Are you sure that you didn't leave at 12:15?

19   A.    I'm positive.

20   Q.    How do you know it was 12:40 or after when you

21   left?

22   A.    'Cuz I wasn't trying to get there until 1:00.

23   Q.    During the time that you were traveling what course

24   of travel would you have taken in order to get to the 4U2B

25   bar?

```
 1   A.      Well, I came down 150th, I had to go by mother's
 2   house, make sure everything is okay, go over 152nd exit,
 3   go onto the freeway, exit on 260.
 4   Q.      How are you familiar with Englewood?
 5   A.      My uncle lived on Columbia and he just moved on
 6   Grantwood so I been familiar with that area for a minute.
 7   Q.      On November 16th or November 17th did you, in
 8   fact, travel down to Englewood Avenue?
 9   A.      No.  I ain't -- To be honest, my whole day consist
10   of 150th, and Benjamin's, and Euclid.  And then later that
11   night went to a little party at St. Aloysius.
12   Q.      Do you know a person by the name of Omar Clark?
13   A.      No.
14   Q.      Do you know a person either named Clark Williams or
15   Clark Lamar or a person named Dude?
16   A.      No, sir.
17   Q.      Let me back up.  You said that you did not know
18   Omar?
19   A.      No.
20   Q.      Do you know whether or not Omar has a child or not?
21   A.      No.
22   Q.      You were not on Englewood that night and said, This
23   is family.  Omar is your cousin's baby's father?
24   A.      No, sir.
25   Q.      You have a cousin?
```

```
 1   A.    Me?

 2   Q.    Yes.

 3   A.    Yes, yes.

 4   Q.    Do you know who the father of their babies are?

 5   A.    Yes.

 6   Q.    Is Omar one of those persons?

 7   A.    No.

 8   Q.    Now, showing you what has been marked as

 9   Defendant's Exhibit M, would you please take a look at

10   this.  Again, for the record, please indicate what it is

11   that I am handing you.

12   A.    Picture we took at St. Aloysius.

13   Q.    Let's go back.  You say at St. Aloysius?

14   A.    Yes.

15   Q.    Okay.  That was not taken at The Benjamin, was it?

16   A.    No.

17   Q.    Wasn't taken at the 4U2B?

18   A.    No.

19   Q.    You went to another place that night?

20   A.    Yes.

21   Q.    Who went with you to that other place that night?

22   A.    Cordell because his cousin had called us and told

23   us --

24                   MR. THOMAS:  Objection.

25                   THE COURT:  Objection is sustained.
```

1    Q.    Okay.  You went to a third place that particular

2    night?

3    A.    Yes.

4    Q.    Now, I'll show you what has been marked for

5    purposes of identification as Defendant's Exhibit N.  Will

6    you please take a look at this and, for the record, please

7    indicate what it is that I have handed you.

8    A.    A picture again from the same place.

9    Q.    Can you describe in that particular photograph

10   what, if anything, that you are wearing?

11   A.    Light blue jeans, gray New Jersey Nets jersey with

12   the headband to match, it is New Jersey Nets, and black

13   leather coat.

14   Q.    Describe what that coat looks like.

15   A.    It is a Phat Farm -- It have a flag with a P and

16   got patches on the sleeve.

17   Q.    You say it is a big flag?

18   A.    Yeah.  Take up the whole back of the coat.

19   Q.    What time did you return on that particular night

20   or early morning?

21   A.    Home?

22   Q.    Yes.

23   A.    About 4, 4:30 probably.

24   Q.    Showing you Defendant's Exhibit O, would you please

25   take a look at this for me.  Again, for the record, would

1  you please describe what it is that I have handed you.

2  A.     Picture from the same spot we was at.

3  Q.     Are you holding your hands in any direction?

4  A.     No.  I was intoxicated.

5  Q.     You mean this, (indicating), means nothing?

6  A.     No, no.

7  Q.     Again, I hand you what has been marked as State's

8  Exhibit 7.  Would you please take a look at this.  For the

9  record, what is it that I have handed you?

10  A.     A picture of somebody.

11  Q.     Have you ever seen that particular person before?

12  A.     No, sir.

13  Q.     Did you see that particular person on November the

14  16th?

15  A.     No, sir.

16  Q.     Did you see this particular person on November the

17  17th?

18  A.     No, sir.

19  Q.     Are you involved in any gang?

20  A.     No, sir.

21          MR. MACK:  One moment, your Honor, please.

22  Q.     This incident that took place when you were in a

23  hospital in December, do you recall when that was?

24  A.     Yes.

25  Q.     When was that, sir?

```
 1   A.      In December.  My mother's birthday.  The day of her
 2   birthday.
 3   Q.      December what?
 4   A.      17th.
 5   Q.      What happened to you?
 6   A.      I approached a male about breakin' in my car and we
 7   was fightin'.  He assaulted me with a brick like several
 8   times to my face.
 9   Q.      Did you receive any damage to your face?
10   A.      Yes.
11   Q.      What damage did you receive?
12   A.      I had to get surgery on my eye.  I had to get
13   stitches inside my eye and staples right here,
14   (indicating), and a couple stitches on my forehead and
15   stuff.
16   Q.      Do you know who did that to you?
17   A.      Yes, sir.
18   Q.      Did you go out and retaliate against that person?
19   A.      No, sir.  I left it in God's hands.
20   Q.      Did you shoot somebody on the morning of
21   either -- Strike that.  Did you shoot anybody November the
22   16th or November the 17th?
23   A.      No, sir.  I wouldn't shoot nobody for myself so I
24   ain't shootin' for nobody else.
25               MR. MACK:  Thank you.  No further
```

```
 1          questions.
 2                    THE COURT:  Mr. Thomas?
 3                    MR. THOMAS:  Thank you.
 4                         - - - - -
 5             CROSS-EXAMINATION OF RU-EL SAILOR
 6    BY MR. THOMAS:
 7    Q.     Your car got broken into in December?
 8    A.     Yes.
 9    Q.     Which car?
10    A.     I had a Monte Carlo.
11    Q.     What color?
12    A.     Blue.
13    Q.     Blue.  What became of that Monte Carlo?
14    A.     I sold it.
15    Q.     Who did you sell it to?
16    A.     Guy in the neighborhood.
17    Q.     What is his name?
18    A.     They call him Ray-Ray.  Just a guy I know from the
19    neighborhood.  He was asking to buy it so I sold it.
20    Q.     What year Monte Carlo?
21    A.     '85 SS.
22    Q.     How much did you get for it?
23    A.     How much did I get for it?  2,000.
24    Q.     Did you title the car to him?
25    A.     Huh?
```

```
 1    Q.    Did you sign over the title?

 2    A.    Yes.

 3    Q.    What was the person's name?

 4    A.    Ray-Ray.

 5    Q.    Ray-Ray what?

 6    A.    I don't know his last name.

 7    Q.    You sold a car and transferred --

 8    A.    He put it in his people's name, in his name.

 9    Q.    Is that common?

10    A.    Yes.

11    Q.    Why?

12    A.    You got to have a driver's license to put a title

13    in your name.

14    Q.    Do you have a license?

15    A.    Not currently I don't.  They suspended it.

16    Q.    How long has it been suspended?

17    A.    Like about since probably like 2001.

18    Q.    How did it get suspended?

19    A.    Plenty of traffic tickets, man.

20    Q.    Where?

21    A.    Cleveland.

22    Q.    Driving what vehicle?

23    A.    All kind of vehicles.

24    Q.    How many?

25    A.    Like my family vehicles, or one of my vehicles that
```

1    I had.

2    Q.    Can you describe some of these vehicles for us?

3    A.    My mother got a Geo Prism, Monte Carlo.  I had a

4    Bonneville, turquoise Bonneville.

5    Q.    The Monte Carlo, how much did you pay for it when

6    you bought it?

7    A.    I think like probably about 2,000, somewhere in

8    there.

9    Q.    When did you buy it?

10   A.    I bought it in like -- I bought it in 2001.

11   Q.    Who did you buy it from?

12   A.    A guy in the neighborhood.

13   Q.    What was that guy's name?

14   A.    Toe.  Guy name Toe.

15   Q.    Toe, like a toe on your foot?

16   A.    Yeah.

17   Q.    Does Toe have a full name?

18   A.    His real name is Torrie.  I don't know his last

19   name.  Just call him Toe.

20   Q.    Did you title that car in your name?

21   A.    No, not at the time I didn't.

22   Q.    Why not?

23   A.    I put it in my fiancee's name.

24   Q.    But you paid for it?

25   A.    Yes.

1  Q.    Why did you put it in her name?

2  A.    'Cuz my license was suspended at that time.

3  Q.    Have you continued to drive while you were

4  suspended?

5  A.    No.  I got my license reinstated, then they

6  suspended them again.

7  Q.    Have you ever driven while under suspension?

8  A.    Yes.

9  Q.    How many times?

10  A.    Plenty.

11  Q.    Why do you do that?

12              MR. MACK:  Objection, your Honor.

13              THE COURT:  Objection is sustained.

14  Q.    Who's Monica Williams?

15  A.    A girl that I used to mess with like in 2001 once.

16  Mess with her once or twice.

17  Q.    What do you mean, Mess with?

18  A.    I had sex with her.

19  Q.    Does your fiancee know about Monica?

20  A.    Now she do.

21  Q.    Have you messed with any women since you have been

22  seeing your fiancee?

23              MR. MACK:  I object.

24              THE COURT:  Overruled.

25  A.    What that got anything to do with this case?

1  Q.    I'm asking you a question, sir.  Have you messed

2  with other women while you been with this woman?

3  A.    I can't recall.

4  Q.    You can't recall.  Now, Mr. Mack asked you if you

5  carried a gun that night, if you took a gun with you.  Do

6  you remember your answer?

7  A.    Yes.

8  Q.    What was your answer?

9  A.    No.

10  Q.    Have you ever carried a gun?

11        MR. MACK:  Objection, your Honor.

12        THE COURT:  The objection is overruled.

13  A.    Yes.

14  Q.    When?

15        THE COURT:  Now the objection is sustained.

16  Q.    Why did you carry a gun?

17        MR. MACK:  Objection, your Honor.

18        THE COURT:  Sustained.

19  Q.    Now, your trafficking cases, was one of those in

20  Lake County?

21  A.    Yes.  That was recent.

22  Q.    Painesville?

23  A.    Yes.

24  Q.    So you sell drugs between Painesville and

25  Cleveland?

```
1    A.      No, sir.

2    Q.      You got busted by the Lake County Narcotics Unit in

3    Painesville?

4    A.      Yes.

5    Q.      Mr. Mack and you pled guilty to that offense there?

6    A.      Yes, sir.  I was set up, sir.

7    Q.      Your earlier drug possession in '98, was Mr. Mack

8    your attorney then?

9    A.      Yes, sir.

10   Q.      Have you ever been violated on probation?

11   A.      No, sir.

12   Q.      Never?

13   A.      No.

14                   MR. THOMAS:  May I stand next to the

15           witness?

16                   THE COURT:  You may.

17   Q.      Let's start up here, (indicating).

18                   MR. MACK:  Objection.

19                   THE COURT:  Objection is sustained.  The

20           objection is sustained.  He will ask you another

21           question.

22   Q.      Would you review this document?

23                   MR. MACK:  Still same objection, your

24           Honor.

25                   THE COURT:  Overruled.
```

| 1 | A. | Yes sir, I reviewed it. |
| 2 | Q. | Does that refresh your recollection at all? |
| 3 | A. | Yes. |
| 4 | Q. | What does it refresh? |
| 5 | | MR. MACK:  Still objection. |
| 6 | | THE COURT:  Objection is sustained. |
| 7 | Q. | I've got the right sheet here, don't I? |
| 8 | A. | Yes. |
| 9 | Q. | Have you ever been to state prison? |
| 10 | A. | No, sir. |
| 11 | Q. | Ever carry a cell phone? |
| 12 | A. | Yes, sir. |
| 13 | Q. | For how long? |
| 14 | A. | Probably since like '98.  1998, probably. |
| 15 | Q. | Has it been one number throughout? |
| 16 | A. | No, sir. |
| 17 | Q. | Did you have a cell phone account in November of |
| 18 | | 2002? |
| 19 | A. | No, sir. |
| 20 | Q. | What is Cordell's cell phone number? |
| 21 | A. | 513-7870. |
| 22 | Q. | What is Sam Brown's number? |
| 23 | A. | 598-1196. |
| 24 | Q. | Do you know Nichole Hubbard? |
| 25 | A. | No.  I just recently met her like last year. |

1  Q.    Have you ever had occasion to talk with her on the

2  phone?

3  A.    No, sir.

4  Q.    Do you know Maria Whitlow?

5  A.    No, sir.

6  Q.    Do you know Ellen Taylor?

7  A.    No, sir.

8  Q.    Did you see Nichole in court here today?

9  A.    Yes, sir.

10  Q.    Point to her and describe what she is wearing.

11  A.    Right there, (indicating), with the brown shirt

12  with white collar.

13                MR. THOMAS:  Would the record reflect the

14          identification of Defendant Nichole Hubbard?

15                THE COURT:  Record will so reflect.

16  A.    Her last name Hubbard.

17  Q.    Do you see Cordell?

18  A.    Yes.

19  Q.    Point to him and describe what he is wearing.

20  A.    Right there, (indicating).  Light-skinned guy with

21  the white shirt and tie.

22                MR. THOMAS:  Would the record reflect the

23          identification of the Defendant?

24                THE COURT:  Record will so reflect.

25  Q.    Do you know them to be brother and sister?

```
 1    A.      Yes.

 2    Q.      How long have you known that?

 3    A.      That, or Cordell?

 4    Q.      Known --

 5    A.      I known he had a sister since I know him.

 6    Q.      Did he ever introduce you to Nichole?

 7    A.      Just last year.

 8    Q.      What did he say when he introduced you?

 9    A.      This is his sister.  His father's daughter.

10    Q.      Do you know anything about Cordell's temper?

11                  MR. WATSON:  Your Honor, may we approach?

12                  THE COURT:  You may.

13                       - - - - -

14                  (Thereupon, a discussion was had

15                   between Court and counsel outside

16                   the hearing of the jury and off the

17                   record.)

18                       - - - - -

19                  (Thereupon, the following proceedings

20                   were had in open court:)

21                  MR. THOMAS:  I will withdraw my last

22           question.

23    BY MR. THOMAS:

24    Q.      Does Cordell have a temper?

25    A.      No, not that I know of.
```

1   Q.   Not that you have ever seen?

2   A.   No.

3   Q.   Now, you were driving the Ford focus that night?

4   A.   Yes.

5   Q.   White Ford focus?

6   A.   Yes, sir.

7   Q.   How many doors?

8   A.   Four doors.

9   Q.   When you left Benjamin's you drove by yourself?

10  A.   No, sir.

11  Q.   Who drove with you?

12  A.   Cordell.

13  Q.   Okay.  What happened to Sam?

14  A.   Sam drove his own car, say he meet us there.

15  Q.   What car did he have?

16  A.   Taurus.

17  Q.   What color?

18  A.   White.

19  Q.   White Taurus?

20  A.   Yes, sir.

21  Q.   Now, when you were together at Benjamin's were you

22  all together for the entire time that you were inside

23  Benjamin's?

24  A.   Yes.

25  Q.   So nobody left to go anywhere?

1   A.      No, not that I am aware of.  No.

2   Q.      How long was Cordell up on stage during the

3   rap-time fest?

4   A.      No stage.  Just in the aisleway or whatever.

5   Q.      How long did he have the mike?  How long was he

6   performing?

7   A.      Two of them, they was battling back and forth

8   probably like 30, 40 minutes long.

9   Q.      What time do you believe that began?

10  A.      I would say like 12.  Around 12.

11  Q.      Went on for about 40 minutes?

12  A.      Yes, sir.

13  Q.      So during the time Cordell is holding a microphone?

14  A.      Yes, back and forth.

15  Q.      I've never seen one of these performances.  If I

16  understand what your testimony is, it was Cordell and

17  another person competing against each other?

18  A.      Yes.

19  Q.      So they pass the mike back and forth?

20  A.      Yes.

21  Q.      Sort of like American Idol; one sings a song, and

22  then the next?

23  A.      Yeah, something like that.

24  Q.      While the person that Cordell is competing with is

25  performing, Cordell is standing there watching?

```
1    A.      Yeah.

2    Q.      Is this free-form rap?

3    A.      What you mean free form?

4    Q.      Just thinking it up as they go.

5    A.      Yeah.  He really believes that he a rapper, so.

6    Q.      It's not memorized rap, right?

7    A.      No.

8    Q.      They are not doing well-known or published rap

9    songs?

10   A.      No.

11   Q.      Just doing free-form rap?

12   A.      Yes.

13   Q.      When you are doing free-form rap you have to be

14   thinking about what happens that you want to respond with,

15   right --

16   A.      Pretty much.

17   Q.      -- to the rappers?

18   A.      I don't think I'm a rapper so I can't answer that.

19   Q.      I understand.  But you have watched the

20   performance?

21   A.      Yeah.

22   Q.      The rappers, when they are performing, do they ever

23   design the lyrics or phrases to throw something verbally,

24   so to speak, back at the person they are competing

25   against?
```

```
 1   A.      Probably so.
 2   Q.      Either taunts or, I'm a better rapper than you
 3   and here is why, that sort of thing?
 4   A.      Yeah, yeah.  That is the whole thing about what
 5   it is all about, competition.
 6   Q.      Competition.  My point is while competing, if you
 7   are going to be a good competitor, your mind has to be on
 8   the rap contest, right?
 9   A.      Not that you win or nothing.  You in the bar and
10   knowin' you with your friends.
11   Q.      I'm referring to Cordell.  Cordell is competing,
12   right?
13   A.      No, not really.
14   Q.      Not really?
15   A.      The other guy wouldn't rap anyway so he really
16   wasn't putting much effort into it.
17   Q.      He is watching the other guy while he has the mike?
18   A.      Yeah.
19   Q.      Cordell is not making any cell phone calls, right?
20   A.      Probably so.  If his phone ring, or he got to call
21   somebody he gonna do it.
22   Q.      Did you see any --
23   A.      In the bar the music loud so we usually go to the
24   bathroom to use the phone or outside in front of the bar
25   to use the phone.
```

1    Q.    Well, did you ever see Cordell go to the bathroom

2    to use his phone?

3    A.    I don't recall.

4    Q.    Did you ever see Cordell go outside with his phone?

5    A.    Probably so.

6    Q.    How many times?

7    A.    I'm not sure.  I didn't think that was something

8    that I have to remember.

9    Q.    Did you hear his phone ring at any time?

10   A.    I was in the bar.

11   Q.    Okay.  You said it's no bigger than this courtroom,

12   right?

13   A.    Loud music.

14   Q.    Is it smaller than the courtroom?

15   A.    Yeah.

16   Q.    How much smaller?

17   A.    Like probably just half this courtroom.

18   Q.    So it is the long shoe box type of bar?

19   A.    Yes.

20   Q.    The bar runs down the length of the space?

21   A.    Stools.  You got another bar on this side,

22   (indicating), you sit at stools, there is a walkway.

23   Q.    Typical storefront?

24   A.    Hole-in-the-wall bar.

25   Q.    That is what I was thinking about.  How many

```
 1   bartenders were there that night?
 2   A.     One.
 3   Q.     One.  Do you know that bartender?
 4   A.     Yes.
 5   Q.     Male or female?
 6   A.     Male -- Female.  Female.
 7   Q.     Name?
 8   A.     Charise.  She light skinned.
 9   Q.     How long have you known her?
10   A.     Some months now.  I frequently go in there.
11   Q.     Back in November, how well did you know Charise?
12   A.     I been going there.  Previous I know her, she know
13   me as El, I know her as Charise.  She know I come in the
14   bar.
15   Q.     Do you know if she knew Cordell or not?
16   A.     Yes.
17   Q.     How do you know?
18   A.     We come in the bar frequently together.
19   Q.     When you buy drinks do you tip?
20   A.     Yes.
21   Q.     Why do you tip?
22   A.     'Cuz I want to get a fatter drink next time.
23   Q.     When it is a crowd you put up your hand?
24   A.     I know when she workin', you know what I'm sayin'.
25   Q.     You try to build up goodwill so when you raise your
```

1    hand and say, I need a round she will recognize you?

2    A.    Yes.

3    Q.    Was she bartending Saturday night, November 16th?

4    A.    Yes.

5    Q.    Do you recall what she was wearing?

6    A.    No.

7    Q.    She was working by herself?

8    A.    Yes.

9    Q.    Do you know the owner of the bar?

10   A.    Yes.

11   Q.    What is the owner's name?

12   A.    Dawn.

13   Q.    Dawn what?

14   A.    I forgot her last name.

15   Q.    Gulsby?

16   A.    Yes.

17   Q.    Was she there that night?

18   A.    Yes.

19   Q.    How do you know Dawn?

20   A.    I come in her bar frequently.

21   Q.    Did you ever talk to her?

22   A.    Yes.

23   Q.    Did you talk to her that night?

24   A.    Yes.  Probably most likely, yes.

25   Q.    When the two of you left Benjamin's you say that

```
 1   you left together, you and Cordell?

 2   A.    Yes.

 3   Q.    Benjamin's is where again?

 4   A.    East 152nd.

 5   Q.    And what generally?

 6   A.    St. Clair.

 7   Q.    152nd and St. Clair?

 8   A.    Yes.

 9   Q.    For you to be as further out as 260th --

10   A.    Euclid.

11   Q.    Where is St. Aloysius?

12   A.    East 109th, if I am not mistaken.  Yeah, East

13   109th and St. Clair.

14   Q.    What was this cabaret at St. Aloysius about or for?

15   A.    I'm not even sure.  I was -- We was invited from

16   the 4U2B.  They say it jumpin' at St. Aloysius so we went.

17   Q.    Is this a party outside in a parking lot, or inside

18   the church hall?

19   A.    It's November.  It's inside the church hall.

20   Q.    Main floor, or basement?

21   A.    Main -- Main floor.

22   Q.    How big was that party at St. Aloysius?

23   A.    It was kind of crowded.  It was crowded.

24   Q.    Now that church hall, is that bigger than this

25   courtroom?
```

```
 1    A.      Yes.

 2    Q.      When you got to St. Aloysius was Cordell with you?

 3    A.      Yes.

 4    Q.      So when you leave Benjamin's the two of you are

 5    together?

 6    A.      Yes.

 7    Q.      When you go to the 4U2B you're together?

 8    A.      Yes.

 9    Q.      Then you leave 4U2B and go to St. Aloysius

10    together?

11    A.      Yes.

12    Q.      So you are in each other's company throughout that

13    entire set of events?

14    A.      Yes.

15    Q.      How far is St. Aloysius from Englewood?

16    A.      Not far.

17    Q.      Can you describe?

18    A.      Take me not five minutes.

19    Q.      109th and St. Clair and talking 105th north of?

20    A.      It's back streets to get there quicker.

21    Q.      What back streets or routes that are quicker?

22    A.      I can't name them by name, but a couple back

23    streets to get you to Parkwood.

24    Q.      How would that route work?  Can you describe it the

25    best that you know?
```

1   A.      No.  I have to be drivin'.

2   Q.      You been that way before down those back streets?

3   A.      Yes.  My uncle stays on 105th.

4   Q.      What time did you arrive at St. Aloysius?

5   A.      It was like after 2.  They weren't serving no more

6   drinks.

7   Q.      Did I hear your testimony to be that you drove

8   direct to St. Aloysius?

9   A.      Yes.

10  Q.      No stops in between?

11  A.      No, not that I can recall none.

12  Q.      During the ride from 4U2B to St. Aloysius was

13  Cordell's phone ringing?

14  A.      I mean, probably so.  I can't recall if somebody

15  phone ring.  Phones supposed to ring.

16  Q.      I understand.  You're driving?

17  A.      I'm drivin', radio up.  We just left one bar going

18  to another bar.

19  Q.      You arrive at St. Aloysius 2:00 or later?

20  A.      Yes.

21  Q.      Because the alcohol was cut off?

22  A.      Yes.

23  Q.      How long did you stay?

24  A.      Probably like 30, 40 minutes 'cuz I was ready to

25  drink but you couldn't drink.  I was ready to leave after

1   about 40 minutes.  Took some pictures and left.

2   Q.     Why did you take those pictures?

3   A.     'Cuz we supposed to take some at the 4U2B but the

4   line was too long.  I like takin' pictures.

5   Q.     Fair enough.  Did Sam come to St. Aloysius?

6   A.     No, sir.

7   Q.     Do you know Yolanda Moore?

8   A.     No, sir.

9   Q.     Do you know Shante Wilkins?

10  A.     Who?

11  Q.     Shante Wilkins.

12  A.     No, sir.

13  Q.     During that night did Nichole Hubbard's name come

14  up in conversation between Cordell and you?

15  A.     No.

16  Q.     Did you ever hear him say that Nichole called, or

17  anything of that sort?

18  A.     No, sir,

19  Q.     How loud is the bar while the rap contest is going

20  on?

21  A.     How loud was it?  I mean, loud music like in a bar.

22  I don't know the kind of bars you go to, but the bars that

23  I go to the music be loud.

24  Q.     Would you have to put your mouth to a person's ear

25  to be heard if you are having conversation?

1    A.      No -- If I am sittin' talkin' to her,

2    (indicating), she probably hear me.

3    Q.      Would you have to raise your voice?

4    A.      Little bit maybe.

5    Q.      You got rid of the Monte Carlo when?

6    A.      2002.

7    Q.      What month?

8    A.      Like January, like February.  Probably like

9    January, February.

10   Q.      Okay.  Do you mean 2003?

11   A.      This 2003.  No.

12   Q.      Way before this incident, or after this incident?

13   A.      The incident occurred in 2001.

14   Q.      The car got broken into in December of 2002?

15   A.      It was in December 2001.

16   Q.      That you got rid of the Monte Carlo?

17   A.      Yes -- No.  The incident about me in the hospital

18   and the car getting broken into occurred in 2001.

19   Q.      Not 2002 like we heard before?

20   A.      No, it's 2001.

21   Q.      Whose car is the white focus?

22   A.      Friend of mine, associate.  Her name Toni.

23   Q.      Is that a female?

24   A.      Yes.

25   Q.      What is her last name?

```
1    A.    I can't recall.  It's funny.  Like funny last name.

2    Q.    Where does she live?

3    A.    Out in Euclid.

4    Q.    Off Euclid where?

5    A.    On 200th.

6    Q.    And what?

7    A.    Euclid.

8    Q.    200th Street itself?

9    A.    Yes.

10   Q.    She lives there?

11   A.    Yes.

12   Q.    What does the house look like?

13   A.    It's an apartment.

14   Q.    She didn't need her car?

15   A.    No.  She don't work on weekends.

16   Q.    How long had you been borrowing her white Contour?

17   A.    Two weeks off and on.  I ain't have no vehicle at

18   the time, so she would let me use it to take my daughter

19   to school.

20   Q.    You have been sitting through this trial, right?

21   A.    Yes.

22   Q.    You have heard the description of the

23   eyewitnesses --

24   A.    Yes.

25   Q.    -- that people left in a car, right?
```

```
1   A.      Yes.

2   Q.      You're telling this Court and jury that you were in

3   a white car that you had borrowed from Toni that night,

4   right?

5   A.      Yes.

6   Q.      Is Toni going to testify to corroborate that?

7                   MR. MACK:  Objection, your Honor.

8                   THE COURT:  Overruled.

9   A.      Huh?

10  Q.      Is Toni going to come in and say, Yes, I lent my

11  car to Ru-el?

12  A.      I mean, if she have to.

13  Q.      What was the capacity of Benjamin's in terms of

14  general numbers?  How many people would you say were

15  there?

16  A.      I'm not sure.  I can't really recall.

17  Q.      More than 5?

18  A.      Yes.

19  Q.      More than 10?

20  A.      Yes.

21  Q.      More than 15?

22  A.      Probably like 20.  20 people.  It was getting ready

23  to start gettin' crowded.  About 12, 12:30 people start

24  coming in.

25  Q.      When you got to the 4U2B how big is that bar?
```

```
 1   A.      Big bar.

 2   Q.      How many people would you estimate were there that

 3   night?

 4   A.      Full house.

 5   Q.      More than 50?

 6   A.      Yeah.

 7   Q.      More than a hundred?

 8   A.      No.

 9   Q.      Any friends there?

10   A.      Couple people.

11   Q.      Names?

12   A.      I'm not sure.  I can't really recall everybody that

13   I seen because I seen them on a normal weekend basis at

14   the same bars.

15   Q.      Do you know any bartenders at the 4U2B?

16   A.      No.

17   Q.      Do you know any doormen at either bar?

18   A.      At either bar?

19   Q.      Are there doormen?

20   A.      At The Benjamin?

21   Q.      Yes.

22   A.      Yes.

23   Q.      Do you know the doorman there?

24   A.      Yeah, security guard named Sport.

25   Q.      How long have you known Sport?
```

```
 1    A.      Some months.  Since I been going to The Benjamin.

 2    Q.      So you knew him back then?

 3    A.      Yes.

 4    Q.      He knew you?

 5    A.      Yes.

 6    Q.      Just like the bartender?

 7    A.      Yes.

 8    Q.      Just like the owner Dawn?

 9    A.      Yes.  D.J.

10    Q.      Who is the D.J.?

11    A.      I don't know his real name.  He call himself D.J.

12 Sweet Daddy.

13    Q.      Have you ever talked or had fun with him?

14    A.      Yes.

15    Q.      How often?

16    A.      As often as I go in there.

17    Q.      You know him as Sweet Daddy?

18    A.      Yes.

19    Q.      Now, your fiancee testified that you came home as

20 the sun was coming up Sunday morning?

21    A.      Yep.

22    Q.      Where were you after the bars?

23    A.      Ridin' around.

24    Q.      With who?

25    A.      Cordell for a minute.
```

```
 1    Q.    How long?  For a minute?

 2    A.    Yes.

 3    Q.    How long did that go on?

 4    A.    Probably about 30, 40 minutes, an hour or so.

 5    Q.    How did Cordell get home?

 6    A.    I took him home.

 7    Q.    Where did you take him home to?

 8    A.    His mother's house.

 9    Q.    Where would that be?

10    A.    East 147th.

11    Q.    And what?

12    A.    St. Clair.

13    Q.    After you dropped him off where did you go?

14    A.    I went home.

15    Q.    What time was that?

16    A.    Probably like about 4:00; going to 4:00 probably.

17    Q.    Well, you were at St. Aloysius from 2 for about

18    how long?

19    A.    About 40 minutes.

20    Q.    You leave somewhere between 2:40, 2:50?

21    A.    Yeah.  In the parking lot talking to some females

22    or whatever, you know.

23    Q.    Which females?

24    A.    Just some females.

25    Q.    Have any names for them?
```

```
1    A.      No.

2    Q.      Do you have any other children besides these three?

3    A.      No, sir.  My fiancee has an older daughter.

4    She's --

5    Q.      I'm talking with other women.

6    A.      No, sir.

7    Q.      Or girls?

8    A.      No, sir.

9    Q.      So you leave St. Aloysius somewhere around 2:40,

10   2:50?

11   A.      Yes, sir.

12   Q.      You and Cordell are together?

13   A.      Yes.

14   Q.      Do you make any stops for any late night food,

15   anything like that?

16   A.      I really can't recall.  I don't think so, though.

17   Q.      Do you go straight from Aloyosius to Cordell's

18   mom's house?

19   A.      We rode around for a minute.

20   Q.      I'm having a hard time understanding what a minute

21   means.

22   A.      I mean, I'm not sure exactly how long or how

23   accurate 'cuz I'm not sure.

24   Q.      Do you recall any phone conversations Cordell was

25   having at that point?
```

```
1   A.      I mean, I don't monitor his phone conversations.

2   Q.      Was he talking on the phone?

3   A.      Yeah.  We just left bars so he was probably tryin'

4   to find himself something to get into.

5   Q.      Like what do you mean?

6   A.      A girl house he gonna go over.

7   Q.      Do you know if he talked to Leshawn McCreary?

8   A.      He probably did.

9   Q.      Do you know if he hooked up with her that night?

10  A.      I'm not sure.

11  Q.      Did he talk to other girls that night?

12  A.      Yeah.  He single, so he knows a lot of girls.

13  Q.      Just like you, right?

14  A.      What?

15  Q.      Single just like you?

16  A.      I ain't single.

17  Q.      Fair statement the two --

18  A.      Is this divorce court or what?  Tell me something I

19  don't know.

20  Q.      No.  It's your murder trial, okay?  The two of you

21  that night at the bars and Aloyosius talked to females,

22  right?

23  A.      Yes.

24  Q.      Fair to say both of you were playing the field that

25  night in terms of single females?
```

```
1    A.      No.

2    Q.      Why not?

3    A.      'Cuz I got a fiancee at home with my children.

4    Q.      Because you're a good, responsible person you were

5    home early that night, right?

6    A.      I was home early?

7    Q.      Yes.

8    A.      No, I wouldn't say that I was home early.

9    Q.      How do you support those three children?

10   A.      Work for my grandmother from time to time.

11   Q.      How often is that?

12   A.      Like every week, every two weeks.  She pay me a

13   little something to clean her day care up, take the

14   garbage out.

15   Q.      How much does she pay you?

16   A.      Like 250 every two weeks.  She know I'm going to

17   school.

18   Q.      $250?

19   A.      Yes.

20   Q.      For taking out the garbage?

21   A.      I do odd jobs around there.

22   Q.      How old is Grandma?

23                   MR. MACK:  Your Honor, I object.

24                   THE COURT:  Overruled.

25   A.      She about 58.
```

```
1    Q.     All right.

2    A.     56.  Something like that.

3    Q.     Is she retired?

4    A.     Is she retired?

5    Q.     Yes.

6    A.     No.

7    Q.     Does she work?

8    A.     She runs a day care.

9    Q.     Is she married?

10   A.     Yes, sir.

11   Q.     To whom?

12   A.     My grandfather.

13   Q.     What is his name?

14   A.     James Brown.

15   Q.     What is Grandma's name?

16   A.     Juanita Brown.

17   Q.     What is the name of the day care?

18   A.     Juanita Brown Day Care Provider.

19   Q.     Is there a sign, or anything public at this

20   location?

21   A.     No.

22   Q.     Do you know if it is --

23   A.     It is through her house.  Her whole house, you know

24   what I'm sayin', top to bottom.

25   Q.     Is it registered with the city?
```

1   A.      Through the county.

2   Q.      Through the county.  Okay.  Every two weeks she

3   pays you $250 bucks?

4   A.      Yes.

5   Q.      You use that to supplement the drug money?

6                   MR. MACK:  Objection, your Honor.

7                   THE COURT:  Objection is sustained.  Please

8           disregard the question.

9   Q.      Now, you've said in your earlier testimony there is

10  no question that these photos, Defendant's Exhibits M, N

11  and O are yourself and Cordell, right?

12  A.      Yes, sir.

13  Q.      You are both wearing red headbands?

14  A.      Yes sir, we are.

15  Q.      You are both wearing sport jerseys of different

16  colors and styles, but both sports jerseys?

17  A.      Yes.

18  Q.      Cordell has silver satiny jogging pants?

19  A.      Not jogging pants, they jeans.

20  Q.      What are they, black with a bleached-out white

21  front?

22  A.      Yes, sir.

23  Q.      There are two different colors on those pants?

24  A.      The back of them is white, like the front of them.

25  Just the side is black.

```
1   Q.    But it looks like the majority of the front of the
2   leg is white, then black on the side, and the back is
3   white?
4   A.    Yes.
5   Q.    Depending on which way the person is standing it
6   looks different?
7              MR. MACK:  Objection.
8              THE COURT:  Overruled.
9   A.    You can see regardless.
10  Q.    If the person is standing sideways, you will see
11  black?
12  A.    You will see white regardless.
13  Q.    Your leather jacket, do we have that here?
14  A.    No.
15  Q.    Nobody thought to bring that?
16  A.    I mean, somebody can go get it for you real quick.
17  Q.    Okay.  You still own it, right?
18  A.    Yes, sir.  Only one that I got.
19  Q.    But it's not here.  It's not here, is it?
20  A.    No, it's not here.
21  Q.    Why were you both wearing the red headbands that
22  night?
23  A.    I mean, if you look at the picture, it match our
24  outfit.  Mine is a New Jersey Nets headband if you look at
25  the picture, but it match the jersey.
```

1    Q.    The red also matches Cordell's red 42 jersey?

2    A.    Red in his shoes coordinating.

3    Q.    A team jersey?

4    A.    Not a team jersey, it's Urban Gear jersey.

5    Q.    It is not meant to reflect football or basketball?

6    A.    No.

7    Q.    The New Jersey Nets, do they wear red headbands

8    when they're playing?

9    A.    Do they wear red headbands?

10   Q.    Yes.

11   A.    You might catch one with their red headbands on.

12   Q.    Did you have that red headband on all night?

13   A.    Yes, sir.

14   Q.    Never took it off?

15   A.    Not that I can recall unless I was sweatin' or

16   something.

17   Q.    Any other headgear that night?

18   A.    No, sir.

19   Q.    No, sir.  Just the red headband?

20   A.    Yes.

21   Q.    Your jacket, I notice in the photos at one point

22   the jacket is on, the next point it is off, right?

23   A.    Yes.

24   Q.    Why were you taking it on and off?

25   A.    I was in a club, like a hall.  It was a party.  I

1  was hot, I took it off.  It's right there on the floor as

2  you can see.  You can look in the picture.  You see it

3  right there?  (Indicating).

4  Q.    Yes.

5  A.    See the flag on the back of it?

6  Q.    Uh-huh.

7  A.    Yeah.

8  Q.    Now, earlier in the evening how much had you worn

9  the jacket?

10  A.    Earlier?

11  Q.    Yes, before you got to Aloyosius.

12  A.    I had it on.

13  Q.    The whole time?

14  A.    Not when I was in the bar.  I took it off.  When I

15  came out of the bar, I put my jacket on.

16              THE COURT:  Ladies and gentlemen, we're

17        going to take a short recess.  Remember the

18        admonition.  Don't discuss the case with anyone or

19        let anyone discuss it with you.  Please don't form

20        an opinion about this case until it is in your

21        hands for deliberation.

22                   (Thereupon, a recess was taken.)

23                   (Thereupon, the jury was brought

24                   into open court and proceedings

25                   were as follows:)

```
 1          THE COURT:  Before we get started, last
 2   week Juror No. 3 was excused because of a
 3   vacation, and I didn't place this on the record.
 4   So everybody agreed to put the alternate in, the
 5   first alternate; is that correct?
 6          MR. WATSON:  Yes.
 7          MR. THOMAS:  Yes.
 8          MR. WILLIS:  Yes.
 9          MR. MACK:  Right.
10          THE COURT:  Mrs. Tully, thank you for being
11   No. 3 now.  We had to put that on the record.
12   You're not Mrs. Tully.  The birthday boy put the
13   wrong person in that seat.  I'm going to guess
14   you're Mrs. Tully.  Mrs. Tully was excused.  Mrs.
15   Winter?  Okay.  Mrs. Winter should actually be in
16   this seat.  You are still an alternate Mrs. -- I
17   surely hope you are Mrs. Debose.
18          JUROR DEBOSE:  Yes.
19          THE COURT:  Everybody have their list?  Do
20   you know what I am saying?  I'm going to have
21   counsel come up here.
22                    (Thereupon, a discussion was had
23                     between Court and counsel outside
24                     the hearing of the jury and off the
25                     record.)
```

```
 1                        - - - - -
 2                    (Thereupon, the jury was brought
 3                    into open court and proceedings
 4                    were as follows:)
 5                        - - - - -
 6            THE COURT:  Okay.  I sit corrected.  Now
 7       I'm so confused.  Mrs. Debose, is you?
 8            JUROR DEBOSE:  Yes.
 9            THE COURT:  You are right where you belong.
10       Excellent.  Mrs. Winter, that is you.  You are
11       right where you belong.  And this is why I should
12       have done it when we switched on Friday.  Thank
13       you.  Go ahead, Mr. Thomas.
14            MR. THOMAS:  Thank you, your Honor.
15  BY MR. THOMAS:
16  Q.   Mr. Sailor, who is Bobby Nettles?
17  A.   A friend of mine.
18            MR. MACK:  Objection, your Honor.
19            THE COURT:  Overruled.
20  Q.   A friend from where?
21  A.   My neighborhood.
22  Q.   Okay.
23  A.   Live around the corner from my mother.
24  Q.   How long have you known him?
25  A.   Like 12, maybe 13 years.
```

```
 1    Q.    Was he with you that night?

 2    A.    He was in The Benjamin that night.

 3    Q.    Has he been here in court this week or past?

 4    A.    No.

 5    Q.    Who is Bernadette Brown?

 6    A.    Bernetta Brown?

 7    Q.    Yes.

 8    A.    That's my mother.

 9    Q.    Was she with you that night?

10    A.    No.

11              MR. MACK:  Your Honor.  I need --

12              THE COURT:  Come on up.

13                   - - - - -

14              (Thereupon, a discussion was had

15               between Court and counsel outside

16               the hearing of the jury and off the

17               record.)

18                   - - - - -

19              (Thereupon, the following proceedings

20               were had in open court:)

21   BY MR. THOMAS:

22    Q.    Mr. Sailor, showing you State's 132, are you in

23   these six photos?

24    A.    Yes.

25    Q.    Where?
```

1    A.    Right here, (indicating).

2    Q.    Okay.  And do you agree that photo existed before

3    November 16, 2002?

4    A.    I'm not sure.

5    Q.    Why aren't you sure?

6    A.    Because I was down here in February, beginning of

7    March I was down here.

8    Q.    Okay.  Now, the gun that you said that you carried

9    in the past, what kind of gun was it?

10                   MR. MACK:  Objection, your Honor.

11                   THE COURT:  Objection is sustained.

12                   MR. THOMAS:  May we approach?

13                   THE COURT:  You may.

14                         - - - - -

15                   (Thereupon, a discussion was had

16                    between Court and counsel outside

17                    the hearing of the jury and off the

18                    record.)

19                         - - - - -

20                   (Thereupon, the following proceedings

21                    were had in open court:)

22   BY MR. THOMAS:

23   Q.    Who is J.D. White?

24   A.    Who?

25   Q.    John White.

```
 1   A.    That's Cordell's brother.

 2   Q.    Do you know him?

 3   A.    Yes, sir.

 4   Q.    How long have you known him?

 5   A.    Long as I've known Cordell.

 6   Q.    That has been how long?

 7   A.    Over ten years.

 8   Q.    Do you know Umar Clark?

 9   A.    No, sir.

10   Q.    Now Monica Williams, do you know her?

11   A.    Yes.

12   Q.    How do you know her?

13              MR. MACK:  Objection!

14   A.    We had sex before.

15   Q.    Does she have children?

16   A.    Yes.

17   Q.    How many children?

18   A.    I think she got like three.  I'm not sure.

19   Q.    Do you know who the father of those children are?

20   A.    I have known it was Umar.

21   Q.    Do you know Takema?

22   A.    Yes, sir.

23   Q.    How do you know Takema?

24   A.    That is Cordell's kid's mother.

25   Q.    How long have you known Takema?
```

```
 1   A.      Quite some years.

 2   Q.      How many years would you say?

 3   A.      Probably like over ten.

 4   Q.      Now, the night of the 16th while the two of you

 5   were traveling in the white focus, is it?

 6   A.      Yes.

 7   Q.      While driving around, have you ever had occasion to

 8   borrow Cordell's phone to make personal calls with his

 9   phone?

10   A.      No.

11   Q.      Never?

12   A.      I mean, probably so.  Like if mine was dead, but

13   not too often.

14   Q.      I believe your earlier testimony was that during

15   November of 2002 you didn't have a phone, right?

16   A.      I did have a phone.  You said a phone account.  I

17   didn't have a phone account.  I owned a phone.

18   Q.      Was it active?

19   A.      Yes.

20   Q.      What was the number?

21   A.      It was 215-4697.

22   Q.      Okay.  Did you have it with you that night?

23   A.      Yes, sir.

24   Q.      At any time that night did you call Cordell?

25   A.      I believe so.
```

1   Q.      About what time?

2   A.      I'm not sure.  Probably like prior to the time we

3   was -- If I did call him, I called him to see where he was

4   at, or telling him we was about to leave, something like

5   that.

6   Q.      How many times did you use your phone to call

7   Cordell that night?

8   A.      I don't recall.

9   Q.      More than five?

10  A.      No.

11  Q.      Less than five?

12  A.      Yes.

13  Q.      More than three?

14  A.      I'm not sure.

15  Q.      What is that number again?

16  A.      215-4697.

17  Q.      What time did the two of you get together that

18  night Saturday?

19  A.      He came to The Benjamin like after 11:30.

20  Q.      Did you call him before hooking up that night?

21  A.      Yes.

22  Q.      Did you call him at any point through the course of

23  the night?

24  A.      Like I said, probably to see where he was at.  We

25  was in the bar.

1   Q.      You said Benjamin's is a small bar?

2   A.      When we was in The Benjamin I don't recall calling

3   him.

4   Q.      What about 4U2B?

5   A.      Probably so.

6   Q.      What time would that have been?

7   A.      Any time after 1:00.

8               MR. THOMAS:  One moment, please.  May I

9           approach the witness, your Honor?

10              THE COURT:  You may.

11  Q.      Cordell's number again is 513-7870?

12  A.      Yes, sir.

13  Q.      Let me ask you to look at Page 4 of State's 141.

14  And look down this column, tell me if your number appears.

15  The third column from the right.

16  A.      This one?  This one, right?  (Indicating).

17  Q.      Yes.

18  A.      Yeah.  Right here, (indicating).

19  Q.      Okay.  That is Ledger 131?

20  A.      Uh-huh.

21  Q.      November 17th at 14:07:29 hours, correct?

22  A.      Yes.

23  Q.      It's to Cordell's number, and your number calling

24  is 215-5619?

25  A.      Yes.

```
 1   Q.    Success for 58 seconds.  Do you agree?

 2   A.    Yes.

 3   Q.    Do you remember where you were when you called at

 4   that time?

 5   A.    What time is that?

 6   Q.    Well, 14 would be about 2:00 in the afternoon on

 7   Sunday.

 8   A.    I was at home.

 9   Q.    Okay.  Why were you calling Cordell?

10   A.    'Cuz that my friend.  I talk to him often.

11   Q.    Highlight that number if you would.  That is 131.

12   A.    The whole line?

13   Q.    Yes.

14   A.    (Indicating).

15                MR. WATSON:  What time was that, 1:31?

16                MR. THOMAS:  No, 14:07:29 on the 17th.

17   Q.    Does it appear anywhere else on the page?

18   A.    No, sir.

19   Q.    Let's go on to Page 3.  I'm going to ask you to do

20   the same thing.  This is part of the 17th and part of the

21   18th but, again, if you would scan this column and tell me

22   if your number appears.

23   A.    Yeah.  Right here, (indicating).

24   Q.    Why don't you put a mark on where you see it.  That

25   is Ledger 80.
```

```
 1   A.      (Indicating).
 2   Q.      November 18th, 2002 at 11:28:04, success for 38
 3   seconds.
 4   A.      Right there, (indicating).
 5   Q.      Again you have Ledger 87, the 17th at 23:48:19.
 6   That is success for 30 seconds.  Then Ledger 88, 23:46 on
 7   the 17th, success for 29 seconds.  Then Ledger 105,
 8   November 17th, at 19:44, success for 25 seconds.  Do you
 9   remember these calls?
10   A.      No.
11   Q.      Do you remember talking to Cordell on either Sunday
12   evening or --
13   A.      I talk to him probably like six or seven days out
14   of a week.
15   Q.      Okay.  Do you remember why you were calling him
16   just before Monday -- or just before midnight on Sunday
17   night?  You called him twice.
18   A.      Probably to go out.
19   Q.      Okay.  Let's go on with what is described as Page
20   2, calls all occurring on November 18th.  Would you check
21   that page and tell me if you see your number.
22   A.      (Indicating).
23   Q.      That is the 18th at 13:59, success for 30 seconds,
24   the 18th at 13:55 for 33 seconds.  Those are Ledgers 36
25   and 37?
```

1    A.    (Indicating).

2    Q.    Any other calls by you on that page?

3    A.    No, sir.

4    Q.    Let's go on to what is described as Page 1.  It

5    begins with Ledger 1 through 35.  Do the same process.

6    A.    Here you go right here, (indicating).

7    Q.    Ledger 35, November 18th, 14:03, success for 31

8    seconds.  Did you make that call?

9    A.    I believe so.

10   Q.    Let's go through Page 7, same process.

11   A.    No.

12   Q.    So for Page 7 the ledger is 221 through 257 which

13   covers midnight.  There were no calls by you, right?

14   A.    No.

15   Q.    The first ledger, November 17th, describes a call

16   time of 0:41, and 257 at the bottom of the page, November

17   16th, describes a call at 19:24.  Do you agree 19:24,

18   which if we take away 12, is 7:24 in the evening?

19   A.    Right.

20   Q.    On the 16th, 41 minutes after midnight on the 17th,

21   there doesn't appear to be any calls to you to Cordell, do

22   you agree?

23   A.    He was callin' me.  You missin' that right there,

24   (indicating).

25   Q.    Did you call in to him?

1    A.     No.

2    Q.     Let's deal with those lines.  Where do you first

3    see that beginning?  That is the Star 82 to unblock the

4    caller privacy.  You heard that testimony, right?  So he

5    is punching in 82 before he dials your number so you will

6    know it's him calling?

7    A.     Yeah.  That is how we -- I don't answer private

8    calls.

9    Q.     It could be the police, right?

10   A.     Police don't call my phone.

11   Q.     If it is private, you don't know who's calling?

12   A.     I seen --

13   Q.     Line all those calls that you see where Cordell

14   dialed your number.

15              THE COURT:  Mr. Mack, can I just see you

16         for one second?

17   Q.     Any other references to your number on this page?

18   A.     No.

19   Q.     I'm sorry?

20   A.     No.

21   Q.     Okay.  The ones that you have just highlighted are

22   Ledgers 237, 238 and 239, November 16th.  And Ledger 237,

23   time is 23:22, which is 11:32 p.m. Saturday night, right?

24   A.     Uh-huh.

25   Q.     Is that a yes?

1   A.      Yes.

2   Q.      And it shows Cordell apparently unblocking his call

3   to dial your number, 82, 215-4697?

4   A.      Yes.

5   Q.      Succession for 107 seconds?

6   A.      Yes.

7   Q.      Do you remember that call?

8   A.      Yeah.

9   Q.      What was it about?

10  A.      Before he got to the bar.

11  Q.      Ledger 238, November 16, 23:31:45.  Again the same

12  process of Cordell unblocking his privacy manager and

13  dialing your number, and it shows success for 39 seconds.

14  That is immediately following the first call, 23:31 and

15  23:32.  Do you remember a second call?

16  A.      Not really.

17  Q.      Do you know why he had to break off and call you

18  right back?

19  A.      No.

20  Q.      Ledger 239, November 16th, 2002 at 23:27:59.  We're

21  going backward in progression here but the same process

22  again.  82, 215-4697, success for 51 seconds.  Do you

23  remember that call?

24  A.      No.

25  Q.      That would actually be the first call in sequence,

1    23:27.  And these came after, 23:31 and 23:32?

2    A.      Yes.

3    Q.      Do you know why Cordell called you three times?

4    A.      I'm not sure.

5    Q.      Did you say that you knew Nichole's number?

6    A.      No.

7    Q.      You have been sitting here through the trial,

8    right?

9    A.      Yes.

10   Q.      What do you recall from sitting through the trial

11   her number to be?

12   A.      It's on the board.  I don't know the number.  926

13   number.

14   Q.      926-5057?

15   A.      Yes.

16   Q.      Would you agree we touched on this earlier, from

17   Ledger 228, which is three minutes after midnight on the

18   17th, up through Ledger 221, your number does not appear

19   either being called by Cordell, or you calling Cordell,

20   correct?

21   A.      Correct.

22   Q.      Page 6.  Please let's go through the same process.

23   Look for calls in by your number.  First dealing with the

24   calls in the column, third from the right, any calls by

25   you to Cordell?

```
 1   A.      No.
 2   Q.      Now, you have identified some where Cordell has
 3   called you?
 4   A.      Yes.
 5   Q.      Can you please use the highlighter on those?
 6   A.      (Indicating).
 7   Q.      These are the calls by him unblocking, again, with
 8   using 82 before he dials your number, correct?
 9   A.      Yes.
10   Q.      We are talking about Ledgers 211 and 212?
11   A.      Yes.
12   Q.      212 occurring on the 17th at 1:09, right?
13   A.      Yes.
14   Q.      Success for 57 seconds?
15   A.      Yes.
16   Q.      Then Ledger 211 on the 17th at 1:10 a.m., a
17   48-second call out by him unblocking his phone to your
18   number, and success for 55 seconds, correct?
19   A.      Yes.
20   Q.      Do you remember those calls?
21   A.      No.
22   Q.      Where were you at that time?
23   A.      We was probably either in The Benjamin or at the
24   4U2B.
25   Q.      Let's work on Page 5.  Same process.  The in calls.
```

```
 1    Scan that column for your number.  Please highlight it.

 2    A.     (Indicating).

 3    Q.     You've just highlighted 152 on Page 5, November

 4    17th, at 10:59 a.m., success for 23 seconds.  That is a

 5    call by you to him.  And now you highlighted Ledger 154 at

 6    same date, November 17th, 10:40 a.m., success for 16

 7    seconds.  156 ledger also 10:13 a.m., success for 106

 8    seconds.

 9               Do you see any other calls either by

10    Cordell to your number, or you calling Cordell on Page 5?

11    A.     No.

12    Q.     On Page 4 we already covered.  Your time line of

13    the bar travel was you arrived at Benjamin's what time?

14    A.     Like 11:30.

15    Q.     Okay.  You stayed at Benjamin's how long?

16    A.     Few hours.  Until like 12:45 maybe, something to 1.

17    Q.     Okay.  You arrived at 4U2B at what time?

18    A.     Probably like 1:10, 1:15.

19    Q.     Stayed there how long?

20    A.     Until like 2.  Yeah, something like that.

21    Q.     After 2 you went to Aloysius?

22    A.     Yes, sir.

23    Q.     You stayed there how long?

24    A.     Like 40, 50 -- probably an hour.  I'll give it an

25    hour.
```

1  Q.    We didn't hear about any of these calls on direct
2  examination, did we?
3  A.    Hear about any of the calls?
4  Q.    What I just brought out here through this record.
5  Your attorney did not ask you about any of those calls,
6  did he?
7  A.    No, sir.
8              MR. MACK:  Objection, your Honor.
9              THE COURT:  Overruled.
10 Q.    What hospital did you go to when your face got
11 busted?
12 A.    I was in -- I was in Huron Road.
13 Q.    That is when you got hit in the face with the
14 brick?
15 A.    Yes, sir.
16 Q.    Now, you are saying that was December of '01, not
17 '02?
18 A.    Yes.  I never said it was '02.
19 Q.    I believe your attorney referenced it as '02.
20 Huron Road.  These photos from the cabaret, do you
21 agree -- First of all, take a look at these real good.
22 Tell me if anything is written on the back itself aside
23 from the folder.  Is there any information on the back of
24 the photo?
25 A.    No, sir.

1    Q.    That is as to which exhibit?

2    A.    N.

3    Q.    Okay.  Would you do the same thing with O, please.

4    A.    No, sir.

5    Q.    And same thing with M.

6    A.    No, sir.

7    Q.    Okay.  So there is no time or date or anything on

8    this, right?

9    A.    No, sir.

10   Q.    No time of the evening?

11   A.    No, sir.

12   Q.    Okay.  Who is in Defendant's Exhibit M?  Going from

13   left to right it is Cordell, yourself, and who is this,

14   (indicating)?

15   A.    Rome.

16   Q.    What is his last name?

17   A.    I don't know his last name.

18   Q.    How do you know him?

19   A.    He's Cordell's cousin.

20   Q.    Was he anywhere besides Aloysius that night with

21   you guys?

22   A.    Every bar we was at he was there.

23   Q.    At Benjamin's from the time that you stated?

24   A.    Yes.

25   Q.    And 4U2B?

```
 1   A.      Yes.

 2   Q.      Then Defendant's Exhibit O, is that Rome again?

 3   A.      Yes.

 4   Q.      The three of you again.  Then in Defendant's

 5   Exhibit N who are these -- I see Cordell in the middle.

 6   There is a woman with her arm around him?

 7   A.      I don't know her.

 8   Q.      Who is the man to the left of the female?

 9   A.      I don't know the dude either.  I don't know him.

10   Q.      As this photo was taken, you're standing with your

11   leather.  There is a person behind you with their hand in

12   the air.  Do you know who that was?      .

13   A.      Let me see.  That's Rome.

14   Q.      You don't know the male and female, but were they

15   with you all night at Aloysius?

16   A.      They know Cordell.

17   Q.      Okay.  Do you know how they know Cordell?

18   A.      No.

19   Q.      Were they there at the cabaret?

20   A.      Yes.

21   Q.      Do you remember them being there the entire time

22   that you were there?

23   A.      Yes.

24   Q.      Do you know any name or street name for them?

25   A.      I just know they call the girl Smiley, that is what
```

```
 1    Cordell call her, and I don't know nothing else.
 2    Q.    Do you know if he has had a relationship with her?
 3    A.    No.
 4                MR. WATSON:  Objection.
 5                THE COURT:  Overruled.
 6    Q.    Have you seen them attend court, or this trial?
 7                MR. WATSON:  Objection.
 8                THE COURT:  Overruled.
 9    A.    Who?
10    Q.    Rome, or Smiley, or the male standing next to
11    Smiley?
12                MR. WATSON:  Objection.
13                THE COURT:  Overruled.
14    A.    No.
15    Q.    Did we touch on Leshawn McCreary's phone number?
16    Do you know her phone number?
17    A.    No.
18                MR. THOMAS:  Right now today if I could --
19           Your Honor, can I ask the witness -- can we put
20           the microphone down for a second?
21                THE COURT:  Sure.
22    Q.    Right now today, how are you wearing your facial
23    hair?
24    A.    I mean, I need a haircut.
25    Q.    You have a light shadow of a mustache, do you
```

1   agree?

2           THE COURT:  You have to answer out loud for

3      the court reporter.

4   A.    Yes.

5   Q.    You have got more growth underneath your chin than

6   along the jawline, but there is growth from the jawline to

7   the chin, do you agree?

8   A.    I get my hair cut once a week so I ain't never have

9   nothing but this and this, (indicating).

10   Q.    You don't usually wear your facial hair like this?

11   A.    Just this and my mustache.  I don't usually have

12   none of this.  (Indicating).

13   Q.    You are saying yes to what is underneath your chin,

14   like the short goatee?

15   A.    Yes.

16   Q.    And yes to the light mustache?

17   A.    Yes, yes.

18   Q.    In fact, in Defendant's Exhibit M can you look at

19   yourself and tell me what facial hair it displays?

20   A.    It appear I got a mustache right there but I still

21   got this hair right here, (indicating).

22   Q.    When you say right here, (indicating), you are

23   talking about the short goatee rubbing your chin?

24   A.    Yes.

25   Q.    What is Cordell's facial hair in that photo?

1  A.      About the same.

2  Q.      Light mustache?

3  A.      Yeah.  His chin hair thicker than mine, though.

4  Q.      He also has sort of a goatee in the photo?

5  A.      I don't see it.  This, (indicating), what you call

6  a light goatee?

7  Q.      I don't mean that it has to run into -- I'm calling

8  any hair underneath the chin a light goatee.

9  A.      Yeah.

10  Q.      Would you agree Defendant's Exhibit O shows

11  basically the same thing --

12  A.      Yes.

13  Q.      -- for both of you?

14  A.      Yes.

15  Q.      How much did you have to drink that night?

16  A.      I don't really recall.

17  Q.      You said earlier in your testimony that you were

18  intoxicated?

19  A.      Yeah.  I had been to two bars.  I was in The

20  Benjamin for quite awhile.

21  Q.      What was your beverage of choice, your alcoholic

22  beverage of choice that night?

23  A.      Tanqueray.

24  Q.      That is a gin?

25  A.      Yes.

1  Q.     How do you take your gin?

2  A.     With ice and a lemon.

3  Q.     Straight up, no mixer?

4             THE COURT:  You have to answer out loud.

5  A.     No.  No, sir.

6  Q.     How many Tanquerays and lemon did you have?

7  A.     I'm not sure.

8  Q.     You don't remember?

9  A.     I don't remember.

10  Q.     At the beginning of the night at Benjamin's do you

11  remember how many you had there?

12  A.     No.

13  Q.     Did you have any alcohol at home to get ready for

14  the evening?

15  A.     No.  I don't have alcohol in the house.

16  Q.     Do you guys share any alcohol in the car during the

17  road trips between?

18  A.     No, sir.

19  Q.     Smoke any weed that night?

20  A.     Yes, sir.

21  Q.     How much?

22  A.     Not a lot.

23  Q.     When did you smoke the weed?

24  A.     Before I went in Benjamin's.

25  Q.     Whose weed was it?

```
 1   A.      My weed.

 2   Q.      A blunt?

 3   A.      Yes, sir.

 4   Q.      Just one?

 5   A.      Yes, sir.

 6   Q.      Did Cordell have any weed?

 7   A.      He don't smoke.

 8   Q.      You smoked the entire blunt by yourself?

 9   A.      Not the entire blunt.  I only smoked half of it and

10   put it out.

11   Q.      Ever smoked any Wet?

12   A.      No.  I don't like that.

13   Q.      What about cocaine?

14   A.      No.

15   Q.      So you had half a blunt or more before Benjamin's?

16   A.      Half a blunt.

17   Q.      Okay.  Tanqueray and lemon, at least one at

18   Benjamin's?

19   A.      Yes.

20   Q.      At least two at Benjamin's?

21   A.      About three or four maybe.

22   Q.      Three to four Tanquerays and lemon at Benjamin's?

23   A.      Yes.

24   Q.      When you went to the 4U2B how many did you have?

25   A.      We weren't there for long so I probably had one.
```

1   Q.    You weren't there for long.  How long were you

2   there?

3   A.    Maybe an hour, if that.

4   Q.    At St. Aloysius did you have anything to drink?

5   A.    No.  They wouldn't serve any liquor when we got

6   there.

7   Q.    Anybody pouring drinks in the parking lot?

8   A.    No.

9   Q.    Toni's car, this female friend that loaned you her

10  car, you were driving that car drunk and high?

11  A.    Yes.

12  Q.    Did you have any insurance to protect her that

13  night?

14              MR. MACK:  Your Honor, objection.

15              THE COURT:  The objection is sustained.

16  Q.    You have heard the earlier testimony about the

17  calls from Nichole's phone to Cordell?

18  A.    Yes.

19  Q.    They are on State's 141 and show calls before or

20  after midnight, right?

21  A.    I ain't look at her number.

22  Q.    Okay.  Right here on Page 7, her number is the 5057

23  number.  See beginning at Ledger 223 and going down to

24  231, (indicating)?

25  A.    Yes.

1  Q.     All right.  You were with Cordell during that time

2  period?

3  A.     Yes.

4  Q.     Do you remember him talking to his sister?

5  A.     No.

6  Q.     You don't want to remember?

7              MR. MACK:  Objection.

8              MR. WATSON:  Objection.

9              MR. THOMAS:  No further questions.

10             THE COURT:  Mr. Watson?

11             MR. WATSON:  Thank you, your Honor.

12                  - - - - -

13             CROSS-EXAMINATION OF RU-EL SAILOR

14  BY MR. WATSON:

15  Q.     Mr. Sailor --

16  A.     Yes.

17  Q.     -- when the prosecutor showed you these phone

18  records, I guess it was State's Exhibit -- I guess we have

19  separate exhibits.  But, nonetheless, that was your first

20  time ever looking at those phone records; is that fair to

21  say?

22             MR. THOMAS:  Objection.

23  A.     Yes.

24             THE COURT:  Overruled.

25  Q.     Meaning that you were not -- these phone calls were

```
 1   not reviewed with you prior to you testifying today?
 2   A.     No, sir.
 3   Q.     Can you tell us whether or not Cordell Hubbard
 4   works at the McClain's Market?
 5   A.     Yes.
 6   Q.     Does he work in the capacity as a manager at one of
 7   the stores?
 8   A.     Yes, sir.
 9   Q.     Which store is that, sir?
10   A.     He work at both of them as manager.  He open and
11   close them sometimes.
12   Q.     Okay.  Where are those stores located?
13   A.     One is on 116th across town, the other is on 32nd
14   and Central.
15   Q.     Okay.  Are you familiar with whether or not the
16   father has or the family owns a general contracting
17   business?
18   A.     I'm not sure.
19   Q.     You're not sure about that.  But you're sure about
20   the stores, correct?
21   A.     Yes.
22   Q.     Now, since you've known Cordell how long has that
23   been?
24   A.     Like over ten years.  We been in the same grade
25   together.
```

1  Q.     To the extent since you have associated with him

2  you know that store to be in existence since your

3  relationship with him; fair to say?

4  A.     Yes, yes.

5  Q.     And you have been there and been present at that

6  store on numerous occasions; is that correct?

7  A.     Yes, yes.

8  Q.     You know Pamela Hubbard?

9  A.     His mother.

10 Q.     His mother, right?

11 A.     Yes.

12 Q.     You are familiar with the Golden Ciphers, aren't

13 you?

14 A.     Yes.

15 Q.     That is a community-based group with girls; is that

16 fair to say?

17 A.     Yes.

18 Q.     The dad works in the business, and there are a

19 number of employees at both stores; fair to say?

20 A.     Yes.

21 Q.     You are familiar with McClain's Market with regard

22 to community activities, correct?

23 A.     Yes.

24 Q.     Now, taking you back to the night in question

25 where you and Cordell -- you told us about Sherome.  He

1   was with you at the 4U2B as well as St. Aloysius?

2   A.      Yes.

3   Q.      We know at the cabaret there was a birthday party.

4   Did you know it to be a birthday party?

5   A.      No.  I didn't even know the purpose -- I just --

6   Sherome called and said that he was going.

7                   MR. THOMAS:  Objection.

8                   THE COURT:  Objection sustained.

9   Q.      You understand that Sherome was supposed to meet

10  his girlfriend at this birthday party, correct?

11                  MR. THOMAS:  Objection.

12                  THE COURT:  Overruled.

13                  MR. WATSON:  If he knows.

14  A.      I'm not sure.

15  Q.      Now, very early on we've talked before; is that

16  correct?

17  A.      Yes.

18  Q.      By way of telephone?

19  A.      Yes.

20  Q.      Correct.  First time that I talked to you was

21  sometime in December; is that fair to say?

22  A.      Yes.

23  Q.      It's fair to say that I spoke to you as a witness?

24                  MR. THOMAS:  Objection.

25  A.      Yes.

```
1                    THE COURT:  Sustained.

2    Q.      What did you understand my phone call to be?

3                    MR. THOMAS:  Objection.

4                    THE COURT:  Objection is sustained.

5    Q.      The prosecutor went through those phone calls.  Do

6    you remember specifically whether or not you called

7    Cordell, or Cordell called you?

8    A.      I'm not sure.  We just be on the phone, you know

9    what I'm sayin'.

10   Q.      You told us during the period of time that you were

11   at Benjamin's Bar, you told us, if I characterized it as

12   such, you said between 10:30 or 11 or 11:30 that you were

13   present at The Benjamin Bar; is that correct?

14   A.      Yes, sir.

15   Q.      The prosecutor showed you a list of phone calls

16   that were made --

17                    MR. WATSON:  May I approach the witness,

18        your Honor?

19                    THE COURT:  Yes.

20   Q.      -- which is Defendant's Exhibit, I believe, P, and

21   discussed with you the timing of those phone calls after

22   237, 238 and 239.  Do you see that?

23   A.      Yes.

24   Q.      These are in military time.  Do you understand what

25   military time is?
```

1    A.    I do now.  Yeah.

2    Q.    Okay.  In the timing of those phone calls you

3    understand that 23:32 hours is?

4    A.    11:32.

5    Q.    Okay.  Same as 23:27; is that correct?

6    A.    Huh?

7    Q.    23:27?

8    A.    Yeah, that is 11:27, yeah.

9    Q.    You told us that Cordell came to the bar sometime

10   after that?

11   A.    Yes.

12   Q.    Fair to say?

13   A.    Yes.

14   Q.    Do you know who he was rappin' against?

15   A.    Bobby Nettles.

16   Q.    You were the one that characterized it wasn't much

17   of a contest because he was not a very good rapper.  Was

18   that you?

19   A.    Yes.

20   Q.    The prosecutor told you about some calls that

21   occurred about 1:10 and 1:09.  Do you recall him asking

22   you questions about that?

23   A.    Yes.

24   Q.    There were some phone calls made, Cordell to you;

25   is that right?

```
 1   A.     Yes.
 2   Q.     Your best guess or best estimate, the sequence of
 3   those calls was probably?
 4   A.     Either he was calling me to say that he ready to go
 5   from The Benjamin, or he was already at the 4U2B.  I'm not
 6   sure because --
 7   Q.     That is your best recollection what those phone
 8   calls may have been; is that right?
 9   A.     Yes.
10   Q.     We know one thing for certain.  You guys were
11   together at The Benjamin Bar?
12   A.     Yes.
13   Q.     Right.  You guys were together at the 4U2B club?
14   A.     Yes.
15   Q.     Right.  And you were together at St. Aloysius?
16   A.     Yes.
17   Q.     Is that fair to say?  Is that fair to say, sir?
18   A.     Yes.
19   Q.     The prosecutor asked you a lot of questions about
20   headbands.  Do you recall those questions?
21   A.     Yes.
22   Q.     It's very popular to wear headbands; isn't that
23   fair to say?
24   A.     Yes.
25   Q.     If anyone would suggest to you that you and Cordell
```

1  started a trend with headbands, that wouldn't be correct,

2  would it?

3  A.     No.

4  Q.     Just like wearing these jerseys.  Your jersey and

5  the 42 jersey he's wearing, it's fair to say that is kind

6  of a trendy thing people your age wear?

7  A.     Yes.

8              MR. WATSON:  No further questions.  Thank

9          you.

10             THE COURT:  Mr. Willis?  Mr. Mack?

11             MR. MACK:  Thank you, your Honor.

12                   - - - - -

13        REDIRECT EXAMINATION OF RU-EL SAILOR

14  BY MR. MACK:

15  Q.     You went through these series of questions about

16  the telephone calls.  I think there was some discussion

17  about calls on November the 18th?

18  A.     Yes.

19  Q.     Did you know on November the 17th or 16th this

20  person by the name of Omar Clark had been shot?

21  A.     No, sir.

22  Q.     So when you called Cordell on the 18th, what was

23  that about?

24  A.     Just talk about what happened last night, or

25  something like that.

```
1   Q.      Did you call him on the 19th?

2   A.      Yes.

3   Q.      The 20th?

4   A.      Yes.

5   Q.      So it was not unusual for you to call him; is that

6   correct?

7   A.      No.  We talk every day.

8   Q.  .   Did you call him on the 16th?

9   A.      Yes.

10  Q.      There would be calls throughout.  You indicated

11  that you talked to him approximately how many times?

12  A.      When?

13  Q.      I mean since you been friends per week.

14  A.      Basically about six days out of the week, maybe

15  seven.

16  Q.      Now, do I understand back when you say that you

17  were at Benjamin's you indicated there were people that

18  received telephone calls in the bar, or went in the

19  bathroom?

20  A.      Yeah.  Go in the bathroom or go stand outside to

21  talk on the phone because you can't really hear.

22  Q.      You did indicate at one point in time Cordell went

23  outside to make some telephone calls?

24  A.      Yeah.  I probably did, too.

25  Q.      You probably did, too.  It's not like you were his
```

```
 1   brother's keeper; is that correct?

 2                 MR. THOMAS:   Objection.

 3   A.    Right.

 4                 THE COURT:   Sustained.

 5   Q.    You were not with him -- You were not in his back

 6   pocket, were you?

 7   A.    No.

 8   Q.    Again, you know what you saw on that particular

 9   night; is that correct?

10   A.    Yes.

11   Q.    That is all you are testifying to?

12   A.    Yes.

13   Q.    Did you, in fact, shoot this man on the night of

14   either November 16th or November 17th?

15   A.    No, sir.

16                 THE COURT:   Any further questions?

17                 MR. MACK:   I'm through, but may I reserve.

18                 THE COURT:   Please approach.

19                      - - - - -

20                      (Thereupon, a discussion was had

21                       between Court and counsel outside

22                       the hearing of the jury and off the

23                       record.)

24                      (Thereupon, the following proceedings

25                       were had in open court:)
```

```
 1                    THE COURT:  All right.
 2                    MR. MACK:  Your Honor, at this time I'm
 3          done.
 4                    THE COURT:  All right.  Mr. Thomas?
 5                    - - - - -
 6             RECROSS-EXAMINATION OF RU-EL SAILOR
 7   BY MR. THOMAS:
 8   Q.     So both bars were loud, right?
 9   A.     Yes.
10   Q.     And, for example, at Benjamin's you would have to
11   step in the bathroom or step outside --
12   A.     Yes.
13   Q.     -- to hold a phone call, right?
14   A.     Yes.
15   Q.     Yet from 12:40 through about 40 minutes or more of
16   that hour to 12:40 on until 1:30 or -- I'm sorry.  11:40
17   through 12:30 you are saying Cordell was in a rap contest?
18   A.     Yes.
19   Q.     Okay.  Your recollection is that is what he was
20   doing?
21   A.     Yes.
22   Q.     You called the next day and talked about what
23   happened last night?
24   A.     Yes.
25   Q.     That is what I heard your testimony to be?
```

1    A.    Yes.

2    Q.    The one call around 1 a.m. or something that Mr.

3    Mack referenced, this was your testimony, I wrote it down,

4    He was calling to say he got there in reference to you.

5    Is that your testimony?

6    A.    I say what?  Repeat that again.

7    Q.    The call at 1 a.m. or whatever Mr. Mack referenced

8    in State's 141, your explanation of the call was, He was

9    calling to say he got there.  That's what I heard you say.

10            Do you recall that?

11   A.    No, I don't recall that.

12            MR. THOMAS:  Your Honor, may we have the

13        transcript read back?

14            THE COURT:  Yeah, from Mr. Mack's

15        examination on redirect.  Step back to the jury

16        room.  She has to find that portion.  Remember the

17        admonition.  Don't discuss the case with anyone or

18        let anyone discuss it with you.  Please don't form

19        or express any opinion about the case until it is

20        in your hands for deliberations.

21                    - - - - -

22            (Thereupon, the jury was excused

23                and proceedings were as follows:)

24                    - - - - -

25

1    (Thereupon, previous testimony

2         of Ru-el Sailor on redirect

3         examination by Mr. Mack was read

4         back by the reporter.)

5    THE COURT:  You can ask the question again

6 if it is inconsistent with that answer; but,

7 otherwise, no.

8    MR. THOMAS:  We already have the

9 inconsistency I thought.

10    THE COURT:  Well, I think it's pretty --

11 Just ask again.

12    MR. THOMAS:  Your Honor --

13    THE COURT:  We need Mr. Willis.  You can

14 ask him, Didn't you say.  You've created the

15 situation, not me.

16    MR. THOMAS:  I thought that I already had

17 the inconsistency in the question and answer that

18 I asked last.

19    THE COURT:  You can ask him.

20         - - - - -

21         (Thereupon, the jury was brought

22         into open court and proceedings

23         were as follows:)

24         - - - - -

25    THE COURT:  Mr. Thomas?

1    BY MR. THOMAS:

2    Q.     Mr. Sailor, you recall my earlier question before

3    we broke to review the record.  Around 1:09 or 1:10 in

4    explaining those calls you stated words to the effect,

5    under oath, that you were either calling him, meaning

6    Cordell, to see if he was ready to leave Benjamin's or see

7    if he already got to the 4U2B.

8                Do you recall that being your answer?

9    A.     Since she read it, yes.

10   Q.     And the attorney examining you later confirmed, And

11   that is your best recollection, and you answered yes?

12   A.     Yes.

13                MR. THOMAS:  Thank you.  No further

14        questions.

15                THE COURT:  Mr. Watson?

16                   - - - - -

17        RECROSS-EXAMINATION OF RU-EL SAILOR

18   BY MR. WATSON:

19   Q.     Mr. Sailor, when I asked you about those phone

20   calls, did I correctly understand you to mean that, one,

21   that you were either leaving Benjamin's --

22   A.     Yes.

23   Q.     -- or that you were already at the 4U2B club?

24   A.     Yes.

25   Q.     And you described the 4U2B club was a lot larger

```
 1   in size --
 2   A.      Yes.
 3   Q.      -- than Benjamin's; is that correct?
 4   A.      Yes.
 5   Q.      How many employees does Benjamin's have?
 6   A.      Just security guard and bartender.
 7   Q.      You have been to The Benjamin a great number of
 8   times; is that fair to say?
 9   A.      Yes.
10   Q.      As a matter of fact, you have been to the bar after
11   November 16th or 17th?
12   A.      Yes.
13   Q.      Is that correct?
14   A.      Yes.
15   Q.      Would you say that you went there quite regularly
16   after November 16th or 17th?
17   A.      Yes.
18   Q.      Did you ever see the presence of Eugene Jones in
19   that bar?
20                   MR. THOMAS:  Objection.
21                   THE COURT:  Objection is sustained.
22                   MR. WATSON:  No further questions.
23                   THE COURT:  Mr. Willis?
24                   MR. WILLIS:  No.
25                   THE COURT:  Okay.
```

```
 1                          - - - - -

 2          FURTHER REDIRECT EXAMINATION OF RU-EL SAILOR

 3     BY MR. MACK:

 4     Q.      Mr. Sailor?

 5     A.      Yes.

 6                     THE COURT:   Let the prosecutors take a look

 7              at that.

 8     Q.      Showing you what has been marked for purposes of

 9     identification as Defendant's Exhibit R, would you please

10     take a look at this and, for the record, would you

11     indicate what it is that I am handing you.

12     A.      It's my leather coat that I got for my birthday.

13     Q.      Okay.  Do you recall where, if anyplace, that

14     particular jacket was on November the 16th and November

15     the 17th?

16     A.      On my back.

17     Q.      On your back.  Okay.  Can you identify and describe

18     that particular jacket?

19     A.      It's all black leather Phat Farm jacket with the

20     flag on the back.

21     Q.      Would you hold it up, please?

22     A.      (Indicating), with a P.  Patches on the sleeve.

23     Q.      Would you hold the jacket up so the jury can see

24     the patches on the sleeve?

25     A.      (Indicating).
```

1  Q.    Showing you what has been marked as Defendant's
2  Exhibit N, would you please take a look at that.  Again,
3  for the record, what is it that I've handed you?
4  A.    A picture of the party.
5  Q.    Is there a jacket in that particular picture?
6  A.    Yes.
7  Q.    Is that the same jacket as Defendant's Exhibit R?
8  A.    Yes.
9  Q.    Is that jacket essentially the same as it was when
10 you wore it -- and I want you to take a look at it -- on
11 November 16th and November 17th?
12 A.    Yes.
13 Q.    And where has this jacket been?
14 A.    At my house.
15              MR. MACK:  No further questions, your
16        Honor.
17              THE COURT:  Mr. Thomas?
18              MR. THOMAS:  Thank you, your Honor.
19                  - - - - -
20     FURTHER RECROSS-EXAMINATION OF RU-EL SAILOR
21 BY MR. THOMAS:
22 Q.    It's been at your house until about 15, 30 minutes
23 ago?
24 A.    Yes.
25 Q.    Someone was dispatched to go get it, right?

```
 1    A.      Yes.

 2    Q.      Because it was not thought important enough to have

 3    it here for your case until I questioned on it, right?

 4    A.      Yes.

 5    Q.      This rip on the back of the sleeve, how did this

 6    happen?

 7    A.      I'm not sure.  My brother be wearin' it without

 8    permission.

 9    Q.      Which of these interior pockets is the gun pocket?

10    A.      I'm not sure.

11    Q.      Oh, but you've carried a gun in the past?

12    A.      Right.  No, not in that jacket.

13                  MR. THOMAS:  No further questions.

14                  THE COURT:  Mr. Watson?

15                       -  -  -  -  -

16          FURTHER RECROSS-EXAMINATION OF RU-EL SAILOR

17    BY MR. WATSON:

18    Q.      This is your jacket?

19    A.      Yes.

20    Q.      Do you want to try it on and see if it fits?

21    A.      Sure.

22    Q.      You wear your jacket big; is that right?

23    A.      Yeah.

24    Q.      That's the style?

25    A.      Yeah.
```

```
 1              MR. WATSON:  No further questions.

 2              THE COURT:  Mr. Willis?  You may step down,

 3       sir.  Mr. Mack, on behalf of Defendant Ru-el

 4       Sailor?

 5              MR. MACK:  With the offering of

 6       exhibits, I now rest my case on behalf of Mr.

 7       Ru-el Sailor.

 8              THE COURT:  Mr. Willis, on behalf of

 9       Nichole Hubbard?

10              MR. WILLIS:  The Defense rests, your Honor.

11              THE COURT:  Any rebuttal, Mr. Thomas and

12       Miss Clancy?

13              MR. THOMAS:  No, your Honor.

14              THE COURT:  All right.  Ladies and

15       gentlemen, we are going to have lunch.  Remember

16       the admonition.  Don't discuss the case with

17       anyone, don't let anyone discuss it with you.

18       Please don't form an opinion about this case until

19       it is in your hands for deliberations.

20              There are a number of legal issues that

21       must be discussed.  It will be a significant

22       amount of time.  I will ask you to be back at

23       2:30.  See you then.

24                       - - - - -

25              (Thereupon, the jury was excused
```

1     and proceedings were as follows:)

2          THE COURT:  Mr. Mack, are you renewing your

3     Rule 29 motion?

4          MR. MACK:  Yes, your Honor.  I will

5     incorporate all my arguments prior to this

6     particular time.

7          THE COURT:  Are you incorporating your

8     arguments, Mr. Thomas?

9          MR. THOMAS:  Yes, your Honor.

10         THE COURT:  Motion is denied.  Mr. Willis,

11    are you renewing your Rule 29 motion?

12         MR. WILLIS:  I certainly am, your Honor.  I

13    incorporate by reference all the statements that I

14    made in the course thereof, but I have another

15    motion after the Court resolves this motion.

16         THE COURT:  Mr. Thomas?

17         MR. THOMAS:  As to the complicity statute I

18    contend the language of aider and abettor clearly

19    indicates language of incitement.  Can constitute

20    aider and abettor.  There is testimony Nichole did

21    incite her brother when calling from 10622

22    Englewood and we, in addition to all the other

23    arguments and evidence in favor of the State of

24    Ohio's case, ask the motion be denied.

25         THE COURT:  It's denied.  Do you have

1   another motion?

2           MR. WILLIS:  With reference to all the

3   witnesses that were interviewed, Cleveland police

4   officers, homicide detective Eugene Jones, we

5   ask the Court to require the State to scrutinize

6   all those statements as to whether or not there is

7   anything that could be used by the Defense as

8   beneficial to the Defendant which would make it

9   Brady material.  And, to the extent the State

10  deems none of those statements would be

11  appropriate, I ask they be produced by the Court

12  and made a part of this record.

13          THE COURT:  Take the lunch hour to look and

14  see if there is any Brady material about Eugene

15  Jones.

16          MR. WILLIS:  Not only Gene Jones.

17          THE COURT:  I thought --

18          MR. WILLIS:  He is not the only person

19  that I am concerned with.

20          THE COURT:  If there is any Brady material

21  in your file.

22          MR. THOMAS:  I thought the Defense had

23  rested?

24          MR. WILLIS:  I can always make a motion,

25  post-trial even.

1    THE COURT:  Take a look.  Over lunch I

2    would like you gentlemen to go through the

3    exhibits with the State.  See which ones you are

4    offering, and then which ones that you will object

5    to, and only discuss the ones that are offered and

6    objected to.  Then we are going to argue this

7    afternoon, we are going to charge in the morning.

8    I think we should talk about the charge before you

9    argue.

10    MR. THOMAS:  Yes.

11    THE COURT:  We will let Lisa have some

12    lunch.

13                    - - - - -

14            (Thereupon, a luncheon recess was

15            taken until 2:30 p.m., Monday,

16            June 2, 2003, at which time the

17            following further proceedings were

18            had:)

19                    - - - - -

20

21

22

23

24

25

Cuyahoga County Prosecutor's Office 5092460 198501 V5560736-5024 PRO1                    11/16/2020 Page 5024

1    JUNE 2, 2003, MONDAY AFTERNOON SESSION

2         MR. WATSON:  I moved my exhibits.

3         THE COURT:  We are going to do it right

4    now.  It is my understanding with respect to

5    Defendant's Exhibit J, the statement of Gibbs, L,

6    the statement of Joseph Mayhand and, Q, the phone

7    of Samuel Brown, are not being offered; is that

8    correct?

9         MR. WATSON:  That's correct.

10        THE COURT:  The rest of the exhibits, A

11   through R, are being offered, correct?

12        MR. WATSON:  That's correct.

13        THE COURT:  There is no objection by the

14   State; is that correct?

15        MR. THOMAS:  Correct.

16        MR. WILLIS:  What about Joint Exhibit 1?

17        MR. THOMAS:  I move it.

18        THE COURT:  I can't remember what it is.

19        MR. THOMAS:  Desatnik's Form 1.

20        THE COURT:  You're offering that, Mr.

21   Thomas?  No objection?

22        MR. WILLIS:  No objection.

23        MR. WATSON:  None.

24        MR. MACK:  No.

25                   - - - - -

```
 1                    (Thereupon, the jury was brought
 2                    into open court and proceedings
 3                    were as follows:)
 4                         - - - - -
 5              THE COURT:  Ladies and gentlemen, we are
 6        now at the point in trial known as closing
 7        arguments.  The closing arguments, like opening
 8        statements, is not evidence and it must not be
 9        considered by you as evidence.  It is an
10        opportunity for the lawyers to summarize the
11        evidence presented, and to present their theory of
12        the case.  The State will go first, then each of
13        the Defendants will have an opportunity to address
14        you, and because the State has the burden of proof
15        the State will have another opportunity to address
16        you.
17              I anticipate we will have closing arguments
18        today, tomorrow morning come in fresh and I will
19        give you the instruction of law or what is called
20        charge of the Court.
21              All right.  On behalf of the State of Ohio,
22        Miss Clancy.
23              MS. CLANCY:  Thank you, your Honor.
24
25
```

```
1                          - - - - -

2    CLOSING ARGUMENT ON BEHALF OF THE STATE OF OHIO

3              MS. CLANCY:  Good afternoon, ladies and

4         gentlemen of the jury.

5              THE PANEL:  Good afternoon.

6              MS. CLANCY:  Our search for the truth has

7         finally come to an end.  I know it has been two

8         long weeks that you have been here and put forth

9         your time and effort into our case and now, pretty

10        soon, the case will be yours to decide the facts

11        once you hear the law from Judge McDonnell.

12             In the beginning of our case we talked

13        about the indictment.  In this indictment, as it

14        pertains to the Defendants Cordell Hubbard and

15        Ru-el Sailor, there are 12 counts.  As it pertains

16        to the Defendant Nichole Hubbard, there are 10

17        counts.

18             Count 1 of this indictment is aggravated

19        murder.  The grand jurors on their oaths further

20        find the Defendants, and those Defendants are

21        again Cordell Hubbard and Ru-el Sailor, unlawfully,

22        purposely, and with prior calculation and design,

23        caused the death of another, Omar Clark.

24             There is a firearm specification.  The

25        grand jurors further find and specify that the
```

1  offender had a firearm on or about his person or

2  under his control while committing the offense.

3  And there is another firearm specification.  The

4  grand jurors find and specify the offender had a

5  firearm on or about his person or under his

6  control while committing the offense and displayed

7  the firearm, brandished the firearm, indicated

8  that he possessed the firearm, or used it to

9  facilitate the offense.

10         In Count 2 of the indictment it's

11  complicity in the commission of aggravated murder.

12  Again, that pertains to the Defendants Ru-el

13  Sailor and Cordell Hubbard.  Again, it's the grand

14  jurors on their oaths further find the Defendants

15  unlawfully did purposely aid or abet each other in

16  committing a violation of Section 2903.01, which

17  is aggravated murder of the Revised Code,

18  purposely and with prior calculation and design

19  caused the death of another, Omar Clark.

20         Again, the same two firearm specifications

21  that are in the first count apply.

22         Count 3 of the indictment is murder.  This

23  count pertains to all three of the Defendants.

24  The grand jurors on their oaths further find the

25  Defendants unlawfully did cause the death of Omar

1  Clark as a proximate result of the offenders

2  committing or attempting to commit an offense of

3  violence, a felony of the 1st or 2nd degree.  And

4  we would argue that, alternatively, kidnapping is

5  a felony of the 1st degree and a felonious assault

6  is a felony of the 2nd degree in violation of

7  Section 2903.02 of the Revised Code.  Again, the

8  same two firearm specifications apply.

9       Count 4, the indictment is a complicity in

10  the commission of murder and, again, it's all

11  three Defendants.  The grand jurors on their oaths

12  further find the Defendants unlawfully did

13  purposely aid or abet each other in committing a

14  violation of Section 2903.02 of the Revised Code.

15  They did cause the death of Omar Clark as a

16  proximate result of the offenders committing or

17  attempting to commit an offense of violence.  That

18  is a felony of the 1st degree or 2nd degree.

19       Again, we would make the same argument as

20  applies to a kidnapping and felonious assault.

21  There are those firearm specifications that I

22  talked about.

23       Count 5 of the indictment is kidnapping.

24  It applies to all three Defendants.  The grand

25  jurors on their oaths further find the Defendants

```
 1        unlawfully and by force, threat, or deception
 2        removed Omar Clark from the place where he was
 3        found or restrained him of his liberty for the
 4        purpose of facilitating the commission of a felony
 5        or the flight thereafter and/or terrorizing and/or
 6        inflicting serious physical harm on Omar Clark.
 7        And there are the firearm specifications again.
 8             Count 6 of the indictment is a complicity
 9        in the commission of kidnapping.  That is the
10        grand jurors on their oaths further find that the
11        Defendants unlawfully did purposely aid or abet
12        each other in committing a violation of Section
13        2905.01, which is a kidnapping, of the Revised
14        Code by force, threat, or deception removed Omar
15        Clark from the place where he was found or
16        restrained him of his liberty for the purpose of
17        facilitating the commission of a felony or in the
18        flight thereafter and/or terrorizing and/or
19        inflicting serious physical harm on Omar Clark.
20        Again, the same two firearm specifications apply.
21             Count 7 of the indictment is kidnapping.
22        I'm not going to read the count to you again.  The
23        difference being the victim in Count 7 is Clark
24        Williams/Clark Lamar, who we heard from in the
25        beginning of this trial.  Again, the same two
```

1     firearm specifications.  It applies to all three

2     Defendants.

3            Count 8 is a complicity in the commission

4     of kidnapping and, again, I'll briefly read to you

5     commission and complicity in the kidnapping and,

6     again, it pertains to Clark Lamar, and that would

7     be they did aid or abet one another.

8            Count 9 is a felonious assault.  That

9     pertains to all three Defendants.  The grand

10     jurors on their oaths further find the Defendants

11     unlawfully did knowingly cause serious physical

12     harm to Omar Clark and/or knowingly did cause or

13     attempt to cause physical harm to Omar Clark by

14     means of a deadly weapon or dangerous ordnance, a

15     firearm, which will be defined to you at a later

16     time.  Again, there are two firearm specifications

17     in that count of the indictment.

18            Count 10 is a felonious assault, and it is

19     the same as Count 9; however, the victim in Count

20     10 is Clark Williams/Clark Lamar, and there are

21     two firearm specifications also.

22            Count 11 is a complicity in the commission

23     of a felonious assault.  And that is the grand

24     jurors on their oaths further find that the

25     Defendants unlawfully did purposely aid or abet

1    each other in committing a violation of 2903.11,

2    which is a felonious assault, and that they did

3    cause serious physical harm to Omar Clark and/or

4    knowingly did cause or attempt to cause physical

5    harm to Omar Clark by means of a deadly weapon or

6    dangerous ordnance and that, again, is a firearm.

7    There are two firearm specifications in that

8    count.

9         Finally, Count 12 is a complicity in the

10   commission of a felonious assault.  And that is

11   the same that I just read to you and the victim

12   in that count would be Clark Williams.

13        Now, I want to go back to just a little bit

14   of what we had discussed in the very beginning of

15   this case, back during jury selection, and we

16   talked about different issues.  Most importantly,

17   the burden is on the State of Ohio to prove each

18   and every one of these counts in this indictment

19   and the elements thereof beyond a reasonable

20   doubt.  That is what we did, and that is what this

21   was about.  Bringing in the witnesses, having them

22   come in and testify and tell you what happened.

23   And through the testimony and the law that you

24   will get from Judge McDonnell, you can apply the

25   facts to the law to see if they match.

1    We talked to you about beyond a reasonable

2    doubt.  You all agreed that you would hold us to

3    that standard and that standard alone.  We all

4    agree it is doubt based on reason and common

5    sense.

6        As you heard from all the testimony this

7    is a case about common sense, this is a case about

8    what makes sense to you and what doesn't.  We all

9    discussed how it is not beyond all possible

10   imaginary doubt because different parts of human

11   nature are subject to some doubt, and you all

12   agreed that you can hold us to that standard.  You

13   said that you all could follow the law as it will

14   be given to you.

15       We talked to you a little about the

16   witnesses and about what type of witnesses that

17   you may hear from, what type of witnesses may be

18   around in this type of a situation involving a

19   homicide.  When you listened to them testify, and

20   you go back and deliberate, you will have to

21   reflect on what some of these witnesses may have

22   had to gain by coming in and testifying, what

23   their demeanor was, how they testified, how

24   intelligent they were, how smart they were.  From

25   that you will be able to determine how much of

1    that testimony you will believe, how much you

2    won't, and that will be for you to decide.

3            We also talked to you about us not being

4    able to go out and pick our witnesses.  These are

5    people who were there at the time that the crime

6    occurred, these are people who have information to

7    provide.  With all those points in mind, we are

8    going to take you back to November 16th into the

9    early morning hours of November 17th on Englewood

10   Avenue in the City of Cleveland that we have heard

11   so much about for the last two weeks and so much

12   that you have heard from all the different people

13   coming in and telling you what happened.

14           So I am not going to go on and on because

15   you heard it, you know, and you will be able to go

16   back and talk amongst yourselves collectively and

17   decide what happened.

18           In examining the testimony and evidence in

19   light of each and every count and each and every

20   element of each and every one of these counts of

21   the indictment, we have proved our case beyond a

22   reasonable doubt.  The evidence was clear.

23           You first heard from the paramedic, the EMS

24   technician paramedic sponsor who arrived on scene.

25   He told you when he got there Omar Clark was still

1   alive, he was still breathing.  He told you that

2   he was combative, he suffered multiple gunshot

3   wounds, and described it as a felonious assault.

4   Not dead at the time.  Suffered serious physical

5   harm injury, and he had a number of gunshot

6   wounds.  And that would establish strongly

7   because of the number of gunshot wounds all over

8   his body he had a serious physical injury to him.

9   He described that he saw him laying on the ground.

10      You also heard from Kristen Clark and Brett

11  Trimble, both representatives from the phone

12  companies.  You heard Brett Trimble told you he

13  was a representative from Sprint.  While he was

14  testifying I had him verify and authenticate the

15  phone record of this number, (indicating), and the

16  number being 296-5057, and he told you the

17  subscriber was a Nichole Hubbard.  Then I had him

18  go through and identify each time there was a call

19  from that number, 296-5057, which he told you was

20  a cell phone, and I had him go through and

21  identify each time that number made a connection

22  with 513-7870.  He could not tell you whose number

23  that was, but he took a highlighter and went

24  through and highlighted each and every one of

25  those calls.  You will be able to take this back

1 and look for yourself, and you will be able to

2 examine the duration of the calls that he

3 testified.

4 He explained it is in seconds, all the

5 number of connections made, and the time the calls

6 started. He went through and counted the number

7 of calls and there was seven starting from 23:57.

8 He told you it is in military time, which would be

9 11:57 p.m. all the way through 12:46 a.m. He

10 told you that with these records these are calls

11 that connected. These are not any calls that went

12 into voice mail so you, too, will be able to go

13 through these and examine them and see for

14 yourself what that information was, the number of

15 times that number connected with 513-7870, and

16 determine who made the calls, which calls were

17 received, and which calls were made.

18 Then we learned from Kristen Clark through

19 State's Exhibits 140 and 141 the subscriber was

20 513-7870, Cordell Hubbard. She told you she was

21 employed by Verizon. She also had cell phone

22 records and she went through and indicated the

23 number of calls that 513-7870 connected with

24 296-5057. She also provided, which you will be

25 able to look at and review, additional information

1    that shows any calls that went into voice mail.

2    She testified that none of the calls that went

3    into voice mail matched up with the State's

4    Exhibit 141 that would have reflected any calls

5    that Nichole Hubbard on her 296-5057 would have

6    made to this phone call.  None of those calls

7    would have went into voice mail and you, too, will

8    have this to take back and review for your

9    yourselves as to the information they did provide.

10   You will also see from those cell phone records

11   all the different times the calls were made and

12   were received.

13        You heard from Officer Desatnik who told

14   you he arrived on scene from the Sixth District

15   Police Department and he made the report as a

16   felonious assault because, again, when he arrived

17   on scene Omar Clark was still alive.  He also told

18   you that he responded to a call of people beating

19   on a door of Clark Lamar's house, and you heard

20   that on the tape played for you about somebody

21   pounding on doors.  It was later explained to you

22   it was Umar Clark, the brother, being devastated

23   about his brother's death trying to figure out

24   what happened and looking for Dude who lived at

25   that house.

1    You heard from Dr. Corcoran, the deputy

2    coroner, who ruled this case a homicide and told

3    you about the multiple gunshots on this person of

4    Omar Clark.  You will be able to take all these

5    photographs back with you.  I know that you had an

6    opportunity to look at them briefly, but you will

7    see all of the gunshots to his body.  What you

8    have come to find out, all the gunshots all

9    throughout his body for a $10 Wet cigarette.  All

10   over his legs, his back.  He told you a number of

11   those gunshots came from behind.

12   You heard from Curt Jones, the forensic

13   scientist, who is a supervisor of Trace Evidence

14   with the Cuyahoga County Coroner's Department.  He

15   told you there were multiple defects on the

16   clothing of Clark Lamar.  He will tell you there

17   was no trace metal detection on his hand.  That

18   was a sign indicative of whether or not he held a

19   gun.  He did not have any gun on him at the time

20   and, again, there are photographs that you did not

21   get to look at while sitting here listening to the

22   testimony but you will be able to review once you

23   go back and deliberate.

24   Then you heard from the fact witnesses, the

25   people who were there who were present at the time

1    this happened.  You heard from Clark Lamar/Clark

2    Williams.  Again, in listening to his testimony

3    and reflecting back on what he told you, you have

4    to consider what did he have to gain by coming in

5    and identifying Ru-el Sailor, as he said in his

6    own words, the killer, and Cordell Hubbard who was

7    there at the scene having conversation on the

8    phone.  You have to consider what did he have to

9    gain.  Whether or not he knew these people, what

10   did he have to gain by identifying them as being

11   there?

12          He told you how he spent the day with Omar,

13   his last day, November 16th of 2002, and he told

14   you he was with Nichole, Puddin, Maria Whitlow.

15   How at some point in the day they went over to

16   Puddin's house, they were drinking beer and

17   playing cards.  There came a time when there was

18   some phone conversations Maria Whitlow had about

19   some party that was going to happen later on.

20   There came a time when they left, and there was a

21   point in time when they dropped Maria off and they

22   decided to look for a Wet cigarette which he

23   described to you as PCP embalming fluid dipped

24   with a cigarette.

25          He told you how Defendant Nichole Hubbard

1    calls Puddin on the phone to find some Wet which

2    is consistent with what Puddin told you because

3    she said she got a call from the Defendant looking

4    for where she could find this Wet cigarette.

5    Puddin was not able to get that information for

6    them so they saw some guy by the name of Nails or

7    Geronimo on the street.  Here is when the dispute

8    started.  Nichole gives Dude $20 for the Wet

9    cigarette with the understanding that he will pay

10   her back.  He tells you they all smoked off of it

11   and there came a time when they stopped and bought

12   some beer.  And he tells you they get back to his

13   house on Englewood where he is staying, he goes

14   in, he decides that he is not going to give her

15   the $20.  He tells you he gave her 10 because she

16   smoked off some of that cigarette.  She gets mad

17   at him and becomes hostile.  He tells you at that

18   point in time she picks up her cell phone and says

19   she's going to call her brother.  He says the next

20   thing he knows she's on the cell phone saying he

21   tried to play her.

22       She's on Englewood, and she describes this

23   blue and yellow Nautica jacket.  He tells you she

24   leaves, and the next thing that happens the

25   Defendants, Cordell Hubbard and Ru-el Sailor, pull

1    up, get out of their car, and Cordell Hubbard

2    says, What did you do to my sister?  He's talking

3    on the phone, pulls out the phone, and he hears him

4    say, Does he have a blue Nautica jacket on?  At

5    this point in time he sees Ru-el Sailor with a

6    gun.  What does he tell you?  It's time to go, and

7    takes off running.

8         Ladies and gentlemen, you will get a

9    definition of prior calculation and design, which

10   is a part of aggravated murder, from the Judge.

11   But at this point in time we have satisfied prior

12   calculation and design.

13        There is a call placed to Nichole Hubbard's

14   brother Cordell.  She gives a description and

15   tells him they F'd her up.  Her brother arrives

16   on scene with Ru-el Sailor as that is a plan, a

17   scheme, a preparation for what is to come.  It is

18   a complicity.  They acted together.  Ru-el Sailor

19   pulls up with Cordell Hubbard.  One has a gun, the

20   other is on the cell phone.  As you come to find

21   out with some other witnesses later on, the other

22   words are exchanged, If my sister says this is

23   you, your ass is out.  One with a gun and one

24   standing there on the cell phone threatening.

25        He says he takes off running, hears shots,

1  he feels something graze him on his butt.  As he

2  is running he comes to find out there was a mark

3  on him.  He was being shot at.  He returns home,

4  hides in his basement.  There is a lot of arguing

5  going on that he hears.  Later in time he comes to

6  view a photo array from the detectives.  He

7  immediately picks Cordell Hubbard as the one being

8  involved in this.  He sees another photo array,

9  and he came in and testified he did not know if

10 it was 3 or 5.  Couldn't tell you through the

11 photo if it was 3 or 5, but when he came into

12 court he pointed to Ru-el Sailor as the killer

13 in this photo array which you will be able to go

14 back and look at yourself.  No. 5 is the Defendant

15 Ru-el Sailor.

16      So through the testimony of Clark Lamar

17 aggravated murder as pertains to Ru-el Sailor and

18 Cordell Hubbard is satisfied.  There is prior

19 calculation and design.  They came with a gun as a

20 result of the sister's call.  She set the wheels

21 into motion.  11 shots were fired.  Not 1, but 11

22 shots.  It was no accident, but a specific intent

23 to kill him.  They all acted together.

24      We talked in voir dire about a bank

25 robbery.  Just because you might be the driver of

```
1    the getaway car doesn't mean that you are not

2    responsible for the crime.  You all have a

3    different role.  Also from his testimony you

4    learned in a kidnapping he is being restrained

5    from leaving when they get out of the car and

6    start this argument.  It does not mean that he is

7    able to leave the scene.  He is being restrained

8    by these two Defendants, one of whom is holding

9    the gun.  He takes off running.

10        There is also a felonious assault that is

11   established.  He gets grazed by the bullet from

12   the gun.  He did not receive any medical treatment

13   but he still suffered a wound because of a

14   firearm.  Again, the testimony from the EMS who

15   arrived on scene and Officer Desatnik when they

16   first arrived on scene Omar Clark was breathing,

17   he was alive, and at that point in time they

18   included in their report it was a felonious

19   assault.

20        You heard from other fact witnesses.

21   Michael Duckworth came in and told you he heard

22   upstairs in his bathroom a male and one female

23   voice arguing from his location.

24        Then you heard from Puddin.  Again, what

25   does she have to gain by coming in here and
```

1    testifying?  She used to be best friends, or close

2    friends with the Defendant Nichole Hubbard.

3    Through her testimony you learned her

4    participation in the crime of murder because she

5    tells you about all these phone calls and she goes

6    through all the calls that were made.  What you

7    learn in some of those calls, one, she's talking on

8    the other line with her brother.  She told you

9    that the brother who she was talking to was

10   Cordell, and she also tells you she heard arguing

11   in the background and she's hanging up.  They call

12   her again because they're concerned because of all

13   the crying going on and the Defendant says, He's

14   arguing with them, and she hangs up.  They are

15   very important and consistent with the cell phone

16   records that you will be able to review, but they

17   were not consistent with the statement Defendant

18   Nichole Hubbard made to the detectives from

19   Homicide.  You will also be able to review this

20   when you go back and deliberate.  You will be able

21   to review this statement of the Defendant in light

22   of these cell phone records.  That she made one

23   call, and she did not get through to him.

24          She also testified at another call she had

25   with the Defendant Nichole Hubbard Nichole told

1   her, My brother called and wanted to know if he is

2   still breathing.  The next day she drives around

3   with her, and Nichole tells Puddin as they are

4   going out looking for Wet cigarettes, Don't

5   discuss this anymore.  Don't discuss this anymore.

6   My brother says don't talk about it.  Their

7   friendship dwindles, as she talked to you about,

8   and she tells you there was one occasion maybe in

9   January where the Defendant came over to her house

10  and the next time she saw her was at a bar when

11  there was an altercation and the Defendant Nichole

12  Hubbard jumps on her at the bar and says, You're

13  testifying against me.

14       So, again, her testimony shows you and

15  tells us about the participation of Nichole

16  Hubbard, about the participation of this

17  Defendant, (indicating), as pertains to a murder.

18  Without Nichole Hubbard, this would never have

19  happened.  She made a cell phone call to her

20  brother Cordell, and there would only be one

21  reason she would call him.  And everything was

22  cool once she called him and got through to him.

23       You heard from Larry Braxton and, again, he

24  further substantiates and supports the State's

25  case beyond a reasonable doubt, of aggravated

1   murder and complicity to commit aggravated murder.

2   He told you on a number of occasions when he sat

3   up here and testified, If I call your sister, your

4   ass is out.  He will tell you this light-skinned

5   guy who had a cell phone, and tells us that, and a

6   number of times that you heard that.  It

7   substantiates the theory of complicity, of aiding

8   and abetting, of assisting, inciting, cooperating

9   with and encouraging somebody else.

10          He told you that he saw the guy with the

11   gun, he is dark skinned, and describes the red

12   headband.  You will see these photos that the

13   Defendants introduced, you will see they are

14   wearing red headbands in these photos.  The red

15   headband that Larry Braxton described, that Mr.

16   Mack put on the board.  He thought it was a red

17   jogging suit.  Red headband, you will see the red

18   throughout the clothing, through the jacket,

19   throughout Cordell Hubbard's shirt.  The red

20   jersey they are both wearing.  He told you that he

21   is about five ten, dark skinned, short black hair,

22   and came in here and identified Ru-el Sailor as

23   the shooter and said that he recognized him

24   because he was right in his face.

25          You also heard from Tenitta Johnson who

1    told you she was driving down the wrong way on

2    Englewood, she told you how she was going slowly,

3    there was a crowd of people.  Each person that you

4    heard from has a different view of what was going

5    on at the time.  She's driving down the street,

6    she sees a group of people, she recognizes

7    Brandon, Larry, Joseph.  As she's driving by she

8    sees the Defendant Cordell Hubbard in her face and

9    came in and identified him.  She said she heard it

10   was some type of argument, she did not know what

11   they were arguing about but she heard it.  It was

12   some type of an argument about a girl she thought.

13        She also identified Cordell Hubbard through

14   the photo array.  This is the same photo array

15   that Clark Lamar/Dude was able to identify Cordell

16   Hubbard.  You, too, will be able to see this photo

17   array when you go back and deliberate.

18        You heard from Brandon Gibbs.  He used to

19   live on that street.  Lives a couple streets over.

20   He said there are two guys that he knew, two guys

21   that he didn't know.  He heard, Can't talk to my

22   sister like that.  Then he said that he heard Dude

23   say, I didn't say anything to your sister.  And he

24   heard, I'm about to call my sister.  If she says

25   something differently, you're out.  He identifies

1  the dark-skinned person as the one doing the

2  shooting.

3  You heard from Joseph Mayhand who said

4  there was an argument in the same type of words,

5  I'm going to call my sister.  If she says it's

6  you, you're out.  You heard this over and over

7  again from the witnesses from the State of Ohio

8  constantly.  One with a gun, both had red on.  He

9  was not sure about the man with the gun.  He said

10  there was a guy on the phone, light skinned with

11  red, and he was stockier.  Again, you will be able

12  to see the photos.

13  You heard from Detective Metzler, the

14  investigating detective from Homicide.  He told

15  you all about the investigation.  Over and over he

16  told you the details how he received the names of

17  the suspects, and once he received the names how

18  he compiled a photo array.  First Nichole, then he

19  found out through further investigation the names

20  of Cordell then Ru-el.  Then, again, once he

21  received the names of each of the Defendants he

22  did the photo array and presented it to each of

23  the witnesses as they were available and as to

24  when he was able to do it.

25  He also told you, and you heard it read

1    into the record, the statement of Nichole Hubbard.

2    As I previously talked to you about, you will be

3    able to see this and you will be able to read it

4    for yourself.  We went kind of fast, but you will

5    have the opportunity to read through the statement

6    on your own.

7         You heard from the Defendants' witnesses.

8    Again, in looking at credibility what do they have

9    to gain?  Well, Samuel Brown was a friend of both

10   for many years and look at what he had to offer.

11   He confirmed the two were together that night.  He

12   confirmed they were together and wearing these

13   outfits, red headbands, described by some of the

14   State's witnesses.  He also, very importantly,

15   discussed and testified about some cell phone

16   records and talked about what was going on at this

17   bar at Benjamin's at 152nd Street.  He told you

18   what his cell phone number was, and he pointed to

19   a time on November 16th in the later evening hours

20   closer to midnight when he was calling the

21   Defendant Cordell Hubbard; however, they should

22   have been at the same bar at the same time at that

23   time.  So when you go through and look at the cell

24   phone records, you will be able to see there were

25   calls made despite the fact they were to be

1   together at this bar that was smaller than this

2   courtroom.  An alley-type bar.  He told you they

3   were there for an hour, Cordell arrived at 11:30

4   and stayed until 12:45 a.m.

5       When you look at the cell phone records you

6   will see on November 16th you can count the number

7   of calls that were made on November 16th from

8   11:30 through 12:45, and there is about 20 of

9   them.  At the same time he is supposed to be doing

10  karaoke on a stage going back and forth with some

11  other guy named Nettles while his cell phone is

12  going on and off throughout the entire time, but

13  we did not hear about him using the cell phone.

14      Then you heard from Miss McCreary, the

15  girlfriend of Cordell.  Still his girlfriend.  You

16  saw her demeanor, you saw her appearance as she

17  testified about her boyfriend.  She told you she

18  loves him, loves him despite him fooling around

19  with other girls.  You saw how she appeared

20  looking at him, talking about him, but she cannot

21  tell you where he was between those hours of

22  11:50, 12:45 a.m. because she was not with him and

23  could not tell you where she was.

24      Then you heard from Ru-el Sailor who came

25  in and told you, confirmed that he was with

1    Cordell Hubbard that night, and confirmed they

2    were wearing these outfits.  This was his jacket,

3    dark leather jacket, the light jeans with black.

4    He confirmed these photos and told you they were

5    together the whole night.  The clothes, the

6    outfits; all the same.

7         You heard from other witnesses who came in

8    and who could tell you that friends of Ru-el

9    Sailor, his family, they saw him in the morning

10   and they saw him the next day, but they don't know

11   where he was during that period of time.

12        So when you are looking at all this

13   testimony from all the witnesses collectively,

14   you are looking back together and rehashing all

15   the events that happened.  No one from the State

16   of Ohio had anything to gain by coming in here and

17   pointing to these two as being the Defendants on

18   scene and pointing to Nichole Hubbard as the one

19   making the cell phone calls.  They did not even

20   know them.  Collectively they all saw different

21   parts.  They were at different locations in the

22   street, driving in their car, and all saw

23   different parts of the events and all had

24   something to add.  When you put all the pieces

25   together sort of like a puzzle, it becomes crystal

1    clear.  Dude took $10 from Nichole Hubbard, she

2    gets her brother.  She's upset.  She calls her

3    brother, she's been played.  She sends him to

4    Englewood to take care of business.  He arrives

5    on scene with Ru-el Sailor.  They're together.  By

6    their own statements of their own witnesses, by

7    Ru-el Sailor's own statement, they are together

8    that night.  They confront the two, Omar and Dude,

9    make the cell phone calls, he's out, and the next

10   thing Omar Clark is dead.  Shot 12 times all over

11   a $10 Wet cigarette.

12          From these events there is prior

13   calculation and design, there is the plan, there

14   is the scheme, there is the preparation.  They

15   arrived with the gun, they have been called and

16   told where to go.  You're out.  All of the words

17   used shows the intent.  It is aggravated murder.

18   Purposely.  12 shots.  Not 1, but 12 all over his

19   body.

20          You heard Jermaine Kidd, what he told you

21   Omar Clark said before he died.  He said, I'm out.

22   When other witnesses said, Where you been shot he

23   says, All over.  Shot all over, over a $10 Wet

24   cigarette.  It's complicity.  They all acted

25   together.  This crime could not have happened

```
 1    without Nichole Hubbard, without Ru-el Sailor, or
 2    Cordell Hubbard.  They all acted together.  They
 3    incited, they carried it out together, they
 4    cooperated, they aided and abetted, and you will
 5    get that instruction from the Judge.  They all
 6    acted together with regards to the felonious
 7    assault and kidnapping and the murder charge as
 8    pertains to Nichole Hubbard, and Nichole Hubbard
 9    with Ru-el Sailor and Cordell Hubbard in the
10    commission of a felonious assault and a
11    kidnapping.
12        Use your common sense, as we stated from
13    the very beginning.  Back to the very beginning.
14    The same common sense you use every day, the same
15    common sense we talked about in any disputes that
16    you have to settle whether it is at work, whether
17    between your kids, and you listen to the
18    instructions Judge McDonnell gives you and apply
19    it to all the testimony that you heard for the
20    last two weeks.
21        Nichole got burned, she called her brother,
22    they take care of business.  Omar Clark is dead.
23    When you go back and deliberate and go through all
24    the testimony and all the exhibits that you will
25    see, I'm confident that you will find the truth
```

1       and justice in this case and convict each and

2       every one of these Defendants of all the crimes

3       charged in this indictment.

4               Thank you.

5               THE COURT:  Mr. Watson, on behalf of

6       Defendant Cordell Hubbard.

7               MR. WATSON:  Thank you, your Honor.

8               - - - - -

9    CLOSING ARGUMENT ON BEHALF OF DEFENDANT CORDELL HUBBARD

10              MR. WATSON:  Good afternoon, ladies and

11      gentlemen.

12              THE PANEL:  Good afternoon.

13              MR. WATSON:  You have listened here to the

14      evidence that has been presented for approximately

15      two weeks, and you have heard a lot of witnesses

16      who have testified in this case, a lot of exhibits

17      that have been introduced into evidence for your

18      review and consideration in this case as relates

19      to the guilt or innocence of Cordell Hubbard.

20              When I talked to you guys in voir dire we

21      talked a lot about presumption of innocence, we

22      talked about proof beyond a reasonable doubt, we

23      talked about credibility of witnesses.  All of

24      those things are things that you can consider in

25      your role as a juror in this case to come to a

1  fair result no matter if it is guilt or innocence.

2       Analyzing this case and breaking this case

3  down I think you can break it down into three

4  major components.  Those components are

5  identification, telephone calls, and the police

6  investigation in this case.  Looking at all those

7  aspects, which are part and parcel of the State's

8  case, are flawed.  Even if you were to consider

9  each and every part separately, or as a whole, you

10  will find their evidence should not satisfy you

11  that Cordell Hubbard is guilty of the charges as

12  outlined by the prosecutor in this case.

13       The State's first star witness is a person

14  by the name of Clark Williams.  We got a chance to

15  get to know Clark Williams who also went by Clark

16  Lamar who also was referred to as Dude.  We find

17  this person, as I said in opening statements, has

18  an 11-cycle criminal history from offenses of drug

19  trafficking, to possession of drugs, having a

20  weapon under disability, escape, that he had been

21  to prison by his own admission 7 times.  Even

22  beyond this we have Clark Lamar/Clark Williams

23  that during the period of time when this event

24  occurred that he consumed alcohol, he used PCP,

25  and he used marijuana.  He further told us that

1    since 1985 he's done as such; used PCP.  In '88

2    he graduated to cocaine and marijuana.  Why is

3    this important?  This is important because, ladies

4    and gentlemen, you are being asked to rely on his

5    testimony which is identification testimony in

6    this case.

7              Let's look at his identification testimony

8    in spite of what we all know about Dude or Clark

9    Lamar.  What we know, ladies and gentlemen, when

10   the first police officer who arrived on scene,

11   Officer Desatnik, when Officer Desatnik told us,

12   and it will be in Joint Exhibit 1, you can take a

13   look at it, is that there was a dispute with a

14   female and that dispute was with Omar Clark.  We

15   further know from that description that he

16   identified two people who were suspects.  He gave

17   a description of five eight, medium brown skin,

18   mustache, slight mustache, short haircuts, ranging

19   from 200 pounds apiece, and they look like

20   brothers.  What we know, ladies and gentlemen, if

21   we look at both Cordell Hubbard and Ru-el Sailor,

22   they do not bear any resemblance as brothers.

23   They don't bear resemblance.

24              Later on in that testimony Clark Lamar/

25   Clark Williams said, Now I remember.  Now he has a

1    goatee because that was not included in his first

2    description, and that description would not be

3    consistent with the photo array because you see

4    Mr. Hubbard has a beard or small goatee under his

5    chin.  We talked about power of suggestion, how

6    someone's description will change.

7         He told us in this courtroom, I'm sure all

8    of you remember him testifying, he said the person

9    was, My same height and he was bigger than I was,

10   and he was medium complexion.  I asked him, I

11   said, looking at State's Exhibit 131, can you tell

12   us do any of the photographs themselves bear any

13   resemblance to Cordell Hubbard?  He said, No,

14   these people do not resemble him at all.  His

15   description.  I said, You said that he was medium

16   brown skinned?  He said yes.  I said, Can you

17   agree that he is light skinned or light brown

18   skinned?  He said yes.  I said, That is different

19   than medium brown skinned.  He said yes.  I asked

20   him to look at the photo array and said, Doesn't

21   the photo give the appearance that he is brown

22   skinned and that his appearance before you is that

23   he is lighter skinned?  He agreed with me.  He

24   said, Yes; that's true.  Because of that fact we

25   know that his description or identification grew,

1    and it grew because, ladies and gentlemen of the

2    jury, what we do know is Umar Clark had influence

3    over this investigation and the people that he

4    spoke to.

5            MR. THOMAS:  Objection.

6            THE COURT:  Overruled.

7            MR. WATSON:  We know from the 9-1-1 tape

8    broadcast there were two complaints coming out of

9    10622 Englewood.  That the first complaint was

10   given by a female by the name of Harriett Brooks.

11   She tells us there are men, three or four men,

12   that are at my door, they are wearing dark black

13   clothing, they have firearms.  You heard the

14   stressed intention of her voice.  We knew at least

15   from Detective Desatnik by the time he arrived

16   there there were relatives of Omar and Umar

17   present in the home, and they were acting

18   surreptitiously or secretly in that Clark Lamar

19   was being evasive.  I believe that is the term

20   that he described, and even thought it was very

21   suspicious.

22           There was a further call on the 9-1-1 tape

23   calling from the same house, ladies and gentlemen.

24   A male voice by the name of Maurice.  Through that

25   voice he said the same people who were doing the

Cuyahoga County Prosecutor's Office 5092460 198501 V5560736-5058 PR21

1   shooting, they are back, and this is at 4:59 which

2   is several hours later.  Which goes to my mind

3   something is amiss here because the prosecutor and

4   the State of Ohio, they are suggesting to us they

5   are saying, well, this disturbance is related to

6   Umar Clark knocking on the door by himself and

7   entering the premises.  Are we supposed to assume

8   that because the State of Ohio tells us this

9   that it could be the case?  Did they present to

10  you evidence that that is what it was about and

11  that the descriptions given on the 9-1-1 tape were

12  separate and apart of what happened here?

13          The prosecutor tells us that there were no

14  guns involved.  There was no one knocking on the

15  door with guns trying to get in.  I thought what

16  was very interesting was that when I asked the

17  detective, I said, Well, did you hear the part

18  where there was a response?  Was there a response

19  to the complaint made by 10622 Englewood?  He

20  said, Well, I heard it.  I said, Well, what is

21  your reaction to it?  We never played this for the

22  jury, but in that tape when the police officers

23  arrived to that complaint no one was there.  So

24  what that suggests to us, ladies and gentlemen,

25  the persons that were there were gone, and when

1   Officer Desatnik tells us there were other

2   relatives that were present inside the home

3   talking with Clark Lamar, those are two separate

4   events.  I want to play this brief portion to you

5   that you did not hear in court.

6          MR. THOMAS:  Objection.  May we approach?

7          THE COURT:  All right.

8                 - - - - -

9                 (Thereupon, a discussion was had

10                 between Court and counsel outside

11                 the hearing of the jury and off the

12                 record.)

13                 - - - - -

14                 (Thereupon, the following proceedings

15                 were had in open court:)

16                 - - - - -

17                 (Thereupon, the 9-1-1 tape was

18                 played to the jury.)

19          MR. WATSON:  I think that is a very

20   critical point, ladies and gentlemen, because what

21   we know from Officer Desatnik is that when he did

22   arrive shortly thereafter, and I think he posted

23   his time somewhere 12:45 that he was present,

24   other people were there on the premises when he

25   conducted his interview with Clark Lamar.  So that

1    suggests to us the persons that the State of Ohio

2    alluded to were those people, the same people who

3    they now say were inside the house talking with

4    the family members of Harriett Brooks and Lonnell.

5    Are we simply supposed to adopt or accept what

6    they told us even though they have not prepared

7    any witnesses to say, yes, those people at my door

8    did not have firearm, were not wearing dark

9    clothing, and were not carrying firearms when they

10   were banging on Miss Brooks' door?

11        Now, when Clark Lamar tells us about the

12   manner in which this happened, ladies and

13   gentlemen, I think it's very, very important to

14   listen to certain parts of what he tells us.  The

15   prosecutor asked and I so asked, let's think about

16   what is common sense.  We know from Clark Lamar he

17   tells us that two men jumped out of a car, a red

18   car, and he is confronted by someone who later he

19   identifies as Cordell Hubbard.  And the person

20   comes up to him and says, Why you messing with my

21   sister?  Why you F'ing with my sister?  That sends

22   a red signal if someone calls you and wants to

23   interview you on their behalf to see what the

24   problem is, isn't the first thing a person is

25   going to say is, Hey, are you Dude?  Are you Omar?

1   Wouldn't that be the first thing they would come

2   up to that person and say?  It doesn't make sense.

3       From his testimony he tells us at the end

4   of the conversation before the shots were fired he

5   says, I'm going to call my sister, and if you have

6   this Nautica coat, you're outta here or, your ass

7   is out.  Now, if that was the last statement that

8   was said during this conversation what is he

9   arguing with a person that he doesn't know the

10  identity of?  Doesn't make any sense because the

11  stories do not jibe through their witness.

12      We heard a lot about identification, and

13  the reliability of identification.  We know when

14  we evaluate someone's identification testimony

15  we have to look at all factors involved.  Which

16  brings me to a very important point about Tenitta

17  Johnson.  Tenitta Johnson came in and testified

18  and said that he was the unfamiliar face on 105th

19  and Englewood.

20      Now, we know she was confronted with the

21  9-1-1 tape while she's perceiving the event,

22  ladies and gentlemen.  She cannot ascertain

23  whether or not a person is actually getting shot,

24  or if gunshots are being shot in the air which

25  suggests to us, ladies and gentlemen, that she was

1   not as close to the event as she may suggest

2   because she tells us she said, Mr. Watson, I

3   didn't say those two people that I could identify

4   them, which was true, she said the unfamiliar face

5   that is involved in the argument.  Wouldn't a

6   logical step when you are talking to the radio

7   dispatcher be to say, look, there is one guy, he

8   has this height, this weight, this build.

9   Arguably he is one of the guys that left in a car

10  because he was unfamiliar and I knew all the other

11  people.

12          She told us, ladies and gentlemen, she

13  thought she made two calls and she explained the

14  whole scenario.  We know, ladies and gentlemen,

15  she only made one 9-1-1 call.  We know that

16  because all 9-1-1 calls are recorded.  You talk to

17  the dispatcher and they are recorded.  She was

18  wrong.  She told us initially that she said I

19  didn't want to get involved in all this.  I didn't

20  deal much with the police.  They had to seek me

21  out, they had to find me.  Lo and behold, what did

22  we find in the field report is that she is one

23  of the reporting persons.  What we find is that

24  the description is not what she described in

25  court, but the name of the person along with Clark

```
 1        Lamar they gave the same and similar description
 2        and nothing is noted in that report of this
 3        light-skinned person.  Where is it?  It wasn't in
 4        his report, and we know and police officers are
 5        going to interview people, they get phone numbers,
 6        they get employment, where you work, where your
 7        phone number is.  Magically, we don't get a
 8        written statement from her until two days before
 9        the man's trial.  I ask, what is going on here?
10             We were told by Mr. Metzler, Well, Mr.
11        Watson, we're so busy, and we could not locate her
12        and we've got a heavy plate.  But I'm convinced on
13        December 1st when we took her statement on
14        December 1st she was able to identify your client.
15        And we have to accept his word for that because
16        there is nothing memorializing that.  And
17        certainly her statement does not lend itself to
18        the idea she ever picked out a photograph before.
19             We talked about the idea trying to
20        corroborate what has been done.  That is
21        fundamental police work.  I asked Detective
22        Metzler, I said, Is it customary to have the photo
23        array and the written statement so there is no
24        problem and there is no dispute in the written
25        statement?  Yes, it is customary.  Now all of a
```

1  sudden he does it with two witnesses.  He does it

2  not with one witness but two witnesses.  Ask

3  yourselves, what is going on here?  What type of

4  investigation is going on here in this case where

5  you have witnesses purportedly making

6  identifications without accompanied written

7  statements and all we can rely on is the

8  detective's word.  He says, Take my word for it.

9      Now what we further know, and I think it's

10  a theme in this case because the witnesses, even

11  though we can agree this argument took place maybe

12  in ten minutes, that the only thing that "the

13  witnesses who observed the event" was that a

14  sister's reference was made, that Omar was

15  probably familiar with one of the persons that

16  were present, and the fact that I am going to take

17  him out or something if that's you.  I suggest to

18  you, ladies and gentlemen, if those are the only

19  three things that stick out in your mind, that is

20  working the power of suggestion.

21      We know that Umar and his family asked Larry

22  Braxton, Who shot my brother?  Can you describe

23  him?  He gave Umar a description.  He said, Well,

24  that sounds like that might be Cordell.  But this

25  is after the fact, after he's talked to Clark

1    Lamar/Clark Williams about this.  Then he had

2    to give some type of explanation of what happened

3    here.  I'm suggesting to you because of all this,

4    surreptious under-the-cover type conversations

5    that we don't know about this.  The State of Ohio

6    doesn't tell us what they are all about.  How can

7    we be sure it was about Nichole?  But what we do

8    know is that once Cordell Hubbard's name is used,

9    then the investigation centered on that and not

10   the reasonableness of his testimony.

11        Detective Metzler told us -- I asked Clark

12   Lamar, I said, Mr. Williams, can you tell us why

13   wasn't the police ever directed toward the

14   driveway or the house so that some evidence could

15   be confiscated?  You won't see any exhibits, you

16   won't see any information, you won't see any

17   cooperation, any police work relative to Detective

18   Metzler and what Detective Veverka had done that

19   they looked to confirm that Clark Lamar was even

20   shot at.  They didn't do it, ladies and gentlemen.

21   But then, again, we have Detective Metzler.  Again

22   he tells us, Mr. Watson, we saw the discoloration

23   on his buttocks.  What any police officer would do

24   is take a picture.  He would look at his clothing.

25   That wasn't done here.  Did they believe him then,

1    or do they believe him now?  There are a lot of

2    things that were not done by the Cleveland Police

3    Department in connection with this case.

4         Now, I want you to look at these telephone

5    calls because these telephone calls are important

6    in this respect.  Remember when Puddin testified

7    in this case, Miss Taylor?  She told us that

8    there was a three-way call.  I want you to look at

9    12:05.  That is the call waiting mechanism that is

10   connected with that phone call.  She told us that

11   when she beeped in with Nichole she was told that

12   they were arguing with the boys or something to

13   that effect.  But we know that that call waiting

14   call that happened again did not occur until

15   12:33.  And you will be able to look at their

16   exhibits to correlate the telephone calls because

17   it does not fit in the time line.

18        You listened to the tape of the 9-1-1

19   calls.  What we do know is that the call, the

20   three-way call, you will see from State's 141 and

21   State's Exhibit 140 that that call, three-way

22   call, was made at 12:05.  That is important

23   because the number that was called according to

24   Puddin was that they were arguing.  So when the

25   detective suggests to you this happened at 12:15

1    they know they have a problem, ladies and

2    gentlemen, because the witnesses who testified in

3    this case said that this happened very quickly.

4    This was not 20-minute interval argument because

5    if it was a 20-minute argument everybody would

6    have been on the street.  This happened in 4 or 5

7    minutes so they can't reconcile that call with her

8    because they know that the homicide took place

9    based upon the 9-1-1 call at 12:26.  So that means

10   it happened or occurred shortly before.  And you

11   listen to the tape, and you can tell from the

12   9-1-1 call it was very recent.  We know that if

13   she says that he's arguing with them at 12:05, if

14   we are to believe her it does not fit in that

15   time.

16         Prior calculation and design, ladies and

17   gentlemen.  It doesn't fit.  That is why they want

18   to change it.  That is why this detective

19   volunteered and said no, no, no.  The other

20   detectives told us that this happened at 12:15.  I

21   want you to look at those records closely because

22   there are going to be additional phone calls that

23   were shown other than the phone calls that were

24   made by the State of Ohio isolating just Nichole's

25   calls and Cordell Hubbard's calls.  What they

1    didn't tell you, ladies and gentlemen, during that

2    time before the calls they talk about, that there

3    were several calls that were made between Cordell

4    and Nichole.  Here we have a call up to 6:25.

5    This is the proceeding day of the homicide there

6    is a call made to Nichole from Cordell at 6:25.

7         There is another call that is at 6:50 that

8    was made by Cordell to Nichole also which is not

9    depicted on my exhibit because there are some

10   exhibits with some phone numbers that I want you

11   to look while you're there.

12        You will examine that there was also a call

13   made from Nichole to Cordell at 6:51, 6:52, and

14   7:02 which are calls that are in rapid succession.

15   They didn't have anything to do with a homicide

16   but I thought what was very interesting when Miss

17   Taylor told us she wanted to go to the party and

18   she mentioned the 4U2B club.  I think it all ties

19   in, ladies and gentlemen, because those phone

20   calls were probably relating to whether or not

21   they would go out or not, and they would suggest

22   they were plans that were made.

23             MR. THOMAS:  Objection.

24             THE COURT:  Overruled.

25             MR. WATSON:  The prosecutor did not isolate

1    those telephone calls because it did not fit in

2    his scenario of what he thought the relevance of

3    the calls were.  We also know, ladies and

4    gentlemen, in the statement, and the State made a

5    big deal about it, well, we knew that Samuel Brown

6    had made telephone calls to Cordell, we know that

7    Ru-el Sailor made telephone calls to Cordell

8    Hubbard, but because they're not exact as relates

9    to those times does that mean that what they are

10   saying is not true?  Their witnesses were unable

11   to tell us with any specificity what times were

12   called.

13        They asked Miss Taylor when was this call

14   made.  Particularly in cross-examination she

15   basically said these calls were 15 minutes apart.

16   She told us, I don't know what the times are.  But

17   by the same tone the State wants to question the

18   witnesses who are telling us that they were

19   together at The Benjamin Bar and they were

20   together at the 4U2B club and they were together

21   at St. Aloysius.

22        The prosecutor showed you some photographs

23   and we present them as exhibits because we contend

24   and we believe that they were at St. Aloysius.

25   The prosecutor wants to probably make a big deal

1   about the headband and the red.  Why would the

2   Defense present this to us?  Ladies and gentlemen,

3   it's not like Detective Metzler suggested that we

4   are trying to hide something from you.  We believe

5   that they were, in fact, at St. Aloysius and that

6   those pictures were taken.  What adds to our

7   belief, our case, is that we know that Brandon

8   Gibbs, that Jermaine Kidd, Larry Braxton, Joseph

9   Mayhand did not pick my client as being on

10  Englewood.  And those persons, even though their

11  descriptions vary among themselves, they were

12  closer than Tenitta Johnson.

13         So what does that tell us?  That those

14  identifications we can't rely on.  We cannot rely

15  on them on this case because the circumstances in

16  which the identification was made were

17  questionable and highly dubious how they were

18  gotten.

19         Now, the State of Ohio tells us that these

20  identifications are strong enough for your

21  reliance.  But what we do know is that we have

22  descriptions that vary among the color scale, the

23  skin complexion scale, the hair scale.  Now, they

24  were asking questions about these hairbands.  What

25  I recall Larry Braxton telling us, it could have

1  been a headband, or it could have been a visor, or

2  some type of hat but he cannot distinguish which.

3  Now, we know that that is a popular type of head

4  gear if, in fact, his identification is correct.

5  But we have to say that his identification is

6  questionable because he cannot make an

7  identification of Mr. Hubbard.

8       We heard from Clark Lamar, Well, I can't

9  identify the second guy but when we get in court

10  I'm going to identify the suspect with the gun.

11  We are going to do that because he's there.

12       MR. THOMAS:  Objection.

13       THE COURT:  Overruled.

14       MR. WATSON:  We are supposed to take his

15  word for it.

16       Now, the State of Ohio tells us that even

17  if you accept their version, which we don't, that

18  they made their case in complicity.  How did they

19  do that?  Their own witnesses say the dispute

20  between the two guys became Omar and the person

21  with the gun.  And that Cordell Hubbard, if you

22  believe it, which we don't, is in dispute with

23  Dude.  They have not presented any evidence,

24  ladies and gentlemen, about their complicity

25  theory other than a convaluted version there was a

1   solicitation made by the sister and the sister

2   sent her brother down there, but they don't have

3   any contents of any conversation.  Did they make

4   their case?  I don't think so.

5       You promised us when we asked you that

6   despite the fact of what type of case it is that

7   you would hold the State to their burden of proof

8   in this case.  That they would prove it.  If they

9   make the charge, they shall prove it.  And it

10  hasn't happened here, ladies and gentlemen.  When

11  you carefully examine the phone records, which I

12  am imploring you to do, you will find that the

13  calls that were made and their witnesses who claim

14  that Nichole told them that something was going on

15  with their brother, it doesn't fit in the theme or

16  the time line in their case.

17      When you examine all the evidence, ladies

18  and gentlemen, you will find that they did not

19  make their case.  And, invariably, in any case

20  which you are talking there are some points that

21  may have been left out because the powers of

22  recall and memory, they are limited.  But it

23  wasn't because I didn't want to address it.  It's

24  just that I just didn't think about it at the

25  time.

1    When you go back in the jury room, I want

2    you to carefully consider the evidence in this

3    case and that this man's, (indicating), life is at

4    stake.  And I'm sure when you have satisfied

5    yourselves that you have done that, you will come

6    to a fair result.

7    Thank you very much.

8    THE COURT:  Mr. Mack, on behalf of the

9    Defendant Ru-el Sailor.

10    - - - - -

11   CLOSING ARGUMENT ON BEHALF OF DEFENDANT RU-EL SAILOR

12   MR. MACK:  Judge McDonnell, Mr. Thomas,

13   Miss Clancy, Mr. Watson and Mr. Willis and, of

14   course you, ladies and gentlemen of the jury,

15   again I started out earlier Friday making a

16   complete apology for making a donkey out of

17   myself.  I apologized to this Honorable Court

18   because, again, it should not have happened in the

19   court and I acted very unprofessionally.  Needless

20   to say when I was doing voir dire I always give

21   the example, if I do something stupid see me after

22   court.  Needless to say, I never thought that I

23   would have to tell you that I made a big mistake

24   and, again, I ask you if you take that into

25   consideration please don't hold it against my

Cuyahoga County Prosecutor's Office 5092460 198501 V5560736-5074 FN31      11/16/2020 Page 5074

1    client.  Really.  Tell me, write me a letter.

2    I'm in the telephone book too.

3            Ladies and gentlemen, when we started out

4    this particular case one of the things that I

5    asked you to do is to look at the witness stand

6    and I asked you to consider the witnesses that

7    would come into court.  And when I indicated

8    during the voir dire the witnesses would come in

9    and they would supposedly give their God-given

10   testimony what they saw, what they heard on that

11   particular night of this particular incident, at

12   that time I indicated to you as well you are the

13   sole judges of the credibility or the

14   believability of all witnesses.  And that still

15   remains true.  I'm going to say some things but,

16   again, it's you who will go back in the jury room

17   and you will be the ones who will decide what are

18   the facts in this particular case.

19           We started out, ladies and gentlemen, I

20   also told you during the voir dire that it is not

21   the quantity of the evidence that is coming into

22   this particular courtroom.  If you look at it, the

23   State has over a hundred exhibits.  But it's not

24   the quantity of the evidence, it is the quality of

25   the evidence that is coming in in this particular

1  case.  Again, I suggest to you that you take a

2  look at what is the quality of the evidence.  And

3  after you look at all the evidence and view all

4  the evidence can you truly say in your hearts that

5  the State of Ohio has proved its case beyond a

6  reasonable doubt?

7       Now, as I stand here I only represent Ru-el

8  Sailor.  As I have indicated before, that is my

9  responsibility and that is whom I am addressing

10  mostly in this particular case.  You will make

11  your decision as to the evidence in this case, but

12  just did they prove his case beyond a reasonable

13  doubt?  The State of Ohio stands up and says, Who

14  has the motive to get anything out of this

15  particular case?  But, ladies and gentlemen, let's

16  look at this.  There are two sides in here.

17  Remember during the voir dire I said there are

18  always two sides to a game.  Sure enough the

19  Defendants are there, but just because they are

20  sitting there -- remember, the Judge told you the

21  indictment is just to inform you that they have

22  been charged with a particular crime.  It is not

23  evidence of itself.

24       There are motives in this particular case

25  from both sides.  That side over there,

1   (indicating).  And, again, I sympathize with them

2   and know they look at me because I'm on the other

3   side but I sympathize with their loss on that

4   particular night.  And they do have a motive as

5   well.  Their witnesses who came into court were

6   all very good friends.  They all testified they

7   were friends gone back from ten years, some were

8   kids that grew up together.  They want to see the

9   persons that did this crime out on that particular

10  night.  So, yes, they are overly zealous.

11          So, again, we ask you to use your common

12  sense.  What does everyone in here have to gain

13  from both sides?  Again, I ask you to think about

14  this.  There will be biases that will be coming,

15  prejudices coming in, and there will be sympathies

16  coming in, but you will not -- you will have to

17  set that aside.  You cannot use that bias,

18  sympathy and prejudice.

19          It was all about a $10 square, as the State

20  has indicated and so forth.  Yes, that is supposed

21  to be put out there and, yes, that is supposed to

22  get you to have some bias against the Defendants

23  because it is a senseless thing.  Yes, it is, but

24  that is not your job.  Your job is to determine

25  whether or not by the facts and the evidence and

1   the explanations that have come in this particular

2   court, have they proved their case beyond a

3   reasonable doubt as far as Ru-el Sailor is

4   concerned?  I would say to you when you start

5   thinking about motive, yes, there is motive on

6   both sides, ladies and gentlemen.

7   Now, we talked about suggestibility.  Mr.

8   Watson talked to you about suggestability.  He

9   cross-examined and talked about suggestion, the

10  power of suggestion.  That someone can put a power

11  of suggestion into your head.  Let's take a look

12  at this, ladies and gentlemen, even before I go

13  into my close.  I took the time, I tried, as bad

14  as my writing is, to indicate to you about the

15  credibility of the identification process in this

16  particular case.  Now, regardless of what time of

17  day or night, or how far you are from me, if I am

18  two feet away, five feet away, or ten feet there

19  should be, as I said, some inconsistencies in the

20  identification.  There was only one shooter.  If

21  you believe the State's case there was only one

22  shooter so there cannot be any doubt as to

23  multiple shooters.  If you had multiple shooters

24  you would have multiple descriptions who was there

25  that night and who did the shooting.  We know

1    there is only one person.

2        So tell me, ladies and gentlemen, when you

3    go back and if you really look at the

4    identification process, because you've got to take

5    a look at some factors to see that, did the

6    persons really have an opportunity to see that

7    night?  What were they concentrating on?  And so

8    forth.  What was the distance they were when they

9    saw what they saw?  And, again, what is the

10   lighting?  How can you tell?  And, again, if I am

11   wrong, one, two, three, four, five, six -- you

12   have six different witnesses the State brought in

13   and the State is trying to say on this particular

14   case that it is the same shooter.

15       Now I suggest to you, ladies and gentlemen,

16   Dude is the one that is the closest to the action

17   on that particular night, and he is the one who

18   has the idea who can see better.  There are two

19   different descriptions.  Once he says the person

20   was light skinned, and then he testified with the

21   patrolman that he was brown skinned.  And if you

22   say brown skinned or light skinned, ladies and

23   gentlemen, there is no way in the world that you

24   can determine or you can sit there and say -- and

25   it is relevant in an African-American society that

1    skin tone is very, very distinguishable.  It is

2    not a mystical thing as to whether you are light

3    skinned, whether you are brown skinned, or whether

4    you are dark skinned, ladies and gentlemen.  You

5    are either of the three.

6         Here we go.  Dude says brown skinned, and

7    earlier he had testified light skinned and they

8    looked like brothers.  Now, that is the same

9    shooter.  This is the shooter.  Then we cannot

10   have any conflict or any disagreement.  And you

11   heard me specifically ask him whether or not he

12   could identify the person.  If you remember I

13   took the transcript, I went up to him, ladies and

14   gentlemen, I read back the question because I

15   didn't want it to have any influence in what he

16   had said on another occasion.  I asked the

17   question, and this was asked by Mr. Thomas, Do you

18   remember the color of the car?  He said, No,

19   sir.  Do you remember the other person that

20   arrived with the person that is talking to you?

21   His answer was, No, I do not remember.  Then I

22   asked, How are they dressed?  He said, T-shirts

23   and jeans.  He doesn't remember.

24        The Judge will instruct you.  That was the

25   first testimony that this person gave on this

1    particular night.  Don't forget this testimony was

2    given or description given to Detective Metzler

3    on or about November the 18th.  This is the very

4    next morning after that.  This is how he describes

5    the person and everything as brown skinned, but he

6    did not remember what their faces looked who.

7         We talk about motive.  What is his motive?

8    His motive is for Umar Clark, who was his good

9    friend.  He comes in here, and the Judge will tell

10   you, are their testimonies any different on an

11   earlier date than their testimony they give at

12   trial?  He came in here at trial and tried to say,

13   oh, after all those months I now can be sure

14   without a doubt that it is Ru-el Sailor.  And

15   despite trying to get around what he said earlier,

16   he tried to take the testimony and he tried to use

17   it and manipulate it to fit that man over there,

18   (indicating), ladies and gentlemen, to fit it

19   because the motive is we can't let anybody come

20   out of Englewood do this and do this to my friend

21   and get away with it.  If he was sitting there at

22   that table with Mr. Hubbard, then he must have

23   done it because the police put him there.

24        I will get to the police testimony in a

25   moment, okay?  Again, that is one person who

1    describes the shooter.  And let's take another

2    look at somebody else.

3           Tenitta Johnson comes in, she sees only one

4    person there.  She doesn't see my client there.

5    Joseph Mayhand, he was a nice young man that sat

6    right there.  He told you the guy was light

7    skinned.  We're only talking about one shooter.

8    Light skinned.  We went through that.  He said

9    light skinned, then he said he had on a red

10   jacket and I do believe a red shirt.  I ask of

11   you, and I'm jumping way ahead, you will have

12   these exhibits, Defendant's Exhibits M, N, I do

13   believe there is an O, you look on here and you

14   tell me on this particular night if my client had

15   anything red on there.

16          Now, Mr. Mayhand is not the only person

17   that said the person had on a red jogging suit, if

18   you recall.  Jermaine Kidd said that the person

19   who was there also had on -- he said the gunman

20   had on a red jogging suit.  My client did not have

21   on a red jogging suit.  Still talking the same

22   gunman?  Do we have multiple gunmen, or still

23   talking about the same gun?

24          Brandon Gibbs was also there.  The

25   over-zealous try to get somebody to put somebody

1    there, Mr. Gibbs.  He is closer than Mr. Braxton

2    is.  He says, Wait a minute.  The guy is light

3    skinned.  I think he changed it some down the road

4    and said now the gunman is dark skinned.  What is

5    so curious about his testimony?  He said the

6    gunman was dark skinned, and in all black, and he

7    was the one with the cell telephone talking, Did

8    you do something to my sister?  Ladies and

9    gentlemen of the jury, how many brothers does

10   this person have out there on that particular

11   night?  Are we talking the same shooter?

12        Let's move on, okay, to Larry Braxton.

13   Larry Braxton comes in on the very next day after

14   this happened.  Jermaine Kidd and Larry Braxton

15   were talking to Umar Clark the very next day.  The

16   strange thing that came out to me when I asked him

17   on the stand, I said, When you gave a description

18   to Umar of the person who was the shooter, what

19   did he say, ladies and gentlemen?  He said it

20   sounded not like my client.  I think you all

21   recall who he said it sounded like.  So, ladies

22   and gentlemen, if it sounded like that person that

23   he was describing, that person was not dark

24   skinned.  He said the name of that person was a

25   light-skinned person.

1    So ladies and gentlemen, it all starts out

2    with a light-skinned shooter who looked like a

3    brother but by the time it got here it came out he

4    was a dark-skinned person.  They saw him sitting

5    there and wanted to make this happen.

6    What was the other thing that was very

7    strange about this testimony and the credibility

8    of the witnesses?  Dude who was there, who was

9    right in the midsts of the situation, what did he

10   tell you about the lighting?  He told you it was

11   dark out.  If you recall, I asked him on the

12   witness stand if he can describe the lighting.

13   Question:  Was there any street lights in an area

14   you were standing?  His answer was:  No, it was

15   dark.  It was real dark.  Because you go down

16   Englewood there are a lot of trees on Englewood.

17   So if it was street lights, the trees would have

18   blocked them out.  Ladies and gentlemen, who are

19   you going to believe?  Dude who is there, who

20   tells you it's dark, then the people who get

21   together afterwards in the neighborhood on the

22   street and all of a sudden everybody else that

23   came in here says it's light.  Let there be light

24   out.  I can see everything.  I can see mustaches

25   that a person had on pencil thin.  I can see

Cuyahoga County Prosecutor's Office 5092460 198501 V5560736-5084 PKG1

1    weaves in a person's hair.  It was that light out

2    there.

3         Now ladies and gentlemen, again, we ask

4    you to think about your common sense and ask

5    yourselves whether or not at that particular time

6    anyone can really see any weaves in anybody's hair

7    at that particular time.  I suggest to you they

8    didn't.

9         The other thing that really got me, I could

10   not do anything about it, when I asked Detective

11   Metzler how do you come up with Ru-el's name he

12   says, there was some witnesses or something.  You

13   recall it.  I said how do you get it, because we

14   have no way of checking.  What did he tell you?

15   Detective Eugene Jones came up and said a

16   confidential informant told him.  Ladies and

17   gentlemen, they had a trial date back in March,

18   they were able to go out and get everybody else's

19   statements and the other witnesses in March two

20   days before Cordell's trial, and my client was not

21   even indicted at that particular time.

22        MR. THOMAS:  Objection, your Honor.

23        THE COURT:  Overruled.

24        MR. MACK:  Do you think, ladies and

25   gentlemen, if they had this confidential informant

1    all they had to do -- They got two big police

2    officers.  The police officer here, and Detective

3    Veverka right there, (indicating).  All they had

4    to do is bring this person in to the courtroom,

5    sit him there just like they did everybody else

6    and say what they said.  We don't know what they

7    said.  Again, I'm saying how come we didn't know

8    what the witnesses said, only what the detective

9    said?  Okay.  Something is wrong with that.

10        Also, in addition, when the identifications

11   were made Detective Metzler told us on the stand,

12   I wasn't there when the photos were taken but my

13   partner was.  Well, Detective Veverka is sitting

14   back there, he has been here every day, he's also

15   worked with the witnesses but in order for us

16   to get him to say how was the procedure done, what

17   was the correctness of the procedure, he would

18   have had to get on the witness stand.  He's been

19   here.  It's not like he has been somewhere else.

20   Yet he did not come in and we did not get that

21   opportunity to talk to him to find out what the

22   identification was on that particular night.

23   Again, why did we not have this?

24        The other thing is Detective Jones, Eugene

25   Jones, a city employee.  He's able to be in here.

```
 1    The prosecutors know where he is.  Ladies and
 2    gentlemen, don't you think if a detective had
 3    supplied that information, had that information of
 4    some confidential reliable informant, he knows
 5    these people are guilty, he would have come and
 6    sat on the witness stand and told you that was the
 7    case?  And they didn't do it.  And I asked them
 8    about it and they still did not produce him
 9    because, again --
10         MR. THOMAS:  Objection, your Honor.
11         THE COURT:  Overruled.
12         MR. MACK:  Ladies and gentlemen, I ask you,
13    these persons all testified they had never seen
14    any of those persons out there that night.  Not
15    the shooter and not the person that was arguing
16    with them.  If you don't see anybody and don't
17    know them, you come back later and you identify
18    them, I asked the detective what was Eugene Jones
19    doing out there?  Mr. Watson asked him what was he
20    doing out there.  We know he was not authorized to
21    be there to do what he was doing.  He was like the
22    phantom man behind the scene doing something out
23    there that night.  We didn't have the opportunity
24    to ask him did you have a picture of Ru-el Sailor
25    because think about this, ladies and gentlemen,
```

1    Ru-el Sailor's picture, according to the police

2    officers, was picked out that night but his

3    picture and skin tone matches none of these

4    descriptions right here.  So tell me how, if they

5    don't match the description, if they don't match

6    the color tone, how are you able to pick out this

7    picture?

8         Ladies and gentlemen, it doesn't take a

9    rocket scientist to figure out what was going on

10   in this particular case.  And they did not bring

11   that in to you.  And don't forget we don't have to

12   prove anything at all.  We are here, and we are

13   expecting the State to prove its case beyond a

14   reasonable doubt.  And they did not do it.

15        Here is the other thing.  Ellen Taylor.

16   Ellen Taylor, the lady who came in with the red

17   wig or whatever on.  She told you she didn't

18   see Ru-el do any shooting on that particular

19   night.  The thing that is most important of all,

20   she came in and told you about all the

21   conversations Nichole was having with her brother.

22   I asked her one thing.  That night, did you ever

23   hear Ru-el Sailor's name mentioned?  She said no.

24   The next day, did you hear when Nichole was

25   supposedly still talking did you hear her mention

1    Ru-el Sailor's name?  No.  The time that you had

2    this alleged confrontation with her did you hear

3    Ru-el Sailor's name?  No.  Ru-el Sailor has never

4    come up.  Nichole was talking all that night

5    and she did not even mention Ru-el Sailor's name

6    if you want to believe that.

7         Now they have all the records, county

8    records, they know where the cars are registered

9    when you go and get your license and so forth and

10   everything.  Has anyone in here from the Cleveland

11   Police Department or anywhere else ever come in

12   here and told you either of these guys had a red

13   car?  It is absolutely unequivocally without a

14   doubt crystal clear the men who supposedly were

15   out there had a red car.  Why did Eugene Jones

16   have all these confidential informants?  Did

17   anybody come in and tell you that Ru-el Sailor had

18   a car?  He was supposed to be the driver.  No,

19   they didn't, ladies and gentlemen.  We know that

20   that is not the truth and that there is nothing

21   there.

22        The State had the ability to bring in

23   anybody from the Department of Lights.  I don't

24   know what they call it, Division of Lights.  The

25   people that put in light bulbs and everything.

1   All they had to do if they wanted to let you know

2   without a doubt if the lighting out there was

3   light on that particular night, despite what Dude

4   said, against Dude, all they had to do is bring

5   somebody in and say we went out there and the

6   lights were working.  Detective Metzler went there

7   the next day, he did not come in and tell you the

8   lights were working on that particular night.

9        Finally -- not finally, but coming close --

10  fingerprints.  Now, the bullets, the casings.

11  Despite what they say, you know that you can get

12  fingerprints off the bullets.

13       MR. THOMAS:  Objection, your Honor.

14       THE COURT:  Overruled.

15       MR. MACK:  A person loads a clip or

16  magazine, the fingerprints will be on there.  All

17  they had to do, according to them -- There were so

18  many of them there, ladies and gentlemen, if they

19  wanted to do it they could have gotten the

20  fingerprints off of it.  They did not have that on

21  that particular night.  They did not do that,

22  ladies and gentlemen, and there is no evidence

23  that shows Ru-el Sailor did any of these things.

24       Again, I can go on and on and on about the

25  clothing.  The clothing is there.  Here is the

1  most important thing.  The prosecutor tried to

2  make a lot to do about this jacket, (indicating).

3  I brought this jacket in too.  If you remember

4  asking Dude because I anticipated that this was

5  going to be the question, I asked Dude

6  specifically did the people have on jackets on

7  that particular night?  What did he say?  He said,

8  No, they did not have on jackets, they had on

9  T-shirts, they had on jeans.  So, ladies and

10  gentlemen, if they try to come and say this black

11  jacket fits in with this man talking all black,

12  that is not true because Dude told you they only

13  had on T-shirts and only had on jeans.

14        Somebody was a shooter out there that

15  night, ladies and gentlemen.  I mean, you can look

16  at it any way that you want, ladies and gentlemen.

17  I don't know what was there, I wasn't there, but

18  Ru-el Sailor wasn't there.

19        Now what we did testify to is that when

20  they left the club, and they left this club at

21  12:40 that night, that he was with Cordell at

22  12:40, and on that particular night I say to

23  you, ladies and gentlemen, it's very obvious to me

24  and I'm not -- I can't speak for you because you

25  are the sole judges, if they left at 12:40 that

1  night, from all the tapes and all the testimony

2  they have said the shooting took place at 12:15.

3  There is no way my client could have been there.

4           Who was the first person at The Benjamin

5  Bar that night?  Think about this.  Ru-el Sailor.

6  Who came next?  Samuel Brown.  Who came last,

7  Cordell, ladies and gentlemen.  That is why I'm

8  saying to you my client was not out there at that

9  particular scene that particular night.  I think

10 the evidence is abundantly clear that he was not

11 out there.

12          I say, ladies and gentlemen, I can talk

13 about complicity, I can talk about all those other

14 things, felonious assault, I can talk about

15 kidnapping, but my main thing to you, ladies and

16 gentlemen, I'm not talking all those particular

17 things because my client was not there.

18          I only represent one person, and that is

19 Ru-el Sailor.  And I say to you, look at all the

20 evidence, telephone calls and all that stuff they

21 put on about Ru-el Sailor.  Ru-el Sailor did not

22 do this, ladies and gentlemen.  And I'm going to

23 tell you right now, I'm going to make the

24 compassionate plea that, again, this is a very

25 serious case and they have to prove this case to

1    you beyond a reasonable doubt and, ladies and

2    gentlemen, I say you can't have six shooters.

3    There is only one.  So you cannot have that many

4    descriptions.  I don't know whether it was

5    inferred, ladies and gentlemen, they would all

6    come up with the same shooter.  You will not have

7    the same type of clothing.  It was the motive on

8    them to get those people together to try to

9    convict one person along with another person, and

10   he was not there.

11            I thank you very much.

12            MR. THOMAS:  Can we approach?

13                 - - - - -

14            (Thereupon, a discussion was had

15            between Court and counsel outside

16            the hearing of the jury and off the

17            record.)

18                 - - - - -

19            (Thereupon, the following proceedings

20            were had in open court:)

21            THE COURT:  We're going to take a break.

22   Remember the admonition.  Don't discuss the case

23   with anyone or let anyone discuss it with you.

24   Please don't form an opinion about this case until

25   it is in your hands for deliberations.

1    All rise.

2                      - - - - -

3               (Thereupon, a recess was taken.)

4                      - - - - -

5          THE COURT:  We have gone over the charge.

6    The State has no deletions, additions, et cetera?

7          MR. THOMAS:  No.

8          THE COURT:  Mr. Watson?

9          MR. WATSON:  No, your Honor.

10         THE COURT:  Mr. Mack, any additions,

11   deletions?

12         MR. MACK:  No, your Honor.

13         THE COURT:  Mr. Willis?

14         MR. WILLIS:  I'm still concerned about that

15   felonious assault.

16         THE COURT:  Okay.  That is what count just

17   for the record?

18         MR. WILLIS:  I don't have it in my mind.

19         THE COURT:  The count that pertains to

20   Clark Williams -- I'm sorry, Omar Clark so it

21   is 9 and 11.  And you object to those?

22         MR. WILLIS:  And the complicity related to

23   them.

24         THE COURT:  All right.  Thanks.

25                      - - - - -

Cuyahoga County Prosecutor's Office 5092460 198501 V5560736-5094 FH31          11/16/2020 Page 5094

```
 1                    (Thereupon, the jury was brought

 2                    into open court and proceedings

 3                    were as follows:).

 4                         - - - - -

 5          THE COURT:  Mr. Willis, on behalf of the

 6     Defendant Nichole Hubbard.

 7          MR. WILLIS:  Thank you, Judge.

 8                    - - - - -

 9     CLOSING ARGUMENT ON BEHALF OF DEFENDANT NICHOLE HUBBARD

10          MR. WILLIS:  Judge McDonnell, counsel,

11     ladies and gentlemen of the jury, this is a

12     serious case.  Make no bones about it.  But there

13     are certain things that are simply obvious to me.

14     I think they ought to be dealt with somewhat

15     summarily, and I will do it in this manner.  You

16     can look at all of these pictures, autopsy photos,

17     the other photographs, the clothing autopsy

18     reports and what have you, and those items are not

19     going to help you, as I see it, in deciding whether

20     or not the State has lived up to its heavy

21     responsibility of proving guilt beyond a

22     reasonable doubt.  And, certainly, with reference

23     to the autopsy photos, I can commiserate with the

24     family certainly.  They lost a human being.  But

25     as once said by a poet, Every man's death
```

1    diminishes me because I am identified with

2    mankind.

3        So the death of Omar Clark diminishes me,

4    diminished you, it diminishes all of us who

5    identify with mankind.  But I'm a firm believer

6    that life is for the living, and although no man

7    is an island onto himself, we certainly have to

8    deal with reality.  And what is the reality here?

9    The reality here is that someone shot and killed

10   Omar Clark.  Your job in this case is to decide

11   whether or not the State has proven its case

12   against these Defendants.  I represent Nichole

13   Hubbard.  Whether they have proven their case

14   against her.

15       In order to come to a decision on that

16   matter we're going to have to come to some kind

17   of understanding and label that we can place on

18   the people the State has asked you to believe.

19   We know who Dude is.  He tells us -- That is Clark

20   Lamar.  He tells us that he was with Omar Clark

21   that day, and early on they started drinking.  We

22   know from the autopsy report that Omar had in his

23   system cocaine, alcohol.  We know this because

24   that is what the autopsy report tells us.  We know

25   from Dude he smoked a blunt, participated in

1    smoking a blunt.  We know from Dude that he

2    participated in the use of this Wet as they call

3    it.  He had all of these substances in his body.

4    Now I'm not saying that to condemn Omar but to

5    show you who Dude is because Dude was there with

6    him and they were participating in each of these

7    narcotic drug uses, bottle for bottle, blunt usage

8    for blunt usage.  We have to believe that he also

9    used cocaine because cocaine was found in the dead

10   man's body.

11        Now, he was classified by one of his

12   neighbors as being a thug.  Do you recall the

13   young lady testified she came by in her truck and

14   she saw these thugs standing in the street.

15   Standing in the street.  She made a call.  I

16   mispronounced her name before, and I'm going to

17   try to get it right, Tenella, or something like

18   that, whatever her name is.  But she tells us

19   things that are very, very important.  She says

20   that from the point when she passed these thugs in

21   the street to the time when she pulled into her

22   driveway and used the phone that was a lapse time

23   of two minutes.  We know what time she used the

24   phone.  At least we know what time her call was

25   answered because the 9-1-1 operator tells us and

1      we heard it on the tape.

2           Now, Mr. Watson makes a very, very serious

3      point when he says all these calls they're talking

4      about, three ways, and my brother is arguing with

5      somebody, all these calls took place at 12:05.

6      12:05.  The 9-1-1 tape was around 12:26 or 12:23,

7      but at least at that point in time.

8           We know from Jermaine Kidd that he was

9      walking down the street or jogging, if my

10     recollection is correct, when he came upon Omar

11     and Dude.  Car pulled up, he went on, and before

12     he could get around the corner at this field where

13     he was going through he started hearing shots.

14     That's pretty consistent with the two-minute

15     interval that the young lady driving the truck

16     gave us.  So that is the one thing that seems to

17     be fixed, the time of the 9-1-1 call.  So you have

18     to relate that back.

19          Now, let's talk a little more about Dude.

20     He got on the witness stand and told us that he

21     was shot in the buttocks.  Didn't tell the police

22     about it, no medical testimony, didn't bring the

23     pants in to show us a hole.  I don't know whether

24     he jumped over a fence or not, but he tells us he

25     went south to Garfield, made his way around, and

1    came back home and went into the basement.  He

2    tells us that he talked to Lamar the next morning,

3    and then there was some question whether he talked

4    to him before the police talked to Dude or whether

5    it was afterwards.  Not really important.  But

6    what do we know?  We know that when the State put

7    him on the witness stand they asked him to

8    identify somebody as the shooter.  He made an

9    identification.

10           Now, what is it that we know?  We know he

11   didn't see any gun being fired.  We know that

12   because he admitted it.  We know that he didn't

13   see anybody get shot.  So what has happened here?

14   He was manipulated because of the questions, Can

15   you identify the shooter?  And, obviously, he

16   knows the State wants him to identify somebody.

17   And he did.

18           About this manipulation.  A man by the name

19   of Joseph Mayhand testified in this case.  You

20   recall there was some discussion about his

21   testimony and whether or not when he made a

22   reference to one of these two people that he

23   claims that he saw being lighter than the other he

24   got manipulated into saying his reference to light

25   was to weight.  Do you recall that?  I'm going to

1   read this testimony.  And the only reason that I

2   am reading is because I want to put it beyond

3   challenge.  Here is what he said.  I said he had

4   on red.  Red also.  I said -- believe I said he

5   was a little taller than the other guy.  I said

6   that he was lighter.  I said that he was lighter

7   than the guy that was arguing with him.  Question:

8   So the guy that was the shooter you said was

9   lighter than the other guy that was arguing; is

10  that correct?  Answer:  Yeah, that's what I said.

11  You described both persons as being light skinned;

12  is that correct?  Answer:  Yes, I did.  That

13  doesn't sound to me like he is talking about light

14  in weight.   The lawyer, to his credit, asked him

15  this question.  Also, in that particular statement

16  you indicated the shooter was light skinned

17  wearing red, got in on which side of vehicle as he

18  pulled off?  I forgot, to be honest with you.  I

19  forgot.  He's still talking about the shooter

20  being light skinned.

21       Now, it bothers me.  It might not bother a

22  lot of people but it bothers me when the police

23  take an answer, which is blatantly obvious, and

24  suggest to the witness in the question they want

25  to alter his answer.  Here is another question.

1    One thing we do know, both individuals out there

2    that night were light skinned.  The shooter was

3    lighter than the other light-skinned gentleman.

4    Is that safe to say?  That is what you put in your

5    statement?  Answer:  Yes, that's what I put in my

6    statement.  Yeah, the prosecutor succeeded in

7    getting him to say that his reference to light was

8    a reference to weight.  To me, that's wrong.  It's

9    just that simple.  There ain't no two ways to put

10   that.  It's wrong.

11        Now one might say, Willis, you are

12   representing Nichole.  Why are you making that

13   argument?  Well, Nichole's fate is tied to a

14   determination by you, ladies and gentlemen of the

15   jury, that her brother was one of the culprits and

16   that she, according to their indictment, was

17   responsible for him doing anything that he did

18   that night.  But even then I have a problem

19   because he is charged with aggravated murder.

20   She's not charged with that.  And the aggravated

21   murder, as you will come to know, he's charged

22   with acting with prior calculation and design.

23   The inference you're supposed to get from that is

24   that the State was going to make the effort to

25   prove that when he went to this location his

1    intent was to kill.  Well, if she's responsible

2    for him being there, and she aided and abetted in

3    his presence, she should have been painted with

4    the same brush, don't you think?  But, no.

5    They're going to be clever.  They're going to say

6    whoever was responsible directly for the death she

7    did not aid and abet in that occurrence, and she

8    was not in complicity with them.  But to the

9    extent they committed a crime less than aggravated

10   murder, then she was in a complicitus relationship

11   with them.  Now that is pretty technical stuff.  I

12   follow it.  I hope that you do too.

13        Now, let's talk about some of the other

14   witnesses.  We mentioned Mr. Kidd, and Mr. Kidd

15   gives us the benefit of his relationship with Gene

16   Jones who, incidentally, is indeed a friend of

17   mine.  I know him.  That is why I talk about him.

18   And I don't want to talk about him behind his

19   back.  I tell him I'm going to talk about him and

20   I talk to him to his face.  He is out there

21   investigating this case, and he comes in contact

22   with this Kidd fellow who tells you he's a drug

23   dealer.  He makes no bones about it.  He says that

24   Jones indicated he was interested in this case to

25   some extent, I take it, and that he was going to

1    make it difficult for Mr. Kidd to practice his

2    profession as a street pharmacist.

3              MR. THOMAS:  Objection.

4              THE COURT:  Overruled.

5              MR. WILLIS:  He told you that he sold drugs

6    and he said that he may have had some drugs on him

7    that night.  I call that street pharmacy.  Now,

8    we're talking about manipulations.  Now, if the

9    police want to put me in a lineup tomorrow, they

10   could do it.  All they have to do is subpoena me,

11   have the grand jury subpoena me, and have the

12   grand jury have me stand in a lineup, give blood,

13   give urine, give hair.  Not impossible.  So to

14   suggest as he does that somebody has to be in jail

15   and locked up to have them stand in a lineup

16   suggests he's living in a fantasy world.

17             Now, any identification can be -- I asked

18   him the question if you show a man a picture

19   the odds are five to one of any one person being

20   hit.  When a person comes down to look at a

21   picture, look at some pictures they know, and the

22   policeman hands you a picture from six photos, the

23   person knows that the police suspect somebody in

24   that group to the tendency of the prior

25   calculation and design.  I'll pick something that

1   comes closest to my recollection.  And how do we

2   know?  How we do know?  We know there are

3   miscarriages of justice.  It is proven that there

4   are a lot of mistaken identification cases of

5   people.  So to suggest that the procedure that

6   Cleveland uses is infallible is ridiculous.  It is

7   like an old saying that I once read in history,

8   when it was said in English, It's a sad commentary

9   if the only argument that can be made in favor of

10  doing something in a particular way is to say

11  we've always done it that way since Henry the

12  Eighth.  That is the same type of analogy that I

13  can say here.  It is a sad commentary the only

14  thing that you can say about Cleveland's

15  identification procedure is to say we've always

16  done it that way.  They could buy a 25 or $30 tape

17  recorder because the officer admitted the most

18  important thing that comes out of a witness's

19  mouth that are called upon to make an

20  identification is the first thing they say.  We

21  should not have to depend on what the officers say

22  the person says.  We can time it.  He said it was

23  spontaneous.  If you put a timer in there, we

24  don't have to guess.  But that is the way they do

25  it, and I suspect we will be stuck with that

```
 1    procedure for a long time.
 2            Now, it's critical I think two witnesses in
 3    this case testified they believed the person that
 4    had this gun and who shot Omar was told by the
 5    other person, Don't shoot Omar.  He's family.
 6    Something like that.  Maybe Omar said something
 7    about he was family.  Supposedly it was said -- I
 8    wasn't there -- My cousin is his baby's mother or
 9    he's my cousin's baby's father.  Whatever it is.
10    Where the girl had the baby and Omar was the
11    daddy.  And that baby's mother concept has come
12    upon me, and I have a lot of trouble somebody is
13    my baby's daddy or baby's mother.  But the point
14    being that he knew and told the shooter according
15    to witnesses, Don't shoot him.  What does that
16    sound like to me?  Assuming they went there to do
17    some mischief and all of a sudden Omar is
18    asserting himself, and the guy says, Wait a
19    minute.  Don't do anything to Omar.  He's my
20    cousin's baby's daddy.  That sounds like an effort
21    to disassociate himself from any violence.  That
22    is what it sounds like to me.  Violence.  Two
23    witnesses have testified to that.  Violence.  An
24    aspect of it.
25            We also had a witness who said he heard
```

1     some women or a woman involved in this

2     confrontation immediately before the shots were

3     fired but he is the only person that tells us that

4     he heard a woman's voice.  We have another voice

5     to tell us that before the red car pulled off and

6     went west on Englewood, 205, a car in which three

7     women were in pulled off first and made a left

8     turn on 105 which would send it towards Superior

9     Avenue.  I was not there.  I don't know anything

10    about what happened.  I don't even know what the

11    evidence is.

12          A person asked me a little while ago, and

13    he may very well be right, he said this supposedly

14    happened on Englewood.  I said that is what they

15    say.  He said that street might be famous.  I said

16    I hope it doesn't become famous for drugs or

17    people getting killed.  He said I truly believe

18    that is the street the man who founded Superman

19    lived on.  We know he's in Cleveland, we know he

20    went to Glenville, so he lived on one of those

21    streets.  He thought that that was the street.  I

22    said, I never heard that.  I do know that he went

23    to Glenville High School and I do know he lived in

24    that area so he could have lived on Englewood.

25          But let's think now seriously about these

```
1    charges.  They charged Nichole with acting in

2    complicity with whoever it was they said was her

3    brother.  The Court is going to instruct you that

4    you have to determine she aided and abetted.

5    Aided and abetted.  The Judge will define aid and

6    abet.  She aided and abetted and caused the death

7    of Omar Clark.  Now, tell me, what did she do?

8    The evidence is she made some calls, or there was

9    some phone calls between her and her brother

10   around 9:05 and some phone calls after the 9-1-1

11   call was made.  Nobody can tell us what was said

12   during those calls.  So if we suppose that what

13   Puddin says she was told, that is that she's

14   arguing -- he's arguing with the boys, that

15   argument stops at 9:05 or thereabouts.  So you

16   have to get from 9:05 -- I'm sorry -- 12:05.

17   12:05.  You have to get from 12:05 all the way to

18   12:23, 24, 25, 26.  If you have got to accommodate

19   in your ability to get there the fact that Kidd

20   says it happened within the span of time and the

21   young lady -- she says after she passed them,

22   which was before the shooting until the shooting

23   took place, you can hear her on the tape, is

24   now -- she says that is a two-minute interval.

25            What did Nichole do?  She made a statement
```

1    to the police.  And the fact that people can't

2    remember where they were and times they made calls

3    and whether or not they talked to somebody else,

4    that is not proof of guilt.  Admittedly she made a

5    statement.  I can say, frankly, if I would have

6    represented her she would, but her attorney

7    advised her and she did.  She got all the times

8    screwed up.  She did not talk to her brother, and

9    there was never a connection.  What does that have

10   to do with this case?  The State wants to offer

11   literally the fact of these connections into proof

12   beyond a reasonable doubt because that is what

13   you have to do in order to convict her of

14   anything.  You have to believe that these phone

15   calls proved to you -- and what Puddin says about

16   them -- proved to you beyond a reasonable doubt

17   she is in some way responsible for this murder.

18        Now they have charged kidnapping.  Where is

19   the kidnapping?  The Judge will instruct you that

20   did you restrain somebody of their liberty?  I

21   guess you can say whoever did this restrained him.

22   He killed him.  Did he remove him from someplace?

23   Nobody said anybody was removed anywhere.  If I

24   understand the kidnapping charge involving Dude,

25   there was a kidnapping involving Dude in which his

1    testimony was when he saw a gun it was time for

2    him to go.  And he did.  When and where was he

3    kidnapped?  They want to say that he was

4    feloniously assaulted because he was supposedly

5    shot in his behind.  Did not tell the policeman

6    who talked to him that night, he did not go the

7    hospital, or bring his clothes in to see there was

8    a bullet hole, or take it to the Trace Evidence

9    people and see if they see any of the oily

10   substances that are on bullets on his clothes

11   which would suggest that a bullet passed across

12   his clothes in order to get to his behind.  They

13   did not do any that.  They did not look around to

14   see if there was bullets holes in a house.  Nobody

15   reported their house was hit.  Where is the

16   felonious assault on Dude?

17        Where is the felonious assault on Omar

18   Clark?  The evidence, as I heard it, was that Omar

19   supposedly put his hands on somebody and the

20   person said, Take your hands off me.  Maybe when

21   this person who did the shooting is ultimately

22   found he may very well say he shot Omar Clark in

23   self defense.  If the person they charged was not

24   there, how does he know?  But the facts do not

25   show Omar Clark was assaulted, and they certainly

```
1    don't show Nichole aided and abetted him in

2    assaulting Omar Clark.  That is what you call a

3    quantum leap to go from that evidence all the way

4    to the conclusion that Nichole aided and abetted

5    in some action which is itself questionable as

6    having been proved beyond a reasonable doubt.

7         With reference to both of these kidnapping

8    charges, I have a lot of trouble in trying to

9    understand the charge itself.  With reference to

10   the murder charge we have to decide, and that is

11   most serious charge against the young lady, that

12   she had an intent.  First of all, you have to

13   prove she sent her brother there.  And when she

14   did so her intent was that he should commit a

15   crime.  Not against Omar, but against Lamar Clark.

16   Because if she has a beef and has an argument it's

17   not with Omar, it's with Lamar Clark.  So you have

18   to say that there is some sort of conspiracy

19   between she and her brother, and she sent her

20   brother there to do some kind of harm to Omar

21   Clark.  The kind of harm in beating him up and

22   killing him for $10.

23        There is testimony they are reasonably well

24   off, they have been in business with a store

25   contracting business for years.  For $10?  Come
```

1    on.  Now, where is the proof she directed any

2    action that took place there by anybody?

3         Now, there is also something in the

4    evidence that Puddin says.  Puddin says Nichole

5    told her she told her brother everything was cool

6    and forget about it, or something to that effect.

7    The State will ignore that, and Puddin certainly

8    is not a friend today of Nichole.  There is one

9    thing about it.  She's a dope fiend.  She uses

10   Wet, she buys it on a regular basis.  She has a

11   way to get it.  She tells us she does hair.  She

12   didn't say she had a license or worked in a beauty

13   shop, and she gets enough money to spend 30, 40,

14   50, $60 a day for her habit.  All of a sudden

15   she's cured, and she doesn't use it anymore.

16   She's clean.  I'm sure the State told her, Clean

17   yourself up when you come to court.  Don't be

18   under the influence of that Wet.  Now, if it was

19   that easy for people to stop using it, we would

20   not have all the headaches we have here in the

21   world today.

22        Now, they talked to a number of people and

23   I think it's apparent that these people they

24   brought in here are the best they could find.  The

25   best they could find.  And, yet, not one witness

1    other than Puddin tells you that the Defendant

2    Nichole Hubbard said or did anything that

3    stimulated or caused any of the action that took

4    place out there on Englewood.  Granted, the

5    testimony was that she used some of these drugs.

6    That is one of her faults.  But that doesn't say

7    ·to you or to me or anybody she was in a

8    complicitus relationship with anybody.

9         Now, the evidence in this case is pretty

10   clear to me.  Pretty clear.  We are not here

11   asking for any mercy, believe me.  Indeed, yours

12   is not the prerogative for mercy.  You are,

13   rather, the administrators of the law that is

14   itself merciful, a law that deems it to be a

15   fastidious thing even if the guilty should escape

16   that and the innocent should suffer.  As

17   Shakespeare's Hamlet said, The slings and arrows of

18   an outrageous fortune.  For, indeed, if she is

19   convicted on any of these charges in my judgment,

20   at least, hopefully in yours, it would be a

21   miscarriage of justice.  The evidence that the

22   State was required to produce does not meet the

23   test, the acid test.  It does not carry with it a

24   persuasive force that is capable of convincing

25   people she is guilty as charged and guilty on the

1  basis of the evidence which proves itself beyond a
2  reasonable doubt.
3      Now I can probably talk longer, but I
4  won't.  I'm aware at the risk of sounding
5  facetitious I'm convinced the mind can absorb only
6  what the seat can endure.  But it is important
7  that you understand with reference to
8  identification testimony that certainty -- or
9  certitude function is not the test for certainty
10 or accuracy.  If it were, the DNA would want be
11 working overtime in the manner that it is today in
12 this country.  And the people who have been freed
13 would be dead by now based on identification
14 testimony manufactured at the hands of the police.
15 Particularly in Chicago.  We're in Cleveland.
16     I'm thankful that you will make the
17 appropriate decision in this case and that you
18 will live up to your oath to well and truly try
19 and in true deliverance make between the State of
20 Ohio and Nichole.
21     Judge McDonnell, I certainly want to thank
22 you for the most judicious way in which you have
23 presided over this case.  I'm really proud of the
24 way this case has been conducted; efficiently,
25 judicially, fairly.  I ask only that you people be

1    fair to this Defendant.  And if, after you have

2    considered all of the evidence, you are satisfied

3    that the State has failed to prove the charges

4    against Nichole Hubbard, you should say so by your

5    verdict.

6         If, on the other hand, you are convinced

7    beyond a reasonable doubt that the State has

8    produced evidence that convinces you beyond a

9    reasonable doubt then, of course, you should find

10   her guilty.  But I don't think that is even

11   remotely possible.  I ask for verdicts of not

12   guilty on all charges.

13        Thank you.

14        THE COURT:  Mr. Thomas, on behalf of the

15   State of Ohio.

16        MR. THOMAS:  Thank you, your Honor.

17             - - - - -

18   FINAL ARGUMENT ON BEHALF OF THE STATE OF OHIO

19        MR. THOMAS:  Let's look at the obvious.

20   Recall these numbers.  This case is not about

21   money.  Ultimately it began about money, but

22   ultimately it's not about money.  What it is about

23   is honor and maltreatment of a sister.  How many

24   points of description do we have that are

25   consistent on that issue?  This case is not solely

1    about eyewitness identification.  Yes, it has

2    eyewitness identification in it, but what other

3    opinions do you have to check with your own

4    conscious, with your own common sense, with your

5    life experience, things that support the

6    identification?  Had the State marched in here

7    witnesses who would say everything that was

8    identical to the highest degree Defense counsel

9    would argue it was descriptive and rehearsed.  You

10   heard variance inscriptions.  There is no getting

11   around that.  We called those witnesses because we

12   wanted you to have the benefit of the portion of

13   the event they saw and how they perceived it as

14   individuals.  We felt they had something of value

15   to present in this murder trial.  And murder trial

16   it is.  A life was taken here.

17         We may not like everything we know now

18   about this slice of events that happened on

19   Englewood on November 16th and 17th, we may not

20   approve of everything that Dude and Omar were

21   engaged in that day or that night, but Omar had a

22   right to live.  Ask yourselves as representatives

23   of the community what do you say to yourself when

24   you hear testimony in a case such as this that

25   when people describe their fear and apprehension

1  about becoming witnesses?  Remember Brandon Gibbs?

2  I didn't come forward because I didn't want

3  somebody coming around to my door and shooting me

4  or my family.  And he made a reference and pointed

5  over there to those guys, (indicating).

6         When death came calling for Omar that

7  night, death wasn't in a hurry.  Death was calm,

8  death was deliberate, and death took its time.

9         Recall Larry Braxton when he said after the

10  shooter pumped the first volley of shots in Omar

11  and he fell to the ground he stood over him calmly

12  and continued to fire.  Do we have anybody

13  describing the shooter then running away in a

14  hurry and in apprehension about being caught?  No.

15  He calmly and coolly walked away knowing that he

16  was leaving witnesses on the street.  He, the

17  shooter, did not care.  He didn't care about

18  witnesses, didn't care about the fact that he was

19  committing this in the middle of a residential

20  area, didn't care the bullets may fly into a

21  house, into a bedroom of an adult or child.  None

22  of that was a concern.  The only concern was the

23  argument that began over the $10 and a sister's

24  honor.  Ask yourselves, how many points of

25  consistency do we have about the words of the

```
1    argument, If my sister says it's you, you're outta
2    here or words to that effect.  There are
3    variations on those words.
4         Here is a point of comparison.  We have
5    those words recurring, and each witness described
6    it with a slight variation.  Does anyone here
7    believe those words in some fashion, some
8    variation of that phrasing were not said?  If so,
9    fine. . That is your province.  But it is an
10   analogy to human experience that everybody sees
11   things a little bit differently and hears things a
12   little differently.
13        On voir dire you recall me saying if
14   someone observed a roadside accident do you think
15   somebody on the other side of the accident would
16   recall what you saw a little differently?  The
17   answer was, yes, of course.  Nichole brazenly
18   talks with an attorney to mislead the police
19   because there is no other context you can put on
20   that statement and these cell phone records but
21   that she is withholding information in an attempt
22   to divert the police away from herself and her
23   brother because as we know, ultimately, the cell
24   phone records bear it out in spades.  She talked
25   to her brother's number seven times.  She only
```

1   tells the police she made one call and didn't even

2   make contact and didn't leave a voice mail. Why?

3   Why say that to the police if you are innocent, if

4   nothing happened that night that you need to be

5   worried about?

6       What Nichole did that night was get angry,

7   and she was high, and she got mad about getting

8   played by Dude. She called in an air strike. You

9   recall the testimony the time between the call and

10  Dude and Omar walking down the street was five

11  minutes or thereabouts. We cross over a moment

12  into the Defense case and the alibi. The

13  testimony that was presented to you where you were

14  asked to believe some pretty improbable things.

15  Improbable that these phone calls took place

16  between Nichole and Cordell. But according to the

17  witnesses Cordell is engaged in a rap contest,

18  free-form rap contest, where if he is thinking at

19  all what he is doing he is thinking about

20  responding to Bobby Nettles as Bobby is shooting

21  verses back at him, and he will get a chance to

22  shoot verses back.

23      When you see State's 141 ask yourselves how

24  from just before midnight to just after going up

25  to 12:30, right at the time or just past the time

1    of the shooting, how is Cordell engaged in the rap

2    contest yet taking all these calls from Nichole?

3    These are successful calls.

4           Recall the testimony that the line was

5    open.  Now, of course, we don't know the content

6    of conversation in those calls except for the

7    portions that were heard by witnesses and what was

8    testified to.  What did Nichole do Mr. Willis

9    asked?  A, she instigated Cordell's involvement

10   and assisted in identifying the person that he was

11   going to extract for her revenge.  How?  Does he

12   have a blue Nautica coat on?  Do you recall the

13   testimony of Dude which is unrefuted?  Think what

14   you know about Dude, about his drug consumption

15   and alcohol consumption, but it was unrefuted he

16   had that Nautica coat on both when talking to

17   Nichole and confronted by Cordell that he had the

18   coat on, and as Omar and Dude are then arguing in

19   turn with Cordell in his anger they get the

20   response to shut the F up.  If my sister says it's

21   you, you're outta here.  There is no gunfire right

22   at the initial approach.  He's being deliberate in

23   his efforts to identify whom he is speaking to.

24   And the testimony is the gunman approaches with

25   the gun down, and raises the gun as Omar is trying

1   to play peacemaker.  In apparent anger at Omar

2   laying hands on Cordell, Ru-el then starts firing.

3   Ru-el is there as the muscle for Cordell.  But

4   there may be even more to it than that.

5       Recall from Desatnik's testimony and Joint

6   Exhibit 1 Dude's description of the event that

7   night.  On Sunday, 11-17-02 at about 00:45 he is

8   in company with patrol Officer Shani Hannah.  I

9   had occasion to interview Clark Lamar concerning

10  the homicide of Omar Clark.  Lamar stated he and

11  Omar were walking westbound on Englewood when

12  approached by two black males both described as 25

13  to 30 years old, five eight, 205 pounds, short

14  hair, slight mustaches, medium complexion.  One

15  wearing light-colored clothing with a black

16  semiautomatic pistol, the other with his hand in

17  his waist band giving Lamar the impression that he

18  was also armed though he did not actually see a

19  weapon.  Lamar also stated the two suspects looked

20  alike, were possibly brothers.  Lamar states the

21  armed suspect and Omar Clark were arguing over a

22  female which is when suspect began firing numerous

23  shots striking Clark several times.  Lamar then

24  stated that he fled into a backyard back to his

25  residence believing that he was also being shot

1  at.  We have people standing on porches, in

2  fields, in the street under trees, and parked

3  cars.  They are getting out to look up, over, and

4  there are variations in the lighting, and in the

5  distances, and in the individual abilities of

6  their eyes to perceive.  Yes, it is your job to

7  test all those variables and say, What do we have

8  here?

9      Well, in addition to those descriptions you

10  have photo identification.  The Defense wants to

11  argue that Umar Clark and Detective Jones of the

12  Cleveland Police had a role to play in this case.

13  The Defense has the power of subpoena the same as

14  the State.  Nothing precluded them from calling

15  either of those two individuals if they felt

16  they had something to add to this case of merit.

17  They did not call them.

18      We have the photo pick in State's 131 of

19  Cordell.  Now, to my eyes -- this could be just

20  me -- he appears heavier in the photo than in

21  court slightly.  His face has a certain fullness

22  that it doesn't have here today but that is an

23  individual judgment.

24      In State's 5 we have the testimony of Ru-el

25  himself that yes that, in fact, is him.  We have

1    Larry Braxton and Joseph Mayhand bringing up the

2    color red.  There is also Brandon Gibbs talking

3    about black.  And then what do we have in these

4    Defense exhibits?  Larry Braxton talks about a red

5    headband or red visor.  What do we have?  Red

6    headbands, a red jogging suit, or red jacket.

7    Cordell; on his upper body the primary color is

8    red.  Just like Mr. Willis didn't touch on

9    Nichole's lies to the police, you didn't hear Mr.

10   Mack touch on Ru-el's admission to totin' guns.

11   Is there a reason?

12       Now, in addition, we have Tenitta.  Tenitta

13   has a job, she was well spoken, fairly articulate,

14   and in the manner of her personality certain about

15   what she saw.  She, too, expressed apprehension.

16   She did not want to give you the color of her

17   truck for fear of announcing it in open court.  Do

18   you recall that?  Do you recall the detective's

19   testimony was that, yes, people were asked for

20   written statements but they took time.  Now

21   Tenitta said, As I rode down that street and

22   looked out my window, the face I did not recognize

23   is this face.  Number 4.  She puts Cordell there

24   at that moment of the fight.  This is just after

25   Brandon Gibbs and Larry Braxton and Damien have

1  pulled up but not completed parking and allow the

2  truck to pull past.

3  What association have you heard in any of

4  this evidence that gave Cordell a reason to be on

5  that street at 12 midnight or 12:15 or 12:26 other

6  than Nichole's problem with Dude?  Ask yourself

7  that.  What reason does he have to be there at

8  that time?  Larry Braxton, the next closest

9  observer after Dude and Tenitta, says as he leaves

10  Brandon Gibbs' car, crosses across the street to

11  go to his porch, he is in the middle of the

12  street.  He looks, he sees the gunman.  The gunman

13  is No. 5 in State's 132, Ru-el Sailor.

14  What felony convictions did Larry Braxton

15  have?  What felony convictions did Tenitta Johnson

16  have?  What felony convictions did Joseph Mayhand

17  have?  Joseph also describes standing on the porch

18  and seeing the shooter in red.

19  You head the testimony of Leshawn McCreary,

20  Cordell's girlfriend, the woman with the job and

21  the children and the Ford Contour you heard her

22  describe, as I recall, purple.  Another witness

23  described it as blue.  But yet they each know the

24  color of the car.  Adjectives, word choice, are

25  subject to personal preference, personal

1   variation, any number of factors.  But for

2   Nichole's actions in calling her brother, which is

3   demonstrated amply and completely in State's 141

4   and State's 3, Cordell would have never been

5   there.  Absent Cordell's argument with Dude over

6   his sister's honor and how she had been talked to

7   or treated, You can't talk to my sister that way.

8   Absent that, Ru-el wouldn't have been there.  This

9   gun-toting young man over here, (indicating).

10       They say a picture tells a thousand

11   stories.  Think back in the moment in time when I

12   was holding this jacket, (indicating), this

13   Defense Exhibit.  I said, Ru-el, which pocket is

14   the gun pocket?  There was a long pause, and what

15   I interpreted as a bit of surprise on his face.

16       MR. MACK:  Objection, your Honor.

17       THE COURT:  Overruled.

18       MR. THOMAS:  But you are free to interpret

19   what you saw.  He didn't have an answer because he

20   had to stop to think.  And for those of you with

21   children, when you are confronting a child about

22   an issue and you say you don't have to stop and

23   think, just tell me what happened, the truth is

24   easy to tell.  You don't have to stop and pause to

25   think about it.  You just tell from memory what

1    you know.  What was the reason for that huge, huge

2    pause at that moment with Ru-el?  Why wasn't the

3    jacket even here at the beginning of the Defense

4    case?  Why didn't Mr. Mack bring out Ru-el's own

5    calls to Cordell?  There are five calls here

6    before or after the critical time beginning at

7    around 11:30 on Page 7, which is the first page of

8    exhibit journal entry 237, 238 and 239, success,

9    107 seconds; success, 39 seconds; success, 51

10   seconds.  Also highlighted are Nichole's calls

11   with Cordell.  Journal entries 223, 225, 227, 229

12   and 230.  Then at 1:10, Ru-el's calls again.

13   Journal entries 211 and 212.  Success for 55 and

14   57 seconds each, 1:09 and 1:10 a.m.  More calls

15   throughout the rest of the day.

16        Samuel Brown, their buddy, says that he's

17   never known either one to hold a job.  All of a

18   sudden after that we started hearing about, oh,

19   well, Cordell works at his parents' market and so

20   on.  But that is not what Samuel Brown testified

21   to.

22        St. Aloysius and the cabaret, 110th and

23   St. Clair or thereabouts, if I recall correctly.

24   Recall Ru-el's testimony.  I asked him how far is

25   105th and Englewood from St. Aloysius?  It's not

1    that far.  It doesn't take that long if you know

2    the back roads how to get there.  Instead of

3    taking the main avenues you take the back roads.

4         Recall the time that Ru-el slipped in his

5    testimony.  Do you recall that?  When he was being

6    asked on cross-examination by Mr. Watson of the

7    1:09 and the 1:10 a.m. calls, what were those

8    about?  Well, he's all over the board.  His

9    answer?  I recall it, but recall it for

10   yourselves.  I'm merely restating it according to

11   my memory, but you rely on your memories.  Well,

12   it was either he was calling to tell me that he

13   was leaving Benjamin's or calling to tell me that

14   he arrived at 4U2B.  Wait a second.  How does that

15   then jibe with we're traveling in a white focus

16   traveling together?  We arrive at Benjamin's

17   together, we left together, we arrive at 4U2B

18   together and left 4U2B together and went to St.

19   Aloysius.  What is going on with that?  A slip of

20   the tongue?  No.  A slip of the truth.

21        What we would suggest the evidence shows is

22   that you have got these Defense witnesses saying

23   certain things happened that night, but time lines

24   aren't exact.  We know from the cell phone records

25   certain time references that, according to the

1   phone company, are computer generated and exact.

2   You have to ask yourself, is it possible that the

3   following happened:  They went to Benjamin's, but

4   not as late.  It was actually earlier.  They

5   stayed about the time they say it was, they stayed

6   there.  Then they went to 4U2B but not as late.

7   And that on the way back from 4U2B they stopped on

8   Englewood.  That is when the shooting occurred.

9   Then they skipped over to St. Aloysius and took

10  his photos with the explicit intent of we'll have

11  photographs to prove where we were not thinking

12  there were time issues from cell phone records.

13          Ellen Taylor interviewed with the police

14  and told them about Nichole's conversations from

15  the moment around 12:15, 12:30 or 12:05, where my

16  brother is on the phone he is arguing with them

17  now.  Was that accurate to your satisfaction to

18  make you believe that that testimony was not

19  credible on that point?  It is backed up by the

20  cell phone records as testified to by the cell

21  phone representatives from Sprint and Verizon.

22          In Nichole's statement she denies talking

23  to Cordell.  She minimizes Puddin or Ellen Taylor,

24  and she exaggerates Maria's involvement.  Why do

25  that?  Why attack Ellen at a bar some months later

1           because "you're testifying against me"?  Why knock

2           her to the pavement and start a female fist fight

3           if you did nothing?  If you are Nichole and did

4           nothing, what do you have to fear from Ellen?

5                Tenitta on the issue of thugs.  Do you

6           recall I asked her, Do you exclude anyone from

7           that description?  She said no.  I said, Did you

8           include Cordell when you used that term?  The

9           answer was yes.  Yeah, she was using this

10          pejorative to say these are all a bunch of young

11          men in some sort of fight or altercation they

12          shouldn't be involved in.  And who knows what it

13          is about or why it is happening.  She jumps on the

14          phone, and you heard in the exhibit the tape

15          recording which has been twisted to suit the

16          satisfaction of the Defense where she begins the

17          call saying, I think somebody has been shot.  But

18          then in the background, and the detective

19          testified to this, you can hear the pops.  Play it

20          for yourself.  As she's speaking and pauses, I

21          recall hearing at least distinctly, and I believe

22          more, pop, pop, pop, pop.  All of a sudden the

23          tone of her voice changes from one of description

24          to one of fear and panic.  Oh my God, somebody is

25          being shot.  Not, I think somebody is shooting.

1  She realizes as she is laying on the ground behind

2  that pine tree what's happening.

3       Folks, we could probably, all of us,

4  belabor this case until the cows come home.  I

5  could stand up hear and argue my points, and the

6  Defense could stand and argue their points.  The

7  question is, are you convinced to a reasonable

8  degree of the standard of proof, which is beyond a

9  reasonable doubt as her Honor instructed you that

10  you only accept that standard, that Nichole,

11  Cordell, and Ru-el collectively caused the death

12  of Omar Clark on November 17th, 2002?  We submit

13  that they did.

14       Take any one of them out of the scenario,

15  you don't have this murder.  Take Nichole out, you

16  don't have the murder.  Take Cordell out, leave

17  Nichole and Ru-el in, you don't have the murder.

18  Take Ru-el out and leave Nichole and Cordell in,

19  you don't have the murder.  It is the three of

20  them together in concert that caused the death of

21  Omar.

22       When you review the autopsy protocol, think

23  about the message that these injuries send.  That

24  the shooter didn't care who was watching, the

25  shooter didn't care how many times he shot, his

```
 1          only apparent intent was to keep shooting until

 2          the high capacity nine millimeter was empty; 9

 3          shots to the jacket, of which we have then 4 shots

 4          to the body, 21 shots to the pants and the

 5          remaining injuries to the legs.  As you sit here

 6          and try to sort through the charges, aggravated

 7          murder with prior calculation and design, murder

 8          in the commission of either kidnapping or

 9          felonious assault, and the remaining charges

10          themselves of complicity to flow with each count,

11          it's for you to determine in your good judgment

12          and collective wisdom what the evidence sustains

13          and what it doesn't.  But we submit that this case

14          cries out for a just verdict.  Don't let a debate

15          of semantics about skin tone or complexion sway

16          you from the supporting points of corroboration.

17          This was wrong.  And these three individuals are

18          responsible.  Please bring back a verdict of guilt

19          that you find just.

20                  Thank you.

21                  THE COURT:  All right.  Ladies and

22          gentlemen, we are going to go home for the

23          evening.  We will have the charge of the Court

24          tomorrow morning at 9:00.  I know we are very

25          close to the end, but the admonition still
```

Cuyahoga County Prosecutor's Office 5092460 198501 V5560736-5130 PRG1          11/16/2020 Page 5130

1     applies.  Don't discuss the case with anybody,

2     don't let anyone discuss it with you.  Please

3     don't form an opinion about this case until it is

4     in your hands for deliberations.

5                         - - - - -

6                    (Thereupon, an adjournment was taken

7                    until 9:00 a.m., Tuesday, June 3,

8                    2003, at which time the following

9                    further proceedings were had:)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cuyahoga County Prosecutor's Office 5092460 198501 V5560736-5131 Fax1      11/16/2020 Page 5131