SUPPORT US

CLEVELAND NEWS     NEWS FEATURE

# A Cleveland Man Fights to Prove His Innocence in a System That Appears Incapable of Correcting Its Own Mistakes

Drug dealer and street hustler? Yes. But killer?

By Kyle Swenson on Wed, Jun 29, 2016 at 1:00 am

SEND A NEWS TIP

   



Dude was ready to smoke some water. The five bucks he'd started off with in his pocket had already stretched into a day of low-key devilment, steady drinking and smoking. Now, as the thermometer slid past the comfortable mid-30s, he was ready to get high.

For hours they'd been hanging inside the house on East 131st Street near Kinsman, slapping playing cards around and drinking beer while her kids jumped around the house. There was Puddin, Maria, Nichole, Omar and Dude — who depending on the day or criminal charge might go by Clark Lamar or Clark Williams. On the street, though, they just called him Dude. The group had already passed around a blunt, finished off the Heineken that Dude and Omar had brought over, and killed the six-pack of Bud. Maria was talking about going to a party but it didn't start until midnight. In the meantime, Dude asked Nichole if she was interested in hunting down a wet square — a cigarette soaked in PCP.

They hopped inside her four-door Tempo, dropping off Maria before going on the run. Nichole called a dealer she knew named Hollywood to ask if he was dancing, code-speak for if he was holding PCP. He was, but Hollywood wasn't in the neighborhood yet. Give him 30 minutes. The Tempo rolled to a convenience store where Omar and Dude each bought a 24-ounce Colt 45 tallboy. Then they motored east, pulling off on Capitol Avenue, a quiet one-way ribbon of pavement

SUPPORT US

SCENE

Before the dealer could show, Dude spotted Nails, a guy he'd bought from before. He hopped out of the car, clunking his Timberlands over to Nails, then back to the car. Dude's pockets were empty, so he asked Nichole to borrow $20. She handed over the bill. Dude watched as Nails dipped the cigarette into the liquid, a mix of PCP cut with embalming fluid. He brought the square back to the car. The burning cigarette circled the vehicle.

The PCP did what it did, wrapping a bubble of distance around you, so much so that you weren't really you anymore but someone else, a character, a superhero even. If he thought about it, Dude had to admit — got nostalgic even — that the high wasn't the same as when he first started screwing around with PCP around 1985. He was now 30 years old. By his own rough count he'd spent half his life in and out of jail on felony charges. Honestly, the engine pushing all that criminal mischief was the search for the old high again.

Dude told Nichole he'd give her back her $20 if she dropped him back at his aunt's house up on Englewood, near where East 105th crosses St. Clair. They slipped into the driveway of the two-story house. Dude ducked inside to grab some money he had stashed. But as he was coming out of the house, a thought scurried out from under the weed, beer and PCP. He told Nichole, *Hey, you smoked half of this cigarette with me, why don't I just give you back 10?*

She started screaming, braiding together a mean rope of curses and accusations, *shiesty* and *scandalous* and *ya'll fucked me up*, talking pretty strong for a female, Dude would later tell people. Mid-tirade she flipped open her phone and began complaining to someone on the other end. Shortly after hanging up, Nichole switched up. "Fuck it, give me the 10 then."

They swapped the cash. Nichole zipped off. Omar and Dude tightened the grips on their tallboys and began walking up the street. But before they could step off Englewood, headlights splashed the road. Omar and Dude heard car doors flying open.

***

SUPPORT US



Ru-El Sailor in a recent photo in prison.

SUPPORT US

Thirteen years after that November night, Ru-El Sailor — El to his friends — sits in the visiting room at the Ohio State Penitentiary on the edge of Youngstown. He's dressed in navy-blue prison scrubs. His wide frame is bent over a table so low to the ground only preschoolers could possibly find it comfortable, but the staging is all the better to keep long-separated lovers from getting handsy. Washed-out fluorescent light showers down from above as visiting children wheel from the tables to the vending machines. El's hands rest on his knees, his face — dark eyes, tidy beard — looks relaxed, but there's a sick tint laid over his dark skin, like a jaundiced Instagram filter. He hasn't been out in the sun in more than a year.

"The only thing to do out there is throw a basketball around," he says with a shrug. "I want the next time I get fresh air to be when they are taking me back to county or when I'm leaving this place."

This place has been home since 2003, because on that November night in 2002, the beef over $10 for a PCP cigarette ended with the death of Omar Clark,

for the crime, as well as her brother, Cordell Hubbard, and his best friend, Ru-El Sailor. All three were convicted.

"To be honest, I was naïve about it," Sailor says now. "I figured that if I didn't do anything, I might as well let the lawyers take care of it."

Since his arrest, Sailor has maintained his innocence, a claim that is seconded by Cordell Hubbard and bolstered by the bizarre way his May 2003 trial progressed. But in the end, Sailor scripted his own outcome, deciding to follow the bearings of a moral compass that was calibrated to higher standards than the world around him. His story reads like ghetto corner Shakespeare, where the best intentions boomerang back around, the fatal blow self-inflicted.

But the 2002 murder case also is a powerful example of how sometimes, in the American legal system, fact and the law wave goodbye to one another to veer off in different directions.

According to the National Registry of Exonerations, 149 innocent individuals had their names cleared in 2015. That's the second record-setting year in a row for exonerations. The steady jump in those numbers tracks with a growing awareness outside the legal system about the failings of American justice, whether it's hashtags about the Black Lives Matter movement or the home run success of shows like *Serial* or *Making a Murderer*. More Americans seem to realize the courts screw up at a regular clip, a fact the legal world has been slow to admit. For all that, what Sailor's case ultimately highlights is how poorly the current system is wired to actually address innocence.

"Like I said," Sailor says, a blip of regret showing briefly in his dark eyes, "I was pretty naïve."

***

Everyone on the Four Block — that was what they called the neighborhood running from East 140th and St. Clair up to East 150th, a lattice of residential streets tucked south beneath I-90 on the northern lip of Cleveland's predominantly black eastside — knew El and Cordell went together like peanut butter and jelly. They were cohorts from the same streets, their lives and choices charting the same course.

El was the oldest, born to a single mother, Bernatte Brown. A nurse who juggled shifts working for an agency and as a private home health aid, she had to rely on El to take care of the others, Sharell and Duke, while she ground through double all-nighters. "He didn't give me too much trouble and he was caring," Brown says now. "When I worked nights, he helped raise the others, and I was happy about that. I could come home and everybody would be in bed, everybody was safe."

Sharell remembers her brother as a watchdog when tapped to babysit, never even letting her venture off the porch when he was boss at home. "He was also a horrible cook," she says today with a laugh. "If she had to work a double, when we came home she'd leave us pizza money. But he would keep the money and try to feed us something else like noodles. He would try and doctor them up but they'd

SUPPORT US

A single mother with three growing kids is bound for some hard knocks. El recalls times growing up when the power company cut the lights over a past-due bill. Brown, an extremely proud woman, wouldn't ask for or take a handout to cover the expense; the family would just wait in the dark until the next paycheck came. The experience stamped El inside. "I was never going to let my kids go through that," he says now.

But on the Four Block, there weren't any handy maps to get out of that kind of economic crunch, except one.

"Social inequality" is the kind of blue-chip buzzword people like to staple to a situation like life in the Four Block, usually without going any further. But if you are trying to unwind the dug-in economic inequality in Cleveland, its origin story is arguably tied to years of intractable housing segregation. The racial partition of Cleveland's neighborhoods stretches back so far now it's baked into the city's DNA; but there is a good argument that much of Cleveland's social problems are bedded in the racial divisions of its neighborhoods.

In the late 1980s, Princeton sociologist Douglas Massey dug into census data and determined that certain metropolitan areas were not just segregated, but *hypersegregated.* Under the definition, these were metros where the black population is historically unevenly distributed through a region. Instead, the minority population is slotted tightly into a specific geographic area. Under Massey's rubric, Cleveland was one of the top hypersegregated cities in American.

Just last year, Massy published a report looking at whether hypersegregation still had a headlock on as many cities as it did 30 years ago. According to the 2010 census, the good news: Half the cities that had been hypersegregated back in the 1980s had shed the label, including Columbus and Cincinnati. The bad news: Cleveland is still hypersegregated. Unlike its Buckeye state brethren, Cleveland remains as racially bifurcated as ever.

Massy's argument is that the numbers game has serious, far-reaching consequences for people living here. Hypersegregation creates the kind of social and economic isolation that pools poverty and cuts off these parts of a city from the mainstream civic bloodstream, creating the harsh differences between locations separated by a 15-minute drive. Imagine the psychological blow of living close to the new buildings climbing into the Cleveland skyline in the Flats or downtown. Then imagine living on the boarded-up blocks deep on the east side that look like Sarajevo after Milosevic.

"People growing up in such an environment have little direct experience with the culture, norms and behaviors of the rest of American society," Massey wrote, going on to explain the irony that in a diverse and densely populated society such as the United States, some inner-city individuals "are among the most isolated people on earth."

The way this big-picture academic theory played out on Four Block, in Cleveland and in nearly every American urban core, is by creating a world apart but parallel

SUPPORT US

in the streets, hustling, selling and using drugs; or you were in society, a citizen working a straight gig. It was one or the other. Red pill, blue pill. Different rulebooks. "If you're in society, and I do something to you and you call the police, I can't get mad at you," El explains. "That's what people in society do. But if you in the streets and call the police, then you're a snitch."

For El and the others coming up in the Four Block, there wasn't much appeal in the straight life.

"I always grew up fascinated by the streets," Sailor admits. "I wanted the nice things — the cars, the money, the clothes — and that inspired me to get into the street life. The people I saw who were working jobs were struggling. The people who don't and are on the street, they kick it. And it was super easy. If you grew up in the urban area, the most accessible thing you can get your hands on was drugs. Getting wasn't any problem."

For El, those two separate worlds were made all the more vivid by the two major male figures in his life: his father and his maternal grandfather. "I grew up with two role models, a positive and a negative," he explains. Sailor's father was in the streets selling drugs and working other hustles. His grandfather, James Brown, however, was a mechanic who could break down and build back up diesel engines with his bare hands. With his feet firmly in society, he preached to his grandson about staying honest and providing for his family and staying humble before the Lord. "He was the strongest man I've ever met," Sailor says ruefully.

El picked the streets, the nickel and dime bags, street-corner pharmacists, the cat-and-mouse routine with cops. By the early 2000s, he'd racked up arrests for possession, trafficking and a gun charge that landed him on probation.

But the undercurrent was different; something of society stuck on him, likely from his grandfather, the honest provider. "My father, he chose the street life over his children," Sharell explains. "Whereas my brother did the street life to help out my mother, to provide for us, to take care of his children. My father did it so he could look good and have friends and women. It was a big difference."

Cordell Hubbard was out there with El. They first met in fourth grade. From then on, they were never apart, including later on the Four Block's street corners. But more than the street game glued them together. Both El and Cordell were big music lovers, Cash Money and No Limit label staples, classics like Biggie and Tupac. They both were also stitched with entrepreneurial streaks gleaned from their fathers. In between his time on the streets, El's dad had tried his hand at various legit businesses — a fitness club, a restaurant — that failed to take. Cordell's father owned a market and some real estate. The two friends recognized the long odds on the streets weren't good. Guys got trapped there, rutted in the endless supply-and-demand hamster wheel. But others used their money as an elevator up to a higher financial perch by getting into real estate or opening a car lot or barbershop.





Cordell Hubbard (center front), Ru-El Sailor (center back) with friends.

By fall 2002, El and Cordell were plotting their own such move into legitimacy, a step off the street back into society. They decided to open a music store — C and El's Music — in a space on East 116th and Martin Luther King Boulevard. They got their vendor's license and were prepping for opening. "We wanted to do something bigger," Sailor says, "instead of just selling drugs and being stuck."

So there was a lot to celebrate — life shifts in the air — when El walked into the Benjamin's Bar on Nov. 16, 2002. Wearing a grey and red-trimmed New York Nets jersey and matching headband, he slid into a seat at a table with friends, hoisting drinks while watching Cordell try to rap on the open mic. Later the group went to another bar, then a party, picking up new company and dropping some as the night deepened, champagne and weed passing in the cars between stops.

By the end of the evening, Omar Clark was bleeding on Englewood, reading his own long odds on the faces of the growing crowd. "I'm not going to make it," the dying man said.

***

When the word "guilty" started rolling off the jury foreperson's lips, again and again and again and again, Sailor felt the hard smack of a reality check. His eyes, bugged out with insistent urge, swung on Cordell next to him at the defense table. He'd rode shotgun with his friend through this; now it was real. "You gotta let me out the car, man," Sailor said.

SUPPORT US

I got tangled up in the murder case late in the game. How and why is still an open question. But court testimony and records indicate that police attention had almost immediately fixed on the Hubbards in the aftermath of the murder: Cordell was indicted in December, Nichole in January. In an early interview with police, the latter claimed that during her fight with Dude over the $10, he'd pulled a gun on her, scaring her into calling Cordell for help.

In court, Sailor's lawyer alleged that police only learned about his association with Cordell in late March 2003, when Hubbard's lawyers filed a notice of alibi stating Ru-El Sailor was with Cordell at the time of the crime. Cleveland police detectives, however, testified in court they'd learned El's name in mid-February from a Sixth District vice detective named Eugene Jones, who had various run-ins with Sailor going back to his days at Collinwood High School.

Sailor learned police were looking for him in late April. He turned himself in. The Hubbards' trial was scheduled for May 19, and the date wasn't pushed back for the new defendant. Sailor's attorney barely had time to prepare. The judge also rejected motions to secure individual trials for the defendants.

The state's theory was that during her argument with Dude, Nichole Hubbard had called Cordell. Her brother came to the scene, where he verbally jarred with Dude and Omar. Sailor also came with Cordell and either was an onlooker or the actual shooter.

Two witnesses put Sailor at the scene. One, an Englewood resident named Larry Braxton, told the court he had been returning home with two friends on the night of the shooting when he noticed Omar Clark and Clark Lamar (Dude) arguing in the streets with two men. Omar tried to calm everyone down. "No, this is family, you all. This is family, calm down, chill out," Omar told the group before he was shot, according to Braxton. The witness later said he saw a stranger in a red jumpsuit pull a gun and shoot Omar. Braxton, as well as his two friends, initially described the shooter as a 5-foot-10, light-skinned black man in his 20s. The other two failed to pick Sailor, who is very dark-skinned, out of a photo lineup. Braxton, however, fingered Sailor as the shooter.

The other witness in the case, however, was the bombshell.

Dude — Clark Lamar or Clark Williams — made his first appearance in court on May 19, 2003, for an evidentiary hearing outside the presence of the jury. On the stand, Dude recounted the evening: beers, weed, card games at Puddin's, the hunt with Nichole and Omar for PCP. Dude told the court that when Nichole was raging at him for stiffing her on $10, she told him she was going to call her brother. After she sped off and the other car pulled up, Dude was accosted by a guy who demanded to know what they had done to his sister. Another guy, the driver of the car, produced a gun, according to Dude. This was the guy who killed Omar.

"Do you remember the other person that arrived with the person that's talking to you?"

"Do I remember him?" Dude responded at the hearing. "No."

But two days later, on May 21, 2003, Dude came to court with a different story.

SUPPORT US

Despite failing to ID the shooter in the previous court hearing, now Dude said he could make the identification.

"I seen the killer," he told the court.

"Who are you referring to?" the prosecutor asked.

"The guy right there," Dude said, throwing a finger toward where Sailor sat at the defense table with Cordell and Nichole. "I recognized him in court the first day that I sat here."

"Are you presuming because he is at the defense table that he must be the shooter?" the prosecutor said.

"No," Dude answered.

Dude had already testified that he hadn't gotten a good look at the shooter. Also, his ID of Sailor ran counter to previous statements. After fleeing the scene, uniformed officers tracked Dude down at his aunt's house, where he reluctantly reported that the two men who had accosted him in the street — the man who yelled at him about his sister and the driver with the gun — were both light-skinned black men who could have been brothers. That account gelled with the initial accounts of Braxton and his two friends. Also, in the months between the shooting and trial (months Dude spent in jail on a probation violation), Dude was shown a photo array of the defendants. He picked out Cordell. He didn't pick out Sailor.

Yet now, after already having been in court for the evidentiary hearing and seeing that Sailor was obviously a co-defendant with Cordell, Dude claimed he was sure. "He could not identify him in six months, yet when he is sitting at the table, he says that this is the man that did this," Sailor's attorney Jimmie Mack argued to the judge. "I say this is not reliable."

The judge ruled against Sailor, letting Dude's change-up stand.

As the trial marched on, the evidence began stacking up against the Hubbards. Cell phone records indicated that the brother and sister had swapped calls before and after the crime. Witnesses put Cordell at the scene and also testified about overhearing a phone conversation between Cordell and Nichole about the killing. At least three witnesses, however, further confused the situation by testifying that one of the men who pulled up on Dude and Omar tried to de-escalate the situation by claiming Omar was "family" or "my cousin's baby daddy."

No additional evidence thrown out by the state tied Sailor to the shooting. But Sailor also didn't have anything sewing together his own alibi: None of the friends he partied with that night agreed to testify. Besides his fiancee as a character witness, he had no one. Sailor would have to take the stand to account for his own activities that night.

Testifying also provided Sailor the opportunity to cut loose from Cordell and Nichole. He was urged to say that he had parted ways with Cordell that night and knew nothing about what happened. It was an opening to save himself.

SUPPORT US

But as far as Sailor could remember, they had been together all night. He wasn't going to tell the jury he wasn't 100 percent sure. Sailor had his suspicions about whether Cordell was involved. But there was no way he was going to tell the jury that either. Sailor wasn't thinking about himself, or about how his friend had put him in this position. He was not going to give the jury anything that could convict Cordell even if it helped his own situation. "It wasn't an option — period," Sailor says. "Me telling on him, or throwing him under the bus? That was my best friend. We grew up like brothers."

Before the jury, Sailor explained that he and Cordell had been together all night with their friends, driving from one bar to another and finally to a party in Euclid. On his own behalf, Sailor pointed out, he may have had criminal charges in the past, but nothing violent. "I wouldn't shoot nobody for myself, so I ain't shooting for nobody else," Sailor told the court.

"When you left Benjamin's you drove by yourself?" Sailor was asked.

"No, sir."

"Who drove with you?"

"Cordell."

"So you were in each other's company throughout that entire set of events?"

"Yes."

Defense attorneys rarely allow their clients to testify at trial, and Sailor's cross-examination by the prosecution is a good illustration of why. With brutal, rapid-fire questions, the state's attorney successfully painted Sailor as a no-account ghetto thug straight out of the cultural stereotype drawer at Fox News. The prosecutor brought up Sailor's past criminal charges ("Now that gun you said that you carried in the past, what kind of gun was it?"), suggested he was a deadbeat dad who fed his kids drug money ("How do you support those three children? You use that to supplement your drug money?"), and had fathered children outside his relationship (Do you have any other children besides these three? I'm talking with other women"). With his fiancee and the mother of his three kids in the courtroom, the prosecutor also quizzed him on his sex life.

"Who's Monica Williams?" the prosecutor asked.

"A girl that I used to mess with like in 2001 once. Mess with her once or twice."

"What do you mean, 'mess with?'"

"I had sex with her."

"Does your fiancee know about Monica?"

"Now she do."

Have you messed with any women since you have been seeing your finance?

"What that got anything to do with this case?"

"I'm asking you a question, sir. Have you messed with other women while you been with this woman?"

"I can't recall."

"You can't recall."

"Is this divorce court or what?" a frustrated Sailor finally blurted out later in the cross.

"No, it's your murder trial, okay?"

The jury found Cordell, Nichole, and Ru-El Sailor all guilty.



**GORDON PARK REDESIGN FEEDBACK MAKES FUTURE MAKEOVER CLEAR: MORE STUFF FOR FAMILIES** 

SUPPORT US

Immediately after the verdict, Cordell opened up to Sailor, telling him that, yes, he was there, and yes, he had done this. He was the shooter. Cordell explained it had been in self-defense. True to his friend, Cordell promised to make it right.

He said as much on July 23, when the three defendants were back before the judge for sentencing. When it was Cordell's turn to speak, he apologized to the victim's family, but also to Sailor.

'There's a lot of things that the Court doesn't know, that my lawyer doesn't know," Cordell said. "Ru-El Sailor wasn't present the night when this took place. It was a guy named Will."

Cordell pressed the judge, who was likely puzzled by this mystery name suddenly surfacing so late in the proceedings. "It was me and Will there," he said. "I didn't think it was going to turn out like this. I didn't think my best friend was going to

The judge cut down Cordell's explanation. The three defendants each received 28 years to life in prison.

\*\*\*

"I think there's a lot of fundamental misunderstanding about your constitutional rights," says Kimberly Kendall Corral, Sailor's current attorney, her words coming in a tired roll, a sign she's had to make this point many, many times. "You are entitled to a fair procedure, not a fair outcome."

What this essentially hits on is that, despite a lot of popular misconception, appeals courts rarely, if ever, address whether a trial court botched a conviction. The higher legal avenues are there to make sure correct processes were followed, not whether a defendant is guilty or innocent. Out of the gate, appeals court starts with the baseline assumption that the jury got it right.

This fact is pretty terrifying when you consider it in terms of wrongful convictions.

In 2011, a law professor looked at 250 innocent people who were convicted but later exonerated through DNA. The study examined the efforts of these innocent defendants to find relief from the higher courts after their convictions but before DNA proved their innocence. The courts shot down 90 percent of those appeals, meaning that if science hadn't rode to the rescue, the erroneous convictions would not have been corrected. The law professor concluded that the study "demonstrates that normal legal mechanisms were incapable of detecting innocence in these (now indisputable) innocence cases."

Immediately following the sentencing, Sailor filed a motion for new trial based on Cordell's admission. In a signed affidavit, Cordell admitted that not only was he there when Omar Clark was killed, but he was the shooter. In Cordell's version, when he pulled up on Englewood, Omar pulled a gun on him. Cordell pulled his gun. After both put their guns away, Omar reached again for his pistol. Cordell fired.

Cordell also now admitted he wasn't alone that night, but not with Sailor. Another friend named Will accompanied him to Englewood. Although Cordell couldn't initially provide a full name, attorneys were able to identify the individual as Will Sizemore.

The basic criterion for securing a new trial is evidence that is credible and new. Cordell's sworn account was new when Sailor initially appealed his case after the conviction in 2003. The judge rejected that motion, ruling Cordell's new story wasn't credible.

But in the intervening 10 years, Sailor and his attorneys have stacked up considerable evidence supporting Cordell's story. Unlike the dark-skinned Sailor, both Cordell and Sizemore are light-skinned. Their features suggest a family connection. Cordell also says Sizemore was the one who tried to break up the fight, appealing to Cordell not to "shoot Omar, he is my cousin's baby daddy."

SUPPORT US

these attorneys, though my own witness testimony attorneys have since confirmed the family connection between Sizemore and the victim. (Sizemore could not be contacted for this article).

Finally, Sailor's attorneys were able to get an affidavit from Omar Clark's brother about an exchange between him and Sizemore following Cordell and Sailor's convictions. In the conversation, Sizemore admitted to being "a few feet away" from Omar Clark when Cordell killed him. Sizemore also told the victim's brother he had "tried like hell to stop this."

Despite the evidence, Sailor's bid for a new trial has run into a cul-de-sac. Cordell's story wasn't credible when it was new; now that it was credible, it was no longer new. "For 10 years he's found information to supplement Cordell's story, but the court is saying, 'That's not new; we've known that's your position since 2003," his attorney Kimberly Corral explains. "That's basically, for lack of a better word, Sailor's shitty position."

\*\*\*

In the end, two eyewitnesses and bad social stereotypes were what sunk Sailor, the latter likely an outgrowth of the extreme life gap between street and society that's cemented in a city like Cleveland.

"I think that the jury got carried away," Corral explains. "They see this guy as a bad guy, a drug dealer with kids and baby mamas, and so his mostly all-white jury, they are people who don't understand the realities of inner city culture. They assume that if someone was involved in that, he must have also been involved in murder."

But if the basic byways of the legal system don't support post-conviction claims of innocence, what then?

Throughout the country, prosecutors and state attorneys have taken it upon themselves to open Conviction Integrity Units (CIU), special branches inside the office tasked with examining claims of innocence put forward by defendants after conviction. In 2013, only nine jurisdictions had such units. By 2015, 24 CIUs were in operation. According to the National Registry of Exonerations, those units are responsible for 151 exonerations, including 58 in 2015 alone.

Cuyahoga County was actually an early adopter. Shortly after taking office in 2013, prosecutor Tim McGinty opened a conviction integrity unit. This was the escape hatch Sailor had been praying for.

"There was no physical evidence, no forensics, nothing," Corral says. "He was only convicted on bad eyewitness testimony. There isn't really an outlet for justice when you have a conviction that rests on bad eyewitness testimony." CIUs exist partly to address that legal gap.

As Sailor and his attorneys began putting together his application for the CIU, they had more than just Cordell's story to back up Sailor's plea for innocence. Dude's eyewitness testimony was shoddy at best. Larry Braxton's account, however, was problematic in a different way. He'd been shown a six-pack photo identification layout by police, a method no longer used after having been tossed

SUPPORT US

For the CIU application, both Sailor and Cordell took polygraph tests with noted expert Bill Evans. Sailor claimed that he was not there at the shooting; Cordell claimed that he was the shooter and Sailor had nothing to do with the killing. Both men passed.

Finally, Sailor's attorneys were able to unearth some suggestion of official shenanigans. At trial, none of Sailor's friends had stepped up to testify on his behalf. In the CIU application, however, one of those friends submitted an affidavit claiming he'd been pressured not to testify by Eugene Jones, the vice cop with history with Sailor but no official role in the Omar Clark murder investigation. "Detective Eugene Jones told my mother that if I testified on behalf of Ruel [sic] 'it would be really bad,'" the witness, Bobby Nettles, said in his affidavit. "[O]n two other occasions he has told me that if I help Ruel, 'things will be really bad for you.'"

Sailor submitted his application to the Cuyahoga County prosecutor's CIU in August 2014. Then they waited. And waited. And waited. Finally, they got an answer. But not the one they'd hoped for. In May 2016, Corral received a short letter from the office explaining the unit had rejected Sailor's case.

Corral says she got zero explanation of what the unit did during its look into Sailor's case, or what led to the rejection. "I'm not sure if they actually investigated," the attorney says. "They said they were assigning a prosecutor, but nothing ever happened." For Sailor and his family, the radio silence has been particularly aggravating.

Sailor's experience with the CIU tracks with the numbers. Of the 129 requests for review submitted to the Cuyahoga County prosecutor's office by late June, 80 cases were rejected. Nine were investigated and rejected. Thirty-six cases were under review. Only three convictions were vacated. But those three cases all stem from arrests made by East Cleveland police officers later indicted in Federal court for drug trafficking and falsifying information, hardly claims of innocence that involved serious investigation.

It's a track record that has Corral, who has also submitted Sailor's case to the Ohio Innocence Project for consideration, asking if the unit is actually doing its job.

Unfortunately, so far, CIUs nationwide are proving to be hit-or-miss. "Half of all CIUs have not been involved in any exonerations — and four others worked on one only — including several that have existed for three to five years," the National Registry's 2015 report concludes. "The performance of these CIUs has been highly variable and some have been criticized as mere window dressing."

***





Amy Spence and others demonstrating in front of the justice center.

Rain was needling out of the sky on a Thursday morning in March, splattering foot traffic that was clocking in and out of the Justice Center in downtown Cleveland. A dozen or so people were huddled under the building's overhang, their cardboard signs wiggling in blasts of lake wind. "Free Ru-El Sailor," written in blocky lettering on each.

Sailor's family has propped him over the past 13 years, including his mother, grandmother, sister and his children. His efforts got a recent boost when he reconnected with a high-school friend named Amy Spence in 2012. Sailor, who is no longer with the mother of his kids, struck up a prison relationship. Ever since, she's been charging hard on his case, including organizing the March demonstration.

"I'd talk to other girls while I've been here and they've always said, 'I can't wait until you get home,'" Sailor explains now. "She was the first one to say, 'Well, what can we do to get you home?'"

As for the demonstration itself, it's usually a hail mary move that rarely produces results, especially for a case that's been out of the news for a decade. Still, the event pulled in more attention than the usual attempts at meaningful noise outside the Justice Center. Yet Sailor seems disappointed in the turnout. Not that he blames his family. It's more about the average Clevelander's lack of awareness of what goes on inside the building, he says. "But if Future was coming downtown, you'd have 100,000 people trying to get there. And they'd pay to be there."

Sitting in the visiting room of Ohio State Penitentiary, Sailor is honest to a fault about his own old street ways. But in the end, his fatal error may have been speaking up for Cordell without fully appreciating the situation he was in, a level of loyalty that the streets never reciprocated. Sailor acknowledges this, but doesn't lay any regret on his past. "I'm a loyal person. It's kind of a curse for me, but it's not something I can contain. My loyalty caused me to be punished, and I got the consequences. But I couldn't take the easy route."

His time inside has been hard due to his own hand. He's hustled in prison, running afoul of guards and authorities. "My prison record is terrible," he admits. "But nothing violent." His meeting with Scene, it should be noted, was his first face-to-face visit in more than a year, a privilege that had been revoked by the prison as

SUPPORT US

The hustles, he explains, are not about putting money in his own pocket but for providing. "My kids haven't gone without a Christmas since I've been in," he says. "And I've also got to pay for my lawyers and trying to get out. No lawyer is taking my case pro bono."

But when he gets out — and it's always when for him, not if — he's off the streets. Sailor's mind churns with legit business ideas. He's got plans, family waiting for him, but also serious voids. His grandfather, the honest provider, the strongest man he'd ever known, passed away in October 2015. Sailor can barely get his words around the subject, and his family tiptoes around it. "He didn't take it too well," his mother admits simply.

Sailor does have reason to be optimistic though. When contacted by Scene about the CIU application and Sailor's rejection, Joe Frolik, the spokesman for the Cuyahoga County Prosecutor's Office, explains that Sailor's case was initially rejected "in part because his new account of the evening in question dramatically differed from the testimony he gave under oath at trial."

But Frolik adds that after some review, "the case has now been referred for re-investigation."

On a recent afternoon, leaning over the comically low visiting table in the prison visitor room, Sailor hadn't yet heard that news. Yet despite not knowing that hope yet, he appears comfortable, at ease, confident. It's a game face he keeps nailed in place so that his family doesn't think he's feeling the pinch of the circumstances. "But that's a double edged sword," he explains. "Because then they think you're just doing fine."

**Like this story?**
**SCENE Supporters** make it possible to tell the Cleveland stories you won't find elsewhere.
<u>**Become a supporter today.**</u>

*Scroll to read more Cleveland News articles*

SUPPORT US

ADVERTISEMENT - SCROLL TO CONTINUE READING

<u>**CLEVELAND NEWS**</u>  <u>**NEWS FEATURE**</u>

# Gordon Park Redesign Feedback Makes Future Makeover Clear: More Stuff For Families

Meaning: soccer fields, playgrounds, murals, hiking trails and actual restrooms

By <u>Mark Oprea</u> on Thu, Jul 18, 2024 at 2:20 pm

<u>SEND A NEWS TIP</u>

   



*Google*

Gordon Park, long split by a six-lane highway and suffering from neglect, will undergo major transformation in early 2025.

Like countless Clevelanders of her generation, Lorraine Bradley has always seen Gordon Park as the go-to place for softball and barbecue on the east side.

At least as it was in the eighties and nineties, when Bradley would accompany her husband for league games on one of the park's five baseball diamonds. The whole trip, typically a short walk from her home in Hough, grew into weekly association. Sundays. Softball. Cookout.

"We always made it into a family affair," Bradley, 75, told Scene. "The kids played. You'd go to the aquarium. All the families would gather. You know, we didn't all live in the same community, but the park's where we all met."

SUPPORT US

**Related**



**Cleveland's New Division of Forestry Could Help Speed Up Far-Reaching Tree Canopy Goals**

A new department will put tree growth, Councilwoman Spencer said, "front and center"

And as it was for countless Clevelanders, the image and aura of Gordon Park as a vibrant gathering space hugging Lake Erie has all but eroded in recent years. Today, the park is a shell of what it once was: 48 acres of underwhelming grass and field comprising a mountainous island surrounded by highway and industry.

Gordon Park's hopeful resurrection was the subject of a town hall situated in the Kovacic Rec Center on St. Clair Ave. on Tuesday evening, a public engagement procedure studded with the usual stickers and Post It notes nearby residents used to help direct the park's future.

Spearheading by the Metroparks, which took over Gordon's lease in October, and a smattering of architecture firms, including LAND Studio and the SmithGroup, that went through the idea-gathering phase used in just about every recent parks project in Cleveland's recent history—from Irishtown Bend Park to the elusive and yet-to-be-fully-funded North Coast Landbridge.

SUPPORT US



*Mark Oprea*

Chad Brintnall, an architect at SmithGroup, led discussions around Gordon Park's redesign on

The ideas, discussed over two hours with some 25 locals, pointed to not just cleaning up and rejuvenating Gordon Park, but bringing one of Cleveland's largest park spaces into the 21st century: add interactive art, butterfly gardens, food kiosks, playspaces, hiking trails, fitness equipment and restrooms.

In other words, the people spoke, reshape Gordon Park for *everyone*.

"I feel like the amenities have to be diversified. To where it's just not basketball, or not just softball," Rodney Middleton, 66, a trustee of the InterCity Yacht Club that's rooted just north of Gordon, told Scene after the meeting sporting a sailor's cap.

"And *safe*," he said. "We have to be mindful of the age groups that utilize the park. It's just not young people. It's just not young Black men. You know, we're talking about a space that families should be able to utilize."

All entities involved in the info-gathering on Tuesday declined to say Gordon Park should be this, or should be that, yet promised that the ideas gathered would help produce a working plan for the park come early 2025.

The $8 million donation from the Mandel Foundation, which permitted Tuesday's session, would also, said Chad Brintnall, an architect with the SmithGroup, be used for some public art installations—"a project that delivers significant impact to the community." And, separately, 200 new trees on behalf of the Western Reserve Land Conservancy. Metroparks also reportedly put in new benches, tables and trash cans shortly after their lease takeover.

But at the same time, as Brintnall exemplified on Tuesday, hunched over a table with a marker in his hand, such engagement helps right the wrong of two ideas of park planning. Ideas that separate Clevelanders who use the park on a regular basis, and those that have, historically, shaped and planned a city from afar.



**ANGIE'S SOUL CAFE TO OPEN IN UNIVERSITY HEIGHTS**



SUPPORT US

Those who feel as if they've been left out of the conversation, who don't feel the same attention. It's vital that you have meaningful dialogue with those folks," Brintnall said. "There's so many empty and broken promises. How do you get over that?"

Which only somewhat appeases Bradley.



Because Gordon Park was split in two by the construction of I-90, and the extension of the CSX railroad line, an ongoing silo effect has only harmed access to the parkland. Gordon Park, to put it simply, is not easy to get to. Residents complain often, as they did Tuesday, about its poor signage. A tiny bridge over a six-lane highway is the only link between Gordon's north and south ends.

*Cleveland Memory Project*
Gordon Park, shown here in 1927, was a bustling haven for east side parkgoers, until years of neglect and the construction of I-90 decimated it.

"Honestly, I'd love to just see that bridge widened," Bradley said. "So that we can go over it—*safely*."

Safe may take two decades. To the northwest, in front of the East 55th Marina, will be the primary location of the Metroparks' gargantuan CHEERS park build, which vows to create six bays of new lakeside green space all from dredged material. (Like Burke and the Shoreway itself.) CHEERS won't be finished until 2042, at the earliest.

Kelly Coffman, an architect with the Metroparks involved with both projects, told Scene she sees Gordon's future geographically intertwined with CHEERS, linked by a brand new bike trail on Marginal Road.

All of which makes Coffman call up old pictures of Gordon Park in its glory days, of postwar women in white one-pieces, lounging on a crystalline lakeside, near bathhouses and hotdog stands. Images destroyed by a highway and decades of neglect.

"I think it's just of a previous era," Coffman mused, regarding past planning. "Like those are the decisions they made, they dealt with in the past.

"I think we get so many more benefits out of the park now by building out, and just kind of working around it," she added. "We can improve crossings, we can reduce interchanges. We can make it better."

The coalition working to restore Gordon Park will meet again for a second engagement session, with early conceptual drawings, Brintnall said, in September.

**Related**



**Cuyahoga Valley Scenic Railroad to Reopen Complete Track Line By Year's End**
Issues had nearly halved the 26-mile route, which typically links Akron and Independence

SUPPORT US

**Like this story?**
**SCENE Supporters** make it possible to tell the Cleveland stories you won't find elsewhere.
**Become a supporter today.**

## ABOUT THE AUTHOR



### Mark Oprea

Mark Oprea is a staff writer at Scene. For the past seven years, he's covered Cleveland as a freelance journalist, and has contributed to TIME, NPR, the Pacific Standard and the Cleveland Magazine. He's the winner of two Press Club awards.

*Scroll to read more Cleveland News articles*

CLEVELAND NEWS     NEWS FEATURE

# Cleveland's New Division of Forestry Could Help Speed Up Far-Reaching Tree Canopy Goals

A new department will tree growth, Councilwoman Spencer said, "front and center"

By Mark Oprea on Thu, Jul 18, 2024 at 8:26 am

SEND A NEWS TIP
    

SUPPORT US



*Mark Oprea*

Cleveland's new Division of Forestry could help repair the depleted tree canopy across the city.

Four years ago, in 2020, the Cleveland Tree Coalition released a report depicting a pretty heinous present and possible future for the city's base of trees.

In line with 2017 data, Cleveland was losing some 75 acres per year—roughly 4,950 trees—simply due to natural death. Trees weren't being maintained quickly enough. City Hall suffered from a dearth of qualified arborists.

The city, an accompanying Tree Plan insisted, would have to plant at least 28,500 new trees per year to ensure about a third of Cleveland would be covered by 2040.

At City Hall, that translated as such: How can government do more to ensure Cleveland's greenery fits its hoped-for population growth and health of residents? Tree canopies are vital in helping to control air quality, in bringing down surface temperatures in neighborhoods, and for general health.

"We understand what our goals are. We understand they're ambitious," Ward 15 Councilwoman Jenny Spencer told Scene. "But in terms of city government, urban forestry has not really been able to be part of the discussion, at least from a council perspective."

Spencer's mindset was the basis of pitch, with Councilman Charles Slife, to the rest of City Council in May, one that urged City Hall to form a new Division of Forestry directly underneath the Department of Parks & Recreation. Its predecessor, the Division of Urban Forestry, was, Spencer mused, too obfuscated from needed attention in the Department of Public Works. It needed to be lifted up, given prestige.

SUPPORT US

### Related

**Cleveland's Parks and Rec Master Plan Leans Into 15-Minute City Concept**
As the city eyes upgrades, maintenance and new builds for parks so that every resident is within a short walk of amenities, the question remains how to pay for

That's what happened. City Council recently approved a new law creating exactly that division, one that will be headed by a new, and yet-to-be-named, Commissioner of Urban Forestry. One that will, in political theory, gain more wherewithal in keeping city trees healthy, kept and taken care of.

And, in City Council's mind, be able to receive more money from Cleveland's general fund. More money—again, in theory—means more trees planted.

"The issue here is that we are not at scale with tree plantings," Spencer said. "This really helps us answer that question: *How* are we gonna scale up?"

City trees are one of those issues seemingly without debate. It's rare to find city dwellers that want *less* greenery on their street rather than petitioning for more.

The problem in Cleveland for the past five or six decades is that local government has seemed to categorize tree maintenance and planting low on the financial totem pole.



**GORDON PARK REDESIGN FEEDBACK MAKES FUTURE MAKEOVER CLEAR: MORE STUFF FOR FAMILIES** 

"The city has multiple departments that influence the urban forest, but coordination is minimal," the 2015 Cleveland Tree Plan, which lambasted City Hall's "Low" performance rating, stated. "City budget levels have remained level since 2005, departments are stretched thin, and trees are currently a low priority compared to other city infrastructure such as roads, curbs, and sidewalks."

It's likely that a new Commissioner of Urban Forestry could devote that attention, at least in a manner that reverses what's been a downward trend in tree health since the 1960s. According to the new law, that person will watch over ever single tree in the city's care -- removing "hazardous" limbs or roots, trimming those in the way of streetlights, and "develop[ing], coordinat[ing] and implement[ing] the city's tree canopy."

In the past, the city has had roughly 10 arborists working under an upper-level

forester and Manager of Urban Forestry. According to data in the 2024 city budget, the output wasn't exactly glowing. In 2021, new trees planted by the department totaled 1,246. In 2022, it was 350. And in 2023, just 15 were planted.

As is discussed ad infinitum by arborists and members of the Urban Forestry Commission, of which Spencer is a member, planting more sumacs and oaks than those that die from infestation or lack of consistent pruning is the tough balancing act the city hasn't yet quite mastered.

And incentivizing property owners to do the same. (City money can't be spent, Spencer reminded Scene, on planting trees on private property.) The only difference now is that the new Tree Commissioner has the final say in what stays up and what goes down, either to split trunks, bad branches, pest infestation, or major interference with nearby buildings.

The recent $3.4 million USDA federal grant, which is intended to aid the city's canopy, should go directly, Spencer said, into growing the new Division of Forestry into a more capable department. Into erecting more sumacs on Euclid Avenue. Into new maples or elms on dusty Payne. More in Jefferson. In Union-Miles. In Glenville.

"In the past, it's been kind of an afterthought," Spencer said. "Now it's front and center."

### Related



**Hough to Get First New Public Park Since 1950s**

"They felt a strong sense of being kind of encroached upon by Cleveland Clinic buying up more property. They wanted to really have a voice in the process. And we feel that the park is going to show that."

_Subscribe to Cleveland Scene newsletters._

_Follow us:_ Google News | NewsBreak | Reddit | Instagram | Facebook | Twitter

**Like this story?**
SCENE Supporters make it possible to tell the Cleveland stories you won't find elsewhere.
**Become a supporter today.**

## ABOUT THE AUTHOR



**Mark Oprea**

𝕏 ⓘ ✉

Mark Oprea is a staff writer at Scene. For the past seven years, he's covered Cleveland as a freelance journalist, and has contributed to TIME, NPR, the Pacific Standard and the Cleveland Magazine. He's the winner of two Press Club awards.

SUPPORT US

## TRENDING



**Despite Objections From City Planning, Councilman Danny Kelly Goes to Bat for Proposed Gas Station on Vacant CVS Property**

By Mark Oprea   Jul 16, 2024



**Gordon Park Redesign Feedback Makes Future Makeover Clear: More Stuff For Families**

By Mark Oprea   Jul 18, 2024



**Cleveland's New Division of Forestry Could Help Speed Up Far-Reaching Tree Canopy Goals**

By Mark Oprea   Jul 18, 2024

**Ohio Disciplinary Office Recommends Two-Year Law License Suspension for Judge Timothy Grendell**

By Mark Oprea   Jul 15, 2024

SUPPORT US



Small space, **big difference.**

Watch now. ▶

BROOKDALE SENIOR LIVING

## ALSO IN NEWS & VIEWS



**Ohio Voter Advocates Warn Group is Making Troubling Challenges, Ask Sec. of State to Guide Counties**

By Susan Tebben, The Ohio Capital Journal
Jul 18, 2024



**U.S. Sen. Sherrod Brown Leads Fundraising Ahead of Crucial Senate Race in Ohio**

By Nick Evans, Ohio Capital Journal
Jul 17, 2024



**Trump Pick of J.D. Vance as Running Mate Opens New Battlefront in Presidential Race**

By Jennifer Shutt and Ashley Murray, States Newsroom
Jul 16, 2024



**Ohio Democrats Unify Behind U.S. Sen. Sherrod Brown Amid Uncertainty at the Top of the Ticket**

By Nick Evans, Ohio Capital Journal
Jul 15, 2024

SUPPORT US

---

## DIGITAL ISSUE

### JULY 3, 2024

1 / 36

VIEW MORE ISSUES ›

**Cleveland Scene**

1422 Euclid Avenue, Suite 730
Cleveland, OH 44115

    

Our website uses technical, analytical, marketing, and preference cookies to provide the best experience for our readers and to give us information about how our site is used. You may request that your data not be shared with third parties here: **Do Not Sell My Data**.

© 2024 Cleveland Scene

Powered by **Foundation**

SUPPORT US