# THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040

**SENT VIA OVERNIGHT DELIVERY BY UPS**

April 7, 2017

Mr. Michael C. O'Malley
Cuyahoga County Prosecutor
1200 Ontario St.
Cleveland, Ohio 44113

  RE: Ru-El Sailor's application to the Conviction Integrity Unit

Dear Mr. O'Malley:

  Kimberly Kendall Corral and I currently represent Mr. Ru-El Sailor. Mr. Sailor was convicted of aggravated murder in 2003. He has always maintained his innocence.

  Enclosed is a memorandum regarding Ru-El Sailor's application to the Conviction Integrity Unit. Mr. Sailor's application was previously submitted to and summarily denied by your predecessor. We believe that Mr. Sailor's application merits a thorough review. Once all of the evidence in the case is examined, we believe that only one conclusion can be reached—Mr. Sailor is actually innocent. Therefore, Mr. Sailor is deserving of relief by the Conviction Integrity Unit.

  Please contact us if you have any questions or concerns about Mr. Sailor's application. We would be happy to meet with you in person to discuss the case. You can reach me directly at 513-556-4274 or jennifer.bergeron@uc.edu, and you can reach Kim at 440-942-7015 or kkc@baionicorral.com.

Sincerely,


Jennifer Paschen Bergeron
Assistant Professor of Clinical Law

cc: Conviction Integrity Unit c/o Russell Tye, Esq.
   Kimberly Kendall Corral, Esq.

Ohio Innocence Project & the Rosenthal Institute for Justice
Main Phone: (513) 556-0752 • Inmate Phone: (513) 861-2946 • Fax Number: (513) 556-0702
TYE DESK FILE 000195

Tye Desk File - Cuyahoga County Prosecutor's Office Civil Division 01/25/2024  Page 7440

<u>MEMORANDUM</u>

**TO:** Michael C. O'Malley, Cuyahoga County Prosecutor; Cuyahoga County Prosecutor's Office Conviction Integrity Unit
**FROM:** Jennifer Paschen Bergeron, Ohio Innocence Project, and Kimberly Kendall Corral, Baoini Corral, LLP, on behalf of Ru-El Sailor
**RE:** Ru-El Sailor's Application for Review by the Conviction Integrity Unit
**DATE:** April 2017

## I. INTRODUCTION

On July 23, 2003, Ru-El Sailor, Cordell Hubbard, and his sister Nichole Hubbard were convicted of multiple felonies in connection with the November 17, 2002, shooting death of Omar Clark. Ru-El Sailor was convicted of aggravated murder and related charges and sentenced to 28 years to life. It is undisputed that there was only one shooter, and Sailor was convicted as that shooter.

However, since Sailor's trial, numerous witnesses have come forward—including the admitted shooter—to say that not only did Sailor *not* pull the trigger, but Sailor was *not* even present at the scene of the crime. During sentencing, Cordell Hubbard admitted to being at the scene with someone named Will, not Ru-El Sailor. In a subsequent affidavit, Cordell Hubbard admitted that not only was he present at the scene—Cordell admitted he was the person who shot and killed Omar Clark. This admission is supported by the results of a polygraph examination.

We now know that the second person present during the murder was indeed someone named Will—William Sizemore. This fact is corroborated by several sources, including Cordell Hubbard's affidavit, William Sizemore's own admission to the victim's family, and statements uttered during the commission of the crime as reported to the police. As the remainder of this Memorandum explains, Ru-El Sailor is innocent of the shooting death of Omar Clark—he was not present and had no involvement whatsoever in the murder. The victim's brother, Umar Clark, agrees that Ru-El Sailor is innocent and supports Sailor's request for relief.

1
TYE DESK FILE 000196

In short, Sailor is actually innocent of the murder of Omar Clark and is therefore deserving of relief by the Conviction Integrity Unit. We submit this document on his behalf and request that your office reexamine the application that he previously submitted. We are joined in this request by Umar Clark, who states: "On behalf of myself, my family and the memory of Omar I ask that you please review Ru-El Sailors [sic] application of innocence." (*See Affidavit of Umar Clark on March 21, 2017*, ("*Umar Clark 2017 Aff.*") (Attached as Exhibit 14).

## II. STATEMENT OF FACTS

### A. The murder of Omar Clark.

On the evening of November 16, 2002, Nichole Hubbard, Ellen "Puddin'" Taylor[1], Maria Whitlow, the victim Omar Clark, and Clark "Dude" Lamar were at Ellen "Puddin'" Taylor's house playing cards and drinking beer. (*Transcript Page* 634 ("*Tp.*")). Nichole, Ellen, and Maria were relatively new acquaintances with Mr. Lamar[2] and Omar Clark. (*Tp.* 633-634). At the end of the night, Nichole agreed to drive Mr. Lamar and Omar Clark home to Englewood Avenue. (*Tp.* 401, 639).

On their way, Nichole, Maria, Mr. Lamar, and Omar Clark decided to stop to buy a wet cigarette.[3] (*Tp* 642). Nichole paid $20 for the wet cigarette because Mr. Lamar did not have enough money; Mr. Lamar promised to pay her back. (*Tp.* 405-407). They all smoked the cigarette while driving to Englewood Avenue, the street where Omar Clark lived and Mr. Lamar was staying. (*Tp.* 409-410). Once they arrived, Mr. Lamar went into his house to retrieve the money he owed Nichole while Omar stayed by the car. (*Tp.* 412-413). When he returned, Mr.

---

[1] The trial transcript, at numerous times, interchanges between Ellen Taylor and Puddin. They are the same person.
[2] Clark Lamar also goes by the names "Clark Lamar," "Clark Williams," "Clark Lamar Williams," and "Dude." He is referred to by these names at different points during the transcripts, in the appeals opinion, and in the attached exhibits. For the sake of clarity, this application will exclusively refer to him as Mr. Lamar.
[3] A wet cigarette, often referred to as a wet square, is a cigarette dipped in PCP.

Tye Desk File - Cuyahoga County Prosecutor's Office Civil Division 01/25/2024    Page 7442

Lamar did not have enough money to pay Nichole back (he only brought ten dollars with him), so they argued for a minute before Nichole got into her car and she and Maria drove away. Meanwhile, Omar Clark and Mr. Lamar stayed on Englewood Avenue. (*Id.* at 413, 420; *State v. Sailor*, 2004 Ohio App. LEXIS 4766).

Nichole called her brother, Cordell Hubbard, and complained about getting cheated out of the full twenty dollars. (*State v. Sailor*, 2004 Ohio App. LEXIS 4766). Cordell stated he "and his nigga Will was on [her] side of town." (*Nichole Hubbard Affidavit* ("*Nichole Aff.*") (Attached as Exhibit 1)). A few minutes later, Cordell called to let Nichole know he was on Englewood Avenue, the street where the argument occurred. (*Id.*; 2004 Ohio App. LEXIS 4766.) Cordell asked Nichole what the guy she argued with was wearing, and she told Cordell the man was wearing a blue Nautica jacket. (*Nichole Hubbard Aff.*; *Tp.* 425-426).

After talking to Nichole, Cordell and one other man, who we now know was William Sizemore, got out of Cordell's car and confronted Mr. Lamar and Omar Clark about the $20. Mr. Lamar was wearing the blue Nautica jacket Nichole had mentioned. (*State v. Sailor*, 2004 Ohio App. LEXIS 4766, (Ohio Ct. App. 2004)). Cordell exclaimed to Mr. Lamar "what the f—k you say to my sister" (*Tp.* 425:12,13), while Omar Clark confronted Cordell with a handgun. (*Affidavit of Cordell Hubbard Aff.* ¶6, ("*Cordell Hubbard Aff.*") (Attached as Exhibit 2)). William Sizemore told Omar Clark to put the gun away and said to Cordell, "Don't shoot Omar, he is a friend of mine . . . he's my cousin's baby's father!"[4] (December 4, 2002, Investigative Report, Page 2, Gibbs Interview ("December 4, 2002, Supplementary Report") (Attached as Exhibit 3); *tp.*944, 982)). According to the testimony, only one of the people from the car had a gun. (*Tp.* 426). In other words, William Sizemore, the second person from the car, did not have a gun; only Cordell Hubbard had a gun.

---

[4] This statement about "my cousin's baby's father" is discussed at length later in this memorandum.

Cordell eventually pulled his weapon and shot at both Omar Clark and Mr. Lamar. (*Id.* at ¶10). Omar Clark was fatally wounded while Mr. Lamar was only grazed by a bullet. (*State v. Sailor*, 2004 Ohio App.; *Tp.* 434). Cordell and William Sizemore then got back into their car and drove away. (*Tp.* 1050).

### B. Ru-El Sailor was not implicated in the murder until months later.

After Hubbard and Sizemore fled the scene, witnesses approached the wounded Omar Clark and tended to him until the police came. (*Tp.* 1050). Omar Clark died that same day, November 17, 2002, after arriving at the hospital. (*Tp.* 256, 257). Omar's brother, Umar, arrived at the scene and was hysterical. (*Tp.* 1060). Not long after his brother's death, Umar Clark began questioning witnesses about the incident. (*Tp.* 1061). Several days later, eyewitness Larry Braxton led Umar Clark to believe that the shooter "sounds like Cordell." (*Tp.* 61). Using this name, the police were eventually able to identify and arrest both Cordell Hubbard and Nichole Hubbard, but not a third person. The identity of the man who was with Cordell was unknown for several months.

Cordell was first arrested in connection to the murder Omar Clark on December 11, 2002. (*State of Ohio vs. Cordell Hubbard*, CR-02-432205). His sister, Nichole Hubbard, was arrested just over a week later. (*State of Ohio vs. Nichole Hubbard*, CR-02-432205). The pair had a trial date set for just a few months later in mid-2003, while the investigators continued to look for the second person present at the time of the shooting. (*See tp.* 1314). Detectives Veverka and Metzler of homicide worked to uncover leads, but they did not have any solid alternate suspects until vice Detective Eugene Jones's involvement yielded Sailor's name. (*Tp* 1321).[5]

---

[5] A description of how Eugene Jones came to find Ru-El Sailor's name is detailed in a later section.

C.  **Ru-El Sailor's conviction is based solely on witness identifications made months after the crime under questionable circumstances.**

Ru-El Sailor was convicted based on identification by two eyewitnesses, Larry Braxton and Mr. Lamar. Neither witness identified Ru-El Sailor as the second person present at the shooting until many months into the investigation after Ru-El Sailor's name was mentioned by an unidentified informant to an officer who was not even assigned to work this case.

1.  **Larry Braxton did not identify Ru-El Sailor as the shooter until months after the crime.**

Months after the crime, Larry Braxton identified Ru-El Sailor as the shooter. However, that identification occurred after Braxton had reported to police that the shooter was light-skinned, which is significant because Ru-El Sailor is a dark-skinned man. By contrast, Cordell Hubbard is a light-skinned man.

The shooting occurred immediately after witnesses Larry Braxton, Joseph Mayhand, and Brandon Gibbs, pulled up to Braxton's house on Englewood. (*Tp.* 1040). Braxton saw an argument happening three houses away, and he began walking towards it in an attempt to calm people down. (*Tp.* 1042). It was dark outside, with only a streetlight illuminating the area. (*Id*). As he approached, Braxton noticed one of the men brandishing a weapon. (*Tp.* 1041-1042). He ran back to his house. (*Tp.* 1048). Shots were fired, and Braxton observed the scene from just inside his house. (*Tp.* 1050).

One week later, Braxton spoke to the police. (*Tp.* 1061). In his initial statement, Braxton described the shooter as "BM 20-25 5'10 Light Skinned." (*See* December 4, 2002, Supplementary Report, Page 1, Braxton Interview). After describing the shooter to the victim's brother Umar Clark, Umar told Braxton that the shooter "sounds like Cordell." (*Tp.* 61).

5

Several months after this description was recorded in the police report, Braxton picked Sailor out of a photo lineup. (*State v. Sailor*, Cuyahoga App. No. 83552, 2004-Ohio-5207, ¶8). Braxton was the only witness to do choose Sailor from a line-up; neither Mayhand nor Gibbs were able to make an identification. (*Id.*).

At a pre-trial suppression hearing, Braxton confirmed his choice of Ru-El Sailor's photo from the photo line-up. (*Tp.* 36). Yet Braxton acknowledged that the description of the assailant he provided to Umar Clark matched Cordell: "I didn't know his name until Umar, that's the only person I know. But at the same time, he didn't describe him or anything. I mean, after I described the shooter to Umar, he said that sounds like Cordell." (*Tp.* 61). Due to the differences in their skin tone, it is not likely that Umar Clark would conclude that the shooter "sounds like Cordell" if Braxton's initial description of the shooter had matched Ru-El Sailor.

At trial, Braxton definitively identified Sailor as the shooter, notwithstanding the discrepancy between Ru-El Sailor's skin tone and Braxton's initial description of the shooter's skin tone. (*Tp.* 1063-1067).

### 2. Mr. Lamar initially identified Cordell Hubbard as a suspect; he did not identify Ru-El Sailor until the middle of the evidentiary hearing.[6]

Mr. Lamar was with the victim Omar Clark the entire night. Mr. Lamar was wearing the blue Nautica jacket Nichole used to identify the man she argued with to Cordell. (*Tp.* 424). Mr. Lamar picked Cordell Hubbard out of a photo array. Hubbard was identified in a photo lineup containing 6 photos. (*Tp.* 453, 454).

---

[6] There is mistake in the record regarding Clark Lamar's identification of Ru-El Sailor. According to the *trial record*, Clark Lamar was unable to identify Ru-El Sailor as the shooter; he was stuck between two photos. (*Tp.* 458). Mr. Lamar only identified Cordell Hubbard—but not Ru-El Sailor—in a photo array. In *State v. Sailor*, 2004 Ohio App. LEXIS 4766, the appellate court mistakenly stated that Clark Williams DID identify Ru-El Sailor in a lineup. This same mistake was repeated in *Sailor v. Bradshaw*, 2006 U.S. Dist. Lexis 97602.

Mr. Lamar was also shown Sailor's photos on several different occasions, but was unable to identify him at those times. (*Tp.* 210). Mr. Lamar could *not* identify Sailor when he was shown Sailor's photograph in a police photo array several months after the shooting, Mr. Lamar was stuck choosing between two different photos in a lineup. (*Tp.* 458). Before trial, Ru-El Sailor's attorney, Mr. Mack, asked Mr. Lamar off the record if he could identify the shooter in the courtroom, and Mr. Lamar could not. (*Tp.* 196-197). It was only after initially stepping off the witness stand at the first day of the evidentiary hearing and talking to Detective Veverka that Mr. Lamar was able to identify Sailor as the shooter, this time identifying him with 100% certainty. (*Tp.* 211-213, 461, 537).

This point merits emphasis—Mr. Lamar failed to identify Sailor until after he spoke with a detective after seeing (and being unable to identify) Sailor in a photographic line-up or live in the courtroom. While it is unknown what Detective Veverka said to Mr. Lamar, this sequence of events raises questions about the reliability of Mr. Lamar's identification of Sailor.

### 3. Detective Eugene Jones, who was not assigned to the case, named Ru-El Sailor as a suspect.

Vice Detective Eugene Jones was a prominent figure in Sailor's and the Hubbards' neighborhood. (*Tp.* 1331). Although Eugene Jones was not a homicide detective, he investigated the case as a courtesy to the homicide detectives working the case. (*Tp.* 1372). Jones canvassed the neighborhood[7] looking for information about the crime, eventually obtaining the names of two suspects from an informant. (*Tp.* 1386; March 25, 2003, Investigative Report of Detective Eugene Jones, ("*Jones Report*") (Attached as Exhibit 4)). The first name was Cordell Hubbard, and the second name was Will. (*Jones Report*). Jones knew Cordell's name, but did not recognize the name "Will." (*Jones Report*). According to Jones's report, after being misled by

---

[7] Four Block is a neighborhood running East 140th and St. Clair up to East 150th.

Tye Desk File - Cuyahoga County Prosecutor's Office Civil Division 01/25/2024    Page 7447

some community members, a former high school classmate told Jones that "L was actually Ruel Sailor."[8] As a result, Jones concluded that the names of the assailants were Cordell Hubbard and Ru-El Sailor. (*Tp.* 1387). Ru-El Sailor and Cordell Hubbard are long-time friends that Detective Jones had run-ins with, so the connection also made sense to him. (*Jones Report*).

In short, it appears that the only reason Ru-El Sailor ever become a suspect in this case in the first place was because an unidentified informant mistakenly (whether purposefully or accidentally) confused the name "Ru-El" with "Will". Had that not happened, there is no reason to believe that Larry Braxton would have ever had the opportunity to misidentify Ru-El Sailor as the shooter, which identification set into motion the chain of events that led to Sailor's conviction.

### D. Ru-El Sailor testified truthfully to his own whereabouts at the time of the crime.

Ru-El Sailor testified at trial about his whereabouts when the murder occurred, namely that he left Benjamin's bar and drove to the 4U2B bar. (*Tp.* 1544-1550). This part of Sailor's testimony was true—he did not go to Englewood and was not present at the murder scene. In an effort to remain loyal to his long-time friend, Sailor also testified that Cordell Hubbard rode with him from one bar to the next such that Cordell could not have been involved in the crime. (*Tp.* 1564). That part of Sailor's testimony was not true. Cordell drove with William Sizemore in Cordell's car to Englewood where he shot Omar Clark. The evidence supporting this fact is detailed in the following section.

### III. EVIDENCE OF RU-EL SAILOR'S INNOCENCE

Cordell Hubbard admitted at sentencing, in a sworn affidavit, and in a polygraph that William Sizemore—not Ru-El Sailor—was with him the night of the murder, and this fact is

---

[8] Jones was unclear at this point of his report. The exact quote is "told me L was Will and L was actual Ruel Sailor."

corroborated by numerous other individuals. These individuals did not testify at trial because, according to their affidavits, Detective Jones intimidated them to keep them from testifying on Ru-El Sailor's behalf. (*Affidavit of Bobby Nettles* ¶6, ("*Bobby Nettles Aff.*") (Attached as Exhibit 5); *Affidavit of Anthony McKenzie*, ("*Anthony McKenzie Aff.*") (Attached as Exhibit 6)).

Importantly, this fact is corroborated by William Sizemore's own admission to the victim's brother, Umar Clark, that he was there when Omar was killed. Umar Clark is so convinced that the second man at the scene was William Sizemore, not Ru-El Sailor, that he supports Ru-El Sailor's application to this conviction integrity unit.

### A. Cordell Hubbard admits *he* shot Omar Clark and William Sizemore—*not* Ru-El Sailor—was with him when the shooting occurred.

Cordell Hubbard chose not to testify during the trial, but at sentencing, he finally spoke for the first time about the night of the crime. Cordell admitted that he was present at the scene of the shooting and identified a man named "Will" as the other person with him that night. Cordell stated that Ru-El Sailor was not there that night:

> Your honor, there's a lot of things that the Court doesn't know, that my lawyer doesn't know. Ru-El Sailor wasn't present and -- this night when this took place. It was a guy named Will . . . It was me and Will there, and I – you know, and I – I kept -- I – you know, because I didn't think it was going to turn out like this, I didn't think my best friend was going to get convicted as the shooter, but he wasn't even there, you know. (Tp. 1815).

"Will" is William Sizemore. Sailor's attorney, Mr. Mancino[9], provided the Court with William Sizemore's full name, his address, and his most recent case number (at the time of the crime). (*Tp.* 1816-1820). Mancino stated that he issued a subpoena for Sizemore; however, Sizemore never appeared. (*Tp.* 1819).

---

[9] Mr. Mancino was Sailor's attorney on appeal.

9
TYE DESK FILE 000204

In April of 2015, Cordell Hubbard voluntarily submitted to a polygraph examination regarding his role in the murder of Omar Clark by Bill Evans of Polytech Associates.[10] Mr. Evans' report of his polygraph examination of Cordell Hubbard is attached as Exhibit 8. ("Hubbard Polygraph"). After conducting a pretest interview, the following questions were asked with the elicited responses indicated:

> 1. November 17, 2002, are you the one who shot Omar Clark?
>
>   Answer: Yes
>
> 2. When Omar Clark was shot, was Ru-El Sailor present with you?
>
>   Answer: No
>
> 3. November 17, 2002, did you shoot Omar Clark with your 9mm Glock?
>
>   Answer: Yes

Evans reported that after careful review of the results and the examination in its entirety, the physiological changes were indicative of truthfulness, meaning that no deception occurred. (*See* Hubbard Polygraph).

### B.  William Sizemore has admitted he was present at the crime scene.

Since the trial, William Sizemore has admitted to the victim's brother, Umar Clark, that he was present with Cordell Hubbard at the scene of the crime. (*See Affidavit of Umar Clark*, ("*Umar Clark Aff.*") (Attached as Exhibit 9). (*See also Letters to Ru-El Sailor from Umar Clark*, ("*Umar Clark Letters*") (Attached with affidavit from Umar Clark confirming he wrote the letters as Exhibit 10)). In an affidavit in 2013, Umar Clark states that William Sizemore called him soon after the Hubbards and Sailor were convicted of killing Omar. (*Umar Clark 2013 Aff.* at ¶1-2). Sizemore and Clark met a couple of days later so that Sizemore could inform Umar Clark about what happened the night Omar Clark was killed. Sizemore told Umar that he was

---

[10] Mr. Evan's qualifications are described in his curriculum vitae, attached as Exhibit 7.

only a few feet away from Omar when Omar was killed. (*Id.*). Sizemore also shared Omar Clark's last words, which were "help me, Will." (*Id.* at ¶2). Sizemore claimed that he "tried like hell to stop this." (*Id.*) The name Ru-El Sailor never came up during their meeting. (*Id.* at ¶3).

After speaking with William Sizemore, Umar Clark contacted Ru-El Sailor through an exchange of letters. (*See Umar Clark Letters*). These letters indicate that Umar believes William Sizemore was present at the shooting and also that Ru-El Sailor was *not* at the crime scene. (*See Umar Clark Letters*). Umar Clark has even promised to help Sailor's case: "buckle down because I'm gone (*sic*) fight to free a (*sic*) innocent man. It's going to be big attention but the truth is going to set you free." (*Umar Clark Letters*, 9-19-10 Letter).

In addition to William Sizemore's admission to Umar Clark, and Umar's belief that Sizemore was telling him the truth, statements heard by witnesses to the shooting (as reported to the police) indicate that William Sizemore was the man with Cordell Hubbard at the scene of the shooting. Brandon Gibbs heard, "Don't shoot Omar, he is a friend of mine . . . he's my cousin's baby's father!"[11] (December 4, 2002, Supplementary Report, Page 2, Brandon Gibbs Interview; *tp.* 944, 982-983). Another witness, Larry Braxton, heard one of the men yelling, "he [is] family, he is okay." (December 4, 2002, Supplementary Report, Page 1, Braxton Interview). Further, witness Jermaine Kidd also heard "We family, we family," coming from one of the men involved in the altercation. (December 4, 2002, Investigative Report, Page 5, Jermaine Kidd Interview). These statements make sense only in reference to William Sizemore, not Ru-El Sailor, because as Umar acknowledged, Marquetta Sizemore—a cousin of William Sizemore— was having a baby with Omar Clark. (*Umar Clark Letters*, Letter Dated 9-19-10).

Lastly, in Mr. Lamar's initial statement to the police, "the driver of the car said Omar and whatever and I think that Omar and that guy knew each other." (Statement of Clark Lynn

---

[11] This is confirmed and discussed at length later in this application.

Williams,[12] November 18, 2002 ("Mr. Lamar Statement") (Attached as Exhibit 11)). This helps further proves that Omar Clark knew one of the men present the night of the crime, and, combined with other statements, we know this man was William Sizemore.

### C. Other individuals confirm Sailor was not at the crime scene.

Several individuals have provided affidavits confirming that Sailor was not involved with the murder of Omar Clark.

#### 1. Bobby Nettles

Bobby Nettles, a friend of Sailor, averred in a February 2014 affidavit that he was with Ru-El Sailor during the timeframe when the crime happened. After nearly 11 years of silence, Nettles stated he was with Sailor the entire time when Hubbard and Sizemore committed the crime. (*Bobby Nettles Aff.* at ¶1-5). Specifically, Nettles recalled that he and Sailor were at Benjamin's Bar until 12:30 A.M., then immediately went to the 4U2B bar until closing. (*Id.* at ¶3-4). Following that, Sailor and Nettles split, with Sailor arriving to St. Aloysius just after 2 A.M. (*Tp.* 1573). Nettles planned to testify on Sailor's behalf, but he was discouraged from testifying after Eugene Jones allegedly told his mother that if he testified, "it would be really bad." (*Bobby Nettles Aff.* ¶6). Also, "on two other occasions [Detective Jones] has told [Nettles] that if [he] helps Ru-El 'things will be really bad for [him].'" (*Id.*).

#### 2. Ronald Snipe

Another friend, Ronald Snipe, provided an affidavit in September 2014. (*Affidavit of Ronald Snipe*, ("*Ronald Snipe Aff.*") (Attached as Exhibit 12)). Snipe stated that Sailor was in his own vehicle the evening of the murder, and that he saw Will and Cordell driving together. (*Id.* at ¶3-4). Snipe overheard Cordell in an argument, and when he and Will left, Snipe followed the pair. (*Id.* at ¶2, 5). Snipe followed the two in his own vehicle but got stopped in traffic and

---

[12] Mr. Lamar's full name

fell behind. (*Id.* at ¶5). Sailor was not with Snipe. (*See id.*) Nor was Sailor with Cordell. (*See id.*) Snipe called Cordell's phone, but Sizemore answered. (*Id.* at ¶6). Snipe arrived on the scene after the shooting, and called Cordell again because Cordell was no longer present at the scene. (*Id.* at ¶7). Cordell told him to leave the neighborhood. (*Id.*).

### 3. Anthony McKenzie

In addition, in July 2016, Anthony McKenzie, a friend of Sailor and Hubbard, signed an affidavit in which he swore that he saw Cordell and Will Sizemore leave the bar together. (*Anthony McKenzie Aff.* ¶3). McKenzie stated he learned of the murder from Detective Eugene Jones at a local basketball game, but was then intimidated by Detective Jones from providing information about the night of the crime. (*Id.* at ¶4-5). Sailor's defense counsel never contacted McKenzie. (Id. at ¶6).

### 4. Nichole Hubbard

As explained in the attached affidavit, Nichole Hubbard's narrative of the events of the evening is in line with the facts developed at the trial. Ms. Hubbard discussed the dispute with Mr. Lamar over the money and her subsequent calls to Cordell. Most importantly, she communicated that Cordell Hubbard told her that he was with "his nigga Will" immediately before arriving on Englewood Avenue. (*Nichole Aff.*). Ms. Hubbard made no mention of Ru-El Sailor in her statement. (*Id.*).

### D. Ru-El Sailor's polygraph supports his claim of innocence.

In February, 2015, Ru-El Sailor voluntarily took a polygraph test regarding the question of whether he was present for the shooting of Omar Clark. (February 23, 2015 Polygraph of Ru-El Sailor, ("Sailor Polygraph") (Attached as Exhibit 13)). This polygraph test was administered by Bill Evans of Polytech Associates, Inc. After a pretest interview, the following questions were

13

asked with the elicited responses indicated:

1. Did you shoot Omar Clark?

   Answer: No

2. Did you pull the trigger on the gun when Omar Clark was shot?

   Answer: No

3. Were you there at 105th and Englewood when Omar Clark was shot?

   Answer: No. (Sailor Polygraph)

Mr. Evans reported that after a careful review of the polygraph results and the examination as a whole, that the physiological changes were indicative of truthfulness, meaning that no deception occurred. (*See* Sailor Polygraph).

### E.  Umar Clark, the victim's brother, believes that Ru-El Sailor is innocent and supports his application for relief.

As explained above, the victim's brother Umar Clark believes that Cordell Hubbard was the shooter and William Sizemore was the other person present with Omar Clark was shot. As a result, Umar believes Ru-El Sailor's claim of innocence and supports this application. He recently provided an affidavit in which he explains this support:

> I truly believe based on the facts and evidence that Ru-El Sailor is innocent of Omar's murder and has been serving a life sentence for a crime that he did not commit.
>
> \*   \*   \*
>
> This wound will never heal for my family knowing that the real murderer wasn't convicted as such and that an innocent man is in prison. It is a true injustice to Ru-El but also to the memory of my brother Omar. (*Umar Clark 2017 Aff.*).

### IV. EXPLANATION OF SAILOR'S INNOCENCE

Put simply, Ru-El Sailor was not present on Englewood when Omar Clark was shot. As we now know, the evidence shows that Cordell Hubbard shot Omar Clark, and William Sizemore was the person with Cordell.

These facts are supported by the evidence explained above, including Cordell Hubbard's admission that he was present at the scene (during the sentencing hearing) and also that he was the shooter (in his affidavit as supported by the polygraph exam he passed). William Sizemore's admission to the victim's brother, Umar Clark, that Sizemore was present at the time of the shooting confirms that Sailor could not have been present since all accounts of the crime indicate only two individuals were there. The fact that Umar Clark believes Sizemore's admission—and in Sailor's innocence—bolsters the credibility of that admission, as do the statements reported by witnesses to the crime that would make sense only in reference to William Sizemore. Sizemore's presence at the crime scene is also supported by Ronald Snipe, who averred that he saw Cordell Hubbard and William Sizemore leave the club together without Sailor just before the time of the shooting.

### V. HOW THIS CASE CAN BE FURTHER INVESTIGATED

The case of Ru-El Sailor's innocence is overwhelming. Nevertheless, if the Conviction Integrity Unit wishes to investigate the case further it could speak with Umar Clark regarding his discussions with William Sizemore. In addition, the Unit could speak with William Sizemore regarding his presence at the crime scene.

## VI.   CONCLUSION

For all of the reasons explained above, Sailor, by and through counsel, respectfully requests that this conviction integrity unit accept his application for review and conduct a meaningful and thorough review of his claim of innocence. Additionally, the Ohio Innocence Project and Kimberly Kendall Corral, Esquire, formally request a meeting with the Conviction Integrity Unity and Prosecutor O'Malley to discuss Ru-El Sailor's innocence.

## Index of Exhibits

**Exhibit 1:** Nichole Hubbard Affidavit ("Nichole Aff.")

**Exhibit 2:** Cordell Hubbard Affidavit ("Cordell Hubbard Aff.")

**Exhibit 3:** December 4, 2002, Investigative Report ("December 4, 2002, Investigative Report")

**Exhibit 4:** Investigative Report of Detective Eugene Jones ("Jones Report")

**Exhibit 5:** Affidavit of Bobby Nettles ("Bobby Nettles Aff.")

**Exhibit 6:** Affidavit of Anthony McKenzie, ("Anthony McKenzie Aff.")

**Exhibit 7:** Bill Evans's Curriculum Vitae

**Exhibit 8:** Polygraph Examination of Cordell Hubbard ("Hubbard Polygraph")

**Exhibit 9:** Affidavit of Umar Clark on February 20, 2013 ("Umar Clark 2013 Aff.")

**Exhibit 10:** Letters to Ru-El Sailor from Umar Clark with Affidavit from Umar Clark on November 18, 2016 confirming he wrote the letters ("Umar Clark Letters")

**Exhibit 11:** Statement of Clark Lynn Williams, November 18, 2002 ("Mr. Lamar Statement")

**Exhibit 12:** Affidavit of Ronald Snipe, ("Ronald Snipe Aff.")

**Exhibit 13:** February 23, 2015 Polygraph of Ru-El Sailor ("Sailor Polygraph")

**Exhibit 14:** Affidavit of Umar Clark on March 21, 2017 ("Umar Clark 2017 Aff.")