

## Michael C. O'Malley
## Cuyahoga County Prosecutor

### REPORT OF THE CONVICTION INTEGRITY UNIT TO THE PROSECUTOR
### State of Ohio v. Ru-El Sailor, CR 435700-03

*This Report represents the internal work product of the members of the Conviction Integrity Unit. As such, this Report may contain information that is confidential, protected by attorney/client privilege or other privileges, and may constitute non-public information. It is intended to be conveyed only to the Prosecutor and to be shared only at the Prosecutor's discretion. Any unauthorized use, reproduction, forwarding, distribution, or other dissemination of this Report is strictly prohibited and may be unlawful.*

### I.    FACTS AS KNOWN BY THE STATE PRIOR TO CIU'S INVESTIGATION.

In July 2003, after a trial by jury, Ru-El Sailor and his codefendant Cordell Hubbard were convicted of multiple violent felony offenses including the Murder of Omar Clark and the Felonious Assault of Clark Lynn Williams.[1] A third defendant, Nichole Hubbard, was also found guilty of several offenses, including Complicity to Commit Murder and Complicity to Commit Felonious Assault.

The events giving rise to the charges against Ru-El Sailor and Cordell Hubbard occurred during the later evening hours of November 16, 2002 going into the early morning hours of

---

[1] Although his legal name is Clark Lynn Williams, he prefers to go by "Clark Lamar Williams", which is how is he referred to for the purposes of this report.

Sailor CIU report - Cuyahoga County Prosecutor's Office Civil Division 01/25/2024                    Page 7173

November 17, 2002.  Omar Clark and his friend, Clark Lamar Williams, were socializing, consuming alcohol, and using illegal drugs with Nichole Hubbard, Maria Whitlow, and Ellen Taylor (who was also known as "Puddin").[2]  Clark Lamar Williams borrowed twenty dollars from Nichole Hubbard in order to purchase illegal drugs with the promise to pay her the money back, in full, upon the group's return to Englewood Avenue in the City of Cleveland. When Clark Lamar Williams and Omar Clark returned to Englewood Avenue, Clark Lamar Williams decided to pay Nichole Hubbard back only half of the money he borrowed and this upset Nichole Hubbard. Nichole Hubbard immediately telephoned her brother, Cordell Hubbard, and explained how Clark Lamar Williams borrowed money from her and then failed to return all of it.

As Omar Clark and Clark Lamar Williams walked down Englewood Avenue, they were approached suddenly by a speeding vehicle.  Cordell Hubbard hurriedly got out of the vehicle and confronted Clark Lamar Williams for disrespecting his sister, Nichole Hubbard. A second male, believed to be Ru-El Sailor, was present in the vehicle. Clark Lamar Williams was unfamiliar with Cordell Hubbard and the second individual, but Clark Lamar Williams surmised it was Nichole Hubbard's brother based on their conversation.  An argument ensued amongst the men and Clark Lamar Williams fled the scene.  As Clark Lamar Williams ran, he heard a series of gunshots and a bullet grazed his buttock.

A short time later, Clark Lamar Williams returned to the area of the argument at 10524 Englewood where he found Omar Clark's body lying in the street.  Omar Clark sustained eleven gunshot wounds to his torso and lower extremities. In the early morning hours of November 17, 2002, Omar Clark was pronounced dead at the hospital after therapeutic measures failed.

---

[2] As of the time of this writing, Ellen Taylor is deceased.

2

The defense put forth by Ru-El Sailor at the time of trial was his claim of innocence. Ru-El Sailor testified at the joint trial and denied being present at the scene of the shooting and untruthfully claimed that Cordell Hubbard was with him that entire night. Specifically, the following exchange took place during Ru-El Sailor's cross-examination testimony in trial:

Q. So when you leave Benjamin's the two of you are together?

A. Yes

Q. When you go to the 4U2B you're together?

A. Yes

Q. Then you leave 4U2B and go to St. Aloysius together?

A. Yes

Q. So you are in each other's company throughout that entire set of events?

A. Yes.

(Exhibit 1, Tr. at p. 1572).

Further, Ru-El Sailor claimed that he and Cordell Hubbard were together after the bars closed until approximately 4:00A.M. when he dropped Cordell Hubbard off at home. (Exhibit 2, Tr. at p. 1580). If the jury believed his testimony, Ru-El Sailor's claim that he was with Cordell Hubbard the entire night at the above-described locations would have given himself and Cordell Hubbard an alibi defense.

The jury returned verdicts of guilt for both Ru-El Sailor and Cordell Hubbard. Ru-El Sailor was sentenced to twenty-five years to life.   At the sentencing hearing, on July 24, 2003, Cordell Hubbard stated in open court, "Your Honor, there's a lot of things that the Court doesn't know, that my lawyer doesn't know. Ru-el Sailor wasn't present and – this night when this took place. It was a guy named Will * * * * It was me and Will there * * * * I didn't think it was going to turn

3

out like this, I didn't think my best friend was going to get convicted as the shooter, but he wasn't even there, you know * * * * And Ru-el Sailor didn't play a part in this, your Honor." (Exhibit 3, Sent. Tr. at p. 1815-1816). In response to the Court's inquiry: "And are you telling me that Will did the shooting?" Hubbard answered: "No, I'm telling you if you find Will, you will find everything was to come out, the whole truth, everything was going to come out." (Exhibit 4, Sent. Tr. at p. 1817).

## II.     REVIEW BY THE CONVICTION INTEGRITY UNIT

At the request of Ru-El Sailor, the Conviction Integrity Unit conducted an extensive investigation into the facts and circumstances surrounding Omar Clark's death. Although his initial application and resubmitted application to the CIU were rejected in 2014 and 2016 respectively, Ru-El Sailor submitted a third application and the CIU initiated its formal investigation in late January 2017. At the outset, CIU notes that Ru-El Sailor continues to maintain that he is actually innocent of these crimes.

The CIU has extensively reviewed and examined all of the following:

➢ CCPO's case file in CR 435700, *State of Ohio v. Ru-El Sailor*;

➢ Police reports (including all the initial police reports, the investigative reports, as well as the corresponding supplemental reports);

➢ All of the evidence submitted at trial;

➢ All transcripts of proceedings (including the transcripts from the pre-trial motion hearings, the trial transcripts, and the post-trial and sentencing transcripts);

➢ All post-conviction motions;

➢ Appellate record and decisions; and,

4

> ➢ Ru-El Sailor's application to the CIU, which was supported by exhibits including affidavits and polygraph examinations.

In addition, the CIU has spent hours consulting with a law enforcement partner with regard to the police investigation in this case and the reliability of the eyewitness evidence.

Finally, CIU has interviewed multiple witnesses and has made repeated attempts to interview others.

## III.    INITIAL OBSERVATION

The CIU's initial observations that resulted in an in-depth investigation are the following: the clothing description and physical appearance of the suspects greatly varied; and the auditory statements prior to Omar's death demonstrates the relationship between Sizemore and victim Omar Clark, thereby excluding Sailor as being present at the scene.

CIU's examination of the investigative reports revealed numerous inconsistencies. It is the aggregate of these inconsistencies that led CIU to the decision to dedicate the time and resources necessary to fully investigate this matter—even though the State's prosecution of Ru-El Sailor was thoroughly successful in the trial and appellate courts fifteen years ago.

The original investigative reports reveal varying eyewitness accounts. Specifically, the descriptions of the suspects' clothing differs vastly from witness to witness. Clark Lamar Williams, for example, described the gunman as wearing blue jeans and a t-shirt. (Exhibit 5, CPD Officer Andrew Desatnik's Report Dated 11-17-02). Meanwhile Larry Braxton[3], another

---

[3] Larry Braxton resided at 10613 Englewood in 2003 and, on the night Omar Clark was killed, he arrived at the scene with friends Brandon Gibbs and Damien Noel. At the time of Omar Clark's death, Larry Braxton was dropped off at the residence of his brother, Joseph Mayhand, located at 10527 Englewood Avenue. Larry Braxton was familiar with Clark Lamar Williams and Omar Clark as residents of Englewood Avenue (they reside at 10622 Englewood Avenue and 10706 Englewood Avenue, respectively). Braxton was unfamiliar with defendant Ru-El Sailor and

5

eyewitness, described the gunman as wearing a "red cloth jogging suit".  (Exhibit 6, <u>Detective Veverka's Supplemental Report</u> Dated 12-4-02, p. 3).

Similarly, the physical appearances of the suspects as described by the eyewitnesses at the time of the victim's death also varied.  Witness Brandon Gibbs[4] described the gunman as having a light complexion and having braids in his hair.  (Exhibit 7, <u>Detective Metzler's Supplemental Report</u> Dated 12-4-02, p. 2).  On the other hand, Clark Lamar Williams described the gunman as having short hair and he said that the two suspects "looked alike, were possibly brothers".  (Exhibit 5, <u>CPD Officer Andrew Desatnik's Report</u> Dated 11-17-02.)  Another witness, Joseph Mayhand[5], described the gunman as possibly wearing a red headband and red jacket.  (Exhibit 8, <u>Detective Metzler's Supplemental Report</u> Dated 12-4-02, p. 1).

One *consistency* in the investigative reports is that the gunman was described as being a light skinned male.  (Joseph Mayhand, fn 5; Exhibit 9, Larry Braxton, <u>Detective Veverka's Supplemental Report</u> Dated 12-4-02, at p. 3; and Exhibit 7, Brandon Gibbs, <u>Detective Metzler's Supplemental Report</u> Dated 12-4-02, p. 2).  Only Clark Lamar Williams described the gunman as medium complexioned.  (Exhibit 5, <u>CPD Officer Andrew Desatnik's Report</u> Dated 11-17-02).  Ru-El Sailor has a dark complexion.

---

codefendant Cordell Hubbard. Besides Clark Lamar Williams, Larry Braxton is the only other witness to make an in-court identification of Ru-El Sailor.

[4] Brandon Gibbs was a friend of Larry Braxton and Damien Noel. Brandon Gibbs, Larry Braxton, and Damien Noel arrived at 10527 Englewood to drop off Larry Braxton at Joseph Mayhand's home. Like Larry Braxton, Brandon Gibbs was not involved in the dispute but he reported general descriptions of the males involved in the argument and he also reported hearing distinctive statements coming from the arguing males about someone's sister and, more specifically, "don't shoot Omar * * * * he's my cousin baby's father."

[5] Joseph Mayhand is Larry Braxton's brother. Joseph Mayhand was on his porch at 10527 Englewood Avenue when he observed the males standing in the street arguing. Mayhand recognized both victim Omar Clark and Clark Lamar Williams as residents of Englewood Avenue. Mayhand was unfamiliar with Cordell Hubbard and Ru-El Sailor. Mayhand described the men as being light skinned.

6

Notably, at Ru-El Sailor's trial (which took place six months after Omar Clark's murder), Larry Braxton and Brandon Gibbs departed from their initial descriptions of a light skinned gunman and instead testified that the gunman was a dark skinned male. (Exhibit 10, Larry Braxton, Tr. at p. 1045-1046, 1087, Brandon Gibbs, Tr. at p. 945, 946, 950, 979, 999).

At trial, Clark Lamar Williams identified Ru-El Sailor in court as the shooter (Exhibit 11, Tr. at p. 427) despite having previously testified in a hearing that he only "glanced" at the shooter for a "few seconds" and admitting it was "real dark" outside and acknowledging he was not paying too much attention to the gunman/driver. (Exhibit 12, Supp. Tr. at p. 126-127).

The investigative and supplemental reports reviewed by the CIU also suggested that several witnesses heard very noteworthy statements coming from the participants of the verbal dispute just prior to Omar Clark's murder. These auditory recollections were very *consistent* with one another. First, witnesses agreed that the verbal argument between the men centered on a female (codefendant Nichole Hubbard). (Exhibit 7, Detective Metzler's Supplemental Report Dated 12-4-02, p. 2) Second, witnesses heard statements relating to one of the participant's sister: specifically, Brandon Gibbs heard one of the men say "you can't talk to my sister that way" and "I'm on the phone with her right now and if she tells me anything different you are out of here". (Exhibit 7, Detective Metzler's Supplemental Report Dated 12-4-02, p. 2). Third, several witnesses heard the arguing men making statements that "family" was involved. Larry Braxton reported hearing the victim or someone say "he was family, he is okay". (Exhibit 6, Detective Veverka's Supplemental Report Dated 12-4-02, p. 3). Similarly, witness Jermain Kidd reported overhearing the victim or someone say "we family, we family" or words to that effect. (Exhibit 9, Detective Veverka's Supplemental Report Dated 12-4-02, p. 5). And Brandon Gibbs reported hearing someone in the controversy say "Don't shoot Omar, He is a friend of mine" and "He's my cousin's

7

baby father". (Exhibit 7, <u>Detective Metzler's Supplemental Report</u> Dated 12-4-02, p. 2). These auditory recollections, which are strengthened by their number and consistency with each other, became particularly curious to the CIU for the reason that, it appears, whomever was trying to intervene in the verbal dispute was somehow a familial relation—and Ru-El Sailor is not known to be related, in any manner, to murder victim Omar Clark.

## IV.    IN-DEPTH INVESTIGATION BY THE CIU.

Over the course of its fourteen-month investigation, the CIU interviewed several witnesses and non-witnesses in this case. Most of the interviews involved CIU's attempts to clarify conflicts between the investigative reports, court transcripts, and the information contained in Ru-El Sailor's resubmitted application to the CIU (which was supported by exhibits). The collective interviews, coupled with the entire fruits of the CIU's investigation, undoubtedly reveal newly discovered evidence that warrants the CIU's ultimate recommendation to the Prosecutor.

Below is a brief synopsis of what was learned from several of the key witness interviews: Umar Clark and Rasheed Mathis (brothers of victim, Omar Clark); William Sizemore (the man who now swears to have been present at the scene, who tried to intervene in the dispute by explaining to Cordell Hubbard that Omar Clark was family); and Clark Lamar Williams (the man grazed by a bullet, who has recanted his identification of Ru-El Sailor as the man present with Cordell Hubbard on the night of Omar Clark's murder).

### A. Interviews of Umar Clark and Rasheed Mathis.

The CIU interviewed Umar Clark (several times) and Rasheed Mathis[6], both of whom are brothers of murder victim Omar Clark. These brothers initially explained that they just wanted to

---

[6]  Rasheed Mathis was interviewed by the CIU in the Winter of 2017. All statements attributed to him in this report are based on the in-person interview he had with the CIU on December 20, 2017.

8

see justice done on behalf of Omar. (Exhibit 13, <u>Umar Clark's Notarized Letter</u> Dated March 21, 2017).

The victims' brothers disclosed that they were aware that Ru-El Sailor did not shoot and kill their brother, Omar Clark, and that they have known this fact for the last fifteen years. (Exhibit 14, <u>Umar Clark's Affidavit</u> Dated February 20, 2013). Specifically, Umar Clark and Rasheed Mathis indicated that they learned from William ("Willie") Sizemore that Sizemore was present when their brother Omar Clark was killed and that it was Cordell Hubbard who murdered him. *Id*.

The CIU learned that, fifteen years ago, Umar Clark and Rasheed Mathis were each separately approached by William Sizemore who told them individually about the circumstances surrounding the death of their brother, Omar Clark. They have informed the CIU that William Sizemore shared this information about Omar Clark's murder with them around the time of the trial in this case. (Exhibit 13, <u>Umar Clark's Notarized Letter</u> Dated March 21, 2017).

The brothers report that William Sizemore explained that he was with Cordell Hubbard on the night of Omar Clark's death and that Sizemore tried his best to intervene and stop Cordell Hubbard from shooting Omar Clark. (Exhibit 14, <u>Umar Clark's Affidavit</u> Dated February 20, 2013). William Sizemore explained to the victim's brothers that he tried to tell Cordell Hubbard that he knew Omar Clark and that Omar Clark was like a family member to Sizemore because his cousin, Marquetta Sizemore, was dating Omar Clark and the two shared a young child together. (Exhibit 13, <u>Umar Clark's Notarized Letter</u> Dated March 21, 2017). William Sizemore indicated to the brothers that, to Sizemore's surprise, Cordell Hubbard angrily shot Omar Clark numerous times after Clark Lamar Williams fled from the scene. The brothers indicate that William Sizemore never told them that Ru-El Sailor was present at the time Omar Clark's death. (Exhibit 13, <u>Umar Clark's Affidavit</u> Dated February 20, 2013).

9

Umar Clark and Rasheed Mathis were present during portions of Ru-El Sailor's trial and sentencing. Umar Clark and Rasheed Mathis candidly indicated to the CIU that they were extremely upset with Ru-El Sailor for testifying in defense of the case and the brothers felt that Ru-El Sailor deserved to be convicted because he gave untruthful testimony during the codefendants' joint trial. More precisely, the brothers were very upset that Ru-El Sailor testified that Cordell Hubbard was with Ru-El Sailor all night and therefore was not present at the time Omar Clark was shot and killed.

Umar Clark and Rasheed Mathis, during their interviews with the CIU, stated that they were much younger at the time of Ru-El Sailor's trial (in 2003) and they were still grieving their brother Omar's death. It was for that reason that the brothers did not reveal to the prosecutors, the detectives, or anyone involved in the case, the subject of their communications with William Sizemore.

**B. Interview of William ("Willie") Sizemore.**

William Sizemore was subpoenaed by Ru-El Sailor's defense counsel during a post-trial hearing, however, he failed to appear. By his own account, since the trial in 2003, William Sizemore has never tried to contact prosecutors or law enforcement officers to offer any information about the murder of Omar Clark, and, in fact, was addicted to drugs and left the State. (Recorded Interview of William Sizemore taken Summer of 2017 by the CIU and recent conversation with the CIU on March 20, 2018).

The CIU finally located and interviewed William Sizemore during the Summer of 2017, after trying to do so for well over one year. William Sizemore's interview proved critical in that it generated new evidence, which is corroborated by the facts as they were known to the State in November 2002.

10

To start, William Sizemore indicated to the CIU that Omar Clark's murder was very traumatic for him and that the circumstances frightened him. (Exhibit 15, <u>Sizemore Affidavit</u> Dated March 20, 2018, ¶ 9). After the incident, William Sizemore began consuming more alcohol and was dealing with a substance abuse problem. Further, William Sizemore disclosed to the CIU that, around the time of Omar Clark's death, the mother of Sizemore's oldest child committed suicide in front of their child. William Sizemore indicated in his interview with CIU that he departed from Ohio for many years mainly because of Omar Clark's murder and the fact that Sizemore was in a very bad place in life at that time.

William Sizemore acknowledged to the CIU that he was present during Omar Clark's murder. (Exhibit 15, <u>Sizemore Affidavit</u> Dated March 20, 2018, ¶ 2-7). William Sizemore stated that Cordell Hubbard confronted Omar Clark and Clark Lamar Williams and that an argument ensued. (Exhibit 15, <u>Sizemore Affidavit</u> Dated March 20, 2018, ¶ 6). William Sizemore indicated that he attempted to stop the argument but things escalated. William Sizemore, again, for the first time, reported that Cordell Hubbard took out a gun during the argument, as did the victim Omar Clark. (Exhibit 15, <u>Sizemore Affidavit</u> Dated March 21, 2018, ¶ 6-7).

William Sizemore indicated that he attempted to calm the situation down but Cordell Hubbard was getting angrier as the moments passed. William Sizemore further revealed that he was trying to explain to Cordell Hubbard that Omar Clark was his friend and like a family member to him in that Omar Clark was dating Sizemore's cousin, Marquetta Sizemore, and the two shared a child together. (Exhibit 15, <u>Sizemore Affidavit</u> Dated March 20, 2018, ¶ 5). William Sizemore indicated that, out of nowhere, Cordell Hubbard fired his gun shooting and killing Omar Clark. (Exhibit 15, <u>Sizemore Affidavit</u> Dated March 20, 2018, ¶ 7).

William Sizemore has unequivocally stated that Ru-El Sailor was not present on Englewood Street when Cordell Hubbard shot and killed Omar Clark. (Exhibit 15, <u>Sizemore Affidavit</u> March 20, 2018, ¶ 10).

### C. Interview of Clark Lamar Williams.

As mentioned above, Clark Lamar Williams testified at both the pre-trial suppression hearing and at the trial in this case. The CIU attempted to locate Clark Lamar Williams for months so that an interview could be conducted. The CIU finally located Clark Lamar Williams after he was arrested on a warrant and was incarcerated in the Cuyahoga County Jail. With the cooperation of his current defense counsel, Clark Lamar Williams was recently interviewed on March 12, 2018.

Clark Lamar Williams acknowledged that, in the moments prior to Omar Clark's death, Clark Lamar Williams was confronted by, and got into an argument with, Cordell Hubbard. The argument was presumably over money that Clark Lamar Williams owed to Nichole Hubbard. (Exhibit 16, <u>Williams' Affidavit</u> Dated March 20, 2018, ¶ 1-5).

Clark Lamar Williams's interview revealed to the CIU new and critical evidence that had not previously been shared with anyone involved in this case. Clark Lamar Williams indicated that he cannot identify Ru-El Sailor currently, nor could he do so during the trial in 2003 (despite his trial testimony to the contrary). (Exhibit 16, <u>Williams' Affidavit</u> Dated March 20, 2018, ¶ 13). Clark Lamar Williams stated that the reason he identified Ru-El Sailor in court in 2003, was because his friend and intimate partner at the time, Ellen Taylor, told him that Ru-El Sailor was the other male with Cordell Hubbard on the night of the murder. (Exhibit 16, <u>Williams' Affidavit</u> Dated March 20, 2018, ¶ 14). Clark Lamar Williams explained that he was with Ellen Taylor in the courthouse for pretrial proceedings in this case and that was when she pointed out Ru-El Sailor through a window in the courtroom door and she told Clark Lamar Williams that Ru-El Sailor was

12

the male with Cordell Hubbard when Omar Clark was killed. (Recorded Interview of Clark Lamar Williams Dated March 12, 2018.)

The CIU asked Clark Lamar Williams why he believed Ellen Taylor's information when Ellen Taylor herself clearly was not present as a witness at the scene of Omar Clark's murder. Clark Lamar Williams explained that Ellen Taylor and codefendant Nichole Hubbard were best friends at the time and therefore, he presumed, Ellen Taylor learned of Ru-El Sailor's involvement from Nichole Hubbard. (Exhibit 16, Williams' Affidavit Dated March 20, 2018, ¶ 15). Clark Lamar Williams further explained that he trusted Ellen Taylor, so back in 2003 he told the detectives that Ru-El Sailor was the person that arrived with Cordell Hubbard and that Ru-El Sailor was the person who possessed the firearm. (Recorded Interview of Clark Lamar Williams Dated March 12, 2018).

Clark Lamar Williams also indicated that murder victim Omar Clark had a firearm during the confrontation with Cordell Hubbard. Clark Lamar Williams qualified, however, that Omar Clark never brandished, pointed, or used the weapon towards anyone. (Recorded Interview of Clark Lamar Williams Dated March 12, 2018). Clark Lamar Williams surmised that Omar Clark simply had the firearm drawn at his side, next to his leg, for protection. Clark Lamar Williams explained that, after initially fleeing the scene, he circled back around to the street where he found Omar Clark's body in the road. Clark Lamar Williams stated that it was at this time that Omar Clark's cousin, a male name Lionel, retrieved the firearm from Omar Clark's body before the medical rescue and police vehicles arrived. (Exhibit 16, Williams' Affidavit Dated March 20, 2018, ¶ 9). The CIU located Lionel Williams, Omar Clark's nephew, who admitted to being present at the scene but denied removing a gun. (CIU's interview of Lionel Williams on March 22, 2018). This concluded the CIU's investigation.

13

## V.     ANALYSIS.

The new information revealed via the CIU's investigation is corroborated by the facts as the State knew them in 2002 and 2003.  For example:

> Statements heard by the witnesses to the effect of "he was family, he is okay"; "we family, we family"; "don't shoot Omar, he is a friend of mine" and "he's my cousin's baby father" corroborate the family relationship that exists between victim Omar Clark, Marquetta Sizemore, and William Sizemore.  (Exhibit 6, <u>Detective Veverka's Supplemental Report</u> Dated 12-4-02, p. 3; Exhibit 9, <u>Detective Veverka's Supplemental Report</u> Dated 12-4-02 at p. 5; and Exhibit 7, <u>Detective Metzler's Supplemental Report</u> Dated 12-4-02, p.2)  Ru-El Sailor has no such familial relationship with these parties.  This is a critical factor in the CIU's analysis and conclusion.

> Initial reports from eye witnesses referred to a light-skinned gunman.  (Exhibit 8, <u>Detective Metzler's Supplemental Report</u> Dated 12-4-02, p. 1; Exhibit 6, <u>Detective Veverka's Supplemental Report</u> Dated 12-4-02, p. 3; and Exhibit 7, <u>Detective Metzler's Supplemental Report Dated</u> 12-4-02, p. 2).  While Cordell Hubbard and William Sizemore could be seen as light-skinned, Ru-El Sailor, whose complexion is markedly darker, cannot.  This is a critical factor in the CIU's analysis and conclusion.

> Cordell Hubbard stated in open court and on the record at the time of his sentencing, "Your Honor, there's a lot of things that the Court doesn't know, that my lawyer doesn't know. Ru-el Sailor wasn't present and – this night when this took place. It was a guy named Will * * * * It was me and Will there * * * * I didn't think it was going to turn

14

out like this, I didn't think my best friend was going to get convicted as the shooter, but he wasn't even there, you know * * * * And Ru-el Sailor didn't play a part in this, your Honor." (Exhibit 3, Sent. Tr. at p. 1815-1816). In response to the Court's inquiry: "And are you telling me that Will did the shooting?" Hubbard answered: "No, I'm telling you if you find Will, you will find everything was to come out, the whole truth, everything was going to come out." (Exhibit 4, Sent. Tr. at p. 1817). This is a critical factor to the CIU's analysis and conclusion.

➢ Cordell Hubbard provided a sworn affidavit indicating that he—not Ru-El Sailor—shot and killed Omar Clark. (Exhibit 17, <u>Cordell Hubbard's Affidavit</u> Dated August 9, 2003). This is a critical factor in the CIU's analysis and conclusion.

➢ Cordell Hubbard provided sworn testimony in the hearing on Ru-El Sailor's motion for new trial held on September 4, 2003, stating: "Q. And on the evening of the shooting of Omar Clark, was Mr. Sizemore with you? A. Yes, sir. Q. Was Ru-el Sailor anywhere present at the time of the shooting? A: No, sir." (Exhibit 18, Sailor's Motion for New Trial Tr. at p. 1864). "Q. When you went to the scene of the shooting, was Mr. Sailor with you? A. "No, sir." "Q. Did you tell him you were leaving or anything? A. No, sir, I just left." (Exhibit 19, Sailor's Motion for New Trial Tr. at p. 1865). "Q. Did Ru-el Sailor have anything to do with the shooting of Omar Clark? A. No, sir." (Exhibit 20, Sailor's Motion for New Trial Tr. at p. 1866). "Q. Is there any doubt in your mind that Ru-el Sailor was not with you? A. No, sir." (Exhibit 21, Sailor's Motion for New Trial Tr. at p. 1868). This is a critical factor in the CIU's analysis and conclusion.

➢ In relation to the actual killing of Omar Clark, Cordell Hubbard provided the following sworn testimony in the hearing on Ru-El Sailor's Motion for New Trial: "Q. As far as

15

the shooting of Omar Clark, you were the one who shot him according to your affidavit, is that right? A. Yes, sir, in self-defense." (Exhibit 22, Sailor's Motion for New Trial Tr. at p. 1867). "Q. So after you killed Omar Clark, then you took William Sizemore home, is that correct? That's what you're telling us today? A. After I left the scene of 150 and Englewood, I dropped William Sizemore off." (Exhibit 23, Sailor's Motion for New Trial Tr. at p. 1876). "Q. All right. Now you testified that you shot Omar Clark. It was in self-defense, right? A. Yes." (Exhibit 23, Sailor's Motion for New Trial Tr. at p. 1876). "Q. The gun pointed at you. A. Yeah. Q. Turned around with the gun pointed at you? A. As he was turning, that's when I shot. Q. How many times did you shoot him? A. I couldn't tell you, ma'am. Q. More than once? A. I don't know. I just know I shot him. I couldn't tell you. I couldn't be exact. I just know I shot him." "Was it more than once? A. Yeah. Q. Yes? A. Yes, I was just shooting. I don't know. I couldn't tell you exactly how many times I shot him, ma'am." (Exhibit 24, Sailor's Motion for New Trial Tr. at p. 1879). This is a critical factor in the CIU's analysis and conclusion.

➢ The victim's brother, Umar Clark, statement that William Sizemore admitted to him fifteen years ago, in 2003, that Sizemore (not Ru-El Sailor) was present at the time of Omar Clark's death is a significant factor (Exhibit 13, Umar's Notarized Letter Dated March 21, 2017 and Exhibit 14, Umar Clark's Affidavit Dated February 20, 2013. Further the victim's brother, Rasheed Mathis, statement that Sizemore told him fifteen years ago that Sizemore was present (not Ru-El Sailor) at the time of Omar Clark's death, further corroborates Sizemore and Umar Clark's recollections (Rasheed Mathis interview with the CIU on December 20, 2017). Umar Clark and Rasheed Mathis' statements corroborate both William Sizemore's and Cordell Hubbard's statements.

This corroboration, combined with the victim's brothers' strong belief that justice must be done by releasing Ru-El Sailor from prison, are additional significant factors in the CIU's analysis and conclusion.

➢ The newly learned fact that Clark Lamar Williams' in-court identification of Ru-El Sailor was based on information from Ellen Taylor. Specifically, as Clark Lamar Williams explained in his interview with the CIU, he was with Ellen Taylor in the courthouse for pretrial proceedings in this case and that was when she pointed out Ru-El Sailor through a window in the courtroom door. Ellen Taylor told Clark Lamar Williams that Ru-El Sailor was the male with Cordell Hubbard when Omar Clark was killed. (Recorded Interview of Clark Lamar Williams Dated March 12, 2018). Yet, Ellen Taylor was not even present at the time of the shooting. This is a critical factor in the CIU's analysis and conclusion.

➢ The fact that Clark Lamar Williams' trial identification of Ru-El Sailor has been recanted, combined with the fact that he was one of only two witnesses to identify Ru-El Sailor at trial is significant in the CIU's analysis and conclusion. (Williams' identification of Sailor Exhibit 11, Tr. at p. 427; Exhibit 25, Tr. at p. 459-461; Braxton's identification of Sailor Exhibit 26, Tr. at p. 1065-1066).

➢ Separately, the CIU is gravely suspicious of Clark Lamar Williams' trial identification of Ru-El Sailor because: Clark Lamar Williams was admittedly under the influence of PCP and alcohol at the time of the crime (Exhibit 27, Tr. at p. 409-411, 413; Exhibit 28, Supp. Tr. at p. 136); it was dark outside (Exhibit 28, Supp. Tr. at p. 136); Clark Lamar Williams fled from the dispute before the shooting began (Exhibit 29, Tr. at p. 432); Clark Lamar Williams only "glanced" at the other person with Cordell Hubbard

17

for a "few seconds" (Exhibit 12, Supp. Tr. at p. 127; Exhibit 30, Tr. at p. 426); Clark Lamar Williams' focus during the verbal altercation was mainly on Cordell Hubbard, who was in Williams' face yelling at him (Exhibit 30, Tr. at p. 425-426); Clark Lamar Williams did not actually witness the shooting; and Clark Lamar Williams picked both Ru-El Sailor and another gentleman, as the possible shooter, out of a photo-array during the original investigation of this case (Exhibit 31, Tr. at p. 456-460). All of these factors coupled with Clark Lamar Williams' recent admissions in 2018 as to the circumstances involving his in-court identification of Ru-El Sailor in 2003, make his original identification of Ru-El Sailor, in the CIU's determination, totally unreliable at this time.

## VI.   RECOMMENDATION OF THE CIU TO THE PROSECUTOR.

Based upon the foregoing, the CIU no longer has confidence in the State's theory as it was presented at Sailor's trial or in the guilty verdict that was rendered in his case. Accordingly, the CIU recommends to the Prosecutor, based upon its review of the old evidence and in consideration of the new evidence gathered in this investigation, that the interests of justice require vacating Ru-El Sailor's convictions and granting him a new trial.

Respectfully submitted,

Russell Tye, Chief of the Conviction Integrity Unit

18

State's Exhibit List

State's Exhibit 1, Tr. at p. 1572

State's Exhibit 2, Tr. at p. 1580

State's Exhibit 3, Sent. Tr. at p. 1815-1816

State's Exhibit 4, Sent. Tr. at p. 1817

State's Exhibit 5, CPD Officer Andrew Desatnik's Report Dated 11-17-02

State's Exhibit 6, Detective Veverka's Supplemental Report Dated 12-4-02, p. 3

State's Exhibit 7, Detective Metzler's Supplemental Report Dated 12-4-02, p. 2

State's Exhibit 8, Detective Metzler's Supplemental Report Dated 12-4-02, p. 1

State's Exhibit 9, Detective Veverka's Supplemental Report Dated 12-4-02, p. 5

State's Exhibit 10, Braxton, Tr. at p. 1045- 1046, 1087; Gibbs, Tr. at p. 945, 946, 950, 979, 999

State's Exhibit 11, Tr. at p. 427

State's Exhibit 12, Supp. Tr. at p. 126-127

State's Exhibit 13, Umar Clark's Notarized Letter, Dated March 21, 2017

State's Exhibit 14, Umar Clark's Affidavit, Dated February 20, 2013

State's Exhibit 15, Sizemore Affidavit Dated March 20, 2018, ¶ 2-7, 9, 10

State's Exhibit 16, Williams' Affidavit Dated March 20, 2018, ¶ 1-5, 9, 13, 14, 15

State's Exhibit 17, Hubbard's Affidavit Dated August 9, 2003

State's Exhibit 18, Sailor's Motion for New Trial Tr. at p. 1864

State's Exhibit 19, Sailor's Motion for New Trial Tr. at p. 1865

State's Exhibit 20, Sailor's Motion for New Trial Tr. at p. 1866

State's Exhibit 21, Sailor's Motion for New Trial Tr. at p. 1868

State's Exhibit 22, Sailor's Motion for New Trial Tr. at p. 1867

State's Exhibit 23, Sailor's Motion for New Trial Tr. at p. 1876

State's Exhibit 24, Sailor's Motion for New Trial Tr. at p. 1879

State's Exhibit 25, Tr. at p. 459-461

State's Exhibit 26, Tr. at p. 1065-1066

State's Exhibit 27, Tr. at p. 409-411, 413

State's Exhibit 28, Supp. Tr. at p. 136

State's Exhibit 29, Tr. at p. 432

State's Exhibit 30, Tr. at p. 425-426

State's Exhibit 31, Tr. at p. 456-460

STATE'S
EXHIBIT

1

1572

```
 1   A.    Yes.

 2   Q.    When you got to St. Aloysius was Cordell with you?

 3   A.    Yes.

 4   Q.    So when you leave Benjamin's the two of you are

 5   together?

 6   A.    Yes.

 7   Q.    When you go to the 4U2B you're together?

 8   A.    Yes.

 9   Q.    Then you leave 4U2B and go to St. Aloysius

10   together?

11   A.    Yes.

12   Q.    So you are in each other's company throughout that

13   entire set of events?

14   A.    Yes.

15   Q.    How far is St. Aloysius from Englewood?

16   A.    Not far.

17   Q.    Can you describe?

18   A.    Take me not five minutes.

19   Q.    109th and St. Clair and talking 105th north of?

20   A.    It's back streets to get there quicker.

21   Q.    What back streets or routes that are quicker?

22   A.    I can't name them by name, but a couple back

23   streets to get you to Parkwood.

24   Q.    How would that route work?  Can you describe it the

25   best that you know?
```

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT

*2*

1580

| | | |
|---|---|---|
| 1 | Q. | How long?  For a minute? |
| 2 | A. | Yes. |
| 3 | Q. | How long did that go on? |
| 4 | A. | Probably about 30, 40 minutes, an hour or so. |
| 5 | Q. | How did Cordell get home? |
| 6 | A. | I took him home. |
| 7 | Q. | Where did you take him home to? |
| 8 | A. | His mother's house. |
| 9 | Q. | Where would that be? |
| 10 | A. | East 147th. |
| 11 | Q. | And what? |
| 12 | A. | St. Clair. |
| 13 | Q. | After you dropped him off where did you go? |
| 14 | A. | I went home. |
| 15 | Q. | What time was that? |
| 16 | A. | Probably like about 4:00; going to 4:00 probably. |
| 17 | Q. | Well, you were at St. Aloysius from 2 for about |
| 18 | | how long? |
| 19 | A. | About 40 minutes. |
| 20 | Q. | You leave somewhere between 2:40, 2:50? |
| 21 | A. | Yeah.  In the parking lot talking to some females |
| 22 | | or whatever, you know. |
| 23 | Q. | Which females? |
| 24 | A. | Just some females. |
| 25 | Q. | Have any names for them? |

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT

*3*

1815

1    family, you know.

2           I would also like to apologize to Ru-el

3    Sailor's family, to my sister.

4           Your Honor, there's a lot of things that the

5    Court doesn't know, that my lawyer doesn't know.  Ru-el

6    Sailor wasn't present and -- this night when this took

7    place.  It was a guy named Will.

8           THE COURT:    I'm sorry, say that again.  A

9    guy named --

10          DEFENDANT CORDELL HUBBARD:    A guy named

11   Will.

12          THE COURT:    And what's his last name?

13          DEFENDANT CORDELL HUBBARD:    Your Honor, I

14   don't know.  We have a picture of him, though.  It was

15   me and Will there, and I -- you know, and I -- I kept --

16   I -- you know, because I didn't think it was going to

17   turn out like this, I didn't think my best friend was

18   going to get convicted as the shooter, but he wasn't

19   even there, you know.

20          THE COURT:    And how can Detective Metzler

21   find Will?

22          DEFENDANT CORDELL HUBBARD:    Your Honor, my

23   understanding, they send indictments, I could tell you

24   where he at, the house where he stay at.

25          THE COURT:    Go ahead.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

1816

1    DEFENDANT CORDELL HUBBARD:    I even talked

2 to him, you know, and tried to get him to come down here

3 and tell the truth, you know.

4    THE COURT:    Well, why don't you tell us

5 now where he could be found, where he works, where --

6    DEFENDANT CORDELL HUBBARD:    He works at

7 Bottom Line there on 68th and St. Clair.  I don't know

8 the correct address.  I got a cell phone number.  As a

9 matter of fact, the cell phone number was --

10    THE COURT:    I'm sorry, the cell phone

11 number is what?

12    DEFENDANT CORDELL HUBBARD:    Was presented

13 in this Court, 323 -- 323-0607, and that was his cell

14 phone number.  And at the time, I didn't even know it

15 was -- I -- I didn't even -- I didn't know that until I

16 found out.  That's why I tried to keep it up under my

17 hat, because like me and you just together, I'm like,

18 damn, I ain't know -- excuse my French -- I didn't know

19 it was a brother or nothing like that.

20    And Ru-el Sailor didn't play a part in this,

21 your Honor.  Truthfully, I just told him that -- the day

22 we got convicted of all these charges, I told them in

23 the bullpen, you know, like, "Man, I was there, man, you

24 know," and I told them, like, I was going to tell my

25 lawyer --

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT

4

1817

1         THE COURT:    You were present at the time of

2  the shooting?

3         DEFENDANT CORDELL HUBBARD:    Yes, I was,

4  your Honor.

5         THE COURT:    And are you telling me that

6  Will did the shooting?

7         DEFENDANT CORDELL HUBBARD:    No, I'm telling

8  you if you find Will, you will find everything was going

9  to come out, the whole truth, everything was going to

10  come out.

11         THE COURT:    Well, if you were there, who

12  did the shooting?

13         DEFENDANT CORDELL HUBBARD:    Your Honor, I

14  would just like to say if you found Will, your Honor, it

15  will come out.  His cousin is the baby mama, you know.

16         THE COURT:    That was discussed during the

17  trial.

18         DEFENDANT CORDELL HUBBARD:    Yes.  You

19  know.  And a lot of things going to come out.  The truth

20  is going to come out, your Honor.

21         That's -- that's what I would like to say.

22  That's it.

23         THE COURT:    All right.  Thank you.

24         Mr. Mack, on behalf of your client,

25  Mr. Sailor.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

Nov 11 2002 SUN 07:53 AM                                    FAX NO. 5629                        P. 01

**STATE'S
EXHIBIT**

**5**

# CLEVELAND DIVISION OF POLICE
### CLEVELAND, OHIO
## DEPARTMENTAL INFORMATION

DIST (          ZONE 622

EXAMINED BY                              RANK                              11-17        20  2

FROM  P.O. Andrew Desatnik #1944                                          11-17        20  02

                                              TO  William Traine, Lieutenant

SUBJECT  Statement of Witness of Homicide

COPIES O  Chief's Office, Unit Files, Homicide Unit

Sir

On Sur., 11-17-02 at approx. 0045hrs., while assigned to ZC622 in co with PO Shani Hannah #1778, I had
occasion to interview Clark Lamar (BM30, SS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, dob5-11-72, 5'10 " 198 lbs. Blk/bro, 10622
Englewood ,ph 268-2780 ) concerning the homicide of Omar Clark. Lamar stated he and Omar were walking
w/b on Englewood when they were approached by 2 b/ms, both described as 25-30 years old, 5'8",
205lbs. short hair, slight mustaches, med. complex., one wearing lt. Colored clothing with a blk semi-auto pistol, the
other with his hand in his wasteband, giving Lamar the impression that he was also armed, though he didn't actually see a
weapon  Lamar also stated the 2 susps looked alike, were possibly brothers. Lamar states the armed susp. and Omar
Clark were arguing over a female, which is when susp began firing numerous shots, striking Clark several times. Lamar
then stated he fled into a backyard and back to his residence, believing he was also being shot at.  Refer to rpt #02-
554850 compl. By  ZC 612 (Collier 237, McMahon 1607)

                                                          Respectfully,

                                                          Andrew Desatnik #194

                                                          P.O. Andrew Desatnik #1944

                              GPD
                            STATEMENT UNIT

                                                          Respectfully,

                                                          _____

**STATE'S EXHIBIT**

6

# SUPPLEMENTARY REPORT
## Cleveland Division of Police

DATE OF THIS REPORT: **DEC. 4, 2002**

COMPLAINT NO.
02-78
02-554850

**SUBJECT : HOMICIDE**

| VICTIM | ADDRESS | PHONE | AGE | SEX | RACE | M-S |
|---|---|---|---|---|---|---|
| OMAR CLARK | 10706 ENGLEWOOD AVE. | | 31 | M | B | |

| ADDRESS OF OCCURRENCE | TYPE OF PLACE | ZONE |
|---|---|---|
| 10524 ENGLEWOOD AVE. | STREET | 612 |

| TIME OF OCCURRENCE | DATE OF OCCURRENCE | DAY OF WEEK |
|---|---|---|
| APPROX. 0015 HOURS | NOV. 17, 2002 | SUN |

PAGE 3 OF 2 PAGE REPORT

**LARRY BRAXTON BM22 DOB: 1-25-80 SSN: 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 OF 10613 ENGLEWOOD PH. 541-4329. CELL. 322-9216**

Reports that he was returning home in company with **BRANDON GIBB & DAMIEN NOEL**. BRAXTON had exited the vehicle that GIBB was driving and was walking up on the porch of his brother JOSEPH MAYHAND house at 10527 Englewood. As he arrived on the porch he observed three males arguing across the street from the house. 2 of these males seemed to be what BRAXTON referred to "collaring up" the 1 male. BRAXTON explained that "collaring up" means to grab at someone. As BRAXTON continued to watch he saw that one of the males had a large gun in his hand, so being fearful for his safety, BRAXTON went inside the house where he met his brother MAYHAND and told him what was happening.

As both he and his brother continued to watch, BRAXTON saw the victim who they both know, approaching the three other males and the victim was telling these males that "he was family, he is okay". At this point BRAXTON recognized one of the males as a cousin of the male who lives down the street. (WILLIAM'S). BRAXTON then heard one of the other male's state "I'M GONNA CALL MY SISTER AND IF SHE SAYS DIFFERENT YOUR OUT", or words to that effect. At this point the victim came out from behind the parked car where they were standing and was telling the males to chill out. BRAXTON then saw the male holding the gun bring it up perpendicular to the ground and fire at the victim. BRAXTON stated he heard multiple shots one after the other BRAXTON then saw that his brother was turning the lights off in the house so he reached and turned off the light in the front room. As he looked out again he saw the male with the gun was standing over the victim who had fallen to the ground and was still shooting while the victim lay on the ground. He observed the shooter walking east on Englewood and did not see where the other males had gone. He then went out and saw the victim was on the ground and he heard siren in the distant.

BRAXTON described the shooter as a BM 20-25 5'10 Light Skinned. Wearing a Red cloth jogging suit and a red sweatband or visor. The weapon was described as a **Large caliber auto/semi auto dark colored with a red glow on the barrel (Possible laser sights)** The other suspect was described as a BM 5'10 170 Brown skinned and bald headed or short hair. NFD.
BRAXTON was shown photo spread #02-78 (#1) but was unable to make a pick from this spread.

BRAXTON showed these Detectives where he was watching from inside the house, with the front door open This viewing point was approximately 30' from the shooting, and was unobstructed. The area was well lit by a street and per BRAXTON the light was working that night.

| INVESTIGATING OFFICERS | | PLATOON | CAR | APPROVED BY |
|---|---|---|---|---|
| DET'S. H. VEVERKA #607  J. METZLER #2489  H. MATLOCK #194 | | 2 | 8184 | |

| WEATHER | | | | | | |
|---|---|---|---|---|---|---|
| ☑ CLEAR ☐ CLOUDY | ☐ RAIN ☐ SNOW | TEMP | ○ WIND | ☐ A.I.U ☐ S.I.U | ☐ REQUESTED ☐ NOT REQUESTED | ☐ ON SCENE |

| ASSIGNMENT RECEIVED FROM: | | | | TIME ASSIGNED |
|---|---|---|---|---|
| ☐ RADIO | ☐ DISTRICT  Det. Bur. | ☐ | | COMPLETED |

**STATE'S EXHIBIT**

**7**

# SUPPLEMENTARY REPORT
## Cleveland Division of Police

COMPLAINT NO.

DATE OF THIS REPORT DECEMBER 4, 2002    02-554850

| SUBJECT OR CRIME   HOMICIDE | | | | | | |
|---|---|---|---|---|---|---|
| VICTIM OMAR CLARK | ADDRESS 10706 ENGLEWOOD AVE. | PHONE | AGE 31 | SEX M | RACE B | M-S |
| ADDRESS OF OCCURRENCE 10524 ENGLEWOOD | TYPE OF PLACE STREET | | | | ZONE 612 | |
| TIME OF OCCURRENCE APPROX. 0015 HOURS | DATE OF OCCURRENCE NOV. 17, 2002 | | | | DAY OF WEEK SUNDAY | |
| PAGE 2 OF 2 PAGE REPORT | | | | | | |

JOSEPH described the second suspect as a B/M early 20's 5'8" and husky with light skin and bald. He was wearing a red jacket.

We showed JOSEPH the photo spread that contained **CORDELL HUBBARD** and he was unable to make any pick.

**BRANDON GIBBS** B/M 21 D.O.B. 9-30-81 SS# 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 10528 Kimberly Phone 268-4517. States he was exiting his vehicle with **DAMIEN NOEL** in front of 10527 Englewood. They were going to see if anyone wanted to go clubbing with them  While crossing Englewood he noticed four black males standing in the street arguing approx. 25' away. BRANDON stated he could only hear what they said when they raised their voices and yelled He stated he knew one male to be OMAR CLARK and the other male was DUDE. He stated he thought they were going to fight and he noticed that one of the other males had a large gun in his right hand. BRANDON described the male with the gun as a B/M 20 to 25, 5'10" slim build, 155 to 165 lbs. with light skin and braids in his hair. He was wearing a black waist length leather coat with a gray hooded sweatshirt under the coat and dark jeans. The male with the gun was yelling at Dude. OMAR kept telling this male "HE IS MY FRIEND, DON'T SHOOT HIM." BRANDON stated the male with the gun became agitated with OMAR and said "DON"T TOUCH ME, YOU ARE TRIPPING-BACK OFF." The male placed the gun in his left hand and was dialing a phone with his right hand. He then placed the phone between his neck and shoulder, put the gun back in his right hand and then started yelling with the male that he was with. He could not make out what the male was yelling at that time.

BRANDON described the suspect without the gun as B/M 20's 5'10" bigger build than the male with the weapon. He had medium brown skin, braided hair and was wearing a waist length leather jacket that was a brownish-red color and he had a gray hooded sweatshirt under his jacket and blue jeans. This suspect was acting like a mediator and said to the suspect with the gun "DON'T SHOOT OMAR, HE IS A FRIEND OF MINE" and "HE'S MY COUSIN'S BABY'S FATHER."  The male with the gun was still talking on the phone and yelling at the other suspect  The suspect with the gun then stated to DUDE "YOU CAN'T TALK TO MY SISTER THAT WAY" and "I'M ON THE PHONE WITH HER RIGHT NOW AND IF SHE TELLS ME ANYTHING DIFFERENT YOU ARE OUT OF HERE." BRANDON then saw that suspect raise the gun and saw about two flashes and heard gunshots. He ran to his grandmother's house a few doors away and he stated he heard several more shots and he got into the house. He remained in his grandmother's house and heard a car speed away.

BRANDON went back outside and saw OMAR lying in the middle of the street with DUDE and LONELL standing over him. Police and ambulances had started to arrive. BRANDON described the gun as shiny with a long barrel and that is was real big. He described the car as red or maroon, small like a newer Taurus or Contour.

*James Metzler 5489*

| INVESTIGATING OFFICERS DETS. METZLER#2489, VEVERKA#607 & MATLOCK#194 | | PLATOON 2nd. | CAR 8184 | APPROVED BY |
|---|---|---|---|---|

| WEATHER | CLEAR CLOUDY | RAIN SNOW | TEMP | WIND - | | A.I.U | REQUESTED NOT REQUESTED | ON SCENE |
|---|---|---|---|---|---|---|---|---|
| ASSIGNMENT RECEIVED FROM: RADIO | DISTRICT Det. Bur. | | | | | TIME ASSIGNED COMPLETED | | |

**STATE'S EXHIBIT**

**8**

# SUPPLEMENTARY REPORT
### Cleveland Division of Police

COMPLAINT NO.

DATE OF THIS REPORT **DECEMBER 4, 2002**    02-554850

| SUBJECT OR CRIME | HOMICIDE | | | | | | |
|---|---|---|---|---|---|---|---|
| VICTIM OMAR CLARK | ADDRESS 10706 ENGLEWOOD AVE. | PHONE | AGE 31 | SEX M | RACE B | M-S | |

| ADDRESS OF OCCURRENCE 10524 ENGLEWOOD | TYPE OF PLACE STREET | CPD | ZONE 612 |
|---|---|---|---|

| TIME OF OCCURRENCE APPROX. 0015 HOURS | DATE OF OCCURRENCE NOV. 17, 2002 | DEC 1 2 2002 | DAY OF WEEK SUNDAY |
|---|---|---|---|

PAGE / OF / PAGE REPORT    STATEMENT UNIT

On Tuesday, December 3, 2002, while assigned to car 8184, in company of Det. Henry Veverka#607 and Det. Harry Matlock#194, further investigated the above crime. The following are the results.

Acting on information supplied by TENITTA JOHNSON (Form-10 dated 12-1-02) we responded to 10613 Englewood. Interviewed MICHELE MAYHAND B/F 50 D.O.B. 5-16-52 SS# 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 Phone 541-4329. Advised MICHELE of this investigation. She stated she was home the night that OMAR was killed and that she heard sirens, but did not hear any gunshots. She further stated that her two sons JOSEPH MAYHAND and LARRY BRAXTON witnessed this incident. She stated that JOSEPH lives at 10527 Englewood and that LARRY lives with her, but he was at JOSEPH'S house now.

We responded to that location, 10527 Englewood where we conducted the following interviews.

**JOSEPH MAYHAND** B/M 28 D.O.B. 4-23-74 SS# 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  10527 Englewood Cell Phone 374-0980. JOSEPH stated that he was at home and his UNCLE MILTON JOHNSON Phone 932-1649 came over to pick him up. His uncle came in the house and JOSEPH could hear males arguing outside in front of his house. He could not make out any of the words the males were saying.

After 3 to 5 minutes he went to leave and went out the front door and was standing on the porch and he observed 4 guys standing in the street. One of the guys was OMAR CLARK and he knew one other guy who lives up the street. (Showed JOSEPH the file photo of CLARK WILLIAMS who he i.d.'d as the other male). The two other guys JOSEPH did not know and had not seen in the neighborhood before. OMAR was talking to one of the other guys trying to calm him down and he looked and saw the fourth male just standing there with a gun in his right hand. That male had the gun pointed down and next to his right leg. JOSEPH stated that when he saw the gun, he immediately went back into his house.

JOSEPH stated that he was back in the house approx. five seconds when he heard multiple gunshots. He turned all the lights out in his house and looked out the front door. He observed a red car that was sitting in the street with its parking lights on head west on Englewood and then north on E.105 St. towards St. Clair. He stated that the other two males that he did not know where in that red car. JOSEPH stated that he had never seen either of those two males before or that car.

He described the male holding the gun as a B/M early 20's 5'9" light skin wearing a red headband and a red jacket. He described the gun this male was holding as a big black automatic.

*James Griffin #2489*

| INVESTIGATING OFFICERS DETS. METZLER#2489, VEVERKA#607 & MATLOCK#194 | PLATOON 2nd. | CAR 8184 | APPROVED BY |
|---|---|---|---|

| WEATHER | CLEAR ☐ CLOUDY ☐ | RAIN ☐ SNOW ☐ | TEMP ☐ | WIND ☐ | A.I.U ☐ S.I.U ☐ | REQUESTED NOT REQUESTED ☐ | ON SCENE ☐ |
|---|---|---|---|---|---|---|---|

| ASSIGNMENT RECEIVED FROM: RADIO ☐ | DISTRICT ☐ Det. Bur. ☐ | | TIME ASSIGNED COMPLETED |
|---|---|---|---|

**STATE'S EXHIBIT**

**9**

# SUPPLEMENTARY REPORT
## Cleveland Division of Police

DATE OF THIS REPORT: **DEC. 4, 2002**

COMPLAINT NO.
02-78
02-554850

| SUBJECT : HOMICIDE | | | | | |
|---|---|---|---|---|---|
| VICTIM **OMAR CLARK** | ADDRESS **10706 ENGLEWOOD AVE.** | PHONE | AGE **31** | SEX **M** | RACE **B** M-S |
| ADDRESS OF OCCURRENCE **10524 ENGLEWOOD AVE.** | TYPE OF PLACE **STREET** | | | ZONE **612** | |
| TIME OF OCCURRENCE **APPROX. 0015 HOURS** | DATE OF OCCURRENCE **NOV. 17, 2002** | | | DAY OF WEEK **SUN** | |

PAGE _3_ OF _7_ PAGE REPORT

**JERMAINE KIDD BM30 DOB: 3-8-72 SSN: 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 OF 10732 ENGLEWOOD PH. 451-9346**

KIDD reports he was jogging down Englewood by himself at approximately midnight when he saw the victim, and DUDE (CLARK WILLIAMS), both of whom he knows from the neighborhood. KIDD stopped and spoke with both of them for a short time, and as they walked together, DUDE was behind them. At this point, KIDD'S cousin **KENNETH SIMPSON** pulled up and he spoke with him for a short while. As his cousin pulled off, KIDD and the victim continued to walk west on ENGLEWOOD. KIDD asked the victim if he was going to the corner with him but the victim just shook his head. KIDD continued to walk to the corner and looked back and saw that DUDE was about 6 houses east on Englewood.

As KIDD neared the corner of E.105th & Englewood he heard a commotion behind him and he turned and saw 2 males arguing with DUDE. The one male was walking across Englewood and KIDD saw that he had a big gun in his hand. KIDD then ran around the corner and saw that the victim's Uncle, **LARNELL BROOKS** had pulled up in his car. KIDD told him that there was a commotion down the street and BROOKS drove off. KIDD then stated that he heard the victim say "WE FAMILY WE FAMILY" or words to that effect. As KIDD walked towards the barbershop on E.105th he heard 11 or 12 gunshots. KIDD stood there and saw a car speed out of Englewood and turn right (North) on E.105th.

KIDD described the car as a **94 Buick La Sabre Red 4 door.** He was unable to describe the occupants

KIDD also stated that he knows **CORDELL (HUBBARD)** from the neighborhood and that the victim also knew CORDELL. KIDD stated that he and the victim used to go to the clubs, and that they both had met CORDELL in the past

**MONICA WILLIAMS BF29 DOB: 8-10-73 SSN: 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 OF 12815 AUSTIN PH. 323-6873**

She is the girlfriend of UMAR CLARK. She reports that approximately 1 week after the Homicide she was at her house with CLARK who was on the phone with 2 females. CLARK later told her that the females were a **PUDDIN & MARIA (LNU)**. WILLIAMS was seated next to CLARK and was listening in on the conversation. WILLIAMS stated that she heard one of the female's state, "NICOLES BROTHER CALLED HER BACK AND TOLD HER THAT THE NIGGER IS ON THE GROUND NOW". WILLIAMS does not know which female made the statement.

| INVESTIGATING OFFICERS DET'S. H VEVERKA #607 J. METZLER #2489 H. MATLOCK #194 | PLATOON 2 | CAR 8184 | APPROVED BY |
|---|---|---|---|
| WEATHER ☐ CLEAR ☐ CLOUDY ☐ RAIN ☐ SNOW TEMP _____ ☐ WIND | | | ☐ A.I.U ☐ S.I.U   ☐ REQUESTED ☐ ON SCENE ☐ NOT REQUESTED |
| ASSIGNMENT RECEIVED FROM: ☐ RADIO ☐ DISTRICT Det Bur. ☐ | | | TIME ASSIGNED _____ COMPLETED |

STATE'S
EXHIBIT

*10*

1045

1  A.     He was saying it like he meant it.

2  Q.     What did you think about the words, You're out or

3  You're outta here?

4  A.     I just wanted to get away from the area.  I seen

5  the gun.  I was thinking like I should be getting in the

6  house, you know, before -- It's been a few shootings.  My

7  brother got shot by somebody shooting at somebody else,

8  and I didn't want to be in the same predicament.

9  Q.     Anybody in the argument holding or using a cell

10  phone?

11  A.     The light-skinned guy.  It was not the shooter with

12  the cell phone, it was the other guy.

13  Q.     Which one of the two is making this statement about

14  the sister and, You're outta here?

15  A.     The light-skinned guy.

16  Q.     The light-skinned guy.  Did you get a look how he

17  was dressed?

18  A.     I can't recall the description.

19  Q.     Let's talk about body size or body build of the guy

20  in the red with the gun.  How tall, how heavy?

21  A.     Maybe five seven, maybe 200 to 215, I guess.  He

22  was a heavyset guy.

23  Q.     The light-skinned guy?

24  A.     No, that was the light skin.

25  Q.     The other guy in the red with the gun, how tall,

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

1046

1    how heavy?

2    A.    Maybe five ten, dark skinned, short hair, short

3    black hair.  I believe he had facial hair, but not too

4    much.

5    Q.    Can you describe anything on his head?

6    A.    No.

7    Q.    Was anybody wearing head gear?

8    A.    The shooter.  I know he had either a headband or

9    visor.  I believe a headband.

10   Q.    Had you ever seen either of those two people,

11   either the shooter or the person on the cell phone who was

12   arguing, had you ever seen them before?

13   A.    Never.

14   Q.    Does anybody direct comments back to them about

15   their state of unhappiness or their anger, the gun holder

16   or the other person arguing?  Does anybody say anything

17   back to them about the fact they're angry?

18                    MR. MACK:  Objection.

19                    THE COURT:  Overruled.

20   A.    No, not that I recall.

21   Q.    Did you know Omar Clark?

22   A.    Yes, I did.

23   Q.    Was he there?

24   A.    Yes, he was.

25   Q.    Where was he at the time of that?

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

1087

1   was light skinned?

2   A.    No.   The light-skinned guy was the guy who collared

3   Dude up.

4   Q.    You never told the detectives?  I want to make

5   sure.

6   A.    I'm not sure.  Like I say, they may have confused

7   it or whatever.  I don't know any names, I just know the

8   faces.

9   Q.    If there is somewhere written where you said the

10   shooter was light skinned, it would be their mistake?

11                  MR. THOMAS:  Objection.

12                  THE COURT:  Overruled.

13   A.    It would be a mistake because the shooter was the

14   dark skinned.  I'm positive.

15   Q.    Now, is it not a fact you were so concerned that

16   you said that you came out and you laid a blanket over

17   Omar?  Isn't that what you testified to earlier?

18   A.    Correct.

19   Q.    If Michael Duckworth came in and said that he put

20   the blanket over Omar, would he be incorrect as well?

21   A.    Yes, he would.

22   Q.    The only person telling the truth would be you?

23                  MR. THOMAS:  Objection.

24                  THE COURT:  Overruled.

25   A.    I'm not sure.  I'm not sure what anybody else

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

945

```
1   Q.     What do you see?

2   A.     I see him -- he had a -- he put the cell phone in

3   one hand and then he had a gun in his other hand.

4   Q.     Who are you referring to?

5   A.     I don't know the guy's name.  I didn't see no face.

6   I just seen it was one guy lighter than the other guy.  So

7   I say the dark-skinned guy had a gun in his hand and a

8   cell phone in his other hand talking on the phone.

9   Q.     Specifically the first time that you see a gun what

10  is going on?

11  A.     The first time I seen the gun is when the cell

12  phone was actually put in this hand.  He had picked up the

13  cell phone and went like this, (indicating), and that is

14  when I seen the gun.

15  Q.     How many guns did you see?

16  A.     Only one.  That one gun.

17  Q.     As you are seeing this are they facing towards you,

18  or away?

19  A.     Away from me.  Still had his back towards -- from

20  the angle that he was I could see over his shoulder.

21  Q.     How was the gun being held?

22  A.     Like regular holding a gun.

23  Q.     Can you stand, please?  Can you demonstrate using

24  your hands the motions that you saw with the cell phone

25  and gun?
```

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

946

1  A.    Like had a yelling tone.  He picked up the cell

2  phone, the gun -- No, the gun was in this hand.  He

3  switched the gun, went just like this and was on the

4  phone, and had the gun down like this.  (Indicating).

5  Q.    Now, I want you to place in context what you just

6  described, the statement of, You can't talk to my sister

7  like that.  If she says anything different, you outta

8  there.  When did that happen?

9  A.    Before he picked up the cell phone.  Before he

10  switched the cell phone to the other hand.  He said that

11  he was about to call his sister before, you know, when he

12  say, You're outta here.  I'm going to call my sister and

13  if she tell me different, you outta here.

14  Q.    Please have your seat.  The person with the cell

15  phone and the gun, were you able to describe to the police

16  the height and general size of that person?

17  A.    About five seven.  He was no taller than about five

18  seven, five eight.

19  Q.    What about weight?

20  A.    260, 270, around that weight.

21  Q.    All right.  Was he African American?

22  A.    Yes.

23  Q.    What degree of complexion?

24  A.    Dark skinned.

25  Q.    When you say dark skinned, what does that mean?

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

950

1   turned around and ran.  I heard about 12.  About 12 more.

2   Q.      Are you able to see who is shooting?

3   A.      Yes.

4   Q.      Who do you see shoot?

5   A.      The dark-skinned guy.

6   Q.      Now, prior to this night had you ever seen either

7   of those two unfamiliar males before?

8   A.      Never before.

9   Q.      You were parked on the left side of Englewood.

10  What direction was Larry's house from when you were

11  parked, on the same side or opposite side?

12  A.      Opposite side.

13  Q.      You had to make a choice running in the street

14  possibly in the line of fire?

15  A.      Right.

16  Q.      When you hear the shots start happening you turned

17  and had a brief moment of decision making about do I stay

18  or go to Larry's?

19  A.      Right.

20  Q.      You hear the shots.  What do you do at that point?

21  A.      I turn around and looked.  It shocked me.  I didn't

22  think it was going to come to no shooting.  It shocked me.

23  I looked for a second, then I turned around and ran.

24  Q.      The gun that you saw, how much of it were you able

25  to see?

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

979

1    the 27th; is that correct?

2    A.    Right.

3    Q.    Now, today when you were questioned by the

4    prosecutor you said the person was dark skinned and he was

5    darker than you; is that correct?

6    A.    Right.

7    Q.    That is not brown skinned, is it, sir?  That is not

8    what you told the police?

9              THE COURT:  One question at a time, Mr.

10       Mack.

11             MR. MACK:  I'm sorry, your Honor.

12             THE COURT:  You can answer the first

13       question.

14    A.    I said that he was darker than me, right.

15    Q.    You said that he was brown skinned.  You're not

16    brown skinned.

17    A.    I'm not dark skinned either.

18    Q.    We will see about that, sir.

19             MR. THOMAS:  Objection, your Honor.

20            THE COURT:  Objection sustained.  Questions

21       only, Mr. Mack.

22    Q.    At that time that is your description of the man,

23    brown skinned.  Now, you said that you talked to the

24    detectives prior to March the 27th; is that correct?

25    A.    Right.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

999

1  complexion.  He read you your answer.  Black male, 20 to

2  25, five ten, weight 160, 170, brown skinned wearing all

3  black?

4  A.  Yes.

5  Q.  That is what you told the police on March 27th?

6  A.  Yes.

7  Q.  Right.  Which one do you stand by today, dark

8  skinned or brown skinned?

9  A.  Dark skinned.

10  Q.  Okay.  Now, earlier in your direct testimony I

11  think that I recall you saying 260 or 270; was that

12  correct?

13  A.  260?  No.

14  Q.  The 160, 170 weight figure in the statement?

15  A.  That's correct.

16  Q.  You're parked one driveway away from the action?

17  A.  Right.

18  Q.  Nitta has to pass by them?

19  A.  Right.

20  Q.  Are you able to see the individuals as they stand

21  in the street and Tenitta's truck comes by?

22  A.  Yes.

23  Q.  How close are they to Tenitta's truck?

24  A.  Very close.  They crowd -- they continue to move

25  for her but her car was -- her truck went right past.  It

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT

//

427

1    Q.    Have you ever seen this individual --

2    A.    No, sir.

3    Q.    -- before that night?

4    A.    No.

5              MR. THOMAS:  Would the record reflect the

6    identification of the Defendant Ru-el Sailor?

7              THE COURT:  The record will so reflect.

8              MR. MACK:  For the record I object to that

9    identification just for the record.

10             THE COURT:  Certainly.

11   BY MR. THOMAS:

12   Q.    How is the gun being held by Mr. Sailor?

13   A.    To his side.  Want me to stand up?

14   Q.    Yes.

15   A.    To his side like this.  (Indicating).

16   Q.    How much of the gun can you see?

17   A.    It was face down, so about this much.  (Indicating).

18   Q.    Please sit back in the chair then.  You just used a

19   name for the gun.  What was the name?

20   A.    A Glock.

21   Q.    Why did you give that name?

22   A.    9 millimeter Glock.  That is what they call them on

23   the street.

24   Q.    Was there any light coming from the gun?

25             MR. MACK:  Your Honor, I object.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT

*12*

```
 1   Q.    Yes.

 2   A.    Well, to tell you the truth, they weren't

 3   coming to play when I seen them guns -- when I

 4   seen a gun, I know they weren't coming to play.

 5   To be honest, it was time to go.

 6   Q.    So what did you do?

 7   A.    I ran.

 8   Q.    How long did you look at the individual

 9   with the gun?

10   A.    Well, I just glanced, because at first

11   when they pulled up, they ain't have no

12   pistols.  He was just talking.  The driver

13   ain't really say too many words.  He had words,

14   but he wasn't directing them to me.

15   Q.    Were there any street lights in the area

16   you were standing?

17   A.    No, it was dark.  It was real dark,

18   because you go down Englewood, there's a lot of

19   trees on Englewood.  So if it was street

20   lights, the trees would block them.

21   Q.    How many times were you able to look at

22   the face of the person holding the gun?

23   A.    How many times?  Well, when he pulled up,

24   when he jumped out, that's one.  Maybe three

25   times.  But I ain't actually stare at him, just
```

127

1   glanced.

2   Q.    Can you estimate the amount of time that

3   that occurred over?

4   A.    Over the period of time I glanced at him?

5   Q.    Yes.

6   A.    A few seconds.

7   Q.    So you weren't paying him too much

8   attention?

9   A.    No, sir, I wasn't.

10  Q.    All right. So you see the gun, you are

11  concerned, they're not there to play, it's

12  serious.  Do you see the gun move in any way?

13  A.    No.

14  Q.    Did there come a point in time where

15  something makes you decide to leave?

16  A.    Yeah.

17  Q.    What makes you decide to leave?

18  A.    When I seen the gun that's when it was

19  time to leave.  I brace myself, turned around

20  and then I ran.

21  Q.    Where did you run?

22  A.    Well, I was right here, almost to the

23  sidewalk. So I ran this way, like going down

24  towards Englewood, the first house I came to,

25  the driveway, I made a left.

**STATE'S EXHIBIT**

*13*

RECEIVED
MAR 3 0 2017
BY:

Dear Prosecutor O'Malley,

I'm writing this letter in regards to Ru-El Sailor. Ru-El was convicted of my Brother Omar Clark's murder on November 17th 2002. I truly believe based on the facts and evidence that Ru-El Sailor is innocent of Omar's murder and has been serving a life sentence for a crime that he did not commit. A crime that Cordell Hubbard committed. It's upsetting to myself and my family to know that the man who murdered Omar was convicted of a lesser charge and may be released on parole one day while Ru-El who is innocent continues to sit in prison. How can anyone expect my family to heal and move forward with our lives when we know Omar isn't resting in peace while his murderer is living life with the expectation of parole? This man can call his family and see his kids but Omar can't! Cordell's actions took Omar's life, he took my brother from his family. Omar has a daughter that will only know the memory of her father. She will never hear Omar's voice or feel his arms around her when she needs his comfort. But I will always be there for my niece. I will never let her go without knowing who her father was. I will continue to fight for her and fight for justice for my brother. I was unaware of all of the facts 14 years ago but after doing some research into this case I whole heartedly believe that Ru-El is innocent and it is mine and my families wish that you review his application of innocence. After Omar's murder I was confronted by a man named William Sizemore who told me that he himself was actually with Cordell when Cordell murdered my brother. William is the cousin of my nieces mother Marquetta Sizemore. Statements were made by witnesses that heard "that's family, that's my cousin's baby daddy". I provided an affidavit about the conversation I had with Mr. Sizemore in hopes that it would have helped bring the truth to light but sadly it was ignored by the courts. This wound will never heal for my family knowing that the real murderer wasn't convicted as such and that an innocent man is in prison. It is a true injustice to Ru-El but also to the memory of my brother Omar. How can anyone expect my family to move forward when the coward who murdered my brother isn't being punished to the fullest extent of the law but an innocent man is? Mr. O'Malley, On behalf of myself, my family and the memory of Omar I ask that you please review Ru-El Sailors application of innocence. The facts and evidence that have been provided in my opinion prove with no doubt that Ru-El is innocent of the crime that Cordell Hubbard committed.

If you have any questions, please contact me at 216-925-6400.

Sincerely,

*Umar Clark*

Umar Clark



ANITRA FOUST · NOTARY PUBLIC
COMM. EXP. OCT 21, 2017
STATE OF OHIO

On March 21, 2017, I Acknowledge
that Umar Clark sign this Form in my
Presence Anitra Foust, Notary Public.

*Anitra Foust*

EX. 14



STATE'S EXHIBIT

14

STATE OF OHIO                    )
                                 )   SS: AFFIDAVIT
COUNTY OF LAKE                    )

Now comes, Umar Clark, being of sound mind and body and competent to testify to all matters set forth herein, and being first duly sworn, and deposes and states as follows:

1. I received a phone call from William Sizemore after Cordell Hubbard and Ru-El Sailor were convicted of murdering my brother. He said he had to meet with me. He said he wanted to bring closure to this matter;

2. I met with him a couple days later. He told me that he wanted to let me know what my brother's last words were. He explained that "he tried like hell to stop this." Sizemore told me everything that occurred that evening. Sizemore was a few feet away from my brother when he was killed;

3. The name of Ru-El Sailor never came up;

4. Sizemore advised me that he asked Cordell why he shot Omar. He reported that Hubbard just had a blank look on his face;

5. I never shared this information with any of Mr. Sailor's attorneys

Further, affiant sayeth naught.

_____
UMAR CLARK

Sworn to and subscribed before me this 20ᵗʰ day of February, 2013.

_____
Notary Public
Tom Pavlish
My commission expires October 29, 2013

EX. 9

**EXHIBIT**

*15*

STATE OF OHIO )
                               )  SS:          __AFFIDAVIT__
COUNTY OF CUYAHOGA )

Now comes William Sizemore, having first been duly cautioned and sworn according to the law, hereby deposes and states the following:

1. Affiant states that he has personal knowledge of the events that occurred on November 17, 2002, between Cordell Hubbard and Omar Clark and another male friend of Omar Clark's at the location known as 10524 Englewood Street, in the City of Cleveland, Cuyahoga County, Ohio;

2. Affiant states that he has personal knowledge of the events because he was present at the time of the shooting that resulted in Omar Clark's death;

3. Affiant states that, in 2002, he was a friend of Cordell Hubbard's;

4. Affiant states that he attempted to intervene in the dispute between Cordell Hubbard and Omar Clark and that he told Cordell Hubbard not to shoot Omar Clark because Omar Clark is family to Affiant;

5. Affiant states that he told Cordell Hubbard that Omar Clark is family because Affiant's cousin, Marquetta Sizemore, was, in 2002, the girlfriend of Omar Clark and they had a child together;

6. Affiant states that during the argument between Cordell Hubbard and Omar Clark, Affiant noticed that Omar Clark had a gun and was holding it down by his side;

7. Affiant states that, despite Affiant's attempts to intervene, Cordell Hubbard shot and killed Omar Clark;

8. Affiant states that, within months of the shooting, Affiant approached Umar Clark (brother of the deceased Omar Clark) and acknowledged that Affiant was

present when Omar Clark was shot and killed and that Affiant wanted to tell Umar Clark what happened and provide Umar Clark with closure;

9. Affiant states that, after the events occurred in 2002, Affiant was frightened, that he feared for his life, and the he decided to leave the State of Ohio, which he did for many years; and,

10. Affiant states that Ru-El Sailor was not present on Englewood Street at the time of shooting death of Omar Clark.

FURTHER AFFIANT SAYETH NAUGHT.

_____
William Sizemore
Witness

Sworn to and subscribed in my presence this _____ day of March, 2018.

_____
Notary Public

ROGERS M. POLAR
Notary Public, State of Ohio, Cuy. Cty.
My commission expires 12/5/18

STATE'S
**EXHIBIT**

*16*

STATE OF OHIO          )                    **AFFIDAVIT**
                       )      SS:
COUNTY OF CUYAHOGA )

Now comes Clark Lynn ("Lamar") Williams, having first been duly cautioned and sworn according to the law, hereby deposes and states the following:

1.  Affiant states that he has personal knowledge of the events that occurred on November 17, 2002, between Cordell Hubbard and Omar Clark at the location known as 10524 Englewood Street, in the City of Cleveland, Cuyahoga County, Ohio;

2.  Affiant states that he has personal knowledge of the events because he was present at the time of the shooting that resulted in Omar Clark's death and that he, himself, sustained a grazing wound to his buttock that night;

3.  Affiant states that, in 2002, he was a friend of Omar Clark's and that Affiant arrived at the Englewood Street location with Omar Clark;

4.  Affiant states he initially reported to police that the male with a medium complexion (who he later came to identify as Cordell Hubbard) and another male with a similar complexion (who looked like he could be Cordell Hubbard's brother), approached Affiant and Omar Clark on Englewood;

5.  Affiant states that Cordell Hubbard got into Affiant's face and was yelling at Affiant about a situation involving Cordell Hubbard's sister;

6.  Affiant states that he observed the other male (not Cordell Hubbard) holding a gun and, sensing that the controversy was escalating, Affiant turned and ran;

7.  Affiant states that, before he could make it to the nearby fence, his buttock was grazed by a bullet;

8.  Affiant states that he heard a series of gunshots as he fled on foot and that, after a period of time, he circled back to the area of the shooting where he found Omar Clark's body on the ground;

9.  Affiant states that he observed "Lionel (sp?)" (Omar Clark's cousin) take the gun out of Omar Clark's hands;

10. Affiant states that, when he returned to the area near Omar Clark's body, Affiant was approached by a male cousin of victim Omar Clark (believed to be named Lionel) who punched Affiant in the face;

11. Affiant states that he cannot identify the other male who was with Cordell Hubbard;

12. Affiant states that, on the night of the incident, Affiant only had a few second glimpse of this other male;

13. Affiant states that he could not identify this other male back in 2003, nor could Affiant identify the other male today;

14. Affiant states that the only reason Affiant identified Ru-El Sailor in court was because Affiant's then female friend, Ellen Taylor (also known as "Puddin"), was present at court with Affiant and she indicated to Affiant that Ru-El Sailor was the person with Cordell Hubbard on the night of Omar Clark's death;

15. Affiant believed what Ellen Taylor told him to be true because Ellen Taylor was, at the time, best friends with Nicole Hubbard (who is Cordell Hubbard's sister), therefore Affiant trusted her; and

16. Affiant states that he did not come forward with this information earlier because he was concerned about disparaging "Puddin" and Omar Clark; and,

17. Affiant further states that he is making this affidavit after consultation with counsel.


FURTHER AFFIANT SAYETH NAUGHT.

_Clark Lynn Williams_
Clark Lynn ("Lamar") Williams
Witness

Sworn to and subscribed in my presence this _20_ day of March, 2018.

_BC Newman_
Notary Public

ATTORNEY AT LAW
MY COMMISSION
DOES NOT EXPIRE

STATE'S EXHIBIT

*17*

STATE OF OHIO      }
                 }   ss.
CUYAHOGA COUNTY  }         **AFFIDAVIT**

I, CORDELL HUBBARD, having first been sworn, deposes and says:

1. That he is the Defendant in Case No. 435700 in which Ru-El Sailor is a co-defendant; that he was convicted of murder in a joint trial in which Ru-El Sailor was also convicted of aggravated murder for the death of Omar Clark.

2. Affiant states that he did not testify at the trial of this case which was tried jointly with Ru-El Sailor and Nicole Hubbard.

3. Affiant states that after the jury returned the verdict of guilty he informed Ru-El Sailor, for the first time, that he was in fact the shooter and that he caused the death of Omar Clark.

4. Affiant states that the person with him that night was "Will", and he had just learned recently that "Will's" full name is William Sizemore.

5. Affiant further states that Will was with him on the night of the shooting of Omar Clark. They arrived together and they left together.

6. Affiant states that Omar Clark, the decedent, actually confronted him with a handgun while he (i.e., Cordell Hubbard) was involved in an argument with Clark Lamar, aka "Dude".

7. Affiant states that William Sizemore told Omar Clark "to put the gun away."

8. Affiant admits that he pulled out his firearm, and when this happened; Will Sizemore stated to me: "Don't shoot Omar, he is my cousin's baby's daddy!"

9. Affiant states he then told Will to tell Omar Clark to put his gun away.

10. Affiant further states that after Omar Clark put his gun in his waistband, he suddenly pulled it back out and pointed it in my direction, and that is when I fired my gun in self-defense.

FURTHER AFFIANT SAYETH NAUGHT.

*Cordell Hubbard*
CORDELL HUBBARD

EX. 2

SUBSCRIBED AND SWORN TO, in my presence, a Notary Public, on this 9th day of

August, 2003.

NOTARY PUBLIC

MYRON WATSON, ATTY.
NOTARY PUBLIC • STATE OF OHIO
My Commission Has No Expiration Date
Section 147.03 O.R.C.

**STATE'S EXHIBIT**

*18*

1864

Q.      Looking at Defendant's Exhibit A there is a

2  person who has, looks like a football jersey or a

3  jersey, it looks like a 92 on it; is that correct?

4  A.      Yes, sir.

5  Q.      Who is that person?

6  A.      That's Will.

7  Q.      Will.  Did you know his last name at that time?

8  A.      No, sir, just Will.

9  Q.      And do you know Will's last name now?

10  A.      I believe it's William Sizemore.

11  Q.      And on the evening of the shooting of Omar

12  Clark, was Mr. Sizemore with you?

13  A.      Yes, sir.

14  Q.      Was Ru-el Sailor anywhere present at the time

15  of the shooting?

16  A.      No, sir.

17  Q.      Previously that evening had you been with

18  Mr. Sailor?

19  A.      We was at the bar.

20  Q.      And do you remember what bar that was?

21  A.      The Benjamin.

22  Q.      What's the name of it again?

23  A.      The Benjamin.  Now it's the 4U2B Lounge.

24  Q.      Where is that located?

25  A.      Benjamin's Lounge is located on 152nd off St.

STATE'S
EXHIBIT
*19*

1   Clair and 4U2B bar is out at 260 and Euclid.

2   Q.      And at these two bars, were you always side by

3   side with Mr. Sailor?

4   A.      No.  No, sir.

5   Q.      Were you doing whatever you wanted to do on

6   your own there?

7   A.      Yes, sir, it was a bar.

8   Q.      When you went to the scene of the shooting, was

9   Mr. Sailor with you?

10  A.      No, sir.

11  Q.      Did you tell him you were leaving or anything?

12  A.      No, sir, I just left.

13  Q.      And how was it that Mr. Sizemore, Will Sizemore

14  or William Sizemore, was with you?

15  A.      Because we rode.

16  Q.      Pardon?

17  A.      We rode together.

18  Q.      From the bar?

19  A.      From the 4U2B Lounge.  We rode from the 4U2B

20  Lounge and went down on 105 and Englewood.

21  Q.      Did you tell Mr. Sailor that you were going to

22  leave or where you were going?

23  A.      No, sir.

24  Q.      After the shooting did you return to either of

25  these bars?

STATE'S
EXHIBIT
20

```
 1    A.      No, sir.  I went to St. Aloysius.

 2    Q.      Where is St. Aloysius located?

 3    A.      On I believe it's 109 and St. Clair.

 4    Q.      Did you meet up with Ru-el Sailor there at

 5    St. Aloysius?

 6    A.      Yes.

 7    Q.      I mean did you come there together or was he

 8    there when you arrived or what was the situation?

 9    A.      We didn't go together, me and Will.  I dropped

10    Will off and I went and told him I was going.  My

11    cousin called and told me to come up there so it was

12    like we met there.

13    Q.      Do you know if you were there first or Ru-el

14    was there first?

15    A.      I was there first.

16    Q.      Then Ru-el arrived?

17    A.      Yes, sir.

18    Q.      Did Ru-el Sailor have anything to do with the

19    shooting of Omar Clark?

20    A.      No, sir.

21    Q.      Did he ever ask you to do anything to Omar

22    Clark?

23    A.      No, sir.

24    Q.      Did he ever encourage you to do anything to

25    Omar Clark?
```

STATE'S
EXHIBIT

21

1868

1    can leave that with the court reporter.  That's

2    the picture from the trial, right?

3              MR. MANCINO:        I don't believe

4    so.  It's a different picture.

5              THE COURT:        I thought it was

6    from the trial.  Oh, but the same -- okay.

7    Q.    Is there any doubt in your mind that Ru-el

8    Sailor was not with you?

9    A.    No, sir.

10             MR. MANCINO:        I have no further

11   questions.

12             THE COURT:        Miss Clancy.

13             MS. CLANCY:        Thank you, Your

14   Honor.

15                        - - -

16        **CROSS-EXAMINATION OF CORDELL HUBBARD**

17   BY MS. CLANCY:

18   Q.    So what you're telling us today is on November

19   16th of 2002 you were with Ru-el Sailor for the

20   evening.  However, when you went to Englewood he

21   wasn't with you?

22   A.    Repeat that question, ma'am.

23   Q.    On November 16th of 2002 when you killed Omar

24   Clark the defendant, Ru-el Sailor, was with you

25   throughout the evening except for when you went over

STATE'S
EXHIBIT

22

1867

1    A.      No, sir.

2    Q.      As far as the shooting of Omar Clark, you were

3    the one who shot him according to your affidavit, is

4    that right?

5    A.      Yes, sir, in self-defense.

6    Q.      Just coming back to Defendant's Exhibit A, you

7    are shown in this picture also; is that correct?

8    A.      Yes, sir.

9    Q.      Where are you in that picture?

10   A.      Second person from the left.  The third from

11   the right in the tan.

12   Q.      And is Ru-el Sailor shown in this picture also?

13   A.      Yes, sir.  He's in the back.

14   Q.      How would you describe your coloring?

15   A.      Light skinned.

16   Q.      How would you describe Will Sizemore's

17   coloring?

18   A.      Light skinned.

19   Q.      How would you describe Ru-el Sailor's coloring?

20   A.      Dark skin.

21   Q.      You know who this fourth person is here?

22   A.      My cousin Sherome.

23                    MR. MANCINO:        We would offer

24   Defendant's Exhibit A, Your Honor.

25                    THE COURT:          All right.  You

STATE'S
EXHIBIT

23

1876

1   A.    He was.

2   Q.    Okay, so what happened to the white car?

3   A.    Who we talking about?  Will or Ru-el?

4   Q.    Ru-el Sailor.

5   A.    You just asked me was William Sizemore present

6   when the picture, photo was taken.  Now you jumped to

7   Ru-el.  You confuse me.

8   Q.    Sorry about that.  Was Ru-el Sailor present at

9   St. Aloysius?

10  A.    Yes, he was.

11  Q.    Was William Sizemore present at St. Aloysius?

12  A.    No, he wasn't.

13  Q.    So after you killed Omar Clark, then you took

14  William Sizemore home, is that correct?  That's what

15  you're telling us today?

16  A.    After I left the scene of 150 and Englewood, I

17  dropped William Sizemore off.

18  Q.    Then where did you go?

19  A.    I went to St. Aloysius.

20  Q.    And that's when you took the photos with Ru-el

21  Sailor?

22  A.    Yes, and my cousin, some females, yes.

23  Q.    All right.  Now you testified that you shot

24  Omar Clark.  It was in self-defense, right?

25  A.    Yes.

STATE'S
EXHIBIT

**24**

```
 1   Q.     The gun pointed at you?

 2   A.     Yeah.

 3   Q.     Turned around with the gun pointed at you?

 4   A.     As he was turning, that's when I shot.

 5   Q.     How many times did you shoot him?

 6   A.     I couldn't tell you, ma'am.

 7   Q.     More than once?

 8   A.     I don't know.  I just know I shot him.  I

 9   couldn't tell you.  I couldn't be exact.  I just know

10   I shot him.

11   Q.     Was it more than once?

12   A.     Yeah.

13   Q.     Yes?

14   A.     Yes, I was just shooting.  I don't know.  I

15   couldn't tell you exactly how many times I shot him,

16   ma'am.

17   Q.     Was anyone else shooting on that night?

18   A.     Yeah, some guy.  The way it happened, the way

19   it happened, I couldn't -- it happened.  It was so

20   messed up.  I had a firearm on me.  Omar Clark had a

21   firearm.  There was another guy on the cut and a

22   cousin had a firearm on him also.

23   Q.     Who is this other guy?

24   A.     I don't know.

25                  THE COURT:            What did you say
```

STATE'S
EXHIBIT

25

459

```
 1   court here today?

 2   A.     Yes, sir.

 3   Q.     Would you point and describe what he is wearing?

 4   A.     Right there, (indicating), fourth one to the left,

 5   black suit, white shirt.

 6               MR. THOMAS:  Would the record reflect the

 7          identification of the Defendant Ru-el Sailor, your

 8          Honor?

 9               THE COURT:  The record will so reflect.

10   BY MR. THOMAS:

11   Q.     Now, on an occasion prior to today did you have an

12   opportunity to be in the same room and recognize someone

13   that previously you had been uncertain about?

14   A.     Excuse me, sir?

15   Q.     On a day prior to today, earlier this week --

16   A.     Yes.

17   Q.     -- did you have occasion to see someone you

18   recognized from the night of November 17th?

19   A.     Yes, sir.

20   Q.     And who did you recognize?

21               MR. MACK:  Objection, your Honor.

22   A.     The killer.

23               THE COURT:  Overruled.

24   A.     The killer, sir.

25   Q.     Okay.  When you recognized that person what were
```

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

460

```
 1   you basing that recognition on?  Why did you recognize
 2   them?
 3   A.      From the night my friend got killed.
 4   Q.      When Omar got killed?
 5   A.      Yes, sir.
 6   Q.      That person that you recognized, do you see them in
 7   court here today?
 8   A.      Yes, sir.
 9   Q.      Can you point to him and describe what he is
10   wearing?
11   A.      Right there in the black suit, white shirt, fourth
12   one to the left.  (Indicating).
13               MR. THOMAS:  Would the record again reflect
14           the identification of Defendant Ru-el Sailor?
15               THE COURT:  The record will so reflect.
16   BY MR. THOMAS:
17   Q.      Going back to the event of the shootings, from your
18   observation of the conversation between Omar and the
19   shooter, I believe you said earlier they were talking to
20   each other or having words?
21   A.      Yes, sir.
22   Q.      Was there anything about that that demonstrated to
23   you that they knew each other?
24   A.      Yes, sir.
25   Q.      What do you base that statement on?
```

461

1  A.    Conversation they made.

2  Q.    Going back again to the event of the shooting, can

3  you give us a time frame or estimate of the point in time

4  when Nichole drives off and how long it took until the

5  car pulls up with the shooter in it and the angry

6  passenger, Mr. Hubbard and Mr. Sailor?  How long between

7  Nichole leaving and that car then showing up?

8  A.    About five minutes after she left.  About three,

9  four minutes after she pulled off.

10            MR. THOMAS:  One moment please, your Honor.

11            THE COURT:  Certainly.

12  Q.    On the occasion when you picked No. 4 in State's

13  131, Mr. Williams, what was your level of confidence in

14  your selection?

15            MR. WILLIS:  Objection.

16            THE COURT:  Objection is overruled.

17  A.    A hundred percent.

18  Q.    And when you recognized Mr. Sailor in court, what

19  was your level of confidence about that recognition?

20            MR. WILLIS:  Objection.

21            THE COURT:  Overruled.

22  A.    100 percent.

23  Q.    The events that you have testified to took place in

24  the City of Cleveland?

25  A.    Yes, sir.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT

26

1065

1   Q.      What is he wearing?

2   A.      Green shirt with collar.

3                   THE COURT:  I can't hear you.

4                   THE WITNESS:  Green button-up shirt with

5           collar.

6                   MR. THOMAS:  Would the record reflect the

7           identification of Defendant Ru-el Sailor?

8                   THE COURT:  The record will so reflect.

9   Q.      Showing you what has been marked as State's 132,

10  have you seen this page of photos before?

11  A.      Yes, I have.

12  Q.      Where did you see it?

13  A.      These are some of the pictures the detective showed

14  me.

15  Q.      Do you recognize, in particular, any of the six

16  photos?

17  A.      No. 5.

18  Q.      Why do you recognize No. 5?

19  A.      This is the shooter that shot Omar.

20  Q.      Looking at No. 5, do you see that person in court

21  today?

22  A.      Yes, I do.

23  Q.      Will you point and describe what he is wearing?

24  A.      The guy in the green shirt with the buttoned

25  collar.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

1066

1   MR. THOMAS:  Would the record reflect the

2   identification of Defendant Ru-el Sailor?

3   THE COURT:  The record will so reflect.

4   Q.   Were you ever asked to see if you could identify

5   the light-skinned male that had Dude up against the van?

6   A.   Excuse me?

7   Q.   Were you asked if you were able to identify the

8   light-skin male who had the angry conversation with Dude?

9   A.   I'm not sure.  It's been a long time now.

10  Q.   Were you ever able to pick any photo of the other

11  person, the light-skinned male?

12  A.   I believe so.

13  MR. THOMAS:  May I approach?

14  THE COURT:  You may.

15  - - - - -

16  (Thereupon, a discussion was had

17  between Court and counsel outside

18  the hearing of the jury and off the

19  record.)

20  (Thereupon, the following proceedings

21  were had in open court:)

22  Q.   When the detectives visited your home and talked to

23  you, did you do anything to demonstrate to them where you

24  were viewing the scene from inside the house?

25  A.   Yes.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT
27

409

1    Q.    Where did she get dropped at?

2    A.    At home.

3    Q.    Do you recall the street she lived on?

4    A.    Harvard.

5    Q.    How long did that portion of the driving take to

6    drop Maria off?

7    A.    It didn't take long from Puddin house.  Maybe about

8    15, 20 minutes.

9    Q.    When you borrowed the 20 from Nichole did you

10   promise to pay her back?

11   A.    Yes, I did, sir.

12   Q.    What did you say?

13   A.    I asked her can I borrow $20 until I get to

14   Englewood and I'll give it back to her.

15   Q.    Now, when you got the Wet cigarette it's Nichole,

16   yourself and Omar.  Do you smoke the Wet?

17   A.    Yes.

18   Q.    Who smokes the Wet?

19   A.    Me, Nichole and Omar.

20   Q.    Is that while you are still parked, or does she

21   begin to drive?

22   A.    No, we pulled off and fired up.

23   Q.    When you smoke Wet can you describe the effect that

24   it has on you?  What does it feel like?

25   A.    To be honest it have you high, but as long as I

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

410

| | |
|---|---|
| 1 | been smokin' it I learn to maintain it but the effect have |
| 2 | you feelin' like spaced out or, you know, maybe like you |
| 3 | a super hero or something, or some type of character. |
| 4 | Just high, spaced out. |
| 5 | Q.    During this ride had you bought any beer? |
| 6 | A.    Yes. |
| 7 | Q.    What had been bought? |
| 8 | A.    We stopped at a gas station after we dropped Maria |
| 9 | off. |
| 10 | Q.    What was bought in terms of beer? |
| 11 | A.    We bought some beer.  We bought the beer before we |
| 12 | bought the Water. |
| 13 | Q.    The Water meaning the Wet? |
| 14 | A.    The Wet. |
| 15 | Q.    Okay. |
| 16 | A.    Yeah. |
| 17 | Q.    How much beer was bought before you bought the Wet? |
| 18 | A.    Two cans.  Omar had a can and I bought a can. |
| 19 | Q.    What size can? |
| 20 | A.    24 ounce. |
| 21 | Q.    What brand? |
| 22 | A.    Colt 45. |
| 23 | Q.    Did you drink any of that can of Colt 45? |
| 24 | A.    Yeah, we sipped on it. |
| 25 | Q.    Did you say how many ounce can that was? |

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

1     A.     24-ounce can of Colt 45, sir.

2     Q.     24 ounce.  How much of the Wet did you smoke?  How

3 many times did you puff on the cigarette?

4     A.     I hit it a couple times and passed it to Nichole.

5     Q.     Were you able to see her smoke the Wet?

6     A.     Yes.

7     Q.     How many times did you see her puff on it?

8     A.     She hit it a couple times.

9     Q.     Was it passed to Omar?

10     A.     Yes.

11     Q.     Were you able to see Omar smoke the Wet?

12     A.     Yes.

13     Q.     How many times did you see him puff on the

14 cigarette?

15     A.     He hit it a couple times, but Omar really don't

16 smoke Water.

17     Q.     Why do you say that?

18     A.     'Cuz he don't.

19     Q.     Now, before hitting the Wet had you drank all the

20 24-ounce Colt?

21     A.     We still had some.

22     Q.     How fast were you drinking that 24-ounce Colt?

23     A.     We were sipping, sir.  We still had beer when we

24 got to Englewood.

25     Q.     Can you say approximately what time it was that

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

413

1   A.    Yeah.  I had a few dollars stashed.

2   Q.    Now, at this point are you thinking about the

3 amount of money that you want to pay Nichole?

4   A.    Yes.

5   Q.    What are you thinking?

6   A.    I was going to give her the whole $20 at first.

7   Q.    At first.  Did that change?

8   A.    Yes.

9   Q.    When?

10   A.    After I came out of the house.

11   Q.    What were you thinking when your thoughts changed

12 about whether or not you would repay the 20?

13   A.    To tell you the truth, sir, since we all got high

14 and we smoked, I asked her can I give her 10 since she got

15 high with me.

16   Q.    Where does that take place at?

17   A.    On Englewood, sir, in my driveway.

18   Q.    Is she out of the car, or in the car?

19   A.    In the car.

20   Q.    Where is Omar?

21   A.    Standing outside the car too.

22   Q.    Now, you say that to her.  Are you physically

23 showing the 20 at that point?

24   A.    Yes, yes.

25   Q.    How does she respond to your proposal to only pay

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

**STATE'S EXHIBIT**

*28*

1    Q.    And you told us that you had smoked a wet

2    square, is that right?

3    A.    Yes, sir.

4    Q.    And you are under the influence, is that

5    right?

6    A.    Yes.

7    Q.    So you were high?

8    A.    Yes, I was high.

9    Q.    Is that right?

10   A.    Yes.

11   Q.    Also, it was very dark, as you were

12   approached, it was very dark?  It wasn't a

13   street light that was looking above you, is

14   that right?

15   A.    Yes, it was dark.

16   Q.    And you told us during this confrontation

17   that you glanced maybe three times towards the

18   person who was sitting in the driver's seat of

19   the car?

20   A.    Yeah.

21   Q.    Because you noticed that he had a gun?

22   A.    Uh-huh.

23   Q.    Is that right?

24   A.    Yeah.

25   Q.    Now, could you tell us what that second

EXHIBIT

29

432

1    A.    He made the statement 'cuz I told him I was setting

2    the beer down he was like, I don't give a fuck about you

3    putting that beer down.

4    Q.    Did you say anything back to him?

5    A.    No.

6    Q.    What do you do after that?

7    A.    Ran.

8    Q.    Why do you run?

9    A.    'Cuz I seen a gun.

10   Q.    How is the gun being held at that point?

11   A.    It was still down like this, (indicating), but when

12   I set the beer down I ain't try to look back.  But when I

13   ran, shots were fired at me.

14   Q.    Hang on.  Slow down for a second.  Was anyone

15   giving you permission to leave?

16   A.    No.

17   Q.    What was the situation there?

18   A.    My guy was in danger.

19   Q.    All right.  Did the angry passenger, Mr. Hubbard,

20   did he want you to leave?

21   A.    No.

22              MR. MACK:  Objection.

23              THE COURT:  Overruled.

24   Q.    The gun is being displayed, right?

25   A.    Yes.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT
30

425

1  observe the driver of the car?

2  A.    Well, I was focused on the person that was in my

3  face.

4  Q.    Has the driver said anything?

5  A.    No.

6  Q.    When the passenger tells you to shut up, do you say

7  anything back?

8  A.    Yeah.

9  Q.    What do you say back?

10  A.    I told him, I asked him, who was he talking to, and

11  that is when he told me to shut the fuck up.  At first

12  when he pulled up he was like, What the fuck you say to my

13  sister?  I was like, Who you talkin' to?  And I was like,

14  I don't even know who you is, and that is when he told me

15  to shut the fuck up.

16  Q.    Did there come a point in time did you see a cell

17  phone?

18  A.    After he told me to shut the fuck up he pulled out

19  a cell phone.

20  Q.    This is the passenger?

21  A.    Yes.

22  Q.    Did you ever see him speak into the cell phone?

23  A.    Yes.  He dialed a number while he was talking to

24  me.

25  Q.    What do you hear him say in the cell phone?

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

1    A.    I heard him say, Nichole, what he got on?  A blue

2  Nautica jacket?  He made some word, he said some word over

3  the phone.  He got a word in and after that he hung up.

4    Q.    Are you watching him this entire time?

5    A.    Yes.

6    Q.    Are you looking at the driver at all?

7    A.    Glanced at him.

8    Q.    The person that walks up on you and starts talking

9  about his sister, I'm going to ask you to look around the

10  courtroom.  Tell me if you see that person in court today.

11    A.    Dude right here, (indicating), in the white shirt.

12  The second dude to the left.

13              MR. THOMAS:  Would the record reflect the

14         identification of the Defendant Cordell Hubbard?

15              THE COURT:  The record will so reflect.

16    Q.    At some point during your glances at the driver do

17  you see anything that causes you concern?

18    A.    Yes, sir.

19    Q.    What?

20    A.    A gun.  A Glock.

21    Q.    When is the first time that you notice a gun?

22    A.    After he hung the phone up.

23    Q.    Who's got the gun?

24    A.    Dude right here, (indicating), in the black suit.

25  Fourth dude to the left.

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

STATE'S
EXHIBIT

*31*

456

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Have you seen that before? |
| 3 | A. | Yes, sir. |
| 4 | Q. | Where did you see it? |
| 5 | A. | Detective showed it to me. |
| 6 | Q. | When you saw it, did anyone appear familiar? |
| 7 | A. | Yes, sir. |
| 8 | Q. | What numbers? |
| 9 | A. | 3 and 4. |

10                    MR. MACK:  Objection, your Honor.

11                    THE COURT:  Overruled.

12    A.    3 and 5.

13    Q.    Between No. 3 and 5 were you able to make a

14    selection?

15    A.    Between the two of them at the time?

16    Q.    Yes.

17    A.    No.

18    Q.    Okay.  What did you tell the detectives in regard

19    to 3 and 5?

20    A.    I told them No. 3 looked familiar.

21    Q.    Familiar from where?

22    A.    The bull pen.  That I was in the bull pen with.

23    Q.    In the jail?

24    A.    Yes, sir.

25    Q.    Okay.  Did you say anything about No. 5?

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

457

```
 1              MR. MACK:  Objection.
 2   A.    Yes, sir.
 3              MR. MACK:  I object.
 4              THE COURT:  What is the problem?
 5              - - - - -
 6                   (Thereupon, a discussion was had
 7                   between Court and counsel outside
 8                   the hearing of the jury and off the
 9                   record.)
10              - - - - -
11                   (Thereupon, the following proceedings
12                   were had in open court:)
13   BY MR. THOMAS:
14   Q.    Mr. Williams, let's look up for a moment.  Do you
15   recall the month that you were shown the first set of six
16   photos?
17   A.    Yes.
18   Q.    When did that occur?
19   A.    When I was in jail.
20   Q.    Okay.  But if the killing happened in November,
21   during what period of time were you in jail?
22   A.    December.
23   Q.    Through when?
24   A.    Excuse me?
25   Q.    For how long?  From December until when?
```

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

458

1   A.    To March.

2   Q.    Okay.  And the second set of photos, State's 132,

3   when were you shown these in relation to that time frame?

4   A.    In, I think, February.

5   Q.    Now, you made a comment or reference to No. 3.  Did

6   you make a comment or reference to any other photo as

7   being familiar?

8   A.    Yes, sir.

9   Q.    Which one?

10  A.    3.

11  Q.    We already touched on 3.  Was there any other

12  comment or familiarity about any other photo other than 3?

13  A.    Yes, sir.

14  Q.    Which one?

15  A.    5.

16  Q.    What was your comment about No. 5?

17  A.    I said he looked familiar.

18  Q.    Why did he look familiar?

19  A.    'Cuz he looked like he was there that night.

20  Q.    Okay.  What role would he have played that night?

21  A.    The driver.  The killer.

22  Q.    Okay.  At the time that you saw the photos were you

23  certain of that?

24  A.    No.

25  Q.    As you sit here right now, do you see No. 5 in

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio

459

1  court here today?

2  A.    Yes, sir.

3  Q.    Would you point and describe what he is wearing?

4  A.    Right there, (indicating), fourth one to the left,

5  black suit, white shirt.

6         MR. THOMAS:  Would the record reflect the

7         identification of the Defendant Ru-el Sailor, your

8         Honor?

9         THE COURT:  The record will so reflect.

10  BY MR. THOMAS:

11  Q.    Now, on an occasion prior to today did you have an

12  opportunity to be in the same room and recognize someone

13  that previously you had been uncertain about?

14  A.    Excuse me, sir?

15  Q.    On a day prior to today, earlier this week --

16  A.    Yes.

17  Q.    -- did you have occasion to see someone you

18  recognized from the night of November 17th?

19  A.    Yes, sir.

20  Q.    And who did you recognize?

21         MR. MACK:  Objection, your Honor.

22  A.    The killer.

23         THE COURT:  Overruled.

24  A.    The killer, sir.

25  Q.    Okay.  When you recognized that person what were

OFFICIAL COURT REPORTERS
Cuyahoga County, Ohio