UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
E A S T E R N   D I V I S I O N

| | | |
|---|---|---|
| RU-EL SAILOR, | ) | CASE NO.:   1:20-cv-00660 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, *et al.*, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendants. | ) | |

Now before the Court is Defendants' motion to dismiss Plaintiff's action with prejudice. R. 88. The Court granted Plaintiff an extension of time to respond (R. 101), and Plaintiff, proceeding *pro se*, has opposed dismissal. R. 102. Defendants have replied. R. 103. For the reasons that follow, Defendants' motion is GRANTED, and this action is dismissed with prejudice.

## BACKGROUND

The undisputed facts relevant to the motion in question are straightforward, but decades in the making. On November 17, 2002, Plaintiff's close friend Cordell Hubbard murdered Omar Clark. *See* R. 88-2, Page ID#: 1374 (deposition testimony of Ru-El Sailor). Soon thereafter, law enforcement identified Hubbard as a suspect, but the investigation into his accomplice stalled. Months later, an eyewitness identified Plaintiff from a photo array, and he too was arrested for the murder, R. 88-7, Page ID# 1523-24 (Cleveland police report of March 25, 2003), and charged, along with his close friend Hubbard. R. 88-4, Page ID# 1516 (Cleveland police report of December 10, 2002.

During their joint trial in 2003, Plaintiff falsely testified—in an effort to exonerate himself and provide a fictitious alibi for Hubbard—that he and Hubbard had been together at different bars and events at the time of the murder and thereafter. R. 88-3, Page ID#: 1545-1550 (trial transcript). He sought to corroborate that story with photographs of the two men at an event at St. Aloysius Church the evening of the murder. *Id.*, Page ID#: 1551, 1584. But given that there was overwhelming evidence against Hubbard—eyewitnesses, phone records, and inconsistencies in witness testimony—Plaintiff's own testimony that he had spent the entire night with Hubbard, *id.*, Page ID#: 1572 (trial transcript), contributed to his 2003 conviction alongside Hubbard. *See* R. 88-12, Page ID#: 1791 (Sailor's 2017 application to Conviction Integrity Unit).

After the verdict but before sentencing, Plaintiff moved for a new trial, claiming he had obtained newly discovered evidence. R. 88-9, Page ID# 1753 (Sailor motion for new trial). Specifically, Plaintiff claimed that after the jury returned its verdict, Hubbard turned to Plaintiff and for the first time told Plaintiff that he, Hubbard, was the shooter. *Id.*  Hubbard, in turn, supplied an affidavit supporting Plaintiff's motion for a new trial; the affidavit confirmed the same statement about when Plaintiff first heard Hubbard admit to being the shooter and stated that Plaintiff was not present with him at the time of the shooting. *Id.* at 1753-1761. The trial court denied the motion for a new trial. *See* R. 88-14, Page ID#: 1883 (2018 joint motion to vacate conviction).

But as recent discovery in this case has established, Hubbard first spoke with Plaintiff immediately after the shooting and confessed. R. 81-9, Page ID#: 1229-1231 (audio recording of May 3, 2016, prison phone call with reporter, Amy Spence and Ru-El Sailor). Thus, Plaintiff knew Hubbard was the shooter on the night of the shooting and has subsequently lied by

claiming not to have known until after the jury verdict.

Beginning in 2014, Plaintiff and Amy Spence, his then-girlfriend and now his wife, retained a local attorney with the goal of obtaining a new trial based on the "facts" as set out in the Hubbard Affidavit. R. 88-1, Page ID#: 1335. In 2016, this group got the attention of a local reporter who interviewed Plaintiff by phone while imprisoned. *Id*. These conversations were recorded, the recordings obtained by the defense, and they have been filed in support of the motion to dismiss. R. 88-19., Page ID#:1983-84 (List of recorded prison phone calls).[1] During one of those calls, at which Plaintiff's then girlfriend Amy Spence was present, Plaintiff told the reporter that, contrary to the Hubbard Affidavit, Hubbard told him, on the night of the shooting, that he was the shooter. R. 81-9, Page ID#: 1230 (transcript of May 3, 2016, phone call with Amy Spence, reporter, and Ru-El Sailor). Because the focus of the story would be to depict Plaintiff as wrongfully convicted of the murder charges, the reporter agreed, so as not to "create an issue" for Plaintiff, to "finesse" the crucial detail of when Plaintiff first learned that Hubbard was the shooter by agreeing to simply "go [with the story] based on that affidavit" that included the falsehood that Plaintiff did not know Hubbard was the shooter until after the jury verdict. R. 81-3, Page ID#: 1098 (transcript of May 3, 2016, phone call with Amy Spence, reporter, and Ru-El Sailor).[2]

In June 2016, *Scene* magazine published a front-page story written by that same reporter depicting Plaintiff as an innocent man, wrongfully convicted. R. 88-11, Page ID#: 1768-1778

---

[1] This decision cites to the transcripts of the phone call recordings, but the Court has reviewed the audio recordings and confirmed the accuracy of the transcript citations.

[2] To be clear, the factual background contained herein is not provided to suggest that Plaintiff was not innocent of the murder-related charges.

3

(*Scene* magazine article).  After the story was published, Plaintiff and his now wife discussed his situation in additional recorded phone calls while he was in prison. In those calls, Plaintiff expressed concern that his new attorneys may learn the truth about when he first knew that Hubbard was the shooter. *See* R. 81-6, Page ID#: 1160-1178 (transcribed recording of audio recorded call on March 9, 2017, between Ru-El Sailor and Amy Sailor).[3]

In 2017, Plaintiff's attorney and the attorneys from the Ohio Innocence Project (OIP) applied to the Cuyahoga County Conviction Integrity Unit (CIU) seeking Plaintiff's release, based in part on Hubbard's affidavit. R. 88-12, Page ID#: 1790 (Sailor's application to the Conviction Integrity Unit). Indeed, when the Cuyahoga County prosecutor's office finally agreed to seek vacation of Plaintiff's sentence, it did so by noting that the Hubbard affidavit was "a critical factor in CIU's analysis and conclusion." R. 88-13, Page ID#: 1822 (Report of the Conviction Integrity Unit to the Cuyahoga County Prosecutor). In 2018, Plaintiff pled guilty to perjury and obstruction related to his trial testimony that he was barhopping with Hubbard on the night of the murder and, after his murder conviction and sentence were vacated in state court, he was released with time served as the consequence for the perjury. R. 88-1, Page ID#: 1339.

Two years later, in 2020, Plaintiff, again relying in part on Hubbard's fraudulent testimony, R. 88-14., Page ID#: 1892 (motion to vacate), obtained a declaratory judgment in Cuyahoga County Common Pleas Court formally finding that Plaintiff was wrongfully

---

[3] Indeed, Plaintiff endeavored to ensure only a limited number of persons knew the actual truth about what happened that night and when he learned it. *See* R. 81-10, Page ID#: 1266 (transcribed recording of June 17, 2016, prison call with reporter, Amy Spence and Ru-El Sailor). Responding to a comment by the reporter that it would be "an issue" if he told the truth in his reporting as to when Hubbard confessed to the crime, Amy Spence stated: "Yeah, that's something that [Sailor's] only told you and Kim...." R. 88-1, Page ID#: 1335.

incarcerated. R. 88-18, Page ID#: 1980-1982 (judgment entry).

That same year, Plaintiff filed the instant action against the City of Cleveland and several officers involved in the investigation of Omar Clark's murder. R. 1. The lawsuit basically contends that police withheld exculpatory evidence that would identify Hubbard's accomplice in the murder. *Id*. During Plaintiff's deposition in this matter, he repeated on several occasions the falsehood contained in the Hubbard affidavit that Plaintiff was unaware that Hubbard was the shooter until after the jury verdict. R. 103, Page ID# 2050. The Defendants' reply brief in support of the motion to dismiss, citing R. 88-2 (Sailor's deposition) at Page ID#: 1375, 1380, 1381, 1383, 1388, 1389, 1390, highlights that Plaintiff stated in answer to seven different questions that he did not know that Hubbard and his actual accomplice Will Sizemore were involved in the shooting until after the trial. In addition, Plaintiff also publicly repeated the same false claim—that he did not know of Hubbard's involvement in the shooting until immediately after the trial—on the Wrongful Conviction Podcast, Episode 191 (March 31, 2021) and on the December 2023 episode of We TV's "Life After Lockup". R. 103, Page ID#: 2050.

On July 1, 2024, Plaintiff's wife was deposed. R. 81-1., Page ID#: 892-1082. During the deposition she was presented with the recordings of phone calls she had with Plaintiff while he was imprisoned, which recordings the Defendants' counsel had obtained and played for her. *Id*. She testified to the authenticity of the recordings. *Id*. In addition to what has already been detailed, these recordings show that:

(1) Plaintiff and his wife arranged to pay an eyewitness to recant his in-court identification of Plaintiff, which the eyewitness subsequently put into the form of an affidavit that was relied on to support the motion to vacate sentence;

(2) Plaintiff's wife ghost wrote a declaration to be later signed by the victim's brother, which declaration was also used to support the motion to vacate; and

(3) Plaintiff and his wife tried to get another eyewitness to recant his in-court testimony, offering him a week's worth of salary.

*See, e.g.*, R. 88-1, Page ID#: 1341-1342 (citations omitted).

Following these revelations, Plaintiff's attorneys moved to withdraw from this case, and in addition asked that this matter be stayed for six months so that Plaintiff could acquire new counsel, while inviting the Court to conduct an *ex parte* conference if additional information regarding the motion to withdraw was required. R. 82. That motion was followed a few days later by another motion from Plaintiff's attorneys asking for a 90-day extension of case deadlines. R. 87.

Just one day after that filing, the Defendants moved to dismiss the case with prejudice, arguing that the sanction of dismissal with prejudice is warranted because Plaintiff based the lawsuit on a known lie and has continued during the pendency of the suit to perjure himself and to tamper with witnesses. R. 88, Page ID#: 1330.

On September 18, 2024, the Court held an in-person hearing with all counsel and with Plaintiff Ru-el Sailor in attendance. R. 97. During the hearing the Court declined to conduct an e*x parte* conference and considered referring the motion to withdraw to the magistrate judge for a substantive hearing. Plaintiff and his counsel conferred and then Plaintiff confirmed that he had decided to discharge his counsel. *Id.*, Page ID#: 2022. The Court questioned Plaintiff about his decision and concluded he had full knowledge of the consequences of that decision. *Id*. Thereafter, the Court permitted Plaintiff to discharge his counsel and deemed the motion to withdraw moot. *Id.* Further, as to Defendants' motion to dismiss, the Court *sua sponte* granted

Plaintiff Ru-el Sailor 90 days from the date of the hearing, or until December 17, 2024, to file a response to the motion to dismiss, either through new counsel or *pro se*. *Id.*, Page ID#: 2023. The Court emphasized to Plaintiff that "failure to respond to the motion to dismiss within that period may be construed as a basis for dismissing the action."

Plaintiff filed a motion for additional time to respond (R. 99), which the Court granted and Plaintiff, now proceeding *pro se*, filed a response on January 7, 2025 (R. 101, 102). Defendants replied. R. 103. Plaintiff's response does not contest the facts, admits he did not answer truthfully in his deposition, contends that was due to mental anguish and stress, and claims that he was unable to correct the record because he no longer had counsel. R. 101, Page ID#: 2036. He further contends that he did not tamper with witnesses but rather, with his wife, only encouraged witnesses to come forward with the truth, while being unaware that such contact had any legal consequences. *Id.*, Page ID#: 2037. He does not challenge the accuracy of the phone call recordings or deny that, on the night of the murder, Hubbard told him Hubbard was the shooter and thus that Plaintiff knew before the police investigation and trial. He asserts that "[m]y knowledge of when the crime occurred does not justify my being framed and wrongfully imprisoned for 15 years." *Id.*

Although the Court has deferred ruling, no counsel has appeared for Plaintiff and Plaintiff has made no further filings.

## ANALYSIS

A trial court has the inherent power to dismiss a case in its entirety as a sanction for lying or other misconduct. *Farrar v. Lapan*, 2023 WL 3151093, at *1 (6th Cir. April 28, 2023) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). In determining whether this sanction should be applied, the Sixth Circuit uses a four-factor test, considering whether: (1) the

offending party acted with willfulness, bad faith or fault; (2) the party's misconduct prejudiced the opposing party; (3) the offending party had warning that its actions could lead to dismissal; and (4) the court considered or tried lesser sanctions before ordering dismissal. *Id.* (citing *Universal Health Grp. v. Allstate Ins. Co.*, 703 F.3d 953, 955-56 (6th Cir. 2013)). No factor is dispositive, and the court's decision is reviewable for abuse of discretion. *Id.* "A case is properly dismissed by the district court where there is a clear record of delay or contumacious conduct." *Schafer v. City of Defiance Police Dep't,* 529 F.3d 731, 737 (6th Cir. 2008) (quoting *Knoll v. AT&T*, 176 F.3d 359, 363 (6th Cir. 1999)). Further, a court may impose sanctions even when the misconduct occurred before another tribunal, rather than in its own case. *See Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 2020 WL 2308319, at *6 (N.D. Ala. May 8, 2020) (discussing cases where the sanctioning court considered behavior in other cases that shared an obvious link to its own case).

The uncontroverted evidence cited herein demonstrates that Plaintiff has knowingly engaged in a twenty-plus year fraud through court proceedings, depositions, affidavits, and in the public media, to hide the fact that from the beginning he knew the details of Omar Clark's murder: Cordell Hubbard was the shooter, and Will Sizemore was with him. R. 88-1, Page ID#: 1344. When Plaintiff knew the identity of the shooter is a critical fact, as the Defendants point out. R. 103, Page ID#: 2051. If, as Plaintiff continuously and falsely claimed, he did not know Hubbard was the shooter until months after the murder and following the jury verdict, Plaintiff's false testimony at trial that he was with Hubbard all night—thus providing Hubbard a potential alibi—might be seen as a misguided act of loyalty to a close friend. *Id.*, Page ID#: 2052. But considering the truth, Plaintiff's silence and subsequent lie covered for a murderer and so corrupted the police investigation and legal proceedings that he claims were somehow

8

rigged against him.

For example, Plaintiff's Complaint alleges that after the murder law enforcement improperly focused on him as Hubbard's accomplice and then wrongly prosecuted him based on a flawed investigation. But Plaintiff possessed critical evidence that could have immediately solved the murder; and if he was still charged as an accomplice, it could have supported a motion for separate trials while also enabling Sailor to establish his own alibi, supporting his innocence. In another example, Plaintiff's subsequent cover-up of his attempts to induce a trial witness to recant their testimony produced a situation where that witness refused to cooperate in his deposition in this case, citing his Fifth Amendment protection against self-incrimination in response to every question (*id*.), thus directly interfering with the judicial process before this Court.

Did Plaintiff act with willfulness, bad faith or fault? Bad faith in this context is demonstrated when a party displays "either an intent to thwart judicial proceedings or a reckless disregard for the effect of his conduct on those proceedings." *Schafer*, 529 F.3d at 737 (quoting *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005)). Plaintiff appears to excuse his conduct as either a single case of making a misstatement during his deposition due to stress or, in the case of witness tampering, as simply an encouragement to tell the truth, without understanding the legal consequences. R. 102, Page ID#: 2036-37. However, the evidence clearly shows that his lies about when he knew the identity of the shooter were not a single instance, but rather, deliberate decisions over many years to corrupt criminal and civil judicial proceedings. Further, even if one were to somehow credit his argument that he was unaware that it is improper to induce witnesses to recant sworn testimony by means of a financial payoff—a highly implausible contention—it remains true that such conduct displays a reckless

9

disregard for the legal consequences and effects of that conduct on the legal process.

Is there prejudice to an opposing party? It is axiomatic that prejudice to an opposing party is presumed when a party offers fraudulent evidence. *Farrar*, 2023 WL 3151093, at *2. "When a Plaintiff offers fraudulent evidence, that casts doubt on every piece of evidence [he] submits and every representation [he] makes." *Id.* By continuously maintaining the fiction that he did not know that Hubbard was the murderer until after the trial, Plaintiff in this case alone put these defendants through years of litigation over claims largely resting on a false predicate; while he also delayed and obstructed the Defendants in meaningfully investigating and evaluating the claims in this case.

Plaintiff and his counsel "were on notice that faking evidence and lying under oath leads to sanctions. The Federal Rules of Civil Procedure…make that clear." *Id.* (citing Fed.R.Civ.P. 11(b)-(c)). Defendants' motion to dismiss with prejudice, as a sanction for Plaintiff's fraud upon the court through false testimony and attempts to tamper with witnesses (R. 88), itself contained due notice to Plaintiff of the Court's inherent authority to dismiss this matter with prejudice. *See also Metz v. Unizan Bank*, 655 F.3d 484, 491 (6th Cir. 2011). Further, this Court's Order of December 20, 2024, was explicitly based on the following facts: at that time Defendants' motion had been pending for months, the motion was the subject of an in-court hearing that Plaintiff attended, and Plaintiff publicly assured the Court that "he understood the consequences and responsibilities" of proceeding *pro se* in addressing that motion. R. 101, Page ID#: 2034. Thus, Plaintiff has received clear notice, extensions, and ample time to respond.

The record shows that Plaintiff had a full opportunity to be heard regarding the motion, including at an in-person hearing, and was afforded over six months to prepare and file a responsive brief. Accordingly, his due process rights regarding a potential dismissal of this case

10

have been preserved. Moreover, it must be noted that in Plaintiff's last filing – the response to the motion to dismiss (R. 102) – Plaintiff raises no issue regarding inadequate notice, nor seeks an additional hearing or an opportunity for further briefing.

A court is not required to address alternative sanctions on the record, but need only consider whether such lesser sanctions are appropriate before dismissing a complaint with prejudice. *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 367 (6th Cir. 1997). Although not dispositive of the issue, Plaintiff has not proposed alternative sanctions and merely contends that Defendants' motion should be denied. *See* R. 102.

The Court, however, concludes that dismissal with prejudice is the only appropriate sanction. *See Milke v. City of Phoenix*, 2022 WL 259937, at *2 (9th Cir. Jan. 27, 2022) (dismissal affirmed in wrongful conviction case where plaintiff and her lawyers destroyed evidence and obstructed the discovery process); *Johnson v. Baltimore Police Dep't*, 2022 WL 9976525, at *39 (D. Md. Oct. 14, 2022) (use of fraudulent testimony and evidence of witness tampering "constitutes fraud on the court," such that dismissal with prejudice "is the only appropriate sanction"), *aff'd in part, appeal dismissed in part*, 2024 WL 1209744 (4th Cir. Mar. 21, 2024). A lesser sanction such as shifting fees, limiting claims, an adverse inference, and so forth, would be insufficient as they would not deter future abuse. Simply put, a more lenient sanction "would only incentive parties to inflate claims and see what they can get away with." *Farrar*, 2023 WL 3151093, at *2.

## CONCLUSION

The sad reality is that sufficient evidence indicates Plaintiff was not involved in the murder and was erroneously convicted. But Plaintiff's deliberate falsehoods—rather than freeing his friend from the consequences of his actions—placed Plaintiff at the center of the

events that fateful evening and engulfed him in the criminal prosecution. By his actions, Plaintiff perpetrated a fraud upon the courts and so corrupted his criminal case and now this civil action with false testimony, obstruction, witness tampering, and fabricated evidence that neither a reasonable jury nor this Court can overlook his actions.

Defendants' motion to dismiss this action with prejudice (R. 88) is GRANTED, for the reasons more fully set forth herein.

IT IS SO ORDERED.

Dated: March 31, 2026

*David A. Ruiz*
David A. Ruiz
United States District Judge